# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
In re:                                    :    Chapter 11
                                          :
GVS Portfolio I B, LLC,                   :    Case No. 21-10690 (CSS)
                                          :
                    Debtor.[1]            :
                                          :
------------------------------------------------------------- x
```

## RREF III STORAGE LLC'S MOTION FOR ENTRY OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE WITH PREJUDICE AND GRANTING RELIEF FROM THE AUTOMATIC STAY

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's taxpayer identification number, is as follows: GVS Portfolio I B, LLC (7171). The Debtor's mailing address is 814 Lavaca Street, Austin, TX 78701.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

JURISDICTION ................................................................................................................. 2

BACKGROUND ................................................................................................................. 3

I.    Overview of the Debtor ............................................................................................. 3

    A.    The World Class Organization and Natin Paul ............................................. 3

    B.    Corporate Structure ....................................................................................... 5

    C.    Several of the Debtor's Affiliates are Debtors in Texas ............................... 6

II.    GVS's Funded Debt Obligations ............................................................................... 6

    A.    Overview of the Mortgage Loan and the Mezz 1 and 2 Loans ...................... 6

    B.    The Mezz 2 Loan ........................................................................................... 7

    C.    The Pledge Agreement and Collateral for the Mezz 2 Loan ......................... 8

    D.    Paul's Personal Guaranty of the Mezz 2 Loan .............................................. 9

III.    The Numerous Loan Defaults ................................................................................... 9

    A.    The Debtor Defaults on the Mezz 2 Loan ..................................................... 9

    B.    Defaults under the Senior Loans .................................................................. 11

    C.    RREF's Cure of Senior Loan Defaults ......................................................... 12

IV.    The Debtor's Prepetition Attempts to Avoid the Consequences of its Default ............. 12

    A.    The Debtor Seeks to Enjoin TIAA's Auction of the Mezz 2 Collateral ............. 13

    B.    The Debtor Seeks To Further Halt UCC Sale ............................................... 14

    C.    The Bankruptcy Case ................................................................................... 15

V.    The Guaranty Action .............................................................................................. 15

VI.    RREF's Rights are Prejudiced by the Bankruptcy Filing ........................................ 16

RELIEF REQUESTED ...................................................................................................... 17

BASIS FOR RELIEF REQUESTED ..................................................................................... 18

I.    This Case Should Be Dismissed with Prejudice For "Cause" Pursuant to Section 1112(b) of the Bankruptcy Code ............................................................................... 18

    A.    The Debtor's Petition Was Filed in Bad Faith. ............................................ 18

        1.    The Debtor's Case Serves No Valid Bankruptcy Purpose ............... 20

        2.    The Debtor's Case Was Commenced Primarily to Obtain a Tactical Litigation Advantage ................................................................ 24

38415094.2

3.     Additional Indicia of Bad Faith are Present Here. .................................. 24

    (a)     This is a single asset case. ........................................................... 25

    (b)     There are few, if any, unsecured creditors. .................................. 25

    (c)     There is no pressure from non-moving creditors. ......................... 26

    (d)     The Debtor's petition was filed on the eve of foreclosure. .......... 26

    (e)     Numerous affiliates of the Debtor have previously filed for bankruptcy. .................................................................................. 27

    (f)     This is a two-party dispute. .......................................................... 27

    (g)     The Debtor has no ongoing business or employees. .................... 28

    (h)     The Debtor currently has no cash or income. .............................. 28

    (i)     The Debtor has no reasonable possibility of reorganizing. .......... 28

    (j)     The Debtor filed the petition solely to invoke the automatic stay. .............................................................................................. 29

B.     The Debtor's Inability to Effectuate a Plan Constitutes "Cause" for Dismissal under Bankruptcy Code Section 1112(b). ............................. 30

C.     Dismissal of the Chapter 11 Case Should be With Prejudice Pursuant to Sections 105(a) and 349(a) of the Bankruptcy Code. ........................... 31

II.     The Court Should Grant Relief from the Automatic Stay. .............................. 33

A.     The Debtor's Bankruptcy Filing Constitutes a Filing in Bad Faith that is Cause for Stay Relief. ........................................................................ 34

B.     There is Also Cause to Lift the Stay Because RREF Lacks Adequate Protection. ........................................................................................... 34

C.     Relief is Appropriate under Section 362(d)(2) Because the Debtor Does Not Have Equity in the Collateral and the Collateral is Not Necessary for an Effective Reorganization. ................................................................ 37

D.     At a Minimum, the Stay Should be Lifted to Permit Application of Amounts on Deposit in Cash Management Account and to Enable RREF to Take Necessary Steps to Cure Defaults on Senior Loans. .............................. 38

E.     Waiver of the Fourteen-Day Stay Under Bankruptcy Rule 4001(a)(3) Is Warranted. ............................................................................................ 39

NOTICE ................................................................................................................. 40

CONCLUSION ...................................................................................................... 41

**Cases**

*In re 3 RAM, Inc.*,
   343 B.R. 113 (Bankr. E.D. Pa. 2006) .......................................................29, 31 n.19

*In re Asanda Air II LLC*,
   600 B.R. 714 (Bankr. N.D. Ga. 2019) ...........................................................27, 30

*In re C.B.G. Ltd.*,
   150 B.R. 570 (Bankr. M.D. Pa. 1992) ...................................................................36

*In re Class A Props. Five, LLC*,
   600 B.R. 27 (Bankr. N.D. Ill. 2019) .....................................................................32

*Cross-Appellees v. BEPCO, LP (In re 15375 Mem'l Corp.)*,
   589 F.3d 605 (3d Cir. 2009)........................................................................ *passim*

*In re Eclair Bakery Ltd.*,
   255 B.R. 121 (Bankr. S.D.N.Y. 2000) ..................................................................39

*In re EFL Partners X*,
   No. 13-11495-MDC, 2013 WL 4508423 (Bankr. E.D. Pa. Aug. 23, 2013).....................25, 27

*Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*,
   141 B.R. 574 (Bankr. D. Del. 1992) ......................................................................33

*In re Jer/Jameson Mezz Borrower II, LLC*,
   461 B.R. 293 (Bankr. D. Del 2011) ............................................................. *passim*

*Kost v. First Interestate Bank of Greybill (In re Kost)*,
   102 B.R. 829 (D. Wyo. 1989).................................................................................36

*In re Lippolis*,
   228 B.R. 106 (E.D. Pa. 1998) ................................................................................34

*In re Merchant*,
   256 B.R. 572 (Bankr. W.D. Pa. 2000) ...................................................................34

*In re Molycorp, Inc.*,
   562 B.R. 67 (Bankr. D. Del. 2017) ........................................................................29

*In re Monitor Single Lift L Ltd.*,
   381 B.R. 455 (Bankr. S.D.N.Y. 2008).............................................................32 n.20

*Mother African Union Methodist Church v. Conference of AUFCMP Church* (*In re Conference of African Union First Colored Methodist Protestant Church*),
    184 B.R. 207 (Bankr. D. Del. 1995) ..................................................................34

*Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs.),*
    61 F.3d 197 (3d Cir. 1995) ...................................................................... 34-35

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),*
    384 F.3d 108 (3d Cir. 2004) .......................................................................19

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),*
    200 F.3d 154 (3d Cir. 1999) ..................................................................19, 24

*Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.),*
    272 B.R. 554 (D. Del. 2002) ................................................................ *passim*

*In re Rent-A-Wreck of Am., Inc.,*
    580 B.R. 364 (Bankr. D. Del. 2018) ...............................................................24

*Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.),*
    16 F.3d 552 (3d Cir. 1994) .......................................................................37

*In re Riverbend Cmty., LLC,*
    No. 11-11771 (KG), 2012 WL 1030340 (Bankr. D. Del. Mar. 23, 2012) ..............................32

*In re SB Properties, Inc.,*
    185 B.R. 198 (E.D. Pa. 1995) ...........................................................26, ,27, 30

*In re Scarborough-St. James Corp.,*
    No. 15-10625 (LSS), 2015 WL 5672628 (Bankr. D. Del. Sept. 24, 2015) ....................27, ,31

*In re Soltzfus,*
    No. 09-11904bf, 2009 Bankr. LEXIS 2634 (Bankr. E.D. Pa. Mar. 30, 2009) ......................39

*St. Paul Self Storage Ltd. P'ship v. Port Auth. (In re St. Paul Self Storage Ltd. P'ship),*
    185 B.R. 580 (B.A.P. 9th Cir. 1995) ..............................................................25

*Steinman v. Spencer (In re Argus Grp. 1700),*
    206 B.R. 737 (Bankr. E.D. Pa. 1996), *aff'd*, 206 B.R. 757 (E.D. Pa. 1997) .................32 n.20

*In re SureFunding, LLC,*
    No. 20-10953 (LSS), 2020 WL 8834902 (Bankr. D. Del. June 2, 2020) .........................20, 26

*United Savs. Ass'n v. Timbers of Inwood Forest Ass'n (In re Timbers of Inwood Forest Ass'n)*,
484 U.S. 365 (1988) ................................................................................37

*United States Tr. v. Stone Fox Capital LLC (In re Stone Fox Capital LLC)*,
572 B.R. 582 (Bankr. W.D. Pa. 2017) ....................................20, 21, 26

*Wilmington Savs. Fund Soc. v. 1025 Assocs., Inc. (In re 1025 Assocs., Inc.)*,
106 B.R. 805 (Bankr. D. Del. 1989) ....................................................33

**Statutes**

11 U.S.C. § 105(a) ...........................................................................3, 31

11 U.S.C. § 327(a) ................................................................................26

11 U.S.C. § 349(a) ...............................................................1, 3, 17, 31

11 U.S.C. § 362(d)(1) .................................................................. *passim*

11 U.S.C. §§ 362(d)(2) ................................................................ *passim*

11 U.S.C. § 362(g)(2) ...........................................................................33

11 U.S.C. § 541(d) ................................................................................38

11 U.S.C. § 1112(b)(1) .........................................................................18

11 U.S.C. § 1112(b)(3) .........................................................................18

11 U.S.C. § 1112(b)(4)(A)-(B) .............................................................30

11 U.S.C. § 1129(a)(9)(A) ....................................................................29

11 U.S.C. § 1129(a)(10) ...................................................................29, 31

**Other Authorities**

3 COLLIER ON BANKR., P 361.03[1] (16th ed. 2021) ................................35

*GVS Portfolio I B, LLC v. Teachers Ins. Annuity Ass'n of Am.*,
Index No. 0654095/2020 (N.Y. Sup. Ct. Aug. 27, 2020) .......... *passim*

*RREF III Storage LLC v. Natin Paul*,
Index No. 0652558/2021 (N.Y. Sup. Ct. Apr. 16, 2021)........................15

Order, *In re Westland DevCo, L.P.*,
No. 10-11166 (CSS) (Bankr. D. Del. May 10, 2010) ...........................23

38415094.2

Transcript of Hearing, *In re Primestone Inv. Partners L.P.*,
No. 01-11355 (MFW) (Bankr. D. Del. Dec. 18, 2001), ECF No. 38 ......................................23

38415094.2

RREF III Storage LLC ("RREF") hereby moves (the "Motion") for entry of an order, a proposed from of which is attached hereto as **Exhibit 1**, pursuant to sections 1112(b) or 305(a) of title 11 of the United States Code (the "Bankruptcy Code"), (i) dismissing the chapter 11 case of the above-captioned debtor (the "Debtor") for cause and with prejudice pursuant to section 349(a) of the Bankruptcy Code and (ii) granting relief from the automatic stay pursuant to sections 362(d)(1) and (d)(2) of the Bankruptcy Code. In support of this Motion, RREF submits the accompanying Declaration of Richard L. O'Toole dated April 26, 2021, and the exhibits annexed thereto, and respectfully states as follows:

## PRELIMINARY STATEMENT

1. On the morning of April 12, 2021, the Debtor—a single-asset, special-purpose entity created for the sole purpose of incurring mezzanine financing—initiated this chapter 11 case less than one hour before RREF was to conduct a court-ordered UCC foreclosure auction of the Debtor's sole asset that was pledged to secure approximately $100 million of indebtedness owed to RREF.

