IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x
In re:                                                             :    Chapter 11
                                                                   :
GVS Portfolio I B, LLC,                                            :    Case No. 21-10690 (CSS)
                                                                   :
               Debtor.[1]                                :
                                                                   :
                                                                   :
------------------------------------------------------------------ x

# DECLARATION OF RICHARD L. O'TOOLE

I, Richard L. O'Toole, hereby declare as follows:

1. I am a Vice President of Related Fund Management LLC, an affiliate of Movant RREF III Storage LLC ("RREF" or "Movant"). I am the Authorized Signatory of RREF.

2. I make this declaration in support of the Movant's *Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* (the "Motion"), which RREF has filed contemporaneously herewith, and in compliance with Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. I make this declaration based on personal knowledge of administration of the documents referenced herein, as well as my review of RREF's relevant business records currently in my possession, and if called to testify as a witness, I would testify under oath to these facts.

3. RREF is the owner of two loans to GVS Portfolio I B, LLC (the "Debtor"), the maturity date of which was and remains accelerated due to the Debtor's default. All obligations thereunder are due and payable.

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's taxpayer identification number, is as follows: GVS Portfolio I B, LLC (7171). The Debtor's mailing address is 814 Lavaca Street, Austin, TX 78701.

1

38414565.1

4. First, RREF is the owner of a $63 million mezzanine loan (the "Initial Mezz 2 Loan") originally extended to the Debtor by UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York ("UBS," and together with its successors and assigns, the "Lender") pursuant to a Mezzanine 2 Loan Agreement, dated as of November 30, 2018 (the "Mezz 2 Loan Agreement"), and evidenced by a Mezzanine 2 Promissory Note, dated as of November 30, 2018 (the "Mezz 2 Note"), made by the Debtor in favor of UBS.

5. Second, UBS assigned the Initial Mezz 2 Loan and Mezz 2 Note—including its rights and property representing, relating to, and arising therefrom—to Teachers Insurance Annuity Association of America ("TIAA") pursuant to that certain Mezzanine Assignment and Assumption Agreement, dated as of December 3, 2018.

6. Third, RREF is the owner of a $19 million loan (the "Mezz 2 Supplemental Loan") originally extended to the Debtor by TIAA pursuant to the Omnibus Amendment to Mezzanine 2 Loan Documents ("Omnibus Amendment"), as evidenced by a Supplemental Promissory Note (Mezzanine 2 Loan), dated as of January 7, 2019 (the "Supplemental Promissory Note"). The Initial Mezz 2 Loan and Mezz 2 Supplemental Loan, in the aggregate outstanding principal amount of $82 million, are collectively referred to herein as the "Mezz 2 Loan."

7. RREF purchased the Mezz 2 Loan on March 8, 2021, and TIAA assigned RREF all of the rights flowing from the Mezz 2 Loan Documents, as defined below.

8. The Debtor defaulted on the Mezz 2 Loan in December 6, 2019. RREF intended to dispose of the collateral pledged to secure the loan—indirect equity interest in 64 self-storage facilities—by auctioning off the collateral via a judicially-approved UCC foreclosure sale. The sale was scheduled to occur at 10 a.m. on April 12, 2021. Less than one hour before the sale was scheduled to commence, however, the Debtor initiated the instant proceedings. The

foreclosure sale is delayed indefinitely in light of the automatic stay that was triggered by the Debtor's filing.

9.  The Mezz 2 Loan remains in default, with an outstanding balance including principal, interest, late payment charges, and all other sums due, including costs and expenses of enforcement as of April 16, 2020, of more than $99 million and growing each day (the "Debt").

**Overview of the Debtor**

10. Upon information and belief, the Debtor is not an operating company and does not have an ongoing business operation or employees. The Debtor was established as a special-purpose entity within a corporate structure, the only business purpose of which is to hold the collateral securing the Mezz 2 Loan.

11. Upon information and belief, the Debtor's sole asset is a 100% membership interest in the next most senior mezzanine borrower, known as GVS Portfolio I, LLC ("GVS Portfolio I"). A true and accurate copy of the Mezz 2 Loan Agreement is attached hereto as Exhibit 1. The Debtor pledged its equity interest in GVS Portfolio I to RREF, which is the Debtor's only secured creditor. A true and accurate copy of the Pledge and Security Agreement to the Mezz 2 Loan Agreement is attached hereto as Exhibit 2. Upon information and belief, non-debtor GVS Portfolio I owns a 100% of the limited liability company membership interest in 12 limited liability companies,[2] each a Delaware limited liability company (collectively, the "Property Owners"). *See* Exhibit 1. The Property Owners own a portfolio of 64 self-storage facilities, branded as Great Value Storage, located in Colorado, Illinois, Indiana, Missouri, Mississippi, Nevada, New York, Ohio, Tennessee, and Texas (the "Properties"). *See id.*

