# Exhibit 4

# MEZZANINE 1 LOAN AGREEMENT

Dated as of November 30, 2018

Between

GVS PORTFOLIO I, LLC,
as Borrower

and

UBS AG, BY AND THROUGH ITS BRANCH OFFICE
AT 1285 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK,
as Lender

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ........................................... 2

    Section 1.1.    Definitions.................................................................................................. 2
    Section 1.2.    Principles of Construction......................................................................... 27

ARTICLE II. THE LOAN ................................................................................................. 28

    Section 2.1.    The Loan. .................................................................................................. 28
        2.1.1        Agreement to Lend and Borrow ............................................................... 28
        2.1.2        Single Disbursement to Borrower ............................................................ 28
        2.1.3        The Note.................................................................................................... 28
        2.1.4        Use of Proceeds........................................................................................ 28
    Section 2.2.    Interest Rate. ............................................................................................ 28
        2.2.1        Interest Rate ............................................................................................. 28
        2.2.2        Default Rate ............................................................................................. 28
        2.2.3        Interest Calculation .................................................................................. 29
        2.2.4        Usury Savings .......................................................................................... 29
    Section 2.3.    Loan Payments. ........................................................................................ 29
        2.3.1        Payment Before Maturity Date ................................................................ 29
        2.3.2        Intentionally Omitted. .............................................................................. 29
        2.3.3        Payment on Maturity Date ....................................................................... 29
        2.3.4        Late Payment Charge ............................................................................... 29
        2.3.5        Method and Place of Payment. ................................................................. 30
    Section 2.4.    Prepayments............................................................................................. 30
        2.4.1        Voluntary Prepayments............................................................................ 30
        2.4.2        Liquidation Events; Mandatory Prepayments.......................................... 30
        2.4.3        Prepayments After Default ...................................................................... 31
        2.4.4        Prepayment Prior to Defeasance Lockout Expiration Date ...................... 32
    Section 2.5.    Defeasance. .............................................................................................. 33
        2.5.1        Conditions to Defeasance. ....................................................................... 33
        2.5.2        Defeasance Collateral Account................................................................ 39
        2.5.3        Successor Borrower ................................................................................. 39
    Section 2.6.    Release of Collateral. ............................................................................... 40
        2.6.1        Release of Collateral................................................................................ 40
        2.6.2        Release on Payment in Full...................................................................... 40
    Section 2.7.    Clearing Account/Cash Management Account/Cash Management............... 40
        2.7.1        Clearing Account ..................................................................................... 40
        2.7.2        Cash Management Account. ..................................................................... 41
        2.7.3        Cash Management. .................................................................................... 41
        2.7.4        Borrower Distributions ............................................................................ 42
        2.7.5        Payments Received Under this Agreement............................................... 42

ARTICLE III. REPRESENTATIONS AND WARRANTIES.................................................. 43

    Section 3.1.    Borrower Representations......................................................................... 43

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 3.1.1 | Organization | 43 |
| 3.1.2 | Proceedings | 44 |
| 3.1.3 | No Conflicts | 44 |
| 3.1.4 | Litigation | 44 |
| 3.1.5 | Agreements | 44 |
| 3.1.6 | Consents | 45 |
| 3.1.7 | Title | 45 |
| 3.1.8 | No Plan Assets | 45 |
| 3.1.9 | Compliance | 45 |
| 3.1.10 | Financial Information | 46 |
| 3.1.11 | Condemnation | 46 |
| 3.1.12 | Affiliates | 46 |
| 3.1.13 | No Contractual Obligations | 46 |
| 3.1.14 | Intentionally Omitted. | 46 |
| 3.1.15 | Enforceability | 46 |
| 3.1.16 | Intentionally Omitted. | 46 |
| 3.1.17 | Insurance | 46 |
| 3.1.18 | Licenses | 47 |
| 3.1.19 | Intentionally Omitted. | 47 |
| 3.1.20 | Intentionally Omitted. | 47 |
| 3.1.21 | Intentionally Omitted. | 47 |
| 3.1.22 | Leases | 47 |
| 3.1.23 | Filing, Recording and Other Taxes | 47 |
| 3.1.24 | Single Purpose. | 48 |
| 3.1.25 | Tax Filings | 54 |
| 3.1.26 | Solvency | 55 |
| 3.1.27 | Federal Reserve Regulations | 55 |
| 3.1.28 | Organizational Chart | 55 |
| 3.1.29 | Bank Holding Company | 55 |
| 3.1.30 | No Other Debt | 55 |
| 3.1.31 | Investment Company Act | 55 |
| 3.1.32 | Intentionally Omitted. | 55 |
| 3.1.33 | No Bankruptcy Filing | 56 |
| 3.1.34 | Full and Accurate Disclosure | 56 |
| 3.1.35 | Foreign Person | 56 |
| 3.1.36 | No Change in Facts or Circumstances; Disclosure | 56 |
| 3.1.37 | Management Agreement | 56 |
| 3.1.38 | Cash Management | 56 |
| 3.1.39 | Residential Units | 57 |
| 3.1.40 | Intentionally Omitted. | 57 |
| 3.1.41 | Patriot Act. | 57 |
| 3.1.42 | Intentionally Omitted. | 57 |
| 3.1.43 | No Casualty | 57 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 3.1.44 | Purchase Options | 57 |
| 3.1.45 | Use of Property | 57 |
| 3.1.46 | Fiscal Year | 57 |
| 3.1.47 | Material Agreements | 57 |
| 3.1.48 | Other Obligations and Liabilities | 58 |
| 3.1.49 | Illegal Activity | 58 |
| 3.1.50 | Underwriting Representations | 58 |
| 3.1.51 | Employees | 59 |
| 3.1.52 | Mortgage Loan Representations and Warranties | 59 |
| Section 3.2. | Survival of Representations. | 59 |
| ARTICLE IV. BORROWER COVENANTS | | 59 |
| Section 4.1. | Borrower Affirmative Covenants. | 59 |
| 4.1.1 | Existence; Compliance with Legal Requirements | 59 |
| 4.1.2 | Taxes and Other Charges | 60 |
| 4.1.3 | Litigation | 61 |
| 4.1.4 | Access to Property | 61 |
| 4.1.5 | Further Assurances; Supplemental Mortgage Affidavits | 61 |
| 4.1.6 | Financial Reporting. | 62 |
| 4.1.7 | Title to Property | 65 |
| 4.1.8 | Estoppel Statement. | 65 |
| 4.1.9 | Leases. | 65 |
| 4.1.10 | Alterations | 68 |
| 4.1.11 | Net Liquidation Proceeds After Debt Service | 69 |
| 4.1.12 | Material Agreements | 69 |
| 4.1.13 | Performance by Borrower | 70 |
| 4.1.14 | Costs of Enforcement/Remedying Defaults | 70 |
| 4.1.15 | Business and Operations | 70 |
| 4.1.16 | Use of Proceeds | 70 |
| 4.1.17 | Intentionally Omitted. | 70 |
| 4.1.18 | Handicap Access. | 70 |
| 4.1.19 | Additional Reports | 71 |
| 4.1.20 | Notice of Certain Events | 71 |
| 4.1.21 | Further Assurances; Power of Attorney | 71 |
| 4.1.22 | Taxes on Security | 71 |
| 4.1.23 | Intentionally Omitted. | 71 |
| 4.1.24 | Intentionally Omitted. | 71 |
| 4.1.25 | Patriot Act Compliance | 71 |
| 4.1.26 | Special Distributions | 72 |
| Section 4.2. | Borrower Negative Covenants. | 72 |
| 4.2.1 | Liens | 72 |
| 4.2.2 | Dissolution | 73 |
| 4.2.3 | Change in Business | 73 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 4.2.4 | Debt Cancellation | 73 |
| 4.2.5 | Affiliate Transactions | 73 |
| 4.2.6 | Zoning | 73 |
| 4.2.7 | Assets | 74 |
| 4.2.8 | No Joint Assessment | 74 |
| 4.2.9 | Principal Place of Business | 74 |
| 4.2.10 | ERISA. | 74 |
| 4.2.11 | Material Agreements | 74 |
| 4.2.12 | Change of Name, Identity, Structure or State of Organization | 75 |
| 4.2.13 | Special Purpose | 75 |
| 4.2.14 | Prohibited Person | 75 |
| 4.2.15 | Residential Units | 76 |
| 4.2.16 | No Contractual Obligations | 76 |
| 4.2.17 | Limitation on Securities Issuances | 76 |
| 4.2.18 | Limitations on Distributions. | 76 |
| 4.2.19 | Other Limitations | 76 |

ARTICLE V. INSURANCE, CASUALTY AND CONDEMNATION ... 76

| | | |
|---|---|---|
| Section 5.1. | Insurance. | 76 |
| Section 5.2. | Casualty and Condemnation. | 77 |
| 5.2.1 | Casualty | 77 |
| 5.2.2 | Condemnation | 78 |
| Section 5.3. | Restoration | 78 |

ARTICLE VI. RESERVE FUNDS AND CASH MANAGEMENT ... 79

| | | |
|---|---|---|
| Section 6.1. | Required Repair Funds. | 79 |
| Section 6.2. | Tax Funds. | 79 |
| Section 6.3. | Insurance Funds. | 80 |
| Section 6.4. | Capital Expenditure Funds. | 80 |
| Section 6.5. | Financial Test Cure Funds. | 80 |
| Section 6.6. | Mezzanine Loan Excess Cash Flow Funds. | 81 |
| 6.6.1 | Deposits of Mezzanine Loan Excess Cash Flow Funds | 81 |
| 6.6.2 | Release of Mezzanine Loan Excess Cash Flow Funds. | 81 |
| Section 6.7. | Excess Cash Flow Funds. | 81 |
| Section 6.8. | Reserve Funds. | 81 |
| 6.8.1 | Security Interest | 81 |
| 6.8.2 | Investments; Income Taxes | 82 |
| 6.8.3 | Indemnity | 82 |
| 6.8.4 | Transfer of Funds In Mortgage Reserve Accounts | 82 |
| Section 6.9. | Provisions Regarding Letters of Credit. | 82 |
| 6.9.1 | Event of Default | 82 |
| 6.9.2 | Security for Debt | 83 |
| 6.9.3 | Limitations on Letters of Credit | 83 |

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 6.9.4 | Additional Rights of Lender | 83 |
| **ARTICLE VII. PROPERTY MANAGEMENT** | | 83 |
| Section 7.1. | Management Agreement. | 83 |
| Section 7.2. | Prohibition Against Termination or Modification. | 84 |
| Section 7.3. | Replacement of Manager. | 84 |
| **ARTICLE VIII. TRANSFERS** | | 85 |
| Section 8.1. | Transfers Generally. | 85 |
| Section 8.2. | Transfers of Interests in Restricted Parties. | 86 |
| Section 8.3. | Loan Assumption. | 90 |
| Section 8.4. | Additional Permitted Debt. | 92 |
| **ARTICLE IX. SALE AND SECURITIZATION OF MORTGAGE** | | 94 |
| Section 9.1. | Sale of Mortgage and Securitization. | 94 |
| Section 9.2. | Securitization Indemnification. | 98 |
| **ARTICLE X. DEFAULTS** | | 101 |
| Section 10.1. | Event of Default. | 101 |
| Section 10.2. | Remedies. | 104 |
| Section 10.3. | Right to Cure Defaults. | 106 |
| Section 10.4. | Remedies Cumulative. | 106 |
| **ARTICLE XI. MISCELLANEOUS** | | 106 |
| Section 11.1. | Successors and Assigns. | 106 |
| Section 11.2. | Lender's Discretion. | 106 |
| Section 11.3. | Governing Law. | 107 |
| Section 11.4. | Modification, Waiver in Writing. | 108 |
| Section 11.5. | Delay Not a Waiver. | 108 |
| Section 11.6. | Notices. | 109 |
| Section 11.7. | Trial by Jury. | 110 |
| Section 11.8. | Headings. | 110 |
| Section 11.9. | Severability. | 110 |
| Section 11.10. | Preferences. | 110 |
| Section 11.11. | Waiver of Notice. | 111 |
| Section 11.12. | Remedies of Borrower. | 111 |
| Section 11.13. | Expenses; Indemnity. | 111 |
| Section 11.14. | Schedules Incorporated. | 112 |
| Section 11.15. | Offsets, Counterclaims and Defenses. | 112 |
| Section 11.16. | No Joint Venture or Partnership. | 113 |
| Section 11.17. | Publicity. | 113 |
| Section 11.18. | Waiver of Marshalling of Assets. | 113 |
| Section 11.19. | Waiver of Offsets/Defenses/Counterclaims. | 113 |
| Section 11.20. | Conflict; Construction of Documents; Reliance. | 113 |

# TABLE OF CONTENTS
(continued)

**Page**

Section 11.21. Brokers and Financial Advisors.................................................. 114
Section 11.22. Exculpation. ........................................................................... 114
Section 11.23. Prior Agreements. ................................................................... 119
Section 11.24. Servicer. ................................................................................ 120
Section 11.25. Intentionally Omitted. ............................................................. 121
Section 11.26. Creation of Security Interest. .................................................... 121
Section 11.27. Uncross of Properties. ............................................................. 121
Section 11.28. Set-Off................................................................................... 122
Section 11.29. Component Notes. ................................................................... 122
Section 11.30. Intentionally Omitted. ............................................................. 123
Section 11.31. Approvals; Third Parties; Conditions. ........................................ 123
Section 11.32. Limitation on Liability of Lender's Officers, Employees, etc.......... 123
Section 11.33. Certain Additional Rights of Lender (VCOC).............................. 123
Section 11.34. Acknowledgment and Consent to Bail-In of EEA Financial
                Institutions................................................................................ 124
Section 11.35. Intercreditor Agreement............................................................ 125
Section 11.36. Waiver of Rights, Defenses and Claims ...................................... 126
Section 11.37. Discussions with Mortgage Lender ........................................... 126
Section 11.38. Independent Approval Rights .................................................... 126
Section 11.39. Direction of Mortgage Borrower or with Respect to the Property .............. 126
Section 11.40. Compliance with Mortgage Loan Documents ............................. 127
Section 11.41. Mortgage Loan Defaults. .......................................................... 127
Section 11.42. Mortgage Loan Estoppels ........................................................ 128
Section 11.43. No Amendments to Mortgage Loan Documents ......................... 129
Section 11.44. Acquisition of the Mortgage Loan. ............................................ 129
Section 11.45. Refinancing or Prepayment of the Mortgage Loan...................... 130
Section 11.46. Deed in Lieu of Foreclosure ..................................................... 130
Section 11.47. Conversion to Registered Form ................................................. 130

## SCHEDULES

Schedule 1:            List of Mortgage Borrowers
Schedule 2:            Allocated Loan Amounts
Schedule 2.5.1         Houston and Dallas Metropolitan Area Properties
Schedule 3.1.28:       Organizational Chart
Schedule 6.1.1-1:      Required Repairs
Schedule 6.1.1-2:      Individual Properties to be Re-Striped
Schedule 9.1(b):       Updated Information

## MEZZANINE 1 LOAN AGREEMENT

**THIS MEZZANINE 1 LOAN AGREEMENT**, dated as of November 30, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **UBS AG**, by and through its branch office at 1285 Avenue of the Americas, New York, New York, a U.S. branch of a Swiss banking corporation, having an address at 1285 Avenue of the Americas, New York, New York 10019 (together with its successors and assigns, collectively, "**Lender**"), and **GVS PORTFOLIO I, LLC**, a Delaware limited liability company, having an address c/o Great Value Storage, 401 Congress Avenue, Austin, Texas 78701 (together with its permitted successors and assigns, collectively, "**Borrower**").

All capitalized terms used herein shall have the respective meanings set forth in <u>Article I</u> hereof.

### W I T N E S S E T H :

**WHEREAS**, UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, in its capacity as mortgage lender ("**Mortgage Lender**"), has made a mortgage loan in the original principal amount of $110,000,000.00 (the "**Mortgage Loan**") to the entities identified on <u>Schedule 1</u> attached hereto (collectively, "**Mortgage Borrower**"), pursuant to that certain Loan Agreement, dated as of the date hereof, by and among Mortgage Borrower and Mortgage Lender (as amended, supplemented or otherwise modified from time to time, the "**Mortgage Loan Agreement**"), and secured by, among other things, certain mortgages and deeds of trust, each dated as of the date hereof and made by Mortgage Borrower in favor of Mortgage Lender (as amended, supplemented or otherwise modified from time to time, individually or collectively, as the context may require, the "**Security Instrument**"), pursuant to which Mortgage Borrower has granted to Mortgage Lender a first priority security interest on, among other things, the Property (as hereinafter defined);

WHEREAS, Borrower is the legal and beneficial owner of all of the equity interests in Mortgage Borrower, consisting of 100% of the limited liability company interests therein;

**WHEREAS**, Borrower desires to obtain the Loan from Lender;

**WHEREAS**, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Borrower has entered into that certain Pledge and Security Agreement (Mezzanine 1 Loan), dated as of the date hereof, in favor of Lender (as amended, supplemented or otherwise modified from time to time, the "**Pledge Agreement**"), pursuant to which Borrower has granted to Lender a first priority security interest in the Collateral (as hereinafter defined) as collateral security for the Debt (as hereinafter defined); and

**WHEREAS**, subject to and in accordance with the terms and conditions of this Agreement and the other Loan Documents and based upon the representations, warranties, covenants and undertakings of Borrower herein and therein contained, Lender is willing to make the Loan to Borrower.

**NOW, THEREFORE**, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## ARTICLE I.
## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

### Section 1.1.    Definitions.

For all purposes of this Agreement, except as otherwise expressly provided:

"**Acceptable Accountant**" shall mean any "Big Four" accounting firm, Maxwell Locke & Ritter, BDO, RSM, or any other independent certified public accountant reasonably acceptable to Lender.

"**Acceptable Accounting Basis**" shall mean GAAP, income tax basis or such other accounting basis reasonably acceptable to Lender, which accounting basis is utilized by Borrower and Guarantor for the purposes of financial reporting in accordance with this Agreement and the other Loan Documents; provided that such accounting basis shall be consistently applied throughout the periods covered by the applicable financial statements and reports.

"**Accounts**" shall mean, collectively, the Mezzanine Deposit Account, the Mezzanine Loan Excess Cash Flow Account and any other account now or hereafter established by this Agreement or the other Loan Documents.

"**Act**" shall have the meaning set forth in Section 3.1.24(s) hereof.

"**Adjusted Release Amount**" shall mean with respect to each Individual Property, an amount equal to 110% of the Release Amount for such Individual Property.

"**Affected Property**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) directly or indirectly, owns fifty percent (50%) or more of the legal, beneficial or economic interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, and/or (iii) is a director or executive officer of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any Manager that is an Affiliate of Mortgage Borrower, Borrower, Key Principal or Guarantor.

"**Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**Allocated Loan Amount**" shall mean the portion of the principal amount of the Loan allocated to any applicable Individual Property as set forth on Schedule 2 hereof.

"**Alteration Threshold**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Annual Budget**" shall mean the operating and capital budget for the Property prepared by or on behalf of Mortgage Borrower in accordance with Section 4.1.6(h) hereof for the applicable period or Fiscal Year.

"**Appraisal**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Assignment of Leases**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Action**" shall mean, with respect to any Person, (i) such Person filing a voluntary petition, case or proceeding under the Bankruptcy Law; (ii) the filing of an involuntary petition, case or proceeding against such Person under the Bankruptcy Law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition, case or proceeding against such Person under the Bankruptcy Law; (iii) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition, case or proceeding filed against it, by any other Person under the Bankruptcy Law; (iv) such Person consenting to or acquiescing in or joining in an application for the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such Person or any portion of the Property or the Collateral; or (v) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Law**" shall mean the U.S. Bankruptcy Code, any other federal, state, or foreign bankruptcy or insolvency law and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Borrower Related Party**" shall have the meaning set forth in Section 11.22(a) hereof.

"**Borrower's Recourse Liabilities**" shall have the meaning set forth in Section 11.22(a) hereof.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York or (ii) the state where the servicing offices of the Servicer are located.

"**Capital Expenditure Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Capital Expenditure Funds**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Capital Expenditures**" shall mean, for any period, the amounts expended for items required to be capitalized in accordance with the Acceptable Accounting Basis (including expenditures for replacements, building improvements, major repairs and alterations).

"**Cash Management Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Cash Management Agreement**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Cash Management Bank**" shall mean Wells Fargo Bank, N.A. or any successor Eligible Institution acting as Cash Management Bank under the Cash Management Agreement.

"**Cash Management Trigger Event Period**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Cash Sweep Trigger Event Period**" shall mean the period commencing as of the date on which an Event of Default occurs hereunder and ending upon the date on which a cure of such Event of Default is accepted or such Event of Default is waived in writing by Lender; provided that Lender shall not have exercised any of its rights under Section 10.2 hereof to accelerate the Loan, move to appoint a receiver or commence a foreclosure action (unless Lender has agreed in writing to waive such acceleration and discontinue any such enforcement actions).

"**Casualty**" shall mean any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Cause**" shall mean, with respect to an Independent Director, (i) any acts or omissions by such Independent Director that constitute systematic, persistent or willful disregard of, or bad faith or gross negligence with respect to, such Independent Director's duties, (ii) such Independent Director has been indicted or convicted for any crime or crimes of moral turpitude or dishonesty or for any violation of any Legal Requirements, (iii) such Independent Director is unable to perform his or her duties as Independent Director due to death, disability or incapacity, or (iv) such Independent Director no longer satisfies the requirements set forth in the definition thereof.

"**Clearing Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Clearing Account Agreement**" shall mean the Deposit Account Control Agreement, dated as of the date hereof, among Mortgage Lender, Mortgage Borrower and Clearing Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Clearing Bank**" shall mean Wells Fargo Bank, National Association or any successor Eligible Institution acting as Clearing Account Bank under the Clearing Account Agreement.

"**Closing Date**" shall mean the date hereof.

"**Closing Date Debt Service Coverage Ratio**" shall mean (i) 1.41 to 1.00, if the Permitted Mezzanine Loan is not then outstanding, or (ii) 1.23 to 1.00, if the Permitted Mezzanine Loan is then outstanding.

"**Closing Date Debt Yield**" shall mean (i) 7.90%, if the Permitted Mezzanine Loan is not then outstanding, or (ii) 7.30%, if the Permitted Mezzanine Loan is then outstanding.

"**Closing Date LTV**" shall mean (i) 73.40%, if the Permitted Mezzanine Loan is not then outstanding, or (ii) 78.50%, if the Permitted Mezzanine Loan is then outstanding.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall mean the "Collateral" as such term is defined in the Pledge Agreement and shall also include all amounts on deposit in any Account and any and all other property or collateral in which Lender is granted a security interest under any of the Loan Documents, in each case whether existing on the date hereof or hereafter pledged or assigned to Lender.

"**Commercial Lease**" shall mean a Lease at any Individual Property for space used for office, retail, industrial or other use (other than primarily storage use) where the Tenant occupies the space demised thereunder under a Lease.  In no event shall a Storage Lease be deemed to constitute a Commercial Lease.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any of Borrower's interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Contractual Obligation**" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlled" and "Controlling" shall have correlative meanings.

"**Crowd Funded Entity**" shall mean a Person that is capitalized through the practice of syndication, advertising or general or broad solicitation, which capitalization is achieved primarily (i) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, and/or (ii) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or other similar methods.

"**DBRS**" shall mean DBRS, Inc. and its successor-in-interest.

"**Debt**" shall mean the Outstanding Principal Balance, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under this Agreement or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, the aggregate amount of scheduled principal and interest payments due and payable under the Note or the Undefeased Note and this Agreement.

"**Debt Service Coverage Ratio**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Debt Yield**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Deemed Approval Procedure**" shall mean, with respect to any request for consent or approval to which it is applicable, (i)(A) Borrower shall have submitted an initial request for approval with the notation "**FIRST NOTICE. FAILURE TO RESPOND TO THIS REQUEST FOR APPROVAL WITHIN TEN (10) BUSINESS DAYS AFTER LENDER'S RECEIPT MAY RESULT IN THE REQUEST BEING DEEMED APPROVED BY LENDER**" prominently displayed in bold, all caps and fourteen (14) point or larger font and is accompanied by all materials required pursuant to the Loan Documents in connection with such matter, together with such other documents and information as Borrower believes in good faith are reasonably required for Lender to adequately evaluate such request, and (B) Lender shall have failed to (I) approve or object to the applicable request or (II) request additional documents and information reasonably required for Lender to adequately evaluate such request, within ten (10) Business Days after Lender's receipt of the first request for approval, and (ii)(A) Borrower shall have submitted a second request for approval with the notation "**SECOND AND FINAL NOTICE. IMMEDIATE RESPONSE REQUIRED. FAILURE TO RESPOND TO THIS REQUEST FOR APPROVAL WITHIN FIVE (5) BUSINESS DAYS AFTER LENDER'S RECEIPT SHALL CONSTITUTE DEEMED APPROVAL BY LENDER**" prominently displayed in bold, all caps and fourteen (14) point or larger font and such request for approval is accompanied by all materials required pursuant to the Loan Documents in connection with such matter, together with such other documents and information as Borrower believes in good faith are reasonably required for Lender to adequately evaluate such request, and (B) Lender shall have failed to (I) approve or object to the applicable request or (II) request additional documents and information reasonably required for Lender to adequately evaluate such request, within five (5) Business Days after Lender's receipt of the second request for approval.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, an interest rate per annum equal to the lesser of (i) the Maximum Legal Rate or (ii) five percent (5%) above the Interest Rate.

"**Defeasance Collateral**" shall mean, individually or collectively (as the context requires), the Total Defeasance Collateral and/or the Partial Defeasance Collateral.

"**Defeasance Collateral Account**" shall have the meaning set forth in <u>Section 2.5.2</u> hereof.

"**Defeasance Event**" shall mean, individually or collectively (as the context requires), a Total Defeasance Event and a Partial Defeasance Event.

"**Defeasance Lockout Expiration Date**" shall mean the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code for the Securitization Vehicle established in connection with the last Securitization involving any portion of the Loan.

"**Defeasance Security Agreement**" shall mean, individually and/or collectively (as the context required), any pledge and security agreement in form and substance that would be satisfactory to a prudent lender pursuant to which Borrower grants Lender a perfected, first priority security interest in the Defeasance Collateral Account and the Total Defeasance Collateral or the Partial Defeasance Collateral, as applicable.

"**Defeased Note**" shall have the meaning set forth in <u>Section 2.5.1(b)</u> hereof.

"**Disclosure Documents**" shall mean, collectively, any written materials used or provided to any prospective investors and/or NRSROs in connection with any public offering or private placement in connection with or relating to a Securitization (including, without limitation, a prospectus, prospectus supplement, private placement memorandum, offering memorandum, offering circular, term sheet, road show presentation materials or other offering documents, marketing materials or information provided to prospective investors), in each case in preliminary or final form and including any amendments, supplements, exhibits, annexes and other attachments thereto.

"**Distributions**" shall have the meaning set forth in <u>Section 4.2.18(a)</u> hereof.

"**Division**" shall mean, as to any Person, such Person dividing and/or otherwise engaging in and/or becoming subject to, in each case, any division (whether pursuant to a plan of division or otherwise) including, without limitation and to the extent applicable, pursuant to Section 18-217 of the Act.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa3" and that, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's, and "F-1" by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit

or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A+" by S&P, "A2" by Moody's and "AA-" by Fitch.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement (Mezzanine 1 Loan), dated as of the date hereof, executed by Borrower and Guarantor for the benefit of Lender in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Law**" shall have the meaning set forth in the Environmental Indemnity.

"**ERISA**" shall have the meaning set forth in Section 4.2.10(a) hereof.

"**ESA**" shall have the meaning set forth in Section 3.1.50(e) hereof.

"**Event of Default**" shall have the meaning set forth in Section 10.1(a) hereof.  An Event of Default shall be deemed to "exist", "be continuing" and "remain outstanding" notwithstanding the fact that such Event of Default may be, is caused by or relates to a one-time, non-recurring event as long as Lender has not accepted or waived a cure of such Event of Default in writing.

"**Excess Cash Flow Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Excess Cash Flow Funds**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Exchange Act Filing**" shall mean a filing pursuant to the Exchange Act in connection with or relating to a Securitization.

"**Executive Order**" shall mean an Executive Order of the President of the United States of America.

"**Extraordinary Expense**" shall have the meaning set forth in Section 4.1.6(h) hereof.

"**Financial Test Cure Collateral Reserve Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

"**Fitch**" shall mean Fitch Ratings, Inc. and its successor-in-interest.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting

8

profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government Lists**" shall mean, collectively, (i) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, and (iii) any similar lists maintained by the U.S. Department of State, the U.S. Department of Commerce or any other Governmental Authority or pursuant to any Executive Order.

"**Governmental Authority**" shall mean any court, agency, board, bureau, commission, department, division, office or other authority of any nature whatsoever of any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Grantor Trust**" shall mean a grantor trust under Subpart E of Part 1 of Subchapter J of the Code.

"**Great Adventure Lease**" shall mean the Lease, dated February 14, 2014, with Adventures Outback, L.P., as tenant, affecting premises at the Individual Property located at Texas Storage Park, 10013 RR, 620 N., Austin, Texas.

"**Gross Income from Operations**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Guarantor**" shall mean Natin Paul, an individual.

"**Guaranty**" shall mean that certain Guaranty of Recourse Obligations (Mezzanine 1 Loan), dated as of the date hereof, executed by Guarantor for the benefit of Lender in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Improvements**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Immediate Family Members**" shall mean, with respect to any natural person, such person's spouse, children and grandchildren.

"**Indebtedness**" shall mean, for any Person, without duplication: (i) all indebtedness or liability (including, without limitation, for borrowed money and indebtedness in the form of mezzanine debt and preferred equity, for amounts drawn under a letter of credit or for deferred purchase price of property or services (including trade obligations) for which such Person is or its assets are directly or indirectly liable), (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable (or to which its assets would be subject) if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person pursuant to any agreement to purchase, to provide funds for payment, to supply funds, or

to invest in any Person, (iv) all indebtedness or liabilities guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures any other Person against loss. Without limiting the generality of the foregoing, with respect to Borrower, the term "Indebtedness" (and "Indebtedness for borrowed money" and other similar terms) shall include or be deemed to include any Partnership Loan.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 11.13(b) hereof.

"**Independent Director**" shall have the meaning set forth in Section 3.1.24(o) hereof.

"**Individual Property**" shall mean each parcel of real property, the Improvements thereon and all personal property owned by Borrower that is encumbered by the applicable Security Instrument, together with all rights pertaining to such property (real and personal) and Improvements, as more particularly described in the granting clauses of the applicable Security Instrument and referred to therein as the "Property".

"**Insolvency Opinion**" shall mean, as the context may require, (i) that certain bankruptcy non-consolidation opinion letter, dated the date hereof, rendered by Searls Shleymovich, PLLC in connection with the Loan or (ii) any other bankruptcy non-consolidation opinion letter delivered to Lender in connection with the Loan (including any bankruptcy non-consolidation opinion letter delivered to Lender subsequent to the closing of the Loan in accordance with the Loan Documents).

"**Insurance Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Insurance Funds**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Insurance Premiums**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Insurance Proceeds**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Insurance Shortfall Obligation**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Intercreditor Agreement**" shall mean that certain intercreditor agreement, dated as of the date hereof, among Lender, Mortgage Lender and Mezzanine 2 Lender, as such agreement may be amended, modified, replaced and/or otherwise changed from time to time, and which agreement may be on such terms as Lender, Mortgage Lender and Mezzanine 2 Lender agree in their respective sole discretion.

"**Interest Period**" shall mean, with respect to any Monthly Payment Date, the period commencing on the eleventh (11th) day of the preceding calendar month and terminating on the tenth (10th) day of the calendar month in which such Monthly Payment Date occurs; provided, however, that the initial Interest Period shall begin on the Closing Date and shall end on the immediately following tenth (10th) day of a calendar month.

"**Interest Rate**" shall mean an interest rate per annum equal to 5.500%.

"**Key Principal**" shall mean Natin Paul.

"**Kroll**" shall mean Kroll Bond Rating Agency, Inc. and its successor-in-interest.

"**Land**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Lease**" shall mean any lease, sublease, sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, sub-sublease, letting, license, concession or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transactions with respect to the Loan, Borrower, Mortgage Borrower, Guarantor, the Collateral or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulation AB, the rules and regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws and the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower or Mortgage Borrower, at any time in force affecting Borrower, Mortgage Borrower, Guarantor, the Collateral or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**Lender Indemnitees**" shall mean (i) Lender, (ii) any Affiliate of Lender that has filed any registration statement relating to a Securitization or has acted as the sponsor or depositor in connection with such Securitization, (iii) any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser in connection with a Securitization, (iv) any other co-underwriters, co-placement agents or co-initial purchasers in connection with a Securitization, (v) each Person who "controls" (within the meaning of Section 15 of the Exchange Act) any Person described in any of the foregoing clauses, (vi) any Person who is or will have been involved in the origination of the Loan, (vii) any Person who is or will have been involved in the servicing of the Loan, (viii) any Person in whose name the Lien created by the Pledge Agreement and the other Loan Documents are or will be filed, (ix) any Person who may hold or acquire or will have held a full or partial interest in the Loan at any time (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan evidenced for the benefit of third parties),

11

(x) any Person who holds or acquires or will have held a participation or other full or partial interest in the Loan at any time, whether during the term of the Loan or as a part of or following a foreclosure of the Loan, (xi) any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business, and (xii) the respective officers, directors, shareholders, partners, members, employees, agents, representatives, contractors, subcontractors, Affiliates, participants, successors and assigns of any Person described in any of the foregoing clauses.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without payment of any transfer fee), clean sight draft letter of credit acceptable to Lender and the Rating Agencies (either an evergreen letter of credit or one which does not expire until at least thirty (30) days after (i) the Stated Maturity Date or (ii) such earlier date as such Letter of Credit is no longer required pursuant to the terms of this Agreement and the other Loan Documents) in favor of Lender and entitling Lender to draw thereon in New York, New York based solely on a statement purportedly executed by an officer of Lender stating that it has the right to draw thereon, issued by a domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution.  If at any time the bank issuing any such Letter of Credit shall cease to be an Eligible Institution, Lender shall have the right immediately to draw down the same in full and hold the proceeds of such draw in accordance with the applicable provisions of this Agreement.

"**Lien**" shall mean any mortgage, deed of trust, deed to secure debt, mortgage deed, indemnity deed of trust, lien (statutory or otherwise), pledge, hypothecation, assignment, security interest, easement, restrictive covenant, preference, or any other encumbrance (other than a Permitted Encumbrance), charge or transfer of, or any agreement to enter into or create any of the foregoing, affecting (i) all or any portion of the Property or the Collateral or any interest therein, (ii) any direct or indirect interest in Borrower, or (iii) any other collateral securing the Debt, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialman's and other similar liens and encumbrances.

"**Liquidation Event**" shall have the meaning set forth in Section 2.4.2(a) hereof.

"**Loan**" shall mean the loan in the original principal amount of One Hundred Three Million and No/100 Dollars ($103,000,000.00) made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge Agreement, the Guaranty, the Environmental Indemnity, the Subordination of Management Agreement and all other documents, agreements, certificates and instruments now or hereafter executed and/or delivered in connection with the Loan.

"**Loan Split Documents**" shall have the meaning set forth in Section 11.27(b) hereof.

"**Loan Splitting**" shall have the meaning set forth in Section 11.27(a) hereof.

"**Loan-to-Value Ratio**" shall mean a ratio, as determined by Lender as of a particular date, in which: (i) the numerator is equal to the sum of the Outstanding Principal Balance, the Mortgage Loan Outstanding Principal Balance and the Mezzanine 2 Outstanding Principal Balance and (ii) the denominator is equal to the appraised value of the Property based on an Appraisal.

"**Major Lease**" shall mean any Lease which (i) requires the payment of base rent in an amount equal to or exceeding fifteen percent (15%) of the portion of Gross Income from Operations derives from the applicable Individual Property, (ii) contains an option or preferential right to purchase all or any portion of the Property, or (iii) is with an Affiliate of Mortgage Borrower, Borrower, Mezzanine 2 Borrower, Guarantor or Manager as Tenant.

"**Management Agreement**" shall mean, individually and/or collectively as the context requires, each management agreement entered into between Mortgage Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms and provisions of this Agreement, or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"**Manager**" shall mean Great Value Storage, LLC or, if the context requires, a Qualified Manager that is engaged to manage the Property pursuant to a Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"**Material Action**" shall have the meaning set forth in Section 3.1.24(p) hereof.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, Mortgage Borrower, Guarantor, the Collateral or the Property, (ii) the ability of Borrower, Mortgage Borrower or Guarantor to perform its obligations under any Loan Document or Mortgage Loan Document, as applicable, to which it is a party, (iii) the enforceability or validity of any Loan Document or Mortgage Loan Document, the perfection or priority of any Lien created under any Loan Document or Mortgage Loan Document, or the rights, interests and remedies of Lender or Mortgage Lender under any Loan Document or Mortgage Loan Document, as applicable, or (iv) the value, use or operation of the Property or the Collateral or the cash flows from the Property.

"**Material Agreements**" shall mean any cleaning, maintenance, service or other contract or agreement of any kind (other than the Leases) of a material nature (materiality for purposes of this definition shall mean any contract with a term longer than one year that (i) involves the payment of amounts in excess of $250,000.00 per year and (ii) is not cancelable on thirty (30) days' or less notice without the payment of any termination fee or payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of the Property, whether written or oral.

"**Maturity Date**" shall mean the date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents,

under the laws of such Governmental Authorities whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Deposit Account**" shall have the meaning set forth in <u>Section 2.7.3(a)</u> hereof.

"**Mezzanine Loan Excess Cash Flow Account**" shall have the meaning set forth in <u>Section 6.6</u> hereof.