2. The Debtor's filing of the chapter 11 petition for the purpose of triggering an automatic stay is nothing more than a naked attempt to misuse the bankruptcy process. Specifically, due to certain unstayed actions that may be taken by creditors at direct and indirect non-debtor subsidiaries that actually own the real properties that form the basis of any value flowing up to the Debtor, this filing will irreparably harm RREF (the Debtor's only secured creditor). The Debtor's chapter 11 filing—which was not accompanied by any first-day motion or affidavit—is yet another step in a series of failed attempts by the Debtor to hinder RREF's rights through frivolous and dilatory litigation. This filing is simply contrary to the purposes of chapter 11.

3.      To be sure, the Debtor is not an operating company and has no ongoing business operations or employees.  Rather, it was established as a special-purpose entity within a corporate structure whose only business is to hold the collateral securing RREF's mezzanine debt, and to pay such debt.  Indeed, the Debtor's sole asset is a 100% membership interest in the next most senior mezzanine borrower known as GVS Portfolio I, LLC (referred to throughout this Motion as "Mezz 1 Borrower").  Mezz 1 Borrower is the direct owner of a number of entities that own a portfolio of self-storage facilities (known as "Great Value Storage" or "GVS," and such entities are referred to throughout this motion as the "Mortgage Borrowers").  The Mortgage Borrowers are non-debtors, are indebted under a mortgage loan, and the Mezz 1 Borrower has pledged its interest in the Mortgage Borrowers as collateral for the mezzanine financing provided to it.

4.      This case cannot achieve any legitimate objective of chapter 11 because the Debtor simply owns a piece of paper, and that piece of paper is pledged to RREF.  *See In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293 (Bankr. D. Del 2011) (granting motion to dismiss and stay relief when mezzanine borrower failed to demonstrate any legitimate purpose of reorganization); *Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002) (same).  Rather, this case bears all the indicia of a bad faith filing, which is cause for dismissal pursuant to Bankruptcy Code section 1112(b).  As discussed in further detail below, the facts also support relief from the automatic stay under Bankruptcy Code sections 362(d)(1) and (d)(2).

## JURISDICTION

5.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b).  The Motion is a core matter within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue of the Motion in this Court is proper pursuant to 28 U.S.C. § 1409.

7. The statutory predicates for the relief requested herein are sections 105(a), 305(a)(l), 349(a), 362(d)(1), 362(d)(2), and 1112(b) of the Bankruptcy Code and related Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), including Bankruptcy Rules 1017, 2002, 4001 and 9014, and Local Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

## BACKGROUND

### I. Overview of the Debtor

8. In light of the fact that the Debtor filed no supporting documents with, or since filing, its bankruptcy petition, it is useful to first provide additional background about the Debtor.

#### A. The World Class Organization and Natin Paul

9. The Debtor is an indirect subsidiary of World Class Holding Company, LLC ("World Class") and is the indirect owner of 64 self-storage facilities—branded as Great Value Storage, or GVS—located throughout the United States.

10. World Class is based in Austin, Texas and describes itself as one of the largest private real estate owners in the United States. According to its website, World Class is in the business of acquiring undervalued businesses and assets located in 17 states for the purpose of owning, operating, and developing properties. In addition to GVS, World Class purports to own (a) World Class Property Company, a real estate investment company that owns, operates, and develops office, retail, multifamily, industrial, mixed-use, hospitality, and self-storage assets; (b) NowSpace, a provider of co-working office space; (c) World Class Technologies, a software development company; (d) World Class Mortgage Capital, a private commercial real estate lender;

and (e) Westlake Industries, a commercial construction, industrial and energy infrastructure, and property services company.[2]

11.    Natin Paul ("Paul") is the Founder, Chairman, President, CEO, and sole owner of World Class, and is therefore the Debtor's indirect owner.  Paul is 34 years old, and according to World Class's website, he is "the youngest person in history to found and own a billion-dollar real estate company, having done so by the age of 28."[3]

12.    World Class and Paul appear to have fallen from grace.  News outlets have reported that in August 2019, agents from the Federal Bureau of Investigations and the U.S. Department of Treasury raided World Class's headquarters and Paul's residence.[4]  Shortly thereafter, starting in November 2019, at least 19 entities affiliated with World Class and Paul have filed for bankruptcy.  According to news reports, most of those bankruptcy filings, as here, were initiated on the day of or the day before foreclosure sales were scheduled to occur, ostensibly for the purpose of obtaining a stay to prevent the sales from going forward.[5]

13.    In addition, news outlets in Texas have reported that at least eight senior aides of Texas Attorney General Ken Paxton ("Paxton") informed law enforcement in late 2020 that they believed Paxton had abused his office to personally benefit Paul, who had previously contributed

---

[2] *See* World-Class.com, *Companies*, https://www.world-class.com/companies (last visited Apr. 26, 2021).

[3] *See* World-Class.com, *Founder*, https://www.world-class.com/#founder (last visited Apr. 26, 2021).

[4] *See* Bob Sechler, *More Paul-controlled Entities File for Bankruptcy*, Austin American-Statesman (Feb. 4, 2020), https://www.statesman.com/business/20200204/more-paul-controlled-entities-file-for-bankruptcy; *see also* Emma Platoff, *In New Email, Senior Aides Say Ken Paxton Used Power of His Office to Benefit Political Donor Nate Paul*, Texas Tribune (Oct. 8, 2020), https://www.texastribune.org/2020/10/08/ken-paxton-texas-document.

[5] *See, e.g.*, Bob Sechler, *World Class Foreclosure Sales Canceled After Paxton Legal Opinion*, Austin American-Statesman (Oct. 10, 2020), https://www.statesman.com/story/business/2020/10/09/world-class-foreclosure-sales-canceled-after-paxton-legal-opinion/42740551; Bob Sechler, *Four Nate Paul-led Entities File for Bankruptcy*, Austin American-Statesman (Nov. 6, 2019), https://www.statesman.com/business/20191106/four-nate-paul-led-entities-file-for-bankruptcy.

38415094.2

$25,000 to Paxton's political campaign.[6]  Specifically, reports have indicated that Paxton's office "rushed a legal opinion" that imposed obstacles to non-GVS foreclosure sales specifically for the purpose of preventing foreclosure sales of World Class's properties from taking place in Texas.[7]

**B.      Corporate Structure**

14.      Below is the Debtor's position within the larger corporate structure of GVS.  *See* O'Toole Decl. ¶ 13.



---

[6] *See* Bob Sechler, *World Class Foreclosure Sales Cancelled After Paxton Legal Opinion*, Austin American-Statesman (Oct. 10, 2020), https://www.statesman.com/story/business/2020/10/09/world-class-foreclosure-sales-canceled-after-paxton-legal-opinion/42740551.

[7] *See* Emma Platoff, *Court Documents Show Friendly Relationship Between Texas Attorney General Ken Paxton and Nate Paul, Donor at the Center of New Criminal Allegations*, Texas Tribune (Nov. 6, 2020), https://www.texastribune.org/2020/11/06/ken-paxton-nate-paul-deposition.

38415094.2

### C. Several of the Debtor's Affiliates are Debtors in Texas

15. The Debtor's bankruptcy petition lists fifteen affiliates with cases pending in the United States Bankruptcy Court for the Western District of Texas (the "Western District of Texas") that were filed between November 2019 and August 2020. These affiliates do not appear to be related to the GVS portfolio and are not within the corporate structure identified above. RREF believes that these debtor-affiliates are otherwise owned or controlled by Paul, but it is unclear where in the overall corporate structure they sit. In addition, RREF understands that at least eight affiliates of the Debtor filed bankruptcy petitions in this Court, but those cases were subsequently transferred to the Western District of Texas.

## II. GVS's Funded Debt Obligations

### A. Overview of the Mortgage Loan and the Mezz 1 and 2 Loans

16. On November 30, 2018, UBS AG ("UBS") originated three loans to GVS: a mortgage loan and two mezzanine loans.

17. UBS originated the mortgage loan (the "Mortgage Loan") in the amount of $110 million to twelve non-debtor limited liability companies (collectively, the "Mortgage Borrowers") that collectively own a portfolio of self-storage facilities located throughout the United States. The Mortgage Loan is secured by a first priority mortgage and security interest in the properties, and is currently held by Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C15 Commercial Mortgage Pass-Through Certificates, Series 2018-C15 (the "Mortgage Loan Lender"). Midland Loan Services, a division of PNC Bank, National Association, is the servicer on behalf of the Mortgage Loan Lender (the "Servicer"). *See* O'Toole Decl. ¶ 15 & Ex. 3.

18. UBS originated a first mezzanine loan (the "Mezz 1 Loan"), and together with the Mortgage Loan, the "Senior Loans") in the amount of $103 million to the Mezz 1 Borrower, which

itself owns 100% of the membership interests in the Mortgage Borrowers.  The Mezz 1 Loan is secured by Mezz 1 Borrower's interests in the Mortgage Borrowers, and is currently held by ESS-GV Holdings LLC (the "Mezz 1 Lender," and together with the Mortgage Lender, the "Senior Lenders").  *See* O'Toole Decl. ¶ 16 & Ex. 4.

19.     UBS also originated a second mezzanine loan in the amount of $63 million to the Debtor (the "Initial Mezz 2 Loan"), which itself owns 100% of the membership interests in Mezz 1 Borrower.  The Initial Mezz 2 Loan is secured by the Debtor's interests in the Mezz 1 Borrower.  *See* O'Toole Decl. ¶ 17 & Ex. 1.

20.     The respective rights, remedies and obligations of the Mortgage Loan Lender, the Mezz 1 Lender, and RREF—including the relative payment and collateral priorities with respect to the loans to which all of the lenders are a party—are governed by, among other things, that certain (a) Intercreditor Agreement, dated as of November 30, 2018 (as amended, restated, or otherwise modified from time to time, the "Intercreditor Agreement") and (b) Cash Management Agreement, dated as of November 30, 2018, as amended by that certain Amendment to Cash Management Agreement, dated as of January 8, 2020 (as the same may be further amended, restated, or otherwise modified from time to time, the "Cash Management Agreement").  *See* O'Toole Decl. ¶ 18 & Exs. 8, 9.