---

[2] These 12 LLCs are: GVS Colorado Holdings I, LLC; GVS Illinois Holdings I, LLC; GVS Indiana Holdings I, LLC; GVS Missouri Holdings I, LLC; WC Mississippi Storage Portfolio I, LLC; GVS Nevada Holdings I, LLC; GVS New York Holdings I, LLC; GVS Ohio Holdings I, LLC; GVS Ohio Holdings II, LLC; GVS Tennessee Holdings I, LLC; GVS Texas Holdings I, LLC; and GVS Texas Holdings II, LLC. *See* Exhibit 1.

38414565.1

12. Upon information and belief, Natin Paul is the President and indirect owner of both Debtor and GVS Portfolio I.

13. Upon information and belief, the below chart illustrates the Debtor's position within the larger corporate structure:



### The Loans

14. Upon information and belief, UBS originated three loans to the Debtor and affiliated non-debtor entities: a mortgage loan and two mezzanine loans.

38414565.1

15. Upon information and belief, UBS originated the mortgage loan (the "Mortgage Loan") to the twelve non-debtor Property Owners pursuant to the Mortgage Loan Agreement. The Mortgage Loan, which is secured by a first priority mortgage security interest in the Properties, is currently held by Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C15 Commercial Mortgage Pass-Through Certificates, Series 2018-C15 (the "Mortgage Loan Lender"). Midland Loan Services, a division of PNC Bank, National Association, is the servicer on behalf of the Mortgage Loan Lender (the "Servicer"). A true and accurate copy of the Mortgage Loan is attached hereto as Exhibit 3.

16. Upon information and belief, pursuant to the Mezzanine 1 Loan Agreement (the "Mezz 1 Loan Agreement"), UBS originated the "Initial Mezz 1 Loan" to GVS Portfolio I (the "Borrower"), which itself owns 100% of the membership interests in the Property Owners. The Initial Mezz 1 Loan, which is secured by the Borrower's interests in the Property Owners, is currently held by ESS-GV Holdings LLC (the "Mezz 1 Lender", and together with the Mortgage Loan Lender, the "Senior Lenders"). A true and accurate copy of the Mezz 1 Loan Agreement is attached hereto as Exhibit 4. Upon information and belief, the Initial Mezz 1 Loan is evidenced by various Promissory Notes (the "Notes") made by the Debtor in favor of UBS. A true and accurate copy of the Notes is attached hereto as Exhibit 5.

17. Upon information and belief, UBS also originated a second mezzanine loan, the "Initial Mezz 2 Loan", to the Debtor, which itself owns 100% of the membership interests in the Borrower. The Initial Mezz 2 Loan is secured by the Debtor's interests in the Borrower. The Initial Mezz 2 Loan is governed by the Mezzanine 2 Loan Agreement dated as of November 30, 2018. *See* Exhibit 1 (Mezz 2 Loan Agreement). The Debtor's obligations under the Mezz 2 Loan

Agreement are evidenced by that certain Mezz 2 Note, dated as of November 30, 2018. A true and accurate copy of the Mezz 2 Note is attached hereto as Exhibit 6. A true and accurate copy of the Note Allonge, dated as of December 3, 2018, is attached hereto as Exhibit 7.

18. Upon information and belief, the respective rights, remedies, and obligations of the Mortgage Loan Lender, Mezz 1 Lender, and RREF—including the relative payment and collateral priorities with respect to the loans to which all of the lenders are a party—are governed by, among other things, that certain Intercreditor Agreement, dated as of November 30, 2018 (as amended, restate, or otherwise modified from time to time, the "Intercreditor Agreement"), and the Cash Management Agreement, dated as of November 30, 2018, as amended by that certain Amendment to Cash Management Agreement, dated as of January 8, 2020 (as the same may be further amended, restate, or otherwise modified from time to time, the "Cash Management Agreement"). A true and correct copy of the Intercreditor Agreement is attached hereto as Exhibit 8. A true and correct copy of the Cash Management Agreement is attached hereto as Exhibit 9.