"**Mezzanine Loan Excess Cash Flow Funds**" shall have the meaning set forth in <u>Section 6.6</u> hereof.

"**Mezzanine 2 Adjusted Release Amount**" shall have the meaning ascribed to the term "Adjusted Release Amount" in the Mezzanine 2 Loan Agreement.

"**Mezzanine 2 Borrower**" shall mean GVS Portfolio IB, LLC, a Delaware limited liability company.

"**Mezzanine 2 Lender**" shall have the meaning ascribed to the term "Lender" in the Mezzanine 2 Loan Agreement.

"**Mezzanine 2 Loan**" shall mean that certain mezzanine loan made on the Closing Date by Mezzanine 2 Lender to Mezzanine 2 Borrower in the principal amount of $63,000,000.00 pursuant to the Mezzanine 2 Loan Agreement.

"**Mezzanine 2 Loan Agreement**" shall mean that certain Mezzanine 2 Loan Agreement, dated as of the date hereof, between Mezzanine 2 Lender and Mezzanine 2 Borrower, as the same may be amended, restated, replaced, supplemented and otherwise modified from time to time.

"**Mezzanine 2 Loan Cash Sweep Trigger Event Period**" shall have the meaning ascribed to the term "Cash Sweep Trigger Event Period" in the Mezzanine 2 Loan Agreement.

"**Mezzanine 2 Loan Documents**" shall mean all documents or instruments evidencing or securing the Mezzanine 2 Loan.

"**Mezzanine 2 Outstanding Principal Balance**" shall mean, as of any date, the aggregate outstanding principal balance of the Mezzanine 2 Loan.

"**Monthly Debt Service Payment Amount**" shall mean, with respect to each Monthly Payment Date, an amount equal to interest which is scheduled to accrue on the Loan through the last day of the Interest Period in which such Monthly Payment Date occurs.

"**Monthly Payment Date**" shall mean, subject to <u>Section 2.3.5</u> hereof, the sixth (6th) day of every calendar month occurring during the Term commencing with January 6, 2019; provided that (i) Lender shall have the right to change the Monthly Payment Date to any other day of a calendar month selected by Lender, in its sole and absolute discretion (including in connection with a Securitization) upon notice to Borrower (in which event, such change shall then be deemed effective), (ii) if Lender shall change the Monthly Payment Date as aforesaid, Lender shall also

adjust the Interest Period accordingly and (iii) if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such changes.

"**Moody's**" shall mean Moody's Investors Service, Inc. and its successor-in-interest.

"**Morningstar**" shall mean Morningstar Credit Ratings, LLC and its successor-in-interest.

"**Mortgage Borrower**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Borrower Company Agreement**" shall mean the limited liability company agreement of Mortgage Borrower as the same may be amended from time to time to the extent permitted under the Mortgage Loan Agreement and this Agreement.

"**Mortgage Lender**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Loan**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Loan Agreement**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Loan Documents**" shall mean the "Loan Documents" as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Event of Default**" shall mean an "Event of Default" under and as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Restoration Provisions**" shall mean the terms and conditions of the Mortgage Loan Agreement relating to Restoration in connection with a Casualty and/or Condemnation to the Property.

"**Net Cash Flow**" shall mean, for any period, the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Liquidation Proceeds After Debt Service**" shall mean, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Mortgage Borrower in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (i) Lender's and/or Mortgage Lender's reasonable costs incurred in connection with the recovery thereof, (ii) if the Liquidation Event was a Casualty or Condemnation, the costs incurred by Mortgage Borrower in connection with a Restoration of all or any portion of the Property made in accordance with the Mortgage Loan Documents, (iii) amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Mortgage Loan Documents to Mortgage Lender, (iv) in the case of a foreclosure sale, disposition or Transfer of the Property in connection with realization thereon following a Mortgage Loan Event of Default, such reasonable and customary costs and expenses of sale or other disposition (including attorneys' fees and brokerage commissions), (v) in the case of a foreclosure sale, such costs and expenses incurred by Mortgage Lender under the Mortgage Loan Documents as Mortgage Lender shall be entitled to receive reimbursement for under the terms of

the Mortgage Loan Documents, (vi) in the case of a refinancing of the Mortgage Loan, such costs and expenses (including attorneys' fees) of such refinancing as shall be reasonably approved by Lender and (vii) the amount of any prepayments required pursuant to the Mortgage Loan Documents and/or the Loan Documents, in connection with any such Liquidation Event.

"**Net Operating Income**" shall mean, for any period, the amount obtained by subtracting the Operating Expenses for such period from the Gross Income from Operations for such period.

"**Net Proceeds**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Net Proceeds Deficiency**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**New Mortgage Borrower**" shall have the meaning set forth in Section 8.3 hereof.

"**New Note**" shall have the meaning set forth in Section 11.27(b) hereof.

"**New Note Amount**" shall have the meaning set forth in Section 11.27(b) hereof.

"**Note**" shall mean, individually and/or collectively (as the context requires), Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7, and Note A-8.

"**Note A-1**" shall mean that certain Mezzanine 1 Promissory Note A-1, dated as of the date hereof, in the stated principal amount of $40,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Note A-2**" shall mean that certain Mezzanine 1 Promissory Note A-2, dated as of the date hereof, in the stated principal amount of $20,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Note A-3**" shall mean that certain Mezzanine 1 Promissory Note A-3, dated as of the date hereof, in the stated principal amount of $18,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Note A-4**" shall mean that certain Mezzanine 1 Promissory Note A-4, dated as of the date hereof, in the stated principal amount of $5,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Note A-5**" shall mean that certain Mezzanine 1 Promissory Note A-5, dated as of the date hereof, in the stated principal amount of $5,000,000.00, made by Borrower in favor of Lender, as

the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Note A-6**" shall mean that certain Mezzanine 1 Promissory Note A-6, dated as of the date hereof, in the stated principal amount of $5,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Note A-7**" shall mean that certain Mezzanine 1 Promissory Note A-7, dated as of the date hereof, in the stated principal amount of $5,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Note A-8**" shall mean that certain Mezzanine 1 Promissory Note A-8, dated as of the date hereof, in the stated principal amount of $5,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including any Defeased Note and Undefeased Note relating thereto that may exist from time to time.

"**Notice**" shall have the meaning set forth in Section 11.6 hereof.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or other Securitization Indemnified Parties in connection with, or in anticipation of, a Securitization.

"**O&M Plan**" shall mean individually and/or collectively as the context may require (i) that certain Asbestos Containing Materials Operations and Maintenance Plan, dated July 21, 2014, prepared by AEI Consultants as Project No. 331240, (ii) that certain Asbestos Safety Awareness Training Presentation prepared by the Military, Public Safety and Security Division of Florida State College, and (iii) the GSV Asbestos and Lead Management Training Program completed on August 15, 2017, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**OFAC**" shall mean the Office of Foreign Assets Control or, if the context requires, any successor Governmental Authority.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"**Open Prepayment Commencement Date**" shall mean the Monthly Payment Date that occurs six (6) months prior to the Stated Maturity Date.

"**Operating Agreements**" shall mean, collectively, any covenants, restrictions or agreements of record relating to the construction, operation or use of the Property.

"**Operating Expenses**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Organizational Documents**" shall mean, as to any Person, the organizational or governing documents of such Person, including the certificate of incorporation and by-laws with respect to a corporation; the certificate of limited partnership and partnership agreement with respect to a limited partnership; the certificate of formation or organization and operating agreement with respect to a limited liability company; and the trust certificate and trust agreement with respect to a trust.

"**Other Charges**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Other Obligations**" shall mean: (i) all obligations of Borrower contained in this Agreement or any other Loan Document, and (ii) all obligations of Borrower contained in any renewal, extension, amendment, restatement, modification, consolidation, change of, or substitution or replacement for all or any part of this Agreement or any other Loan Document, excluding, in each case, Borrower's obligation for the payment of the Debt.

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**PACE Loan**" shall mean any Property-Assessed Clean Energy loan or any similar financing.

"**Partial Defeasance Collateral**" shall mean, in connection with each Partial Defeasance Event, U.S. Obligations which provide payments (i) on or prior to, but as close as possible to, the Business Day immediately preceding all scheduled Monthly Payment Dates and other scheduled payment dates, if any, under each applicable Defeased Note after the applicable Partial Defeasance Date upon which payments are required under each applicable Defeased Note and this Agreement, and (ii) in amounts equal to the scheduled payments due on such Monthly Payment Dates or other scheduled payment dates under each applicable Defeased Note and this Agreement (including, without limitation, scheduled payments of principal, interest, servicing fees (if any), and any other amounts due under the Loan Documents on such Monthly Payment Dates or other scheduled payment dates); provided that each applicable Defeased Note shall be deemed, for purposes of this definition, to be due and payable and shall be prepaid in full on the Open Prepayment Commencement Date (such scheduled payments, collectively, the "**Scheduled Partial Defeasance Payments**").

"**Partial Defeasance Date**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Partial Defeasance Event**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Partial Defeasance Notice Date**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Patriot Act**" shall mean, collectively, all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"**Patriot Act Offense**" shall mean (i) any violation of the laws of the United States of America or of any of the several states, or any act or omission that would constitute a violation of such laws if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or money laundering, including any offense under (A) the laws against terrorism, (B) the laws against money laundering, (C) the Bank Secrecy Act, as amended, (D) the Money Laundering Control Act of 1986, as amended, or (E) the Patriot Act, or (ii) the conspiracy to commit, or aiding and abetting another to commit, any violation of any such laws.

"**Permitted Debt**" shall mean, (A) the Debt and (B) liabilities incurred in the ordinary course of business relating to the ownership and management of the Collateral and the routine administration thereof in amounts not to exceed $100,000.00 and which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances.

"**Permitted Encumbrances**" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters expressly set forth on Schedule A or Schedule B of the Title Insurance Policy, (iii) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent (other than Liens securing any PACE Loan), (iv) the Liens granted pursuant to the Mortgage Loan Documents and the Mezzanine 2 Loan Documents, (v) any workers', mechanics' or other similar Liens on the Property during such period that any such Lien is being contested in accordance with the terms of this Agreement and the other Loan Documents, the Mortgage Loan Documents and/or the Mezzanine 2 Loan Documents, (vi) utility easements entered into in the ordinary course of business provided the same would not be reasonably expected to result in a Material Adverse Effect, and (vii) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Mezzanine Loan**" shall have the meaning set forth in <u>Section 8.4</u> hereof.

"**Permitted Release Date**" shall mean the earlier to occur of (i) the third (3rd) anniversary of the first (1st) Monthly Payment Date and (ii) the Defeasance Lockout Expiration Date.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any Governmental Authority or any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledge Agreement**" shall have the meaning set forth in the Recitals to this Agreement.

"**Pledged Interests**" shall have the meaning set forth in the Pledge Agreement.

"**Policies**" or "**Policy**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Prepayment Date**" shall mean the date on which the Loan is prepaid in accordance with the terms hereof.

"**Prohibited Entity**" shall mean any Person which (i)(A) is a Crowd Funded Entity or (B) owns (or, in connection with a proposed assumption of the Loan or a proposed Transfer, proposes to own) any direct or indirect interest in Borrower, any prospective transferee or the Property through a Crowd Funded Entity, (ii) is a trust formed under Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code §§ 3801 et seq., or any successor statute thereto, in each case, as amended from time to time or (iii) owns (or, in connection with a proposed assumption of the Loan or a proposed Transfer, proposes to own) any direct or indirect interest in Borrower, any prospective transferee or the Property through a tenancy-in-common or other similar form of ownership.

"**Prohibited Person**" shall mean any Person:

(i)     listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders;

(ii)    that is owned or Controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224;

(iii)   with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including Executive Order No. 13224;

(iv)    who commits, threatens, conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v)     that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or at any replacement website or other replacement official publication of such list;

(vi)    that is subject to trade restrictions under United States law, including, without limitation, the Patriot Act, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder;

(vii)   that is listed on any Government List;

(viii)  that has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense;

(ix)     that is currently under investigation by any Governmental Authority for alleged criminal activity consisting of a felony involving a crime or moral turpitude or a Patriot Act Offense; or

(x)     who is an Affiliate of any Person that is described by or that satisfies any of <u>clauses (i)</u> through <u>(ix)</u> above.

"**<u>Property</u>**" shall mean, individually and/or collectively (as the context may require), any Individual Property, each Individual Property or the Individual Properties, in each case, subject to the terms hereof and of the other Loan Documents.

"**<u>Property Condition Report</u>**" shall mean those certain property condition reports with respect to the Property delivered by GRS Group to Lender in connection with the origination of the Loan.

"**<u>Property Management Trigger Event</u>**" shall mean an indictment for fraud or misappropriation of funds by Mortgage Borrower, Borrower, Mezzanine 2 Borrower, Guarantor, Key Principal or Manager or any director (other than an Independent Director) or officer of Mortgage Borrower, Borrower, Mezzanine 2 Borrower, Guarantor, Key Principal or Manager.

"**<u>Property Zoning Report</u>**" shall mean those certain zoning reports with respect to the Property delivered by The Planning & Zoning Resource Company to Lender in connection with the origination of the Loan.

"**<u>Qualified Manager</u>**" shall mean (i) Manager or (ii) a reputable and experienced manager (which, prior to the occurrence of a Property Management Trigger Event, may be an Affiliate of Borrower), which (A) in the reasonable judgment of Lender, possesses experience in managing properties similar in location, size, class, use, operation and value as the Property and (B) has been approved by Mortgage Lender to the extent such approval is required pursuant to the Mortgage Loan Documents; provided, that (i) Borrower shall have obtained (a) if required by Lender, a Rating Agency Confirmation from the Rating Agencies and (b) if such Person is an Affiliate of Borrower, a new bankruptcy non-consolidation opinion letter reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion and (ii) the conditions set forth in the Mortgage Loan Documents have been satisfied.

"**<u>Rating Agencies</u>**" shall mean (i) prior to the final Securitization of the Loan, each of S&P, Moody's, Fitch, Morningstar, DBRS, Kroll or any other nationally recognized statistical rating agency that has been designated by Lender and (ii) after the final Securitization of the Loan, any of the foregoing that has rated any of the Securities.

"**<u>Rating Agency Confirmation</u>**" shall mean, collectively, a written affirmation from each of the Rating Agencies that the rating of the Securities (or any class thereof) by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.  In the event that, at any given time, no Rating Agency has elected to consider whether to grant or withhold such an affirmation, then the term "Rating Agency Confirmation" shall be deemed instead to require the written approval of Lender based on its good

faith determination of whether the Rating Agencies would issue a Rating Agency Confirmation; provided that the foregoing requirement shall not apply in the event Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement.

"**Register**" shall have the meaning set forth in <u>Section 11.47</u> hereof.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such regulation may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Regulation S-K**" means Regulation S-K of the Securities Act, as such regulation may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Regulation S-X**" means Regulation S-X of the Securities Act, as such regulation may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Related Loan**" shall mean (i) a loan made to an Affiliate of Borrower or Guarantor or secured by a Related Property that is included in a Securitization with the Loan or any portion thereof or interest therein or (ii) any loan that is cross-collateralized or cross-defaulted with the Loan.

"**Related Property**" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of "Significant Obligor" to the Property.

"**Release Amount**" shall mean, with respect to each Individual Property, an amount equal to the original Allocated Loan Amount for such Individual Property.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note or any portion thereof or interest therein.

"**Rent Roll**" shall have the meaning set forth in <u>Section 3.1.22</u> hereof.

"**Rents**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Replacement Management Agreement**" shall mean, collectively, (i)(A) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement and which satisfies the requirements of the Mortgage Loan Documents, or (B) a management agreement with a Qualified Manager, which management agreement shall be in form and substance reasonably acceptable to Lender and which satisfies the requirements of the Mortgage Loan Documents; provided, that, with respect to this clause (B), if required by Lender, Borrower shall have obtained a Rating Agency Confirmation from the Rating Agencies, and (ii) a subordination of management agreement substantially in the form then used by Lender (or in such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower, Mortgage Borrower and such Qualified Manager.

"**Required Repair Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Required Repair Funds**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Required Repairs**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Reserve Accounts**" shall mean, collectively, the Required Repair Account, the Tax Account, the Insurance Account, the Capital Expenditure Account, the Mezzanine Loan Excess Cash Flow Account, and any other escrow or reserve account established by or in accordance with the Loan Documents.

"**Reserve Funds**" shall mean, collectively, the Required Repair Funds, the Tax Funds, the Insurance Funds, the Capital Expenditure Funds, the Excess Cash Flow Funds, the Mezzanine Loan Excess Cash Flow Funds and any other escrow or reserve fund established by or in accordance with the Loan Documents.

"**Restoration**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Restoration Threshold**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Restricted Party**" shall mean, collectively, (i) Borrower, Mortgage Borrower, Guarantor, and any Affiliated Manager and (ii) any shareholder, partner, member, non-member manager or any other direct or indirect legal or beneficial owner of Borrower, Mortgage Borrower, Guarantor, any Affiliated Manager, or any non-member manager.

"**S&P**" shall mean S&P Global Ratings and its successor-in-interest.

"**Scheduled Partial Defeasance Payments**" shall have the meaning set forth in the definition of "Partial Defeasance Collateral".

"**Scheduled Total Defeasance Payments**" shall have the meaning set forth in the definition of "Total Defeasance Collateral".

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securities**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securities Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Securitization**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securitization Indemnification Liabilities**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Securitization Indemnified Parties**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Securitization Vehicle**" shall mean each REMIC Trust or Grantor Trust into which all or a portion of the Loan or an interest therein has been transferred.

"**Security Instrument**" shall have the meaning set forth in the Recitals to this Agreement.

"**Servicer**" shall have the meaning set forth in Section 11.24(a) hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 11.24(a) hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Section 10.2(c) hereof.

"**Significant Obligor**" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**Sole Member**" shall have the meaning set forth in Section 3.1.24(q) hereof, which as of the Closing Date, shall mean Mezzanine 2 Borrower, the sole member of Borrower.

"**Special Member**" shall have the meaning set forth in Section 3.1.24(q) hereof.

"**Split Loan**" shall have the meaning set forth in Section 11.27(a) hereof.

"**Splitting Documentation**" shall have the meaning set forth in Section 11.27(a) hereof.

"**Springing Recourse Event**" shall have the meaning set forth in Section 11.22(b) hereof.

"**State**" shall mean the State or Commonwealth in which the Property or the Collateral, as applicable, or any part thereof is located.

"**Stated Maturity Date**" shall mean, subject to Section 2.3.5 hereof, December 6, 2023; provided, however, that, in the event Lender changes the Monthly Payment Date in accordance with this Agreement, the Stated Maturity Date shall also be deemed to have been changed such that the Stated Maturity Date and the Monthly Payment Date shall occur on the same calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

"**Storage Lease**" shall mean any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of any storage space in the Property, and every modification, amendment or other agreement relating thereto, but specifically excluding any Commercial Lease or Major Lease.

"**Subordination of Management Agreement**" shall mean that certain Subordination of Management Agreement (Mezzanine 1 Loan), dated as of the date hereof, among Lender, Borrower, Mortgage Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Successor Borrower**" shall have the meaning set forth in Section 2.5.3 hereof.

"**Tax Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

24

"**Tax Funds**" shall have the meaning set forth in the Mortgage Loan Agreement

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates, sewer rents, and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof, together with all interest and penalties thereon.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Term**" shall mean the term of the Loan.

"**TIAA**" shall mean Teachers Insurance and Annuity Association of America or any Affiliate Controlled by such Person in which such Person owns more than 50% of the direct or indirect beneficial ownership interest in such Affiliate.

"**Title Insurance Policy**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Total Defeasance Collateral**" shall mean, in connection with each Total Defeasance Event, U.S. Obligations which provide payments (i) on or prior to, but as close as possible to, the Business Day immediately preceding all scheduled Monthly Payment Dates and other scheduled payment dates, if any, under the Note or each applicable Defeased Note, as applicable, after the Total Defeasance Date upon which payments are required under the Note or each applicable Defeased Note, as applicable, and this Agreement, and (ii) in amounts equal to the scheduled payments due on such Monthly Payment Dates or other scheduled payment dates under the Note or each applicable Defeased Note, as applicable, and this Agreement (including, without limitation, scheduled payments of principal, interest, servicing fees (if any), and any other amounts due under the Loan Documents on such Monthly Payment Dates or other scheduled payment dates under the Note and this Agreement); provided, that the Note or each applicable Defeased Note, as applicable, shall be deemed, for purposes of this definition, to be due and payable and shall be prepaid in full on the Open Prepayment Commencement Date (such scheduled payments, collectively, the "**Scheduled Total Defeasance Payments**").

"**Total Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Total Defeasance Event**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Transfer**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Transferee**" shall have the meaning set forth in Section 8.3 hereof.

"**Transferee SPE Constituent Entity**" shall mean, with respect to any Transferee, the entity that qualifies as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies that is (i) the general partner of such Transferee, if such Transferee is a limited

partnership, or (ii) the managing member of such Transferee, if such Transferee is a multi-member limited liability company.

"**Transferee Sponsors**" shall mean, with respect to any Transferee, such Transferee's shareholders, general partners or managing members that, directly or indirectly, (i) own fifty-one percent (51%) or more of legal, beneficial and economic interests in such Transferee, or (ii) are in Control of such Transferee.

"**Treasury Note Rate**" shall mean, at the time of the prepayment, as applicable, the rate of interest per annum equal to the yield to maturity (converted by Lender to the equivalent monthly yield using Lender's then system of conversion) of the United States Treasury obligations selected by the holder of the Note having maturity dates closest to, but not exceeding, the remaining term to the Open Prepayment Commencement Date.

"**Trustee**" shall mean any trustee of a Securitization Vehicle.

"**UBS AG 1285 Branch**" shall mean UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, a U.S. branch of a Swiss banking corporation, and its successors in interest.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State of Delaware.

"**Uncrossing Event**" shall have the meaning set forth in Section 11.27(a) hereof.

"**Undefeased Note**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Updated Information**" shall have the meaning set forth in Section 9.1(b)(i) hereof.

"**U.S. Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder.

"**U.S. Obligations**" shall mean (i) direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption or (ii) to the extent acceptable to the Rating Agencies, other "government securities" within the meaning of Treasury Regulations Section 1.860G-2(a)(8)(ii) that are not subject to prepayment, call or early redemption.

"**Waived Restoration Provisions**" shall have the meaning set forth in Section 5.3 hereof.

"**WCHC**" shall mean World Class Holding Company, LLC, a Delaware limited liability company.

"**WCHC LLC Agreement**" shall mean the Amended and Restated Limited Liability Company Agreement of WCHC, dated July 10, 2017.

"**Yield Maintenance Default Premium**" shall mean an amount equal to the greater of: (i) five percent (5%) of the principal amount of the Loan being prepaid and (ii) the excess, if any,

of (A) the present value (determined using a discount rate equal to the Treasury Note Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being prepaid (including, without limitation, the payment of principal and interest due on the Stated Maturity Date in respect of the amount of the Loan being prepaid) provided that the Note or the Undefeased Note, as applicable, shall be deemed, for purposes of this definition, to be due and payable on the Open Prepayment Commencement Date, over (B) the principal amount of the Loan being prepaid.

"**Yield Maintenance Premium**" shall mean an amount equal to the greater of:  (i) 1% of the principal amount of the Loan being prepaid and (ii) the excess, if any, of (A) the present value (determined using a discount rate equal to the Treasury Note Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being prepaid (including, without limitation, the payment of principal and interest due on the Stated Maturity Date in respect of the amount of the Loan being prepaid) provided that the Note or the Undefeased Note, as applicable, shall be deemed, for purposes of this definition, to be due and payable on the Open Prepayment Commencement Date, over (B) the principal amount of the Loan being prepaid.

### Section 1.2.    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation," unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

With respect to references to the Mortgage Loan Documents (including without limitation terms defined by cross-reference to the Mortgage Loan Documents), such references shall refer to the Mortgage Loan Documents as in effect on the Closing Date (and any such defined terms shall have the definitions set forth in the Mortgage Loan Documents as of the Closing Date) and no amendments, restatements, replacements, supplements, waivers or other modifications to or of the Mortgage Loan Documents shall have the effect of changing such references (including without limitation any such definitions) for the purposes of this Agreement unless Lender expressly agrees in writing that such references or definitions, as appearing, incorporated into or used in this Agreement, have been revised.

Notwithstanding anything stated herein to the contrary, any provisions in this Agreement cross-referencing or incorporating by reference provisions of the Mortgage Loan Documents shall be effective notwithstanding the termination of the Mortgage Loan Documents by payment in full of the Mortgage Loan or otherwise to the extent necessary to give effect to the terms of the Loan Documents incorporating such provisions of the Mortgage Loan Documents.

To the extent that any terms, provisions or definitions of any Mortgage Loan Documents that are incorporated herein by reference are incorporated into the Mortgage Loan Documents by reference to any other document or instrument, such terms, provisions or definitions that are

incorporated herein by reference shall at all times be deemed to incorporate each such term, provision and definition of the applicable other document or instrument as the same is set forth in such other document or instrument as of the Closing Date, without regard to any amendments, restatements, replacements, supplements, waivers or other modifications to or of such other document or instrument occurring after the Closing Date, unless Lender expressly agrees that such term, provision or definition as appearing, incorporated into, or used in this Agreement have been revised.

The words "Borrower shall cause" or "Borrower shall not permit" (or words of similar meaning) shall mean "Borrower shall cause Mortgage Borrower to" or "Borrower shall not permit Mortgage Borrower to", as the case may be, to so act or not to so act, as applicable.

## ARTICLE II.
## THE LOAN

**Section 2.1.    The Loan**.

**2.1.1    Agreement to Lend and Borrow**.  Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

**2.1.2    Single Disbursement to Borrower**.  Borrower shall receive only one (1) borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

**2.1.3    The Note**.  The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement and the Note.

**2.1.4    Use of Proceeds**.  Borrower shall use the proceeds of the Loan to (a) finance the Collateral, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (c) make an equity contribution to Mortgage Borrower in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.4 of the Mortgage Loan Agreement, and (d) distribute the balance of the proceeds, if any, to Borrower for further application pursuant to the terms and provisions of the Organizational Documents of Borrower.

**Section 2.2.    Interest Rate**.

**2.2.1    Interest Rate**.  Interest on the Outstanding Principal Balance shall accrue at the Interest Rate and be payable from and including the Closing Date through and including the last day of the Interest Period in which the Maturity Date occurs.

**2.2.2    Default Rate**.  In the event that, and for so long as, any Event of Default has occurred and remains outstanding, the Outstanding Principal Balance shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

**2.2.3   Interest Calculation**.  Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days in the applicable period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the Outstanding Principal Balance.

**2.2.4   Usury Savings**.  This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required or obligated to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan shall, to the extent permitted by the applicable Legal Requirements, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

Section 2.3.   **Loan Payments**.

**2.3.1   Payment Before Maturity Date**.   Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Interest Period.  Borrower shall make a payment to Lender equal to the Monthly Debt Service Payment Amount on each Monthly Payment Date until the Debt shall be paid in full in accordance with the terms and provisions of this Agreement and the other Loan Documents.

**2.3.2   Intentionally Omitted**.

**2.3.3   Payment on Maturity Date**.  Borrower shall pay to Lender on the Maturity Date (a) the Outstanding Principal Balance, (b) all interest which would accrue through and including the last day of the Interest Period in which the Maturity Date occurs and (c) all other amounts due hereunder and under the other Loan Documents.

**2.3.4   Late Payment Charge**.  Subject to the provisions of Section 2.7.4, if any principal, interest or any other sum due under the Loan Documents (excluding the Outstanding Principal Balance due and payable on the Maturity Date) is not paid by Borrower within five (5) Business Days after the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Pledge Agreement and the other Loan Documents to the extent permitted by applicable law.

### 2.3.5    Method and Place of Payment.

(a)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the other Loan Documents shall be made to Lender not later than 3:00 p.m., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the first (1st) Business Day that is immediately preceding such due date (notwithstanding such adjustment of due dates, Borrower shall not be entitled to any deduction of interest due under this Agreement or any of the other Loan Documents).

(c)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

### Section 2.4.    Prepayments.

**2.4.1    Voluntary Prepayments.**  Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.  Subject to Section 2.4.3 and Section 2.4.4 hereof, on and after the Open Prepayment Commencement Date, Borrower may, at its option and upon thirty (30) days' prior notice to Lender (which notice shall specify the proposed Prepayment Date), prepay the Debt in whole (but not in part), on any Business Day. Notwithstanding the foregoing, Borrower may withdraw its notice of prepayment tendered pursuant to this Section 2.4.1 no later than one (1) Business Day prior to the proposed Prepayment Date set forth in such notice to Lender; provided, however, that Borrower shall pay all reasonable out-of-pocket costs, fees and expenses (including, but not limited to, reasonable attorneys' fees and disbursements) incurred by Lender in connection with actions taken as a result of its receipt of the notice of prepayment and the revocation thereof.  Any prepayment received by Lender shall be accompanied by (a) all interest which would have accrued on the amount of the Loan to be prepaid through and including the last day of the Interest Period relating to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period relating to such Monthly Payment Date), (b) all reasonable out-of-pocket, third party costs and expenses actually incurred by Lender in connection with such prepayment, and (c) all other sums due and payable under this Agreement and the other Loan Documents.  Subject to Borrower's right to withdraw a notice of prepayment in accordance with this Section 2.4.1, if a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.4.1, the amount designated for prepayment and all other sums required under this Section 2.4.1 shall be due and payable on the proposed Prepayment Date.  Notwithstanding anything to the contrary set forth herein, the Loan may not be voluntarily prepaid in whole or in part unless there is a simultaneous pro rata prepayment of the Mortgage Loan and the Mezzanine 2 Loan.

### 2.4.2    Liquidation Events; Mandatory Prepayments.

(a)      In the event of (i) any Casualty to all or any portion of the Property, (ii) any Condemnation of all or any portion of the Property, (iii) the receipt by Mortgage Borrower of any excess proceeds realized under its owner's title insurance policy after application of such proceeds by Mortgage Borrower to cure any title defect, (iv) a Transfer of the Property in connection with realization thereon following a Mortgage Loan Event of Default, including, without limitation, a foreclosure sale, or (v) any refinancing of the Property or the Mortgage Loan (each, a "**Liquidation Event**"), Borrower shall cause the related Net Liquidation Proceeds After Debt Service to be deposited directly into the Mezzanine Deposit Account.  On each date on which Lender actually receives a distribution of Net Liquidation Proceeds After Debt Service, the same shall be used (and Borrower hereby authorizes and confirms such use) to prepay the Outstanding Principal Balance in an amount equal to one hundred percent (100%) of such Net Liquidation Proceeds After Debt Service, together with all interest which would have accrued on the amount of the Loan to be prepaid through and including the last day of the Interest Period related to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period related to such Monthly Payment Date) and payment of any applicable Yield Maintenance Premium.  Any amounts of Net Liquidation Proceeds After Debt Service in excess of the Debt shall be paid to Mezzanine 2 Lender.  Any prepayment received by Lender pursuant to this Section 2.4.2 on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan and shall be applied by Lender on the next Monthly Payment Date.  Other than during the continuance of an Event of Default, no Yield Maintenance Premium shall be due in connection with any prepayment made pursuant to this Section 2.4.2(a)(i) or (ii).

(b)      Borrower shall notify Lender of any Liquidation Event not later than three (3) Business Days following the first date on which Borrower has knowledge of such event. Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of all or any portion of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given, and (ii) a refinancing of all or any portion of the Property, on the date on which a commitment for such refinancing has been entered into. The provisions of this Section 2.4.2 shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or Transfer of the Property set forth in this Agreement, the other Loan Documents and the Mortgage Loan Documents.

2.4.3   **Prepayments After Default**.  If, during the continuation of any Event of Default, prepayment of all or any part of the Debt is tendered by Borrower (which tender Lender may reject to the extent permitted by the applicable Legal Requirements), a purchaser at foreclosure or any other Person, Borrower, such purchaser at foreclosure or such other Person shall pay, in addition to the amount of the Loan to be prepaid, (a) an amount equal to the Yield Maintenance Default Premium, (b) all interest which would have accrued on the amount of the Loan to be prepaid through and including the last day of the Interest Period relating to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period relating to such Monthly Payment Date), (c) all reasonable out-of-pocket, third party costs and expenses actually incurred by Lender in connection with such prepayment, and (d) all other sums due and payable under the Loan Documents.

**2.4.4** **Prepayment Prior to Defeasance Lockout Expiration Date**. If the Permitted Release Date has occurred but the Defeasance Lockout Expiration Date has not occurred, Borrower shall have the right either to (a) prepay the Debt in whole (but not in part) on any Business Day; provided that (i) no Event of Default has occurred and remains outstanding, (ii) Borrower shall have provided not less than thirty (30) days' (or such shorter period of time as may be permitted by Lender in its reasonable discretion) prior notice to Lender (which notice shall specify the proposed Prepayment Date (it being understood that such notice may be given prior to the Permitted Release Date and the applicable proposed Prepayment Date may be the Permitted Release Date), and (iii) such prepayment shall be accompanied by (A) the Yield Maintenance Premium, (B) all interest which would have accrued on the amount of the Loan to be prepaid through and including the last day of the Interest Period relating to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period relating to such Monthly Payment Date), (C) all reasonable out-of-pocket, third party costs and expenses actually incurred by Lender in connection with such prepayment, and (D) all other sums due and payable under this Agreement and the other Loan Documents, or (b) prepay a pro rata portion of the Debt in connection with the partial prepayment of the Debt (as defined in the Mortgage Loan Agreement) made pursuant to Section 2.4.4(b) of the Mortgage Loan Agreement; provided that (i) no Event of Default has occurred and remains outstanding, (ii) Borrower shall have provided not less than thirty (30) days' (or such shorter period of time as may be permitted by Lender in its reasonable discretion) prior notice to Lender (which notice shall specify the proposed Prepayment Date (it being understood that such notice may be given prior to the Permitted Release Date and the applicable proposed Prepayment Date may be the Permitted Release Date), (iii) Borrower shall have satisfied the conditions set forth in clauses (xiii) through (xviii) of Section 2.5.1(b) as if the applicable prepayment were being handled as a Partial Defeasance Event, (iv) Borrower shall have paid all costs and expenses of Lender in connection with such partial release, including reasonable attorneys' fees and expenses and the fees, costs and expenses of Servicer and any Trustee, and (v) such prepayment shall be accompanied by (A) the Yield Maintenance Premium, (B) all interest which would have accrued on the amount of the applicable portion of the Loan to be prepaid through and including the last day of the Interest Period related to the Monthly Payment Date next occurring following the date of such prepayment (or, if such prepayment occurs on a Monthly Payment Date, through and including the last day of the Interest Period related to such Monthly Payment Date), and (C) all other sums due and payable under the Loan Documents with respect to such portion of the Loan. Following its receipt from Borrower of a notice described in the foregoing clauses (a)(ii) and/or (b)(ii), Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration. Notwithstanding the foregoing, Borrower may withdraw its notice of prepayment tendered pursuant to this Section 2.4.4 no later than two (2) Business Days prior to the proposed Prepayment Date set forth in such notice to Lender; provided, however, that Borrower shall pay all reasonable out-of-pocket costs, fees and expenses (including, but not limited to, reasonable attorneys' fees and disbursements) incurred by Lender in connection with actions taken as a result of its receipt of the notice of prepayment and the revocation thereof. Subject to Borrower's right to withdraw a notice of prepayment in accordance with this Section 2.4.4, if a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.4.4, the Debt shall be due and payable on the proposed Prepayment Date. Lender shall not be obligated to accept any prepayment of the Debt unless it is accompanied by the prepayment consideration due in connection therewith.