**B.     The Mezz 2 Loan**

21.     The Initial Mezz 2 Loan is governed by that certain Mezzanine 2 Loan Agreement dated as of November 30, 2018 (the "Mezz 2 Loan Agreement"), *see* O'Toole Decl. ¶ 17 & Ex. 1. The Debtor's obligations under the Mezz 2 Loan Agreement are evidenced by that certain Mezzanine 2 Promissory Note, dated as of November 30, 2018 (the "Mezz 2 Note").  *See* O'Toole Decl. ¶ 17 & Ex. 1.  Shortly after the Initial Mezz 2 Loan was made, UBS assigned it to Teachers

Insurance Annuity Association of America ("TIAA"),[8] and TIAA thereafter made a supplemental

loan in the amount of $19 million (the "Mezz 2 Supplemental Loan," and together with the Initial

Mezz 2 Loan, the "Mezz 2 Loan") to the Debtor on January 7, 2019, which is also secured by the

Debtor's interests in the Mezz 1 Borrower.[9]

22.     On March 8, 2021, RREF acquired the Mezz 2 Loan from TIAA pursuant to that

certain Mezzanine Assignment and Assumption Agreement (the "Assignment Agreement") and

was transferred all of TIAA's right and interests in the Mezz 2 Loan.[10]  O'Toole Decl. ¶ 21 & Ex.

13.  As of the Petition Date, the Debtor was indebted to RREF on account of its obligations under

the Mezz 2 Loan and Mezz 2 Notes in the amount of approximately $100 million.[11]

**C.     The Pledge Agreement and Collateral for the Mezz 2 Loan**

23.     In order to secure the Debtor's obligations to UBS under the Initial Mezz 2 Loan

and Mezz 2 Note, the Debtor and UBS executed that certain Pledge and Security Agreement, dated

---

[8] This assignment was made pursuant to that certain Mezzanine Assignment and Assumption Agreement (Mezzanine 2 Loan), dated as of December 3, 2018.  *See* O'Toole Decl. ¶¶ 5 and 19 & Ex. 10.  The assignment is permitted by Section 9.1(a) of the Mezzanine 2 Loan Agreement.  O'Toole Decl. Ex. 1 §§ 9.1(a)(i), (ii).  By Note Allonge dated December 3, 2018, UBS transferred its right to payment under the Mezz 2 Note by endorsing the Mezz 2 Note in favor of TIAA.  *See* O'Toole Decl. ¶ 17 & Ex. 7.

[9] This Mezz 2 Supplemental Loan was extended pursuant to that certain Omnibus Amendment to Mezzanine 2 Loan Documents, dated as of January 7, 2019 (the "Omnibus Amendment").  *See* O'Toole Decl. ¶ 20 & Ex. 11.  The Debtor's obligations under the Omnibus Amendment are evidenced by that certain Supplemental Promissory Note (Mezzanine 2 Loan), dated as of January 7, 2019 (the "Supplemental Promissory Note").  *See* O'Toole Decl. ¶ 20 & Ex. 12.  The Omnibus Amendment incorporates the Mezz 2 Loan Agreement and the Guaranty (as defined herein), and defines "Loan" to express the aggregate principal amount of $82 million (*i.e.*, $63 million plus $19 million).  *See* O'Toole Decl. Ex. 11 ¶ 1.3.  The Omnibus Amendment ratified all terms, covenants, and provisions of the Mezz 2 Loan Agreement, the Mezz 2 Note, and the Guaranty.  *See id.* ¶ 9.

[10] Under the Assignment Agreement, TIAA assigned to RREF "all of its right, title, and interest in and to" the "Loan Documents," which is defined in the Assignment to include the Omnibus Amendment and the Guaranty, along with other documents.  *See* O'Toole Decl. Ex. 10 ¶ 2.  By two Note Allonges, dated March 8, 2021, TIAA transferred its right to payment under the Mezz 2 Note and Supplemental Promissory Note (together, the "Mezz 2 Notes") by endorsing them in favor of RREF.  *See* O'Toole Decl. ¶ 21 & Exs. 14 and 15.

[11] As of April 16, 2021, this debt consists of (a) $82 million of principal; (b) $595,525.00 in interest accruing at the contractual interest rate of 8.715%; (c) $14,084,080.17 in default interest accruing at the default rate (the "Default Rate") of 13.715% from the date of default on December 6, 2019 plus late fees; (d) $1,153,244.46 of protective advances, and (e) $1,563,838.09 in costs and expenses related to enforcement of the Mezz 2 Loan.  *See* O'Toole Decl. ¶ 31 & Exs. 1 and 9.

38415094.2

as of November 30, 2018 (the "Pledge Agreement"). *See* O'Toole Decl. ¶ 11 & Ex. 2. Under the

Pledge Agreement, the Debtor granted to UBS a first priority security interest in certain collateral

(the "Mezz 2 Collateral"), which consisted primarily of the Debtor's equity ownership interest (the

"Membership Interest") in Mezz 1 Borrower, along with any associated dividends, proceeds, or

other property relating to the Membership Interest.[12] *See id.*

### D. Paul's Personal Guaranty of the Mezz 2 Loan

24.     As further security for the Debtor's obligations under the Mezz 2 Loan and Mezz

2 Notes, Paul irrevocably and unconditionally guaranteed the payment and performance of certain

obligations in respect of the Mezz 2 Loan pursuant to that certain Guaranty of Recourse

Obligations (Mezzanine 2 Loan), dated as of November 30, 2018 (the "Mezz 2 Guaranty"). *See*

O'Toole Decl. ¶ 22 & Ex. 16. The Mezz 2 Guaranty is irrevocable, remains in effect, and contains

no obligation to exhaust any remedies in order to collect. *See* O'Toole Decl. Ex. 16 §§ 1.2, 1.3,

1.5, 2.10. Critically, any subsequent holder of the Mezz 2 Note—including RREF—can enforce

the Guaranty. *See id.* § 1.2.[13]

## III.    The Numerous Loan Defaults

### A.    The Debtor Defaults on the Mezz 2 Loan

25.      On December 6, 2019, the Debtor failed to make its monthly debt service payment

on the Mezz 2 Loan, and TIAA issued an Event of Default notice (the "Notice of Default").[14] *See*

---

[12] As a result of the Assignment Agreement, RREF is considered the "Lender" under all of the Mezz 2 Loan Documents, including the Pledge Agreement. RREF thus holds a first priority lien on the Mezz 2 Collateral, as reflected by that certain UCC Financing Statement Amendment, filed with the Delaware Department of State on March 8, 2021, naming RREF as the secured party. *See* O'Toole Decl. ¶ 21 & Ex. 13.

[13] Paul subsequently executed the Omnibus Amendment—both on behalf of the Debtor and in his personal capacity— in order to reaffirm his obligations under the Guaranty in connection with the extension of the Mezz 2 Supplemental Loan to the Debtor by TIAA. *See* O'Toole Decl. ¶ 22 & Ex. 16.

[14] The Mezz 2 Loan Agreement provides that the Debtor's failure to pay its monthly Debt Service payment of the Mezz 2 Loan shall constitute an "Event of Default." *See* O'Toole Decl. Ex. 1 § 10.1(a)(i). The Mezz 2 Loan Agreement further provides that, "[u]pon the occurrence and during the continuance of an Event of Default . . . , [Mezz 2] Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other

9

O'Toole Decl. ¶ 29 & Ex. 17.  The Notice of Default accelerated the Mezz 2 Loan and there have been no payments that have reduced the outstanding principal on the loan.  *See* O'Toole Decl. Ex. 18, at 2.

26.     The Debtor's default also constituted a "Cash Management Trigger Event" under the Mortgage Loan Agreement, *see* O'Toole Decl. Ex. 3, at 4, thereby causing certain provisions in the Mortgage Loan Agreement, the Mezz 2 Loan Agreement, and the Cash Management Agreement to take effect.  *See* O'Toole Decl. Ex. 3 § 2.7; O'Toole Decl. Ex. 1 § 2.7.  Specifically, from and after the occurrence of a Cash Management Trigger Event—and until the underlying event of default giving rise to such trigger event has been cured—all rents collected by the Mortgage Borrower are deposited into a controlled account, and to the extent an event of default is continuing, those funds are then swept into a designated "Cash Management Account" held at PNC Bank, N.A.  The Cash Management Account, in turn, contains a number of sub-accounts for the benefit of creditors, including a "Mezzanine 2 Debt Service Subaccount" (the "Mezz 2 Subaccount").  *See* O'Toole Decl. Ex. 9 § 2.1.

27.     Each month, funds in the Cash Management Account that are available for debt service on the Mezz 2 Loan (if any, after application of a priority waterfall to such funds) are deposited into the Mezz 2 Subaccount.  *See* O'Toole Decl. Ex. 9 §§ 2.1(j), 3.1(j).  Pursuant to the Mortgage Loan Agreement, any deposit into the Mezz 2 Subaccount "is intended by the parties to constitute, and shall constitute, a distribution from [Mortgage Borrower] to Mezzanine 1 Borrower

---

[Mezz 2] Loan Documents or at law or in equity, take such action, without notice or demand, that [Mezz 2] Lender deems advisable to protect and enforce its rights against [Mezz 2] Borrower and in and to the Collateral, including, without limitation, declaring the Debt to be immediately due and payable."  *Id.* § 10.1(b).  The Mezz 2 Loan Agreement, as amended by the Omnibus Amendment, provides "that, and for so long as, any Event of Default has occurred and remains outstanding" the principal balance shall accrue interest at the Default Rate of 13.715%.  *See* O'Toole Decl. Ex. 1 § 2.2.2; O'Toole Decl. Ex. 11 § 1.2.  The Mezz 2 Loan Agreement also provides for a "Late Payment Charge," which can total 5% of the unpaid sum or the maximum amount permitted by applicable law.  *See* O'Toole Decl. Ex. 1 § 2.3.4.

and from Mezzanine 1 Borrower to Mezzanine 2 Borrower . . . ." O'Toole Decl. Ex. 3 § 2.7.3; *see also* O'Toole Decl. Ex. 1 § 2.7.2(a). Amounts owed to RREF on account of monthly debt service on the Mezz 2 Loan are then paid from the Mezz 2 Subaccount. *See* O'Toole Decl. Ex. 9 § 3.2(j).

28. In addition, on July 16, 2020, TIAA exercised its rights under Section 4 of that certain Subordination of Management Agreement and provided notice to the Debtor and Great Value Storage, LLC (the "Property Manager") of its election to terminate the Property Manager at the properties, effective immediately. *See* O'Toole Decl. ¶ 33 & Ex. 25. Under the Subordination of Management Agreement, the Debtor was contractually required to appoint a "Qualified Manager" to replace the Property Manager, but notwithstanding repeated demands from TIAA, it has failed to do so. *See* O'Toole Decl. Ex. 25.

29. On information and belief, there was $0 on deposit in the Mezz 2 Subaccount as of the Petition Date. *See* O'Toole Decl. ¶ 32.

**B.  Defaults under the Senior Loans**

30. On April 5, 2021, counsel for the Servicer delivered to RREF a copy of a notice of event of default by the Mortgage Borrowers under the Mortgage Loan (the "Mortgage Loan Default Notice"). *See* O'Toole Decl. ¶ 34 & Ex. 18. In the Mortgage Loan Default Notice, the Servicer identified an "Event of Default" under the Mortgage Loan Agreement due to the Mortgage Borrowers' failure to complete each of the "Required Repairs" as contemplated by Section 6.1.3 of the Mortgage Loan Agreement. Moreover, the Servicer identified certain financial reporting defaults, which, if not remedied within thirty days of the Mortgage Borrowers' receipt of the Mortgage Loan Default Notice, would each constitute an additional "Event of Default" under the Mortgage Loan. These financial reporting defaults included failures to: (i) timely furnish quarterly reports which were due, but not provided, on June 30, 2020, September 30, 2020 and December

31, 2020; (ii) timely submit an annual budget for 2021; and (iii) of Paul to submit year-end 2019 financial statements. O'Toole Decl. Ex. 18.