19. Upon information and belief, and shortly after the Initial Mezz 2 Loan was made, UBS assigned the Mezz 2 Loan and Mezz 2 Note—including its rights and property representing, relating to, and arising therefrom—to TIAA pursuant to that certain Mezzanine Assignment and Assumption Agreement (Mezz 2 Loan), dated as of December 3, 2018. A true and correct copy of the Mezzanine Assignment and Assumption Agreement (Mezz 2 Loan) between UBS and TIAA is attached hereto as Exhibit 10. The assignment of the Mezz 2 Loan and the Mezz 2 Note is expressly permitted by Section 9.1(a) of the Mezz 2 Loan Agreement. Exhibit 1 § 9.1(a)(i), (ii) ("Lender shall have the right, at any time and from time to time, (i) to sell or otherwise transfer the Mezz 2 Loan as a whole loan or sell or otherwise transfer any portion thereof

or any interest therein, [and] (ii) to sell participation interests in the Loan[.]"). By Note Allonge dated December 3, 2018, UBS transferred its right to payment under the Mezz 2 Note by endorsing the Mezz 2 Note in favor of TIAA. *See* Exhibit 7.

20. Upon information and belief, TIAA made the $19 million Mezz 2 Supplemental Loan to the Debtor pursuant to the Omnibus Amendment and as evidenced by the Supplemental Promissory Note. A true and accurate copy of the Omnibus Amendment and Supplemental Promissory Note are attached hereto as Exhibits 11 and 12, respectively. The Omnibus Amendment incorporates the terms of the Mezz 2 Loan Agreement and defines the Mezz 2 Loan as the aggregate principal amount of $82 million (*i.e.*, $63 million plus $19 million). Exhibit 11 ¶ 1.3. The Omnibus Amendment ratified all terms, covenants, and provisions of the Mezz 2 Loan Agreement and Mezz 2 Note, and the Mezz 2 Guaranty, as defined below. *Id.* at ¶ 1.9.

21. On March 8, 2021, RREF executed a Mezzanine Assignment and Assumption Agreement with TIAA (the "Assignment") and acquired all of TIAA's rights and interests in the Mezz 2 Loan. A true and accurate copy of the Assignment is attached hereto as Exhibit 13. Pursuant to the Assignment, TIAA assigned to RREF "all of its right, title, and interest in and to . . . the Notes, the Loan, the Loan Agreement and the other Loan Documents." Exhibit 13 ¶ 2. Loan Documents is defined to include the Omnibus Amendment and the Mezz 2 Guaranty, defined below, among others documents. By two Note Allonges, dated March 8, 2021, TIAA transferred its right to payment under the Mezz 2 Note and Supplemental Promissory Note by endorsing them in favor of RREF. A true and accurate copy of the March 8, 2021 Note Allonges are attached hereto as Exhibits 14 and 15.

38414565.1

**Paul's Personal Guaranty of the Mezz 2 Loan**

22. Paul irrevocably guaranteed payment and performance to Lender of the Guaranteed Obligations, defined below, pursuant to a Guaranty of Recourse Obligations (Mezz 2 Loan), dated as of November 30, 2018 (the "Mezz 2 Guaranty"), whereby he irrevocably and unconditionally guaranteed to Lender, and its successors and assigns, payment and performance of the Guaranteed Obligations (as defined in the Mezz 2 Guaranty) as a primary obligor. A true and accurate copy of the Mezz 2 Guaranty is attached hereto as Exhibit 16.

23. RREF purchased the Mezz 2 Loan and all other amounts due and payable with respect with the Mezz 2 Loan. Pursuant to the Assignment by which RREF acquired the Mezz 2 Loan, RREF has acquired all of the rights flowing from all of the Mezz 2 Loan Documents, which include the Mezz 2 Guaranty.

24. Paul's obligation under the Mezz 2 Guaranty to pay the outstanding Mezz 2 Loan Debt became irrevocable and unconditional upon the Debtor's filing of the voluntary petition for bankruptcy on April 12, 2021. Exhibit 16 § 1.1 (b). The Debt guaranteed by Paul includes the outstanding Mezz 2 Loan principal, interest, late payment charges, and all other sums due, including costs and expenses of enforcement.

25. The obligations that are guaranteed pursuant to the Mezz 2 Guaranty (referred to therein as the "Guaranteed Obligations") include, "from and after the date that any Springing Recourse Event occurs, payment of the entire Debt." Exhibit 16 § 1.1(b). The Mezz 2 Loan Agreement defines "Debt" to mean the "[o]utstanding [p]rincipal [b]alance, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the [Mezz 2 Loan] under this [Mezz 2 Loan] Agreement or any other Loan Document." Exhibit 1 § 1.1. The

Mezz 2 Guaranty incorporates by reference the definition of "Springing Recourse Event" from the Mezz 2 Loan Agreement, which definition is described more fully in paragraph 25 below.