**Section 2.5.    Defeasance**.

**2.5.1    <u>Conditions to Defeasance</u>**.

(a)    **<u>Total Defeasance</u>**.  So long as no Event of Default has occurred and remains outstanding, Borrower shall have the right at any time after the Defeasance Lockout Expiration Date and prior to the Open Prepayment Commencement Date to voluntarily defease the entire Loan and obtain a release of the Lien of the Pledge Agreement (a "**<u>Total Defeasance Event</u>**"), subject to the satisfaction of the following conditions precedent:

(i)    Borrower shall provide Lender not less than thirty (30) days' prior notice (or such shorter period of time if permitted by Lender in its reasonable discretion) specifying a date (the "**<u>Total Defeasance Date</u>**") on which the Total Defeasance Event is to occur; provided that notwithstanding the foregoing, Borrower may withdraw its notice of defeasance tendered pursuant to this <u>Section 2.5.1(a)</u> no later than one (1) Business Day prior to the proposed Total Defeasance Date set forth in such notice to Lender, provided, further, that Borrower shall pay all reasonable out-of-pocket fees, costs and expenses (including, but not limited to, reasonable attorneys' fees and disbursements) incurred by Lender in connection with actions taken as a result of its receipt of the notice of defeasance and the revocation thereof;

(ii)    Borrower shall pay to Lender (i) the Monthly Debt Service Payment Amount due on the Total Defeasance Date (including, without limitation, all interest which would have accrued on the amount of the Loan through and including the last day of the Interest Period related to the Monthly Payment Date next following the Total Defeasance Date) and (ii) all other sums due and payable under this Agreement, the Note and the other Loan Documents;

(iii)    Borrower shall deposit the applicable Total Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of <u>Sections 2.5.2</u> and <u>2.5.3</u> hereof and, if applicable, <u>Section 2.6.3</u> hereof;

(iv)    Borrower shall execute and deliver to Lender a Defeasance Security Agreement in respect of the Defeasance Collateral Account and the Total Defeasance Collateral;

(v)    Borrower shall deliver to Lender an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (i) Borrower has legally and validly transferred and assigned the Total Defeasance Collateral and all rights and obligations under the Note to Successor Borrower, (ii) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Total Defeasance Collateral, (iii) if a Securitization has occurred, the Securitization Vehicle formed in connection with such Securitization will not fail to maintain its status as a Securitization Vehicle as

a result of the Total Defeasance Event, (iv) the Total Defeasance Event will not result in a deemed exchange for purposes of the Code and will not adversely affect the status of the Note as indebtedness for federal income tax purposes, and (v) the delivery of the Total Defeasance Collateral and the grant of a security interest in the Defeasance Collateral Account and the Total Defeasance Collateral to Lender shall not constitute an avoidable preference under Section 547 of the U.S. Bankruptcy Code or any other Bankruptcy Law;

(vi)    If required by the Rating Agencies, Borrower shall deliver to Lender a bankruptcy non-consolidation opinion with respect to Successor Borrower reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion;

(vii)    Following a Securitization, Lender shall have received (at Borrower's sole cost and expense) a Rating Agency Confirmation as to the Total Defeasance Event;

(viii)    Borrower shall deliver a certificate of a "big four" or other nationally recognized public accounting firm acceptable to Lender certifying that the Total Defeasance Collateral will generate amounts equal to or greater than the applicable Scheduled Total Defeasance Payment on or prior to each corresponding Monthly Payment Date or other scheduled payment date;

(ix)    Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request;

(x)    Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.5.1(a) have been satisfied;

(xi)    Borrower shall pay all fees, costs and expenses incurred by Lender in connection with the Total Defeasance Event or otherwise required to accomplish the agreements set forth in this Section 2.5.1(a) and, if applicable, Section 2.6.3 hereof, including (i) reasonable attorneys' fees and expenses, (ii) the fees, costs and expenses of the Rating Agencies, (iii) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or each applicable Defeased Note, as applicable, the creation of each applicable Defeased Note and each related Undefeased Note, if applicable, and (iv) the fees, costs and expenses of Servicer and any Trustee. Simultaneously with the notice described in Section 2.5.1(a)(i) above, Borrower shall deliver to Lender an amount reasonably determined by Lender to be sufficient to pay such fees, costs and expenses, which amount may be used by Lender to pay such fees, costs and expenses if a proposed Total Defeasance Event does not occur; and

(xii)    If the Mortgage Loan and/or the Mezzanine 2 Loan is outstanding, the Mortgage Loan and the Mezzanine 2 Loan shall have been paid in full on the Total Defeasance Date.

If Borrower has elected to defease the entire Loan and the requirements of this Section 2.5 have been satisfied, the Collateral shall be released from the Lien of the Pledge Agreement. In connection with such release of the Lien, Borrower shall submit to Lender, not less than ten (10) Business Days prior to the Total Defeasance Date, a release of Lien (and related Loan Documents) for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Collateral is located and that contains standard provisions protecting the rights of the releasing lender. In addition, Borrower shall provide all other documentation that a prudent lender originating commercial loans for securitization similar to the Loan would reasonably require to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement. Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Pledge Agreement, including Lender's reasonable attorneys' fees and disbursements.

(b)      **Partial Defeasance**. So long as no Event of Default has occurred and remains outstanding, Borrower shall have the right at any time after the Defeasance Lockout Expiration Date and prior to the Open Prepayment Commencement Date to voluntarily defease a portion of the Loan (a "**Partial Defeasance Event**"), subject to the satisfaction of the following conditions precedent:

(i)      Borrower shall provide Lender not less than thirty (30) days' prior written notice (or such shorter period of time, if permitted by Lender in its reasonable discretion) specifying a date (the "**Partial Defeasance Date**") on which the Partial Defeasance Event is to occur (the date of Lender's receipt of such notice shall be referred to herein as the "**Partial Defeasance Notice Date**"); provided that notwithstanding the foregoing, Borrower may withdraw its notice of defeasance tendered pursuant to this Section 2.5.1(b) no later than one (1) Business Day prior to the proposed Partial Defeasance Date set forth in such notice to Lender, provided, further, that Borrower shall pay all reasonable out-of-pocket fees, costs and expenses (including, but not limited to, reasonable attorneys' fees and disbursements) incurred by Lender in connection with actions taken as a result of its receipt of the notice of defeasance and the revocation thereof;

(ii)      Borrower shall pay to Lender (i) the Monthly Debt Service Payment Amount due on the Partial Defeasance Date (including, without limitation, all interest which would have accrued on the amount of the Loan through and including the last day of the Interest Period related to the Monthly Payment Date next following the Partial Defeasance Date) and (ii) all other sums due and payable under this Agreement, the Note and the other Loan Documents through and including the Partial Defeasance Date;

(iii)      Borrower shall deposit the applicable Partial Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of Sections 2.5.2 and 2.5.3 hereof and, if applicable, Section 2.6.3 hereof;

(iv)    Lender shall prepare and Borrower shall execute all necessary documents to modify this Agreement and to amend and restate each Note and issue two (2) new substitute notes with respect to each Note, with a portion of such substitute notes having, in the aggregate, a principal balance equal to the Adjusted Release Amount for the subject Individual Property (including, at Borrower's election, such additional amount that would permit Borrower to satisfy the requirements of subparagraphs (xiii) through (xv) of this Section 2.5.1(b)) (individually and/or collectively (as the context requires), the "**Defeased Note**") and the remainder of such substitute notes having, in the aggregate, a principal balance equal to the excess of (1) the outstanding principal amount of the Loan existing immediately prior to the applicable Partial Defeasance Event over (2) the principal amount of the Defeased Note (individually and/or collectively (as the context requires), the "**Undefeased Note**") and, if a Partial Defeasance Event has previously occurred, the outstanding principal amount of each of the Defeased Notes relating to such previous Partial Defeasance Event.  The Defeased Note and the Undefeased Note shall have identical terms as the Note, except for the principal balance and except that a Defeased Note cannot be the subject of any further Partial Defeasance Event;

(v)    Borrower shall execute and deliver to Lender a Defeasance Security Agreement in respect of the Defeasance Collateral Account and the Partial Defeasance Collateral;

(vi)    Borrower shall deliver to Lender an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (i) Borrower has legally and validly transferred and assigned the Partial Defeasance Collateral and all rights and obligations under the Note or each applicable Defeased Note, as applicable, to Successor Borrower, (ii) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Partial Defeasance Collateral, (iii) if a Securitization has occurred, the Securitization Vehicle formed in connection with such Securitization will not fail to maintain its status as a Securitization Vehicle as a result of the Partial Defeasance Event, (iv) the Partial Defeasance Event will not result in a deemed exchange for purposes of the Code and will not adversely affect the status of the Note or each applicable Undefeased Note, as applicable, as indebtedness for federal income tax purposes, and (v) the delivery of the Partial Defeasance Collateral and the grant of a security interest in the Defeasance Collateral Account and the Partial Defeasance Collateral to Lender shall not constitute an avoidable preference under Section 547 of the U.S. Bankruptcy Code or any other Bankruptcy Law;

(vii)    If required by the Rating Agencies, Borrower shall deliver to Lender a bankruptcy non-consolidation opinion with respect to Successor Borrower reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion;

(viii)    Following a Securitization, if required by Lender, Lender shall have received (at Borrower's sole cost and expense) a Rating Agency Confirmation as to the Partial Defeasance Event;

(ix)    Borrower shall deliver a certificate of a "big four" or other nationally recognized public accounting firm acceptable to Lender certifying that the Partial Defeasance Collateral will generate amounts equal to or greater than the applicable Scheduled Partial Defeasance Payment on or prior to each corresponding Monthly Payment Date or other scheduled payment date;

(x)    Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request;

(xi)    Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.5.1(b) have been satisfied;

(xii)    Borrower shall pay all fees, costs and expenses incurred by Lender in connection with the Partial Defeasance Event or otherwise required to accomplish the agreements set forth in this Section 2.5.1(b) and, if applicable, Section 2.6.3 hereof, including (i) reasonable attorneys' fees and expenses, (ii) the fees, costs and expenses of the Rating Agencies, (iii) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or any applicable Defeased Note, as applicable, the creation of each applicable Defeased Note and each applicable Undefeased Note, if applicable, and (iv) the fees, costs and expenses of Servicer and any Trustee.  Simultaneously with the notice described in Section 2.5.1(b)(i) above, Borrower shall deliver to Lender an amount reasonably determined by Lender to be sufficient to pay such fees, costs and expenses, which amount may be used by Lender to pay such fees, costs and expenses if a proposed Partial Defeasance Event does not occur;

(xiii)    The Individual Property or Individual Properties proposed by Mortgage Borrower to be released by Mortgage Lender from the Lien of the applicable Security Instrument(s) pursuant to the terms of Section 2.5.1(b) of the Mortgage Loan Agreement shall be conveyed to a third party purchaser that is not an Affiliate of Borrower or Mortgage Borrower pursuant to an arms' length agreement on market terms;

(xiv)    As of the date of consummation of the Partial Defeasance Event, after giving effect to the partial release of the Individual Property or Individual Properties proposed by Mortgage Borrower to be released by Mortgage Lender from the Lien of the applicable Security Instrument(s) pursuant to the terms of Section 2.5.1(b) of the Mortgage Loan Agreement, the Debt Service Coverage Ratio with respect to the remaining Individual Properties securing the Debt shall be equal to or greater than the greater of (1) the Closing Date Debt Service Coverage Ratio and (2) the Debt Service Coverage Ratio of all Individual Properties encumbered by the Security Instrument immediately prior to the consummation of the Partial Defeasance Event;

(xv)    As of the date of consummation of the Partial Defeasance Event, after giving effect to the partial release of the Individual Property or Individual Properties proposed by Mortgage Borrower to be released by Mortgage Lender from the Lien of the applicable Security Instrument(s) pursuant to the terms of Section 2.5.1(b) of the Mortgage Loan Agreement, the Debt Yield shall be equal to or greater than the greater of (1) the Closing Date Debt Yield and (2) the Debt Yield of all Individual Properties encumbered by the Security Instrument immediately prior to the consummation of the Partial Defeasance Event;

(xvi)    As of the date of consummation of the Partial Defeasance Event, after giving effect to the partial release of the Individual Property or Individual Properties proposed by Mortgage Borrower to be released by Mortgage Lender from the Lien of the applicable Security Instrument(s) pursuant to the terms of Section 2.5.1(b) of the Mortgage Loan Agreement, the Loan-to-Value Ratio (based on the Appraisals delivered to Lender in connection with the initial closing of the Loan, it being agreed that no new Appraisals shall be required by Lender in connection with such determination) shall be no greater than the lesser of (1) the Closing Date LTV and (2) the Loan-to-Value Ratio of all Individual Properties encumbered by the Security Instrument immediately prior to the consummation of the Partial Defeasance Event;

(xvii)    As of the date of consummation of the Partial Defeasance Event, after giving effect to the partial release of the Individual Property or Individual Properties proposed by Mortgage Borrower to be released by Mortgage Lender from the Lien of the applicable Security Instrument(s) pursuant to the terms of Section 2.5.1(b) of the Mortgage Loan Agreement, (A) the aggregate Net Operating Income of the remaining Individual Properties located in the Houston, Texas metropolitan area shall not exceed forty percent (40%) of the aggregate Net Operating Income of all of the remaining Properties, and (B) the aggregate Net Operating Income of the remaining Individual Properties located in the Dallas, Texas metropolitan area shall not exceed twenty percent (20%) of the aggregate Net Operating Income of all of the remaining Properties; the Individual Properties that are considered to be located in the Houston, Texas metropolitan area and the Individual Properties that are considered to be located in the Dallas, Texas metropolitan area are described on <u>Schedule 2.5.1</u> attached hereto.

(xviii)    To the extent the ratio of the Outstanding Principal Balance to the value of the remaining Property is greater than one hundred and twenty-five percent (125%) (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, (i) based solely on real property and excluding any personal property and going concern value, if any, and (ii) for purposes of clarification, it being understood and agreed that such value shall be determined by Lender in compliance with Treasury Regulations Section 1.860G-2(a)(2), in addition to the Adjusted Release Price, the principal balance of the Loan must be paid down by an amount such that the loan-to-value ratio of the Loan (as so determined by Lender) does not increase after the release, unless Lender receives an opinion letter of counsel that if such amount is not paid, the

applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Collateral from the Lien of the Pledge Agreement;

(xix)    Mortgage Borrower shall have satisfied all of the conditions to a partial defeasance of the Mortgage Loan pursuant to Section 2.5.1(b) of the Mortgage Loan Agreement; and

(xx)    If the Mezzanine 2 Loan is outstanding, Mezzanine 2 Borrower shall have prepaid or defeased a portion of the Mezzanine 2 Loan in an amount equal to the Mezzanine 2 Adjusted Release Amount for the subject Individual Property on the Partial Defeasance Date in accordance with the applicable Mezzanine 2 Loan Documents.

2.5.2    **Defeasance Collateral Account**.  On or before the date on which Borrower delivers the Defeasance Collateral, Borrower shall open at an Eligible Institution the defeasance collateral account (the "Defeasance Collateral Account"), which shall at all times be an Eligible Account.  Each of the U.S. Obligations that constitutes a part of the Defeasance Collateral shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be reasonably satisfactory to a prudent lender (including, without limitation, such instruments as may be required by the Eligible Institution at which the Defeasance Collateral Account is to be maintained to effectuate book-entry transfers and pledges through the book-entry facilities of such Eligible Institution) in order to perfect, upon the delivery of the Defeasance Collateral, a first priority security interest therein in favor of Lender in conformity with all applicable Legal Requirements governing the granting of such security interest.  The Defeasance Collateral Account shall contain only (a) the Defeasance Collateral and (b) cash from principal and interest paid on the Defeasance Collateral or other cash proceeds thereof.  Pursuant to the Defeasance Security Agreement or other appropriate agreement or instrument, Borrower or Successor Borrower, as applicable, shall authorize and direct that all payments received from and all proceeds of the Defeasance Collateral be made or paid directly to the Cash Management Account (unless otherwise directed by Lender) and applied to satisfy the Debt Service and, if applicable, other payment obligations of Borrower under the Note or the Defeased Note, as applicable.  Borrower or Successor Borrower, as applicable, shall be the owner of the Defeasance Collateral Account and shall report all income accrued on the Defeasance Collateral for federal, state and local income tax purposes in its income tax return.  Borrower or Successor Borrower, as applicable, shall prepay all fees, costs and expenses associated with opening and maintaining the Defeasance Collateral Account.  Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.

2.5.3    **Successor Borrower**.  In connection with a Defeasance Event, Borrower shall establish a successor entity designated by UBS AG 1285 Branch or, at UBS AG 1285 Branch's option, a successor entity designated by Borrower (in each case, a "Successor Borrower"), which (a) shall be a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies and (b) shall be approved by the Rating Agencies.  Borrower shall transfer and assign all rights and obligations under and to the Note or the Defeased Note, as applicable, and the Defeasance Security Agreement, together with the Defeasance Collateral, to such Successor Borrower.  Such Successor Borrower shall assume the obligations under the Note

or the Defeased Note, as applicable, and the Defeasance Security Agreement and Borrower shall be relieved of its obligations under such documents. Borrower shall pay a minimum of One Thousand and No/100 Dollars ($1,000.00) to any Successor Borrower as consideration for assuming the obligations under the Note or the Defeased Note, as applicable, and the Defeasance Security Agreement. Borrower shall pay all fees, costs and expenses incurred by Lender and the Rating Agencies in connection therewith.

**Section 2.6.    Release of Collateral**.

**2.6.1    Release of Collateral**.

(a)    Except as set forth in <u>Section 2.5</u> and this <u>Section 2.6</u>, no repayment, prepayment or defeasance of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Pledge Agreement on the Collateral.

(b)    If Borrower has elected to defease the entire Loan and the requirements of <u>Section 2.5</u> and this <u>Section 2.6</u> have been fully satisfied, the Collateral shall be released from the Lien of the Pledge Agreement and the Defeasance Collateral Account and the Defeasance Collateral, pledged pursuant to the Defeasance Security Agreement, shall be the sole source of collateral securing the Note.

**2.6.2    Release on Payment in Full**.

(a)    Upon payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents, upon the written request and at the sole cost and expense of Borrower, Lender shall release the Lien of the Pledge Agreement on the Collateral.

(b)    In connection with the release of the Lien of the Pledge Agreement on the Collateral, Borrower shall submit to Lender, concurrently with the request under <u>Section 2.6.2(a)</u>, a release of Lien of the Pledge Agreement (and the related Loan Documents) on the Collateral for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Collateral is located, would be satisfactory to a prudent lender and shall contain standard provisions, if any, protecting the rights of the releasing lender. In addition, Borrower shall provide all other certificates, documents and instruments Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all applicable Legal Requirements and (ii) will effect such release in accordance with the terms of this Agreement.

**Section 2.7.    Clearing Account/Cash Management Account/Cash Management**.

**2.7.1    Clearing Account**. During the term of the Loan, Borrower shall cause Mortgage Borrower to establish and maintain the Clearing Account for the benefit of Mortgage Lender in accordance with the Clearing Account Agreement. The Clearing Account shall be under the sole dominion and control of Mortgage Lender. Mortgage Lender shall have the sole right to make withdrawals from the Clearing Account (subject to the terms of the Mortgage Loan Documents, including Section 2.7.2 thereof). All costs and expenses for establishing and maintaining the Clearing Account shall be paid by Mortgage Borrower. Borrower shall cause

Mortgage Borrower to at all times comply with the provisions of Section 2.7.1 of the Mortgage Loan Agreement.

### 2.7.2    **Cash Management Account**.

(a)    Upon the commencement of the first Cash Management Trigger Event Period, Borrower shall cause Mortgage Borrower to establish and maintain the Cash Management Account to be held by Cash Management Bank in trust and for the benefit of Mortgage Lender in accordance with the Cash Management Agreement. The Cash Management Account shall be under the sole dominion and control of Mortgage Lender. Mortgage Lender shall have the sole right to make withdrawals from the Cash Management Account (subject to the terms of the Mortgage Loan Documents, including Section 2.7.2 thereof). All costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Mortgage Borrower. Borrower will cause Mortgage Borrower to at all times comply with the provisions of Section 2.7.2 of the Mortgage Loan Agreement. Borrower shall not cause or permit Mortgage Borrower to (i) amend the Cash Management Agreement or any provisions relating to cash management set forth in the Mortgage Loan Agreement or any other Mortgage Loan Document without Lender's prior written consent or (ii) in any way alter or modify the Cash Management Account. Borrower will notify Lender of the account number of the Cash Management Account.

(b)    In the event that Mortgage Lender waives the foregoing cash management provisions or the requirement of Mortgage Borrower to maintain the Clearing Account, or in the event that the Loan remains outstanding after the Mortgage Loan has been paid in full, Borrower shall promptly (i) enter into and cause Mortgage Borrower to enter into a cash management agreement with Lender upon substantially the same terms as the Clearing Account Agreement or the Cash Management Agreement, as applicable, and the provisions relating to cash management set forth in the Mortgage Loan Agreement and any other Mortgage Loan Document; and (ii) enter into and deliver to Lender all other reasonable and customary agreements required by Lender in connection therewith in form reasonably acceptable to Lender including, without limitation, an amendment to this Agreement and any related documentation; provided that Lender has obtained written consent from Mortgage Lender in the event that the Mortgage Loan is still outstanding.

### 2.7.3    **Cash Management.**

(a)    During the term of the Loan, Lender shall designate an account (the "**Mezzanine Deposit Account**"), which Mezzanine Deposit Account shall be under the sole dominion and control of Lender. Lender shall have the sole right to make withdrawals from the Mezzanine Deposit Account. All costs and expenses for establishing and maintaining the Mezzanine Deposit Account shall be paid by Borrower. Borrower shall direct or cause Mortgage Borrower to direct that all cash distributions from the Cash Management Account to be paid to Lender in accordance with Section 2.7.2 of the Mortgage Loan Agreement be deposited into the Mezzanine Deposit Account. Additionally, during any Cash Management Trigger Event Period, Borrower shall cause all distributions of Property net cash flow or other cash distributions by Mortgage Borrower to its direct or indirect equity owners (including the Net Liquidation Proceeds After Debt Service) to be made to Borrower and deposited directly into the Mezzanine Deposit Account on the date the same are made.

(b)      Provided that no Event of Default shall have occurred and remain outstanding, all funds on deposit in the Mezzanine Deposit Account shall be applied in the following amounts and order of priority:

(i)      First, funds sufficient to pay all amounts then due and payable to Lender pursuant to the Loan Documents;

(ii)      then, funds sufficient to pay the next monthly deposits into the Reserve Funds that are then required to be deposited therein, if any, pursuant to Article VI of this Agreement;

(iii)      then, during a Cash Sweep Trigger Event Period, the remaining amount (the "**Mezzanine Loan Excess Cash Flow**") shall be deposited into the Mezzanine Loan Excess Cash Flow Account and held and applied in accordance with the terms and conditions of Section 6.6 hereof; and

(iv)      Last, all amounts remaining in the Mezzanine Deposit Account after deposits for items (i) through (iii) above shall be (A) in the event a Mezzanine 2 Loan Cash Sweep Trigger Event Period shall be continuing, transferred to Mezzanine 2 Lender (subject to Section 2.7.4) to be applied in accordance with the Mezzanine 2 Loan Documents, or (B) in the event no Mezzanine 2 Loan Cash Sweep Trigger Event Period shall be continuing, deposited into an account designated by Borrower.

(c)      Notwithstanding anything to the contrary contained in this Agreement, the Note or the other Loan Documents, upon the occurrence and during the continuation of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any amounts then on deposit in the Mezzanine Deposit Account, the Mezzanine Loan Excess Cash Flow Account or any other Account to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.

**2.7.4**      **Borrower Distributions**.      Any transfer of Borrower's funds from the Mezzanine Deposit Account or any other source to or for the benefit of Mezzanine 2 Lender or Mezzanine 2 Borrower pursuant to this Agreement, the Cash Management Agreement or any of the other Loan Documents and/or Mortgage Loan Documents is intended by the parties to constitute, and shall constitute, a distribution from Borrower to Mezzanine 2 Borrower and shall be recorded as such on the books and records of each party.  All such distributions must comply with the requirements of Section 18-607 of the Act.  No provision of any Loan Document is intended to nor shall create a debtor-creditor relationship between Borrower and Mezzanine 2 Lender.

**2.7.5**      **Payments Received Under this Agreement**.      The insufficiency of funds on deposit in the Accounts shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligation shall be separate and independent, and not conditioned on any event or circumstance whatsoever. Borrower shall in all events be required to pay when due hereunder all monthly installments of

principal and/or interest on the Loan, all monthly deposits for reserves and escrows (if any are maintained pursuant to Article VI hereof) and all other amounts due under this Agreement, the Note and the other Loan Documents, regardless of whether funds are deposited or held in sufficient amount in, or disbursed from, the Mezzanine Deposit Account or any other Accounts. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, and provided that no Event of Default shall have occurred and remain outstanding, Borrower's obligations with respect to the payment of the Monthly Debt Service Payment Amount and amounts required to be deposited into the Reserve Funds, if any, shall be deemed satisfied to the extent sufficient amounts are deposited in the Mezzanine Deposit Account to satisfy such obligations pursuant to this Agreement on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

**Section 3.1.    Borrower Representations**.

Borrower represents and warrants to Lender that:

### 3.1.1    <u>Organization</u>.

(a)    Borrower is, and since the date of its formation has been, duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is, and since the date of its respective formation has been, duly qualified and in good standing in all jurisdictions in which the ownership or leasing of its property or the conduct of its business requires such qualification (except where the failure to be so qualified would not have a Material Adverse Effect) and Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby and thereby.

(b)    Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement.  Borrower is an organization of the type specified in the first paragraph of this Agreement.  Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement.  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change).

(c)    Borrower has the power and authority and the requisite ownership interests in Mortgage Borrower to control the actions of Mortgage Borrower, and upon the realization of the Collateral, Lender or any other party succeeding to Borrower's interest in the Collateral would have such control.  Without limiting the foregoing, Borrower has sufficient control over Mortgage Borrower to cause Mortgage Borrower to (i) take any action on Mortgage

Borrower's part required by the Loan Documents and (ii) refrain from taking any action prohibited by the Loan Documents.

(d)    WCHC has not issued any Preferred Units (as such term is defined in the WCHC LLC Agreement), any units designated as Series A Preferred Units (as such term is defined in the WCHC LLC Agreement), or any other type of preferred equity interests, and there are no Preferred Interest Holders (as such term is defined in the WCHC LLC Agreement).

**3.1.2    Proceedings**.  This Agreement and the other Loan Documents have been duly authorized, executed and delivered by or on behalf of Borrower and, to Borrower's knowledge, constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law).

**3.1.3    No Conflicts**.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any asset or property of Borrower pursuant to the terms of any mortgage, deed of trust, deed to secure debt, mortgage deed, indemnity deed of trust, indenture, loan agreement, management agreement or other agreement, document or instrument to which Borrower is a party or by which Borrower or any of its assets or properties is bound, nor, to Borrower's knowledge, will such action result in any violation of the provisions of any Legal Requirements of any Governmental Authority having jurisdiction over Borrower or any of Borrower's assets or properties.

**3.1.4    Litigation**.  There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower, Mortgage Borrower, Sole Member, Guarantor, Key Principal, Manager, the Collateral or the Property in any court or by or before any other Governmental Authority that would be reasonably likely to have a Material Adverse Effect.

**3.1.5    Agreements**.  Borrower is not a party to any agreement or instrument or subject to any restriction which would be reasonably likely to materially and adversely affect Borrower, the Collateral or the Property, or Borrower's business, assets or properties, operations or condition (financial or otherwise).  To Borrower's knowledge, Borrower is not in default in any material respect in any manner that would be reasonably likely to have a Material Adverse Effect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which Borrower, Mortgage Borrower, the Collateral or the Property is bound. Borrower has no material financial obligation (contingent or otherwise) under any mortgage, deed of trust, deed to secure debt, mortgage deed, indemnity deed of trust, indenture, loan agreement or other agreement, document or instrument to which Borrower is a party or by which Borrower, Mortgage Borrower, the Collateral or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership of the Collateral and the management of the Mortgage Borrower and (b) obligations under the Loan Documents.

**3.1.6    Consents**.  Each consent, approval, authorization, order, registration or qualification of or with any court or any other Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement and the other Loan Documents has been obtained and is in full force and effect.

**3.1.7    Title**.  Borrower is the record and beneficial owner of, and has good title to, the Collateral, free and clear of all Liens whatsoever, except the Liens created by the Loan Documents.  The Pledge Agreement, together with the UCC financing statements relating to the Collateral, when properly filed in the appropriate records, will create a valid, perfected security interest in and to the Collateral, all in accordance with the terms thereof for which a Lien can be perfected by filing a UCC financing statement.  Borrower's delivery to Lender of the original certificates evidencing the Pledged Interests creates a valid and perfected first-priority security interest in the Collateral.

**3.1.8    No Plan Assets**.  As of the date hereof and throughout the Term, (a) neither Borrower nor Guarantor is obligated to contribute to or is itself or will be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, (b) none of the assets of Borrower or Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. §2510.3-101 as modified by Section 3(42) of ERISA, (c) neither Borrower nor Guarantor is or will be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower or Guarantor are not and will not be subject to any statute, rule or regulation regulating investments of, or fiduciary obligations with respect to, "governmental plans" within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement (including, but not limited to, the exercise by Lender of any of its rights under the Loan Documents).

**3.1.9    Compliance**.  Except as disclosed in the ESA, the Property Condition Report and/or the Property Zoning Report, Borrower, Mortgage Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes.  To Borrower's knowledge, except as set forth in the Property Zoning Report, in the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  Except as set forth in the Property Zoning Report, no legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property.  Except as set forth in the Property Zoning Report, neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.  To Borrower's knowledge, neither Borrower nor Mortgage Borrower is in default or violation of any order, regulation, writ, injunction, decree or demand of any Governmental Authority, the violation of which could have a Material Adverse Effect.  To Borrower's knowledge, there has not been committed by Borrower, Mortgage Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government, any state or local government or any other Governmental Authority the

right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents.

**3.1.10  Financial Information**.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property, the Collateral or otherwise in connection with the Loan (a) are true, correct and complete in all material respects, (b) accurately represent the financial condition of Borrower, Mortgage Borrower, the Collateral and the Property, as applicable, as of the date of such reports, and (c) have been prepared in accordance with the Acceptable Accounting Basis. Neither Borrower nor Mortgage Borrower has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and that could have a Material Adverse Effect.  Since the date of such financial statements, there has been no material adverse change in the financial condition, operation or business of Borrower, the Collateral or the Property from that set forth in said financial statements.

**3.1.11  Condemnation**.  No Condemnation or other similar proceeding has been commenced or, to Borrower's best knowledge, has been threatened or is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

**3.1.12  Affiliates**.  Borrower does not own any equity interests in any other Person other than the Pledged Interests.

**3.1.13  No Contractual Obligations**.   Other than the Loan Documents, the Organizational Documents of Borrower, and the Organizational Documents of Mortgage Borrower, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which it or its assets are bound, or has incurred any Indebtedness, except as permitted under the Loan Documents.

**3.1.14  Intentionally Omitted**.

**3.1.15  Enforceability**.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, Mortgage Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject only to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and, as to enforceability, to principles of equity), and none of Borrower, Mortgage Borrower or Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**3.1.16  Intentionally Omitted**.

**3.1.17  Insurance**.  Borrower has caused Mortgage Borrower to obtain and deliver to Lender (a) original or certified copies of the Policies or certificates of insurance acceptable to Lender reflecting the insurance coverages, amounts and other requirements set forth in the Mortgage Loan Agreement and (b) evidence acceptable to Lender that all premiums thereunder have been prepaid.  No claims have been made under any of the Policies, and no Person, including

Borrower or Mortgage Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**3.1.18** **Licenses**.  All approvals, authorizations, certifications, licenses and permits, including, without limitation, certificates of completion and occupancy, required by any Governmental Authority or otherwise necessary for the legal ownership, use, occupancy and operation of the Property in the manner in which the Property is currently being owned, used, occupied and operated have been obtained by or on behalf of Mortgage Borrower and are in full force and effect.

**3.1.19** **Intentionally Omitted**.

**3.1.20** **Intentionally Omitted**.

**3.1.21** **Intentionally Omitted**.

**3.1.22** **Leases**.  Borrower represents and warrants to Lender with respect to the Leases that:  (a) the rent rolls delivered to Lender in connection with the closing of the Loan bearing a print date of September 16, 2018 (collectively, the "Rent Roll") are true, correct and complete in all material respects as of the dates set forth thereon and the Property is not subject to any Leases other than the Leases described on the Rent Roll (other than potential subleases that have not been disclosed to Borrower), (b) the copies of the Commercial Leases and Major Leases delivered to Lender are true, correct and complete and there are no oral agreements with respect thereto, (c) except as shown on the Rent Roll or otherwise in a manner consistent with current market practices of prudent owners, no Rent (including security or other deposits) has been paid more than one (1) month in advance of its due date, (d) except as shown on the Rent Roll or otherwise in a manner consistent with current market practices of prudent owners, any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any Tenant has already been received by such Tenant, (e) all security or other deposits are being held in accordance with the applicable Leases and all applicable Legal Requirements, (f) Mortgage Borrower has not assigned or pledged any of the Leases, the rents or any interest therein except to Mortgage Lender, (g) no Tenant or other Person has an option, right of first refusal or offer or any other preferential right to purchase all or any portion of, or interest in, the Property, (h) to Borrower's knowledge, except as disclosed in the ESA, no Hazardous Substances have been disposed, stored or treated by any Tenant on, under or about the Property, and (i) Borrower does not have any knowledge of any Tenant's intention to use its leased premises for any activity which, directly or indirectly, involves the use, generation, treatment, storage, disposal or transportation of any petroleum product or any other Hazardous Substances.

**3.1.23** **Filing, Recording and Other Taxes**.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under the applicable Legal Requirements have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid under the applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Pledge Agreement, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property and the Collateral

have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established under the Loan Documents.

### 3.1.24 <u>Single Purpose</u>.

Borrower hereby represents and warrants to, and covenants with, Lender that since the date of its formation and at all times on and after the date hereof and until such time as the Debt shall be paid in full:

(a) Borrower (i) has been, is, and will be organized solely for the purpose of owning and managing the Collateral, entering into and performing its obligations under the Loan Documents, refinancing the Collateral in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, and (ii) has not owned, does not own, and will not own any asset or property other than (A) the Collateral and (B) incidental personal property necessary for the ownership and management of the Collateral.

(b) Borrower has not engaged and will not engage in any business or activity other than the ownership and management of the Collateral and Borrower will conduct and operate its business as presently conducted and operated.

(c) Borrower has not entered and will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party, except upon terms and conditions that are intrinsically fair, commercially reasonable, and no less favorable to it than those that would be available on an arm's-length basis from an unrelated third party.

(d) Except with respect to any previously existing financing which has been paid in full on or prior to the date hereof, Borrower has not incurred and, from and after the date hereof, will not incur any Indebtedness other than Permitted Debt. No Indebtedness, other than the Debt, may be secured (senior, subordinate or pari passu) by the Collateral.

(e) Borrower has not made and will not make any loans or advances to any other Person (including any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party), and has not acquired and shall not acquire obligations or securities of its Affiliates.

(f) Borrower has been, is, and intends to remain solvent and Borrower has paid its debt and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same became due and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due to the extent sufficient cash flow from the Property is available for such purposes; provided that the foregoing shall not create an obligation on the part of any direct or indirect member, partner, shareholder, beneficiary or other beneficial interest holder in Borrower, or any officer, director, employee, trustee, beneficiary or Affiliate of any of the foregoing, to make capital contributions, equity infusions or loans to Borrower.

48

(g)    (i) Borrower has done or caused to be done, and will do and cause to be done, all things necessary to observe its organizational formalities and preserve its separate existence, (ii) Borrower has not terminated or failed to comply with and will not terminate or fail to comply with the provisions of its Organizational Documents, (iii) Borrower has not amended, modified or otherwise changed its Organizational Documents, and (iv) unless (A) Lender has consented in writing and (B) following a Securitization of the Loan, the Rating Agencies have issued a Rating Agency Confirmation in connection therewith, Borrower will not amend, modify or otherwise change its Organizational Documents.

(h)    Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person. Borrower's assets have not been listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may have been included in a consolidated financial statement of its Affiliates; provided that, if applicable, (i) appropriate notation was made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit were not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets were listed on Borrower's own separate balance sheet. Borrower's assets will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates; provided that, if applicable, (A) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (B) such assets shall be listed on Borrower's own separate balance sheet. Borrower has filed and shall file its own tax returns (except to the extent that Borrower was or is treated as a "disregarded entity" for tax purposes and was or is not required to file tax returns under applicable law), has not filed and shall not file a consolidated federal income tax return with any other Person, and has paid and shall pay any taxes required to be paid under applicable law. Borrower has maintained and shall maintain its books, records, resolutions and agreements as official records.

(i)    Borrower (i) has been, will be, and at all times has held and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or any constituent party of Borrower), (ii) has corrected and shall correct any known misunderstanding regarding its status as a separate entity, (iii) has conducted and shall conduct business in its own name, (iv) has not identified and shall not identify itself or any of its Affiliates as a division or department or part of the other, and (v) has maintained and utilized and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)    Borrower has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, that the foregoing shall not create an obligation on the part of any direct or indirect member, partner, shareholder, beneficiary or other beneficial interest holder in Borrower, or any officer, director, employee, trustee, beneficiary or Affiliate of any of the foregoing, to make capital contributions, equity infusions or loans to Borrower.

(k)    Neither Borrower nor any constituent party of Borrower has sought and, to the fullest extent permitted by applicable law, neither Borrower nor any constituent party

of Borrower will seek or effect the Division, liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Borrower, any sale or other transfer of all or substantially all of its assets or any sale or other transfer outside the ordinary course of business.

(l)     Except pursuant to the Loan Documents or any previously existing financing which has been repaid in full on or prior to the date hereof, Borrower has not commingled and will not commingle funds or other assets of Borrower with those of any Affiliate or constituent party or any other Person, and has held and will hold all of its assets in its own name.

(m)     Borrower has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)     Except pursuant to the Loan Documents or any previously existing financing which has been repaid in full on or prior to the date hereof, Borrower did not assume, guarantee or become obligated for the debts or obligations of any other Person and did not hold itself out to be responsible for or have its credit or assets available to satisfy the debts or obligations of any other Person.  Except pursuant to the Loan Documents, Borrower will not assume, guarantee or become obligated for the debts or obligations of any other Person and does not and will not hold itself out to be responsible for or have its credit or assets available to satisfy the debts or obligations of any other Person.