31.     On April 13, 2021, counsel for the Mezz 1 Lender delivered to RREF a copy of a notice of event of default by the Mezz 1 Borrower under the Mezz 1 Loan (the "Mezz 1 Loan Default Notice"). The Mezz 1 Loan Default Notice declared the same "Event of Default" under the Mezz 1 Loan as the Mortgage Loan Default Notice, and identified the same financial reporting defaults, each of which would constitute an additional "Event of Default" under the Mezz 1 Loan if not remedied within thirty days of the Mezz 1 Borrower's receipt of the Mezz 1 Loan Default Notice.

### C.     RREF's Cure of Senior Loan Defaults

32.     Under the Intercreditor Agreement, as noted above, the Mezz 1 Lender and RREF have customary rights to cure non-monetary defaults under the Mortgage Loan. *See* O'Toole Decl. Ex. 8 § 12(c). RREF sent the Mortgage Borrower a demand notice shortly after the Mortgage Loan Default Notice with instructions to cure the defaults (both financial reporting and required repairs). However, RREF cannot perform the required repairs until a foreclosure occurs, and the financial reporting defaults are otherwise personal defaults and therefore not susceptible to cure by RREF. *See* O'Toole Decl. ¶ 34. Due to the longstanding defaults of the Mortgage Borrowers and the Mezz 1 Lender, RREF's collateral position is in jeopardy unless this case is dismissed or relief from the stay is granted so it may exercise its cure rights for existing defaults and any other defaults that may arise.

### IV.     The Debtor's Prepetition Attempts to Avoid the Consequences of its Default

33.     Despite TIAA's and RREF's efforts to protect their rights under the Mezz 2 Loan, the Debtor has gone to extraordinary lengths to avoid the consequences of its December 2019 default.

38415094.2

**A.     The Debtor Seeks to Enjoin TIAA's Auction of the Mezz 2 Collateral**

34.     TIAA originally sought to auction off the Mezz 2 Collateral at a UCC foreclosure sale on September 3, 2020 (the "Original UCC Sale").  On August 27, 2020, however, the Debtor commenced an action in the Supreme Court of the State of New York, County of New York (the "NYS Court") seeking to enjoin the Original UCC Sale.  *See GVS Portfolio I B, LLC v. Teachers Ins. Annuity Ass'n of Am.*, Index No. 0654095/2020 (N.Y. Sup. Ct. Aug. 27, 2020) ("*GVS v. TIAA*").  The NYS Court granted the Debtor's motion for a preliminary injunction and ordered the Debtor and TIAA to meet and confer regarding a revised schedule and proposed terms for a foreclosure sale, and to submit a stipulation setting forth the terms of an agreement.  *See* Decision + Order on Motion, *GVS v. TIAA*, ECF No. 108.

35.     Counsel for the Debtor and TIAA then entered into that certain *Stipulation Regarding Terms of UCC Sale, Notice of UCC Sale, and Confidentiality Agreement* (the "Sale Stipulation"), and the NYS Court "so-ordered" the Sale Stipulation in October 2020, thereby approving the sale process and rescheduling the UCC foreclosure sale for March 10, 2021 (the "Rescheduled UCC Sale").  *See id.*, ECF Nos. 112 and 121.

36.     Ultimately, representatives of 6 qualified bidders (including RREF) were expected to participate in the Rescheduled UCC Sale.  The Debtor, however, did not register as a potential bidder, which was a prerequisite to its participation in the Rescheduled UCC Sale, pursuant to the terms of sale set forth in the Sale Stipulation.  *See* O'Toole Decl. Ex. 21 ¶ 1.

37.     As noted above, on March 8, 2021, prior to the Rescheduled UCC Sale, TIAA sold the Mezz 2 Loan to RREF, and pursuant to the Assignment Agreement, assigned the Mezz 2 Notes and all of TIAA's corresponding rights and interests therein to RREF.

38415094.2

### B.    The Debtor Seeks To Further Halt UCC Sale

38.    On March 9, 2021—one day prior to the Rescheduled UCC Sale—and despite the Debtor's failed litigation and the NYS Court's finding that the Rescheduled UCC Sale was commercially reasonable, the Debtor filed for a temporary restraining order from the NYS Court, halting the Rescheduled UCC Sale.  *See* Order to Show Cause, *GVS v. TIAA*, ECF No. 129.  The Debtor then sought a preliminary injunction and a further adjournment of the Rescheduled UCC Sale to June 8, 2021.  Corrected Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. Relief, *GVS v. TIAA*, ECF No. 148.  Notwithstanding the fact that the Rescheduled Sale was to be conducted via Zoom conference out of New York, the Debtor claimed that certain anti-gathering orders related to COVID-19 issued by the State of Texas and the Texas Counties of Travis and Harris applicable to public sales held within Texas also applied to the Rescheduled UCC Sale and purportedly prevented that sale from going forward as scheduled and so-ordered by the NYS Court. *Id.* at 10-11.  The Debtor also claimed that the "deep freeze" event that occurred in Texas in February 2021 had adversely affected the marketing of those self-storage properties located in Texas.  *Id.* at 7-10.  Finally, the Debtor claimed that the sale of the Mezz 2 Loans to RREF constituted a unilateral modification of the sale terms memorialized in the Sale Stipulation, further justifying an adjournment of the Rescheduled UCC Sale.  *Id.* at 12-13.

39.    The NYS Court denied injunctive relief on March 30, 2021, finding that the Debtor's arguments were without merit, including that the Texas anti-gathering restrictions were not applicable to a virtual sale conducted from New York (and some restrictions had in fact already expired by their terms), the Debtor had not demonstrated that the "deep freeze" event had adversely affected the marketing process for the collateral, and that the sale of the Mezz 2 Loans to RREF was expressly contemplated by the documents governing the Mezz 2 Loans.  *See* Decision + Order on Motion, *GVS v. TIAA*, ECF No. 177.

14

40.     RREF's collateral was then re-scheduled to be sold at auction pursuant to the Uniform Commercial Code on April 12, 2021 at 10:00 a.m. in compliance with the terms and procedures for the sale that had been approved by the NYS Court in its decision denying the preliminary injunction.

C.     **The Bankruptcy Case**

41.     On April 12, 2021—less than an hour before the re-rescheduled foreclosure sale was to occur—the Debtor filed the instant bankruptcy case, thwarting RREF's completion of the foreclosure process. The original chapter 11 petition, which listed no unsecured creditors, was amended one day later to list only two professional firms as unsecured creditors with claims totaling less than $22,000.

42.     The board resolution accompanying the petition was executed four times by Paul— once in his capacity as president and three times in his capacity as a director. Richard Arthur and Colleen De Vries also consented to the filing of the case in their capacity as independent directors. Moreover, the board resolution authorizing the filing purports to authorize the Debtor to, among other things, commence this chapter 11 case, retain professionals, and take other actions in the case. Notably, however, the Debtor has filed no motions and, to the best of RREF's knowledge, has taken no action to protect RREF's collateral, which is the Debtor's only asset.

V.     **The Guaranty Action**

43.     Promptly after the bankruptcy filing, RREF invoked its rights under the Mezz 2 Guaranty and commenced an action against Paul in the NYS Court. *See RREF III Storage LLC v. Natin Paul*, Index No. 0652558/2021 (N.Y. Sup. Ct. Apr. 16, 2021) (the "Guaranty Action"). The Guaranty Action, which remains pending, seeks payment from Paul of the full amount due and owing to RREF on account of the Mezz 2 Loan.

38415094.2

**VI.     RREF's Rights are Prejudiced by the Bankruptcy Filing**

44.     As noted above, due to the longstanding defaults of the Mortgage Borrowers and the Mezz 1 Lender, RREF's collateral position is in jeopardy unless this case is dismissed or relief from the stay is granted so RREF may exercise its cure rights for the existing defaults and any other defaults that may arise.  If RREF is not permitted to continue curing defaults under the Mortgage Loan and Mezz 1 Loan, the Mezz 1 Lender may then seek to foreclose on the Mezz 1 Borrower's assets, or the Mortgage Loan Lender may seek to foreclose on the properties owned by the Mortgage Borrowers.  Further, due to the structural subordination of the Mezz 2 Loan to the Senior Loans—and the attendant increase in the claims of the Senior Lenders due to the imposition of fees, default interest, and other penalties in the event that defaults on the Senior Loans remain uncured—the value of the Debtor's sole asset may be severely impaired and the Debtor's estate irretrievably harmed.

45.     These concerns are all the more salient here because the portfolio of 64 self-storage facilities owned by the Mortgage Borrowers is worth approximately $325 million.  *See* O'Toole Decl. ¶ 44.  Thus, in light of the fact that the Senior Loans are approximately $213 million (the Mortgage Borrowers owe $110 million, and the Mezz 1 Borrower owes $103 million), there is only $113 million in collateral enterprise value left over to secure the Debtor's obligation to RREF, which is roughly $100 million.  As discussed herein, this equates to an equity cushion with respect to the entire debt stock of, at most, 3.7%.  *See* § II.B, *infra*.  This estimated collateral figure, however, does not take into account any claims of unsecured creditors against the Mortgage Borrowers or Mezz 1 Borrower, which are structurally senior to the Debtor's interest in the Mezz 1 Loan, or the imposition of fees, costs, default interest, and other penalties in favor of the Senior Lenders.  RREF is already aware of certain state tax liens and mechanics' liens that encumber the portfolio, and these claims exceed $1.5 million.  *See* O'Toole Decl. ¶ 44.  Moreover, GVS indicated

to the NYS Court that unsecured claims sitting at the Mortgage Borrowers could be substantial because the Texas "deep freeze" "resulted in significant damage to a number of the [p]roperties" that are now in need of repair. *See* Corrected Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. Relief at 3, 8, *GVS v. TIAA*, ECF No. 148.

46.     Beyond the obvious risks of the Debtor's bankruptcy filing to RREF's collateral, the filing will also frustrate RREF's ability to apply any amounts held in the Mezz 2 Subaccount toward the satisfaction of the Debtor's obligations to it. Notwithstanding the fact that the owner of the Mezz 2 Subaccount is (and any amounts on deposit therein were deposited by) the Mortgage Borrowers—which have not filed for bankruptcy—the Mortgage Loan Agreement (and analogous provisions in the Mezz 1 and Mezz 2 Loan Agreements) provides that any deposits by the Mortgage Borrowers into the Mezz 2 Subaccount are deemed to be distributions from the Mortgage Borrowers to Mezz 1 Borrower to the Debtor. *See* ¶ 27, *supra*. Such amounts on deposit in the Mezz 2 Subaccount, and any amounts deposited in the future, are thus arguably property of the estate subject to the automatic stay.

## RELIEF REQUESTED

47.     By this Motion, RREF requests several forms of relief. *First*, RREF seeks entry of an order pursuant to sections 1112(b) or 305(a)(l) of the Bankruptcy Code dismissing the Debtor's chapter 11 case for cause. RREF also respectfully requests that the dismissal be with prejudice pursuant to section 349(a) of the Bankruptcy Code because it is in the interest of the Debtor and its creditors. *Second*, RREF seeks entry of an order terminating the automatic stay with respect to its collateral so as to permit RREF to exercise its state-law rights and remedies against the Debtor, including, without limitation, the right to complete the UCC foreclosure sale in compliance with the terms and procedures for the sale that had been approved in the NYS Court action and its decision denying the preliminary injunction. *Third*, RREF seeks termination of the automatic stay

to ensure that amounts held in the Mezz 2 Subaccount for the benefit of RREF can be applied to satisfy the Debtor's obligations to RREF (to the extent so applied) and that RREF is permitted to take all actions necessary to keep the Senior Loans current and cure defaults, to the extent permissible under the governing loan documents or Intercreditor Agreement. *Finally*, RREF requests that any order granting this Motion not be stayed under Bankruptcy Rule 4001(a)(3) and be effective and enforceable immediately upon entry.