26. Under the Mezz 2 Loan Agreement, the Debt shall be fully recourse to the Debtor upon the occurrence of certain "Springing Recourse Events." Exhibit 1 § 11.22(b)(ii). The Mezz 2 Loan Agreement expressly provides that a Springing Recourse Event has occurred where the Debtor "files a voluntary petition, case or proceeding under any applicable Bankruptcy Law." Exhibit 1 § 11.22(b)(ii)(D). The Mezz 2 Guaranty further provides that, from and after the date that any Springing Recourse Event occurs—such as the Debtor's filing a voluntary petition for bankruptcy—the Guaranteed Obligations means "payment of the entire Debt." Exhibit 16 § 1.1(b).

### The Loans are in Default

27. The Mezz 2 Loan Agreement provides that the Debtor's failure to pay its monthly Debt Service payment of the Mezz 2 Loan shall constitute an "Event of Default":

> (i)(A) [I]f any monthly Debt Service, any monthly deposit of Reserve Funds or the payment due on the Maturity Date is not paid when due or (B) if any other portion of the Debt is not paid when due; provided that, with respect to this clause (B), such non-payment continues for five (5) days following notice to Borrower that the same is due and payable.

Exhibit 1 § 10.1(a)(i). Upon information and belief, on December 6, 2019, the Debtor failed to make its monthly Debt Service payment under the Mezz 2 Loan Agreement. *See* Exhibit 17.

28. The Mezz 2 Loan Agreement further provides that, "[u]pon the occurrence and during the continuance of an Event of Default . . . , Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and

9

enforced its rights against Borrower and in and to the collateral, including, without limitation, declaring the Debt to be immediately due and payable." Exhibit 1 § 10.1(b).

29.     Upon information and belief, on December 6, 2019, TIAA provided the Debtor with notice that an Event of Default had occurred by virtue of the Debtor's failure to pay its monthly Debt Service on the Mezz 2 Loan by 3:00 p.m. on December 6, 2019.  A true and accurate copy of the December 6, 2019 Notice of Default is attached hereto as Exhibit 17.  The notice informed the Debtor that, in light of the Events of Default, "Mezzanine 2 Lender hereby accelerates the Mezzanine 2 Loan and declares the Mezzanine 2 Loan to be immediately due and payable in full."  Exhibit 17, at 2.

30.     The Debtor, therefore, has been in default on the Mezz 2 Loan since December 6, 2019.  As of April 16, 2021, the Debt stands at $99,396,687.72, comprising an aggregate principal amount of $82 million plus $595,525.00 in interest accruing at 8.715%; $14,084,080.17 in default interest accruing at 13.715% from the date of the Debtor's default on December 6, 2019 and late payment charges; $1,153,244.46 in protective advances; and $1,563,838.09 in costs and expenses related to enforcement of the Mezz 2 Loan.

31.     The Mezz 2 Loan Agreement, as amended by the Omnibus Amendment, provides "that, and for so long as, any Event of Default has occurred and remains outstanding" the principal balance shall accrue interest at the Default Rate of 13.715%.  Exhibits 1 § 2.3.4 and 9 § 1.1.

32.     The Debtor's default was also a "Cash Management Trigger Event" under the Mortgage Loan Agreement.  *See* Exhibit 3 § 1.1.  This triggering event caused certain provisions to take effect, including the requirement that the Property Owners are required to remit monthly payments into a designated "Cash Management Account" held at PNC Bank, N.A. from

38414565.1

and after the occurrence of a Cash Management Trigger Event. *Id.* at § 2.7.2 (b). The Cash Management Account contains various sub-accounts for the benefit of the creditors, including a Mezzanine 2 Debt Service Subaccount. *Id.* at § 2.1. Moreover, and upon information and belief, as of the Petition Date, there was $0 on deposit in the Mezz 2 Subaccount.

33. Upon information and belief, on July 16, 2020, TIAA exercised its rights under Section 4 of that certain Subordination of Management Agreement and provided notice to the Debtor and Great Value Storage, LLC, (the "Property Manager"), of its election to terminate the Property Manager at the properties, effective immediately. Under the Subordination of Management Agreement, the Debtor was contractually required to appoint a "Qualified Manager" to replace the Property Manager, but despite TIAA's repeated demands, the Debtor failed to do so. A true and correct copy of the July 16, 2020 notice is attached hereto as Exhibit 25.

34. On April 5, 2021, counsel for the Servicer delivered to RREF a copy of a notice of event of default by the Property Owners under the Mortgage Loan (the "Mortgage Loan Default Notice"), a true and correct copy of which is attached hereto as Exhibit 18. RREF sent the Property Owners a demand notice with instructions to cure the defaults shortly after the Mortgage Loan Default Notice (the "Demand Notice"), a true and correct copy of which is attached hereto as Exhibit 19. RREF, however, cannot perform the required repairs until a foreclosure occurs, and the financial reporting defaults are otherwise personal defaults and therefore not susceptible to cure by RREF.