(o)     The Organizational Documents of Borrower shall provide that the business and affairs of Borrower shall be managed by or under the direction of a board of one or more directors or managers designated by Sole Member, and at all times there shall be at least two (2) duly appointed individuals on the board of directors or managers (each, an "**Independent Director**") of Borrower, each of whom (i) has at least three (3) years prior employment experience and continues to be employed as an independent director, independent manager or independent member by Cogency Global, CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional independent directors, independent managers and independent members, another nationally recognized company that provides such services and which is reasonably approved by Lender; (ii) is not on the board of directors or managers of more than two (2) Affiliates of Borrower (other than in the capacity of an Independent Director for one or more Affiliates of Borrower which do not own any direct or indirect interest in Borrower); and (iii) is not, and has never been, and will not, while serving as an Independent Director be, any of the following: (A) a stockholder, director (other than in the capacity of an Independent Director for Borrower or for one or more Affiliates of Borrower which do not own any direct or indirect interest in Borrower), manager, officer, employee, partner, member, attorney or counsel of Borrower, any Affiliate of Borrower or any direct or indirect equity holder of any of them, (B) a creditor, customer, supplier, service provider (including a provider of professional services) or other Person who derives any of its purchases or revenues from its activities with Borrower or any Affiliate of Borrower (other than a nationally recognized company that routinely provides professional independent directors, independent managers or independent members and other corporate services to Borrower or any Affiliate of Borrower in the ordinary course of its business), (C) a member of the immediate family of any such stockholder, director, manager, officer, employee, partner, member, creditor, customer, supplier, service provider or

other Person, or (D) a Person Controlling or under common Control with any of the Persons described in <u>clause (iii)(A)</u>, <u>(iii)(B)</u> or <u>(iii)(C)</u> above.  A natural person who satisfies the foregoing definition other than <u>clause (iii)</u> shall not be disqualified as a result of <u>clause (iii)(A)</u> by reason of (1) being, having been or becoming an Independent Director of an Affiliate of Borrower that is not in the direct chain of ownership of Borrower or Sole Member and that is required by a creditor to be a "single purpose entity"; provided that such Independent Director is, was or will be employed by a company that routinely provides professional independent directors, independent managers or independent members, or (2) being, having been or becoming a member of Borrower pursuant to an express provision in Borrower's operating agreement providing for the appointment of such Independent Director as a member of Borrower upon the occurrence of any event pursuant to which Sole Member ceases to be a member of Borrower (including the withdrawal or dissolution of Sole Member).  A natural person who satisfies the foregoing definition other than <u>clause (iii)</u> shall not be disqualified as a result of <u>clause (iii)(A)</u> or <u>(iii)(B)</u> by reason of being, having been or becoming an Independent Director of a "single purpose entity" affiliated with Borrower; provided that the fees or other compensation that such individual earns by serving as an Independent Director of one or more Affiliates of Borrower in any given year constitute, in the aggregate, less than five percent (5%) of such individual's income for such year.  The Organizational Documents of Borrower shall provide that no Independent Director of Borrower may be removed or replaced without Cause, and unless Borrower provides Lender with not less than three (3) Business Days' prior notice of (X) any proposed removal of any Independent Director, together with a statement as to the reasons for such removal, and (Y) the identity of the proposed replacement Independent Director, together with a certification that such replacement satisfies the requirements set forth in the Organizational Documents of Borrower relating to an Independent Director.  In addition, the Organizational Documents of Borrower shall provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" and "separateness" provisions of such Organizational Documents.  As used in this paragraph, the term "single purpose entity" shall mean a Person whose Organizational Documents contain, and who covenants that such Person shall comply or cause compliance with, provisions substantially similar to those set forth in this <u>Section 3.1.24</u>.

(p)    The Organizational Documents of Borrower shall provide that the board of directors or managers of Borrower shall not take any action which, under the terms of any Organizational Documents (including, if applicable, any voting trust agreement with respect to any common stock), requires a unanimous vote of the board of directors or managers of Borrower unless, at the time of such action, there shall be at least two (2) members of the board of directors or managers who are Independent Directors (and, if such action is or relates to a Material Action, such Independent Directors have participated in such vote).  The Organizational Documents of Borrower shall provide that Borrower will not (and Borrower agrees that it will not), without the unanimous consent of its board of directors or managers, including the consent of each Independent Director, (i) file or consent to the filing of any petition, case or proceeding, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (ii) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower or a substantial portion of its assets or properties, (iii) take any action intended to cause such entity to become insolvent or be consolidated with an Affiliate of such entity, (iv) make an assignment for the benefit of creditors, (v) admit in writing Borrower's inability to pay its debts generally as they become due (except for any such admission to Lender or any Servicer that Borrower cannot pay its operating expenses

(including Debt Service payments due in respect of the Loan) or that Borrower cannot refinance the Loan on the Maturity Date), (vi) declare or effectuate a moratorium on the payment of any obligations, or (vii) take any action in furtherance of any of the foregoing (each, a "**Material Action**").  In addition, the Organizational Documents of Borrower shall provide that, when voting with respect to any of the matters set forth in the immediately preceding sentence of this Section 3.1.24(p), each Independent Director shall consider only the interests of Borrower, including its creditors.

      (q)      The Organizational Documents of Borrower shall provide that, as long as any portion of the Debt remains outstanding, upon the occurrence of any event that causes the sole member of Borrower ("**Sole Member**") to cease to be a member of Borrower (other than (i) upon an assignment by Sole Member of all of its limited liability company interests in Borrower and the admission of the transferee, if permitted pursuant to the Organizational Documents of Borrower and the Loan Documents, or (ii) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the Organizational Documents of Borrower and the Loan Documents), each person acting as an Independent Director of Borrower shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as a member of Borrower (a "**Special Member**") and shall preserve and continue the existence of Borrower without dissolution.  The Organizational Documents of Borrower shall further provide that, as long as any portion of the Debt remains outstanding, no Special Member may resign or transfer its rights as a Special Member unless (A) a successor Special Member has been admitted to Borrower as a Special Member, and (B) such successor Special Member has also accepted its appointment as an Independent Director of Borrower.

      (r)      The Organizational Documents of Borrower shall provide that, as long as any portion of the Debt remains outstanding, except as expressly permitted pursuant to the terms of the Loan Documents, (i) Sole Member may not resign as a member of Borrower, and (ii) no additional member shall be admitted to Borrower.

      (s)      The Organizational Documents of Borrower shall provide that, as long as any portion of the Debt remains outstanding: (i) Borrower shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower, unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "**Act**"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (ii) upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (A) upon an assignment by Sole Member of all of its limited liability company interests in Borrower and the admission of the transferee, if permitted pursuant to the Organizational Documents of Borrower and the Loan Documents, or (B) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the Organizational Documents of Borrower and the Loan Documents), to the fullest extent permitted by applicable law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing (1) to

continue the existence of Borrower, and (2) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower; (iii) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member to cease to be a member of Borrower and upon the occurrence of such event, the business of Borrower shall continue without dissolution; (iv) in the event of the dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of its assets and properties in an orderly manner) and its assets and properties shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (v) to the fullest extent permitted by applicable law, each of Sole Member and Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets or properties to be partitioned, to cause the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for all or any portion of the assets or properties of Borrower, to compel any sale of all or any portion of the assets or properties of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the Division, liquidation, dissolution, winding up or termination of Borrower.

(t)     Borrower shall conduct its business so that the assumptions made with respect to Borrower in the Insolvency Opinion shall be true and correct in all respects. In connection with the foregoing, Borrower hereby covenants and agrees that it will comply with or cause the compliance with, (i) all of the facts and assumptions (whether regarding Borrower or any other Person) set forth in the Insolvency Opinion, (ii) all of the representations, warranties and covenants in this Section 3.1.24, and (iii) all of the Organizational Documents of Borrower.

(u)     Borrower has not permitted and will not permit any Affiliate or constituent party independent access to its bank accounts.

(v)     Borrower has paid and shall pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations to the extent of sufficient cash flow from the Property available for such purposes; provided that the foregoing shall not create an obligation on the part of any direct or indirect member, partner, shareholder, beneficiary or other beneficial interest holder in Borrower, or any officer, director, employee, trustee, beneficiary or Affiliate of any of the foregoing, to make capital contributions, equity infusions or loans to Borrower.

(w)     Borrower has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and Borrower has paid and shall pay from its assets all obligations of any kind incurred to the extent of sufficient cash flow from the Property available for such purposes; provided that the foregoing shall not create an obligation on the part of any direct or indirect member, partner, shareholder, beneficiary or other beneficial interest holder in Borrower, or any officer, director, employee, trustee, beneficiary or Affiliate of any of the foregoing, to make capital contributions, equity infusions or loans to Borrower.

(x)     Borrower has not taken any Material Action. Without the unanimous consent of all of its directors or managers (including each Independent Director), as applicable, Borrower will not take any Material Action.

(y)     Borrower has maintained and will maintain an arm's-length relationship with its Affiliates.

(z)     Borrower has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including shared office space.

(aa)     Except in connection with the Loan or any previously existing financing which has been paid in full on or prior to the date hereof, Borrower has not pledged and will not pledge its assets or properties for the benefit of, or to secure the obligations of, any other Person.

(bb)     Borrower has had, has and will have no obligation to indemnify its directors, managers, officers, members or Special Members, as the case may be, or, if applicable, has such an obligation that is fully subordinated to the Debt and that will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(cc)     The Organizational Documents of Borrower shall provide that Borrower will not:  (i) divide, liquidate, dissolve, wind up, consolidate or merge, in whole or in part; (ii) sell, transfer, dispose, or encumber (except in accordance with the Loan Documents) all or substantially all of its assets or properties or acquire all or substantially all of the assets or properties of any other Person; or (iii) engage in any other business activity, or amend its Organizational Documents with respect to any of the matters set forth in this Section 3.1.24, without the prior consent of Lender in its sole discretion.

(dd)     Borrower and each Independent Director will consider the interests of Borrower's creditors in connection with all Material Actions.

(ee)     Except in connection with any previously existing financing which has been paid in full on or prior to the date hereof, Borrower has not had and, except in connection with the Loan, does not have and will not have any of its obligations guaranteed by any Affiliate.

(ff)     Borrower has not owned or acquired and will not own or acquire any stock or securities of any Person (other than Mortgage Borrower and except to the extent expressly permitted under the Loan Documents).

(gg)     Borrower has not bought or held and will not buy or hold evidence of indebtedness issued by any other Person (other than cash or investment-grade securities).

(hh)     Borrower has not formed, acquired or held and will not form, acquire or hold any subsidiary other than Mortgage Borrower (whether corporation, partnership, limited liability company or other entity), and Borrower has not owned and will not own any equity interest in any other entity other than Mortgage Borrower.

3.1.25  **Tax Filings**.  To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.  Borrower believes that its tax returns (if any) properly reflect

the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**3.1.26  Solvency**.  Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become or may become absolute and matured.  Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

**3.1.27  Federal Reserve Regulations**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulations T, U or X or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

**3.1.28  Organizational Chart**.  The organizational chart attached hereto as Schedule 3.1.28, relating to Borrower and certain Affiliates and other Persons, is true, correct and complete on and as of the date hereof.  No Person, other than those Persons shown on Schedule 3.1.28, has any ownership interest in, or right of Control, directly or indirectly, in Borrower.

**3.1.29  Bank Holding Company**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**3.1.30  No Other Debt**.  Borrower has not borrowed or received debt financing (other than permitted pursuant to this Agreement) that has not been heretofore repaid in full.

**3.1.31  Investment Company Act**.  Neither Borrower nor Guarantor is (a) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended; or (b) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**3.1.32  Intentionally Omitted**.

**3.1.33  No Bankruptcy Filing**.  No petition in bankruptcy has ever been filed against Borrower or any constituent party of Borrower or Mortgage Borrower and none of Borrower, Mortgage Borrower nor any constituent party of Borrower has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. None of Borrower, Mortgage Borrower nor any of its constituent parties is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's, Mortgage Borrower's or such constituent party's assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower, Mortgage Borrower or any of their constituent parties.

**3.1.34  Full and Accurate Disclosure**.  No information contained in this Agreement, the other Loan Documents, or any written statement or document furnished by or on behalf of Borrower in connection with the Loan or pursuant to the terms of this Agreement or any other Loan Document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which could have a Material Adverse Effect.

**3.1.35  Foreign Person**.  Borrower (or, if Borrower is a disregarded entity for U.S. federal income tax purposes, Borrower's beneficial owner) is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

**3.1.36  No Change in Facts or Circumstances; Disclosure**.  All information submitted by or on behalf of Borrower or Guarantor to Lender and in all financial statements, rent rolls (including the Rent Roll), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms of this Agreement or the other Loan Documents and all statements of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any other Loan Document are true, correct and complete in all material respects.  To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make any such information or statement of fact inaccurate, incomplete or otherwise misleading in any material respect or that otherwise has or could have a Material Adverse Effect.

**3.1.37  Management Agreement**.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  The Management Agreement was entered into on commercially reasonable terms.

**3.1.38  Cash Management**.  Borrower hereby represents and warrants to Lender that:

(a)  Other than in connection with the Mortgage Loan Documents, Mortgage Borrower has not sold, pledged, transferred or otherwise conveyed the Clearing Account or the Cash Management Account; and

(b)    The Property is not subject to any cash management system (other than pursuant to the Mortgage Loan Documents, the Loan Documents and the Mezzanine 2 Loan Documents).

**3.1.39    Residential Units**.  To Borrower's knowledge, no Person other than an on-site employee of Manager (and such on-site employee's immediate family members) occupies any residential units at the Property.  No Rent is payable with respect to any such residential units.

**3.1.40    Intentionally Omitted**.

**3.1.41    Patriot Act**.

(a)    None of Borrower or any of its constituents or Affiliates, and, to the best of Borrower's knowledge, any of their respective brokers or other agents acting or benefiting in any capacity in connection with the Loan is a Prohibited Person.

(b)    None of Borrower, any of its constituents or Affiliates and, to Borrower's knowledge, any of their respective brokers or other agents acting in any capacity in connection with the Loan, (i) has conducted or will conduct any business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) has dealt or will deal in, or otherwise has engaged or will engage in, any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) has engaged or will engage in or has conspired or will conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Patriot Act.

(c)    Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its sole discretion, confirming Borrower's compliance with this Section 3.1.41.

**3.1.42    Intentionally Omitted**.

**3.1.43    No Casualty**.  The Property has suffered no material Casualty which has not been fully repaired and the cost thereof fully paid.

**3.1.44    Purchase Options**.  Neither the Property, any part thereof nor any interest therein is subject to any purchase options, rights of first refusal to purchase, rights of first offer to purchase or other similar rights in favor of any Person.

**3.1.45    Use of Property**.  The Property consists solely of self-storage facilities and related operations and is used for no other purpose.

**3.1.46    Fiscal Year**.  Each fiscal year of Borrower commences on January 1.

**3.1.47    Material Agreements**.

(a)    Neither Borrower nor Mortgage Borrower has entered into, or is bound by, any Material Agreement which continues in existence, except those previously disclosed in writing to Lender.

(b)    Each of the Material Agreements is in full force and effect, there are no monetary or other defaults by Borrower or Mortgage Borrower, as applicable, thereunder and, to the best knowledge of Borrower, there are no monetary or other defaults thereunder by any other party thereto.   None of Borrower, Mortgage Borrower, Manager or any other Person acting on Borrower's or Mortgage Borrower's behalf has given or received any notice of default under any Material Agreement that remains outstanding or in dispute.

(c)    Borrower has delivered true, correct and complete copies of the Material Agreements (including all amendments and supplements thereto) to Lender.

**3.1.48  Other Obligations and Liabilities**.   Borrower has no liabilities or other obligations that arose or accrued prior to the Closing Date that, either individually or in the aggregate, could have a Material Adverse Effect that has not been disclosed to Lender in writing prior to the Closing Date.   Borrower has no known contingent liabilities except pursuant to the Loan Documents.

**3.1.49  Illegal Activity**.   No portion of the Property or the Collateral has been or will be purchased with proceeds of any illegal activity.

**3.1.50  Underwriting Representations**.   Borrower hereby represents that:

(a)    it has no judgments or liens of any nature against it except for tax liens not yet due;

(b)    except for ad valorem tax protests conducted in the ordinary course of business, it is not involved in any dispute with any taxing authority;

(c)    except as disclosed to Lender in writing, it is not now, nor has ever been, a party to any lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it or its assets or properties that has not been paid in full;

(d)    it has no knowledge of any lawsuit, arbitration, summons, or legal proceeding threatened against it;

(e)    it delivered (or has caused Mortgage Borrower to deliver) to Lender a current Phase I environmental site assessment (and, if applicable, a current Phase II environmental assessment) for the Property (collectively, the "**ESA**");

(f)    each amendment or restatement of Borrower's Organizational Documents has been accomplished in accordance with, and was permitted by, the relevant provisions of said documents prior to such amendment or restatement from time to time; and

(g)    it does not have, and has not had, any employees.

**3.1.51 Employees**.  All personnel employed in connection with the management and operation of the Property are the direct employees of Manager.

**3.1.52 Mortgage Loan Representations and Warranties**.    All of the representations and warranties contained in the Mortgage Loan Documents (as modified by the limitations and qualifications set forth in the Mortgage Loan Documents) are (a) true and correct in all material respects and (b) hereby incorporated into this Agreement and deemed made hereunder as and when made thereunder and shall remain incorporated without regard to any waiver, amendment or other modification thereof by the Mortgage Lender or to whether the Mortgage Loan has been repaid or the related Mortgage Loan Document has been terminated, unless otherwise consented to in writing by Lender.

**Section 3.2.    Survival of Representations.**

The representations and warranties set forth in Section 3.1 hereof are made as of the date hereof only but shall survive for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

**ARTICLE IV.**
**BORROWER COVENANTS**

**Section 4.1.    Borrower Affirmative Covenants**.

From the Closing Date and for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

**4.1.1 Existence; Compliance with Legal Requirements**.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply, and cause Mortgage Borrower to comply, with all Legal Requirements applicable to it, the Collateral and the Property.  Borrower shall cause Mortgage Borrower to use commercially reasonable efforts to cause all existing building code violations with respect to the Property to be discharged of record, in each case, within a reasonable period of time following the date hereof.  There shall never be committed by Borrower, and Borrower shall use commercially reasonable efforts not to permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording the federal government, any state or local government or any other Governmental Authority the right of forfeiture against the Collateral or the Property, or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, and to use commercially reasonable efforts not to permit or suffer to exist, any act or omission affording such right of forfeiture.  Borrower shall, and shall cause Mortgage Borrower to, at all times maintain, preserve and protect all franchises and trade names and preserve all of its assets and properties used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument.  Borrower shall keep (and/or shall cause Mortgage Borrower to keep) the Property

insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement. Borrower shall cause Mortgage Borrower to operate the Property in accordance with the terms and provisions of the O&M Plan in all material respects.  After prior notice to Lender, Borrower, at its sole cost and expense, may contest (and/or cause Mortgage Borrower to contest) by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower, Mortgage Borrower, the Collateral or the Property or any alleged violation of any Legal Requirement; provided that (a) no Event of Default has occurred and remains outstanding; (b) such proceeding shall be permitted under the provisions of each agreement, document or instrument to which Borrower, Mortgage Borrower, the Collateral or the Property is subject and shall not constitute a default thereunder, and such proceeding shall be conducted in accordance with such agreements, documents and instruments and all applicable Legal Requirements; (c) none of the Collateral, the Property or any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (d) Borrower shall promptly upon final determination thereof comply with such Legal Requirement determined to be valid or applicable or cure any violation of such Legal Requirement; (e) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower, Mortgage Borrower, the Collateral or the Property; and (f) Borrower shall furnish (and/or cause Mortgage Borrower to furnish) such cash or other security as may be required in the proceeding, or as may be requested by Lender, to ensure compliance with such Legal Requirement, together with the payment of all costs, interest and penalties that are or may be payable in connection therewith.  Lender may apply any such security or part thereof as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Collateral or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Security Instrument or the Pledge Agreement being primed by any related Lien.  Upon the resolution of any such contest in favor of Borrower or Mortgage Borrower determining that Borrower or Mortgage Borrower is not in violation of the applicable Legal Requirement, Lender shall return any remaining portion of such security to Borrower.

    **4.1.2  Taxes and Other Charges**.  Borrower shall pay (and/or shall cause Mortgage Borrower to pay) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay (and/or to cause Mortgage Borrower to pay) Taxes shall be suspended for so long as Mortgage Borrower complies with the terms and provisions of Section 6.2 of the Mortgage Loan Agreement.  Borrower shall furnish (and/or shall cause Mortgage Borrower to furnish) to Lender receipts for the payment of the Taxes and the Other Charges no later than ten (10) days prior to the date the same shall become delinquent; provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Mortgage Lender pursuant to Section 6.2 of the Mortgage Loan Agreement.  Borrower shall not (and/or shall cause or permit Mortgage Borrower to) permit or suffer and shall promptly cause to be paid and discharged any Lien or charge against the Property. After prior notice to Lender, Borrower, at its sole cost and expense, may (and/or may cause or permit Mortgage Borrower to) contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges; provided that (a) no Event of Default has occurred and

remains outstanding; (b) such proceeding shall be permitted under the provisions of each agreement, document or instrument to which Borrower, the Mortgage Borrower,  the Collateral or the Property is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with such agreements, documents and instruments and all applicable Legal Requirements; (c) none of the Collateral, the Property or any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (d) Borrower shall (and/or shall cause Mortgage Borrower to) promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties that are payable in connection therewith; (e) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (f) Borrower shall (and/or shall cause Mortgage Borrower to) furnish such cash or other security as may be required in the proceeding, or as may be requested by Lender, to ensure the payment of any such Taxes or Other Charges, together with all costs, interest and penalties that are or may be payable in connection therewith.  Lender may pay over, assign or transfer any such security or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the Collateral or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Security Instrument or the Pledge Agreement being primed by any related Lien.  Upon the resolution of any such contest in favor of Borrower or Mortgage Borrower, Lender shall return any remaining portion of such security to Borrower.

        **4.1.3**　　__Litigation__.  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against the Property, the Collateral, Mortgage Borrower, Borrower or Guarantor which, if adversely determined, would be reasonably likely to have a Material Adverse Effect.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

        **4.1.4**　　__Access to Property__.　　Borrower shall (and/or shall cause Mortgage Borrower to) permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to rights of Tenants under their Leases.

        **4.1.5**　　__Further Assurances; Supplemental Mortgage Affidavits__.  Borrower shall (and/or shall cause Mortgage Borrower to), at Borrower's sole cost and expense (provided that, in each case, Borrower shall not be required to take any such action to the extent that it would increase in any material respect Borrower's liabilities or decrease in any material respect Borrower's rights under the Loan Documents):

                (a)　　furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

(b)      cure, or cause to be cured, any defects in the execution and delivery of the Loan Documents;

(c)      execute and deliver, or cause to be executed and delivered, all such documents, instruments, certificates, assignments and other writings and do, or cause to be done, such other acts reasonably necessary or desirable (i) to correct any omissions in the Loan Documents, (ii) to evidence and more fully describe the collateral at any time securing or intended to secure the Obligations, (iii) to perfect, protect or preserve any Liens created under any of the Loan Documents, or (iv) to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith; and

(d)      do and execute, or cause to be done and executed, all such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

### 4.1.6    **Financial Reporting**.

(a)      **Acceptable Accounting Basis**.  Borrower shall keep and maintain, or shall cause to be kept and maintained, in accordance with the Acceptable Accounting Basis, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower, Mortgage Borrower and all items of income and expense in connection with the Collateral and the operation of the Property.  All financial statements delivered to Lender pursuant to this Section 4.1.6 shall be prepared in accordance with the Acceptable Accounting Basis.

(b)      **Monthly Reports**.  Prior to a Securitization, and at the request of Lender, Borrower shall furnish, or cause to be furnished, to Lender on or before thirty (30) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete and fairly present the financial condition and results of the operations of Borrower, Mortgage Borrower, the Collateral and the Property (subject to normal year-end adjustments), as applicable:  (i) a rent roll for the subject month; (ii) monthly and year-to-date operating statements prepared for such month, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such month, all in form reasonably satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such month for such month and for the immediately preceding twelve (12) month period.  In addition, such Officer's Certificate shall also state the representations and warranties of Borrower set forth in Section 3.1.24 are true and correct in all material respects as of the date of such certificate and that there are no trade payables and operational debt other than Permitted Debt.

(c)      **Quarterly Reports**.  Borrower shall furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete and fairly present the financial condition and results of the operations of Borrower, Mortgage Borrower, the Collateral and the Property (subject to normal year-end adjustments), as applicable:  (i) a current rent roll as of the end of the subject quarter; (ii)(A) a balance sheet for

Borrower as of the last day of such quarter and (B) quarterly and year-to-date operating statements prepared for such quarter, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such quarter, all in form reasonably satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter for such quarter and for the last four quarters.  In addition, such Officer's Certificate shall also state that the representations and warranties of Borrower set forth in <u>Section 3.1.24</u> are true and correct in all material respects as of the date of such certificate and that there are no trade payables and operational debt outstanding other than Permitted Debt.

(d)    **Annual Reports**.  Borrower shall furnish, or cause to be furnished, to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's and Mortgage Borrower's annual financial statements prepared in accordance with the Acceptable Accounting Basis and certified by the chief financial officer of Borrower covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower, Mortgage Borrower, the Collateral and the Property and a balance sheet for Borrower and Mortgage Borrower.  Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year and shall include, but not be limited to, amounts representing annual Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income and Net Cash Flow.  Borrower's and Mortgage Borrower's annual financial statements shall be accompanied by (i) an Officer's Certificate stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower, Mortgage Borrower, the Collateral and the Property being reported upon and has been prepared in accordance with the Acceptable Accounting Basis, (ii) intentionally omitted, (iii) a current rent roll as of the end of the subject Fiscal Year, (iv) unless shown on the rent roll delivered to Lender pursuant to <u>clause (iii)</u> above, a list of Tenants, if any, occupying more than ten percent (10%) of the total floor area of the Improvements, and (v) a schedule reconciling Net Operating Income to Net Cash Flow, which shall itemize all adjustments made to Net Operating Income to arrive at Net Cash Flow reasonably deemed material by Borrower or an Acceptable Accountant, provided that during the continuance of a Cash Management Trigger Event, all financial statements delivered pursuant to this <u>Section 4.1.6(d)</u> shall be (i) audited by an Acceptable Accountant in accordance with the Acceptable Accounting Basis and (ii) accompanied by an unqualified opinion of such Acceptable Accountant; <u>provided</u>, <u>further</u>, that with respect to the first such audited financial statements due for a Fiscal Year ending after the occurrence of any such Cash Management Trigger Event, if Borrower has not provided such audited financial statements within one hundred twenty (120) days following such Fiscal Year and has proceeded and is proceeding with reasonable diligence to complete such audited financial statements, as determined by Lender, Borrower shall have up to an additional sixty (60) days to provide such audited financial statements as long as Borrower is proceeding with reasonable diligence.

(e)    **Certification; Supporting Documentation**.  Each such financial statement shall be in scope and detail reasonably satisfactory to Lender and certified by the chief financial officer or other duly qualified and authorized representative of Borrower.

(f)    **Access**.  Lender shall have the right from time to time, upon reasonable prior notice during normal business hours to examine such books, records and accounts

at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  During the continuation of an Event of Default, Borrower shall pay any reasonable out-of-pocket costs and expenses actually incurred by Lender to examine Borrower's and/or Mortgage Borrower's accounting records with respect to the Collateral and/or the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(g)    **Format of Delivery**.  Any reports, statements or other information required to be delivered under this Agreement shall be delivered in electronic form reasonably acceptable to Lender.

(h)    **Annual Budget**.  For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall (and/or shall cause Mortgage Borrower to) submit to Lender an Annual Budget not later than sixty (60) days prior to the commencement of such period or Fiscal Year, which Annual Budget shall set forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's good faith estimate of Gross Income from Operations, Operating Expenses and Capital Expenditures for such period or Fiscal Year and shall otherwise be in form reasonably satisfactory to Lender, which budget (i) in the absence of an existing Cash Management Trigger Event Period, shall be provided to Lender for informational purposes and (ii) during a Cash Management Trigger Event Period, shall be subject to Lender's prior approval (not be unreasonably withheld or delayed)  (upon Lender's approval, an "**Approved Annual Budget**").  In the absence of a continuing Cash Management Trigger Event Period, the Annual Budget submitted by Borrower shall be deemed to be the Approved Annual Budget.  During the continuance of a Cash Management Trigger Event Period, in the event that Lender objects to a proposed Annual Budget submitted by Borrower for Lender's approval, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender.  Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this Section 4.1.6(h) until Lender approves the Annual Budget.  During the continuance of a Cash Management Trigger Event Period, until such time that Lender approves a proposed Annual Budget, the most recent Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Other Charges, Insurance Premiums, utility expenses and other non-discretionary items.  In the event that Mortgage Borrower must incur an extraordinary operating expense or capital expense not set forth in the applicable Approved Annual Budget (each, an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense.  During the continuance of a Cash Management Trigger Event Period, any such Extraordinary Expense shall be subject to Lender's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  To the extent Lender's consent is required with respect to an Annual Budget pursuant to the terms hereof, Lender's consent shall be subject to the Deemed Approval Procedures.

(i)    **Additional Information**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, Borrower shall (and/or shall cause Mortgage

Borrower to) submit to Lender the financial data and financial statements required, and within the time periods required, under Sections 9.1(d), (e) and (f), if and when applicable.

(j)    **Other Required Information**.  Borrower shall (and/or shall cause Mortgage Borrower to) furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Collateral and the Property and the financial affairs of Borrower and Mortgage Borrrower as may be reasonably requested by Lender (including, without limitation, a comparison of the budgeted income and expenses as set forth in the applicable Approved Annual Budget and the actual income and expenses for the applicable month, quarter or year and year-to-date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such periods).

(k)    **Reporting Default**.  If Borrower fails to provide to Lender the financial statements and other information specified in this Section 4.1.6 within the respective time period specified, then such failure shall constitute an Event of Default if it continues for ten (10) Business Days after notice to Borrower from Lender.

4.1.7    **Title to Property**.  Borrower shall (and/or shall cause Mortgage Borrower to) warrant and defend (a) title to the Property, subject only to Permitted Encumbrances, and (b) the validity and priority of the Liens of the Security Instrument and the Assignment of Leases on the Property, subject only to Permitted Encumbrances, in each case against the claims of all Persons whomsoever.  Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property or any part thereof is claimed by any other Person except as expressly permitted hereunder.

4.1.8    **Estoppel Statement**.

(a)    Borrower shall deliver to Lender, within five (5) Business Days after Lender's request, a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Loan, (ii) the unpaid principal amount of the Loan, (iii) the interest rate of the Loan, (iv) the date installments of principal and/or interest were last paid, (v) any offsets or defenses to the payment and performance of the Obligations, if any, and (vi) that this Agreement and the other Loan Documents are valid, legal and binding obligations of Borrower and have not been modified (or, if modified, giving particulars of such modification).

(b)    Borrower shall deliver to Lender, within thirty (30) days after Lender's request, an estoppel certificate from each Tenant under any Lease (other than a Storage Lease) in form and substance reasonably satisfactory to Lender; provided that (i) Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant, (ii) such estoppel certificate may be in the form required under such Lease, and (iii) after the final Securitization of the Loan, Borrower shall not be required to deliver such estoppel certificate from any Tenant more frequently than two (2) times in any calendar year.

4.1.9    **Leases**.

(a)      Borrower may, in good faith and in the ordinary course of its business, enter into, amend or modify any Storage Lease (other than a Major Lease) entered into on the standard form of Storage Lease approved by Lender without Lender's consent (including customary negotiated changes made by Borrower using its good faith commercially reasonable business judgment consistent with market practices), provided the economic terms of such Storage Lease entered into by Borrower or any amendment or modification thereof are comparable to existing market rates for similar properties.  With respect to all Leases which are not Storage Leases, all such Leases and all extensions or renewals of such Leases executed after the Closing Date shall (i) provide for economic terms, including rental rates, tenant allowances and tenant improvements, comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms (and, to the extent any leasing commissions or other similar fees are payable in connection therewith, such leasing commissions or other similar fees shall be on commercially reasonable terms that are consistent with existing local market rates for similar properties), (iii) have a term of not less than twelve (12) months (unless Lender approves in writing a shorter term), (iv) have a term of not more than ten (10) years, including all extensions and renewals (unless Lender approves a longer term in writing), (v) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder will attorn to Mortgage Lender and any purchaser at or after a foreclosure sale, (vi) intentionally omitted, (vii) be written substantially in accordance with a standard form of Lease which shall have been approved by Lender in writing (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant), (viii) not be with any Affiliate of Borrower, Guarantor or Manager, and (ix) not contain (A) any option to purchase, any right of first offer to purchase, any right of first refusal to purchase, or any other preferential right to purchase all or any portion of the Property or any interest therein, (B) any right to terminate (in whole or in part) (other than customary termination rights based on material casualty or condemnation or a material default by the landlord that continues beyond any applicable notice and/or cure period), (C) any requirement for a non-disturbance or recognition agreement, or (D) any other terms which are reasonably likely to materially adversely affect Lender's rights or remedies under the Loan Documents; provided that, in connection with extensions or renewals of Leases existing on the date hereof, any applicable term that would otherwise breach the requirements set forth in this Section 4.1.9(a) shall be permitted to the extent necessary to implement any extension or renewal term expressly contained in the applicable Lease and with respect to which Mortgage Borrower has no material discretion.  Any non-compliance with the foregoing requirements shall require Lender's prior written approval, which shall not be unreasonably withheld, conditioned or delayed; provided that, notwithstanding anything to the contrary contained herein, Lender's approval of any proposed Lease or any proposed renewal, modification or amendment of any Lease that contains or provides for (1) any option to purchase, any right of first offer to purchase, any right of first refusal to purchase, or any other preferential right to purchase all or any portion of the Property or any interest therein or (2) any other terms which are reasonably likely to materially adversely affect Lender's rights or remedies under the Loan Documents may be withheld in Lender's sole and absolute discretion.  Borrower shall within ninety (90) days of the date hereof cause Mortgage Borrower to (x) terminate the Great Adventure Lease or amend such Lease to eliminate the right of first refusal contained in Section 45 of such Lease, and (y) provide Lender with evidence of such termination or amendment.

(b)      Borrower shall (and/or shall cause Mortgage Borrower to) (i) perform in a commercially reasonable manner the obligations which Mortgage Borrower is

required to perform under the Leases; (ii) enforce in a commercially reasonable manner the obligations to be performed by the Tenants thereunder; (iii) promptly furnish to Lender any notice of default or termination (in whole or in part) received by Mortgage Borrower from any Tenant under a Major Lease, and any notice of default or termination (in whole or in part) given by Mortgage Borrower to any Tenant under a Major Lease; (iv) (A) with respect to Leases which are not Storage Leases, not collect any Rents for more than one (1) month in advance of the time when the same shall become due, except for bona fide security deposits not in excess of an amount equal to two (2) months' rent, and (B) with respect to Storage Leases, not collect any Rents in advance in excess of what is consistent with customary market practices; (v) not enter into any ground lease or master lease of any part of the Property; (vi) not further assign or encumber any Lease or the Rents (except as expressly contemplated by the Loan Documents and the Mortgage Loan Documents); (vii) not cancel or terminate (in whole or in part), or accept the surrender (in whole or in part) or termination (in whole or in part) of, any Major Lease (except with Lender's prior approval, or (B) if the acceptance of such surrender or termination is pursuant to the rights of the Tenant expressly set forth in the applicable Lease); and (viii) shall not modify or amend any Major Lease (except (A) with Lender's prior approval or (B) such modification or amendment is entered into in the ordinary course of business and is consistent with prudent property management practices). Any action in violation of <u>clause (v)</u>, <u>(vi)</u>, <u>(vii)</u> or <u>(viii)</u> of this <u>Section 4.1.9(b)</u> shall be void at the election of Lender.

(c)    All Major Leases and all renewals, modifications and amendments thereof (other than renewals, modifications and amendments strictly limited to the implementation of options or rights expressly contained in Major Leases and with respect to which Mortgage Borrower has no material discretion as to the terms thereof) executed after the date hereof shall be subject to Lender's prior approval. Notwithstanding anything to the contrary contained herein, Lender's approval of any proposed Lease or any proposed renewal, modification or amendment of any Lease that contains or provides for (i) any option to purchase, any right of first offer to purchase, any right of first refusal to purchase, or any other preferential right to purchase all or any portion of the Property or any interest therein or (ii) any other terms which are reasonably likely to materially adversely affect Lender's rights or remedies under the Loan Documents may be withheld in Lender's sole and absolute discretion.

(d)    Subject to the last sentence of this <u>Section 4.1.9(d)</u>, to the extent that Lender's approval is required in connection with any proposed Lease or any proposed renewal, modification, amendment or termination (in whole or in part) of any Lease pursuant to <u>Section 4.1.9(a)</u>, <u>(b)</u> or <u>(c)</u> above, Lender's approval shall be subject to the Deemed Approval Procedure. Notwithstanding anything to the contrary contained herein, the terms of this <u>Section 4.1.9(d)</u> shall not apply in connection with any proposed Lease or any proposed renewal, modification or amendment of any Lease that contains or provides for any option to purchase, any right of first offer to purchase, any right of first refusal to purchase, or any other preferential right to purchase all or any portion of the Property or any interest therein.

(e)    Borrower shall not permit or consent to any assignment or sublease of any Major Lease except (i) with Lender's prior approval, which approval shall not be unreasonably withheld so long as the applicable Tenant, assignee or sub-lessee is not an Affiliate of Borrower, Mortgage Borrower, Guarantor or Manager, or (ii) any assignment or sublease

expressly permitted under a Major Lease pursuant to a unilateral right of Tenant thereunder not requiring the consent of Mortgage Borrower.

(f)        Intentionally omitted.

(g)        Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) actually incurred by Lender in connection with the review of any proposed Lease, any other matter requiring Lender's consent or approval under this Section 4.1.9 or execution and delivery of any subordination, non-disturbance and attornment agreement in accordance with this Section 4.1.9.

(h)        Within ten (10) days after Lender's request, Borrower shall (and/or shall cause Mortgage Borrower to) furnish to Lender (i) a statement of all tenant security or other deposits and (ii) copies of all Leases (other than Storage Leases which do not constitute Major Leases) not previously delivered to Lender, in each case, certified as being true, correct and complete.

(i)        All security deposits of Tenants, whether held in cash or any other form, shall be held in compliance with all applicable Legal Requirements, shall not be commingled with any other funds of Borrower or Mortgage Borrower and, if cash, shall be deposited by Mortgage Borrower in a separately designated account under Mortgage Borrower's control.  After the occurrence of an Event of Default, upon Lender's request, Borrower shall cause Mortgage Borrower to, if permitted by the applicable Legal Requirements, cause all such security deposits (and any interest thereon) to be transferred to Lender to be held by Lender in a separate Eligible Account subject to the terms of the Leases.  Any bond or other instrument which Mortgage Borrower is permitted to hold in lieu of cash security deposits under the applicable Legal Requirements (i) shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as described above, (ii) shall be issued by an institution reasonably satisfactory to Lender, (iii) shall, if permitted by the applicable Legal Requirements, name Lender as payee or mortgagee thereunder (or, at Lender's option, be fully assignable to Lender), and (iv) shall in all respects comply with the applicable Legal Requirements and otherwise be reasonably satisfactory to Lender.  Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's and Mortgage Borrower's compliance with the foregoing.