## BASIS FOR RELIEF REQUESTED

### I. This Case Should Be Dismissed with Prejudice For "Cause" Pursuant to Section 1112(b) of the Bankruptcy Code

48. This chapter 11 case should be dismissed with prejudice because the Debtor filed its petition in bad faith and has no reasonable prospect of reorganization. Section 1112(b) of the Bankruptcy Code, provides, in pertinent part, that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1). A request for dismissal under section 1112(b) must be scheduled by the Court no later than 30 days after filing of the motion, and must be decided by the Court no later than 15 days after commencement of the hearing, unless the movant expressly consents to a continuance for a specific period of time or "compelling circumstances" prevent the Court from meeting the time limits. 11 U.S.C. § 1112(b)(3).

#### A. The Debtor's Petition Was Filed in Bad Faith

49. "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith." *Cross-Appellees v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d

Cir. 2009) (quotations omitted). Although the phrase "good faith" suggests an inquiry into the debtor's subjective intent in filing a bankruptcy petition, the Third Circuit has firmly held that the "good faith" filing requirement is "based more on objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor." *Id.* at 618 n.8; *see also Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999). In assessing a debtor's good faith, the bankruptcy court must consider "the totality of facts and circumstances" to determine where the bankruptcy petition falls "along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.* at 162.

50. The Third Circuit has identified two essential elements for a "good faith" bankruptcy filing. First, the bankruptcy petition must "serve[] a valid bankruptcy purpose." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),* 384 F.3d 108, 120 (3d Cir. 2004). Second, the bankruptcy cannot be filed "merely to obtain tactical litigation advantage." *15375 Memorial,* 589 F.3d at 625 (citation omitted).

51. Moreover, in determining whether a filing was made in bad faith, courts in the Third Circuit have also considered whether the following factors are present: (a) single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure; (e) two-party dispute that can be resolved in pending state court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous bankruptcy petitions; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k) debtor formed immediately prepetition; (l) the debtor filed solely to create automatic stay; and (m) the subjective intent of the debtor. *See In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298-99 (Bankr. D. Del. 201) (quoting *Primestone Investment Partners*, 272 B.R. at 557).

38415094.2

52.     For the reasons set forth below, the Debtor's petition meets virtually all of the indicia of bad faith, warranting dismissal of this bankruptcy proceeding.

### 1.     The Debtor's Case Serves No Valid Bankruptcy Purpose

53.     The basic purposes of chapter 11 are "preserving going concerns," and "maximizing property available to satisfy creditors." *Integrated Telecom,* 384 F.3d at 119 (citation omitted).  Liquidation and distribution of the debtor's estate to stakeholders, standing alone, are not valid bankruptcy purposes justifying chapter 11 relief.  *Id.* at 126.  Instead, "[w]here there is no going concern to preserve," the debtor must affirmatively prove that a chapter 11 liquidation would "maximize value," *United States Tr. v. Stone Fox Capital LLC (In re Stone Fox Capital LLC)*, 572 B.R. 582, 590 (Bankr. W.D. Pa. 2017) (citing *15375 Memorial,* 589 F.3d at 619), which "means seeking to create or preserve some value that would otherwise be lost outside of bankruptcy, not merely distributed to a different stakeholder." *In re SureFunding, LLC*, No. 20-10953 (LSS), 2020 WL 8834902, at *4 (Bankr. D. Del. June 2, 2020); *see also Jameson Mezz*, 461 B.R. at 303 ("[T]he sale process contemplated in the bankruptcy case must be designed to realize some value that would not be available outside of bankruptcy.").

54.     Here, it is beyond dispute that the Debtor is not a "going concern" capable of reorganization because it is a special purpose entity that has no employees or operations and was created only for the limited purposes of, and may not conduct any activities other than, owning the 100% Membership Interest in Mezz 1 Borrower and paying the Mezz 2 Loan.  *See* O'Toole Decl. ¶ 10; *see also 15375 Memorial,* 589 F.3d at 619 (no "going concern" where debtor had "no employees, offices or business other than the handling of litigation…").  To establish a valid bankruptcy purpose, the Debtor must therefore show the chapter 11 case will maximize the value of the Debtor's estate, and that such value would be lost outside of bankruptcy.  *Id.*  The Debtor here cannot make such a showing.

20

55.     The Debtor's purpose in seeking chapter 11 relief here advances a singular and improper goal:  to obtain the benefit of the automatic stay and halt the state-law foreclosure process in favor of an alternative process of liquidating and distributing the Debtor's assets, which the Debtor perceives will be more favorable to Paul.[15]  But the Third Circuit has held consistently that a debtor's bald desire to obtain the protections of the automatic stay is not a valid justification for seeking bankruptcy relief and has upheld the dismissal of cases under factual circumstances similar to those presented by this case.  *See, e.g.*, *15375 Memorial,* 589 F.3d at 620; *Integrated Telecom,* 384 F.3d at 128; *see also Stone Fox*, 572 B.R. at 591 ("Filing a bankruptcy case to obtain the protection of the automatic stay is not a valid purpose; rather the stay is a benefit of a good faith filing.").

56.     This Court's decision in *Jameson Mezz* is instructive.  In *Jameson Mezz*, the debtor—a "Mezz II" borrower entity—was a special purpose entity formed in order to obtain mezzanine financing to acquire a chain of hotels.  *See Jameson Mezz*, 461 B.R. at 301.  Like the Debtor here, Mezz II was the direct parent of a "Mezz I" borrower entity that had obtained senior mezzanine financing and the indirect parent of operating entities that owned the hotels subject to mortgage loans.  *Id*. at 299.  In addition, Mezz II had at least two parent entities—"Mezz III" and "Mezz IV"—that had obtained junior mezzanine financing.  *Id.* at 299.  The sole asset held by each of the *Jameson* mezzanine borrowers was a 100% membership interest in each entity's respective subsidiaries, with the mezzanine loans at each level of the capital structure secured by such interests.  *Id.* at 306.

---

[15] RREF cannot anticipate every conceivable "bankruptcy purpose" the Debtor may yet contend establishes its good faith in commencing this chapter 11 case.  But RREF is confident that any purported justification for the Debtor's bankruptcy filing will not withstand scrutiny by the Court, particularly in light of the extraordinary circumstances presented by this case, which include nearly *all* of the indicia of "bad faith" filings ordinarily identified by courts, as discussed herein.  *See* ¶¶ 63-76, *infra*.

57.    The Jameson hotel chain subsequently fell into financial distress and was unable to repay or refinance the mezzanine or mortgage loans at maturity.  Accordingly, lenders at all levels of the capital structure commenced enforcement actions against their respective borrowers.  *Id.* at 296.  The lender that controlled the more senior Mezz I and Mezz II loans (an entity known as "Colony") commenced foreclosure proceedings and scheduled a UCC foreclosure sale.  *Id.* at 300.  Meanwhile, the lender that controlled the more junior Mezz III and Mezz IV loans (an entity known as "Gramercy") exercised its proxy rights to replace the non-independent directors at all levels of the capital structure and caused Mezz II to obtain an *ex parte* temporary restraining order against the scheduled UCC foreclosure sale, which was later vacated.  *Id.* at 296.  After the TRO was vacated, Colony scheduled its UCC foreclosure sale for the morning of October 19.  *Id.* at 296.  On October 18 at approximately 11:00 p.m., hours before the scheduled foreclosure sale, Gramercy caused Mezz II to file for bankruptcy in this Court.  *Id.* at 296.  Colony then filed a motion to dismiss the case with prejudice and for relief from the automatic stay to proceed with the UCC foreclosure sale.  *Id.* at 297.

58.    This Court agreed with Colony and both dismissed the case with prejudice and granted relief from the automatic stay for several reasons, including because Mezz II's bankruptcy was a bad faith filing.  Noting that Mezz II had "only one asset," and that the "petition was filed on the eve of foreclosure" on that asset, the Court found that Gramercy caused Mezz II to file its petition "solely to obtain the benefit of the automatic stay," which is not a valid purpose for seeking bankruptcy relief.  *Id.* at 299.  In addition to holding that "nearly all" of the indicia of bad faith were present, the Court also found "compelling" Colony's arguments that the Mezz II bankruptcy filing was merely a "litigation tactic" to "forestall [Colony's] efforts to foreclose on its collateral . . . ."  *Id.* at 300.  Further, the Court found that the debtor had not demonstrated any "benefit to be

38415094.2

gained by having Mezz II remain in bankruptcy" because there was "no evidence that the bankruptcy case" would "realize some value that would not be available" pursuant to a UCC foreclosure sale.  *Id.* at 303.

59.     The *Primestone Investment Partners* case is also particularly instructive.   In *Primestone*, the debtor—Primestone Investment Partners—was a special-purpose entity organized for the purpose of holding beneficial ownership interests in a real estate investment trust.   The debtor's loans were secured by such interests, and after the debtor defaulted on its loans, the lender informed the debtor of its goal of disposing of the interests at a public auction.  *Primestone,* 272 B.R. at 556.  As in *Jameson Mezz*, the debtor filed a chapter 11 petition at 11:51 p.m. on the eve of the auction, resulting in the automatic stay of the foreclosure proceeding.  As a result, the lender moved to dismiss the case for lack of good faith and the court granted the relief, reasoning that where the debtor filed for bankruptcy "on the eve of foreclosure, apparently in an attempt to stay the foreclosure," it had not demonstrated "a valid bankruptcy purpose . . . allowing this debtor to remain in Chapter 11."  Transcript of Dec. 18, 2001 Hearing at 63:20-64:16, *In re Primestone Inv. Partners L.P.,* No. 01-11355 (MFW) (Bankr. D. Del. Jan. 15, 2001), ECF No. 38.  This Court also granted a motion to dismiss in *In re Westland DevCo, L.P.*, where the debtor owned a single asset, had no income, had no foreseeable prospects for a successful reorganization and filed the bankruptcy petition at the last minute to halt a pending state-court foreclosure action.  *See* Order, *In re Westland DevCo, L.P.,* No. 10-11166 (CSS) (Bankr. D. Del. May 10, 2010), ECF No. 104.

60.     Here, just like the debtors in *Jameson Mezz*, *Primestone*, and *Westland DevCo*, the Debtor attempted to invoke the automatic stay less than an hour before the scheduled foreclosure sale to thwart the foreclosure process for which it bargained in the Mezz 2 Loan documents and which it agreed could proceed in the Sale Stipulation.  Debtor's dilatory tactics will prejudice

RREF, the Debtor's only substantial creditor. This chapter 11 case was thus not commenced in good faith and should be dismissed under section 1112(b) of the Bankruptcy Code.

### 2. The Debtor's Case Was Commenced Primarily to Obtain a Tactical Litigation Advantage

61.     A chapter 11 case is also subject to dismissal if it was commenced primarily to obtain a tactical litigation advantage. *See 15375 Memorial,* 589 F.3d at 605; *SGL Carbon,* 200 F.3d at 165; *see also In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 387 (Bankr. D. Del. 2018) (dismissing chapter 11 petition as bad faith filing where primary purpose was to circumvent unfavorable ruling in prepetition litigation against primary creditor).