**The Debtor's Prepetition Attempts to Avoid UCC Foreclosure**

35. On or about August 27, 2020, the Debtor commenced an action in the Supreme Court of the State of New York, County of New York, against TIAA seeking to enjoin TIAA's scheduled auction of the Mezz 2 Collateral at a UCC foreclosure sale on September 3,

2020. On September 18, 2020, the New York State court granted the Debtor's motion for a preliminary injunction and ordered the Debtor and TIAA to meet and confer regarding a revised schedule and proposed terms for the sale, and to submit a stipulation setting forth the terms of the agreement, a true and correct copy of which is attached hereto as Exhibit 20.

36. Upon information and belief, counsel for the Debtor and TIAA entered into that certain Stipulation Regarding Terms of UCC Sale, Notice of UCC Sale, and Confidentiality Agreement (the "Sale Stipulation"), a true and correct copy of which is attached hereto as Exhibit 21. The New York State court "so-ordered" the Sale Stipulation in October 2020 and rescheduled the UCC foreclosure sale for March 10, 2021.

37. On March 9, 2021, one day prior to the sale, the Debtor sought a temporary restraining order from the New York State Court and later sought a preliminary injunction against RREF and a further adjournment of the sale to June 8, 2021. The New York State Court denied injunctive relief on March 30, 2021, finding that the Debtor's arguments were without merit. A true and correct copy of the Court's Order is attached hereto as Exhibit 22.

38. The Mezz 2 Collateral was scheduled to be sold pursuant to the UCC on April 12, 2021 at 10:00 a.m.

### The Debtor's Bankruptcy Filing

39. On April 12, 2021, before the Collateral sale occurred, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, thwarting the UCC foreclosure. A true and correct copy of the Debtor's Petition is attached hereto as Exhibit 23. Paul signed the bankruptcy petition on behalf of the Debtor. *See* Exhibit 23.

40. The Debtor's initiation of chapter 11 proceedings and invocation of the automatic stay is causing irreparable harm to RREF, the Debtor's only secured creditor. The Mezz 2 Loan is secured by Debtor's sole asset: a 100% equity ownership interest in GVS Portfolio I, which is in turn the owner of a 100% membership interest in twelve other LLCs that own 64 self-storage facilities. These facilities compose the basis of any value flowing up to the Debtor. Creditors of these non-debtor subsidiary entities, however, are unaffected by the restrictions of the automatic stay. Such creditors are therefore free to take action to enforce their rights against these non-debtor entities that will harm the value of the estate to RREF's detriment.

### **RREF's Guaranty Action**

41. Shortly after the Debtor's bankruptcy filing, RREF invoked its rights under the Mezz 2 Guaranty and commenced an action against Paul in New York State Court, a true and correct copy of which is attached hereto as Exhibit 24.

42. Under the terms of the Mezz 2 Guaranty, the Debtor's bankruptcy filing constitutes a Springing Recourse Event which obligates Paul to pay the entire Debt owed to RREF, Exhibit 1 § 1.1(b), meaning the outstanding balance including principal, interest, late payment charges, and all other sums due, including costs and expenses of enforcement, Exhibit 1, at 6.

43. The Guaranty Action remains pending and seeks payment from Paul of the full amount due and owing to RREF on account of the Mezz 2 Loan.

### **The Portfolio**

44. Upon information and belief, the portfolio of 64 self-storage facilities is worth approximately $325 million and likely does not account for any claims that unsecured creditors may have against the Mortgage Borrowers or Mezz 1 Borrower, which are structurally senior to the Debtor's interest in the Mezz 1 Borrower, or the imposition of fees, costs,

default interest, and other penalties in favor of the Senior Lenders.  RREF is aware of certain state tax liens and mechanics' liens that encumber the portfolio, and these claims exceed $1.5 million.

## Amounts Due and Owing

45. As of April 16, 2021, the principal, interest due, fees for late payment, and costs and expenses total $99,396,687.72.  This amount comprises an aggregate principal amount of $82 million plus $595,525.00 in interest accruing at 8.715%, $14,084.080.17 in default interest accruing at 13.715% from the date of the Debtor's default on December 6, 2019 and late payment charges, $1,153,244.46 in protective advances, and $1,563,838.09 in costs and expenses related to enforcement of the Mezz 2 Loan.

[*Signature block on next page*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:    April 26, 2021
         New York, New York

*Richard L. O'Toole* (signature)

Richard L. O'Toole