**4.1.10  Alterations**.  Lender's prior approval shall be required in connection with any alterations to the Property (a)(i) that could have a Material Adverse Effect, (ii) the cost of which (including any related alterations, improvements and replacements) could reasonably be expected to exceed the Alteration Threshold, or (iii) that could adversely affect any structural component of any Improvements, any utility or HVAC system at the Property or the exterior of any building constituting a part of any Improvements or (b) any alterations to the Property during the continuation of any Event of Default, which approval, in each case under clause (a) or (b), may be granted or withheld in Lender's sole discretion.  Any alteration to the Property shall be performed and completed by Mortgage Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements.  If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Property (and any related alterations, improvements and replacements) shall at any time exceed the Alteration Threshold, Borrower shall

(and/or shall cause Mortgage Borrower to) promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:  (A) cash, (B) Letters of Credit, (C) U.S. Obligations or (D) other securities acceptable to Lender, provided that, with respect to clause (D), Lender shall have received a Rating Agency Confirmation as to the form, substance and issuer of same.  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (and any related alterations, improvements and replacements) (other than such amounts to be paid or reimbursed by Tenants under the Leases; provided that the applicable Leases shall be in full force and effect and no monetary default or material non-monetary default shall have occurred and remain outstanding thereunder) over the Alteration Threshold, and, at Lender's option, Lender shall have the right to apply such security from time to time to pay for such alterations (and any related alterations, improvements and replacements) if not otherwise paid by Borrower or Mortgage Borrower.  Upon substantial completion of any alteration to the Property, Borrower shall (and/or shall cause Mortgage Borrower to) provide evidence reasonably satisfactory to Lender that (1) such alteration was performed and completed in accordance with all applicable Legal Requirements, (2) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with such alteration have been paid in full and have delivered unconditional releases of liens, and (3) all licenses and permits necessary for the use, operation and occupancy of the Improvements have been issued, provided that, if any such license or permit is temporary in nature, Borrower shall (and/or shall cause Mortgage Borrower to) diligently pursue procuring a permanent license or permit from the applicable Governmental Authority.  To the extent Lender's approval is required pursuant to this Section 4.1.10, Lender's approval shall be subject to the Deemed Approval Procedure.  Notwithstanding the foregoing, Borrower shall not be required to deliver to Lender any security described in this section if Mortgage Borrower has delivered to Mortgage Lender security under the comparable section of the Mortgage Loan Agreement.

       **4.1.11** **Net Liquidation Proceeds After Debt Service**.  Borrower shall cooperate with Lender in obtaining for Lender, in accordance with the relevant provisions of this Agreement, the benefits of any Net Liquidation Proceeds After Debt Service, and Lender shall be reimbursed for any reasonable out-of-pocket expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements and the reasonable expense of any appraisal obtained by Lender in case of a Liquidation Event that is a Casualty or Condemnation).

       **4.1.12** **Material Agreements**.  Borrower shall (and/or shall cause Mortgage Borrower to) (a) promptly perform and/or observe in all material respects the covenants, agreements and conditions required to be performed and observed by it under each Material Agreement and Operating Agreement to which Borrower or Mortgage Borrower is a party or the Collateral or the Property, or any portion thereof, is subject, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any default by any party under any Material Agreement of which it is aware, (c) promptly deliver to Lender copies of all material notices, summonses, pleadings, applications and other documents received in connection with any Material Agreement, and (d) promptly enforce the performance and observance in all material respects of all of the covenants, agreements and conditions required to be performed and/or observed by any other party under each Material Agreement and Operating Agreement to which Borrower or Mortgage Borrower is a party or the Collateral or the Property, or any portion thereof, is subject in a commercially reasonable manner.

**4.1.13  Performance by Borrower**.  Borrower shall, in a timely manner, observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by Borrower without the prior consent of Lender.

**4.1.14  Costs of Enforcement/Remedying Defaults**.  In the event (a) that Lender exercises any or all of its rights or remedies under the Pledge Agreement or any other Loan Document as and when permitted thereby, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower, Mortgage Borrower or Guarantor or an assignment by Borrower, Mortgage Borrower or Guarantor for the benefit of its creditors, or (c) Lender shall remedy or attempt to remedy any Event of Default, Borrower shall be chargeable with and agrees to pay all reasonable out-of-pocket costs and expenses actually incurred by Lender as a result thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action, which shall be due and payable on demand, together with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such indebtedness shall be secured by the Pledge Agreement.

**4.1.15  Business and Operations**.  Borrower will continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership and management of the Collateral.  Borrower will cause Mortgage Borrower to continue to engage in the business presently conducted by it as and to the extent the same are necessary for the ownership, management and operation of the Property.  Borrower will (and will cause Mortgage Borrower to) qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership of the Collateral and the ownership, management and operation of the Property, as applicable.  Borrower shall cause Mortgage Borrower to, at all times, cause the Property to be maintained as self-storage facilities.

**4.1.16  Use of Proceeds**.  Borrower shall use the proceeds of the Loan only for the purposes set forth in Section 2.1.4 hereof.

**4.1.17  Intentionally Omitted**.

**4.1.18  Handicap Access**.

(a)  The requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all federal, state and local laws and ordinances related to handicap access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities shall be referred to herein as the "**Access Laws**".

(b)  Borrower covenants and agrees to give prompt notice to Lender of the receipt by Borrower or Mortgage Borrower of any written complaints related to the violation of any Access Laws and of the commencement of any proceedings or investigations which relate

to compliance with any Access Laws of which Borrower and/or Mortgage Borrower has knowledge.

**4.1.19 Additional Reports**.    Borrower shall (and/or shall cause Mortgage Borrower to) deliver to Lender as soon as reasonably available, but in no event later than thirty (30) days after such items become available to Borrower, copies of any engineering, environmental or seismic reports prepared for, or provided to, Borrower or Mortgage Borrower with respect to the Property.

**4.1.20 Notice of Certain Events**.    Borrower shall promptly notify Lender of (a) any Event of Default, together with a detailed statement of the steps being taken to cure such Default or Event of Default; (b) any notice of default received by Borrower or Mortgage Borrower under any obligations which are (i) relating to the Collateral or the Property, (ii) under a Material Contract, or (iii) otherwise material to Borrower's and/or Mortgage Borrower's business; and (c) any pending or threatened (in writing) legal, judicial, administrative or regulatory proceedings which, if adversely determined, would be reasonably likely to have a Material Adverse Effect, including any disputes between Borrower, Mortgage Borrower or Guarantor and any Governmental Authority, affecting Borrower, Mortgage Borrower, Guarantor, the Property or the Collateral.

**4.1.21 Further Assurances; Power of Attorney**.    During the continuance of an Event of Default, Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary for the purpose of exercising, perfecting or preserving any and all rights and remedies available to Lender under the Loan Documents, at law and in equity, including, without limitation, such rights and remedies available to Lender pursuant to Section 10.2, Section 10.3, and Section 10.4 hereof (and the above powers granted to Lender are coupled with an interest and shall be irrevocable).

**4.1.22 Taxes on Security**.    Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender.  If there shall be enacted any law (or an amendment thereto) (a) deducting the Loan from the value of the Collateral for the purpose of taxation or (b) affecting any Lien on the Collateral, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender is or may be liable as a result thereof; provided, however, that if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be due and payable within one hundred twenty (120) days without any prepayment premium or penalty.

**4.1.23 Intentionally Omitted**.

**4.1.24 Intentionally Omitted**.

**4.1.25 Patriot Act Compliance**.    Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  Lender shall have the right

to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering. In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, Lender may, at its option, cause Borrower to comply therewith. All costs and expenses incurred by Lender in connection therewith shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender. All such indebtedness shall be secured by the Pledge Agreement.

**4.1.26** **Special Distributions**. On each date on which amounts are required to be disbursed to the Mezzanine Deposit Account pursuant to the terms of the Mortgage Loan Documents or are required to be paid to Lender pursuant to the terms of any of the Loan Documents, Borrower shall exercise its rights under the Mortgage Borrower Company Agreement to cause Mortgage Borrower to make to Borrower a distribution in an aggregate amount required to be so disbursed to the Mezzanine Deposit Account or so paid to Lender on such date.

**Section 4.2.    Borrower Negative Covenants.**

From the Closing Date and for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

**4.2.1** **Liens**. Borrower shall not (and/or shall not cause or permit Mortgage Borrower to) create, incur, assume or suffer to exist any Lien on any direct or indirect interest in Borrower or Mortgage Borrower or on any portion of the Collateral or Property except for Permitted Encumbrances. Notwithstanding the foregoing, after prior written notice to Lender, Borrower, at its sole cost and expense, may (and/or may cause or permit Mortgage Borrower to) contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, any mechanics', materialman's or contractors' Lien and the amount or validity or application in whole or in part of any amounts due to such mechanics, materialmen or contractors, provided that (a) no Event of Default has occurred and remains outstanding, (b) intentionally omitted; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower, Mortgage Borrower, the Collateral or the Property is subject and shall not, to the extent the same would have a Material Adverse Effect, constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements in all material respects; (d) none of the Collateral, the Property or any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (e) Borrower shall (and/or shall cause Mortgage Borrower to) promptly upon final determination thereof pay the amount of any such Lien, together with all costs, interest and penalties which may be payable in connection therewith; (f) such proceeding shall suspend the collection of such contested Lien from the Property; (g) Borrower shall (and/or shall cause Mortgage Borrower to) furnish such cash or other security as may be required in the proceeding, or, without duplication, as may be reasonably requested by Lender, to ensure the payment of any such Lien, together with all interest and penalties thereon; and (h) such contest by Borrower or Mortgage Borrower is not in violation of the Leases. Lender may pay over, assign or transfer any such security or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the Collateral or the Property

72

(or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Pledge Agreement or the Security Instrument being primed by any related Lien.  Notwithstanding the foregoing, Borrower shall not be required to deliver to Lender any security described in this section if Mortgage Borrower has delivered to Mortgage Lender security under the comparable section of the Mortgage Loan Agreement.

      **4.2.2**    **Dissolution**.  Borrower shall not (a) engage in any Division, liquidation, dissolution, winding up or consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership, management and operation of the Collateral, (c) amend, modify, waive or terminate any Organizational Document or any provision thereof, (d) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the assets or properties of Borrower except to the extent expressly permitted by the Loan Documents, in each case, without obtaining the prior consent of Lender.

      **4.2.3**    **Change in Business**.  Borrower shall not (a) (i) enter into any line of business other than the ownership and management of the Collateral, (ii) make any material change in the scope or nature of its business objectives, purposes or operations, or (iii) undertake or participate in activities other than the continuance of its present business or (b) cause or permit Mortgage Borrower to (i) enter into any line of business other than the ownership, management and operation of the Property, (ii) make any material change in the scope or nature of its business objectives, purposes or operations, or (iii) undertake or participate in activities other than the continuance of its present business.

      **4.2.4**    **Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.  In addition, Borrower shall not permit or cause Mortgage Borrower to cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance with the Mortgage Loan Agreement) owed to Mortgage Borrower by any Person, except for adequate consideration and in the ordinary course of Mortgage Borrower's business.

      **4.2.5**    **Affiliate Transactions**.  Borrower shall not enter into, or be a party to, any transaction with any Affiliate of Borrower or any partner, member, or shareholder, as applicable, of Borrower or any Affiliate of Borrower except in the ordinary course of business and on terms and conditions that are intrinsically fair, commercially reasonable and no less favorable to Borrower or such Affiliate, partner, member or shareholder than those that would be available on an arm's-length basis with an unrelated third party.

      **4.2.6**    **Zoning**.  Borrower shall not (and/or shall not cause or permit Mortgage Borrower to) initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**4.2.7   Assets**.  Borrower shall not permit Mortgage Borrower to purchase or own any asset or property other than the Property and any asset or property necessary for or incidental to the operation of the Property.

**4.2.8   No Joint Assessment**.  Borrower shall not (and/or shall not cause or permit Mortgage Borrower to) suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) with any portion of the Property which may be deemed to constitute personal property, or any other action or procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property or any portion thereof.

**4.2.9   Principal Place of Business**.  Borrower shall not change its principal place of business from the address set forth on the first page of this Agreement without first giving Lender ten (10) days' prior notice.

**4.2.10   ERISA**.  (a) Borrower shall not engage in any transaction which would cause any obligation, or any action taken or to be taken, hereunder or under the other Loan Documents (or the exercise by Lender of any of its rights under this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(b)       Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one (1) or more of the following circumstances is true:

(A)       Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(B)       Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2);

(C)       Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e); or

(D)       The assets of Borrower are not otherwise "plan assets" of one or more "employee benefit plans" as defined in Section 3(3) of ERISA subject to Title I of ERISA, within the meaning of 29 C.F.R. §2510.3-101 as modified by Section 3(42) of ERISA.

**4.2.11   Material Agreements**.  Borrower shall not (and/or shall not cause or permit Mortgage Borrower to), without Lender's prior consent: (a) enter into, surrender or terminate any Material Agreement or Operating Agreement to which it is a party or to which Borrower, Mortgage

Borrower, the Collateral or the Property is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement or Operating Agreement to which it is a party or to which Borrower, Mortgage Borrower, the Collateral or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement or Operating Agreement to which it is a party or to which Borrower, Mortgage Borrower, the Collateral or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.  To the extent Lender's consent is required pursuant to this Section 4.2.11, Lender's consent shall be subject to the Deemed Approval Procedures.

**4.2.12  Change of Name, Identity, Structure or State of Organization**. Borrower will not cause or permit any change to be made to (a) its name or identity (including its trade name or names), (b) its form of organization (i.e., partnership, limited liability company or other organizational structure, as applicable) or (c) the state of its formation or organization without first, in each case, (i) notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change, (ii) taking all actions required by Lender for the purpose of perfecting or protecting the Liens granted by the Loan Documents (including the priority thereof), and (iii) obtaining the prior consent of Lender.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or amendment to financing statement required by Lender to establish or maintain the validity, perfection and priority of the security interests granted by the Loan Documents.  At Lender's request, Borrower shall execute a certificate in form reasonably satisfactory to Lender listing each trade name under which Borrower operates or intends to own the Collateral, and representing and warranting that Borrower does business under no other trade name with respect to the Collateral.

**4.2.13  Special Purpose**.  Without in any way limiting the provisions of this Article IV, Borrower shall not take or permit any action that would result in Borrower not being in compliance with the representations, warranties and covenants set forth in Section 3.1.24 hereof.

**4.2.14  Prohibited Person**.  At all times throughout the Term, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Key Principal or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Prohibited Person, with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law, or the Loan made by Lender would be in violation of law, (b) no Prohibited Person shall have any interest of any nature whatsoever in Borrower, Key Principal or Guarantor, as applicable, with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, Key Principal or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**4.2.15  Residential Units**.  Borrower shall not cause or permit Mortgage Borrower to (i) lease or permit any Person to occupy any residential unit at the Property other than an on-site employee of Manager (and such on-site employee's immediate family members), or (ii) charge or collect any Rent with respect to any such residential unit.

**4.2.16  No Contractual Obligations**.  Other than the Loan Documents, the Organizational Documents of Borrower, and the Organizational Documents of Mortgage Borrower, neither Borrower nor any of its assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which it or its assets are bound, except for such liabilities, not material in the aggregate, that are incidental to its activities as a member of Mortgage Borrower.

**4.2.17  Limitation on Securities Issuances**. Neither Borrower nor Mortgage Borrower shall issue any limited liability company interests, partnership interests, capital stock interests or other securities other than those that have been issued as of the date hereof.

**4.2.18  Limitations on Distributions.**

(a)  Any and all dividends, including capital dividends, stock or liquidating dividends, distributions of property, redemptions or other distributions made by Mortgage Borrower on or in respect of any interests in Mortgage Borrower, and any and all cash and other property received in payment of the principal of or in redemption of or in exchange for any such interests (collectively, the "**Distributions**"), shall become part of the Collateral.

(b)  If any Distributions shall be received by Borrower or any Affiliate of Borrower after the occurrence and during the continuance of an Event of Default, Borrower shall hold, or shall cause the same to be held, in trust for the benefit of Lender.  After the occurrence and during the continuance of an Event of Default, any Distributions in cash shall be deposited in the Mezzanine Deposit Account.  Any and all revenue derived from the Property paid directly by tenants, subtenants or occupants of the Property shall be held and applied in accordance with the terms and provisions of the Mortgage Loan Agreement.

(c)  Following the occurrence and during the continuance of an Event of Default, Borrower shall not make any distributions to Mezzanine 2 Borrower.

**4.2.19  Other Limitations**.  Prior to the payment and performance in full of the Debt, neither Borrower nor any of its subsidiaries shall, without the prior written consent of Lender (which may be furnished or withheld at its sole and absolute discretion), give its consent or approval to the distribution to the partners, members or shareholders of Mortgage Borrower of property other than cash.

## ARTICLE V.
## INSURANCE, CASUALTY AND CONDEMNATION

**Section 5.1.  Insurance**.

(a)  Borrower shall cause Mortgage Borrower to (i) maintain at all times during the term of the Loan the Policies required under the Mortgage Loan Agreement, and (ii)

otherwise satisfy all covenants related thereto as provided in the Mortgage Loan Agreement. Subject to applicable law and the prior rights of Mortgage Lender under the Mortgage Loan and to the extent not inconsistent with the terms of the Mortgage Loan Documents, Borrower shall cause Lender to (A) be named as certificate holder on all property Policies and as an additional insured on all liability Policies, (B) be entitled to such notice and consent rights afforded Mortgage Lender under the applicable terms and conditions of the Mortgage Loan Agreement relating to the Policies as may be designated by Lender, and (C) receive such protections and benefits afforded Mortgage Lender under the applicable terms and conditions of the Mortgage Loan Agreement relating to the Policies.  Borrower shall not permit the Policies to be canceled without at least thirty (30) days' prior notice to Lender (or, in the case of non-payment of premiums, ten (10) days' notice to Lender).  Borrower shall provide Lender with evidence of all such insurance required hereunder and with the other related notices required under the Mortgage Loan Documents, in each case, on or before the date on which Mortgage Borrower is required to provide the same to Mortgage Lender.

(b)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder and under the Mortgage Loan Documents is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property and the Collateral, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate; provided, however, that Lender shall not obtain insurance to the extent that such insurance is duplicative of insurance obtained by Mortgage Lender pursuant to the Mortgage Loan Documents. All costs and expenses (including any insurance premiums) incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such indebtedness shall be secured by the Pledge Agreement.

(c)     For purposes of this Agreement, Lender shall have the same approval rights over the insurance referred to above (including, without limitation, the insurers, deductibles and coverages thereunder, as well as the right to require other reasonable insurance) as are provided in favor of the Mortgage Lender in the Mortgage Loan Agreement.  All liability insurance provided for in the Mortgage Loan Agreement shall provide insurance with respect to the liabilities of both Mortgage Borrower and Borrower.  The insurance policies delivered pursuant to the Mortgage Loan Agreement shall include endorsements of the type described in Section 5.1.1(e) thereof, but pursuant to which Lender shall have the same rights as the Mortgage Lender as referred to in such Section 5.1.1(e).

### Section 5.2.    Casualty and Condemnation.

**5.2.1    Casualty**.  If the Property shall sustain a Casualty, Borrower shall give, or shall cause Mortgage Borrower to give, prompt notice of such Casualty to Lender and shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property in accordance with Section 5.3 of the Mortgage Loan Agreement.  Borrower shall cause Mortgage Borrower to pay all costs and expenses of such Restoration whether or not such costs and expenses are covered by insurance, provided that Borrower shall not be in violation of the foregoing obligation to the extent that Mortgage Lender is required to disburse Net Proceeds

to Mortgage Borrower pursuant to the terms of the Mortgage Loan Agreement and fails to disburse such Net Proceeds to Mortgage Borrower as and to the extent provided therein.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender may, but shall not be obligated to, make proof of loss if not made promptly by Mortgage Borrower.  In addition, subject to the rights of Mortgage Lender under the Mortgage Loan Documents, in the event of a Casualty where the loss or the applicable Net Proceeds are equal to or greater than the Restoration Threshold or if an Event of Default has occurred and remains outstanding, Lender shall have the opportunity to participate, at Borrower's cost and expense, in any claim adjustments.  Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement and the other Loan Documents.

      **5.2.2**   **Condemnation**.  Borrower shall give, or shall cause Mortgage Borrower to give, Lender prompt notice of any actual or threatened (in writing) Condemnation by any Governmental Authority of all or any part of the Property and shall deliver, or shall cause Mortgage Borrower to deliver, to Lender a copy of any and all written notices or papers served in connection with such Condemnation or related proceedings.  Borrower may permit Mortgage Borrower to settle and compromise any Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed) and Lender shall, subject to the rights of Mortgage Lender, have the opportunity to participate, at Borrower's cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall, or shall cause Mortgage Borrower to, from time to time deliver to Lender all instruments requested by Lender to permit such participation.  Borrower shall cause Mortgage Borrower to, at Borrower's or Mortgage Borrower's cost and expense, diligently prosecute any such litigations or proceedings, and consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings.  During the continuance of an Event of Default, subject to the rights of Mortgage Lender, Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Condemnation.  Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement and the other Loan Documents.  Lender shall not be limited to the interest paid on the Award by any Governmental Authority, but shall be entitled to receive interest at the rate or rates provided herein or in the Note.  If any portion of the Property is taken by any Governmental Authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of Section 5.3 of the Mortgage Loan Agreement, provided that Borrower shall not be in violation of the foregoing obligation to the extent that Mortgage Lender is required to disburse any portion of the Award to Mortgage Borrower pursuant to the terms of the Mortgage Loan Agreement and fails to disburse such portion of the Award to Mortgage Borrower as and to the extent provided therein.  Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.

     **Section 5.3.**   **Restoration**.  Borrower shall, or shall cause Mortgage Borrower to, deliver to Lender all reports, plans, specifications, documents and other materials that are delivered to Mortgage Lender under the Mortgage Loan Agreement in connection with the Restoration of the

Property after a Casualty or Condemnation. Borrower shall cause Mortgage Borrower to comply with the terms and conditions of the Mortgage Loan Documents relating to Restoration. Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason the Mortgage Loan Restoration Provisions cease to exist or are waived or modified in any material respect (in each case, including, without limitation, due to any waiver, amendment or refinance) (such provisions, the "Waived Restoration Provisions"), to the extent permitted to do so pursuant to the Mortgage Loan Documents (if applicable), Borrower shall promptly (a) notify Lender of the same, (b) execute any amendments to this Agreement and/or the Loan Documents implementing the Waived Restoration Provisions as may be required by Lender (provided such amendments are substantially similar to the provisions set forth in the Mortgage Loan Agreement relating to the same) and shall cause Mortgage Borrower to acknowledge and agree to the same and (c) remit to Lender, and shall cause Mortgage Borrower to remit to Lender, any Net Proceeds related to the Waived Restoration Provisions.

## ARTICLE VI.
## RESERVE FUNDS AND CASH MANAGEMENT

### Section 6.1.    Required Repair Funds.

(a)    Borrower shall, or shall cause Mortgage Borrower to, perform the Required Repairs in accordance with all of the terms and conditions set forth in Section 6.1 of the Mortgage Loan Agreement.

(b)    In the event that, prior to the payment and performance in full of all obligations of Borrower under the Loan Documents, (i) Mortgage Borrower is required to maintain the Required Repair Account pursuant to the terms of Section 6.1 of the Mortgage Loan Agreement, but Mortgage Lender waives such requirement, or (ii) the Mortgage Loan has been repaid in full, (A) Lender shall have the right to require Borrower to promptly establish and maintain a reserve account that would operate in the same manner (including disbursements therefrom) as the Required Repair Account pursuant to Section 6.1 of the Mortgage Loan Agreement, and (B) the provisions of Section 6.1 of the Mortgage Loan Agreement and all related definitions shall be incorporated herein by reference.

### Section 6.2.    Tax Funds.

(a)    Borrower shall cause Mortgage Borrower to comply with all the terms and conditions set forth in Section 6.2 of the Mortgage Loan Agreement.

(b)    In the event that, prior to the payment and performance in full of all obligations of Borrower under the Loan Documents, (i) Mortgage Borrower is required to maintain the Tax Account pursuant to the terms of Section 6.2 of the Mortgage Loan Agreement, but Mortgage Lender waives such requirement, or (ii) the Mortgage Loan has been repaid in full, (A) Lender shall have the right to require Borrower to promptly establish and maintain a reserve account that would operate in the same manner (including disbursements therefrom) as the Tax Account pursuant to Section 6.2 of the Mortgage Loan Agreement (and which would be funded in the same manner pursuant to Section 2.7.2 of the Mortgage Loan Agreement), and (B) the

provisions of Section 6.2 of the Mortgage Loan Agreement and all related definitions shall be incorporated herein by reference.

**Section 6.3.    Insurance Funds**.

(a)    Borrower shall cause Mortgage Borrower to comply with all the terms and conditions set forth in Section 6.3 of the Mortgage Loan Agreement.

(b)    In the event that, prior to the payment and performance in full of all obligations of Borrower under the Loan Documents, (i) Mortgage Borrower is required to maintain the Insurance Account pursuant to the terms of Section 6.3 of the Mortgage Loan Agreement, but Mortgage Lender waives such requirement, or (ii) the Mortgage Loan has been repaid in full, (A) Lender shall have the right to require Borrower to promptly establish and maintain a reserve account that would operate in the same manner (including disbursements therefrom) as the Insurance Account pursuant to Section 6.3 of the Mortgage Loan Agreement (and which would be funded in the same manner pursuant to Section 2.7.2 of the Mortgage Loan Agreement), and (B) the provisions of Section 6.3 of the Mortgage Loan Agreement and all related definitions shall be incorporated herein by reference.

**Section 6.4.    Capital Expenditure Funds**.

(a)    Borrower shall cause Mortgage Borrower to comply with all the terms and conditions set forth in Section 6.4 of the Mortgage Loan Agreement.

(b)    In the event that, prior to the payment and performance in full of all obligations of Borrower under the Loan Documents, (i) Mortgage Borrower is required to maintain the Capital Expenditure Account pursuant to the terms of Section 6.4 of the Mortgage Loan Agreement, but Mortgage Lender waives such requirement, or (ii) the Mortgage Loan has been repaid in full, (A) Lender shall have the right to require Borrower to promptly establish and maintain a reserve account that would operate in the same manner (including disbursements therefrom) as the Capital Expenditure Account pursuant to Section 6.4 of the Mortgage Loan Agreement (and which would be funded in the same manner pursuant to Section 2.7.2 of the Mortgage Loan Agreement), and (B) the provisions of Section 6.4 of the Mortgage Loan Agreement and all related definitions shall be incorporated herein by reference.

**Section 6.5.    Financial Test Cure Funds**.

(a)    Borrower shall cause Mortgage Borrower to comply with all the terms and conditions set forth in Section 6.5 of the Mortgage Loan Agreement.

(b)    In the event that, prior to the payment and performance in full of all obligations of Borrower under the Loan Documents, (i) Mortgage Borrower is required to maintain the Financial Test Cure Collateral Reserve Account pursuant to the terms of Section 6.5 of the Mortgage Loan Agreement, but Mortgage Lender waives such requirement, or (ii) the Mortgage Loan has been repaid in full, (A) Lender shall have the right to require Borrower to promptly establish and maintain a reserve account that would operate in the same manner (including disbursements therefrom) as the Financial Test Cure Collateral Reserve Account pursuant to Section 6.5 of the Mortgage Loan Agreement (and which would be funded in the same manner

pursuant to Section 2.7.2 of the Mortgage Loan Agreement), and (B) the provisions of Section 6.5 of the Mortgage Loan Agreement and all related definitions shall be incorporated herein by reference.

Section 6.6. **Mezzanine Loan Excess Cash Flow Funds**.

6.6.1 **Deposits of Mezzanine Loan Excess Cash Flow Funds**. During the continuance of a Cash Sweep Trigger Event Period, Borrower shall deposit with Lender all Mezzanine Loan Excess Cash Flow, which sums shall be held by Lender as additional security for the Loan. Amounts so deposited shall hereinafter be referred to as the "Mezzanine Loan Excess Cash Flow Funds" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "Mezzanine Loan Excess Cash Flow Account".

6.6.2 **Release of Mezzanine Loan Excess Cash Flow Funds.**

(a)     Upon the termination of the applicable Cash Sweep Trigger Event Period, all Mezzanine Loan Excess Cash Flow Funds shall be deposited into the Mezzanine Deposit Account and applied in accordance with this Agreement.

(b)     All reasonable out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Mezzanine Loan Excess Cash Flow Funds shall be paid by Borrower.

Section 6.7. **Excess Cash Flow Funds**.

(a)     Borrower shall cause Mortgage Borrower to comply with all the terms and conditions set forth in Section 6.7 of the Mortgage Loan Agreement.

(b)     In the event that, prior to the payment and performance in full of all obligations of Borrower under the Loan Documents, (i) Mortgage Borrower is required to maintain the Excess Cash Flow Account pursuant to the terms of Section 6.7 of the Mortgage Loan Agreement, but Mortgage Lender waives such requirement, or (ii) the Mortgage Loan has been repaid in full, (A) Lender shall have the right to require Borrower to promptly establish and maintain a reserve account that would operate in the same manner (including disbursements therefrom) as the Excess Cash Flow Account pursuant to Section 6.7 of the Mortgage Loan Agreement (and which would be funded in the same manner pursuant to Section 2.7.2 of the Mortgage Loan Agreement), and (B) the provisions of Section 6.7 of the Mortgage Loan Agreement and all related definitions shall be incorporated herein by reference.

Section 6.8. **Reserve Funds**.

6.8.1 **Security Interest**. Borrower hereby pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Reserve Accounts as additional security for the performance of the Obligations. Until expended or applied as provided in this Agreement, the Reserve Funds shall constitute additional security for the performance of the Obligations. Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the occurrence and during the continuation of an Event of Default, Lender shall have no obligation to release any of the Reserve Funds and Lender may, in addition to any and all

other rights and remedies available to Lender, apply any sums then on deposit in any Reserve Account to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion. Borrower shall not further pledge, assign or grant any security interest in any Reserve Account or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any financing statements, except those naming Lender as the secured party, to be filed with respect thereto.

6.8.2 **Investments; Income Taxes**. The Reserve Accounts shall be held in Lender's name and the Reserve Funds may be commingled with Lender's own funds at financial institutions selected by Lender in its sole discretion. The Reserve Funds shall be held in an Eligible Account and may be invested in Permitted Investments as directed by Lender. Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds. Borrower shall deposit with Lender an amount equal to the actual losses sustained on the investment of any funds constituting the Reserve Funds in Permitted Investments within one (1) Business Day of Lender's notice. All interest or other income on the Reserve Funds shall not be added to or become a part thereof and shall be the sole property of, and shall be paid to, Lender.

6.8.3 **Indemnity**. Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid or reimbursed from, or secured by, the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains outstanding.

6.8.4 **Transfer of Funds In Mortgage Reserve Accounts**. If Mortgage Lender waives any reserves or escrow accounts now or hereafter required in accordance with the terms of the Mortgage Loan Agreement or any other Mortgage Loan Documents, which reserves or escrow accounts are also required in accordance with the terms of this Article VI, or if the Mortgage Loan is refinanced or paid off in full (without a prepayment of the Loan in full) and Reserve Funds that are required hereunder are not required under the new mortgage loan, if any, then Borrower shall promptly cause any amounts that would have been deposited into any reserves or escrow accounts in accordance with the terms of the Mortgage Loan Agreement to be transferred to and deposited with Lender in accordance with the terms of this Article VI (and Borrower shall promptly enter into a cash management and lockbox agreement for the benefit of Lender substantially similar to the cash management arrangement described in the Mortgage Loan Agreement at the time of the closing of the Mortgage Loan).

Section 6.9. **Provisions Regarding Letters of Credit**.

6.9.1 **Event of Default**. An Event of Default shall occur if Borrower shall fail to (i) replace or extend any Letter of Credit (or to substitute cash in lieu of any such Letter of Credit) prior to the date which is thirty (30) days prior to the expiration thereof or (ii) replace any outstanding Letter of Credit (or to substitute cash in lieu of any such Letter of Credit) within thirty (30) days if such Letter of Credit fails to meet the requirements set forth in the definition of Letter

of Credit.  Lender shall not be required to exercise its rights under Section 6.9.4 below in order to prevent any such Event of Default from occurring and shall not be liable for any losses due to the insolvency of the issuer of the Letter of Credit as a result of any failure or delay by Lender in the exercise of such rights, but if Lender draws on the Letter of Credit and the issuer honors such draw and no Event of Default shall exist, Lender shall hold the proceeds of such draw in the same manner as Lender holds the Reserve Funds.

**6.9.2    Security for Debt**.  Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt.  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine or to hold such proceeds as security for the Debt.

**6.9.3    Limitations on Letters of Credit**.  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, the Borrower shall not have any rights to deliver any Letter of Credit pursuant to any provision of this Agreement or any other Loan Document if the aggregate amount of any Letters of Credit delivered to Lender in accordance with this Agreement or any other Loan Document shall exceed ten percent (10%) of the Outstanding Principal Balance.  Notwithstanding the foregoing, Borrower shall be permitted to exceed such ten percent (10%) threshold (but in no event more than fifteen percent (15%) of the Outstanding Principal Balance), subject to delivery of an Insolvency Opinion reasonably acceptable to Lender and acceptable to the Rating Agencies.

**6.9.4    Additional Rights of Lender**.  In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit:  (a) with respect to any evergreen Letter of Credit, if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit (or cash in lieu thereof) is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date, if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire or a substitute Letter of Credit (or cash in lieu thereof) is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; or (c) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution and Borrower has not, within thirty (30) days after notice thereof, obtained a new Letter of Credit (or cash in lieu thereof) from an Eligible Institution.

## ARTICLE VII.
## PROPERTY MANAGEMENT

**Section 7.1.    Management Agreement**.

Borrower shall (and/or shall cause Mortgage Borrower to) cause the Property to be operated in accordance with the Management Agreement.  Borrower shall (and/or shall cause Mortgage Borrower to) (a) diligently perform and observe all of the terms, covenants and

conditions of the Management Agreement on the part of Mortgage Borrower to be performed and observed, (b) promptly notify Lender of any default under the Management Agreement of which it is aware, (c) promptly deliver to Lender a copy of each business plan or capital expenditures plan received by it under the Management Agreement, and (d) promptly enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner. Subject to the rights of Mortgage Lender, if Mortgage Borrower shall default in the performance or observance of any term, covenant or condition of the Management Agreement on the part of Mortgage Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, under the other Loan Documents or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of the Management Agreement on the part of Mortgage Borrower to be performed or observed in all material respects.

### Section 7.2.    **Prohibition Against Termination or Modification**.

(a)    Borrower shall not, without the prior consent of Lender, cause or permit Mortgage Borrower to (i) surrender, terminate or cancel the Management Agreement; provided that Borrower may, without Lender's consent, permit Mortgage Borrower to replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement, or (ii) amend or modify the Management Agreement in any manner that would reduce the term (including any extension or renewal term) of the Management Agreement, or increase or consent to the increase of the amount of any fees or other charges under the Management Agreement, or otherwise modify, change, supplement, alter or amend, or waive or release any of its material rights and remedies under, the Management Agreement in any material respect.  In connection with the replacement of Manager with a Qualified Manager, Borrower shall execute and cause Mortgage Borrower and a Qualified Manager to execute a subordination of management agreement in the form then used by Lender or in such other form as may be reasonably acceptable to Lender.

(b)    In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall cause Mortgage Borrower to promptly enter into a Replacement Management Agreement with a Qualified Manager.

### Section 7.3.    **Replacement of Manager**.

Lender shall have the right to require Borrower to cause Mortgage Borrower to replace Manager with a Qualified Manager pursuant to Replacement Management Agreement, which Qualified Manager is not an Affiliate of, but is chosen by, Borrower, upon the occurrence of any one or more of the following events:  (a) at any time during the continuation of an Event of Default, (b) if Manager shall be in default under the Management Agreement beyond any applicable notice and/or cure period, (c) if Borrower, Mortgage Borrower, Guarantor, Key Principal or Manager shall become insolvent or a debtor in any Bankruptcy Action, and/or (d) if at any time Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds.

## ARTICLE VIII.
## TRANSFERS

**Section 8.1.    Transfers Generally**.

(a)    Except as otherwise set forth in this <u>Article VIII</u>, <u>Section 4.1.9</u> hereof, and the definition of "Permitted Encumbrances", without the prior consent of Lender, Borrower shall not, and shall not permit any other Restricted Party to, sell, contract to sell, transfer, dispose of, convey, assign, mortgage, pledge, encumber, alienate, grant a Lien on, grant any option or other similar right with respect to, or grant any other interest in (each, a "**Transfer**") the Property or the Collateral, or any part thereof or any interest therein (including any legal, beneficial or economic interest in any Restricted Party), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record.