62.     The tactical advantages gained by the Debtor in commencing this case are manifest. Similar to *Jameson*, the Debtor's chapter 11 petition automatically stayed the pending foreclosure sale less than an hour before it was set to begin and without any showing whatsoever by the Debtor. This is significant because the Debtor could not obtain similar relief outside of bankruptcy. Indeed, the Debtor had already attempted—and failed—to obtain an injunction against foreclosure in NYS Court. *See* Decision + Order on Motion, *GVS v. TIAA*, ECF No. 177; *see also Jameson Mezz*, 461 B.R. at 299 (debtor unsuccessfully sought state court injunction against foreclosure sale). Moreover, the bankruptcy filing also saddled RREF with the burden of coming forward to affirmatively seek relief from the Debtor's abusive filing. In light of the foregoing, this Court should dismiss the Debtor's chapter 11 case because the Debtor's filing was impermissible and was "clearly just a litigation tactic designed to forestall [RREF's] efforts to foreclose on its collateral . . . ." *See Jameson Mezz*, 461 B.R. at 300.

### 3. Additional Indicia of Bad Faith are Present Here

63.     The Court should also dismiss the Debtor's chapter 11 case because it involves an overwhelming majority of the additional factors courts consider in determining whether a

bankruptcy petition was filed in bad faith.[16]  In fact, as discussed below, of the thirteen factors

generally considered by courts, *all but three* are present here, which militates strongly in favor of

dismissal.

### (a)    This is a single asset case

64.     As previously noted, the Debtor's sole asset is its 100% Membership Interest in

Mezz 2 Borrower.  *See* O'Toole Decl. ¶ 11.  Although "there is nothing inherently improper in a

single asset debtor filing" for chapter 11 bankruptcy, *Primestone Inv. Partners*, 272 B.R. at 558,

courts have uniformly held that this factor weighs against a finding of good faith on the part of the

debtor.  *See, e.g.*, *Jameson Mezz*, 461 B.R. at 299 (chapter 11 filing by junior mezzanine lender

was in bad faith where, among other things, "Mezz II ha[d] only one asset (the membership interest

in Mezz I)"); *Primestone Inv. Partners*, 272 B.R. at 558 (same); *see also SGL Carbon*, 200 F.3d

at 165 (same).

### (b)    There are few, if any, unsecured creditors

65.     The Debtor's petition lists only two purported unsecured creditors, both of which

are professionals retained by the Debtor prior to the bankruptcy filing.  *See* D.I. 3.  Numerous

courts have recognized that an unsecured claims pool that consists predominantly or exclusively

of professional fee claims weighs in favor of a finding of bad faith.  *See, e.g.*, *In re EFL Partners*

*X*, No. 13-11495-MDC, 2013 WL 4508423, at *5 (Bankr. E.D. Pa. Aug. 23, 2013); *Jameson Mezz*,

461 B.R. at 299; *St. Paul Self Storage Ltd. P'ship v. Port Auth. (In re St. Paul Self Storage Ltd.*

*P'ship)*, 185 B.R. 580, 583 (B.A.P. 9th Cir. 1995) (the debtor's "lack of creditors, other than

---

[16] As noted in ¶ 51, *supra*, those factors are:  (a) single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure; (e) two party dispute that can be resolved in pending state court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous bankruptcy petitions by the debtor; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k) debtor formed immediately prepetition; (l) debtor filed solely to create automatic stay; and (m) the subjective intent of the debtor.  *See Jameson Mezz*, 461 B.R. at 298-99 (quoting *Primestone Investment Partners*, 272 B.R. at 557).

insiders and its own professionals, further indicated . . . that protection under the Bankruptcy Code was not necessary to a . . . legitimate reorganization").

66.    Moreover, it is not clear that these entities are even bona fide creditors of the Debtor.  If, for instance, these entities received a prepetition retainer, are proposed to be retained by the estate postpetition (in which case they would be required to waive any prepetition claim, *see* 11 U.S.C. § 327(a)), or have been paid by a non-debtor GVS affiliate or third party, then they would not hold valid unsecured claims.  *See Jameson Mezz*, 461 B.R. at 299.

### (c)    There is no pressure from non-moving creditors

67.    To the extent that the Debtor's two purported unsecured creditors even have valid claims against the estate, there is no indication that such creditors have been exerting pressure on or commenced collection efforts against the Debtor prior to the bankruptcy filing.  *See Jameson Mezz*, 461 B.R. at 299 (the debtor's creditors, "if they [even] are creditors, were exerting no pressure on [the debtor] before the filing").

### (d)    The Debtor's petition was filed on the eve of foreclosure

68.    The Debtor filed this case on the eve of (indeed, less than one hour before) the Rescheduled UCC Sale ordered by the NYS Court.  Courts have repeatedly held under similar circumstances that such timing is highly suggestive of bad faith.  *See, e.g.*, *Jameson Mezz*, 461 B.R. at 299-300; *Stone Fox Capital*, 572 B.R. at 586 (filing was in bad faith where bankruptcy proceeding commenced four days before sheriff's sale of collateral); *cf. SureFunding*, 2020 WL 8834902, at *5 (finding bad faith where, "[a]lthough not filed on the eve of a foreclosure, the petition was filed merely a day after [a] receivership order was entered[]" against the debtor and its property); *In re SB Properties, Inc.*, 185 B.R. 198, 205 (E.D. Pa. 1995) (dismissing petition where debtor filed for bankruptcy immediately prior to state court appraisal of debtor's sole asset in connection with court-ordered sale).

26

### (e) Numerous affiliates of the Debtor have previously filed for bankruptcy

69.     To the best of RREF's knowledge, the Debtor is the first—and only—entity related to the GVS self-storage portfolio to file for bankruptcy.  Numerous of the Debtor's affiliates, however, that are under the common ownership of Paul have filed for bankruptcy in the Western District of Texas.  *See* ¶ 64, *supra*.  Indeed, at least eight entities owned by Paul previously filed for bankruptcy in this Court, only to have venue subsequently transferred to the Western District of Texas.  *See id.*  Moreover, it has been reported that most of these bankruptcy filings were initiated on the day of or the day before foreclosure sales were scheduled to occur.  *Id.*  Courts have considered previous bankruptcies filed by entities closely related to the debtor as probative of whether the debtor's own filing was made in good faith.  *See EFL Partners*, 2013 WL 4508423, at *4 (citations omitted).

### (f) This is a two-party dispute

70.     The Debtor's bankruptcy proceeding is really a two-party dispute that can be resolved in pending state court actions:  specifically, a foreclosure proceeding, as well as the related state court litigation.  *See GVS v. TIAA*.  Courts generally hold in these circumstances that such a dispute does not belong in bankruptcy court.  *See, e.g.*, *In re Scarborough-St. James Corp.*, No. 15-10625 (LSS), 2015 WL 5672628, at *2 (Bankr. D. Del. Sept. 24, 2015) (dismissing a "two-party dispute" between debtor and its landlord relating to entitlement to rents from debtor's sole material real estate asset); *Jameson Mezz*, 461 B.R. at 299 (dismissing case where Court found it "involve[d] only a two-party dispute" between two competing lenders); *SB Properties*, 185 B.R. at 205 (dismissing debtor's petition where filing was "no more than a thinly veiled litigation tactic in a two party . . . dispute."); *In re Asanda Air II LLC*, 600 B.R. 714, 722 (Bankr. N.D. Ga. 2019) ("[T]his reorganization essentially involves the resolution of a two-party dispute . . . as the Debtor's

38415094.2

'financial problems' stem solely from [a] [s]tate [c]ourt [p]roceeding and the underlying contract dispute [with the debtor's sole major creditor]").

### (g)    The Debtor has no ongoing business or employees

71.    The Debtor is a special purpose entity formed solely for the purpose of receiving mezzanine financing to support the broader GVS self-storage portfolio, and it therefore has no (nor has it ever had any) other ongoing business or employees.  This fact weighs in favor of a finding of bad faith.  *See Primestone Inv. Partners*, 272 B.R. at 558; *see Jameson Mezz*, 461 B.R. at 298-99.

### (h)    The Debtor currently has no cash or income

72.    Similarly, the Debtor—again, a special purpose entity—currently has no cash or income.  *See* O'Toole Decl. ¶ 10.  Instead, and as set forth in the documents governing the various GVS loans, any necessary expenses are paid on the Debtor's behalf either out of the priority "waterfall" applied to monthly payments made by the Mortgage Borrowers or by another GVS entity on its behalf.  *See* O'Toole Decl. Ex. 9 § 3.1; O'Toole Decl. Ex. 3 § 2.7.  This factor weighs in favor of a finding of bad faith.  *See Jameson Mezz*, 461 B.R. at 298-99.

### (i)    The Debtor has no reasonable possibility of reorganizing

73.    The Debtor also has no reasonable prospect of reorganization under the Bankruptcy Code for several reasons.  First, as described above, the Debtor currently has no cash or income. *See* ¶ 72, *supra*; *see also* O'Toole Decl. ¶ 10.  Any cash that does become available under the cash management waterfall for the Debtor is deposited into the Mezz 2 Subaccount to be used exclusively for debt service, and, at a minimum, constitutes RREF's cash collateral (to the extent such cash is property of the estate at all).  *See* O'Toole Decl. Ex. 9 § 3.1; O'Toole Decl. Ex. 3 § 2.7; O'Toole Decl. Ex. 1 § 2.7.  Thus, because the Debtor has not sought RREF's consent to use

cash collateral, and in the absence of outside financing, the Debtor will not be able to fund the bankruptcy case.[17]

74.    Second, even if the Debtor were able to fund the basic costs and expenses attendant to a chapter 11 filing, it cannot demonstrate that it would be able to confirm a plan, which would, at a minimum, require a cash payment in full of all allowed administrative expense and priority claims on the effective date.  *See* 11 U.S.C. § 1129(a)(9)(A); *see also In re Molycorp, Inc.*, 562 B.R. 67, 78 (Bankr. D. Del. 2017) (administrative and priority claims must be paid in full absent consent of affected claimholders).

75.    Finally, any plan proposed by the Debtor (regardless of how it is funded) cannot meet the confirmation requirements set forth in section 1129 of the Bankruptcy Code.  RREF, the Debtor's only secured creditor—and, possibly, its only creditor—will not consent to any such plan, rendering confirmation practically impossible, because there will be no impaired accepting class.[18] *See* 11 U.S.C. § 1129(a)(10); *see also Jameson Mezz*, 461 B.R. at 302 (where there is only one secured creditor, confirmation is impossible over the objection of such creditor); *In re 3 RAM, Inc.*, 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) (same).  Accordingly, there is no reasonable prospect for the Debtor to confirm a plan.

**(j)    The Debtor filed the petition solely to invoke the automatic stay**

76.    Finally, the fact that the Debtor filed the petition solely to obtain the benefit of the automatic stay against RREF weighs strongly in favor of a finding of bad faith.  *See Primestone*,

---

[17] To the extent that the case is funded on the Debtor's behalf by another GVS entity, that would further weigh in favor of a finding of bad faith.  *Cf. Jameson Mezz*, 461 B.R. at 306 (noting that debtor had no funds and that costs of bankruptcy had been paid solely through an undisclosed advance by the junior lender).

[18] Even assuming that the unsecured creditors listed in the Debtor's petition hold valid claims, confirmation still cannot be reasonably achieved.  Instead, it is much more likely that either (a) RREF is oversecured and the excess value will be enough to satisfy unsecured claims in full rendering them unimpaired, or (b) RREF is undersecured in which case unsecured creditors will receive nothing and be deemed to reject.  Either case would result in there being no impaired, accepting class that could be utilized to "cram up" RREF.