(b)    A Transfer shall include, without limitation, (i) any agreement to sell the Property or the Collateral, or any part thereof or any interest therein (including an installment sales agreement wherein Borrower or Mortgage Borrower agrees to sell the Property or the Collateral, or any part thereof or any interest therein for a price to be paid in installments); (ii) an agreement by Mortgage Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgage Borrower's right, title and interest in and to any Leases or any Rents; (iii) if any Restricted Party is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly Controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock such that such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the Control of such corporation; (iv) if any Restricted Party is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, managing partner, limited partner, joint venturer or member, the voluntary or involuntary transfer of the partnership interest of any general partner, managing partner or limited partner, the creation or issuance of new limited partnership interests, the voluntary or involuntary transfer of the interest of any joint venturer or member or the creation or issuance of new non-managing member interests; (v) if any Restricted Party is a trust or nominee trust, the voluntary or involuntary transfer of the legal or beneficial interest in such trust or nominee trust or the creation or issuance of new legal or beneficial interests; (vi) any Division of a particular individual Borrower or Guarantor into two (2) or more separate entities (or any allocation of Borrower's or Guarantor's assets, liabilities, rights and/or obligations between or among such entities) and (vii) if Borrower enters into, or the Property is or becomes subject to, any PACE Loan.

(c)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder or under the other Loan Documents in order to declare the Debt immediately due and payable upon a Transfer without Lender's prior consent, if such consent is required hereunder.  This provision shall apply to every Transfer regardless of whether voluntary or not, and whether or not Lender has consented to any previous Transfer.

(d)    Lender's consent to one Transfer shall not be deemed to be a waiver of Lender's right to require such consent to any future occurrence of same.  Any Transfer made in contravention of this <u>Article VIII</u> shall be null and void and of no force and effect.

(e)    Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses, title search costs and title insurance endorsement premiums) actually incurred by Lender in connection with the review, approval and/or documentation of any proposed Transfer.  If required by Lender, Borrower shall deposit with Lender an amount equal to Lender's anticipated costs and expenses in evaluating any proposed Transfer.

**Section 8.2.    Transfers of Interests in Restricted Parties**.

Notwithstanding anything to the contrary contained in <u>Section 8.1</u> hereof, but subject to the provisions of this <u>Section 8.2</u>, Lender's consent shall not be required in connection with any of the following Transfers:

(a)    any Transfer, directly as a result of the death of a natural person, of the stock, partnership interests, membership interests or other direct or indirect ownership interests in any Restricted Party previously held by the decedent in question to the Person or Persons lawfully entitled thereto (other than any Transfer of any direct interests in Mortgage Borrower or the Collateral);

(b)    any Transfer, directly as a result of the legal incapacity of a natural person, of the stock, partnership interests, membership interests or other direct or indirect ownership interests in any Restricted Party previously held by such natural person to the Person or Persons lawfully entitled thereto (other than any Transfer of any direct interests in Mortgage Borrower or the Collateral);

(c)    any Transfer for estate planning purposes by a natural person of the stock, partnership interests, membership interests or other direct or indirect ownership interests in any Restricted Party to any Immediate Family Member of such natural person or to a trust for the benefit of any Immediate Family Member of such natural person (other than any Transfer of any direct interests in Mortgage Borrower or the Collateral);

(d)    any Transfer, pursuant to a single Transfer or a series of Transfers, of not more than forty-nine percent (49%) in the aggregate of the direct or indirect ownership interests in any Restricted Party (other than any Transfer of any direct interests in Mortgage Borrower or the Collateral); and

(e)    any pledge by a Mezzanine 2 Borrower of the direct or indirect, as applicable, ownership interests in Mezzanine 1 Borrower and other collateral pursuant to the applicable Mezzanine 2 Loan Documents, as well as any Transfer made in accordance with all requirements of the Intercreditor Agreement occurring upon the foreclosure of, or other remedial action with respect to, any such ownership interests or delivery of an assignment in lieu of foreclosure in respect of any such ownership interests;

provided that such Transfer shall not consist of, provide for or at any time require any Division of a particular individual Borrower or Guarantor into two (2) or more separate entities (or any allocation of Borrower's or Guarantor's assets, liabilities, rights and/or obligations between or among such entities) or any pledge, encumbrance or other Lien upon the Property or the Collateral or any direct or indirect interest in any Restricted Party (other than pursuant to the Mezzanine 2 Loan) and the following conditions are satisfied:

(i)      (A) with respect to any Transfer described in Section 8.2(a) or Section 8.2(b) above, no Event of Default shall occur (with the giving of notice or passage of time or otherwise) solely as a result of such Transfer; provided that, with respect to any Transfer described in Section 8.2(a) or Section 8.2(b) above that fails to satisfy the condition set forth in this clause (i), such Transfer shall constitute a Transfer in violation of this Agreement and the other Loan Documents, but such Transfer shall not, in and of itself, result in any recourse liability pursuant to Section 11.22 hereof and (B) with respect to any Transfer described in Section 8.2(c) or Section 8.2(d) above, no Event of Default shall have occurred and remain outstanding or shall occur (with the giving of notice or passage of time or otherwise) solely as a result of such Transfer;

(ii)      (A) with respect to any Transfer described in Section 8.2(a) or Section 8.2(b) above, Borrower shall give Lender (1) notice of such Transfer, together with a copy of an updated, post-Transfer organizational chart and copies of all instruments effecting such Transfer reasonably promptly following such Transfer (but in no event later than ten (10) Business Days after Lender's request therefor) and (2) copies of any Organizational Documents that Lender may reasonably require within ten (10) Business Days of Lender's request therefor; and (B) with respect to any Transfer described in Section 8.2(c) or Section 8.2(d) above, Borrower shall give Lender (1) notice of such Transfer, together with a copy of an updated pro-forma organizational chart assuming such Transfer and copies of all instruments effecting such Transfer not less than ten (10) days prior to the proposed date of such Transfer and (2) copies of any Organizational Documents that Lender may reasonably require within five (5) Business Days of Lender's request therefor;

(iii)      to the extent the transferee, together with its Affiliates, shall own ten percent (10%) or more of the direct or indirect interests in any Restricted Party immediately following such Transfer (provided that such transferee did not own ten percent (10%) or more of the direct or indirect ownership interests in such Restricted Party as of the Closing Date), Lender shall have performed searches (it being understood and agreed that the results of such searches must be reasonably satisfactory to Lender) and/or received such documents and information as required by Lender, in each case in form and substance reasonably satisfactory to Lender, to comply with Lender's then customary "know your customer" and compliance requirements with respect to the transferee and its Affiliates; provided that, with respect to any Transfer described in Section 8.2(a) or Section 8.2(b) above, to the extent necessary, (A) such searches and review of the applicable search results, documents and information shall be performed by Lender following such Transfer (and following its receipt of the documents and information required to be provided

to Lender pursuant to <u>clause (ii)(A)</u> above), (B) Borrower shall deliver the documents and information required by Lender pursuant to <u>clause (iii)(B)</u> above reasonably promptly following Lender's request therefor (but in no event later than ten (10) Business Days after Lender's request therefor), and (C) if the conditions set forth in this <u>clause (iii)</u> are not satisfied, such Transfer shall constitute a Transfer in violation of this Agreement and the other Loan Documents, but such Transfer shall not, in and of itself, result in any recourse liability pursuant to <u>Section 11.22</u> hereof;

(iv)  to the extent the transferee, together its Affiliates, shall own twenty percent (20%) or more of the direct or indirect interests in any Restricted Party immediately following such Transfer (provided that such transferee did not own twenty percent (20%) or more of the direct or indirect ownership interests in such Restricted Party as of the Closing Date), Borrower shall have delivered the results of customary searches with respect to such transferee and its Affiliates as Lender may reasonably require (it being understood and agreed that the scope of such searches and such search results must be reasonably satisfactory to Lender); provided that, with respect to any Transfer described in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u> above, to the extent necessary, (A) Borrower shall deliver such search results reasonably promptly following such Transfer (but in no event later than ten (10) Business Days after Lender's request therefor), (B) such review of the applicable search results shall be performed by Lender following its receipt of the documents and information required to be provided to Lender pursuant to <u>clause (ii)(A)</u> above), and (C) if the conditions set forth in this <u>clause (iii)</u> are not satisfied, such Transfer shall constitute a Transfer in violation of this Agreement and the other Loan Documents, but such Transfer shall not, in and of itself, result in any recourse liability pursuant to <u>Section 11.22</u> hereof;

(v)  (A) with respect to any Transfer described in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u> above, (1) such Transfer shall not cause, or result in, a change of Control of any Restricted Party; provided that, in connection with a Transfer directly as a result of the death or legal incapacity of Key Principal, the Immediate Family Members of Key Principal or trusts established for their benefit may acquire Control of the applicable Restricted Party, and (2) such Transfer shall not cause the transferee, together with its Affiliates, to acquire (or increase) its direct or indirect interest in any Restricted Party to an amount which exceeds forty-nine percent (49%) in the aggregate; provided that, in connection with a Transfer directly as a result of the death or legal incapacity of Key Principal, the Immediate Family Members of Key Principal or trusts established for their benefit may acquire (or increase) their direct or indirect interest in the applicable Restricted Party to an amount which exceeds forty-nine percent (49%) in the aggregate; (B) with respect to any Transfer described in <u>Section 8.2(c)</u> above, (1) such Transfer shall not cause the transferee, together with its Affiliates, to acquire Control of any Restricted Party, (2) such Transfer shall not result in any Restricted Party no longer being Controlled by Key Principal, and (3) such Transfer shall not cause the transferee, together with its Affiliates, to acquire (or increase) its direct or indirect interest in any Restricted Party to an amount which exceeds forty-nine percent (49%) in the

aggregate; provided that, in connection with a Transfer for estate planning purposes by Key Principal, the Immediate Family Members of Key Principal or trusts established for their benefit may acquire (or increase) their direct or indirect interest in the applicable Restricted Party to an amount which exceeds forty-nine percent (49%) in the aggregate; and (C) with respect to any Transfer described in Section 8.2(d) above, (1) such Transfer shall not cause the transferee, together with its Affiliates, to acquire Control of any Restricted Party, (2) such Transfer shall not result in any Restricted Party no longer being Controlled by Key Principal, and (3) such Transfer shall not cause the transferee, together with its Affiliates, to acquire (or increase) its direct or indirect interest in any Restricted Party to an amount which exceeds forty-nine percent (49%) in the aggregate;

(vi)     (A) with respect to any Transfer described in Section 8.2(c) above, after giving effect to such Transfer, Key Principal, the Immediate Family Members of Key Principal and trusts established for the benefit of Key Principal or the Immediately Family Members of Key Principal shall continue to own, directly or indirectly, at least fifty-one percent (51%) of all legal, beneficial and economic interests in each Restricted Party and (B) with respect to any Transfer described in Section 8.2(d) above, after giving effect to such Transfer, Key Principal shall continue to own, directly or indirectly, at least fifty-one percent (51%) of all legal, beneficial and economic interests in each Restricted Party;

(vii)     after giving effect to such Transfer, (A) no Prohibited Entity shall own any direct or indirect interest in Borrower and (B) no Prohibited Entity shall Control Borrower; provided that, with respect to any Transfer described in Section 8.2(a) or Section 8.2(b) above, if the conditions set forth in this clause (vii) are not satisfied, such Transfer shall constitute a Transfer in violation of this Agreement and the other Loan Documents, but such Transfer shall not, in and of itself, result in any recourse liability pursuant to Section 11.22 hereof;

(viii)     the Property shall continue to be managed by Manager pursuant to the Management Agreement or another Qualified Manager pursuant to a Replacement Management Agreement;

(ix)     the legal and financial structure of Borrower and Mortgage Borrower, and the single purpose nature and bankruptcy remoteness of Borrower and Mortgage Borrower, after such Transfer, shall satisfy Lender's the then current underwriting criteria and requirements and the criteria established by the Rating Agencies for single purpose, bankruptcy remote entities;

(x)     in no event shall Borrower Transfer all or any portion of the Collateral; and

(xi)     Borrower shall have paid all reasonable out-of-pocket costs and expenses actually incurred by Lender in connection with such Transfer (including reasonable fees and disbursements of Lender's counsel and fees, costs and expenses of the Rating Agencies).

(f)     Notwithstanding anything to the contrary contained herein, if, after giving effect to any Transfer, more than forty-nine percent (49%) of direct or indirect interests in Borrower are owned by any Person and its Affiliates that owned less than forty-nine percent (49%) direct or indirect interests in Borrower as of the Closing Date, Borrower shall deliver to Lender prior to the effective date of such Transfer an updated Insolvency Opinion reasonably acceptable to Lender and acceptable to the Rating Agencies.

(g)     In addition, notwithstanding anything to the contrary contained herein, neither the issuance of any preferred equity interests with any of the characteristics of debt (such as a fixed redemption date or maturity date, a fixed rate of return, regular payments of interest, a pledge of ownership interests as collateral, any right to demand repayment or any right to cause a change of Control) in any Restricted Party nor the pledge of any such preferred equity interests shall be permitted without the consent of Lender.

### Section 8.3.    Loan Assumption.

No assumption of the Loan shall be permitted before the first (1st) anniversary of the first (1st) Monthly Payment Date.  Thereafter, in the event Mortgage Borrower obtains the consent of Mortgage Lender to a Transfer consisting of the sale of the Property to a new mortgage borrower (a "**New Mortgage Borrower**") and the concurrent assumption of the Mortgage Loan by New Mortgage Borrower, Lender's consent to such a Transfer shall not be unreasonably withheld after consideration of all relevant factors and provided that the following conditions are satisfied:

(a)     Lender shall have received a notice from Borrower requesting Lender's consent to such Transfer not less than forty-five (45) days prior to the proposed date of such Transfer;

(b)     no Event of Default shall have occurred and remain outstanding or shall occur (with the giving of notice or passage of time or otherwise) solely as a result of such Transfer;

(c)     New Mortgage Borrower shall be a corporation, partnership or limited liability company that qualifies as a single purpose, bankruptcy remote entity with Organizational Documents acceptable to Lender.  The sole holder of 100% of the equity interests in the New Mortgage Borrower ("**Transferee**") and Transferee's SPE Constituent Entities, if applicable, shall be a newly formed, corporation, partnership or limited liability company that qualifies as a single purpose, bankruptcy remote entity with Organizational Documents acceptable to Lender (for all purposes hereof, Organization Documents in form and substance substantially identical to those of Borrower as of the Closing Date shall be acceptable to Lender as long as they are satisfactory to the Rating Agencies, if applicable);

(d)     neither Transferee nor any Transferee SPE Constituent Entity shall be a Prohibited Entity;

(e)     (i) Lender shall have received an organizational chart of Transferee in form and substance reasonably satisfactory to Lender, (ii) Lender shall have performed searches (it being understood and agreed that the results of such searches must be reasonably satisfactory to Lender) and/or received such documents and information as required by Lender, in each case in

form and substance reasonably satisfactory to Lender, to comply with Lender's then customary "know your customer" and compliance requirements and the transferee and its Affiliates and (iii) Borrower shall have delivered the results of customary searches with respect to such transferee and its Affiliates as Lender may reasonably require (it being understood and agreed that the scope of such searches and such search results must be reasonably satisfactory to Lender);

(f)　Transferee shall have pledged its entire equity interest in New Mortgage Borrower to Lender pursuant to a pledge agreement in substantially the same form as the Pledge Agreement and Transferee shall have delivered original certificates of 100% of the equity interest in New Mortgage Borrower in substantially the same form of the certificate delivered to Lender on the Closing Date together with stock, limited liability company membership or partnership interest powers (which powers shall be executed in blank) together with such opinions and other information as reasonable required by Lender (it being agreed that if Lender required such information in connection with the closing of the Loan, it shall be reasonable for Lender to request the same in connection with the sale or conveyance described herein);

(g)　neither any Transferee Sponsor, Transferee nor any other Person owned or Controlled, directly or indirectly, by Transferee Sponsors shall have been a debtor in any Bankruptcy Action or taken advantage of any Bankruptcy Law or any law for the benefit of debtors within seven (7) years prior to the date of the proposed Transfer;

(h)　such Transfer has been approved or deemed approved or is permitted under the Mortgage Loan Documents and all conditions set forth in the Mortgage Loan Documents relating thereto have been satisfied;

(i)　neither any Transferee Sponsor, Transferee nor any other Person owned or Controlled, directly or indirectly, by Transferee Sponsors shall have defaulted under its obligations with respect to any Indebtedness in a manner which is not reasonably acceptable to Lender;

(j)　there shall be no material litigation or regulatory action pending or threatened against any Transferee Sponsor, Transferee or any other Person owned or Controlled, directly or indirectly, by Transferee Sponsors which is not reasonably acceptable to Lender;

(k)　Transferee and Transferee Sponsors shall, as of the date of such Transfer, have an aggregate net worth and liquidity reasonably satisfactory to Lender;

(l)　New Mortgage Borrower and its Affiliates (together with New Mortgage Borrower's proposed property manager) shall be experienced owners and operators of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably satisfactory to Lender (it being understood and agreed that Lender reserves the right to approve New Mortgage Borrower without approving its proposed property manager);

(m)　If the Management Agreement will be terminated as a result of such Transfer, the Property shall be managed by a Qualified Manager in accordance with a Replacement Management Agreement;

(n)     Transferee and Transferee SPE Constituent Entities shall have delivered all agreements, certificates and opinions reasonably required by Lender (including, if applicable, an amendment to Section 3.1.24 or Section 8.2 hereof to incorporate necessary changes based on differences in the organizational structures of Borrower and Transferee);

(o)     Transferee shall have assumed all obligations of Borrower under the Loan Documents in a manner reasonably satisfactory to Lender, including, without limitation, pursuant to an assumption agreement in form and substance reasonably satisfactory to Lender;

(p)     (A) Borrower shall have delivered to Lender, at its sole cost and expense, (i) a new UCC title insurance policy in form and substance satisfactory to Lender; and (ii) a mezzanine endorsement to the owner's title policy in form and substance acceptable to Lender, relating to the change in the identity of the vestee and execution and delivery of the conveyance documents or a mezzanine endorsement to a new owner's title policy in form and substance acceptable to Lender, and (B) Lender shall have approved New Mortgage Borrower's owner's title insurance policy with respect to the Property;

(q)     one (1) or more substitute or additional guarantors reasonably acceptable to Lender shall (i) have assumed all obligations of Guarantor under the Guaranty and the Environmental Indemnity arising from and after the date of this Agreement or (ii) have executed a replacement or additional guaranty and a replacement or additional environmental indemnity in form and substance reasonably satisfactory to Lender covering all obligations arising under the Guaranty and the Environmental Indemnity arising from and after the date of this Agreement, and following the delivery of such assumption or replacement or additional guaranty and environmental indemnity, Guarantor shall be released from all obligations arising thereunder;

(r)     Borrower or Transferee, at its sole cost and expense, shall have delivered a new bankruptcy non-consolidation opinion letter reflecting such Transfer reasonably acceptable to Lender and acceptable to the Rating Agencies;

(s)     if required by Lender, Borrower shall have delivered a Rating Agency Confirmation as to such Transfer and Transferee;

(t)     Borrower shall have paid to Lender an assumption fee equal to (i) $250,000.00 with respect to the first assumption of the Loan and (ii) one percent (1%) of the Outstanding Principal Balance with respect to any subsequent assumption of the Loan; and

(u)     Borrower shall have paid all reasonable out-of-pocket costs and expenses actually incurred in connection with such Transfer (including reasonable fees and disbursements of Lender's counsel and fees, costs and expenses of the Rating Agencies).

### Section 8.4.    Additional Permitted Debt.

During the period prior to November 30, 2020, a newly-formed single-purpose entity that owns 100% of the direct equity interests of Mezzanine 2 Borrower shall have a one-time right to pledge all or any portion of its limited liability company interests in Mezzanine 2 Borrower to secure a loan up to a maximum principal amount of $19,000,000.00 (a "**Permitted Mezzanine**

**Loan**") to such single-purpose entity, provided that the following conditions precedent are satisfied:

(a)    Lender shall have reasonably approved (A) the terms of the Permitted Mezzanine Loan and (B) the documents and instruments evidencing the Permitted Mezzanine Loan;

(b)    The lender providing the Permitted Mezzanine Loan shall be an institutional lender meeting the standards of a Qualified Transferee (as such term is defined in the Intercreditor Agreement) which is reasonably acceptable to Lender (it being agreed that Lender's reasonable objection to such institutional lender may include, without limitation, prior adverse relationship with such institutional lender) and acceptable to the Rating Agencies; provided, that Lender hereby acknowledges that (i) C-III Capital Partners LLC, Resource Capital Corp. or any Affiliate Controlled by any such Person in which such Person owns more than 50% of the direct or indirect beneficial ownership interest in such Affiliate and (ii) TIAA are hereby approved to provide the Permitted Mezzanine Loan;

(c)    The lender providing the Permitted Mezzanine Loan shall either join in the Intercreditor Agreement in a manner acceptable to Lender or have entered into a new intercreditor agreement reasonably acceptable to Lender and acceptable to the Rating Agencies; provided, that no approval of the Rating Agencies shall be required to the extent the lender providing the Permitted Mezzanine Loan is TIAA and there is no material amendment to the Intercreditor Agreement;

(d)    Lender shall have reasonably determined that the Debt Service Coverage Ratio (after giving effect to such Permitted Mezzanine Loan) shall be equal to or greater than 1.20:1.00; provided, that if the Permitted Mezzanine Loan is obtained within (6) months of the date hereof, the Debt Service Coverage Ratio shall be calculated based on the Net Operating Income as of the Closing Date;

(e)    After giving effect to such Permitted Mezzanine Loan, the Loan-to-Value Ratio (based on the lesser of (i) the appraised value of the Property from the appraisals received by Lender in connection with the closing of the Loan and (ii) the appraised value of the Property based on new appraisals to be delivered in connection with such Permitted Mezzanine Loan) shall not exceed 79%; provided, that if the Permitted Mezzanine Loan is obtained within six (6) months of the date hereof, the Loan-to-Value Ratio shall be calculated based on the appraisals received by Lender in connection with the closing of the Loan;

(f)    Lender shall have reasonably determined that the Debt Yield (after giving effect to such Permitted Mezzanine Loan) shall be no less than 7.30%; provided, that if the Permitted Mezzanine Loan is obtained within six (6) months of the date hereof, the Debt Yield shall be calculated based on the Net Operating Income as of the Closing Date;

(g)    No Event of Default, nor any event which with notice or the passage of time or both would constitute an Event of Default, shall have occurred and be then continuing under any of the Loan Documents;

(h)    Following a Securitization, Lender shall have received a Rating Agency Confirmation with respect to the Permitted Mezzanine Loan; provided that no Rating Agency Confirmation will be required to the extent the lender providing the Permitted Mezzanine Loan is TIAA;

(i)    If required by Lender, Lender shall have received a new Insolvency Opinion reasonably acceptable to Lender and acceptable to the Rating Agencies;

(j)    Borrower shall have executed such amendments to the Loan Documents as may be reasonably required by Lender to reflect the existence of such Permitted Mezzanine Loan, and Lender shall have received enforceability and due authorization opinions with respect thereto;

(k)    The Permitted Mezzanine Loan shall (i) have the same maturity date as the Loan and (ii) provide for a fixed rate of interest; and

(l)    Borrower shall have paid all reasonable out-of-pocket costs and expenses actually incurred by Lender, including reasonable attorneys' fees and fees and expenses of the Rating Agencies, in reviewing the documents evidencing and securing the Permitted Mezzanine Loan and negotiating and documenting the compliance with this Section 8.4.

# ARTICLE IX.
## SALE AND SECURITIZATION OF MORTGAGE

### Section 9.1.    Sale of Mortgage and Securitization.

(a)    Lender shall have the right, at any time and from time to time, (i) to sell or otherwise transfer the Loan as a whole loan or sell or otherwise transfer any portion thereof or any interest therein, (ii) to sell participation interests in the Loan or (iii) to securitize the Loan or any portion thereof or any interest therein in one or more private or public securitizations.  (The transactions referred to in clauses (i), (ii) and (iii) are each hereinafter referred to as a "**Secondary Market Transaction**" and the transaction referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**".  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".)

(b)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be required in the marketplace, by the Rating Agencies or by any Legal Requirements in connection with any Secondary Market Transactions:

(i)    (A) provide or cause Mortgage Borrower to provide updated financial and other information with respect to the Collateral, the Property, the business operated at the Property, Mortgage Borrower, Borrower, Guarantor, any Affiliate of Borrower or Guarantor and Manager (including, without limitation, the information set forth on Schedule 9.1(b) hereto), (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each Tenant) relating to the Property and (C) provide updated appraisals, market studies, environmental audits, reviews and reports

(Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the information required under clauses (A), (B) and (C) shall hereinafter be referred to collectively as the "**Updated Information**"), together with appropriate verification of the Updated Information through letters of auditors, certificates of third party providers or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)    provide opinions of counsel, which may be relied upon by Lender, the NRSROs and their respective counsel, agents and representatives, as to bankruptcy non-consolidation, fraudulent conveyance, and "true sale" or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, the Collateral, Mortgage Borrower, Borrower, Guarantor and any Affiliate of Mortgage Borrower, Borrower or Guarantor, which counsel and opinions shall be reasonably satisfactory to Lender and satisfactory to the Rating Agencies;

(iii)    provide, and cause to be provided, updated representations and warranties made in the Loan Documents and make, and cause to be made, such additional representations and warranties as may be requested by Lender or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof;

(iv)    execute, and cause to be executed, such amendments, replacements or other modifications to the Loan Documents or Mortgage Borrower's or Borrower's Organizational Documents as may be requested by Lender or the Rating Agencies to effect the Secondary Market Transactions, including without limitation, to amend and/or supplement the Independent Director provisions provided herein and therein, in each case, in accordance with the applicable requirements of the Rating Agencies; provided, however, that Borrower shall not be required to amend, restate or otherwise modify any Loan Document if such amendment, restatement or other modification would (A) increase the initial weighted average interest rate or change the principal amortization schedule for the Loan (except that the weighted average interest rate or the principal amortization schedule for the Loan may subsequently change due to involuntary prepayments or if an Event of Default shall occur) or (B) amend or otherwise modify any other material economic term of the Loan; and

(v)    attend management meetings, provide access to the Property and conduct tours of the Property; and

(vi)    provide, and cause to be provided, certificates or other evidence of reliance reasonably satisfactory to Lender and the Rating Agencies with respect to any information or third party reports obtained in connection with the origination of the Loan or any Updated Information from Mortgage Borrower, Borrower, Guarantor, any Affiliate of Mortgage Borrower, Borrower or Guarantor, Manager and any accountants, appraisers, engineers, environmental assessment

experts and other experts or third party providers of such information, reports or Updated Information.

(c)     If, at the time one or more Disclosure Documents are being prepared for or in connection with a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower (including any guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Property alone or the Property and Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following financial information:

(i)     if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all loans included or expected to be included in the Securitization, net operating income for the Property and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii)     if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed twenty percent (20%) of the aggregate principal amount of all loans included or expected to be included in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)     Further, if requested by Lender, Borrower shall, promptly upon Lender's request, furnish to Lender financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any tenant of the Property if, in connection with a Securitization, Lender expects there to be, as of the cut-off date for such Securitization, a concentration with respect to such tenant or group of Affiliated tenants within all of the loans included or expected to be included in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor. Borrower shall furnish to Lender, on

an ongoing basis, financial data or financial statements with respect to such tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (i) Exchange Act Filings in connection with or relating to the Securitization are required to be made under applicable Legal Requirements or (ii) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)    If Lender determines that Borrower alone or Borrower and one or more Affiliates of any Borrower collectively, or the Property alone or the Property and Related Properties collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (i) Exchange Act Filings are required to be made under applicable Legal Requirements or (ii) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(f)    Any financial data or financial statements provided pursuant to this Section 9.1 shall be furnished to Lender within the following time periods:

(i)    with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender; and

(ii)    with respect to ongoing information required under Sections 9.1(d) and (e) above, (A) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each Fiscal Year of Borrower.

(g)    All financial data and financial statements provided by Borrower hereunder pursuant to Sections 9.1(c), (d), (e) and (f) hereof shall be prepared in accordance with the Acceptable Accounting Basis and, if applicable, shall meet the requirements of Regulation AB, Regulation S-K, Regulation S-X, and/or any other applicable Legal Requirements.  If required by the applicable Legal Requirements, all such financial statements relating to a Fiscal Year shall be audited by independent accountants of Borrower acceptable to Lender in accordance with generally accepted auditing standards, Regulation S-X or Regulation S-K, as applicable, Regulation AB, and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and all other applicable Legal Requirements, and shall be further accompanied by a manually executed consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document, any Exchange Act Filing or any report that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document, any Exchange Act Filing or any report that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, all of which shall be provided at the same time as the related financial statements are required to be provided.  All other financial data and

financial statements (audited or unaudited) provided by Borrower shall be accompanied by an Officer's Certificate which shall state that such financial data and financial statements meet the requirements set forth in the first sentence of this paragraph.

(h)    In the event Lender determines, in connection with a Securitization, that financial statements and financial data required in order to comply with Regulation AB or any amendment, modification or replacement thereto or any other Legal Requirements are other than as provided herein, then notwithstanding the foregoing provisions of this Section 9.1, Lender may request, and Borrower shall promptly provide, such other financial statements and financial data as Lender determines to be necessary or appropriate for such compliance.

(i)    Without limiting the generality of Section 9.1(h) above, if requested by Lender, Borrower shall promptly provide Lender with any financial statements or financial, statistical, operating or other information as Lender shall determine to be required pursuant to Regulation AB or any amendment, modification or replacement thereto or any other Legal Requirements in connection with any Disclosure Document, any Exchange Act Filing or any report that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements or as shall otherwise be reasonably requested by Lender.

(j)    Borrower agrees that Lender may disclose any information relating to Borrower, its Affiliates, the Property, the Collateral or any aspect of the Loan (including information provided by or on behalf of Borrower or any of its Affiliates to Lender) to the parties requesting such information and, if applicable, the NRSROs in connection with any Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by Lender or other Securitization Indemnified Parties may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act, any rules promulgated thereunder or any other applicable Legal Requirements.

(k)    Borrower shall be solely responsible for: (i) all costs and expenses incurred by Borrower and Guarantor in connection with this Section 9.1 (including, without limitation, the fees and expenses of the Rating Agencies), and (ii) in connection with any Secondary Market Transaction by UBS AG 1285 BRANCH, all reasonable out-of-pocket costs and expenses incurred by Lender and any applicable transferee of Lender (in an amount not to exceed $100,000.00 in the aggregate).

**Section 9.2.    Securitization Indemnification**.

(a)    Borrower understands that information provided to Lender by Borrower, Mortgage Borrower or their respective agents, counsel and representatives may be included in Disclosure Documents in connection with a Securitization and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), and may be made available to investors or prospective investors in the Securities, the NRSROs and other advisory and service providers relating to a Securitization.  In the event that any Disclosure Document is required to be revised prior to the sale of all Securities in connection with a Securitization, Borrower will cooperate with Lender (or, if applicable, the holder of the applicable interest in the Loan) in updating the Disclosure Document by providing

all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)      Borrower hereby agrees to indemnify Lender, UBS AG 1285 BRANCH, any Affiliate of UBS AG 1285 BRANCH that has filed any registration statement relating to the Securitization or has acted as the issuer, the sponsor or depositor in connection with a Securitization, any Affiliate of UBS AG 1285 BRANCH that acts as an underwriter, placement agent or initial purchaser of the Securities issued in connection with a Securitization, any other issuers, depositors, underwriters, placement agents or initial purchasers of the Securities issued in connection with a Securitization, and each of their respective directors, officers, partners, employees, representatives, agents and Affiliates, and each Person that controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Securitization Indemnified Parties**") for any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs and expenses (collectively, the "**Securitization Indemnification Liabilities**") to which any Securitization Indemnified Party may become subject insofar as the Securitization Indemnification Liabilities arise out of or are based upon (i) any untrue statement of any material fact contained in the information provided to Lender by Borrower, any Affiliate of Borrower or any of their respective agents, counsel or representatives and (ii) the omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading.  Borrower also agrees to reimburse each Securitization Indemnified Party for any reasonable legal or other costs and expenses reasonably incurred by such Securitization Indemnified Party in connection with investigating or defending the Securitization Indemnification Liabilities.  Borrower's liability under this paragraph will be limited to any such liability, obligation, loss, damage, penalty, action, judgment, suit, claim, cost or expense that arises out of or is based upon an  untrue statement or omission made therein in reliance upon and in conformity with information furnished by or on behalf of Borrower in connection with the preparation of the Disclosure Documents or in connection with the underwriting or closing of the Loan (including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Property).  This indemnity provision will be in addition to any obligation or liability which Borrower may otherwise have.

(c)      In connection with Exchange Act Filings and information therein or other reports containing comparable information that are required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirement, as it relates to the Property, the Collateral, Mortgage Borrower, Borrower, Guarantor, any Affiliate of Mortgage Borrower, Borrower or Guarantor, Manager or any other aspect of the Loan, Borrower agrees to (i) indemnify the Securitization Indemnified Parties for Securitization Indemnification Liabilities to which any Securitization Indemnified Party may become subject insofar as the Securitization Indemnification Liabilities arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document, in connection with the underwriting or closing of the Loan or any of the reports, statements or other information furnished by or on behalf of Borrower pursuant to the terms of this Agreement, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse each Securitization Indemnified Party for any reasonable legal or other costs and expenses

reasonably incurred by such Securitization Indemnified Party in connection with defending or investigating the Securitization Indemnification Liabilities.

(d)     Promptly after receipt by a Securitization Indemnified Party of notice of any claim or the commencement of any action or suit, such Securitization Indemnified Party shall, if a claim for indemnification in respect thereof is to be made against Borrower, notify Borrower in writing of the claim or the commencement of such action or suit; provided, however, that the failure to notify Borrower shall not relieve Borrower from any liability which it may have under the indemnification provisions of this Section 9.2, except to the extent that it has been materially prejudiced by such failure and, provided further that the failure to notify Borrower shall not relieve Borrower from any liability which it may have to any Securitization Indemnified Party otherwise than under the provisions of this Section 9.2.  If any such claim, action or suit shall be brought against any Securitization Indemnified Party, and it shall notify Borrower thereof, Borrower shall be entitled to participate therein and, to the extent that it wishes, assume the defense thereof with counsel reasonably satisfactory to such Securitization Indemnified Party.  After notice from Borrower to the applicable Securitization Indemnified Party of Borrower's election to assume the defense of such claim, action or suit, Borrower shall not be liable to such Securitization Indemnified Party for any legal or other costs and expenses subsequently incurred by such Securitization Indemnified Party in connection with the defense thereof except as provided in the following sentence; provided, however, if the defendants in any such action or suit include both Borrower, on the one hand, and one or more Securitization Indemnified Parties on the other hand, and a Securitization Indemnified Party shall have reasonably concluded that there are legal defenses available to it and/or other Securitization Indemnified Parties that are different or in addition to those available to Borrower, the Securitization Indemnified Party or Parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action or suit on behalf of such Securitization Indemnified Party or Parties.  The Securitization Indemnified Party shall instruct its counsel to maintain reasonably detailed billing records for fees and disbursements for which such Securitization Indemnified Party is seeking or intends to seek reimbursement hereunder and shall submit copies of such detailed billing records to substantiate that such counsel's fees and disbursements are related solely to the defense of a claim for which Borrower is required hereunder to indemnify such Securitization Indemnified Party.  Borrower shall not be liable for the costs and expenses of more than one (1) such separate counsel unless a Securitization Indemnified Party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another Securitization Indemnified Party.

(e)     Without the prior written consent of the applicable Securitization Indemnified Party (which consent shall not be unreasonably withheld or delayed), Borrower shall not settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any Securitization Indemnified Party is an actual or potential party to such claim, action, suit or proceeding) unless Borrower shall have given the applicable Securitization Indemnified Party reasonable prior notice thereof and shall have obtained an unconditional release of each Securitization Indemnified Party from all Securitization Indemnification Liabilities arising out of or relating to such claim, action, suit or proceeding.  As long as Borrower has complied with its obligations to defend and indemnify hereunder, Borrower shall not be liable for any settlement

made by any Securitization Indemnified Party without the consent of Borrower (which consent shall not be unreasonably withheld or delayed).

(f)     Borrower agrees that if any indemnification or reimbursement sought pursuant to this Section 9.2 is finally judicially determined to be unavailable for any reason or is insufficient to hold any Securitization Indemnified Party harmless (with respect only to the Securitization Indemnification Liabilities that are the subject of this Section 9.2), then Borrower, on the one hand, and such Securitization Indemnified Party, on the other hand, shall contribute to the Securitization Indemnification Liabilities for which such indemnification or reimbursement is held unavailable or is insufficient:  (i) in such proportion as is appropriate to reflect the relative benefits to Borrower, on the one hand, and such Securitization Indemnified Party, on the other hand, from the transactions to which such indemnification or reimbursement relates; or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative faults of Borrower, on the one hand, and all Securitization Indemnified Parties, on the other hand, as well as any other equitable considerations.  Notwithstanding the provisions of this Section 9.2, (A) no Person found liable for a fraudulent misrepresentation shall be entitled to contribution from any other Person who is not also found liable for such fraudulent misrepresentation, and (B) Borrower agrees that in no event shall the amount to be contributed by the Securitization Indemnified Parties collectively pursuant to this Section 9.2(f) exceed the amount of the fees actually received by the Securitization Indemnified Parties in connection with the closing of the Loan.

(g)     Borrower agrees that the indemnification, contribution and reimbursement obligations set forth in this Section 9.2 shall apply whether or not any Securitization Indemnified Party is a formal party to any claim, action, suit or proceeding. Borrower further agrees that the Securitization Indemnified Parties are intended third party beneficiaries under this Section 9.2.