38415094.2

272 B.R. at 557 (noting factors); *see also Jameson Mezz*, 461 B.R. at 300. Although the Debtor did not file an affidavit or evidentiary support with its petition—and it is thus impossible to ascertain the Debtor's purported intent in commencing this chapter 11 case—Courts routinely infer from circumstances and timing similar to those here that a debtor intended to abuse the automatic stay. *See, e.g., Jameson Mezz*, 461 B.R. at 299 ("The petition was filed on the eve of foreclosure, solely to obtain the benefit of the automatic stay."); *Asanda Air*, 600 B.R. at 722 ("[T]he timing of the events in this case supports the conclusion that the Debtor filed its petition to create the automatic stay" against its sole non-insider creditor); *In re SB Properties, Inc.*, 185 B.R. 198, 205 (E.D. Pa. 1995) (where debtor filed for bankruptcy immediately prior to appraisal of its sole asset in connection with state court-ordered sale, the "timing of [debtor's] filing fairly manifests an intent to delay or frustrate the state court's attempts to liquidate the [p]roperty.").

**B.      The Debtor's Inability to Effectuate a Plan Constitutes "Cause" for Dismissal under Bankruptcy Code Section 1112(b)**

77.      Under section 1112(b)(4) of the Bankruptcy Code, "cause" for dismissal also exists where there is "substantial and continuing loss to or diminution of the estate and [an] absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A)-(B). Here, the Debtor's estate faces a serious threat of loss or diminution resulting from the accrual of chapter 11 administrative expenses because the Debtor has no income, is likely balance-sheet insolvent, and has no "going concern" to preserve in bankruptcy. In addition, and as previously noted, the Debtor holds no cash on its balance sheet to satisfy operating expenses and any cash to which it otherwise might have recourse constitutes RREF's cash collateral. Accordingly, in the absence of outside financing, the Debtor's estate is administratively insolvent.

78.      Further, while RREF's claims continue to accrue interest at the Default Rate, the Senior Lenders' claims continue to grow. Indeed, every day that the Debtor remains in bankruptcy

imposes a substantial risk of loss on RREF to the extent it is prevented from exercising its cure rights on the Senior Loans. Finally, there is no reasonable likelihood of rehabilitation because a chapter 11 plan cannot be confirmed over RREF's objection. *See* 11 U.S.C. § 1129(a)(10) (requiring at least one impaired accepting class); *see also* ¶ 73, *supra*.[19] For these reasons, even if the Debtor had commenced its case in good faith (which, as discussed above, it did not), dismissal is still be mandatory under Bankruptcy Code section 1112(b)(4).

### C. Dismissal of the Chapter 11 Case Should be With Prejudice Pursuant to Sections 105(a) and 349(a) of the Bankruptcy Code

79. Section 349(a) of the Bankruptcy Code provides in relevant part that "[u]nless the court, for cause, orders otherwise, the dismissal of a case under this title does not . . . prejudice the debtor with regard to the filing of a subsequent petition under this title . . . ." 11 U.S.C. § 349(a). Pursuant to section 105(a) of the Bankruptcy Code, the Court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, *or to prevent an abuse of process*." 11 U.S.C. § 105(a) (emphasis added).

80. A bankruptcy court may apply its inherent powers under sections 105(a) and 349(a) to dismiss a debtor's chapter 11 case with prejudice and prohibit subsequent filings where the debtor commenced its bankruptcy case for an improper purpose and in bad faith. *See Jameson Mezz*, 461 B.R. at 304 (dismissing case with prejudice due to bad faith filing). Dismissal with prejudice is also appropriate where necessary to prevent the debtor from obtaining an unfair advantage in ongoing disputes outside of the bankruptcy court. *See, e.g.*, *Scarborough-St. James Corp.*, 2015 WL 5672628, at *3 ("Court [] prohibit[ed] Debtor from filing another bankruptcy

---

[19] Moreover, even if there was no "loss or continuing diminution to the estate," the Debtor's inability to effectuate a chapter 11 plan would alone constitute "cause" for dismissal. *In re 3 RAM, Inc.*, 343 B.R. 113, 117 n.14 (noting the "loss or continuing diminution" element of section 1112(b)(4) might not be implicated, strictly speaking, in the case of a holding-company debtor having no operations; nonetheless, the inability to effectuate a chapter 11 plan would constitute independent "cause" for dismissal).

petition for a period of four months" to allow debtor's landlord to obtain relief in pending state court proceeding); *In re Riverbend Cmty., LLC*, No. 11-11771 (KG), 2012 WL 1030340, at *4-5 (Bankr. D. Del. Mar. 23, 2012) (dismissing case with prejudice and enjoining subsequent petition until after foreclosure sale occurred); *see also In re Class A Props. Five, LLC*, 600 B.R. 27, 38-39 (Bankr. N.D. Ill. 2019) (dismissal of prior bad faith bankruptcy with prejudice barred debtor from filing subsequent bankruptcy).

81.     Here, it is necessary for the Court to dismiss the Debtor's case with prejudice to prevent the Debtor from attempting to file a successive petition in this or another jurisdiction to further forestall RREF's foreclosure sale and otherwise frustrate RREF's rights with respect to its collateral.   RREF and its predecessor in interest have vigorously and extensively marketed the opportunity to purchase the collateral at the foreclosure sale.   As a consequence of the Debtor's bad faith filing, RREF has suffered significant setbacks in completing the foreclosure sale, has incurred significant enforcement costs, and faces the risk of material diminution of the value of its collateral based upon actions that could be taken by third parties at the Mezz 1 and Mortgage Loan level within the capital structure.   *See* ¶¶ 44 - 46, *supra*.   Accordingly, RREF respectfully submits that the Court should order the dismissal of the Debtor's chapter 11 case with prejudice and prospectively enjoin any further filings by the Debtor to prevent any further harm to RREF.[20]

---

[20] To the extent the Court does not feel that dismissal pursuant to section 1112(b) would be appropriate, RREF submits that, in the alternative, the Court should abstain from exercising its jurisdiction over this chapter 11 case and dismiss it pursuant to section 305(a)(l) of the Bankruptcy Code.   Although abstention under section 305(a) is generally considered "an extraordinary remedy," *In re Monitor Single Lift L Ltd.,* 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008), the rare set of circumstances presented by this case falls squarely within the type of case that courts have found to merit dismissal under section 305(a)(l).   In considering whether dismissal under section 305(a)(l) is warranted, courts look at "'a wide range of factors, including but not limited to who filed the bankruptcy petition, the availability of another forum to resolve the pending disputes, the necessity of federal proceedings to achieve a just and equitable solution, the expense of the federal proceedings in comparison with the proceedings in another forum, the purpose of the party seeking to remain in bankruptcy court, the economy and efficiency of having the bankruptcy court handle the matter and the possible prejudice to various parties.'" *Steinman v. Spencer (In re Argus Grp. 1700)*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996), *aff'd*, 206 B.R. 757 (E.D. Pa. 1997) (quoting *In re Carl Mazzocone*, 200 B.R. 568, 575 (E.D. Pa. 1996)).   Here, it is clear that the Debtor and its only real creditor—RREF—would be better served if this case were dismissed.   Indeed, the Debtor acknowledges that it does not have material creditors other than RREF (*see*

38415094.2

## II.    The Court Should Grant Relief from the Automatic Stay

82.    Section 362(d)(l) of the Bankruptcy Code provides that the bankruptcy court "shall" grant relief from the automatic stay on request of a party in interest "for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ."  11 U.S.C. § 362(d)(l).  If the movant makes a *prima facie* case for "cause" for relief, the burden of going forward shifts to the debtor pursuant to section 362(g) of the Bankruptcy Code.  *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.),* 141 B.R. 574, 576 (Bankr. D. Del. 1992).  The burden of proof on the issue of whether a secured creditor's interest in property is adequately protected, however, belongs at all times to the debtor.  *See* 11 U.S.C. § 362(g)(2); *Wilmington Savs. Fund Soc. v. 1025 Assocs., Inc. (In re 1025 Assocs., Inc.),* 106 B.R. 805, 810 (Bankr. D. Del. 1989).

83.    In addition, under section 362(d)(2) of the Bankruptcy Code, the stay of an act against property must be lifted if "the debtor does not have an equity in such property" and "such property is not necessary for an effective reorganization."  11 U.S.C. § 362(d)(2).  The movant requesting relief from the stay under section 362(d)(2) bears the burden of proof as to the debtor's equity in the property, at which point the burden shifts to the debtor to prove the feasibility of reorganization.  *See* 11 U.S.C. § 362(g); *1025 Assocs.,* 106 B.R. at 810.

---

List of Creditors Holding 20 Largest Unsecured Claims [D.I. 3].), and, as noted above, the Debtor's status as a mezzanine financing vehicle makes this case a two-party dispute between RREF and the Debtor.  The Debtor would most certainly not be able to confirm a plan of liquidation or reorganization without the support of RREF.  Moreover, if this case were to be dismissed, RREF, the Debtor's primary creditor, would foreclose on and conduct a public auction of the Debtor's only asset, its 100% Membership Interest in Mezz 1 Borrower.  The proceeds of the public auction would be distributed, as all relevant parties expressly contemplated, and as would be done in connection with any other mezzanine financing.  Because the Debtor has no actual business and no material creditors other than RREF, no more value could be created for the Debtor or its creditors inside of bankruptcy than could be realized through public auction; and the commercial reasonableness of the auction (which, in light of the NYS Court's decision in *GVS v. TIAA* cannot be genuinely disputed) could be subject to challenge and approval in state court, in a proceeding that is already pending.  *See* Decision + Order on Motion, *GVS v. TIAA*, ECF No. 177.

38415094.2

**A.** **The Debtor's Bankruptcy Filing Constitutes a Filing in Bad Faith that is Cause for Stay Relief**

84.    "Filing bankruptcy in bad faith is 'cause' for relief under [] section 362(d)(l)." *Mother African Union Methodist Church v. Conference of AUFCMP Church* (*In re Conference of African Union First Colored Methodist Protestant Church*), 184 B.R. 207, 218 (Bankr. D. Del. 1995); *see In re Lippolis*, 228 B.R. 106, 112 (E.D. Pa. 1998) (stay relief granted based upon debtor's bad faith filing); *In re Merchant*, 256 B.R. 572, 576-77 (Bankr. W.D. Pa. 2000) (finding bad faith filing can constitute "cause" for relief from the stay, noting it is an "abuse of § 362 . . . when a debtor has no intention of effectuating a realistic plan of reorganization.").

85.    As demonstrated above, the Debtor filed its bankruptcy petition in bad faith. RREF is the Debtor's primary creditor, and the only asset of the Debtor is the Membership Interest in Mezz 1 Borrower, which constitutes RREF's Collateral. The Debtor commenced this chapter 11 case less than one hour before RREF's foreclosure sale to dispose of such Collateral. The Debtor has no operating business, no employees, no bondholders, and no material trade creditors. In short, the Debtor's bankruptcy filing accomplishes little more than to frustrate the exercise of legitimate, bargained-for rights by the Debtor's secured creditor. Accordingly, RREF respectfully submits that cause exists to lift the automatic stay to permit RREF to proceed with a foreclosure sale of its Collateral in accordance with state law.