(h)     The liabilities and obligations of Borrower and the Securitization Indemnified Parties under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

## ARTICLE X.
## DEFAULTS

**Section 10.1.  Event of Default**.

(a)     Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)     (A) if any monthly Debt Service, any monthly deposit of Reserve Funds or the payment due on the Maturity Date is not paid when due or (B) if any other portion of the Debt is not paid when due; provided that, with respect to this clause (B), such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

(ii)     if any of the Taxes or Other Charges are not paid when due, unless such failure is solely a result of Mortgage Lender's failure to apply funds on deposit in the Tax Account in accordance with Section 6.2 of the Mortgage Loan Agreement, provided the balance of Tax Funds on deposit is sufficient to pay such Taxes and Mortgage Lender's access to such Tax Funds has not been impaired or impeded by Borrower and/or Mortgage Borrower;

(iii)     if the Policies are not kept in full force and effect, unless such failure is solely a result of Lender's failure to apply funds on deposit in the Insurance Reserve in accordance with Section 6.3 of the Mortgage Loan Agreement, provided that the balance of the Insurance Funds is sufficient to pay Insurance Premiums and Mortgage Lender's access to such Insurance Funds has not been impaired or impeded by Borrower and/or Mortgage Borrower;

(iv)     if Borrower commits, permits or suffers a Transfer in violation of the provisions of this Agreement;

(v)     if any certification, representation or warranty made by Borrower herein (including any representation or warranty of Mortgage Borrower that is incorporated herein by reference pursuant to Section 3.1.52 hereof and made by Borrower hereunder) or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date such certification, representation or warranty was made;

(vi)     (A) if Borrower or Mortgage Borrower shall make an assignment for the benefit of creditors or (B) if Guarantor shall make an assignment for the benefit of creditors;

(vii)     (A) if Borrower or Mortgage Borrower admits in writing its inability to pay debts generally as they become due or (B) if, Guarantor admits in writing its inability to pay debts generally as they become due;

(viii)     (A) if a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official shall be appointed for Borrower or Mortgage Borrower or if Borrower or Mortgage Borrower shall be adjudicated a bankrupt or insolvent, or if any petition, case or proceeding for bankruptcy, reorganization or arrangement pursuant to any applicable Bankruptcy Law, shall be filed by or against, consented to, or acquiesced or joined in by, Borrower or Mortgage Borrower, or if any petition, case or proceeding for the dissolution or liquidation of Borrower or Mortgage Borrower shall be instituted; provided, however, if such appointment, adjudication, petition, case or proceeding was involuntary and not consented to by Borrower or Mortgage Borrower, upon the same not being discharged or dismissed within ninety (90) days, or (B) if a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official shall be appointed for Guarantor or if Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition, case or proceeding for bankruptcy, reorganization or arrangement pursuant

to any applicable Bankruptcy Law, shall be filed by or against, consented to, or acquiesced or joined in by, Guarantor, or if any petition, case or proceeding for the dissolution or liquidation of Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Guarantor, upon the same not being discharged or dismissed within ninety (90) days or if an order for relief is entered;

(ix)    if Borrower or Guarantor attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(x)    subject to Section 4.2.1 hereof, if Borrower shall be in default beyond any applicable cure periods under any agreement (other than the Loan Documents) creating a Lien on the Collateral or any part thereof;

(xi)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xii)    if Borrower shall continue to be in Default under any of the terms, covenants or provisions set forth in Section 9.1 or Section 11.29 hereof, or fails to cooperate with Lender in connection with a Secondary Market Transaction in accordance with the terms, covenants and provisions set forth in Section 9.1 hereof, for five (5) Business Days after notice to Borrower from Lender;

(xiii)    if any of the assumptions contained in any Insolvency Opinion is or shall become untrue in any material respect;

(xiv)    if Borrower breaches any representation, warranty or covenant contained in Section 3.1.24 hereof unless (A) such breach was inadvertent, de minimis and non-recurring and (B) to the extent curable, Borrower promptly cures such breach within ten (10) Business Days after notice from Lender;

(xv)    intentionally omitted;

(xvi)    if a material default has occurred and continues beyond any applicable cure period under any Management Agreement with an Manager which is not an Affiliated Manager and such default permits such Manager thereunder to terminate or cancel such Management Agreement;

(xvii)    if the Liens created pursuant to any Loan Document shall cease to be a fully enforceable first priority security interest due to any act or omission of Borrower (unless such unenforceability results solely from an act or omission of Lender);

(xviii) if a Mortgage Loan Event of Default shall occur or if Mortgage Borrower enters into or otherwise suffers or permits any amendment,

waiver, supplement, termination, extension, renewal, replacement or other modification of any Mortgage Loan Document without the prior written consent of Lender except to the extent expressly permitted by this Agreement, to the extent that such consent was required to be obtained hereunder; or

(xix)    if Borrower or Guarantor, as applicable, shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or of any of the other Loan Documents to which Borrower or Guarantor, as applicable, is party, which Default is not specified in clauses (i) through (xviii) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days.

(b)    Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 10.1(a)(vi), (vii) or (viii) above), Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents and may exercise the rights and remedies of a secured party under the UCC against Borrower and the Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in Section 10.1(a)(vi), (vii) or (viii) above, the Debt shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 10.2.    Remedies**.

(a)    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any portion of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or initiated or taken other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Collateral. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, to the fullest extent permitted by law, without impairing or otherwise affecting

the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that, if an Event of Default has occurred and remains outstanding, (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its rights and remedies against the Collateral and the Pledge Agreement has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Obligations or the Debt has been paid in full.

(b)    With respect to Borrower and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Collateral or any portion thereof for the satisfaction of any of the Debt in any order, proportion or priority, and Lender may seek satisfaction out of all of the Collateral, or any part thereof, in its sole and absolute discretion in respect of the Debt.  In addition, upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose upon the Collateral in any manner and for any amounts secured by the Pledge Agreement then due and payable as determined by Lender in its sole and absolute discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose upon the Collateral to recover such delinquent payments or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose upon the Collateral to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Pledge Agreement as Lender may elect.  Notwithstanding one or more partial foreclosures, the Collateral shall remain subject to the Pledge Agreement to secure payment of sums secured by the Pledge Agreement and not previously recovered.

(c)    Upon the occurrence and during the continuance of an Event of Default (but without limiting Lender's rights under <u>Section 9.1</u> or <u>Section 11.29</u> hereof), Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages, pledges and other security documents (collectively, the "**<u>Severed Loan Documents</u>**") in such denominations and priority as Lender shall determine in its sole and absolute discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and other matters and documentation in connection therewith.  The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(d)    Any amounts recovered from the Collateral or any other collateral for the Loan after the occurrence and during the continuance of an Event of Default may be applied by Lender toward the payment of any principal and/or interest of the Loan and/or any other amounts due under the Loan Documents in such order, proportion and priority as Lender in its sole and absolute discretion shall determine.

**Section 10.3.  Right to Cure Defaults**.

Upon the occurrence and during the continuance of an Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or under the other Loan Documents or being deemed to have cured any Event of Default, make, do or perform any obligation of Borrower hereunder or under the other Loan Documents in such manner and to such extent as Lender may deem necessary. Lender is authorized to appear in, defend, or bring any action or proceeding to protect its interest in the Collateral for such purposes.  All costs and expenses incurred by Lender in remedying or attempting to remedy such Event of Default or such other breach or default by Borrower or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate from the date such costs and expenses were incurred to the date reimbursement payment is received by Lender.  All such costs and expenses incurred by Lender, together with interest thereon calculated at the Default Rate, shall be deemed to constitute a portion of the Obligations, shall be secured by the liens and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

**Section 10.4.  Remedies Cumulative**.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.  No delay or omission to exercise any right, power or remedy accruing upon an Event of Default shall impair any such right, power or remedy or shall be construed as a waiver thereof, but any such right, power or remedy may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any right, power or remedy consequent thereon.

**ARTICLE XI.**
**MISCELLANEOUS**

**Section 11.1.  Successors and Assigns**.

This Agreement and all agreements, covenants, representations and warranties in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 11.2.  Lender's Discretion**.

Whenever pursuant to this Agreement or any of the other Loan Documents, Lender exercises any right given to it to approve or disapprove, or any arrangement, document, instrument or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements, documents, instruments or terms are satisfactory or not satisfactory shall (except as is otherwise specifically provided herein or in such other Loan Document) be in the sole discretion of Lender and shall be final and conclusive. Prior to a Securitization, whenever pursuant to this Agreement or any other Loan Document, the Rating Agencies are given any right to approve or disapprove, or any arrangement, document, instrument or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove or to decide whether arrangements, documents, instruments or terms are satisfactory or not satisfactory, based upon Lender's determination of Rating Agency criteria, shall be substituted therefor.

**Section 11.3.  Governing Law**.

(a)    **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE COLLATERAL IS LOCATED OR AS OTHERWISE DETERMINED BY APPLICABLE LAW, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

(b)     **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.    BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

> **Great Value Storage**
> **767 Fifth Avenue, 16th Floor**
> **New York, New York 10153**
> **Attention: General Counsel**

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE AGENT IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

**Section 11.4.  Modification, Waiver in Writing**.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 11.5.  Delay Not a Waiver**.

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement in, or exercising any right, power, remedy or privilege under, this Agreement or any other Loan Document shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**Section 11.6.  Notices**.

All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted, or desired to be given hereunder shall be in writing (a) sent by registered or certified mail, postage prepaid, return receipt requested, (b) delivered by hand, or (c) delivered by reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth.  Any Notice shall be deemed to have been received: (i) if sent by registered or certified mail, on the date of delivery or the date of the first attempted delivery, in either case on a Business Day (otherwise on the next Business Day), (ii) if delivered by hand, on the date of delivery if delivered during business hours on a Business Day (otherwise on the next Business Day), and (iii) if sent by an overnight commercial courier, on the next Business Day, in each case addressed to the parties as follows:

If to Lender:

UBS AG
1285 Avenue of the Americas
New York, New York 10019
Attention:  Transaction Management - Henry Chung

with a copy to:

Dechert LLP
1095 Avenue of the Americas
New York, New York  10036
Attention:  Timothy A. Stafford, Esq.

If to Borrower:

c/o Great Value Storage
401 Congress Avenue, 33rd Floor
Austin, Texas 78701
Attention: Natin Paul

with a copy to:

Great Value Storage
767 Fifth Avenue, 16th Floor
New York, New York 10153
Attention: General Counsel

Any party may change the address to which any Notice is to be delivered by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this Section 11.6.  Notices shall be deemed to have been given on the date as set forth above, even if there is an inability to actually deliver any Notice because of a changed address as to which no Notice was given or there is a rejection or refusal to accept any Notice offered for delivery.  Any Notice by any party may be given by its counsel.

### Section 11.7.  Trial by Jury.

**BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

### Section 11.8.  Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

### Section 11.9.  Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

### Section 11.10. Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations.  To the extent Borrower makes any payment to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or a

portion thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11. Waiver of Notice**.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to the applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 11.12. Remedies of Borrower**.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender or its agent has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 11.13. Expenses; Indemnity**.

(a)      Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and expenses) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) intentionally omitted; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise, in each case against, under or affecting Borrower, Mortgage Borrower, this Agreement, any other Loan Document, the Collateral, or any other security given for the Loan; (vi) enforcing any obligations of, or collecting any payments due from, Borrower or Guarantor under this Agreement or the other Loan Documents or with respect to the Collateral or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; and (vii) securing Borrower's compliance with any requests made by Lender pursuant to the provisions of this Agreement,

including Section 9.1 or Section 11.29 hereof; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.  At Lender's discretion, any such costs and expenses due and payable to Lender may be paid to Lender from any amounts in the Mezzanine Deposit Account.

(b)  Borrower shall indemnify, defend and hold harmless the Lender Indemnitees from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and expenses of counsel for any Lender Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Lender Indemnitee shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Lender Indemnitee in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, (ii) any misstatement or omission in any report, certificate, financial statement, other agreement, instrument or document or other materials or information provided by or on behalf of Borrower pursuant to this Agreement or any other Loan Document or in connection with the Loan, or (iii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Lender Indemnitees hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Lender Indemnitees.  Any amounts payable to the Lender Indemnitees by reason of the application of this Section 11.13(b) shall be due and payable on demand, together with interest at the Default Rate from the date the applicable Indemnified Liabilities are incurred to and including the date payment is received by the Lender Indemnitees.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in this Section 11.13(b) may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Lender Indemnitees.

(c)  Borrower shall pay for or, if Borrower fails to pay, to reimburse Lender for, any fees, costs and expenses of any Rating Agency in connection with any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees, costs and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

### Section 11.14. Schedules Incorporated.

The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

### Section 11.15. Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and

no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

### Section 11.16. No Joint Venture or Partnership.

Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender.

### Section 11.17. Publicity.

All news releases, publicity or advertising by Borrower or its Affiliates through any media which refers to the Loan, the Loan Documents or Lender or any of its Affiliates shall be subject to the prior approval of Lender.  Borrower authorizes Lender to issue press releases, advertisements and other promotional materials in connection with Lender's own promotional and marketing activities, including in connection with a Secondary Market Transaction, and such materials may describe the Loan in general terms or in detail and Lender's participation in the Loan.

### Section 11.18. Waiver of Marshalling of Assets.

To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners, members and others with interests in Borrower, and of the Collateral, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Collateral for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Collateral in preference to every other claimant whatsoever.

### Section 11.19. Waiver of Offsets/Defenses/Counterclaims.

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

### Section 11.20. Conflict; Construction of Documents; Reliance.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the

principle of construing their meaning against the party which drafted same. Borrower acknowledges and agrees that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any legal, beneficial or economic interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

### Section 11.21. Brokers and Financial Advisors.

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower shall indemnify, defend and hold Lender harmless from and against any and all liabilities, obligations, losses, damages, claims, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this <u>Section 11.21</u> shall survive the expiration and termination of this Agreement and the payment of the Debt.

### Section 11.22. Exculpation.

(a)    Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under this Agreement and the other Loan Documents, or in the Collateral, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Collateral, and in any other collateral given to Lender, and Lender, by accepting this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with this Agreement or the other Loan Documents. The provisions of this <u>Section 11.22</u> shall not, however, constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Pledge Agreement; affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan or any of the rights and remedies of Lender thereunder; impair the right of Lender to obtain the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official; constitute a prohibition against Lender to seek a deficiency judgment against Borrower in

order for Lender to fully realize the security granted by the Pledge Agreement or to commence any other appropriate action or proceeding in order for Lender to exercise its rights and remedies against the Collateral or any other collateral given to Lender pursuant to the Loan Documents; impair the right of Lender to assert the Debt as a set-off, affirmative defense or limitation on any liability of Lender for any claim for damages made by Borrower, Guarantor or any Borrower Related Party arising from or in connection with the Loan, in any arbitration, mediation, proceeding or other action; or constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including reasonable attorneys' fees and costs reasonably incurred but excluding consequential, exemplary or punitive damages except to the extent Lender is liable for such damages pursuant to a third-party claim) arising out of or in connection with, and Borrower shall be personally liable for, the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as the "**Borrower's Recourse Liabilities**"):

(i)    fraud or intentional or material misrepresentation by Borrower, Guarantor or any Affiliate of Borrower, Mortgage Borrower or Guarantor (each, a "**Borrower Related Party**") in connection with the Loan;

(ii)    the willful misconduct by or on behalf of Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party in connection with the Loan;

(iii)    the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity concerning Environmental Laws and Hazardous Substances;

(iv)    the removal or disposal of any portion of the Property during the continuation of an Event of Default, other than in the ordinary course of owning and operating the Property with respect to the portion of the Property that is either being replaced or that is no longer necessary in connection with the operation of the Property; provided that such removal or disposal will not (A) have a Material Adverse Effect, (B) impair the utility or operation of the Property in any material respect, or (C) result in a reduction or abatement of, or right of offset against, the rents under any Lease in respect of the Property;

(v)    (A) the misappropriation, misapplication or conversion by Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party of any Insurance Proceeds paid by reason of any Casualty or any Awards or other amounts received in connection with a Condemnation of all or a portion of the Property, (B) the misappropriation or conversion by Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party of any Rents, (C) the misapplication by Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party of any Rents during the continuation of an Event of Default, or (D) the misapplication or conversion by Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party of any Net Liquidation Proceeds After Debt Service or any distributions or other payments made in respect of any part of the Property or the Collateral;

(vi) any security deposits, advance deposits or any other deposits or prepaid rents (including reimbursements) collected with respect to the Property, which are not delivered to Mortgage Lender upon a foreclosure of the Property or action in lieu thereof, except, if applicable, to the extent any such security deposits were applied in accordance with the terms and conditions of the applicable Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(vii) Borrower's or Mortgage Borrower's failure to pay any Taxes affecting the Property, subject in all cases to Borrower's and Mortgage Borrower's right to contest Taxes as set forth in, and in accordance with, the terms and conditions of the Loan Documents and the Mortgage Loan Documents; provided that there shall be no liability hereunder if (A)(1) there are sufficient funds on deposit in the Tax Account that are fully available to Mortgage Lender (or, if applicable, Lender) in accordance with the terms and conditions of the Mortgage Loan Documents (or, if applicable, the Loan Documents) and (2) Mortgage Lender (or, if applicable, Lender) fails to apply the requisite portion of the Tax Funds to the payment of such Taxes in accordance with the terms and conditions of the Mortgage Loan Documents (or, if applicable, the Loan Documents), or (B) there is insufficient cash flow from the operation of the Property to pay such Taxes;

(viii) Borrower's or Mortgage Borrower's failure to obtain and maintain in full force and effect fully paid for Policies as required by this Agreement and the Mortgage Loan Agreement; provided that there shall be no liability hereunder if (A) such failure arises solely due to non-payment of the applicable Insurance Premiums and (B)(1) there are sufficient funds on deposit in the Insurance Account that are fully available to Mortgage Lender (or, if applicable, Lender) in accordance with the terms and conditions of the Mortgage Loan Documents (or, if applicable, the Loan Documents) and Mortgage Lender (or, if applicable, Lender) fails to apply the requisite portion of the Insurance Funds to the payment of such Insurance Premiums in accordance with the terms and conditions of the Mortgage Loan Documents (or, if applicable, the Loan Documents), or (2) there is insufficient cash flow from the operation of the Property to pay the applicable Insurance Premiums;

(ix) Borrower's or Mortgage Borrower's failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Collateral or the Property, except, in the case of any such charges incurred in accordance with the provisions of the Loan Documents and the Mortgage Loan Documents, as applicable, (A) subject in all cases to Borrower's and Mortgage Borrower's right to contest Liens as set forth in, and in accordance with, the terms and conditions of the Loan Documents and the Mortgage Loan Documents, as applicable, and (B) except to the extent that (1) sums sufficient to pay such amounts have been deposited in escrow accounts with Lender or Mortgage Lender pursuant to the terms hereof or the Mortgage Loan Agreement, which accounts were established for the payment thereof, such escrowed sums are fully available to Lender or Mortgage Lender in accordance with the terms and conditions of the

Loan Documents or the Mortgage Loan Documents, and Lender or Mortgage Lender fails to apply the requisite portion thereof in accordance with the terms and conditions of the Loan Documents or the Mortgage Loan Documents to the payment of such amounts or (2) there is insufficient cash flow from the operation of the Property to pay such amounts);

(x)    Borrower's indemnification of Lender set forth in Section 9.2 hereof;

(xi)    any material physical waste at the Property caused by the intentional or willful acts or omissions of Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party, except, in the case of any such waste arising solely from omissions of Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party, to the extent there is insufficient cash flow from the operation of the Property to prevent such waste at the Property;

(xii)    Borrower's failure to pay or perform (or cause Mortgage Borrower to pay or perform) any Insurance Shortfall Obligation;

(xiii)    commission of any criminal act by Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party which results in the forfeiture of the Property or the Collateral, or any portion thereof;

(xiv)    the breach of any representation, warranty or covenant set forth in Section 3.1.8 or Section 4.2.10 hereof;

(xv)    subject to clause (ii)(A) in Section 11.22(b) hereof, (A) if Borrower breaches any representation, warranty or covenant set forth in Section 3.1.24 hereof or otherwise fails to maintain its status as a single purpose entity as required by, and in accordance with, the terms and provisions of this Agreement, or (B) if Mortgage Borrower breaches any representation, warranty or covenant set forth in Section 3.1.24 of the Mortgage Loan Agreement or otherwise fails to maintain its status as a single purpose entity as required by, and in accordance with, the terms and provisions of the Mortgage Loan Agreement;

(xvi)    the breach of any "backward looking" representations set forth in Section 3.1.24 hereof;

(xvii)    Borrower fails to appoint a new property manager upon the request of Lender, in each case as required by, and in accordance with, the terms and provisions of, this Agreement and the other Loan Documents;

(xviii)    the breach of Section 4.2.11 hereof;

(xix)    any obligation or liability of Mortgage Borrower to indemnify or otherwise pay money to any Affiliate of Borrower or any other Person that is a direct or indirect owner of Borrower to the extent such obligation or

liability continues to be an obligation or liability thereof following a foreclosure on the Collateral or an assignment-in-lieu of foreclosure under the Loan Documents;

(xx)    Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party that Controls, directly or indirectly, Borrower contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents or objects to any notice of strict foreclosure or similar notice; provided that the foregoing shall not include any defense, claim or counterclaim raised in good faith and shall only apply to the extent a court of competent jurisdiction has issued an order finding that such party has not acted in good faith for the purpose of delay or interference with Lender's remedial action(s);

(xxi)   If Borrower or Mortgage Borrower or any Affiliate of Borrower or Mortgage Borrower causes any termination or cancellation of the limited liability company membership certificate evidencing Borrower's one hundred percent (100%) ownership interest in Mortgage Borrower as delivered to Lender on the Closing Date in connection with the Pledge Agreement;

(xxii)  Borrower or any Affiliate of Borrower acquires all or any portion of any interest in the Mortgage Loan; or

(xxiii) Mortgage Borrower "opting out" of Article 8 of the UCC or causing the Collateral not to be treated as "securities" governed by and within the meaning of Article 8, or Borrower or Mortgage Borrower or any Affiliate of Borrower or Mortgage Borrower causing Mortgage Borrower to amend or otherwise modify its Organizational Documents in order to amend or repeal its election to be governed by Article 8 of the UCC.

(b)     Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b) or 1111(b) or any other provisions of the U.S. Bankruptcy Code or any other Bankruptcy Law to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (ii) the Debt shall be fully recourse to Borrower in the event that any of the following occurs (each, a "**Springing Recourse Event**"):    (A) Borrower and/or Mortgage Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of, this Agreement, the other Loan Documents, the Mortgage Loan Agreement and the other Mortgage Loan Documents, as applicable (other than those single purpose entity covenants that relate to solvency or adequacy of capital and excluding any breach to the extent arising out of insufficient cash flow from the operation of the Property) and such failure is cited by a court of competent jurisdiction as a contributing factor in the event of the substantive consolidation of (1) Borrower with any other entity (other than another Borrower) and/or (2) Mortgage Borrower with any other entity (other than another Mortgage Borrower); (B) Borrower fails to obtain Lender's prior consent to any Indebtedness for borrowed money or any voluntary Lien encumbering the Property or the Collateral, or any portion thereof or interest therein (other than a Lien resulting from the failure to pay charges for labor or materials or other

charges incurred in accordance with the provisions of the Loan Documents and the Mortgage Loan Documents), except, in each case, to the extent expressly permitted by this Agreement or the other Loan Documents; (C) Borrower fails to obtain Lender's prior consent to any Transfer (1) except to the extent expressly permitted by this Agreement and the other Loan Documents or (2) except as otherwise expressly set forth in <u>Section 8.2(d)</u> hereof; (D) Borrower or Mortgage Borrower files a voluntary petition, case or proceeding under any applicable Bankruptcy Law; (E) Guarantor or any Borrower Related Party that Controls, directly or indirectly, Borrower or Mortgage Borrower files, or joins in the filing of, an involuntary petition, case or proceeding against Borrower or Mortgage Borrower under any applicable Bankruptcy Law, or solicits or causes to be solicited petitioning creditors for any involuntary petition, case or proceeding against Borrower or Mortgage Borrower from any Person; (F) Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party that Controls, directly or indirectly, Borrower or Mortgage Borrower files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition, case or proceeding filed against it by any other Person under any applicable Bankruptcy Law, or solicits or causes to be solicited petitioning creditors for any involuntary petition, case or proceeding against Borrower or Mortgage Borrower from any Person; (G) Borrower, Mortgage Borrower, Guarantor or any Borrower Related Party that Controls, directly or indirectly, Borrower consents to or acquiesces or joins in an application for the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower or Mortgage Borrower or all or any portion of the Collateral or the Property (other than a receiver appointed by Lender or its designee); (H) Borrower or Mortgage Borrower makes an assignment for the benefit of creditors, or admits, in writing or in any action or proceeding, its insolvency or inability to pay its debts as they become due, which admission is used as evidence of Borrower's or Mortgage Borrower's insolvency in connection with an involuntary petition under any applicable Bankruptcy Law by a Person other than Lender (except for (1) any admissions that Borrower or Mortgage Borrower believes in good faith are truthful when made and (2) any such admission to Lender or any Servicer that Borrower cannot pay its operating expenses or Debt Service payments due in respect of the Loan or that Borrower cannot refinance the Loan on the Maturity Date); or (I) the first full monthly payment of principal and interest under the Note is not paid when due.

(c)     Notwithstanding anything contained in this Agreement or in any other Loan Document, no shareholder, member, partner, principal, officer, director, employee, agent, representative or affiliate of Borrower or Guarantor (other than Borrower and Guarantor pursuant to this Agreement, the Guaranty or the Environmental Indemnity) shall have any personal liability for, nor be joined as a party to any action with respect to (i) the payment of any sum of money which is or may be payable hereunder or under any other Loan Document (including, but not limited to, the repayment of the Debt) or (ii) the performance or discharge of any covenants, obligations or undertakings of Borrower or Guarantor with respect thereto.

### Section 11.23. Prior Agreements.

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including, without limitation, the Term Sheet, dated October 3, 2018, between Nate Paul and Lender, are superseded by the terms of this Agreement and the other Loan Documents.

**Section 11.24. Servicer**.

(a)    At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer and trustee, together with its agents, nominees or designees, are collectively referred to herein as "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for any reasonable set-up fees or any other initial costs and expenses relating to or arising under the Servicing Agreement (in an amount not to exceed $1,000.00), but Borrower shall not be responsible for payment of regularly scheduled base monthly master servicing fees due to Servicer under the Servicing Agreement or any fees or expenses required to be borne by, and not reimbursable to, Servicer pursuant to the Servicing Agreement.  Notwithstanding anything to the contrary contained herein, Borrower shall be responsible for, and shall promptly pay upon demand (without duplication), (i) any fees and expenses of Servicer (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any release of the Property, any prepayment, defeasance, assumption, amendment or modification of the Loan, any documents or matters requested by Borrower, (ii) interest payable on advances made by Servicer, Trustee or other Persons pursuant to the Servicing Agreement with respect to delinquent debt service payments (to the extent that default interest pursuant to Section 2.2.2 hereof and late payment charges pursuant to Section 2.3.4 hereof actually paid by Borrower in respect of such delinquent debt service payments are insufficient to pay interest on such advances by Servicer, Trustee or such other Persons, as applicable), (iii) expenses paid by Servicer, Trustee or other Persons pursuant to the Servicing Agreement to protect or preserve the Property (including, without limitation, payments of Taxes, Insurance Premiums and other items (including, without limitation, maintenance costs, Capital Expenditures, tenant allowances, tenant improvement costs and leasing commissions) that are reasonably necessary to protect or preserve the Property) and any interest on any advances made by Servicer, Trustee or such other Persons with respect thereto, (iv) any special servicing fees, work-out fees, liquidation fees, operating advisor fees and other similar fees payable to Servicer, Trustee or other Persons pursuant to the Servicing Agreement, (v) all fees, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) (A) as a result of any Event of Default, (B) in connection with the enforcement of any obligations of Borrower or Guarantor under this Agreement or the other Loan Documents, (C) as a result of the Loan becoming a specially serviced loan or (D) in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement and the other Loan Documents in the nature of a "work-out" of the Loan or of any insolvency or bankruptcy proceeding, and (vi) the costs of all property inspections and/or appraisals of the Property (or any updates to any existing inspection or appraisal) that Servicer, Trustee or other Persons may be required to perform or obtain pursuant to the Servicing Agreement (other than the cost of any regular annual inspections required to be borne by, and not reimbursable to, Servicer in accordance with the Servicing Agreement).  Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto under this Agreement and the other Loan Documents.

(b)　　Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and Guarantor pursuant to the provisions of this Agreement and the other Loan Documents.

(c)　　Provided Borrower shall have been given notice of Servicer's address by Lender, Borrower shall deliver, or cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments, which Borrower or Guarantor may or shall be required to deliver to Lender pursuant to this Agreement and the other Loan Documents (and no delivery of such notices or other documents and instruments by Borrower or Guarantor shall be of any force or effect unless delivered to Lender and Servicer as provided above).

**Section 11.25. Intentionally Omitted**.

**Section 11.26. Creation of Security Interest**.

Notwithstanding any other provision set forth in this Agreement or any of the other Loan Documents, Lender may at any time grant a security interest in all or any portion of its rights under this Agreement or any of the other Loan Documents (including, without limitation, the payments owing to it) (a) to any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System or to the central reserve bank or similar authority of any other country to secure any obligation of Lender or its Affiliates to such bank or similar authority or (b) to secure any borrowing by Lender or its Affiliates from any company that purchases or funds financial assets by issuing commercial paper.

**Section 11.27. Uncross of Properties**.

(a)　　If pursuant to Section 11.27 of the Mortgage Loan Agreement any Affected Property is uncrossed from the Mortgage Loan in accordance with the terms of the Mortgage Loan Agreement (an "**Uncrossing Event**"), Borrower shall cooperate with Lender in connection with any corresponding uncross or severing of a pro rata portion of the Loan (any such splitting and severing, a "**Loan Splitting**" and any such severed and split loan, a "**Split Loan**") and/or such other modifications to the Loan and the Loan Documents as Lender may reasonably require in connection with any Uncrossing Event, including, delivering to Lender (i) updates of the opinions of counsel delivered on the Closing Date with respect to due authorization, execution and non-consolidation, (ii) endorsements and/or updates to the owner's title insurance policies and UCC title insurance policy, and (iii) such other certificates, instruments and documentation as Lender may reasonably determine are necessary or appropriate to effect the Loan Splitting (the items described in subclauses (i) through (iii) collectively hereinafter shall be referred to as the "**Splitting Documentation**"), which Splitting Documentation shall be in form and substance reasonably acceptable to Lender.

(b)　　In furtherance of any Loan Splitting, Lender shall have the right to (i) sever or divide the Note and the other Loan Documents in order to allocate the Split Loan to the applicable Collateral related to the Affected Properties and to evidence the same with a new note having an original principal amount equal to the New Note Amount (the "**New Note**") and other necessary loan documents (such loan documents, collectively with the New Note and the Note and other Loan Documents, as severed and divided, the "**Loan Split Documents**"), (ii) segregate the

applicable portion (if any) of each of the Reserve Accounts relating to the Affected Properties and (iii) take such additional action as is reasonably necessary to effect the Loan Splitting; provided, that the Loan Split Documents, together with the Loan Documents, shall not, in the aggregate, increase (A) any monetary obligation of Borrower under the Loan Documents or (B) any other material obligation of Borrower under the Loan Documents in any material respect.  .  The Loan Split Documents may, at Lender's option, contain provisions that cross-default and/or cross-collateralize the Split Loan with the Loan and/or one or more other Split Loans.  Upon a Loan Splitting, the principal amount of the Loan shall be reduced by an amount equal to the aggregate Allocated Loan Amounts of the Affected Properties (the "**New Note Amount**"), and the original principal amount of the Split Loan, as evidenced by the New Note, shall be equal to the New Note Amount.

### Section 11.28. Set-Off.

In addition to any other rights and remedies of Lender provided by the Loan Documents and by law, upon the occurrence and during the continuation of an Event of Default, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder or under the other Loan Documents (whether at the stated maturity, by acceleration or otherwise) to set-off, appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate of Lender to or for the credit or the account of Borrower.  Lender agrees to promptly notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

### Section 11.29. Component Notes.

Without in any way limiting Lender's other rights under this Agreement or any other Loan Document (including Lender's rights under Section 9.1 hereof), Lender shall have the right, at any time and in its sole and absolute discretion, to require Borrower to execute and deliver new component notes (including senior and junior notes) to replace the original note or modify the original note to reflect multiple components of the Loan, which notes may be paid in such order of priority as may be designated by Lender, provided that (a) the aggregate principal amount of such component notes shall, on the date created, equal the Outstanding Principal Balance immediately prior to the creation of such component notes, (b) the weighted average interest rate of all such component notes shall, on the date created, equal the interest rate that was applicable to the Loan immediately prior to the creation of such component notes, and (c) the scheduled debt service payments on all such component notes shall, on the date created, equal the scheduled debt service payments under the Loan immediately prior to the creation of such component notes. Borrower shall cooperate with all reasonable requests of Lender in order to establish the component notes and shall execute and deliver, and cause to be executed and delivered, such documents as shall reasonably be required by Lender or any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and, if applicable, satisfactory to such Rating Agency (including, without limitation, the severance of security documents).  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful

attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to establish the component notes as described in this <u>Section 11.29</u>, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until five (5) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. Borrower shall pay all costs and expenses incurred by Borrower or its Affiliates in connection with the creation of the component notes and all requirements relating thereto, including any title insurance premiums.

**Section 11.30.** **Intentionally Omitted**.

**Section 11.31.** **Approvals; Third Parties; Conditions**.

(a)    All approval rights retained or exercised by Lender with respect to any Leases, contracts, plans, studies and other matters are solely to facilitate Lender's credit underwriting, and shall not be deemed or construed as a determination that Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrower or any other Person.

(b)    This Agreement and the other Loan Documents are for the sole and exclusive use of Borrower and Lender and may not be enforced, nor relied upon, by any other Person.  Nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon any Person other than Borrower and Lender any right to insist upon or to enforce the performance or observance of any of the terms, covenants and conditions contained herein or therein.  All conditions to the obligations of Lender hereunder or under the other Loan Documents are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions or be entitled to assume that Lender will refuse to make the Loan (or, if applicable, make any advances) or otherwise perform or satisfy such obligations in the absence of strict compliance with any or all of such conditions and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender at any time in Lender's sole and absolute discretion.

**Section 11.32.** **Limitation on Liability of Lender's Officers, Employees, etc**.

Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's interest in the Property only.  No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, any other asset or property of Lender or the asset or property of any of Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

**Section 11.33.** **Certain Additional Rights of Lender (VCOC)**.

Notwithstanding anything to the contrary contained in this Agreement, Lender shall have:

(a)    the right to routinely consult with and advise Borrower's management regarding the significant business activities and business and financial developments

123

of Borrower; provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of Hazardous Substances. Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times upon reasonable notice;

(b)     the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower or Mortgage Borrower during normal business hours upon not less than 48 hours prior written notice;

(c)     the right, in accordance with the terms of this Agreement, including, without limitation, Section 4.1.6 hereof, to receive the reports described therein; and

(d)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property).

The rights described above in this Section 11.33 may be exercised by any entity which owns and Controls, directly or indirectly, substantially all of the interests in Lender.

**Section 11.34. Acknowledgment and Consent to Bail-In of EEA Financial Institutions**.

(a)     Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the respective parties thereto, each party hereto agrees and acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and hereby agrees and consents to, and acknowledges and agrees to be bound by:

(i)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)     the effects of any Bail-In Action on any such liability, including, if applicable:

(A)     a reduction in full or in part or cancellation of any such liability;

(B)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

(b) For purposes of this <u>Section 11.34</u>:

(i) "**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution;

(ii) "**Bail-In Legislation**" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule;

(iii) "**EEA Financial Institution**" shall mean (A) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (B) any entity established in an EEA Member Country which is a parent of an institution described in clause (A) of this definition, or (C) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (A) or (B) of this definition and is subject to consolidated supervision with its parent;

(iv) "**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway or any other member state of the European Economic Area;

(v) "**EEA Resolution Authority**" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegate) having responsibility for the resolution of any EEA Financial Institution;

(vi) "**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time; and

(vii) "**Write-Down and Conversion Powers**" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**Section 11.35.  Intercreditor Agreement**.

Borrower hereby acknowledges and agrees that the Intercreditor Agreement is solely for the benefit of Lender, Mortgage Lender and Mezzanine 2 Lender, and that none of Borrower,

Mortgage Borrower or Mezzanine 2 Borrower shall be third-party beneficiaries (intended or otherwise) of any of the provisions therein, have any rights thereunder, or be entitled to rely on any of the provisions contained therein.  Lender, Mortgage Lender and Mezzanine 2 Lender have no obligation to disclose to Borrower, Mortgage Borrower or Mezzanine 2 Borrower the contents of the Intercreditor Agreement.  Borrower's obligations under the Loan Documents are and will be independent of the Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof.  In the event Lender is required pursuant to the terms of the Intercreditor Agreement to pay over any payment or distribution of assets, whether in cash, property or securities which was previously applied to the Debt, including, without limitation, any proceeds of the Property previously received by Lender on account of the Loan to Mortgage Lender or Mezzanine 2 Lender, and Lender does pay over any such payment or distribution to Mortgage Lender or Mezzanine 2 Lender, then Borrower agrees to indemnify Lender for any amounts so paid, and any amount so paid shall continue to be owing pursuant to the Loan Documents as part of the Debt notwithstanding the prior receipt of such payment by Lender.

**Section 11.36. Waiver of Rights, Defenses and Claims**.  Borrower hereby unconditionally and irrevocably waives all rights, defenses and claims that Borrower may have based on the fact that certain terms and provisions of the Mortgage Loan Agreement, including without limitation certain definitions set forth in Section 1.1 of the Mortgage Loan Agreement, are incorporated into this Agreement by reference.

**Section 11.37. Discussions with Mortgage Lender**.  In connection with the exercise of its rights as set forth in the Loan Documents, Lender shall have the right at any time to discuss the Property, the Mortgage Loan, the Collateral, the Loan or any other matter directly with Mortgage Lender or Mortgage Lender's consultants, agents or representatives without notice to or permission from Borrower, Guarantor or any other Person, nor shall Lender have any obligation to disclose such discussions or the contents thereof with Borrower, Guarantor or any other Person.