**B.** **There is Also Cause to Lift the Stay Because RREF Lacks Adequate Protection**

86.    The automatic stay should also be lifted because RREF's interest in the Collateral is not adequately protected. 11 U.S.C. § 362(d)(1). In determining whether an interest in property is adequately protected, courts engage in an analysis of the property's "equity cushion," which is the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and the amount of any claims that have a senior interest in such property. *Nantucket Investors*

*II v. Cal. Fed. Bank (In re Indian Palms Assocs.)*, 61 F.3d 197, 207 (3d Cir. 1995). For purposes of section 362(d)(l), adequate protection exists if there is an equity cushion and (a) such cushion is sufficient to absorb continued interest accrual, or (b) the debtor is servicing the debt. *Indian Palms*, 106 B.R. at 210; *see also* 3 COLLIER ON BANKR. P 361.03[1] (16th ed. 2021) ("existence of a small equity cushion does not assure protection; the cushion must be sufficiently substantial to assure that the decline in value will not affect the secured claim."). Otherwise, the movant's interest is not adequately protected and grounds for relief from the stay exist. *Id.* Here, RREF's interest in the Collateral is not adequately protected, making stay relief appropriate, for the following reasons. Moreover, there is, at most, a de minimis equity cushion on the Collateral that is deteriorating daily.

87.    As noted, the entire GVS portfolio of 64 self-storage facilities is worth approximately $325 million. *See* O'Toole Decl. ¶ 44. The Collateral securing RREF's claim of approximately $100 million (that continues to accrue interest daily) does not consist of the actual properties in the portfolio, however, but merely the Membership Interest in Mezz 1 Borrower, which in turn is the owner of the Mortgage Borrowers that hold title to the self-storage properties. Accordingly, the amount that RREF can realize on its interest in the Collateral is reduced by the approximately $213 million of structurally senior claims held by the Senior Lenders. Thus, the Collateral has, at most, an equity cushion of $12 million dollars ($325 million less $313 million in aggregate secured claims), or a mere 3.7%. *See Jameson Mezz*, 461 B.R. at 305-06 (calculating Mezz II lender's equity cushion based on difference between enterprise value and the amount of all debt "up to the [Mezz II] level"). Courts have uniformly held that such an equity cushion is woefully inadequate to protect a secured creditor's interest. *See, e.g.*, *Jameson Mezz*, 461 B.R. at 305 ("9% equity cushion" was "not sufficient to constitute adequate protection alone."); *In re*

*C.B.G. Ltd.*, 150 B.R. 570, 572 (Bankr. M.D. Pa. 1992) (equity cushion of 14% insufficient); *Kost v. First Interstate Bank of Greybill (In re Kost)*, 102 B.R. 829, 831-32 (D. Wyo. 1989) (collecting cases and observing that equity cushion below 11% has "uniformly" been held to be inadequate).

88.     RREF's equity cushion, however, is likely even lower than that (if such a cushion exists at all).  That is because the value of the Collateral is not only reduced by the secured claims of the Senior Lenders, but also by any unsecured claims against Mezz 1 Borrower and the Mortgage Borrowers (which are also structurally senior to RREF's secured claim) and tax and mechanics liens of approximately $1.5 million, as noted above.  And while Mezz 1 Borrower (like the Debtor) is a special purpose entity that is unlikely to have any meaningful liabilities beyond the Mezz 1 Loan, there are almost certainly unsecured claims that exist at the Mortgage Borrower level; those claims are potentially substantial, in light of the purportedly extensive damage to certain of the GVS portfolio properties caused by the Texas "deep freeze," which according to the Debtor necessitated significant repairs.  *See* ¶¶ 65 - 66, *supra*; *see also* Corrected Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. Relief at 3, 8, *GVS v. TIAA*, ECF No. 148.   As a result, it is exceedingly likely that RREF's equity cushion as of the Petition Date was even less than 3.7%, and to the extent that unsecured claims at the Mortgage Borrower level exceeded $12 million, RREF may be undersecured.

89.     The Debtor thus cannot rely on any "equity cushion" in the Collateral to protect RREF's interests.  And because the Debtor has not provided or offered any alternative form of adequate protection to RREF from the immediate deterioration of its Collateral's value caused by the imposition of the automatic stay, RREF is entitled to relief from the stay under Bankruptcy Code section 362(d)(l).

38415094.2

**C.   Relief is Appropriate under Section 362(d)(2) Because the Debtor Does Not Have Equity in the Collateral and the Collateral is Not Necessary for an Effective Reorganization**

90.     As noted above, because the Debtor lacks—or will soon lack—any equity in RREF's Collateral, relief is also mandatory under section 362(d)(2) as the Debtor cannot establish that the collateral is "necessary to an effective reorganization."  11 U.S.C. §§ 362(d)(2), (g)(2). This standard requires "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*."  *United Savs. Ass'n v. Timbers of Inwood Forest Ass'n, (In re Timbers of Inwood Forest Ass'n)*, 484 U.S. 365, 375-76 (1988) (emphasis in original).  In other words, there must be a "reasonable possibility of an effective reorganization within a reasonable time."  *Id.* at 376 (citation omitted)

91.     As described above, the Debtor has no reasonable possibility of reorganization.  *See* ¶¶ 73 - 75, *supra*.  The Debtor currently has no cash or income to fund the bankruptcy case, and even if it did, it cannot demonstrate that it would be able to confirm a plan, which would require, among other things, the payment in full, in cash of all allowed administrative expense and priority claims.  *See* ¶ 74, *supra*.  Further, any plan proposed by the Debtor would not be confirmable, as RREF, the Debtor's only secured creditor, will not consent to any such plan.  *See* ¶ 75, *supra*.  The Debtor therefore cannot effectively reorganize here within a reasonable time under these circumstances.  *See Timbers of Inwood Forest*, 484 U.S. at 376; *see also Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 568 (3d Cir. 1994) (finding no effective reorganization was in prospect where creditor whose vote was necessary to carry a chapter 11 plan indicated it would oppose any proposed plan).  Consequently, RREF is entitled to relief from the automatic stay pursuant to Bankruptcy Code section 362(d)(2).  *See Jameson Mezz*, 461 B.R. at 308.

**D.  At a Minimum, the Stay Should be Lifted to Permit Application of Amounts on Deposit in Cash Management Account and to Enable RREF to Take Necessary Steps to Cure Defaults on Senior Loans**

92.     To the extent the Court is not inclined to grant RREF blanket relief from the stay to pursue a UCC foreclosure sale of the Collateral, RREF requests that the Court, at a minimum, enter an order lifting the stay to permit RREF to apply any amounts on deposit (or that are subsequently deposited from future monthly payments by the Mortgage Borrower after application of the cash management waterfall) in the Mezz 2 Subaccount towards the satisfaction of the Mezz 2 Loan and to take any actions necessary to cure defaults under the Mezz 1 Loan and Mortgage Loan, and otherwise keep such loans current.

93.     As discussed above, the Debtor currently has no cash or income of its own from which to fund operations and, instead, any expenses it incurs are paid for on its behalf by other GVS entities.  *See* ¶ 72, *supra*.  The only account in which the Debtor and its estate may have an arguable interest is the Mezz 2 Subaccount.  But such interest, if any, would be limited to a bare legal title to the funds in such account,[21] *see* 11 U.S.C. § 541(d), which are held in trust for the benefit of RREF and may be used solely to pay debt service on the Mezz 2 Loan.  The Court should lift the stay to allow RREF to apply any amounts on deposit or that may be deposited in the future in the Mezz 2 Subaccount towards the satisfaction of the Debtor's obligations on the Mezz 2 Loans because any funds in the Mezz 2 Subaccount are held solely for the benefit of RREF and are, at most, cash collateral, the Debtor's use of which RREF has not consented to.  *See* 11 U.S.C. § 362(d)(2).

---

[21] Such interest would arise solely by virtue of the Mortgage Loan Agreement provision that "deems" any deposit in the Mezz 2 Subaccount to be a distribution from Mortgage Borrower to Mezz 1 Borrower to the Debtor.

94.     The Court should also lift the stay to the extent necessary to allow RREF to cure rights that it may have to protect its collateral and to exercise its state-law rights and remedies against its collateral, including but not limited to the right to reregister the Debtor's pledged 100% membership interest in GVS Portfolio I, LLC; the right to continue and complete the foreclosure sale of such interest in compliance with the terms and procedures for the sale that had been approved in the NYS Court in its decision denying the preliminary injunction, to transfer title to such interest, and apply the sale proceeds (if any) to the Debtor's obligations to RREF; and the right to apply any amounts on deposit in the PNC Cash Management Account to the Debtor's obligations to RREF. Although RREF does not believe that stay relief is necessary for it to take many (if not all) of these actions, it seeks stay relief out of an abundance of caution.

95.     As noted, the consequences of a default by the Mezz 1 Borrower or the Mortgage Borrower on their respective indebtedness would be devastating: due to the structural subordination of the Mezz 2 Loan to the Senior Loans—and the attendant increase in the claims of the Senior Lenders due to the imposition of fees, default interest, and other penalties in the event that defaults on the Senior Loans remain uncured—a default on the Senior Loans could severely impair the value of the Collateral and irretrievably harm the Debtor, its estate, and, ultimately, RREF.

### E.     Waiver of the Fourteen-Day Stay Under Bankruptcy Rule 4001(a)(3) Is Warranted

96.     Courts may waive the fourteen-day stay under Bankruptcy Rule 4001(a)(3) based upon the totality of the circumstances and as an equitable remedy. *See In re Eclair Bakery Ltd.,* 255 B.R. 121, 143 n.42 (Bankr. S.D.N.Y. 2000) (stay under Rule 4001(a)(3) waived due to debtor's unclean hands); *In re Soltzfus,* No. 09-11904bf, 2009 Bankr. LEXIS 2634, at *18-19

(Bankr. E.D. Pa. Mar. 30, 2009) (stay under Rule 4001(a)(3) waived due to debtor's improper filing of bankruptcy case).

97.     Here, the Debtor's bad faith filing of its chapter 11 case, where it clearly lacks any ability to effectively reorganize, combined with the risk to the value of RREF's collateral caused by threatened adverse actions beneath the Debtor in the GVS capital structure—*i.e.*, foreclosure on the Mortgage Loan or Mezz 1 Loan—all warrant a waiver of the fourteen-day stay.  Moreover, given that RREF was less than a day away from holding the Rescheduled UCC Sale and disposing of its Collateral (after protracted delays caused by the Debtor's objections to the commercial reasonability of that sale), it would be inequitable for RREF to be forced to wait any longer. Accordingly, RREF respectfully requests that the Court waive the fourteen-day stay period under Bankruptcy Rule 4001(a)(3).

## NOTICE

98.     Notice of this Motion has been provided to (a) counsel for the United States Trustee for the District of Delaware, (b) counsel for the Debtor, and (c) all parties who have filed appearances in the chapter 11 case.  RREF submits that no other or further notice is necessary under the circumstances.


[remainder of page left intentionally blank]

38415094.2

## CONCLUSION

For the foregoing reasons, RREF respectfully requests entry of an order (i) dismissing the above-captioned chapter 11 case pursuant to sections 1112(b) and/or 305(a) of the Bankruptcy Code, with prejudice, (ii) granting stay relief under sections 362(d)(1) and (d)(2) of the Bankruptcy Code, and (iii) granting such other relief as may be just and appropriate.

Dated: April 26, 2021
Wilmington, Delaware

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique Bair DiSabatino (DE Bar No. 6027)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Email: mark.minuti@saul.com
Email: monique.disabatino@saul.com

-and-

**MORRISON & FOERSTER LLP**
James M. Peck (*pro hac vice admission pending*)
Mark A. Lightner (*pro hac vice admission pending*)
Andrew Kissner
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Email: jpeck@mofo.com
Email: mlightner@mofo.com
Email: akissner@mofo.com

*Attorneys for RREF III Storage LLC*

38415094.2