**Section 11.38. Independent Approval Rights**.  If any action, proposed action or other decision is consented to or approved by Mortgage Lender, such consent or approval shall not be binding or controlling on Lender.  Borrower hereby acknowledges and agrees that (a) the risks of Mortgage Lender in making the Mortgage Loan are different from the risks of Lender in making the Loan, (b) in determining whether to grant, deny, withhold or condition any requested consent or approval Mortgage Lender and Lender may reasonably reach different conclusions, and (c) Lender has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view.  Furthermore, the denial by Lender of a requested consent or approval shall not create any liability or other obligation of Lender if the denial of such consent or approval results directly or indirectly in a default under the Mortgage Loan, and Borrower hereby waives any claim of liability against Lender arising from any such denial.

**Section 11.39. Direction of Mortgage Borrower or with Respect to the Property**.  Borrower and Lender hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement or any of the other Loan Documents to the effect that (a) Borrower shall cause Mortgage Borrower to act or to refrain from acting in any manner or (b) Borrower shall cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to Mortgage Borrower or the Property, or (c) other similar effect, such clause or

provision, in each case, is intended to mean, and shall be construed as meaning, that Borrower has undertaken to act and is obligated to act only in Borrower's capacity as the sole member of Mortgage Borrower (which Mortgage Borrower, in turn, is the fee owner of the Property) but not directly with respect to Mortgage Borrower or the Property or in any other manner which would violate any of the covenants contained in <u>Section 3.1.24</u> hereof or other similar covenants contained in Borrower's Organizational Documents.

**Section 11.40. Compliance with Mortgage Loan Documents**.  Borrower shall, or shall cause Mortgage Borrower to:  (a) pay all principal, interest and other sums required to be paid by Mortgage Borrower under and pursuant to the provisions of the Mortgage Loan Documents; (b) diligently perform and observe all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of any Mortgage Borrower to be performed and observed, unless such performance or observance shall be waived in writing by Mortgage Lender; (c) promptly notify Lender of the giving of any notice by Mortgage Lender to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed and deliver to Lender a true copy of each such notice (including electronically transmitted items); and (d) deliver a true, correct and complete copy of all material notices, demands, requests or material correspondence (including electronically transmitted items) given or received by Mortgage Borrower or Guarantor to or from Mortgage Lender or its agent.  Without limiting the foregoing, Borrower shall cause Mortgage Borrower to fund all reserves required to be funded pursuant to the Mortgage Loan Documents.

**Section 11.41. Mortgage Loan Defaults.**

(a)    Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, if there shall occur any Mortgage Loan Event of Default (whether or not Mortgage Lender shall have delivered proper notice to Mortgage Borrower, and without regard to any other defenses or offset rights Mortgage Borrower may have against Mortgage Lender), Borrower hereby expressly agrees that Lender shall have the immediate right, without notice to or demand on Borrower or Mortgage Borrower, but shall be under no obligation, to exercise Borrower's rights under the Mortgage Borrower Company Agreement: (i) to pay all or any part of the Mortgage Loan and any other sums that are then due and payable, and to perform any act or take any action on behalf of Mortgage Borrower to cause all of the terms, covenants and conditions of the applicable Mortgage Loan Document on the part of Mortgage Borrower to be performed or observed thereunder to be promptly performed or observed; and (ii) to pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender in the Loan and/or the Collateral.  Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender.  All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section (including, without limitation, reasonable attorneys' and other professional fees) (i) shall constitute additional advances of the Loan to Borrower, (ii) shall increase the then Outstanding Principal Balance, (iii) shall bear interest at the Default Rate for the period from the date that such costs or expenses were incurred to the date of payment to Lender, (iv) shall constitute a portion of the Debt, (v) shall be secured by the Pledge Agreement, and (vi) shall be due and payable to Lender within two Business Days following demand therefor.  In the event that Lender makes any payment in respect of the

Mortgage Loan, Lender shall be subrogated to all of the rights of Mortgage Lender under the applicable Mortgage Loan Document against the Property, in addition to all other rights it may have under the Loan Documents.

(b)      Subject to the rights of Tenants, Borrower hereby grants, and shall cause Mortgage Borrower to grant, Lender and any Person designated by Lender the right to enter upon the Property at any time for the purpose of carrying out the rights granted to Lender under this Section.  Borrower shall not, and shall not cause or permit Mortgage Borrower or any other Person to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under the Mortgage Loan, or to otherwise protect or preserve Lender's interests in the Loan and the Collateral, including the Property in accordance with the provisions of this Agreement and the other Loan Documents.

(c)      Borrower hereby indemnifies Lender from and against all liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including, without limitation, reasonable attorneys' and other professional fees, whether or not suit is brought, and settlement costs), and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the foregoing actions, other than claims arising out of the fraud, illegal acts, gross negligence or willful misconduct of Lender.  Lender shall have no obligation to Borrower, Mortgage Borrower or any other party to make any such payment or performance.

(d)      If Lender shall receive a copy of any notice of default under any of the Mortgage Loan Documents sent by Mortgage Lender to Mortgage Borrower, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.  As a material inducement to Lender's making the Loan, Borrower hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this Section other than claims arising out of the fraud, illegal acts, gross negligence or willful misconduct of Lender.

**Section 11.42. Mortgage Loan Estoppels**.  Borrower shall, or shall cause Mortgage Borrower to, from time to time, use commercially reasonable efforts to obtain from Mortgage Lender such certificates of estoppel with respect to compliance by Mortgage Borrower with the terms of the Mortgage Loan Documents as may be requested by Lender.  In the event or to the extent that Mortgage Lender is not legally obligated to deliver such certificates of estoppel and is unwilling to deliver the same, or is legally obligated to deliver such certificates of estoppel but breaches such obligation, then Borrower shall not be in breach of this provision so long as Borrower furnish to Lender an estoppel executed by Borrower and Mortgage Borrower expressly representing to Lender the information requested by Lender regarding compliance by Mortgage Borrower with the terms of the Mortgage Loan Documents.  Borrower hereby indemnifies Lender from and against all liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including, without limitation, reasonably attorneys' and other professional fees, whether or not suit is brought and settlement costs) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Lender based in whole or in part upon any fact, event, condition, or circumstances relating to the Mortgage Loan which was misrepresented in, or which warrants

disclosure and was intentionally omitted from such estoppel executed by Borrower and Mortgage Borrower.

**Section 11.43. No Amendments to Mortgage Loan Documents**.  Without obtaining the prior written consent of Lender, Borrower shall not cause or permit Mortgage Borrower to (a) enter into or be bound by any Mortgage Loan Documents after the date hereof or enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any of the Mortgage Loan Documents (other than ministerial or de minimis modifications, which do not affect any of the economic terms therein or change any rights or obligations of the parties thereunder) or (b) grant to Mortgage Lender any written consent or waiver (other than ministerial or de minimis written consents or waivers, which do not affect any of the economic terms of the Mortgage Loan Documents or change any rights or obligations of the parties thereunder). Borrower shall cause Mortgage Borrower to provide Lender with a copy of any amendment, waiver, supplement, termination or other modification to the Mortgage Loan Documents within five (5) Business Days after the execution thereof.  Without obtaining the prior written consent of Lender, Borrower shall not cause or permit Mortgage Borrower to amend or modify the Organizational Documents of Mortgage Borrower in any respect which would (i) limit distributions to be made to Borrower, (ii) limit cure rights of Borrower, (iii) modify the special purpose entity requirements set forth therein or (iv) in any other respect have any material adverse effect on Lender.

**Section 11.44. Acquisition of the Mortgage Loan.**

(a)    Neither Borrower, Mortgage Borrower, Guarantor nor any Affiliate of any of them nor any Person acting at any such Borrower's, Mortgage Borrower's, Guarantor's or such Affiliate's request or direction, shall acquire or agree to acquire the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect controlling ownership interest in the holder of the Mortgage Loan, via purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder.  If, solely by operation of applicable subrogation law, Borrower, Mortgage Borrower, Guarantor or any Affiliate of any of them shall have failed to comply with the foregoing, then Borrower:  (i) shall immediately notify Lender of such failure; and (ii) shall cause any and all such prohibited parties acquiring any interest in the Mortgage Loan Documents: (A) not to enforce the Mortgage Loan Documents; and (B) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly: (1) cancel the promissory note evidencing the Mortgage Loan, (2) reconvey and release the Lien securing the Mortgage Loan and any other collateral under the Mortgage Loan Documents, and (3) discontinue and terminate any enforcement proceeding(s) under the Mortgage Loan Documents.

(b)    Lender shall have the right at any time to acquire all or any portion of the Mortgage Loan or any interest in any holder of, or participant in, the Mortgage Loan without notice or consent of Borrower, Mortgage Borrower, Guarantor or any other Person, in which event Lender shall have and may exercise all rights of Mortgage Lender thereunder (to the extent of its interest), including the right (i) to declare that the Mortgage Loan is in default, in accordance with the terms thereof, (ii) to accelerate the Mortgage Loan indebtedness, in accordance with the terms thereof, and (iii) to pursue all remedies against any obligor under the Mortgage Loan Documents, in accordance with the terms thereof.  In addition, Borrower hereby expressly agrees that any

claims, counterclaims, defenses, offsets, deductions or reductions of any kind which Mortgage Borrower or any other Person may have against Mortgage Lender relating to or arising out of the Mortgage Loan shall be the personal obligation of Mortgage Lender, and in no event shall Mortgage Borrower be entitled to bring, pursue or raise any such claims, counterclaims, defenses, offsets, deductions or reductions against Lender or any Affiliate of Lender or any other Person as the successor holder of the Mortgage Loan or any interest therein, provided that Mortgage Borrower may seek specific performance of its contractual rights under the Mortgage Loan Documents.

Section 11.45. **Refinancing or Prepayment of the Mortgage Loan**.  Except as expressly permitted by the Mortgage Loan Documents, Borrower shall not make or permit to be made any partial or full prepayment of amounts owing under the Mortgage Loan or any refinancing of the Mortgage Loan without the prior written consent of Lender.

Section 11.46. **Deed in Lieu of Foreclosure**.  Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into, execute, deliver, or consent to, as the case may be, any deed-in-lieu or consensual foreclosure with or for the benefit of Mortgage Lender or any of its Affiliates or designees.  Except as expressly permitted in the Loan Documents or the Mortgage Loan Documents, without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into any consensual sale or other transaction in connection with the Mortgage Loan which could diminish, modify, terminate, impair or otherwise adversely affect the interests of Lender or Borrower in the Collateral or any portion thereof or any interest therein or the interests of Mortgage Lender or Mortgage Borrower in the Property or any portion thereof or any interest therein.

Section 11.47. **Conversion to Registered Form**.  At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "Registrar") reasonably acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, such books and records as are necessary for the registration and transfer of the Note in a manner that shall cause the Note to be considered to be in registered form for purposes of Section 163(f) of the IRS Code.  The option to convert the Note into registered form once exercised may not be revoked. Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender.  Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar.  The Registrar shall not be entitled to any fee from Borrower or Lender or any other lender in respect of transfers of the Note and other Loan Documents.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

**UBS AG**

By: _____
Name:
Title:        Michael Mills
              Associate Director

By: _____
Name:
Title:        Kathleen Donovan
              Managing Director

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

[Signature Page to Mezzanine 1 Loan Agreement]

**MEZZANINE 1 BORROWER:**

**GVS PORTFOLIO I, LLC**, a Delaware limited liability company

By: _____
    Name: Natin Paul
    Title: President

**SCHEDULE 1**

**LIST OF MORTGAGE BORROWERS**

1.      GVS Colorado Holdings I, LLC

2.      GVS Illinois Holdings I, LLC

3.      GVS Indiana Holdings I, LLC

4.      GVS Missouri Holdings I, LLC

5.      WC Mississippi Storage Portfolio I, LLC

6.      GVS Nevada Holdings I, LLC

7.      GVS New York Holdings I, LLC

8.      GVS Ohio Holdings I, LLC

9.      GVS Ohio Holdings II, LLC

10.     GVS Tennessee Holdings I, LLC

11.     GVS Texas Holdings I, LLC

12.     GVS Texas Holdings II, LLC

## SCHEDULE 2

## ALLOCATED LOAN AMOUNTS

| Street # | Street Name | City | State | Zip | Senior Mezzanine ALAs |
|---|---|---|---|---|---|
| 60 | Westpark Road | Dayton | OH | 45459 | $970,290.00 |
| 111 | North Layfair Drive | Flowood | MS | 39232 | $2,201,810.00 |
| 123 | South Meridian Road | Youngstown | OH | 44509 | $1,642,030.00 |
| 410 | Gulf Freeway | Texas City | TX | 77591 | $2,052,540.00 |
| 426 | North Smithville Road | Dayton | OH | 45431 | $970,290.00 |
| 435 | Congress Park Drive | Dayton | OH | 45459 | $2,201,810.00 |
| 443 | Laredo Street | Aurora | CO | 80011 | $1,492,750.00 |
| 580 | East Dublin Granville Road | Worthington | OH | 43085 | $1,679,350.00 |
| 613 | North Freeway | Fort Worth | TX | 76102 | $1,380,800.00 |
| 632 | Timkin Road | Tomball | TX | 77375 | $858,330.00 |
| 765 | South Street | Newburgh | NY | 12550 | $2,127,170.00 |
| 920 | Highway 80 East | Mesquite | TX | 75149 | $2,239,130.00 |
| 941 | Fairmount Parkway | Pasadena | TX | 77504 | $858,330.00 |
| 1151 | East Expressway 83 | San Benito | TX | 78586 | $559,780.00 |
| 1330 | Georgesville Road | Columbus | OH | 43228 | $1,642,030.00 |
| 1585 | Lexington Avenue | Mansfield | OH | 44907 | $1,044,930.00 |
| 1594 | Route 9G | Hyde Park | NY | 12538 | $1,044,930.00 |
| 1661 & 1670 | West Government Cove | Brandon | MS | 39042 | $1,455,430.00 |
| 1710 | North Cunningham Avenue | Urbana | IL | 61802 | $2,015,220.00 |
| 1910 | 25th Avenue North | Texas City | TX | 77590 | $1,306,160.00 |
| 1961 | Covington Pike | Memphis | TN | 38128 | $1,119,570.00 |
| 2033 | Oak Grove Road | Hattiesburg | MS | 39402 | $1,828,620.00 |
| 2150 | Wirt Road | Houston | TX | 77055 | $1,604,710.00 |
| 2202 | North Market Street | Champaign | IL | 61822 | $2,239,130.00 |
| 2407 | South US Highway 183 | Leander | TX | 78641 | $970,290.00 |
| 2502 | Bay Street | Texas City | TX | 77590 | $2,015,220.00 |
| 3380 | North Post Road | Indianapolis | IN | 46226 | $1,604,710.00 |
| 3412 | Garth Road | Baytown | TX | 77521 | $895,650.00 |
| 3785 | Shiloh Springs Road | Dayton | OH | 45426 | $1,119,570.00 |
| 3951 | Highway 78 | Memphis | TN | 38118 | $783,700.00 |
| 4145 | State Route 741 | Mason | OH | 45040 | $1,156,880.00 |
| 4311 | Samuell Boulevard | Dallas | TX | 75228 | $2,686,960.00 |
| 4641 | Production Drive | Dallas | TX | 75235 | $2,239,130.00 |
| 4806 | Marie Lane | Deer Park | TX | 77536 | $671,740.00 |
| 4901 | South Freeway | Fort Worth | TX | 76115 | $1,940,580.00 |
| 5199 | Westerville Road | Columbus | OH | 43231 | $2,052,540.00 |
| 5301 | Tamarack Circle East | Columbus | OH | 43229 | $1,530,070.00 |
| 5550 | Antoine Drive | Houston | TX | 77091 | $1,716,670.00 |
| 5811 | North Houston Rosslyn Road | Houston | TX | 77097 | $970,290.00 |
| 6250 | Westward Lane | Houston | TX | 77081 | $4,067,750.00 |
| 7116 | South IH-35 Frontage Road | Austin | TX | 78745 | $223,910.00 |
| 7200 | Tussing Road | Reynoldsburg | OH | 43068 | $1,306,160.00 |

| Street # | Street Name | City | State | Zip | Senior Mezzanine ALAs |
|---|---|---|---|---|---|
| 7273 | Kearney Street | Commerce City | CO | 80022 | $2,276,450.00 |
| 7821 | Taylor Road | Reynoldsburg | OH | 43068 | $2,015,220.00 |
| 7986 | Southern Boulevard | Boardman | OH | 44512 | $1,642,030.00 |
| 8320 | Alabonson Road | Houston | TX | 77088 | $1,007,610.00 |
| 8450 | Cook Road | Houston | TX | 77072 | $1,455,430.00 |
| 8501 | North Springboro Pike | Miamisburg | OH | 45342 | $1,231,520.00 |
| 8801 | Boone Road | Houston | TX | 77099 | $783,700.00 |
| 9010 | Emmett F Lowry Expressway | Texas City | TX | 77591 | $2,575,000.00 |
| 9530 | Skillman Street | Dallas | TX | 75243 | $3,134,780.00 |
| 9600 | Marion Ridge | Kansas City | MO | 64137 | $1,940,580.00 |
| 9951 | Harwin Road | Houston | TX | 77036 | $1,903,260.00 |
| 9984 | South Old State Road | Lewis Center | OH | 43035 | $2,425,720.00 |
| 10013 | FM 620 | Austin | TX | 78726 | $1,007,610.00 |
| 10601 | West Fairmont Parkway | La Porte | TX | 77571 | $1,343,480.00 |
| 10640 | Hempstead Road | Houston | TX | 77092 | $2,388,410.00 |
| 11702 | Beechnut Street | Houston | TX | 77072 | $1,791,300.00 |
| 13825 | FM 306 | Canyon Lake | TX | 78133 | $1,716,670.00 |
| 14318 | Highway 249 | Houston | TX | 77086 | $1,306,160.00 |
| 15300 | Kuykendahl Road | Houston | TX | 77090 | $1,903,260.00 |
| 16530 | West Hardy Road | Houston | TX | 77060 | $671,740.00 |
| 16905 | Indian Chief Drive | Cedar Park | TX | 78613 | $783,700.00 |
| 1223, 1235, 1431, 1441, 1451, 1491, 1527, 1543 & 1559 | North Nellis Boulevard | Las Vegas | NV | 89110 | $3,209,410.00 |
| | | | | | $103,000,000.00 |

# SCHEDULE 2.5.1

## HOUSTON AND DALLAS METROPOLITAN AREA PROPERTIES

| Street # | Street Name | City | State | Zip | SMA |
|---|---|---|---|---|---|
| 410 | Gulf Freeway | Texas City | TX | 77591 | Houston-The Woodlands-Sugar Land, TX |
| 613 | North Freeway | Fort Worth | TX | 76102 | Dallas-Fort Worth-Arlington, TX |
| 632 | Timkin Road | Tomball | TX | 77375 | Houston-The Woodlands-Sugar Land, TX |
| 920 | Highway 80 East | Mesquite | TX | 75149 | Dallas-Fort Worth-Arlington, TX |
| 941 | Fairmount Parkway | Pasadena | TX | 77504 | Houston-The Woodlands-Sugar Land, TX |
| 1910 | 25th Avenue North | Texas City | TX | 77590 | Houston-The Woodlands-Sugar Land, TX |
| 2150 | Wirt Road | Houston | TX | 77055 | Houston-The Woodlands-Sugar Land, TX |
| 2502 | Bay Street | Texas City | TX | 77590 | Houston-The Woodlands-Sugar Land, TX |
| 3412 | Garth Road | Baytown | TX | 77521 | Houston-The Woodlands-Sugar Land, TX |
| 4311 | Samuell Boulevard | Dallas | TX | 75228 | Dallas-Fort Worth-Arlington, TX |
| 4641 | Production Drive | Dallas | TX | 75235 | Dallas-Fort Worth-Arlington, TX |
| 4806 | Marie Lane | Deer Park | TX | 77536 | Houston-The Woodlands-Sugar Land, TX |
| 4901 | South Freeway | Fort Worth | TX | 76115 | Dallas-Fort Worth-Arlington, TX |
| 5550 | Antoine Drive | Houston | TX | 77091 | Houston-The Woodlands-Sugar Land, TX |
| 5811 | North Houston Rosslyn Road | Houston | TX | 77097 | Houston-The Woodlands-Sugar Land, TX |
| 6250 | Westward Lane | Houston | TX | 77081 | Houston-The Woodlands-Sugar Land, TX |
| 8320 | Alabonson Road | Houston | TX | 77088 | Houston-The Woodlands-Sugar Land, TX |
| 8450 | Cook Road | Houston | TX | 77072 | Houston-The Woodlands-Sugar Land, TX |
| 8801 | Boone Road | Houston | TX | 77099 | Houston-The Woodlands-Sugar Land, TX |
| 9010 | Emmett F Lowry Expressway | Texas City | TX | 77591 | Houston-The Woodlands-Sugar Land, TX |
| 9530 | Skillman Street | Dallas | TX | 75243 | Dallas-Fort Worth-Arlington, TX |
| 9951 | Harwin Road | Houston | TX | 77036 | Houston-The Woodlands-Sugar Land, TX |
| 10601 | West Fairmont Parkway | La Porte | TX | 77571 | Houston-The Woodlands-Sugar Land, TX |
| 10640 | Hempstead Road | Houston | TX | 77092 | Houston-The Woodlands-Sugar Land, TX |

| 11702 | Beechnut Street | Houston | TX | 77072 | Houston-The Woodlands-Sugar Land, TX |
| 14318 | Highway 249 | Houston | TX | 77086 | Houston-The Woodlands-Sugar Land, TX |
| 15300 | Kuykendahl Road | Houston | TX | 77090 | Houston-The Woodlands-Sugar Land, TX |
| 16530 | West Hardy Road | Houston | TX | 77060 | Houston-The Woodlands-Sugar Land, TX |

**SCHEDULE 3.1.28**

<u>**ORGANIZATIONAL CHART**</u>



## SCHEDULE 6.1.1-1

## REQUIRED REPAIRS

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| 13825 FM 306 | Canyon Lake | TX | $1,700 | - Paint one accessible parking space to meet ADA standards.<br>- Install signage indicating one accessible parking space.<br>- Add ADA grab bar and blocking to one bathroom.<br>- Wrap drain pipes below one accessible lavatory. | $0 | | $1,700 | $1,870 |
| 16905 Indian Chief Drive | Cedar Park | TX | $400 | - Paint one van-accessible parking space.<br>- Install one sign indicating accessible parking to meet ADA standards. | $750 | - Asphalt pavement overlay. | $1,150 | $1,265 |
| 7116 S I H 35 | Austin | TX | $400 | - Paint one accessible parking space.<br>- Install one sign indicating accessible parking to meet ADA standards. | $2,500 | - Asphalt pavement overlay. | $2,900 | $3,190 |
| 2407 S. 183 | Leander | TX | $900 | - Paint one ADA accessible parking space.<br>- Install one sign indicating accessible parking to meet ADA standards.<br>- Install one buzzer or intercom for assistance at exterior entrance doors or parking space. | $5,500 | - Install concrete steps at 22 storage units. | $6,400 | $7,040 |
| 1151 E Expressway 83 | San Benito | TX | $0 | | $500 | - Repair building envelope column. | $500 | $550 |
| 613 North Fwy. | Fort Worth | TX | $0 | | $24,750 | - Repair 16,500 SF of TPO membrane. | $24,750 | $27,225 |
| 4901 South Fwy. | Fort Worth | TX | $0 | | $0 | | $0 | $0 |

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| 9530 Skillman Street | Dallas | TX | $400 | - Paint one van-accessible parking space to meet ADA standards.<br>- Install one sign indicating accessible parking. | $13,500 | - Full depth repair for 5,000 SF of asphalt pavement.<br>- Provide one current cargo lift permit.<br>- Repair one cargo lift equipment leak. | $13,900 | $15,290 |
| 920 Highway 80 East | Mesquite | TX | $850 | - Paint one van-accessible parking space.<br>- Install one sign indicating Accessible Parking.<br>- Construct a new handicap access ramp. | $1,000 | - Provide current elevator permit.<br>- Perform current elevator load test. | $1,850 | $2,035 |
| 4311 Samuell Blvd | Dallas | TX | $700 | - Install one sign indicating Accessible Parking.<br>- Replace lavatory fittings with ADA lever handles in one restroom. | $2,500 | - Renovate down unit. | $3,200 | $3,520 |
| 6250 Westward St | Houston | TX | $0 | | $2,500 | - Replace roof sheathing and asphalt shingles above manager's apartment balcony. | $2,500 | $2,750 |
| 8801 Boone Rd | Houston | TX | $0 | | $0 | | $0 | $0 |
| 8450 Cook Rd. | Houston | TX | $1,250 | - Add one ADA Grab bar and blocking in bathroom. | $5,000 | - Repair concrete. | $6,250 | $6,875 |
| 9951 Harwin Dr | Houston | TX | $0 | | $12,500 | - Renovate down unit. | $12,500 | $13,750 |
| 9010 Emmett F. Lowry Expressway | Texas City | TX | $0 | | $2,000 | - Repair corrosion for porte-cochere.<br>- Investigate septic system seepage and make necessary repairs. | $2,000 | $2,200 |
| 410 North IH-45/Gulf Fwy | Texas City | TX | $0 | | $1,000 | - Repair exterior walls. | $1,000 | $1,100 |
| 5550 Antoine Dr | Houston | TX | $0 | | $10,000 | - Repair concrete pavement. | $10,000 | $11,000 |
| 10640 Hempstead Rd | Houston | TX | $0 | | $12,000 | - Repair and replace asphalt pavement.<br>- Drain installation from water intrusion. | $12,000 | $13,200 |
| 14318 Highway 249 | Houston | TX | $0 | | $0 | | $0 | $0 |

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| 3412 Garth Road | Baytown | TX | $600 | - Paint one van-accessible parking space.<br>- Install one sign indicating Accessible Parking.<br>- Install one lever handle hardware at accessible locations at entrances and exits. | $20,950 | - Replace concrete flatwork.<br>- Seal coat and restripe asphalt pavement. | $21,550 | $23,705 |
| 11702 Beechnut St. | Houston | TX | $0 | | $0 | | $0 | $0 |
| 10601 West Fairmont Parkway | La Porte | TX | $500 | - Wrap two drain pipes below accessible lavatories in bathroom.<br>- Install lever handle hardware at two accessible locations. | $4,600 | - Remove trees and repair broken fences.<br>- Replace concrete flatwork.<br>- Replace window and frame.<br>- Repair electric conduit. | $5,100 | $5,610 |
| 2150 Wirt Rd. | Houston | TX | $0 | | $8,000 | - Repair concrete pavement.<br>- Repair fixtures and plumbing in out-of-service restroom. | $8,000 | $8,800 |
| 941 Fairmont Parkway | Pasadena | TX | $0 | | $0 | | $0 | $0 |
| 4806 Marie Lane | Deer Park | TX | $0 | | $700 | - Replace 200 SF of hardboard siding. | $700 | $770 |
| 8320 Alabonson Road | Houston | TX | $0 | | $7,250 | - Replace ten storage unit overhead doors.<br>- Inspect one fire extinguisher as part of routine maintenance. | $7,250 | $7,975 |
| 5811 North Houston Rosslyn Road | Houston | TX | $0 | | $3,000 | - Repair asphalt pavement. | $3,000 | $3,300 |
| 632 Timkin Road | Tomball | TX | $0 | | $6,000 | - Repairs needed on roof.<br>- Repair/Replace two damaged and missing light poles.<br>- Repair minor impact damage as part of routine maintenance. | $6,000 | $6,600 |
| 16530 West Hardy Street | Houston | TX | $0 | | $500 | - Provide one current elevator permit. | $500 | $550 |

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| 4641 Production Dr | Dallas | TX | $400 | - Paint one van-accessible parking space. -Install one sign indicating accessible parking. | $5,000 | - Replace 500 SF of concrete flatwork. - Hire structural engineer to review and report on building superstructure. - Complete a current inspection of the fire alarm system. | $5,400 | $5,940 |
| 2502 Bay Street Extension | Texas City | TX | $0 | | $0 | | $0 | $0 |
| 1910 25th Avenue North | Texas City | TX | $0 | | $8,000 | - Repair 800 SF of concrete pavement. | $8,000 | $8,800 |
| 15300 Kuykendahl | Houston | TX | $0 | | $0 | | $0 | $0 |
| 3785 Shiloh Springs Road | Trotwood | OH | $300 | - Paint one van-accessible parking space. - Wrap one drain pipe below accessible lavatory. | $1,500 | - Repair asphalt pavement. | $1,800 | $1,980 |
| 426 N Smithville Rd | Dayton | OH | $600 | - Replace one lavatory fitting with ADA lever handle. - Wrap one drain pipe below accessible lavatory. | $8,250 | - Restripe and seal coat 45,000 SF of asphalt pavement. - Overlay 500 SF of asphalt pavement. | $8,850 | $9,735 |
| 60 Westpark Dr | Centerville | OH | $0 | | $30,334 | - Replace 180 SF of concrete retaining wall. - Overlay 10,000 SF of asphalt pavement. - Renovate 26 downed units. | $30,334 | $33,367 |
| 435 Congress Park Dr | Centerville | OH | $1,400 | - Paint one ADA accessible parking space. - Construct one new H/C access ramp. - Install one sign indicating accessible parking. - Replace lavatory fitting with one ADA lever handle. | $7,375 | - Replace two GFCI outlets by onsite staff. - Replace one smoke detector. - Renovate 15 downed units. | $8,775 | $9,653 |

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| 8501 Springboro Pike | Miamisburg | OH | $0 | | $35,100 | - Replace 100 FT of wood board 6' high fence.<br>- Replace damaged concrete and walkways.<br>- Replace 150 CMU sills.<br>- Install 12 storage unit swing doors.<br>- Repaint, clean, and re-caulk exterior walls.<br>- Repair roof leak.<br>- Replace two GFCI outlets by onsite staff. | $35,100 | $38,610 |
| 4145 State Route 741 S | Mason | OH | $0 | | $12,500 | - Overlay 2,500 SF of asphalt pavement. | $12,500 | $13,750 |
| 7986 Southern Blvd | Boardman | OH | $0 | | $48,200 | - Full depth repair of 16,000 SF of asphalt pavement.<br>- Replace metal siding.<br>- Repair 500 SF of EIFS.<br>- Replace one storage unit door.<br>- Provide one current fire extinguisher inspection. | $48,200 | $53,020 |
| 123 S Meridian Rd | Youngstown | OH | $0 | | $17,664 | - Install one storm drain catch basin.<br>- Overlay 6,000 SF of asphalt pavement.<br>- Replace 1,160 SF of metal siding for building envelope.<br>- Replace one metal overhead dock door.<br>- Replace two GFCI outlets by onsite staff. | $17,664 | $19,430 |
| 7821 Taylor Road SW | Pataskala | OH | $0 | | $0 | | $0 | $0 |

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| 1582 Route 9g | Hyde Park | NY | $1,000 | - Paint two accessible parking spaces.<br>- Install two signs indicating accessible parking.<br>- Install lever handle hardware at one accessible location. | $2,500 | - Make repairs to one of the catch basins for storm water management. | $3,500 | $3,850 |
| 765 South Street | Newburgh | NY | $600 | - Paint one accessible parking space.<br>- Install one sign indicating accessible parking.<br>- Install one lever handle hardware at the accessible location. | $16,800 | - Full depth repair for 3,000 SF of asphalt pavement.<br>- Seal coat & restripe 60,000 SF of asphalt pavement.<br>- Replace six fire extinguishers. | $17,400 | $19,140 |
| 1961 Covington Pike | Memphis | TN | $400 | - Install one sign indicating accessible parking.<br>- Paint one accessible parking space. | $250 | - Provide one current fire extinguisher inspection. | $650 | $715 |
| 3951 Lamar Ave (U.S. Hwy 78) | Memphis | TN | $400 | - Install one sign indicating Accessible parking.<br>- Paint one van-accessible parking space. | $2,500 | - Overlay 500 SF of asphalt pavement. | $2,900 | $3,190 |
| 1441 N Nellis Blvd | Las Vegas | NV | $400 | - Install one sign indicating accessible parking.<br>- Paint one van-accessible parking space. | $500 | - Complete renovation of two down units. | $900 | $990 |
| 3380 North Post Road | Indianapolis | IN | $400 | - Paint one van-accessible parking space.<br>- Install one sign indicating accessible parking. | $10,000 | - Overlay 15,000 SF of asphalt pavement. | $10,400 | $11,440 |
| 9600 Marion Ridge | Kansas City | MO | $0 | | $4,290 | - Full depth repair for 12,000 SF of asphalt pavement. | $4,290 | $4,719 |
| 10013 Ranch Road 620 North | Austin | TX | $700 | - Paint two van-accessible parking spaces.<br>- Install one lever handle hardware at the accessible location. | $12,650 | - Complete compliance for two septic tanks.<br>- Grind one tripping hazard for pavement and concrete.<br>- Install plywood for soffits and trim for building envelope. | $13,350 | $14,685 |

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | - Replace 2,100 SF of asphalt composition shingles for the roof. | | |
| 1661 West Government Cove | Brandon | MS | $400 | - Paint one van-accessible parking space. - Install one sign indicating accessible parking. | $26,500 | - Replace concrete flatwork. - Clean, re-caulk, and repaint exterior walls. - Repair roof leak. - Renovate two down units. | $26,900 | $29,590 |
| 2033 Oak Grove Rd | Hattiesburg | MS | $0 | | $11,500 | - Repair perimeter wall. - Diagnose and repair drainage. - Concrete pavement repair. - Apply roof coating to repair leaks. | $11,500 | $12,650 |
| 111 N Layfair Dr | Flowood | MS | $0 | | $0 | | $0 | $0 |
| 7271-7273 Kearney Street and 6345 E 78th Street | Commerce City | CO | $400 | - Paint one van-accessible parking space. - Install one sign indicating accessible parking. | $9,000 | - Repair chain link fence. - Asphalt pavement overlay. - Seal asphalt cracking. - Scrape, clean, repair, and repaint exterior walls. - Provide current fire extinguisher inspection certificate. | $9,400 | $10,340 |
| 443 Laredo Street | Aurora | CO | $0 | | $7,775 | - Landscape material and tree trimming. - Asphalt pavement overlay. - Replace concrete flatwork. - Repair EIFS. - Paint metal overhead doors. | $7,775 | $8,553 |
| 1719 Cunningham Avenue | Urbana | IL | $400 | - Paint one van-accessible parking space. - Install one sign indicating accessible parking to meet ADA standards. | $14,000 | - Replace concrete flatwork. - Repair roof leak. | $14,400 | $15,840 |
| 2202 North Market Street | Champaign | IL | $400 | - Paint one van-accessible parking space. - Install one sign indicating accessible parking to meet ADA standards. | $18,000 | - Repair erosion as part of the storm water management. - Replace 1,500 SF of concrete flatwork. - Repair roof leak. | $18,400 | $20,240 |

| Address | City | State | ADA | ADA Descriptions | Immediate Costs | Immediate Costs Descriptions | Total Immediate Repairs + ADA | Immediate Repairs Reserve (110%) |
|---|---|---|---|---|---|---|---|---|
| 1585 Lexington Avenue | Mansfield | OH | $0 | | $0 | | $0 | $0 |
| 9984 S. Old State Road | Lewis Center | OH | $0 | | $1,500 | - Repair two gutters. - Provide one current fire extinguisher inspection. - Complete renovation of two downed units. | $1,500 | $1,650 |
| 5199 Westerville Road | Columbus | OH | $200 | - Install one lever handle hardware at the accessible location. | $6,250 | - Overlay 2,500 SF of asphalt pavement. | $6,450 | $7,095 |
| 7200 Tussing Road | Reynoldsburg | OH | $0 | | $0 | | $0 | $0 |
| 5301 East Tamarack Circle | Columbus | OH | $0 | | $0 | | $0 | $0 |
| 580 East Dublin-Granville Road | Worthington | OH | $0 | | $6,250 | - Asphalt pavement overlay. | $6,250 | $6,875 |
| 1330 Georgesville Road | Columbus | OH | $0 | | $0 | | $0 | $0 |
| | | | **$16,100** | | **$471,188** | | **$487,288** | **$536,017** |

**SCHEDULE 6.1.1-2**

**<u>INDIVIDUAL PROPERTIES TO</u>**
**<u>BE RE-STRIPED</u>**

- Tussing Road Storage Park, 7200 Tussing Rd., Reynoldsburg, OH (1 additional parking space required)
- Allsafe Storage Park, 7116 S. Interstate Hwy 35, Austin, TX (4 additional parking spaces required)

## SCHEDULE 9.1(b)

## UPDATED INFORMATION

1.  Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

2.  The general competitive conditions to which the Property is or may be subject.

3.  Management of the Property.

4.  Occupancy rate expressed as a percentage for each of the last five (5) years (or such lesser period that the applicable Borrower has owned the applicable Individual Property).

5.  Principal businesses, occupations and professions carried on, in or from the Property.

6.  Number of tenants occupying ten percent (10%) or more of the total rentable square footage of the Property, the principal business of each such tenant, and the principal provisions of the Leases with such tenants (including, but not limited to: rent per annum, expiration date, and renewal options), provided that the foregoing shall not be required for Storage Leases.

7.  The average effective annual rent per square foot or unit for each of the last three (3) years (or such lesser period that the applicable Borrower has owned the applicable Individual Property).

8.  Except with respect to Storage Leases, schedule of the lease expirations for each of the following ten (10) years stating:

    (a)    The number of tenants whose leases will expire.

    (b)    The total area in square feet covered by such Leases.

    (c)    The annual rent represented by such Leases.

    (d)    The percentage of gross annual rent represented by such Leases.