Exhibit 8

**INTERCREDITOR AGREEMENT**

by and among

**UBS AG, by and through its branch**
**office at 1285 Avenue of the Americas, New York, New York,**
as Senior Lender,

**UBS AG, by and through its branch**
**office at 1285 Avenue of the Americas, New York, New York,**
as Mezzanine 1 Lender,

and

**UBS AG, by and through its branch**
**office at 1285 Avenue of the Americas, New York, New York,**
as Mezzanine 2 Lender

Dated as of November 30, 2018

**Great Value Storage**

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated as of November 30, 2018 (this "**Agreement**"), by and among **UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York**, having an address at 1285 Avenue of the Americas, New York, New York 10019, as the holder of the Senior Loan (as such term is hereinafter defined) (together with any successor or assign as holder of a direct interest in the Senior Loan permitted by this Agreement, "**Senior Lender**"); **UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York**, having an address at 1285 Avenue of the Americas, New York, New York 10019, as the holder of the Mezzanine 1 Loan (as such term is hereinafter defined) (together with any successor or assign as holder of a direct interest in the Mezzanine 1 Loan permitted by this Agreement, "**Mezzanine 1 Lender**"); and **UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York**, having an address at 1285 Avenue of the Americas, New York, New York 10019, as the holder of the Mezzanine 2 Loan (as such term is hereinafter defined) (together with any successor or assign as holder of a direct interest in the Mezzanine 2 Loan permitted by this Agreement, "**Mezzanine 2 Lender**"; Mezzanine 1 Lender and Mezzanine 2 Lender are each a "**Junior Lender**" and, collectively, "**Junior Lenders**").

## RECITALS

**WHEREAS**, pursuant to the terms, provisions and conditions set forth in that certain Loan Agreement, dated as of the Closing Date (as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time, subject to the limitations and agreements contained in this Agreement, the "**Senior Loan Agreement**"), between the entities set forth on Schedule 1 hereto (collectively, "**Borrower**") and Senior Lender, Senior Lender made a loan to Borrower in the original principal amount of $110,000,000.00 (the "**Senior Loan**"), which Senior Loan is evidenced by the Note (as defined in the Senior Loan Agreement) (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively the "**Senior Note**"), and secured by, among other things, the Security Instrument (as defined in the Senior Loan Agreement), which Security Instrument encumbers the real property and all improvements thereon and appurtenances thereto described in such Security Instrument (individually and/or collectively as the context may require, the "**Premises**") (the Security Instrument, together with the instruments and documents set forth on Exhibit A hereto as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement, collectively the "**Senior Loan Documents**");

**WHEREAS**, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine 1 Loan Agreement, dated as of the Closing Date, between GVS Portfolio I, LLC, a Delaware limited liability company ("**Mezzanine 1 Borrower**"), and Mezzanine 1 Lender (as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time, subject to the limitations and agreements contained in this Agreement, the "**Mezzanine 1 Loan Agreement**"), Mezzanine 1 Lender made a loan to Mezzanine 1 Borrower in the stated principal amount of $103,000,000.00 (the "**Mezzanine 1 Loan**"), which Mezzanine 1 Loan is evidenced by the Note (as defined in the Mezzanine 1 Loan Agreement) (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Mezzanine 1 Note**"), which

Mezzanine 1 Loan is secured by, among other things, that certain Pledge and Security Agreement (Mezzanine 1 Loan), dated as of the Closing Date, from Mezzanine 1 Borrower pursuant to which Mezzanine 1 Lender is granted a first priority security interest in all of Mezzanine 1 Borrower's ownership interests in Borrower (as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time, the "**Mezzanine 1 Pledge Agreement**", and together with the documents and instruments set forth on <u>Exhibit B</u> hereto as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement, are collectively referred to as the "**Mezzanine 1 Loan Documents**");

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine 2 Loan Agreement, dated as of the Closing Date, between GVS Portfolio I B, LLC, a Delaware limited liability company ("**Mezzanine 2 Borrower**"), and Mezzanine 2 Lender (as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time, subject to the limitations and agreements contained in this Agreement, the "**Mezzanine 2 Loan Agreement**"), Mezzanine 2 Lender made a loan to Mezzanine 2 Borrower in the stated principal amount of $63,000,000.00 (the "**Mezzanine 2 Loan**"), which Mezzanine 2 Loan is evidenced by the Note (as defined in the Mezzanine 2 Loan Agreement) (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively or individually as context may require, the "**Mezzanine 2 Note**"), which Mezzanine 2 Loan is secured by, among other things, that certain Pledge and Security Agreement (Mezzanine 2 Loan), dated as of the Closing Date, from Mezzanine 2 Borrower pursuant to which Mezzanine 2 Lender is granted a first priority security interest in all of Mezzanine 2 Borrower's ownership interests in Mezzanine 1 Borrower (as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time, the "**Mezzanine 2 Pledge Agreement**", and together with the documents and instruments set forth on <u>Exhibit C</u> hereto as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement, are collectively referred to as the "**Mezzanine 2 Loan Documents**"); and

WHEREAS, Senior Lender and Junior Lenders desire to enter into this Agreement to provide for the relative priority of, and to evidence certain agreements with respect to, the Senior Loan Documents, the Mezzanine 1 Loan Documents and the Mezzanine 2 Loan Documents.

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Junior Lenders each hereby agree as follows:

**Section 1.**     **Certain Definitions; Rules of Construction**.  As used in this Agreement, the following capitalized terms shall have the following meanings:

"**Affected Property**" has the meaning provided in <u>Section 15(h)</u>.

"**Affiliate**" means, as to any particular Person (as hereinafter defined), any Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under common Control with the Person or Persons in question.

"**Affiliated Mezzanine Lender**" means an owner of all or any portion of any Junior Loan (or any interest therein) who (i) owns, directly or indirectly, more than twenty-five percent (25%) of the direct or indirect ownership interests in Borrower, Mezzanine 1 Borrower or Mezzanine 2 Borrower, or (ii) has the power, directly or indirectly, to direct or cause the direction of the management or policies of Borrower, Mezzanine 1 Borrower or Mezzanine 2 Borrower, whether through the ability to exercise voting power, by contract or otherwise (but excluding any such ability arising solely through operation of the Junior Loan Documents).

"**Agreement**" means this Agreement, as the same may be amended, restated, supplemented or otherwise modified, and in effect from time to time, pursuant to the terms hereof.

"**Approved Servicer**" has the meaning set forth in the definition of the term "Qualified Transferee".

"**Apollo/Athene**" means, collectively, Athene Annuity and Life Company, Athene Annuity & Life Assurance Company, American Equity Investment Life Insurance Company, and/or any of their respective Affiliates (it being agreed that all Persons for which Apollo Global Management or Athene Asset Management LLC or any of their respective Affiliates is a fund/investment advisor or asset manager shall be deemed to be Affiliates of Apollo/Athene for purposes of this definition).

"**Award**" has the meaning provided in Section 10(e).

"**Borrower**" has the meaning provided in the Recitals hereto.

"**Borrower Group**" has the meaning provided in Section 11(d).

"**Borrower Party**" means Borrower, each Junior Borrower and any substantively consolidated entity that includes any of the foregoing.

"**Business Day**" has the meaning set forth in the Senior Loan Agreement.

"**Capital Commitments**" means, with respect to any Person, any unfunded, irrevocable, unconditionally (subject only to customary administrative conditions such as minimum advance notice) callable investor capital commitments to such Person that are from investors that are not in continuing default beyond applicable notice and grace periods on their obligations to make capital contributions to such Person under the organizational documents of such Person or any other agreement related to the making of their capital contributions, and that are not required, designated or reserved for current or designated investments or other purposes (but only to the extent such commitments (a) are owed by Persons that are not Affiliates of such Person (other than blocker, feeder or other similar Persons constituted and capitalized with capital commitments from Persons who are not Affiliates of such underlying Person) and (b) have not (i) previously been pledged as security for a so-called "commitment loan facility" or "commitment line of credit" or (ii) if so pledged, solely with respect to determining the total amount of the such Person's Liquid Assets (which, for the avoidance of doubt, is included in such Person's total assets), only the amount by which such unfunded capital commitments of all investors exceeds the then outstanding principal obligations under such "commitment loan facility" or "commitment line of credit" will be counted).

"**Cash Management Agreement**" has the meaning set forth in the Senior Loan Agreement.

"**CDO**" has the meaning provided in the definition of the term "Qualified Transferee".

"**CDO Asset Manager**" means, with respect to any Securitization Vehicle that is a CDO, the entity that is responsible for managing or administering a Junior Loan (or any portion thereof or interest therein, including, without limitation, a participation interest in such Junior Loan) as an underlying asset of such Securitization Vehicle or, if applicable, as an asset of any Intervening Trust Vehicle (including, without limitation, the right to exercise any consent and control rights available to the holder of such Junior Loan).

"**Certificates**" means any securities (including all classes thereof) representing beneficial ownership interests in all or any portion of the Senior Loan or in a pool of mortgage loans including the Senior Loan or any interest in the Senior Loan issued in connection with a Securitization.

"**CIL Notice**" has the meaning set forth in Section 14(d).

"**Closing Date**" means November 30, 2018.

"**Common Guarantor**" means any guarantor or indemnitor which has granted a guaranty or indemnity in favor of Senior Lender (or, as applicable, Senior Junior Lender), and which has also granted a guaranty or indemnity in favor of a Junior Lender.

"**Conduit**" has the meaning set forth in Section 16(b).

"**Conduit Credit Enhancer**" has the meaning set forth in Section 16(b).

"**Conduit Inventory Loan**" has the meaning set forth in Section 16(b).

"**Contingent Obligations**" means any contingent indemnification or similar obligations that, pursuant to the terms of the applicable Senior Loan Document or Junior Loan Document giving rise thereto, survive the repayment in full of all other Senior Loan Liabilities, Mezzanine 1 Loan Liabilities or Mezzanine 2 Loan Liabilities, respectively.

"**Continuing Event of Default**" means (a) with respect to the Senior Loan and the Senior Loan Documents, any "Event of Default" (as defined therein) thereunder which has occurred and is continuing for which (i) Senior Lender has provided notice of such Event of Default to Junior Lenders and any Loan Pledgee in accordance with Section 12(a), and (ii) the cure periods provided to all Junior Lenders and their respective Loan Pledgees (if any) pursuant to Section 12(b) and Section 12(c) shall have expired or terminated, and (b) with respect to a Senior Junior Loan, any "Event of Default" as defined in the Senior Junior Loan Documents which has occurred and is continuing for which (i) a Senior Junior Lender has provided notice of such Event of Default in accordance with Section 12(d), and (ii) the cure periods of the Subordinate Junior Lender and its Loan Pledgees (if any) pursuant to Section 12(e) and Section 12(f) shall have expired or terminated.

"**Control**" means (a) the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of a Person, and (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise (other than possession of voting or control rights granted to Senior Lender under the Senior Loan Documents or to a Junior Lender under the Junior Loan Documents, in each case, the exercise of which is contingent upon the occurrence and continuance of an Event of Default under the Senior Loan Documents or Junior Loan Documents, as applicable); provided, however, that for purposes of (i) the last sentence of Section 5(a), (ii) the fifth and sixth sentences of Section 5(d), (iii) the last sentence of each of Section 11(d)(iii) and Section 11(d)(v), (iv) Section 16, (v) Section 17, (vi) Section 18(q), (vii) the definition of "Qualified Manager" and (viii) the last sentence in the definition of "Qualified Transferee", and not otherwise, the term "Control", when used to define any Affiliate of Borrower or of any Junior Borrower, shall mean either ownership of Borrower or any Junior Borrower (directly or indirectly, and to any extent) or the possession of the power to direct or cause direction of the management or policies of Borrower or a Junior Borrower (other than possession of voting or control rights granted to a Junior Lender pursuant to the related Junior Loan Documents, the exercise of which is contingent upon the occurrence and continuance of an Event of Default under such Junior Loan Documents, unless and until so exercised by such Junior Lender). "Controlled by," "Controlling" and "under common Control with" shall have the respective correlative meaning thereto. For purposes of this definition, if more than one Qualified Transferee owns (directly or indirectly) more than fifty percent (50%) of the beneficial ownership interests of a Person and one or more of the Qualified Transferees possess the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise, even though each such Qualified Transferee individually owns less than fifty percent (50%) of such beneficial interests, such Person shall be deemed to be "Controlled by" a Qualified Transferee.

"**Control Event**" has the meaning set forth in Section 6(a).

"**Conversion Conditions**" means unsecured indebtedness or preferred equity meeting the following criteria: (i) a maturity date no earlier than the maturity date of the Senior Loan (and, in the case of a Junior Loan Modification of a Junior Loan, the Senior Junior Loan), (ii) a principal amount equal to or less than the principal amount of the Junior Loan being converted plus accrued interest and all other amounts due and unpaid in respect of the Junior Loan being converted, (iii) a current-pay interest rate or rate of return, as applicable, equal to or less than the interest rate on the Junior Loan being converted, (iv) other economic terms substantially similar to the Junior Loan being converted, (v) such indebtedness or preferred equity does not create a Lien on the Premises or any other collateral for the Senior Loan (and, in the case of a Junior Loan Modification of a Junior Loan, the Separate Collateral for the Senior Junior Loan), (vi) such indebtedness or preferred equity is subordinate by its terms to the Senior Loan (and, in the case of a Junior Loan Modification of a Junior Loan, the Senior Junior Loan) and, if requested by Senior Lender (or Senior Junior Lender, as applicable), a replacement intercreditor agreement is entered into on terms substantially similar to this Agreement, (vii) such indebtedness or preferred equity does not result in a change (or provide the holder with any rights to effect a change) in the Person who directly or indirectly has the power to direct or cause the direction of the management or policies of the Borrower (as opposed to veto rights in connection with major decisions), other than following an event of default beyond all notice and cure periods under the terms of the documents governing

such unsecured indebtedness or preferred equity, provided that, in connection with any exercise of such power by the applicable Junior Lender, such Junior Lender delivers Senior Lender and Senior Junior Lender (if applicable) supplemental Third Party Agreements from one or more Substitute Third Party Obligors in respect of each Third Party Agreement then constituting a Senior Loan Document or a Senior Junior Loan Document, as applicable, and in each case in a form substantially similar to the respective original Third Party Agreement that it is replacing (subject to the Deemed Exclusions) as to Future Third Party Obligations; provided, however, that in the event such converting Junior Loan has Participating Holders, one or more Participating Holders may deliver separate supplemental Third Party Agreements, which supplemental Third Party Agreements (A) shall guaranty in the aggregate 100% of all Future Third Party Obligations, and (B) shall be on a several basis limiting the respective liability of each Participating Holder under the applicable supplemental Third Party Agreements to its pro rata portion (based on the percentage interest of the related Junior Loan held by such Participating Holder (as such percentage interests may be adjusted to equal the percentage interests identified in such supplemental Third Party Agreement as the percentage interest in such Junior Loan held by each such Participating Holder, respectively) in such supplemental Loan as of the date of such conversion) of the Future Third Party Obligations, (viii) if such transaction results in a change to Borrower's ownership structure such that any new Person holds more than a forty-nine percent (49%) (direct or indirect) interest in Borrower, if requested by Senior Lender or Senior Junior Lender, as applicable, a non-consolidation opinion reasonably acceptable to Senior Lender or Senior Junior Lender, as applicable, is delivered to Senior Lender or Senior Junior Lender, as applicable, with respect thereto within ten (10) Business Days after the applicable conversion, and (ix) if any Certificates are outstanding and rated by at least one Rating Agency, a Rating Agency Confirmation is obtained relating thereto.  In addition, the applicable Junior Lender shall reimburse Senior Lender and, if applicable, Senior Junior Lender, for any reasonable out-of-pocket costs and expenses incurred by Senior Lender or Senior Junior Lender in connection with the Conversion Conditions, including customary fees charged by the Rating Agencies in connection therewith.

"**Covered Holder**" means any participant or co-lender that does not deliver a supplemental Third Party Agreement to satisfy the Conversion Conditions, or pursuant to Section 6(a) in connection with a Realization Event of such Junior Loan, and on behalf of which one or more other participants or co-lenders in the related Junior Loan delivers a supplemental Third Party Agreement undertaking the respective liability (or portion thereof) of such participant or co-lender for such participant's or co-lender's pro rata portion (based on the percentage interest held by such participant or co-lender in such Junior Loan as of the date of such assumption, conversion or Realization Event) of the applicable Future Third Party Obligations.

"**Crowd Funding Structure**" means the practice of soliciting financial contributions and primarily funding a project or venture by raising monetary contributions which are funded primarily (a) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended and/or (b) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or other similar methods.

"**DBRS**" means DBRS, Inc. and its successor-in-interest.

"**Deemed Exclusions**" shall mean: (a) with regard to a Third Party Agreement delivered to Senior Lender, Section 11.22 of the Senior Loan Agreement shall be deemed modified as follows: (1) clause (i) of Section 11.22 shall be deemed modified by deleting the words "or material"; (2) clause (ii) of Section 11.22 (together with the related Environmental Indemnity (as defined in the Senior Loan Agreement) and/or Security Instrument) may be updated to reflect any state of facts existing as of the date of the related Realization Event and may be qualified to the knowledge of the applicable Substitute Third Party Obligor, (3) clause (vi) of Section 11.22 shall be deemed not to apply to any security deposits that were not received by the applicable Junior Lender or transferee in connection with the related Realization Event; and (4) clauses (x) and (xvii) of Section 11.22 shall be deemed replaced with the words "intentionally omitted"; and (b) with regard to a Third Party Agreement delivered to Senior Junior Lender, Section 11.22 of the Mezzanine 1 Loan Agreement shall be deemed modified as follows: (1) clause (i) of Section 11.22 shall be deemed modified by deleting the words "or material"; (2) clause (ii) of Section 11.22 (together with the related Environmental Indemnity (as defined in the Mezzanine 1 Loan Agreement)) may be updated to reflect any state of facts existing as of the date of the related Realization Event and may be qualified to the knowledge of the applicable Substitute Third Party Obligor, (3) clause (vi) of Section 11.22 shall be deemed not to apply to any security deposits that were not received by the applicable Junior Lender or transferee in connection with the related Realization Event; and (4) clauses (x) and (xvii) of Section 11.22 shall be deemed replaced with the words "intentionally omitted".

"**DIL Notice**" has the meaning set forth in Section 14(b).

"**Directing Junior Lender**" has the meaning provided in Section 5(e).

"**Directing Senior Lender**" has the meaning set forth in Section 5(f).

"**Divesting Event**" has the meaning set forth in Section 6(a).

"**Eligibility Requirements**" means, with respect to any Person, that such Person (i) has total assets (in name or under management or advisement) in excess of $600,000,000 (including Capital Commitments) and (except with respect to a pension advisory firm, asset manager, registered investment advisor or manager or similar fiduciary) either (x) capital/statutory surplus or shareholder or partner's equity of at least $250,000,000 (including Capital Commitments) or (y) market capitalization of at least $400,000,000 and (ii) is regularly engaged in the business of making or owning (or, in the case of a pension advisory firm, asset manager, registered investment advisor or manager or similar fiduciary, regularly engaged in managing investments in) commercial real estate loans or interests therein (which may include mezzanine loans to direct or indirect owners of commercial properties, which loans are secured by pledges of direct or indirect ownership interests in the owners of such commercial properties), originating preferred equity investments in direct or indirect owners of commercial properties, or owning or operating or making investments in commercial properties; provided, that in the event that a Qualified Transferee acquiring the Equity Collateral in connection with a Realization Event consists of more than one Person all such Persons shall be aggregated (and shall be jointly and severally liable for all of the obligations and liabilities of a Qualified Transferee) as if they were one Person for purposes of measuring compliance with clause (i) of the Eligibility Requirements.

"**Enforcement Action**" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Senior Loan Collateral or any portion thereof, or Borrower, including, without limitation, the taking of possession or control of the Premises or any portion thereof, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Senior Loan Collateral (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or the Senior Loan Collateral or any portion thereof. An "Enforcement Action" shall not include (A) the delivery of reservation of rights or partial payment letters, (B) the declaration or determination that a Cash Sweep Trigger Event (as such term is defined in the Senior Loan Agreement) has occurred or (C) the assessment and/or collection of default interest or late charges in accordance with the Senior Loan Documents.

"**Equity Collateral**" means the equity interests in Borrower or any Junior Borrower pledged pursuant to any of the Junior Loan Documents, as the context may require.

"**Equity Collateral Enforcement Action**" means any action, proceeding, foreclosure, the taking of a bill of sale or assignment in lieu of any proceeding or foreclosure or any retention of title to the Equity Collateral authorized under the Uniform Commercial Code as now or hereafter in effect, including, without limitation, obtaining the appointment of a receiver or similar agent with respect to the Equity Collateral, the taking of possession or control of Equity Collateral or any portion thereof (other than the physical possession of any certificates evidencing Equity Collateral) or other exercise of a Junior Lender's rights and remedies commenced by such Junior Lender (other than the giving of notices of default and statements of overdue amounts), at law, in equity, or otherwise, in order to realize upon or vest title in the Equity Collateral (including, without limitation, an assignment in lieu of foreclosure or other negotiated settlement in lieu of any such enforcement action) in Junior Lender, or otherwise obtaining, selling or transferring the Equity Collateral or the proceeds thereof. An "Equity Collateral Enforcement Action" shall not include (A) the delivery of reservation of rights or partial payment letters, (B) the declaration or determination that a Cash Sweep Trigger Event (as such terms are defined in the applicable Junior Loan Agreement) has occurred, (C) subject to the terms and conditions of this Agreement, the assessment and/or collection of default interest or late charges in accordance with the applicable Junior Loan Documents, (D) the making of Protective Advances, (E) exercising rights of offset, or (F) isolated instances of exercising consent or approval rights afforded to a Junior Lender in the applicable Junior Loan Documents and actions to prevent the occurrence of an event that would trigger recourse under the Senior Loan or the Senior Junior Loan, as applicable.

"**Event of Default**" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default (as defined therein) thereunder which has occurred and is continuing (i.e., has not been cured by Borrower or a Junior Lender in accordance with the terms of this Agreement or waived in writing by Senior Lender); (ii) with respect to the Mezzanine 1 Loan and the Mezzanine 1 Loan Documents, any Event of Default (as defined therein) thereunder which has occurred and is continuing (i.e., has not been cured by Mezzanine 1 Borrower or Subordinate Junior Lender in accordance with the terms of this Agreement or waived in writing by Mezzanine 1 Lender); and (iii) with respect to the Mezzanine 2 Loan and the Mezzanine 2 Loan Documents, any Event of Default (as defined therein) thereunder which has occurred and is

continuing (i.e., has not been cured by Mezzanine 2 Borrower) and has not been waived in writing by Mezzanine 2 Lender.

"**Executive Order**" shall mean an Executive Order of the President of the United States of America.

"**Fitch**" means Fitch Ratings, Inc. and its successor-in-interest.

"**Future Third Party Obligations**" means, with respect to each supplemental or substitute Third Party Agreement delivered in connection with a Realization Event pursuant to Section 6(a) or to comply with Conversion Conditions, as applicable, substantially the same guaranteed or indemnified obligations as the original Third Party Agreement (subject to the Deemed Exclusions) that it is supplementing or replacing as to obligations arising in respect of circumstances, acts, omissions, conditions, events and/or other matters covered by such supplemental or substitute Third Party Agreement that first occur or arise from and after the applicable Third Party Agreement Date (although such Future Third Party Obligations shall not include liability for circumstances, acts, omissions, conditions, events and/or other matters, regardless of when such circumstances, acts, omissions, conditions, events and/or other matters transpired or arose, that were actually caused by or resulted from actions taken by (regardless of when taken) the prior direct or indirect equity owners of Borrower or Senior Junior Borrower, or their respective predecessors in interests, as applicable).

"**Government Lists**" shall mean, collectively, (i) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, and (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order.

"**Guarantor**" has the meaning provided in Section 6(b).

"**Guaranty Claim**" has the meaning provided in Section 6(b).

"**Intervening Trust Vehicle**" shall mean with respect to any Securitization Vehicle that is a CDO, a trust vehicle or other Person which holds the applicable Junior Loan (or any interest therein) as collateral securing (in whole or in part) any obligation or security held by such Securitization Vehicle as collateral for the CDO.

"**Junior Borrower**" means, Mezzanine 1 Borrower and/or Mezzanine 2 Borrower, individually or collectively as the context may require.

"**Junior Borrower Group**" has the meaning provided in Section 11(d).

"**Junior Lender**" has the meaning provided in the first paragraph of this Agreement. As the context requires, Junior Lenders shall have the following order of priority: first, Mezzanine 1 Lender and second, Mezzanine 2 Lender.

"**Junior Lender Monthly Payment Notice**" has the meaning set forth in Section 15(e).

"**Junior Loan**" means the Mezzanine 1 Loan and/or the Mezzanine 2 Loan, individually or collectively, as the context may require.

"**Junior Loan Agreement**" means the Mezzanine 1 Loan Agreement and/or the Mezzanine 2 Loan Agreement, individually or collectively, as the context may require.

"**Junior Loan Default Notice**" has the meaning provided in Section 12(d).

"**Junior Loan Documents**" means the Mezzanine 1 Loan Documents and/or the Mezzanine 2 Loan Documents, individually or collectively, as the context may require.

"**Junior Loan Liabilities**" means the Mezzanine 1 Loan Liabilities and/or the Mezzanine 2 Loan Liabilities, individually or collectively, as the context may require.

"**Junior Loan Modification**" has the meaning provided in Section 8(b).

"**Junior Loan Monetary Cure Period**" has the meaning provided in Section 12(e).

"**Junior Loan Non-Monetary Cure Period**" has the meaning provided in Section 12(f).

"**Junior Loan Non-Monetary Cure Period Extension Conditions**" has the meaning provided in Section 12(f).

"**Junior Loan Purchase Option Event**" has the meaning provided in Section 14(b).

"**Junior Note**" means the Mezzanine 1 Note and/or the Mezzanine 2 Note, individually or collectively, as the context may require.

"**Junior Purchase Election Notice**" has the meaning set forth in Section 14(c).

"**Junior Purchase Notice**" has the meaning provided in Section 14(b).

"**KBRA**" shall mean Kroll Bond Rating Agency, Inc., and its successor-in-interest.

"**Kicker Conditions**" means any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises (or similar equity participation, but excluding any obligation to distribute cash otherwise available for distribution) that does not (i) become payable or otherwise impose monetary obligations prior to the date the Senior Loan Liabilities (and, in the case of a Junior Loan Modification of the Subordinate Junior Loan, the Senior Junior Loan Liabilities) are no longer outstanding, or (ii) violate any applicable law.

"**Liquid Assets**" shall mean any of the following, but only to the extent owned individually, free of all security interests, liens, pledges, charges or any other encumbrance: (i) cash, (ii) certificates of deposit (with a maturity of two years or less) issued by, or savings account with, any bank or other financial institution reasonably acceptable to Senior Lender, (iii) uncalled Capital Commitments from a Qualified Transferee, an institutional "accredited investor" within the meaning of Regulation D promulgated under the Securities Act of 1933, as amended, and/or a

"qualified institutional buyer" within the meaning of Rule 144A promulgated under the Securities Exchange Act of 1934, as amended, or (iv) marketable securities listed on a national or international exchange reasonably acceptable to Senior Lender, marked to market.

"**Loan Pledgee**" has the meaning provided in <u>Section 16(a)</u>.

"**Loan Purchase Price**" has the meaning provided in <u>Section 14(a)</u>.

"**Major Lease**" shall have the meaning provided for in the Senior Loan Agreement but shall specifically exclude any Lease (as defined in the Senior Loan Agreement) that is a residential lease.

"**Mezzanine 1 Borrower**" has the meaning provided in the Recitals hereto.

"**Mezzanine 1 Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine 1 Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine 1 Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine 1 Loan Documents**" has the meaning provided in the Recitals hereto.

"**Mezzanine 1 Loan Liabilities**" shall mean, collectively, all of the indebtedness, liabilities and obligations of Mezzanine 1 Borrower under any Mezzanine 1 Loan Document, including, without limitation, (i) the principal amount of, and accrued interest on (including, without limitation, any interest which accrues after the commencement of any Proceeding of Mezzanine 1 Borrower, whether or not such interest would be allowed in such Proceeding), the Mezzanine 1 Loan, (ii) all other indebtedness, obligations and liabilities of Mezzanine 1 Borrower to Mezzanine 1 Lender now existing or hereafter incurred or created under the Mezzanine 1 Loan Documents, and (iii) all other indebtedness, obligations and liabilities of Mezzanine 1 Borrower to Mezzanine 1 Lender now existing or hereafter incurred, created and arising from or relating to the Mezzanine 1 Loan (other than Contingent Obligations), including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

"**Mezzanine 1 Note**" has the meaning provided in the Recitals hereto.

"**Mezzanine 1 Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine 2 Borrower**" has the meaning provided in the Recitals hereto.

"**Mezzanine 2 Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine 2 Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine 2 Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine 2 Loan Documents**" has the meaning provided in the Recitals hereto.

"**Mezzanine 2 Loan Liabilities**" shall mean, collectively, all of the indebtedness, liabilities and obligations of Mezzanine 2 Borrower under any Mezzanine 2 Loan Document, including, without limitation, (i) the principal amount of, and accrued interest on (including, without limitation, any interest which accrues after the commencement of any Proceeding of Mezzanine 2 Borrower, whether or not such interest would be allowed in such Proceeding), the Mezzanine 2 Loan, (ii) all other indebtedness, obligations and liabilities of Mezzanine 2 Borrower to Mezzanine 2 Lender now existing or hereafter incurred or created under the Mezzanine 2 Loan Documents, and (iii) all other indebtedness, obligations and liabilities of Mezzanine 2 Borrower to Mezzanine 2 Lender now existing or hereafter incurred, created and arising from or relating to the Mezzanine 2 Loan(other than Contingent Obligations), including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

"**Mezzanine 2 Note**" has the meaning provided in the Recitals hereto.

"**Mezzanine 2 Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Monetary Cure Period**" has the meaning set forth in Section 12(b).

"**Moody's**" means Moody's Investors Service, Inc. and its successor-in-interest.

"**Morningstar**" shall mean Morningstar Credit Ratings, LLC, and its successor-in-interest.

"**Net Worth**" shall mean, as of a given date, (i) a Person's total assets (including, without limitation, uncalled Capital Commitments) as of such date (excluding such Person's interest in the Premises) less (ii) such Person's total liabilities (excluding contingent liabilities under non-recourse carve-out guarantees) as of such date, determined in accordance with GAAP.

"**Non-Monetary Cure Period**" has the meaning set forth in Section 12(c).

"**Non-Monetary Cure Period Extension Conditions**" has the meaning set forth in Section 12(c).

"**OFAC**" shall mean the Office of Foreign Assets Control or, if the context requires, any successor Governmental Authority.

"**Participating Holder**" shall mean, in the case of any Junior Loan, any participant or co-lender that elects to deliver a Third Party Agreement in order to satisfy the Conversion Conditions or pursuant to the terms and conditions of Section 6(a), as the case may be.

"**Permitted Fund Manager**" means any Person that on the date of determination (i) is not subject to a Proceeding, (ii) is not a Prohibited Person, (iii) is not a Prohibited Entity, (iv) is either (A) one of the entities listed on Exhibit D, any Affiliate of any such entity or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (B) an entity that is a Qualified Transferee pursuant to clause (iii)(A), (B), (C), (D), or (H) of the definition thereof, or (C) a Junior Lender, and (iv) which is investing through a fund or funds with aggregate committed capital under management of at least $250,000,000.00.

"**Permitted Investment Fund**" has the meaning set forth in the definition of "Qualified Transferee".

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, bank, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledge**" has the meaning provided in Section 16(a).

"**Premises**" has the meaning provided in the Recitals hereto.

"**Prior Payment Amount**" has the meaning set forth in Section 15(e).

"**Proceeding**" has the meaning provided in Section 11(d).

"**Prohibited Entity**" means (i) an entity the owners of which are tenants in common, or (ii) a Person capitalized with any Crowd Funding Structure (excluding an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933.

"**Prohibited Person**" means any Person:

(i)    listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders;

(ii)    that is owned or Controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224;

(iii)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including Executive Order No. 13224;

(iv)    who commits, threatens, conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v)    that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or at any replacement website or other replacement official publication of such list;

(vi)    that is subject to trade restrictions under United States law, including, without limitation, the Patriot Act, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder;

(vii)    that is listed on any Government List; or

(viii)    who is an Affiliate (as defined in the Senior Loan Agreement) of any Person that is described by or that satisfies any of clauses (i) through (vii) above.

"**Property Manager**" means the current Manager (as defined in the Senior Loan Agreement) or any successor thereto as property manager of the Premises pursuant to the Senior Loan Documents.

"**Protective Advances**" means all sums advanced for the purpose of payment of real estate taxes (including special assessments or payments in lieu of real estate taxes), maintenance costs, insurance premiums, ground rents or other items (including capital expenses and leasing costs such as (without limitation) leasing commissions and tenant improvement allowances) reasonably necessary to protect the Senior Loan Collateral or the applicable Separate Collateral respectively, or any portion thereof (including, but not limited to, all reasonable attorneys' fees, costs relating to the entry upon the Premises or any portion thereof to make repairs and the payment, purchase, contest or compromise of any encumbrance, charge or lien which in the reasonable judgment of Senior Lender or the applicable Junior Lender is reasonably likely to be prior or superior to the Senior Loan Documents or the applicable Junior Loan Documents) from forfeiture, casualty, loss or waste, including, with respect to the Senior Loan or a Junior Loan, as applicable, amounts advanced or otherwise paid by a Junior Lender pursuant to Section 12.

"**Purchase Election Notice**" has the meaning provided in Section 14(a).

"**Purchase Notice**" has the meaning provided in Section 14(a).

"**Purchase Option Event**" has the meaning provided in Section 14(a).

"**Qualified Manager**" shall mean a property manager of the Premises, which (a) (i) is a reputable management company having at least five (5) years' experience in the management of self-storage properties with similar size, scope, class, use and value as the Premises and in the jurisdiction in which the Premises are located, (ii) has, for at least five (5) years prior to its engagement as property manager, managed at least twenty (20) properties similar in size, scope, class, use and value as the Premises which comprise in the aggregate at least 5,000 self-storage units, and (iii) is not the subject of a Proceeding, or (b) any other property manager approved by Senior Lender and, if applicable, Senior Junior Lender (which approval shall not be unreasonably withheld, conditioned or delayed, it being agreed that it shall be reasonable for Senior Lender or Senior Junior Lender, as applicable, to withhold approval pending receipt of a Rating Agency Confirmation).

"**Qualified Transferee**" means (i) UBSAG or any Affiliate thereof, (ii) Apollo/Athene, TIAA or any of their respective Affiliates, or (iii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or

an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)     an institution substantially similar to any of the foregoing entities described in clause (iii)(A), clause (iii)(B) or clause (iii)(F) of this definition that satisfies the Eligibility Requirements;

(D)     any Person Controlled by, Controlling or under common Control with any one or more of the Persons described in clause (i), clause (ii), clause (iii)(A), clause (iii)(B) or clause (iii)(F) of this definition (provided that for this purpose, such Person and all such other Persons shall be aggregated as if they were one Person for purposes of measuring compliance with clause (i) of the Eligibility Requirements);

(E)     a Qualified Trustee (or, in the case of collateralized debt obligations ("**CDO**"), a single-purpose bankruptcy-remote entity which contemporaneously assigns or pledges its interest in the applicable Junior Loan or a participation interest therein (or any portion thereof or interest therein) to a Qualified Transferee) in connection with a securitization of, or the creation of a CDO secured by, or a financing through an "owner trust" of, such Junior Loan (or any portion thereof or interest therein) (any of the foregoing, a "**Securitization Vehicle**"), provided, that (1) one or more classes of securities issued by such Securitization Vehicle is initially rated at least investment grade by each of the Rating Agencies which assigned a rating to one or more classes of securities issued in connection with a Securitization (it being understood that with respect to any Rating Agency that assigned such a rating to the securities issued by such Securitization Vehicle, a Rating Agency Confirmation will not be required in connection with a transfer of such Junior Loan (or any portion thereof or interest therein) to such Securitization Vehicle (and, if DBRS is not one of such Rating Agencies, the special servicer for the Securitization Vehicle is an Approved Servicer), except that if one or more classes of securities issued in connection with a Securitization is rated by Moody's, the transferee may not rely on this clause (1) with respect to Moody's); (2) in the case of a Securitization Vehicle that is not a CDO, the special servicer of such Securitization Vehicle has the Required Special Servicer Rating at the time of Transfer and the related transaction documents for such Securitization Vehicle require that any successor special servicer have the Required Special Servicer Rating (such entity, an "**Approved Servicer**") and such Approved Servicer is required to service and administer such Junior Loan (or any portion thereof or interest therein) in accordance with servicing arrangements for the assets held by such Securitization Vehicle which require that such Approved Servicer act in accordance with a servicing standard notwithstanding any contrary direction or instruction from any other Person; or (3) in the case of a Securitization Vehicle that is a CDO, the CDO Asset Manager and, if applicable, each Intervening Trust Vehicle that is not administered and managed by a CDO Asset Manager which is a Qualified Transferee, are each a Qualified Transferee under clause (iii)(A), (B), (C), (D), (F) or (H) of this definition;

(F)     (an investment fund, limited liability company, limited partnership or general partnership (a "**Permitted Investment Fund**") where (I) a Permitted Fund Manager acts (directly or indirectly) as general partner, managing member or fund

manager, and (II) (x) at least fifty percent (50%) of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more of the following: a Junior Lender, a Qualified Transferee, an institutional "accredited investor", within the meaning of Regulation D promulgated under the Securities Act of 1933, as amended, and/or a "qualified institutional buyer" or both within the meaning of Rule 144A promulgated under the Securities Exchange Act of 1934, as amended, provided such institutional "accredited investors" or "qualified institutional buyers" that are used to satisfy the fifty percent (50%) test set forth above in this clause (F) satisfy the financial tests in clause (i) of the definition of Eligibility Requirements, or (y) such Permitted Investment Fund, collectively with one or more other Permitted Investment Funds that then hold interests in the applicable Junior Loan and are managed by such Permitted Fund Manager, in the aggregate satisfy the financial tests in clause (i) of the Eligibility Requirements; provided, further, that such institutional "accredited investors", "qualified institutional buyers" and/or the Qualified Transferees that are used to satisfy the fifty percent (50%) test set forth above in this clause (F) do not need to satisfy the experience test set forth in clause (ii) of the definition of Eligibility Requirements so long as the Permitted Fund Manager does;

(G)     any Person that is a Qualified Transferee but is acting in an agency capacity in connection with a lending syndicate, so long as more than fifty percent (50%) of the lenders in the lending syndicate (by loan balance or committed loan amounts) are Qualified Transferees; provided that the Qualified Transferees that are used to satisfy the fifty percent (50%) test set forth above in this clause (G) do not need to satisfy the experience test set forth in clause (ii) of the definition of Eligibility Requirements so long as the Qualified Transferee acting in such agency capacity does;

(H)     following a Securitization any Person for which the Rating Agencies have issued a Rating Agency Confirmation with respect to such Transfer; or

(I)     any entity that would otherwise constitute a Qualified Transferee but for the fact that it is jointly Controlled and owned equally by two entities that are each a Qualified Transferee under clause (iii)(A), (B), (C), or (F) of this definition.

Notwithstanding the foregoing, no Person shall be (or be deemed to be) a Qualified Transferee if (i) such Person is the subject of any Proceeding, (ii) such Person is a Prohibited Person or a Prohibited Entity, or (iii) such Person is the Borrower or an Affiliate of the Borrower.

"**Qualified Trustee**" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top three (3) rating categories of S&P and either Fitch or Moody's (provided, however, if the Senior Loan has been securitized, the rating requirement of any agency not a Rating Agency will be disregarded).

"**Rating Agencies**" shall mean, prior to the final Securitization of the Senior Loan, collectively, S&P, Moody's, Fitch, DBRS, KBRA and Morningstar and any other nationally-recognized statistical rating agency which has been designated by Senior Lender and, after the final Securitization of the Senior Loan, shall mean any of the foregoing that have rated any of the Certificates.

"**Rating Agency Confirmation**" means a written affirmation from each of the applicable Rating Agencies that the credit rating of the Certificates assigned by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event. In the event that (i) no Certificates are outstanding, (ii) each Rating Agency, in writing, waives, declines or refuses to review or otherwise engage any request for Rating Agency Confirmation hereunder (or fails to provide any written reply to a request by Senior Lender for a Rating Agency Confirmation hereunder within a reasonable period of time after such request has been made, as determined by Senior Lender in Senior Lender's reasonable discretion, despite Senior Lender's commercially reasonable efforts to procure such written reply), or (iii) the Senior Loan or any portion thereof or interest therein is not part of a Securitization, any action that would otherwise require a Rating Agency Confirmation shall instead require the consent of Senior Lender holding the portion of the Loan not part of a Securitization, which consent shall not be unreasonably withheld, conditioned or delayed, provided that Senior Lender shall not charge a Junior Lender any fees in connection with such consent. Nothing in the preceding sentence shall be deemed to limit or modify any independent approval or discretion right that Senior Lender may have under the Agreement or under the Senior Loan Documents. If, within ten (10) Business Days following delivery to a Rating Agency of a written request for a Rating Agency Confirmation in connection with a proposed action by any Junior Lender hereunder and all information and documents that would be reasonably required for such Rating Agency to provide a Rating Agency Confirmation for the proposed action, such Rating Agency has not replied to such request or has responded in a manner that indicates that such Rating Agency is neither reviewing such request nor waiving the requirement for a Rating Agency Confirmation, then Senior Lender shall reasonably cooperate with such Junior Lender to obtain confirmation (i) if applicable, that such Rating Agency has received such request, and (ii) whether such Rating Agency waives, declines or refuses to review or otherwise engage such request. For the purposes of this Agreement, if any Rating Agency shall, in writing, waive, decline or refuse to review or otherwise engage any request for Rating Agency Confirmation hereunder (or shall fail to provide any written reply to a request by Senior Lender for a Rating Agency Confirmation hereunder within a reasonable period of time after such request has been made, as determined by Senior Lender in Senior Lender's reasonable discretion, despite Senior Lender's commercially reasonable efforts to procure such written reply), such waiver, declination, or refusal shall be deemed to eliminate, for such request only, the condition that a Rating Agency Confirmation by such Rating Agency be obtained for purposes of this Agreement. For purposes of clarity, any such waiver, declination or refusal to review or otherwise engage in, or failure to reply to, any request for a Rating Agency Confirmation hereunder shall not be deemed a waiver, declination or refusal to review or otherwise engage in, or intention not to reply to, any subsequent request for a Rating Agency Confirmation hereunder and the condition for Rating Agency Confirmation pursuant to this Agreement for any subsequent request shall apply regardless of any previous waiver, declination or refusal to review or otherwise engage in, or failure to reply to, any prior request. For the purpose of this definition, any Rating Agency

Confirmation, waiver, request, acknowledgement or approval, from or by the applicable Rating Agency, that is required to be in writing may be in the form of electronic mail.

"**Realization Event**" has the meaning provided in <u>Section 6(a)</u>.

"**Redirection Notice**" has the meaning provided in <u>Section 16(a)</u>.

"**Required Special Servicer Rating**" means a special servicer that (i) has a rating of "CSS3" in the case of Fitch, (ii) is on S&P's select servicer list as a "U.S. Commercial Mortgage Special Servicer" in the case of S&P, (iii) in the case of Moody's, such special servicer is acting as a transaction-level special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities as the reason for such downgrade or withdrawal, (iv) in the case of Morningstar, such special servicer has a ranking by Morningstar equal to or higher than "MOR CS3" as a special servicer, is acting as special servicer in a commercial mortgage loan securitization that was rated by a Rating Agency within the twelve (12) month period prior to the date of determination, and Morningstar has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities as the reason for such downgrade or withdrawal, (v) in the case of DBRS, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by DBRS within the twelve (12) month period prior to the date of determination and DBRS has not downgraded or withdrawn the then current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities as the reason for such downgrade or withdrawal and (vi) in the case of Kroll, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Kroll within the twelve (12) month period prior to the date of determination and Kroll has not downgraded or withdrawn the then current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities as the reason for such downgrade or withdrawal.  The requirement of any rating agency that is not a Rating Agency shall be disregarded.

"**S&P**" means S&P Global Ratings, and its successor-in-interest.

"**Securitization**" has the meaning set forth in the Senior Loan Agreement as of the date hereof.

"**Securitization Vehicle**" has the meaning set forth in the definition of Qualified Transferee.

"**Security Instrument**" has the meaning provided in the Recitals hereto.

"**Senior Junior Borrower**" means, (a) with respect to the Mezzanine 1 Loan, no other Junior Borrower, and (b) with respect to the Mezzanine 2 Loan, the Mezzanine 1 Borrower.

"**Senior Junior Lender**" means, (a) with respect to the Mezzanine 1 Loan, no other Junior Lender, and (b) with respect to the Mezzanine 2 Loan, the Mezzanine 1 Lender.

"**Senior Junior Loan Agreement**" means, (a) with respect to the Mezzanine 1 Loan, no other Junior Loan Agreement, and (b) with respect to the Mezzanine 2 Loan, the Mezzanine 1 Loan Agreement.

"**Senior Junior Loan Documents**" means, (a) with respect to the Mezzanine 1 Loan, no other Junior Loan Documents, and (b) with respect to the Mezzanine 2 Loan, the Mezzanine 1 Loan Documents.

"**Senior Junior Loan Liabilities**" means, (a) with respect to the Mezzanine 1 Loan, no other Junior Loan Liabilities, and (b) with respect to the Mezzanine 2 Loan, the Mezzanine 1 Loan Liabilities.

"**Senior Junior Loan Purchase Price**" has the meaning provided in Section 14(a).

"**Senior Junior Loan**" means, (a) with respect to the Mezzanine 1 Loan, no other Junior Loan, and (b) with respect to the Mezzanine 2 Loan, the Mezzanine 1 Loan.

"**Senior Lender**" has the meaning provided in the first paragraph hereof.

"**Senior Loan**" has the meaning provided in the Recitals hereto.

"**Senior Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Senior Loan Collateral**" shall mean, collectively, the Premises and all other collateral securing the Senior Loan.

"**Senior Loan Default Notice**" has the meaning provided in Section 12(a).

"**Senior Loan Documents**" has the meaning provided in the Recitals hereto.

"**Senior Loan Liabilities**" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower under any Senior Loan Document, including, without limitation (i) the principal amount of, and accrued interest on (including, without limitation, any interest which accrues after the commencement of any Proceeding of Borrower, whether or not such interest would be allowed in such Proceeding), the Senior Loan, (ii) all other indebtedness, obligations and liabilities of Borrower to Senior Lender now existing or hereafter incurred or created under the Senior Loan Documents, and (iii) all other indebtedness, obligations and liabilities of Borrower to Senior Lender now existing or hereafter incurred, created and arising from or relating to the Senior Loan (other than Contingent Obligations), including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances, post-petition interest, and special servicing, workout and liquidation fees payable to the Servicer.

"**Senior Loan Modification**" has the meaning provided in Section 8(a).

"**Senior Note**" has the meaning provided in the Recitals hereto.

"**Separate Collateral**" means, with respect to any Junior Loan, (i) the Equity Collateral securing such Junior Loan, (ii) the accounts (and monies therein from time to time) established pursuant to the Cash Management Agreement (or a replacement cash management agreement) for such Junior Loan, and (iii) any other collateral given as security for such Junior Loan pursuant to the related Junior Loan Documents, in each case not directly constituting security for the Senior Loan or any Senior Junior Loans.

"**Servicer**" has the meaning set forth in the Senior Loan Agreement as of the date hereof.

"**Statements**" has the meaning provided in Section 15(d).

"**Subordinate Junior Borrower**" means, (a) with respect to the Mezzanine 1 Loan, Mezzanine 2 Borrower, and (b) with respect to the Mezzanine 2 Loan, no other Junior Borrower.

"**Subordinate Junior Lender**" means, (a) with respect to the Mezzanine 1 Loan, the Mezzanine 2 Lender, and (b) with respect to the Mezzanine 2 Loan, no other Junior Lender.

"**Subordinate Junior Loan**" means, (a) with respect to the Mezzanine 1 Loan, the Mezzanine 2 Loan, and (b) with respect to the Mezzanine 2 Loan, no other Junior Loan.

"**Subordinate Junior Loan Documents**" means, (a) with respect to the Mezzanine 1 Loan, the Mezzanine 2 Loan Documents, and (b) with respect to the Mezzanine 2 Loan, no other Junior Loan Documents.

"**Substitute Third Party Obligor**" means a transferee of the applicable Equity Collateral, or a Person who, alone or together with others, owns, directly or indirectly, interests in the applicable Junior Loan or the applicable Equity Collateral or Controls, directly or indirectly, the transferee of the applicable Equity Collateral, that either (a) is reasonably acceptable to Senior Lender and Senior Junior Lender, if applicable, or (b) collectively with all other Substitute Third Party Obligors satisfies a covenant to maintain a Net Worth and Liquid Assets equal to or greater than the Net Worth and Liquid Assets required for Guarantor under the Senior Loan Documents and the Junior Loan Documents; provided, however, that the obligation to maintain Liquid Assets equal to or greater than the Liquid Assets required for Guarantor under the Senior Loan Documents and the Junior Loan Documents shall be deemed satisfied and shall not be applicable in the event the Substitute Third Party Obligor is TIAA or a wholly-owned subsidiary (whether direct or indirect) of TIAA, which is Controlled by TIAA.  Notwithstanding the foregoing, no Person shall be a Substitute Third Party Obligor if (i) such Person is the subject of any Proceeding or (ii) such Person is a Prohibited Person or a Prohibited Entity.

"**Third Party Agreement**" has the meaning set forth in Section 6(a).

"**Third Party Agreement Date**" means, as applicable in connection with the delivery of any supplemental Third Party Agreement, the date and time of the applicable Realization Event or the date and time of the applicable conversion in respect of which the Conversion Conditions apply.

"**TIAA**" means Teachers Insurance and Annuity Association of America.

"**Transfer**" shall mean any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, conversion or other disposition (including, without limitation, pursuant to a foreclosure or deed or assignment-in-lieu thereof), either directly or indirectly, by operation of law or otherwise.

"**Transferring Senior Lender**" has the meaning set forth in Section 5(d).

"**UBSAG**" means UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, and its successors in interest.

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)      all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other gender;

(ii)      all capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Senior Loan Agreement as of the date hereof, or, with respect to any defined term that has been amended pursuant to an amendment in accordance with the Senior Loan Documents and this Agreement, a copy of which amendment has been given to the Junior Lenders in accordance with the notice provisions hereof and acknowledged by the Junior Lenders as effective for the purposes of this clause (ii) only (nothing in this clause (ii) being deemed to waive, amend, restated, replace, supplement or otherwise modify any provisions of Section 8(a) hereof or otherwise to grant any Junior Lender any right of consent with respect to any Senior Loan Modification not otherwise expressly set forth in Section 8(a) hereof), the meaning assigned to such term in such amendment;

(iii)      all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)      a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)      the headings and captions used in this Agreement are for convenience of reference only and do not define, limit or describe the scope or intent of the provisions of this Agreement;

(vi)      the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vii)      the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(viii)    the words "to a Junior Lender's knowledge" or "to the knowledge of a Junior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of a Junior Lender with direct oversight responsibility for its Junior Loan without independent investigation or inquiry and without any imputation whatsoever;

(ix)    the words "to Senior Lender's knowledge" or "to the knowledge of Senior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever;

(x)    unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined; and

(xi)    the use of terms "**Junior Lender**", "**Senior Junior Lender**", or "**Subordinate Junior Lender**" to refer to any Person shall include, as applicable, each permitted designee of such Person that takes title to (a) Equity Collateral pursuant to a Realization Event, or (b) the Senior Loan or the Senior Junior Loan pursuant to a purchase thereof in accordance with Section 14.

**Section 2.    Characterization of the Senior Loan and the Junior Loans**.

(a)    Senior Loan.  Each Junior Lender, with respect only to its Junior Loan and with respect to itself only, hereby acknowledges that (i) Borrower will not ever have any liability or obligation whatsoever with respect to the Junior Notes or otherwise in connection with the payment of the Junior Loans, (ii) the Junior Loans do not constitute or impose, and shall not be deemed or construed as constituting or imposing now or hereafter, a lien or encumbrance upon, or security interest in any portion of the Senior Loan Collateral or otherwise grant to any Junior Lender the status of a creditor of Borrower, (iii) such Junior Lender shall not assert, claim or raise as a defense, any such lien, encumbrance upon or security interest in any portion of the Senior Loan Collateral or any status as a creditor of Borrower in any action or proceeding, including any Proceeding commenced by or against Borrower and (iv) such Junior Lender shall not assert, pursue, confirm or acquiesce in any way to any recharacterization of the Junior Loans as having conferred upon any Junior Lender any lien or encumbrance upon, or security interest in, the Senior Loan Collateral or any portion thereof or as having conferred upon such Junior Lender the status of a creditor of Borrower.

(b)    Mezzanine 1 Loan.  Mezzanine 1 Lender hereby acknowledges that (i) no Junior Borrower other than Mezzanine 1 Borrower will ever have any liability or obligation whatsoever with respect to the Mezzanine 1 Note or otherwise in connection with the payment of the Mezzanine 1 Loan; (ii) the Mezzanine 1 Loan does not constitute or impose, and shall not be deemed or construed as constituting or imposing now or hereafter, a lien or encumbrance upon, or security interest in any portion of the Separate Collateral securing any Junior Loan other than the Mezzanine 1 Loan; (iii) the Mezzanine 1 Loan does not grant to Mezzanine 1 Lender the status of a creditor of any Junior Borrower other than Mezzanine 1 Borrower; (iv)  Mezzanine 1 Lender shall not assert, claim or raise as a defense, any such lien or encumbrance upon, or security interest in any portion of the Separate Collateral securing any Junior Loan other than the Mezzanine 1 Loan; (v)  Mezzanine 1 Lender shall not assert, claim or raise as a defense any status as a creditor

of any Junior Borrower other than Mezzanine 1 Borrower in any action or proceeding, including any Proceeding commenced by or against Mezzanine 1 Borrower; and (vi)  Mezzanine 1 Lender shall not assert, pursue, confirm or acquiesce in any way to any recharacterization of the Mezzanine 1 Loan as having conferred upon Mezzanine 1 Lender any lien or encumbrance upon, or security interest in, the Separate Collateral securing any Junior Loan other than the Mezzanine 1 Loan or as having conferred upon Mezzanine 1 Lender the status of a creditor of any Junior Borrower other than Mezzanine 1 Borrower.

(c)     <u>Mezzanine 2 Loan</u>.  Mezzanine 2 Lender hereby acknowledges that (i) no Junior Borrower other than the Mezzanine 2 Borrower will ever have any liability or obligation whatsoever with respect to the Mezzanine 2 Note or otherwise in connection with the payment of the Mezzanine 2 Loan; (ii) the Mezzanine 2 Loan does not constitute or impose, and shall not be deemed or construed as constituting or imposing now or hereafter, a lien or encumbrance upon, or security interest in any portion of the Separate Collateral securing any Junior Loan other than the Mezzanine 2 Loan; (iii) the Mezzanine 2 Loan does not grant to Mezzanine 2 Lender the status of a creditor of any Junior Borrower other than Mezzanine 2 Borrower; (iv) Mezzanine 2 Lender shall not assert, claim or raise as a defense, any such lien or encumbrance upon, or security interest in the Separate Collateral securing any Junior Loan other than the Mezzanine 2 Loan; (v) Mezzanine 2 Lender shall not assert, claim or raise as a defense any status as a creditor of any Junior Borrower other than Mezzanine 2 Borrower in any action or proceeding, including any Proceeding commenced by or against Mezzanine 2 Borrower; and (vi) Mezzanine 2 Lender shall not assert, pursue, confirm or acquiesce in any way to any recharacterization of the Mezzanine 2 Loan as having conferred upon Mezzanine 2 Lender any lien or encumbrance upon, or security interest in, the Separate Collateral securing any Junior Loan other than the Mezzanine 2 Loan or as having conferred upon Mezzanine 2 Lender the status of a creditor of any Junior Borrower other than Mezzanine 2 Borrower.

(d)     <u>Junior Loans</u>.  Senior Lender hereby acknowledges that (i) no Junior Borrower will ever have any liability or obligation whatsoever with respect to the Senior Note or otherwise in connection with the payment of the Senior Loan; (ii) the Senior Loan does not constitute or impose, and shall not be deemed or construed as constituting or imposing now or hereafter, a lien or encumbrance upon, or security interest in any portion of the Separate Collateral securing any Junior Loan, and the Separate Collateral securing any Junior Loan is not collateral for the Senior Loan; (iii) the Senior Loan does not grant to Senior Lender the status of a creditor of any Junior Borrower; (iv) Senior Lender shall not assert, claim, or raise as a defense, any such lien or encumbrance upon, or security interest in the Separate Collateral securing any Junior Loan; (v) Senior Lender shall not assert, claim, or raise as a defense any status as a creditor of any Junior Borrower in any action or proceeding, including any Proceeding commenced by or against any Junior Borrower; and (vi) Senior Lender shall not assert, pursue, confirm, or acquiesce in any way to any recharacterization of the Senior Loan as having conferred upon Senior Lender any lien or encumbrance upon, or security interest in, the Separate Collateral securing any Junior Loan or as having conferred upon Senior Lender the status of a creditor of any Junior Borrower, and (vii) Junior Lenders may obtain title to their respective Separate Collateral subject to the terms of <u>Section 6</u> and Senior Lender hereby consents thereto.  Notwithstanding any provisions herein to the contrary, Senior Lender agrees that no default or Event of Default under any of the Junior Loan Documents shall, in and of itself, constitute or give rise to a default or Event of Default under the Senior Loan Documents, entitle Senior Lender to accelerate payments under the Senior Loan

Documents or entitle Senior Lender to modify any provisions of the Senior Loan Documents; provided, however, the circumstances giving rise to a default or Event of Default under the Junior Loan Documents may independently give rise to a default or Event of Default under the Senior Loan Documents as provided for therein.  Notwithstanding any provisions herein to the contrary, Senior Junior Lender agrees that no default or Event of Default under any Subordinate Junior Loan Documents shall, in and of itself, constitute or give rise to a default or Event of Default under the Senior Junior Loan Documents, entitle Senior Junior Lender to accelerate payments under the Senior Junior Loan Documents or entitle Senior Junior Lender to modify any provisions of the Senior Junior Loan Documents; provided, however, the circumstances giving rise to a default or Event of Default under any Subordinate Junior Loan Documents may independently give rise to a default or Event of Default under the Senior Junior Loan Documents as provided for therein.

Section 3.    **Approval of Loans and Loan Documents**.

(a)    Junior Lenders.  Each Junior Lender hereby acknowledges (with respect to itself only) that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and each of the Junior Loans (other than the Junior Loan held by such Junior Lender) and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents and each of the Junior Loan Documents (other than the Junior Loan Documents relating to the Junior Loan held by such Junior Lender); (ii) the execution, delivery and performance of the Senior Loan Documents and each of the Junior Loan Documents (other than the Junior Loan Documents relating to the Junior Loan held by such Junior Lender) will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Junior Loan Documents relating to the Junior Loan held by such Junior Lender; (iii) none of Senior Lender or any of the other Junior Lenders is under any obligation or duty to, nor has Senior Lender or any of the other Junior Lenders represented that it will, see to (A) the application of the proceeds of the Senior Loan and (B) the application of the proceeds of any Junior Loan; (iv) (A) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents and (B) any application or use of the proceeds of any Junior Loan (other than the Junior Loan held by such Junior Lender) for purposes other than those provided in the related Junior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the related Junior Loan Documents; and (v) any conditions precedent to such Junior Lender's consent to the other Junior Loans as set forth in such Junior Lender's Junior Loan Documents or any other agreements with the applicable Junior Borrower, as they apply to the other Junior Loan Documents or the making of the other Junior Loans, have been either satisfied or waived.

(b)    Senior Lender.  Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Junior Loans and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Junior Loan Documents; (ii) the execution, delivery and performance of the Junior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents; (iii) none of the Junior Lenders is under any obligation or duty to, nor has any Junior Lender represented that it will, see to the application of the proceeds of the Junior

Loans; (iv) any application or use of the proceeds of the Junior Loans for purposes other than those provided in the Junior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Junior Loan Documents; (v) any conditions precedent to Senior Lender's consent to the Junior Loans as set forth in the Senior Loan Documents or any other agreements with any Borrower Party, as they apply to the Junior Loan Documents or the making of the Junior Loans, have been either satisfied or waived; and (vi) any Junior Lender may obtain title to its respective Separate Collateral pursuant to the terms of <u>Section 6</u> hereof and Senior Lender consents thereto.

**Section 4.** **Representations and Warranties**.

(a)    <u>Senior Lender</u>.  Senior Lender hereby represents and warrants as follows:

(i)    <u>Exhibit A</u> attached hereto and made a part hereof is a true, correct and complete listing of all of the Senior Loan Documents (including all amendments, modifications, replacements, restatements, and supplements thereof) as of the date hereof. To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents, including, without limitation, any breach of any of the representations and warranties made by any Borrower Party in the Senior Loan Documents. The Senior Loan has been fully funded.

(ii)    Senior Lender is the legal and beneficial owner of the entire Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii)    There are no conditions precedent to the effectiveness of this Agreement with respect to the Senior Loan that have not been satisfied or waived.

(iv)    Senior Lender has, independently and without reliance upon Junior Lenders and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought at law or in equity.

(viii)    To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or

declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any material contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such material contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)    The Senior Loan is not cross-defaulted with any other loan. The Premises do not secure any other loan from Senior Lender to any Borrower Party or any other Person other than the Senior Loan.

(b)    <u>Junior Lenders</u>. Each Junior Lender hereby severally represents and warrants, for and with respect to itself only, as follows:

(i)    There are no conditions precedent to the effectiveness of this Agreement with respect to such Junior Loan that have not been satisfied or waived.

(ii)    Such Junior Lender has, independently and without reliance upon Senior Lender or any other Junior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(iii)    Such Junior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(iv)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of such Junior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(v)    Such Junior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of such Junior Lender enforceable against such Junior Lender in accordance with its terms subject to

(x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought at law or in equity.

(vi)    To the knowledge of such Junior Lender, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by such Junior Lender of this Agreement or consummation by such Junior Lender of the transactions contemplated by this Agreement.

(vii)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of such Junior Lender, (w) to such Junior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any material contract, mortgage, lease, bond, indenture, agreement, or other instrument to which such Junior Lender is a party or to which any of its properties are subject, (x) to such Junior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of such Junior Lender pursuant to the terms of any such material contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (provided, however, that such Junior Lender and any holder of any interest in a Junior Loan shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Junior Loan held by such Junior Lender or any portion thereof to a Loan Pledgee as contemplated by the provisions of <u>Section 16</u>), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which such Junior Lender has knowledge against, or binding upon, such Junior Lender or upon any of the securities, properties, assets, or business of such Junior Lender or (z) to such Junior Lender's knowledge, constitute a violation by such Junior Lender of any statute, law or regulation that is applicable to such Junior Lender.

(c)    <u>Mezzanine 1 Lender</u>.  Mezzanine 1 Lender hereby represents and warrants as follows:

(i)    <u>Exhibit B</u> attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine 1 Loan Documents (including all amendments, modifications, replacements, restatements and supplements thereof) as of the date hereof. To Mezzanine 1 Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine 1 Loan Documents, including, without limitation, any breach of any of the representations and warranties made by any Borrower Party in the Mezzanine 1 Loan Documents.  The Mezzanine 1 Loan has been fully funded.

(ii)    Mezzanine 1 Lender is the legal and beneficial owner of the entire Mezzanine 1 Loan free and clear of any lien, security interest, option or other charge or

encumbrance, other than any lien or security interest granted to any Loan Pledgee as contemplated by the provisions of <u>Section 16</u>.

(iii)    The Mezzanine 1 Loan is not cross-defaulted with any loan other than the Senior Loan.  The Senior Loan Collateral does not secure any loan from Mezzanine 1 Lender to Mezzanine 1 Borrower or any other Affiliate of Borrower.

(iv)    Mezzanine 1 Lender is a Qualified Transferee as such term is defined herein.

(d)    <u>Mezzanine 2 Lender</u>.    Mezzanine 2 Lender hereby represents and warrants as follows:

(i)    <u>Exhibit C</u> attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine 2 Loan Documents (including all amendments, modifications, replacements, restatements and supplements thereof) as of the date hereof. To Mezzanine 2 Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine 2 Loan Documents, including, without limitation, any breach of any of the representations and warranties made by any Borrower Party in the Mezzanine 2 Loan Documents.  The Mezzanine 2 Loan has been fully funded.

(ii)    Mezzanine 2 Lender is the legal and beneficial owner of the entire Mezzanine 2 Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee as contemplated by the provisions of <u>Section 16</u>.

(iii)    The Mezzanine 2 Loan is not cross-defaulted with any loan other than the Senior Loan and the Mezzanine 1 Loan.  The Senior Loan Collateral does not secure any loan from Mezzanine 2 Lender to Mezzanine 2 Borrower or any other Affiliate of Borrower.

(iv)    Mezzanine 2 Lender is a Qualified Transferee as such term is defined.

**Section 5.**    <u>**Transfer of Junior Loans or Senior Loan**</u>.

(a)    No Junior Lender shall Transfer more than forty-nine percent (49%) of its interests in its respective Junior Loan (when aggregated with all prior Transfers of interests in such Junior Loan that are not to Qualified Transferees) in each case unless, with respect to the excess over forty-nine percent (49%), either (i)  a Rating Agency Confirmation has been given with respect to such Transfer (and in the case of such a Transfer of interests in the Subordinate Junior Loan, approval by the Senior Junior Lender has been given with respect to such Transfer), which in either case the related transferee shall thereafter be deemed to be a "Qualified Transferee" for all purposes of this Agreement; (ii) such Transfer is to a Qualified Transferee; (iii) such Transfer complies with <u>Section 6</u>; or (iv) such Transfer complies with <u>Section 14</u> or <u>Section 16</u>.  For the avoidance of doubt, at all times one or more Qualified Transferees must own at least a fifty-one percent (51%) of legal and beneficial interests in each Junior Loan and control the management, administration and enforcement of the Junior Loan held by such Junior Lender.  Any such

transferee of a direct interest in a Junior Loan (excluding participants and Loan Pledgees (prior to the realization on the pledged Junior Loan)) must assume in writing the obligations of the applicable Junior Lender hereunder from and after the date of such Transfer and agree to be bound by the terms and provisions hereof (in which event the transferring Person or Persons shall be released from obligations hereunder accruing after the date of such assumption with respect to the transferred interest). Such proposed transferee (other than a Loan Pledgee (prior to its realization on the pledged Junior Loan) or a participant in connection with a participation of the applicable Junior Loan) shall also remake each of the representations and warranties contained herein made by the transferring Junior Lender as of the date of Transfer (except (w) with respect to the representations made in the first and last sentences of Section 4(c)(i) or 4(d)(i), as applicable, such representations may be qualified to such transferee's knowledge, (x) with respect to the representations made in Section 4(c)(ii) or 4(d)(ii), as applicable, such transferee shall only be required to make such representation with respect to the portion of the Junior Loan it is assuming, (y) with respect those made in Sections 4(b)(iii), 4(b)(iv) and 4(b)(v) that refer to the execution and delivery of this Agreement, such representations shall be deemed to refer to the execution and delivery of each document or instrument by which such Person assumed its obligations under this Agreement and (z) with respect to the second sentence of Section 4(c)(i) or 4(d)(i), as applicable, to the extent that a Junior Lender has knowledge that a default exists under its Junior Loan, in which case, such Junior Lender shall describe the default) for the benefit of Senior Lender and the other Junior Lender. Notwithstanding anything herein to the contrary, each Junior Lender shall have the right to Transfer (i) up to and including forty-nine percent (49%) of its interest in the aggregate in its respective Junior Loan to any Person, and (ii) more than forty-nine percent (49%) of its interests in its respective Junior Loan (or any other interests therein) to a Qualified Transferee, in each case without the consent of Senior Lender or the other Junior Lender and without a Rating Agency Confirmation; provided, however, more than forty-nine percent (49%) of its interests in any Junior Loan (or any other interest therein) shall not be transferred, in the aggregate, to one or more Prohibited Entities. Notwithstanding anything contained herein to the contrary, neither any Junior Lender nor any Loan Pledgee may Transfer all or any portion of its respective beneficial interest in a Junior Loan to Borrower or any Junior Borrower or any Affiliate of Borrower or any Junior Borrower and any Transfer of any interest in any Junior Loan to Borrower, any Junior Borrower or an Affiliate of Borrower or any Junior Borrower shall be void *ab initio* unless such Transfer results in the substantially contemporaneous extinguishment of such Junior Loan. Nothing in this Agreement shall be deemed to prohibit the transfer of any direct or indirect equity interest in any Junior Lender, so long as such Junior Lender remains a Qualified Transferee after such transfer. Notwithstanding anything to the contrary herein, Apollo/Athene shall be permitted to Transfer all or any portion of the Mezzanine 1 Loan to any trust account established by Apollo/Athene or permit a reinsurer advised by Apollo/Athene to hold the Mezzanine 1 Loan "in trust" pursuant to and in compliance with the obligations of any reinsurance transaction entered into between Apollo/Athene and the beneficiary of such trust account, without the consent of Senior Lender or Subordinate Junior Lender, and such transfer shall not constitute a "Transfer" for the purposes of this Section 5; solely to the extent that the following are satisfied: (i) Apollo/Athene retains control over the Mezzanine 1 Loan or applicable portion thereof, (ii) Apollo/Athene retains ownership and control over the trust account, (iii) Apollo/Athene shall continue to be the Mezzanine 1 Lender for purposes of this Agreement, (iv) as a condition precedent to any Transfer of the Mezzanine 1 Loan to a beneficiary of any such trust account or the reinsurer holding the Mezzanine 1 Loan other than "in trust" pursuant to the terms of any

reinsurance agreement, such Transfer shall be required to satisfy requirements of Section 5 and (v) to the extent there is a trustee with respect to such reinsurance trust, the trustee is Apollo/Athene.

(b)      Within five (5) Business Days after a Transfer of more than forty-nine percent (49%) of its interests in the applicable Junior Loan, the applicable Junior Lender shall provide to Senior Lender, the other Junior Lender, and, if any Certificates are outstanding and rated by any Rating Agency, to the Rating Agencies, a certification that such Transfer was made in accordance with this Section 5, such certification to include the name and contact information of the applicable transferee.  This Section 5(b) shall not apply to Transfers made in accordance with Section 16 to Loan Pledgees (prior to its realization on the pledged Junior Loan).

(c)      Each Junior Lender acknowledges that (i) any Rating Agency Confirmation or approval by Senior Lender or the other Junior Lender may be granted or denied by Senior Lender, the Rating Agencies or the other Junior Lender in their sole and absolute discretion (unless otherwise specified herein), and (ii) that, in connection with any such Rating Agency Confirmation, such Rating Agencies may charge customary fees in connection with any such action, which shall be paid by the transferring Junior Lender.  Senior Lender agrees to use commercially reasonable efforts to assist the transferring Junior Lender in promptly obtaining any such Rating Agency Confirmation, provided that the transferring Junior Lender shall reimburse Senior Lender for any reasonable out-of-pocket costs and expenses incurred by Senior Lender in connection therewith.

(d)      Senior Lender may, from time to time, in its sole discretion Transfer all or any part of the Senior Loan or any interest therein (the "**Transferring Senior Lender**"), provided the Transfer is made subject to this Agreement and provided further that any direct transferee (other than in connection with a Securitization provided the Transfer is made subject to this Agreement) (i) assumes in writing the obligations of Transferring Senior Lender hereunder accruing from and after such Transfer and (ii) agrees to be bound by the terms and provisions hereof.  Upon any Transfer of all or any part of its portion of the Senior Loan or any interest therein in accordance with the terms of this Agreement, the applicable Transferring Senior Lender shall be released from obligations hereunder accruing after the date of such assumption with respect to the transferred interest.  Notwithstanding any such Transfer or subsequent Transfer by a transferee of Transferring Senior Lender, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Junior Loans and the Junior Loan Documents in accordance with the terms and provisions of this Agreement.  Notwithstanding the foregoing, but subject to the following sentence, Senior Lender may, at any time, and from time to time, in its sole discretion, grant, issue or sell participations, sub-participations or other indirect, contractual interests in the Senior Loan to any Person.  Transferring Senior Lender may not Transfer any legal or beneficial interest in the Senior Loan to Borrower or any Affiliate of Borrower, and any transfer in violation of this sentence shall be void *ab initio*, provided, however, that the aforesaid prohibition shall not apply to a Transfer in accordance with the terms of Section 14 below by Senior Lender to any Junior Lender or an Affiliate thereof that has acquired title to Equity Collateral.  Notwithstanding the foregoing prohibition, Borrower or any Affiliate of Borrower may purchase any Certificates issued in connection with a Securitization of the Senior Loan (or any portion thereof or interest therein) and no such purchase by Borrower or any Affiliate of Borrower shall cause the trustee of any Securitization of the Senior Loan or any portion thereof or interest therein (or the Securitization Vehicle holding the Senior Loan or any portion thereof or

interest therein) to be an Affiliate of Borrower so long as the applicable pooling and servicing agreement provides that once acquired by Borrower or any Affiliate of Borrower, such Certificates will be non-controlling Certificates with respect to the Senior Loan and in no event shall Borrower or any Affiliate of Borrower serve as "operating advisor," "directing holder" or in a similar capacity with respect to the Senior Loan, or be appointed as a special servicer for the Senior Loan. Transferring Senior Lender shall give each Junior Lender written notice of any Transfer of the Senior Loan with the name and contact information of the transferee within five (5) Business Days following each such Transfer, provided that no notice shall be required in connection with the Transfers made to a depositor and by such depositor into a securitization trust in connection with the Securitization of the Senior Loan or any portion thereof or interest therein or in connection with Transfers made thereafter of Certificates issued pursuant to such Securitization.

(e)     If more than one Person shall hold a direct interest in a Junior Loan, the holder(s) of more than fifty percent (50%) of the principal amount of such Junior Loan (unless the applicable participation agreement or co-lender agreement between or among the holders of the applicable Junior Loan provides a different designation mechanism, which different mechanism shall be specified in such notice and upon which Senior Lender and the other Junior Lender shall be entitled to rely upon without independent investigation) shall designate by written notice to Senior Lender and the other Junior Lender one of such Persons (or a servicer on their behalf) (a "**Directing Junior Lender**") to act on behalf of all such Persons holding an interest in such Junior Loan.  Except as otherwise agreed in writing by Senior Lender and the Junior Lender, a Directing Junior Lender shall have the sole right to receive any notices which are required to be given or which may be given to the Junior Lender holding the applicable Junior Loan pursuant to this Agreement and to exercise the rights and powers given to the Junior Lender holding the applicable Junior Loan hereunder, including any approval rights of the Junior Lender holding the applicable Junior Loan; provided, that until a Directing Junior Lender has been so designated, the last Person known to Senior Lender and the other Junior Lender to hold more than a fifty percent (50%) direct interest in the applicable Junior Loan shall be deemed to be the Directing Junior Lender for such Junior Loan.  Once a Directing Junior Lender has been designated hereunder with respect to a Junior Loan, Senior Lender and each other Junior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than fifty percent (50%) of the principal amount of the applicable Junior Loan of the designation of a different Person to act as the Directing Junior Lender for such Junior Loan (unless the applicable participation or co-lender agreement between or among the holders of the applicable Junior Loan provides a different designation mechanism, which different mechanism shall be specified in such notice and upon which Senior Lender and the other Junior Lender shall be entitled to rely upon without independent investigation).  Notwithstanding any provision of this Section 5(e) to the contrary, each Person holding an interest in a Junior Loan shall be deemed to be a Junior Lender with respect to the applicable Junior Loan for purposes of the rights and restrictions contained in Sections 5(a), (b) and (c), and shall be subject to the rights and restrictions thereof with respect to such Person's interest in the applicable Junior Loan.

(f)     If more than one Person shall hold a direct interest in the Senior Loan, the holder(s) of more than fifty percent (50%) of the principal amount of the Senior Loan (unless the applicable participation agreement or co-lender agreement between or among the holders of the Senior Loan provides a different designation mechanism, which different mechanism shall be specified in such notice and upon which each Junior Lender shall be entitled to rely upon without independent

investigation) shall designate by written notice to the Junior Lenders one of such Persons (a "**Directing Senior Lender**") to act on behalf of all such Persons holding an interest in the Senior Loan.  The Directing Senior Lender shall have the sole right to receive any notices which are required to be given or which may be given to Senior Lender pursuant to this Agreement and to exercise the rights and powers given to Senior Lender hereunder, including any approval rights of Senior Lender; provided, that until a Directing Senior Lender has been so designated, the last Person known to the Junior Lenders to hold more than a fifty percent (50%) direct interest in the Senior Loan shall be deemed to be the Directing Senior Lender.  Once a Directing Senior Lender has been designated hereunder with respect to the Senior Loan, Junior Lenders shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than fifty percent (50%) of the principal amount of the Senior Loan of the designation of a different Person to act as the Directing Senior Lender for the Senior Loan (unless the applicable participation or co-lender agreement between or among the holders of the Senior Loan provides a different designation mechanism, which different mechanism shall be specified in such notice and upon which Junior Lenders shall be entitled to rely upon without independent investigation). Notwithstanding any provision of this Section 5(f) to the contrary, each Person holding an interest in the Senior Loan shall be deemed to be a Senior Lender for purposes of the rights and restrictions contained in Sections 5(a), (b), (c) and (d), and shall be subject to the rights and restrictions thereof with respect to such Person's interest in the Senior Loan.

Section 6.    **Foreclosure of Separate Collateral**.

(a)    No Junior Lender shall complete foreclosure, assignment-in-lieu or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral or selling or otherwise transferring the Equity Collateral or exercising the voting power in respect of the Equity Collateral pursuant to rights granted in the applicable Junior Loan Documents to direct or cause the direction of the management or policies of Borrower (it being acknowledged and agreed that in the case of such voting power, the mere grant of such voting power in the applicable Junior Loan Documents shall not constitute a Realization Event, provided that, the affirmative exercise of such voting power to direct or cause the direction of the management or policies of Borrower or Senior Junior Borrower, as applicable, by or on behalf of the applicable Junior Lender shall constitute a Realization Event) (a "**Realization Event**"; for the avoidance of doubt, isolated instances of exercising consent or approval rights afforded to a Junior Lender in the applicable Junior Loan Documents and actions to prevent the occurrence of an event that would trigger recourse liability under the Senior Loan or the Senior Junior Loan, if applicable, and any other exercise of remedies by a Junior Lender to the extent the same does not result in a realization upon such Junior Lender's Equity Collateral or an exercise of voting power, as applicable, shall not, in and of themselves, constitute a Realization Event) without (i) a Rating Agency Confirmation (if any Certificates are outstanding and rated by at least one Rating Agency) or the approval of the Senior Lender (if there are no Certificates outstanding that are rated by at least one Rating Agency), and (ii) the approval of the Senior Junior Lender, if applicable (not to be unreasonably withheld, conditioned or delayed), in each case unless (1) the transferee of the title to the Equity Collateral (with respect to a Transfer of the Equity Collateral) or the applicable Person controlling Borrower and the Premises (with respect to any Realization Event that is not a Transfer of the Equity Collateral) is, in either case, a Qualified Transferee and (2) the Premises will be managed by a Qualified Manager selected by such Junior Lender or Qualified Transferee, as applicable, within thirty (30) days after the Realization Event; it being acknowledged and agreed

that notwithstanding anything to the contrary contained herein (including, without limitation, Section 6(h)), it shall not be a condition to commencing or completing a Realization Event that (x) the applicable Junior Lender or such transferee cures any default under the Senior Loan or the Senior Junior Loan, if applicable, which remains outstanding as of the date of the Realization Event (including, without limitation, due to failure to repay the Senior Loan or the Senior Junior Loan, if applicable, on the respective maturity date thereof) or (y) the applicable Junior Lender has exercised any right hereunder to purchase the Senior Loan and the Senior Junior Loan, if applicable; provided, however, that nothing in this sentence is intended as (i) a waiver by Senior Lender or Senior Junior Lender of any such default or of any rights or remedies Senior Lender or Senior Junior Lender may have as a result of such default or otherwise under the Senior Loan Documents or Senior Junior Loan Documents, at law or in equity or (ii) any agreement on the part of Senior Lender or Senior Junior Lender to extend the term of the Senior Loan or Senior Junior Loan or otherwise modify any of the Senior Loan Documents or Senior Junior Loan Documents in any respect except as expressly set forth herein, including, without limitation, in Section 6(c) below. The transferee of the Equity Collateral in connection with any such foreclosure or other realization may replace any Independent Director relating to such Equity Collateral that is an individual with another Person satisfying the requirements of an Independent Director under the applicable Senior Loan Documents or Senior Junior Loan Documents, as applicable. Additionally, the transferee of the Equity Collateral shall deliver a new non-consolidation opinion relating to the transferee acceptable to the Rating Agencies (if any Certificates are outstanding and rated by at least one Rating Agency) or reasonably acceptable to the Senior Lender (if there are no Certificates outstanding that are rated by at least one Rating Agency) and reasonably acceptable to the Senior Junior Lender (if applicable) within ten (10) Business Days after the Realization Event. Upon consummation of any Realization Event pursuant to this Section 6(a), the applicable Junior Lender shall provide (to Senior Lender, the Senior Junior Lender (if applicable) and the Rating Agencies) notice of the Realization Event and an officer's certificate from an officer of such Junior Lender certifying that all applicable conditions set forth in this Section 6(a) have been satisfied (except with respect to conditions that by the terms of this Section 6 are to be satisfied after the Realization Event, as to which the applicable Junior Lender shall provide one or more additional certificates as of the date or dates on which such conditions are respectively satisfied in accordance herewith). Senior Lender and Senior Junior Lender (if applicable) may request reasonable evidence that the requirements of Sections 6(a)(ii)(1) and (2) have been satisfied. Regardless of whether or not any Realization Event results in the explicit release from future liability of any guarantor, indemnitor, pledgor, or other obligor under the Senior Loan and/or the Senior Junior Loan, if any, or the Senior Loan Documents or any Senior Junior Loan Documents as of the Closing Date, or under any other guaranty, pledge or indemnity which may constitute a Senior Loan Document and/or Senior Junior Loan Document, if any, that is entered into after the Closing Date and has been approved by the applicable Junior Lender to the extent such Junior Lender approval is required under this Agreement (each, a "**Third Party Agreement**"), the applicable Junior Lender (or the transferee of its Equity Collateral) shall, as a condition precedent to completing any such Realization Event (other than solely obtaining the appointment of a court appointed receiver or similar court appointed agent with respect to the Equity Collateral), cause a Substitute Third Party Obligor to execute and deliver as of the date of such Realization Event to Senior Lender and, if applicable, Senior Junior Lender a substitute Third Party Agreement, in each case in a form substantially similar to the original Third Party Agreement that it is replacing (subject to the Deemed Exclusions), pursuant to which (x) in the event such Junior Lender has obtained title to the Equity

Collateral or the Equity Collateral is sold or transferred (a "**Divesting Event**"), such Substitute Third Party Obligor shall guaranty or indemnify, as applicable, only the Future Third Party Obligations (and only to the extent arising from and after the date of such Divesting Event) and (y) in the event the Realization Event does not involve such Junior Lender taking title to the Equity Collateral or the Equity Collateral being sold or transferred but involves such Junior Lender directing or causing the direction of the management or policies of the Equity Collateral (a "**Control Event**"), such Substitute Third Party Obligor shall guaranty or indemnify, as applicable, only the Future Third Party Obligations only to the extent such action was directly caused by or directly results from Junior Lender's exercise of its rights to vote on, direct or manage the affairs of Borrower (and only to the extent first arising from and after such Control Event); provided, however, that in the event such Junior Loan has Participating Holders, one or more Participating Holders may deliver separate Third Party Agreements, which Third Party Agreements (I) in the aggregate shall guaranty or indemnify, as applicable, one hundred percent (100%) of the Future Third Party Obligations, and (II) shall be on a several basis limiting the respective liability of each Substitute Third Party Obligor under such substitute Third Party Agreement to a pro rata portion (based on the percentage interest held by such Participating Holder (as such percentage interest of such Participating Holder may be increased by an amount equal to the portion identified in such substitute Third Party Agreement as the percentage interest in the Junior Loan held by each applicable Covered Holder, if any, being covered by the substitute Third Party Agreement being delivered by such Participating Holder) in such Junior Loan as of the date of the applicable Realization Event) of the Future Third Party Obligations from respective Substitute Third Party Obligors.  For the avoidance of doubt, such Junior Lender shall be required to deliver or cause a Substitute Third Party Obligor to deliver a substitute Third Party Agreement described in clause (x) upon the occurrence of a Divesting Event even though such Junior Lender previously delivered or caused to be delivered a substitute Third Party Agreement described in clause (y) upon the occurrence of a prior Control Event.

(b)    Nothing contained herein shall limit or restrict the right of the Junior Lenders to exercise their rights and remedies, at law, in equity or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral (including exercising any remedy against any guarantor pursuant to any guaranty or indemnity granted to any Junior Lender as additional collateral to secure the obligations under the applicable Junior Loan Documents) in accordance with this Agreement and to apply the proceeds therefrom as they deem appropriate in their discretion, including exercising any remedy against any guarantor or indemnitor (each a "**Guarantor**") pursuant to any guaranty or indemnity granted to such Junior Lender as additional collateral to secure the obligations under the related Junior Loan Documents (a "**Guaranty Claim**"); provided, however, each Junior Lender agrees that it shall not seek or pursue the enforcement of any judgments against a Common Guarantor (but shall not be precluded from obtaining a judgment in any event) pursuant to this Section 6(b) unless (i) it has delivered to Senior Lender (and, in the case of a Subordinate Junior Lender, to each Senior Junior Lender) prior written notice thereof, and (ii)  the proceeds of any such enforcement are promptly turned over:

(c)    (1)    to Senior Lender (to be held in trust for the Junior Lender turning over such proceeds and to be returned or applied by Senior Lender to the Senior Loan Liabilities as described in this clause (1) below) if (A) Senior Lender is simultaneously exercising any rights and remedies that it may have against such Common Guarantor under any guaranty or indemnity granted to Senior Lender as additional collateral to secure the obligations under the Senior Loan Documents

with respect to a claim against such Common Guarantor based on the same action, omission, event or occurrence which such Junior Lender's claim against such Common Guarantor is based, or (B) Senior Lender has notified such Junior Lender that Senior Lender has a claim against such Common Guarantor based on the same action, omission, event or occurrence which such Junior Lender's claim against such Common Guarantor is based and Senior Lender commences litigation of such claim within forty-five (45) Business Days of such notice to such Junior Lender, and if Senior Lender is successful in its claim against such Common Guarantor and fails to recover the amount of such claim from Common Guarantor, then Senior Lender shall have the right to apply any amounts held pursuant to this <u>Section 6(b)(1)</u> to the Senior Loan Liabilities, provided that if such claim by Senior Lender is determined to be unsuccessful due to a final, unappealable court order (or if such claim is paid by such Common Guarantor), Senior Lender shall promptly return any amounts held pursuant to this <u>Section 6(b)(1)</u> to the Junior Lender which turned over such amounts except if such Junior Lender is the Subordinate Junior Lender, in which case Senior Lender shall instead turn over such amounts to Senior Junior Lender pursuant to <u>subclause (2)</u> below), provided in each case, that, subject to <u>Section 11(c)</u>, such Junior Lender is subrogated to such claim of Senior Lender.  Any right of payment of a Junior Lender under a Guaranty Claim shall be subject and subordinate as provided in this <u>Section 6(b)</u> in all respects to the rights and claims of Senior Lender against such Common Guarantor; or

(2)    if Senior Lender is not entitled to the same pursuant to <u>subclause (1)</u> above or no Senior Loan Liabilities are outstanding, then, solely in the case of Subordinate Junior Lender (it being acknowledged that if Senior Lender is not entitled to the same pursuant to <u>subclause (1)</u> above or no Senior Loan Liabilities are outstanding, then Senior Junior Lender shall be entitled to apply the proceeds of any such enforcement by Senior Junior Lender to the Senior Junior Loan Liabilities in its sole discretion), to Senior Junior Lender (to be held in trust for Subordinate Junior Lender and to be returned to such Junior Lender or applied by Senior Junior Lender to the Senior Junior Loan Liabilities as described in this <u>clause (2)</u> below) if (A) Senior Junior Lender is simultaneously exercising any rights and remedies that it may have against such Common Guarantor under any guaranty granted to such Senior Junior Lender as additional collateral to secure the obligations under the Senior Junior Loan Documents with respect to a claim against such Common Guarantor based on the same action, omission, event or occurrence on which Subordinate Junior Lender's claim against such Common Guarantor is based, or (B) Senior Junior Lender has notified Subordinate Junior Lender that Senior Junior Lender has a claim against such Common Guarantor based on the same action, omission, event or occurrence on which Senior Junior Lender's claim against such Common Guarantor is based and Senior Junior Lender commences litigation of such claim within forty-five (45) Business Days of such notice to Subordinate Junior Lender (and if Senior Junior Lender is successful in its claim against such Common Guarantor and fails to recover the amount of such claim from Common Guarantor, then Senior Junior Lender shall have the right to apply any amounts held pursuant to this <u>Section 6(b)(2)</u> to the Senior Junior Loan Liabilities provided if such claim is unsuccessful or paid by such Common Guarantor, Senior Junior Lender shall promptly return any amounts held to Subordinate Junior Lender), provided in each case, that, subject to <u>Section 11(c)</u>, Subordinate Junior Lender is subrogated to such claim of Senior Junior Lender.

If neither Senior Lender nor Senior Junior Lender is entitled to such proceeds pursuant to clauses (1) and (2) above, Subordinate Junior Lender shall not be precluded from enforcing such judgment and obtaining the proceeds thereof.

Except to the extent that a Junior Lender becomes subrogated in accordance with the provisions set forth in clauses (b)(1) and (b)(2) above, any right of payment of a Junior Lender under a Guaranty Claim that is required to be turned over to Senior Lender or Senior Junior Lender pursuant to this Section 6(b) shall be subject and subordinate as provided in this Section 6(b) in all respects to the rights and claims of Senior Lender (and Senior Junior Lender, as applicable) against the applicable Common Guarantor.

(d)        In the event a Junior Lender or any Qualified Transferee purchaser at a UCC sale obtains title to the Equity Collateral in accordance with the terms of this Agreement, Senior Lender acknowledges and agrees that (i) any transfer, acquisition or assumption fee in the Senior Loan Agreement shall be waived with respect to such Transfer, provided, however, that all reasonable expenses incurred by Senior Lender directly in connection with any such Transfer shall be paid by such Junior Lender and/or any such Qualified Transferee, (ii) any such Transfer shall not constitute a breach or default under the Senior Loan Documents, and (iii) Senior Lender shall be deemed to have consented to (A) any such Transfer of the Equity Collateral (provided that, in all events, such Transfer shall be subject to Borrower's compliance with Senior Lender's then-existing "know your customer" requirements and applicable law), (B) the admission of such Junior Lender or Qualified Transferee as a new member, partner or other equity owner, as the case may be, of each entity whose equity interests previously constituted a part of such Equity Collateral, provided the conditions in Section 6(a) are met, to the extent applicable, and (C) such amendments to the Senior Loan Documents relating to Borrower's or Guarantor's organizational structure and direct and indirect ownership (in form and substance reasonably satisfactory to Senior Lender and in all events shall be subject to Borrower's compliance with Senior Lender's then-existing "know your customer" requirements and applicable law) as may be (1) reasonably necessary to reflect the Junior Lender's or Qualified Transferee's structure and direct and indirect ownership and to permit such Junior Lender or Qualified Transferee to comply with the representations and covenants relating thereto set forth in the Senior Loan Documents (including, without limitation, replacing any organizational structure chart), and (2) otherwise reasonably requested by such Junior Lender or Qualified Transferee and consented to by Senior Lender, which consent shall not be unreasonably withheld, conditioned or delayed provided that such amendments pursuant to this clause (2) are consistent with the intent of the Senior Loan Documents in effect as of the date hereof and would, in Senior Lender's reasonable judgment, be acceptable to a prudent lender of a mortgage loan similar to the Senior Loan.  Senior Lender also acknowledges and agrees that the Senior Loan will not be or become due as a result of such Transfer and that it will not impose any fees or charges (other than any right to recover any related costs and expenses expressly provided for in any Senior Loan Document or as set forth in clause (i) above) or unreasonable delays in connection with such Transfer.

(e)        In the event Subordinate Junior Lender or any Qualified Transferee purchaser at a UCC sale obtains title to the Equity Collateral pledged to Subordinate Junior Lender pursuant to the applicable Junior Loan Documents in accordance with the provisions and conditions of this Agreement, Senior Junior Lender acknowledges and agrees that (A) any transfer, acquisition or assumption fee in the Senior Junior Loan Documents shall be waived as a condition to such

Transfer, provided, however, that all reasonable expenses incurred by Senior Junior Lender directly in connection with any such Transfer shall be paid by Subordinate Junior Lender and/or any such Qualified Transferee, (B) any such Transfer shall not constitute a breach or default under the Senior Junior Loan Documents, and (C) Senior Junior Lender shall be deemed to have consented to (1) any such Transfer of the Equity Collateral (provided that, in all events, such Transfer shall be subject to the applicable Junior Borrower's compliance with Senior Junior Lender's then-existing "know your customer" requirements and applicable law), (2) the admission of Subordinate Junior Lender or Qualified Transferee as a new member, partner or other equity owner, as the case may be, of each entity whose membership interests constitute a part of such Equity Collateral, provided the conditions in Section 6(a) are met, to the extent applicable, and (3) such amendments to the Senior Junior Loan Documents relating to the applicable Junior Borrower's or Guarantor's organizational structure and direct and indirect ownership (in form and substance reasonably satisfactory to Senior Junior Lender and in all events shall be subject to Junior Borrower's compliance with Senior Junior Lender's then-existing "know your customer" requirements and applicable law) as may be (I) reasonably necessary to reflect the Junior Lender's or Qualified Transferee's structure and direct and indirect ownership and to permit Subordinate Junior Lender or Qualified Transferee to comply with the representations and covenants set forth in the Senior Junior Loan Documents (including, without limitation, replacing any organizational structure chart), and (II) otherwise reasonably requested by Subordinate Junior Lender or Qualified Transferee and consented to by Senior Junior Lender, which consent shall not be unreasonably withheld, conditioned or delayed provided that such amendments pursuant to this clause (II) are consistent with the intent of the Senior Junior Loan Documents in effect as of the date hereof and would, in Senior Junior Lender's reasonable judgment, be acceptable to a prudent lender of a mezzanine loan similar to the Senior Junior Loan.  Senior Junior Lender also acknowledges and agrees that the Senior Junior Loan will not be or become due as a result of such Transfer and that it will not impose any fees or charges (other than any right to recover any related costs and expenses expressly provided for in any Senior Junior Loan Document or as set forth in clause (A) above) or unreasonable delays in connection with such Transfer.

(f)    Notwithstanding anything to the contrary in the Senior Loan Documents or the Senior Junior Loan Documents, in the event that a Junior Lender or Qualified Transferee forecloses or otherwise realizes on any Equity Collateral, thereafter such Junior Lender or Qualified Transferee or its designee, in its capacity as the managing member or general partner, as applicable, of any Borrower Party, shall have the right without the consent of any Person, to amend the partnership or operating agreement of such Borrower Party and any general partner or managing member of such Borrower Party in a manner permitted under the Senior Loan Documents and/or Senior Junior Loan Documents, as applicable, to expressly permit any transfers which are expressly permitted under the Senior Loan Documents and the Senior Junior Loan Documents as the same are modified in accordance with Section 6(c) above.  For the avoidance of doubt, any amendment to the Senior Loan Documents, Senior Junior Loan Documents, or organizational documents permitted by Section 6(c) above or this Section 6(e) shall be subject to compliance with the single purpose entity and/or special purpose entity requirements contained in the Senior Loan Documents and the Senior Junior Loan Documents, as applicable.

(g)    Nothing contained in Section 5(a) or this Section 6 is intended (i) to limit any Loan Pledgee's right under its financing documents with any Junior Lender to foreclose against such Junior Lender, provided that such Loan Pledgee complies with the applicable provisions of

Section 16, or (ii) if any such Loan Pledgee has foreclosed under its financing documents as aforesaid, to limit such Loan Pledgee's right to foreclose against the applicable Junior Borrower's interest in the related Separate Collateral, provided that such Loan Pledgee complies with the applicable provisions of Section 5 and this Section 6. For the avoidance of doubt, in the event that a Loan Pledgee becomes a Junior Lender, such Loan Pledgee must comply with the provisions of this Section 6 regarding the delivery of substitute or supplemental Third Party Agreements by Substitute Third Party Obligors.

(h)     In the event of a Transfer of Equity Collateral pursuant to the provisions of Section 6(a), the transferee of such Equity Collateral shall have the right to cure any non-monetary default under the Senior Loan or the Senior Junior Loan that remains uncured as of the date of such Realization Event and was not susceptible to cure without foreclosure of the Equity Collateral, so long as (A) such transferee is continuously and diligently pursuing a cure of such non-monetary default, provided if such default is caused by a Proceeding of Borrower or, if applicable, a Junior Borrower, such Proceeding shall be dismissed within 60 days, and (B) during the period in which such transferee is pursuing such cure in accordance with this Section 6(g), there is no material impairment to the value, use or operation of the Premises or the Separate Collateral taken as a whole as a result of such default as reasonably determined by Senior Lender and the Senior Junior Lender (if applicable) in good faith that is not cured by the transferee of such Equity Collateral within five (5) Business Days after the receipt of written notice from Senior Lender (and/or Senior Junior Lender, if applicable) describing such material impairment in reasonable detail. This Section 6(g) shall survive the termination of this Agreement pursuant to Section 18(m) with respect to any Junior Lender resulting from a Transfer of title of such Junior Lender's Equity Collateral to such Junior Lender.

(i)     In the event a Junior Lender or any Qualified Transferee purchaser at a UCC sale obtains title to the Equity Collateral pledged to a Junior Lender pursuant to the Junior Loan Documents in accordance with the provisions and conditions of this Agreement, such Junior Lender or Qualified Transferee shall acquire such Equity Collateral subject to (A) the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents and (B) if applicable, the Senior Junior Loan and the terms, conditions and provisions of the Senior Junior Loan Documents, in each case for the balance of the term thereof, which shall not be accelerated by Senior Lender or the Senior Junior Lender (if applicable) solely due to such acquisition and shall remain in full force and effect; provided, however, that all defaults, other than resulting from any acceleration of the Senior Loan or Senior Junior Loan, as applicable, under (1) the Senior Loan and (2) the Senior Junior Loan, in each case which remain uncured or unwaived as of the date of such acquisition have been cured by such Junior Lender or Qualified Transferee or in the case of defaults that can only be cured by the applicable Junior Lender or Qualified Transferee following its acquisition of its Equity Collateral, the same shall be cured by such Junior Lender or Qualified Transferee as soon as reasonably practicable following its acquisition subject, in all instances, to the terms set forth in Section 6(g) hereof; provided that the cure of any such default by such Qualified Transferee or Junior Lender shall be (I) with respect to any default under the Senior Loan, subject to the reimbursement of Senior Lender for any interest charged by Senior Lender on any required (pursuant to applicable trust and servicing agreement or pooling and servicing agreement or equivalent agreement) advances (including Protective Advances) for amounts required to be paid by Borrower pursuant to the Senior Loan Documents, together with payment of all other amounts then due under the Senior Loan Documents (excluding the principal due upon acceleration, any

late charge or default interest), and (II) with respect to any default under the Senior Junior Loan (if applicable), subject to the reimbursement of the Senior Junior Lender for any interest charged by the Senior Junior Lender on any required (pursuant to an applicable trust and servicing agreement or pooling and servicing agreement or equivalent agreement) advances on the Senior Junior Loan for amounts required to be paid by the Senior Junior Borrower pursuant to the Senior Junior Loan Documents (only pursuant to an applicable trust and servicing agreement or pooling and servicing agreement or equivalent agreement), together with payment of all other amounts then due under the Senior Junior Loan Documents (excluding the principal due upon acceleration, any late charge or default interest).  Provided that all defaults susceptible of being cured under the Senior Loan and the Senior Junior Loan, if applicable, which remain uncured or unwaived as of the date of the acquisition of the Equity Collateral, other than the payment of the accelerated principal, have been cured by the applicable Qualified Transferee or are non-monetary defaults for which such Qualified Transferee is diligently and continuously pursuing a cure pursuant to Section 6(h) above, Senior Lender and, if applicable, Senior Junior Lender shall waive all defaults that are not susceptible of being cured by such Qualified Transferee (including, without limitation, defaults that are personal to Borrower and/or Senior Junior Borrower, if applicable); provided, that such defaults which are not susceptible of being cured do not materially impair the value, use or operation of the Premises or the Separate Collateral, in each case, taken as a whole, as reasonably determined by Senior Lender and, if applicable, Senior Junior Lender in good faith unless the transferee of such Equity Collateral cures such material impairment within five (5) Business Days after the receipt of written notice from Senior Lender (and/or Senior Junior Lender, if applicable) describing such material impairment in reasonable detail.

       **Section 7.**    **Notice of Rating Confirmation**.  The applicable Junior Lender shall promptly notify Senior Lender and the other Junior Lender of any intended action relating to the related Junior Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate at no out-of-pocket expense to Senior Lender (or the other Junior Lender) with Senior Lender in obtaining such Rating Agency Confirmation.  Senior Lender promptly shall notify Junior Lenders of any intended action relating to the Senior Loan which would require Rating Agency Confirmation pursuant to this Agreement and Junior Lenders shall cooperate at no out-of-pocket expense to such Junior Lenders with Senior Lender in obtaining such Rating Agency Confirmation.  The applicable Junior Lender shall pay all fees and expenses of the Rating Agencies in connection with any request for any Rating Agency Confirmation with respect to actions by such Junior Lender pursuant to this Agreement.  Senior Lender shall pay all fees and expenses of the Rating Agencies in connection with any request for any Rating Agency Confirmation with respect to actions by Senior Lender pursuant to this Agreement (other than such actions taken at the request of a Junior Lender).  No Rating Agency Confirmation with respect to any action or matter hereunder is required unless specifically stated to be required.

       **Section 8.**    **Modifications, Amendments, etc**.

       (a)    Senior Lender shall have the right, without the consent of any Junior Lender, in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "**Senior Loan Modification**") of the Senior Loan or the Senior Loan Documents, provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount of the Senior Loan except for increases in principal to cover Protective Advances, (ii) increase in any other material respect any monetary

obligations of any Borrower Party under the Senior Loan Documents, (iii) shorten the scheduled maturity date of the Senior Loan (other than by acceleration of the Senior Loan pursuant to the Senior Loan Documents) or extend the scheduled maturity date (other than pursuant to an extension option scheduled pursuant to the terms of the Senior Loan Documents on the date hereof or in any amendment to the Senior Loan Documents consented to by the Junior Lenders) by more than three (3) months, or amend or waive any conditions to extension of the Senior Loan, (iv) convert or exchange the Senior Loan (or any portion thereof or interest therein) into or for any other indebtedness or subordinate any of the Senior Loan (or any portion thereof or interest therein) to any other indebtedness of Borrower, (v) amend or modify or waive the provisions limiting encumbrances or transfers of direct or indirect interests in Borrower or the Premises, or governing Borrower's right to replace Property Manager, (vi) modify or amend or waive the terms and provisions of the Senior Loan Agreement (or the Cash Management Agreement or any other provisions of the Senior Loan Documents regarding cash management) with respect to the manner, timing, priority, amounts, sequence of distribution or method of the application of Rents (as defined in the Senior Loan Documents) or other payments under the Senior Loan Documents or the Junior Loan Documents, (vii) cross-default the Senior Loan with or subordinate the Senior Loan to any other indebtedness, or cross-collateralize the security for the Senior Loan with any other indebtedness, (viii) modify or amend the definitions of "Adjusted Release Amount", "Allocated Loan Amount", "Approved Annual Budget", "Cash Management DSCR Trigger Event", "Cash Management Trigger Event", "Cash Management Trigger Event Cure", "Cash Management Trigger Event Period", "Cash Sweep DSCR Trigger Event", "Cash Sweep Trigger Event", "Cash Sweep Trigger Event Cure", "Cash Sweep Trigger Event Period", "Closing Date Debt Service Coverage Ratio", "Closing Date Debt Yield", "Closing Date LTV", "Debt Service Coverage Ratio", "Debt Yield", "Excess Cash Flow", "Gross Income from Operations", "Mezzanine Debt Service", "Mezzanine 1 Debt Service", "Mezzanine 2 Debt Service", "Mezzanine Adjusted Release Amount", "Mezzanine 1 Adjusted Release Amount", "Mezzanine 2 Adjusted Release Amount", "Net Cash Flow", "Net Operating Income", "Operating Expenses", "Release Amount", "Yield Maintenance Default Premium", or "Yield Maintenance Premium" (as such terms are defined in the Senior Loan Agreement and/or Cash Management Agreement), and any of the terms used within such definitions or the covenants relating thereto, in effect on the date hereof, (ix) extend the period during which defeasance or voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge or impose any new prepayment fee, premium or yield maintenance charge or exit fee in connection with the Senior Loan when none is now required or increase the amount of any such prepayment fee, premium or yield maintenance charge or exit fee, (x) release its lien on any portion of the Premises, the Leases and Rents (each as defined in the Senior Loan Documents) or any other material portion of the collateral originally granted under the Senior Loan Documents (except as may be required or permitted in accordance with the terms of the Senior Loan Documents on the date hereof in connection with a defeasance of the Senior Loan or a portion thereof or in exchange for prepayment in full in cash of the Senior Loan, or in part, in connection with the release of the Premises or a portion thereof), (xi) obtain any equity interest in any Borrower Party or provide for any contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises (or other similar equity participation), (xii) impose any financial covenants on any Borrower Party or Guarantor under any Senior Loan Document (or if such covenants exist, impose more restrictive financial covenants on

such Borrower Party or such Guarantor), (xiii) modify or amend any default provision (other than waivers of defaults), including by way of shortening any notice and cure periods provided in the Senior Loan Documents, (xiv) amend, waive or modify the terms and provision relating to the Reserve Accounts (as defined in the Senior Loan Documents) or impose any new reserve requirements, (xv) intentionally omitted, (xvi) modify, amend or waive any insurance requirements (including any deductibles, limits, qualifications of insurers, terrorism insurance requirements or environmental insurance requirements), (xvii) impose any new or additional fees not provided for in the Senior Loan Documents on the date hereof, (xviii) spread the lien of the Mortgage to encumber and/or accept a grant of any lien on any collateral or property of Borrower or any other Person not originally granted or contemplated to be granted under the Senior Loan Documents, (xix) modify, amend or waive any allocated loan amounts or terms or provisions relating to property releases or any related defined terms, (xx) modify or amend or waive the terms and provisions of Section 2.6 of the Loan Agreement, (xxi) modify, amend or waive any obligations or liability of any guarantor or indemnitor under any Guaranty or Environmental Indemnity (each, as defined in the Senior Loan Documents) delivered with respect to the Senior Loan except in connection with an assumption of the Senior Loan pursuant to the terms of the Senior Loan Agreement and acceptance of a replacement guarantor and/or a replacement indemnitor, as applicable, in accordance therewith (provided that, notwithstanding anything to the contrary in Section 6(a), no substitute Third Party Agreement delivered to Senior Lender under Section 6(a) shall be required to reflect any such amendment or modification that was not consented (to the extent such consent was required under this Agreement) to by the applicable Junior Lender in accordance with its rights hereunder) or (xxii) permit any additional encumbrances on the Premises or additional debt of Borrower other than as expressly permitted in the Senior Loan Documents; provided, however, that after the later of (A) the expiration of the applicable Monetary Cure Period or Non-Monetary Cure Period (and provided a Continuing Event of Default under the Senior Loan exists) and (B) the date that is thirty (30) days after the Junior Lenders have been given notice of a Purchase Option Event (plus an additional ten (10) Business Days to the extent a Junior Lender has delivered a Purchase Election Notice prior to the expiration of such thirty (30) day period and an additional thirty (30) days in the event any Junior Lender has extended such ten (10) Business Day period in accordance with Section 14), Senior Lender shall not be obligated to obtain the consent of any Junior Lender to a Senior Loan Modification in the case of a work-out or other surrender, extension, compromise, release, renewal, or indulgence relating to the Senior Loan, except that under no circumstance shall modifications as described in clause (i) (with respect to increase in principal amount only (which shall not be deemed to include accrued and deferred interest permitted pursuant to clause (i) above)), clause (iii) (with respect to shortening maturity only (other than by acceleration in respect of an Event of Default under the Senior Loan in accordance with the terms hereof)), clause (iv), clause (v) (to the extent such modification would limit or prohibit the exercise of remedies and realization upon the Equity Collateral by a Junior Lender or Loan Pledgee in accordance with the terms hereof or cause such exercise to constitute an Event of Default with respect to the Senior Loan), clause (ix), clause (x), clause (xi), clause (xii) or clause (xxi) be made without the written consent of each of the Junior Lenders; provided, further, that notwithstanding anything to the contrary above in this Section 8(a), during the continuance of an Event of Default with respect to the Senior Loan that is caused by a Proceeding of Borrower (to which Senior Lender has not consented), after the later of (X) the expiration of the applicable Non-Monetary Cure Period (and provided a Continuing Event of Default under the Senior Loan exists) and (Y) the date that is thirty (30) days following receipt

by the Junior Lenders of the Purchase Notice (plus an additional ten (10) Business Days to the extent a Junior Lender has delivered a Purchase Election Notice prior to the expiration of such thirty (30) day period and an additional thirty (30) days in the event any Junior Lender has extended such ten (10) Business Day period in accordance with <u>Section 14</u>), Senior Lender shall not be obligated to obtain the consent of any Junior Lender to a Senior Loan Modification in the case of any proposed plan of reorganization including Borrower under such Proceeding.  In addition and notwithstanding the foregoing provisions of this <u>Section 8(a)</u>, any amounts funded by Senior Lender pursuant to the Senior Loan Documents in effect on the date hereof as a result of (A) the making of any Protective Advances or other advances by Senior Lender to the extent that such other advances are contemplated in the Senior Loan Documents as of the date hereof (or as otherwise modified pursuant to this <u>Section 8(a)</u>), (B) interest accruals or accretions and any compounding thereof (including default interest) to the extent provided for in the Senior Loan Documents (as the same may be modified pursuant to a Senior Loan Modification permitted under this Agreement), or (C) any costs and expenses incurred by Senior Lender in connection with any workout or enforcement of the Senior Loan or any of the Senior Loan Documents shall not be deemed to contravene this <u>Section 8(a)</u>.

(b)     Each Junior Lender shall have the right, without the consent of Senior Lender or the other Junior Lender, in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "**<u>Junior Loan Modification</u>**") of its respective Junior Loan or the related Junior Loan Documents provided that no such Junior Loan Modification shall (i) increase the interest rate or principal amount of its Junior Loan except for (A) accrual and deferral of interest for any period in which amounts payable to the applicable Junior Lender pursuant to the Cash Management Agreement are insufficient to pay interest in accordance with the Junior Loan Documents for such Junior Loan or (B) increases in principal to cover Protective Advances, (ii) increase in any other material respect any monetary obligations of the applicable Junior Borrower under the related Junior Loan Documents, (iii) shorten the scheduled maturity date of its Junior Loan (other than by acceleration of the applicable Junior Loan in respect of an Event of Default thereunder pursuant to the applicable Junior Loan Documents) or extend the scheduled maturity date by more than three (3) months (other than pursuant to an extension option scheduled pursuant to the terms of the applicable Junior Loan Documents on the date hereof or in any amendment to the applicable Junior Loan Documents consented to by Senior Lender and the other Junior Lender), or amend or waive any conditions to extension of the applicable Junior Loan (iv) convert or exchange its Junior Loan (or any portion thereof or interest therein) into or for any indebtedness or subordinate any of its Junior Loan (or any portion thereof or interest therein) to any other indebtedness of the applicable Junior Borrower (except that the Subordinate Junior Lender (only) may effect such a conversion if the Conversion Conditions have been satisfied), (v) provide for any additional contingent interest, additional interest or so-called "kicker" interest in the applicable Junior Borrower measured on the basis of the cash flow or appreciation of the Premises (or other similar equity participation in the applicable Junior Borrower), (vi) amend or modify or waive the provisions limiting transfers of interest in the applicable Junior Borrower, (vii) modify or amend or waive the terms and provisions of the Cash Management Agreement with respect to the manner, timing, priority, amounts or method of the application of payments under the applicable Junior Loan Documents, (viii) cross default the applicable Junior Loan with any other indebtedness or otherwise modify any default provisions (other than waivers of default), (ix) extend the period during which defeasance or voluntary prepayments are prohibited or during which prepayments

require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge or impose any new prepayment fee, premium or yield maintenance charge, (x) intentionally omitted, (xi) impose any financial covenants on the related Junior Borrower or Guarantor under any of the Junior Loan Documents delivered with respect to the applicable Junior Loan (or if such covenants exist, impose more restrictive financial covenants on such Junior Borrower or such Guarantor under the Junior Loan), (xii) impose any new or additional fees not provided for in the applicable Junior Loan Documents, (xiii) modify or amend the terms of the Junior Loan Documents with respect to the manner, timing, priority, amounts, sequence of distribution or method of the application of payments, under the applicable Junior Loan Documents, (xiv) modify or amend the definitions of "Allocated Loan Amount", "Approved Annual Budget", "Cash Management Trigger Event Period", "Cash Sweep Trigger Event Period", "Closing Date Debt Service Coverage Ratio", "Closing Date Debt Yield", "Closing Date LTV", "Debt Service Coverage Ratio", "Debt Yield", "Gross Income from Operations", "Mezzanine 2 Adjusted Release Amount", "Net Cash Flow", "Net Operating Income", "Operating Expenses", "Release Amount", "Yield Maintenance Default Premium", or "Yield Maintenance Premium" (as such terms are defined in the applicable Junior Loan Agreement), and any of the terms used within such definitions or the covenants relating thereto, in effect as of the date hereof, (xv) release its lien on any Equity Collateral or any other material portion of the collateral originally granted under the applicable Junior Loan Documents (except as may be required or permitted in accordance with the terms of the applicable Junior Loan Documents as of the date hereof in exchange for prepayment in full in cash of the applicable Junior Loan), (xvi) modify, amend or waive any insurance requirements, (xvii) amend, waive or modify the terms and provision relating to the Reserve Accounts (as defined in the applicable Junior Loan Documents) or impose any new reserve requirements, (xviii) modify, amend or waive any obligations or liability of the Guarantor under the applicable Junior Loan Documents with respect to the Junior Loan debt being recourse to such Guarantor pursuant to and in accordance with the related Guaranty or Environmental Indemnity, (xix) modify or amend the terms and provisions of Section 2.6 of the applicable Junior Loan Agreement, (xx) permit any additional encumbrances on the collateral for the applicable Junior Loan or additional debt of the applicable Junior Borrower other than as expressly permitted in the applicable Junior Loan Documents or (xxi) release any guarantor or indemnitor under any guaranty, indemnity or similar document delivered with respect to the applicable Junior Loan except in connection with an assumption of its Junior Loan pursuant to the terms of the applicable Junior Loan Agreement and acceptance of a replacement guarantor and/or a replacement indemnitor, as applicable, in accordance therewith; provided, however, that after the later of (A) the expiration of the applicable Junior Loan Monetary Cure Period or Junior Loan Non-Monetary Cure Period and provided a Continuing Event of Default under the applicable Junior Loan exists and (B) the date that is thirty (30) days after the Junior Lenders have been given notice of a Junior Loan Purchase Option Event (plus, if such Junior Lender is Subordinate Junior Lender, an additional ten (10) Business Days to the extent Subordinate Junior Lender has delivered a Junior Purchase Election Notice to Senior Junior Lender prior to the expiration of such thirty (30) day period), the applicable Junior Lender shall not be obligated to obtain the consent of Senior Lender or any other Junior Lender to a Junior Loan Modification in the case of a work-out or other surrender, extension, compromise, release, renewal, or indulgence relating to the applicable Junior Loan, except that under no circumstance shall modifications as described in clause (i) (with respect to increases in principal amounts only (which shall not be deemed to include accrued and deferred interest permitted pursuant to clause (i) above)), clause (ii), clause (iii) (with respect to shortening

maturity only (other than by acceleration of such Junior Loan in respect of an Event of Default thereunder pursuant to the applicable Junior Loan Documents and in accordance with the terms hereof)), clause (iv), clause (v), clause (viii), clause (ix) or clause (xi) be made without the consent of Senior Lender or Senior Junior Lender unless, with respect to clause (iv), the Conversion Conditions have been satisfied and with respect to clause (v), the Kicker Conditions have been satisfied, in which case such modifications in clause (iv) and/or clause (v), as applicable, may be made without the consent of Senior Lender or Senior Junior Lender; and provided further, that notwithstanding anything to the contrary above, during the continuance of an Event of Default that is caused by a Proceeding of Senior Junior Borrower (to which the Senior Junior Lender has not consented), after the later of (X) the expiration of the applicable Junior Loan Non-Monetary Cure Period (and provided a Continuing Event of Default under the applicable Junior Loan exists) and (Y) the date that is thirty (30) days after Subordinate Junior Lender has been given notice of a Junior Loan Purchase Option Event to Senior Junior Lender (plus an additional ten (10) Business Days to the extent Subordinate Junior Lender has delivered a Junior Purchase Election Notice prior to the expiration of such thirty (30) day period), Senior Junior Lender shall not be obligated to obtain the consent of Subordinate Junior Lender to a Junior Loan Modification in the case of any proposed plan of reorganization including the Senior Junior Borrower under such Proceeding.  In addition and notwithstanding the foregoing provisions of this Section 8(b), the following shall not be deemed to contravene the terms of this Section 8(b):

     (i)     (A) any amounts funded by a Junior Lender under its Junior Loan Documents as a result of the making of any Protective Advances or cure payments by such Junior Lender or (B) interest accruals or accretions and any compounding thereof (including default interest);

     (ii)     to the extent no Continuing Event of Default has occurred and is continuing under the Senior Loan or, if applicable, the Senior Junior Loan, retention by the Junior Lender that is the holder of the Junior Loan that is the subject of a Continuing Event of Default of excess net cash flow that would otherwise be payable to the applicable Junior Borrower and application of such excess net cash flow by such Junior Lender either to an account to be held as cash collateral for the Junior Loan held by such Junior Lender or to amortize the principal balance of the Junior Loan held by such Junior Lender; and

     (iii)     accrual of interest on a Junior Loan in accordance with the terms of the applicable Junior Loan Documents following an Event of Default under such Junior Loan Documents.

     (c)     Each of Senior Lender and each Junior Lender hereby agree to respond promptly to any request for consent to a Senior Loan Modification or Junior Loan Modification.

     (d)     Senior Lender shall deliver to the Junior Lenders promptly upon execution thereof copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender) after any of such applicable instruments have been executed by Senior Lender (and regardless of whether Senior Lender is then permitted hereunder to execute the same without any Junior Lender's consent, provided that, in no event shall the obligation to deliver

copies of any document pursuant to this <u>Section 8(d)</u> be construed to permit Senior Lender to execute such document without any Junior Lender's consent, as applicable, if Senior Lender is not otherwise permitted hereunder to do so).

(e)        Each Junior Lender shall deliver to Senior Lender and the other Junior Lenders promptly upon execution thereof copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of its respective Junior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by such Junior Lender) after any of such applicable instruments have been executed by such Junior Lender (and regardless of whether such Junior Lender is then permitted hereunder to execute the same without Senior Lender or the other Junior Lender's consent, as applicable, provided that, in no event shall the obligation to deliver copies of any document pursuant to this <u>Section 8(e)</u> be construed to permit a Junior Lender to execute such document without the consent of  Senior Lender or the other Junior Lender, as applicable, if such Junior Lender is not otherwise permitted hereunder to do so).

**Section 9.        <u>Subordination of Junior Loans and Junior Loan Documents</u>**.  Except as otherwise provided in this Agreement, each Junior Lender hereby subordinates and makes junior the Junior Loan held by such Junior Lender, the related Junior Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan and, if applicable, the Senior Junior Loan, (ii) the liens and security interests created by the Senior Loan Documents and, if applicable, the Senior Junior Loan Documents, and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents and, if applicable, the Senior Junior Loan Documents and no extensions, modifications, consolidations, supplements, amendments, replacements, waivers and restatements of and/or to the Senior Loan Documents or, if applicable, the Senior Junior Loan Documents shall affect the subordination thereof as set forth in this <u>Section 9</u> (provided that such subordination shall not preclude any Junior Lender from bringing action against Senior Lender as a result of any Senior Loan Modification entered into by Senior Lender without the prior written consent of each Junior Lender whose consent, in connection therewith, is required pursuant to <u>Section 8(a)</u> hereof). Notwithstanding the foregoing, this Agreement shall not be construed as subordinating and shall not subordinate or impair a Junior Lender's first lien priority right, estate and interest in and to the Separate Collateral relating solely to the Junior Loan that is held by such Junior Lender, and Senior Lender and the other Junior Lender each hereby acknowledges and agrees that none of Senior Lender or the other Junior Lender has, and shall not hereafter acquire, any lien on, or any other interest whatsoever in such Separate Collateral, or any part thereof, and that collection from any such Separate Collateral (including the sale by such Junior Lender of all or any of its interest in the Junior Loan that is held by such Junior Lender and the related sales proceeds), the exercise of remedies and realization upon such Separate Collateral by such Junior Lender or a Loan Pledgee that has become a Junior Lender in accordance with the terms of this Agreement and the application of proceeds therefrom (including the proceeds from any sale of such Junior Lender's interest in the Junior Loan that is held by such Junior Lender) as such Junior Lender deems appropriate in its discretion (*i.e.*, without payment subordination) are expressly permitted and shall not constitute a default or an event of default under this Agreement, the Senior Loan Documents or, if applicable, the Senior Junior Loan Documents; provided that such sales, exercise of remedies and realization are conducted in accordance with this Agreement.  Notwithstanding the foregoing or anything contained in <u>Section 10(c)</u> to the contrary, each Junior Lender may, at any time, accept,

retain and apply any payment from any Affiliate of the related Junior Borrower or any other party (other than Senior Junior Borrower, Borrower or Common Guarantor) to the extent such payment is made from such Person's own funds (or the funds of an Affiliate other than Borrower, Senior Junior Borrower or Common Guarantor) not derived from the Premises, insurance, condemnation proceeds, reserve/escrow amounts or the other collateral for the Senior Loan or the Senior Junior Loan (as applicable).

**Section 10.** **Payment Subordination**.

(a) Except (1) as otherwise expressly provided in this Agreement or (2) in connection with the exercise by a Junior Lender of its rights and remedies with respect to its Separate Collateral and the application of the proceeds therefrom (in accordance with this Agreement, including the proceeds from any sale of such Junior Lender's interest in the related Junior Loan (in accordance with this Agreement)) as such Junior Lender deems appropriate in its sole discretion, (i) all of such Junior Lender's rights to payment of the Junior Loan held by such Junior Lender and the obligations evidenced by the related Junior Loan Documents are hereby subordinated to all of Senior Lender's rights to payment of the Senior Loan and the obligations secured by the Senior Loan Documents, and such Junior Lender shall not, from and after receipt by such Junior Lender of written notice of the declaration of a Continuing Event of Default under the Senior Loan Documents, and thereafter, during the continuance of a Continuing Event of Default under the Senior Loan Documents (provided, however, that (I) application of proceeds from the enforcement, sale, liquidation or other disposition of the Equity Collateral and (II) proceeds from any Transfer of such Junior Lender's interest in the Junior Loan held by such Junior Lender, in each case in accordance with this Agreement, may be made under the Junior Loans as if the Continuing Event of Default under the Senior Loan had not occurred), accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or from the Senior Loan Collateral prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are paid in full; and (ii) all of Subordinate Junior Lender's rights to payment of the Subordinate Junior Loan and the obligations evidenced by the Subordinate Junior Loan Documents are hereby subordinated to all of the rights of the Senior Junior Lender to payment by the Senior Junior Borrower of the Senior Junior Loan and the obligations secured by the Senior Junior Loan Documents, and Subordinate Junior Lender shall not, from and after receipt by Subordinate Junior Lender of written notice of the declaration of, and thereafter, during the continuance of, a Continuing Event of Default under the Senior Junior Loan Documents, accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower, the Senior Loan Collateral or any portion thereof, the Senior Junior Borrower, and/or proceeds of the Separate Collateral securing or guaranteeing the Senior Junior Loan prior to the date that all obligations of the Senior Junior Borrower to the Senior Junior Lender under the Senior Junior Loan Documents are paid in full in cash (in the case of either clause (i) or (ii) above, other than (A) payments with respect to a Junior Lender's Separate Collateral, including the proceeds of any enforcement, sale or liquidation of such Junior Lender's Separate Collateral permitted pursuant to the terms of this Agreement, (B) proceeds from any Transfer of such Junior Lender's interest in the Junior Loan held by such Junior Lender in accordance with this Agreement and the Junior Lender receiving such payment may retain such payments) or (C) as permitted under Section 6(b) hereof.

(b)      If a Proceeding affecting Borrower or the Premises shall have occurred and has not been dismissed or there shall have occurred and be continuing a Continuing Event of Default under the Senior Loan Documents (provided, however, that if a Proceeding affecting Borrower or the Premises shall not have occurred (or, if it has occurred, it has been dismissed) and a Junior Lender is diligently exercising its cure rights pursuant to Section 12 with respect to the Senior Loan, payments may be made under its Junior Loan, as well as under the Senior Junior Loan, if applicable, as if the Event of Default under the Senior Loan had not occurred), and except as otherwise provided herein, Senior Lender shall be entitled to receive payment in full and performance in full of all amounts due or to become due to Senior Lender under the Senior Loan Documents before any Junior Lender is entitled to receive any payment on account of its Junior Loan (other than as expressly permitted by Section 9, Section 10(a), this Section 10(b) or Section 10(c)).  If a Proceeding affecting Senior Junior Borrower shall have occurred and has not been dismissed or there shall have occurred and be continuing an Event of Default under any the Senior Junior Loan Documents (provided, however, that if a Proceeding affecting Senior Junior Borrower shall not have occurred (or, if it has occurred, it has been dismissed) and Subordinate Junior Lender is diligently exercising its cure rights pursuant to Section 12 with respect to the Senior Junior Loan, payments may be made under the Subordinate Junior Loan, as if the Event of Default under the Senior Junior Loan had not occurred), the Senior Junior Lender shall be entitled to receive payment in full and performance in full of all amounts due or to become due to the Senior Junior Lender under the Senior Junior Loan Documents before Subordinate Junior Lender is entitled to receive any payment on account of the Subordinate Junior Loan, other than as expressly permitted by Section 9, Section 10(a), this Section 10(b) or Section 10(c).  All payments or distributions upon or with respect to a Junior Loan which are received by a Junior Lender contrary to the provisions of this Agreement shall be received in trust for the benefit of Senior Lender and, if applicable, Senior Junior Lender and shall be paid over first to Senior Lender to the extent that Senior Lender is entitled thereto hereunder and under the Senior Loan Documents and then, if applicable, to Senior Junior Lender to the extent the same is entitled thereto hereunder and under the Senior Junior Loan Documents in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance first of the Senior Loan in accordance with the terms of the Senior Loan Documents and then, if applicable, the Senior Junior Loan in accordance with the terms of the Senior Junior Loan Documents (provided that if such payments or distributions are not so applied, and the Senior Loan and, if applicable, the Senior Junior Loan have otherwise been paid in full, such payments or proceeds shall be returned to the Junior Lender that paid over such amounts).  Nothing contained herein shall prohibit a Junior Lender from making Protective Advances (and adding the amount thereof to the principal balance of its Junior Loan) notwithstanding the existence of an Event of Default under the Senior Loan at such time (and, in the case of Subordinate Junior Lender, notwithstanding the existence of an Event of Default under the Senior Junior Loan at such time).

(c)      Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Sections 10(a) and (b):

(i)      provided that no Continuing Event of Default shall then exist under the Senior Loan Documents or (with respect to acceptance of payments by Subordinate Junior Lender only) the Senior Junior Loan Documents, a Junior Lender may accept and retain payments of any amounts (both current and delinquent) due and payable from time to time

(including, without limitation, payments to cure a default under its Junior Loan) (A) which the applicable Junior Borrower is obligated to pay such Junior Lender in accordance with the terms and conditions of the applicable Junior Loan Documents, and (B) from a Junior Borrower from its own funds and from funds of any Affiliate contributed to such Junior Borrower (and not revenue derived from the Premises, insurance, condemnation proceeds, reserve/escrow amounts or the other collateral for the Senior Loan or, if applicable, the Senior Junior Loan except to the extent the same was distributed or dividended to such Junior Borrower or parent thereof (and the same was not a distribution or dividend in violation of applicable terms and conditions of the Senior Loan Documents or, if applicable, Senior Junior Loan Documents)), and, in either case, such Junior Lender shall have no obligation to pay any such amounts over to Senior Lender or Senior Junior Lender

(ii)    provided that no Continuing Event of Default shall then exist under the Senior Loan Documents or (with respect to acceptance of payments by Subordinate Junior Lender only) the Senior Junior Loan Documents, nothing herein shall (A) prohibit a Junior Borrower from making payments from its own funds and from funds of any Affiliate contributed to such Junior Borrower (and not revenue derived from the Premises, insurance, condemnation proceeds, reserve or escrow amounts or the other collateral for the Senior Loan or (with respect to Subordinate Junior Loan only) the Senior Junior Loan except to the extent the same was distributed or dividended to such Junior Borrower or Affiliate thereof (and the same was not a distribution or dividend in violation of applicable terms and conditions of the Senior Loan Documents or Senior Junior Loan Documents)) to cure a default under or otherwise to comply with its Junior Loan notwithstanding the existence of an Event of Default that is not a Continuing Event of Default under the Senior Loan or Senior Junior Loan at such time or (B) prohibit a Junior Lender from accepting and retaining any such permitted payment described in <u>clause (A)</u> of this <u>subsection (ii)</u> (it being acknowledged and agreed that any funds received by a Junior Lender from distributions or dividends made in violation of the terms of the Senior Loan Documents or the Senior Junior Loan Documents shall be held in trust for the benefit of Senior Lender and Senior Junior Lender and shall be paid over first to Senior Lender to the extent that Senior Lender is entitled thereto hereunder and under the Senior Loan Documents and then to Senior Junior Lender to the extent the same is entitled thereto hereunder and under the Senior Junior Loan Documents in the same form as so received (with any necessary endorsement) to be applied to, or held as collateral for, as applicable, the payment or performance first of the Senior Loan in accordance with the terms of the Senior Loan Documents and then the Senior Junior Loan in accordance with the terms of the Senior Junior Loan Documents (provided that if such funds are not so applied, and the Senior Loan and Senior Junior Loan have otherwise been paid in full, such payments or proceeds shall be returned to Subordinate Junior Lender));

(iii)    provided that no Continuing Event of Default shall then exist under the Senior Loan Documents or (with respect to acceptance of payments by Subordinate Junior Lender only) the Senior Junior Loan Documents, any guarantor or indemnitor under or with respect to any Junior Loan, any Affiliate of any guarantor or indemnitor under or with respect to any Junior Loan, and any other Person may make payments from its own funds (which may include any Premises-related revenue that is or was distributed or dividended to such Person (other than a distribution or dividend in violation of applicable terms and

conditions of the Senior Loan Documents or, if applicable, the Senior Junior Loan Documents)) to cure a default or otherwise make any payments under or in respect of the respective Junior Loan, and the applicable Junior Lender may receive and retain any such payments notwithstanding the existence of any Event of Default that is not a Continuing Event of Default under the Senior Loan or the Senior Junior Loan (it being acknowledged and agreed that any funds received by a Junior Lender from distributions or dividends made in violation of the terms of the Senior Loan Documents or the Senior Junior Loan Documents shall be held in trust for the benefit of Senior Lender and Senior Junior Lender and shall be paid over first to Senior Lender and then to Senior Junior Lender in the same form as so received (with any necessary endorsement) to be applied to, or held as collateral for the payment or performance first of the Senior Loan in accordance with the terms of the Senior Loan Documents and then the Senior Junior Loan in accordance with the terms of the Senior Junior Loan Documents (provided that if such funds are not so applied, and the Senior Loan and Senior Junior Loan have otherwise been paid in full, such payments or proceeds shall be returned to Subordinate Junior Lender));

(iv)    as long as no Continuing Event of Default shall then exist under the Senior Loan Documents (or with respect to acceptance of payments by Subordinate Junior Lender only , the Senior Junior Loan Documents), nothing herein shall prohibit a Junior Lender from accepting a voluntary prepayment from the applicable Junior Borrower pursuant to the provisions of Section 2.4 of the applicable Junior Loan Agreement to the extent the same is permitted pursuant to the Senior Loan Documents (and, if applicable, the Senior Junior Loan Documents) as long as Borrower (and, if applicable, Senior Junior Borrower) concurrently makes a pro rata prepayment of the Senior Loan (and, if applicable, the Senior Junior Loan) as required pursuant to Section 2.4 of the Senior Loan Agreement (and, if applicable, the Senior Junior Loan Agreement); and

(v)    a Junior Lender may accept and retain amounts received in connection with the exercise of its rights and remedies with respect to its related Separate Collateral in accordance with the terms and conditions of this Agreement, including the proceeds of any Equity Collateral Enforcement Action and any other enforcement, sale or liquidation of a Junior Lender's Separate Collateral permitted pursuant to the terms of this Agreement, or proceeds from any sale in accordance with the terms and conditions of this Agreement of such Junior Lender's interest in the Junior Loan held by such Junior Lender or any other payments permitted to be made to such Junior Lender hereunder.

(d)    A Junior Lender may effect any Realization Event which is not prohibited by Section 6 in its sole and absolute discretion without Senior Lender's or Senior Junior Lender's consent; provided, however, that (i) such Junior Lender shall, prior to commencing any Realization Event, give Senior Lender and the other Junior Lender written notice of the default which would permit such Junior Lender to commence such Realization Event, and (ii) such Junior Lender shall keep Senior Lender and Senior Junior Lender reasonably apprised as to the status of any Realization Event, provided, that a Junior Lender's compliance with its obligations under this sentence shall not in and of itself constitute a condition to completing a Realization Event (or otherwise give rise to any right of Senior Lender or any other Junior Lender to, or to move or otherwise seek to, stay, delay, postpone, prevent or otherwise interfere with such Realization

Event), so long as such Realization Event is otherwise implemented in accordance with the terms and provisions of this Agreement.

(e)     In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, any payments, awards, proceeds, distributions, or consideration arising from any such event, net of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such payments, awards, proceeds, distributions, or consideration (the "**Award**"), shall be applied by Senior Lender in accordance with the terms of the Senior Loan Agreement. In the event that the Award is in excess of amounts due to Senior Lender in accordance with the terms of the Senior Loan Agreement, then Senior Lender shall, so long as there is no Continuing Event of Default under the Senior Loan Documents, distribute such excess to Mezzanine 1 Lender to be applied in accordance with the terms of the Mezzanine 1 Loan Agreement or, if the Mezzanine 1 Loan is not then outstanding, or to the extent that the remainder of the Award is in excess of amounts due to the Mezzanine 1 Lender under the terms of the Mezzanine 2 Loan Agreement, to Mezzanine 2 Lender, to be applied in accordance with the terms of the Mezzanine 2 Loan Agreement or if none of the Junior Loans are outstanding, to Borrower. In the event of any competing claims for all or any part of the Award, Senior Lender shall hold the Award (or such portion thereof) until Senior Lender receives an agreement signed by all relevant parties making a claim to the Award (or such portion thereof) or a final order of a court of competent jurisdiction directing Senior Lender as to how the Award (or such portion thereof) is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Awards in any such event to Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises or any portion thereof in accordance with the terms and provisions of the Senior Loan Documents. Awards made available to, and used by, Borrower for the repair or restoration of the Premises or any portion thereof shall not be subject to attachment by any Junior Lender. Upon a Junior Lender's written request, Senior Lender shall advise such Junior Lender of the status of the adjustment or the settlement of a claim or of any destination of proceeds to the extent received or disbursed by Senior Lender. Each Junior Lender shall have the right to participate (to the extent permitted under the related Junior Loan Agreement) in the adjustment and settlement of a claim to any Award if such Award will not be used solely for restoration of the Premises.

(f)     Each Junior Lender shall be entitled to retain (i) any proceeds generated as a result of any Equity Collateral Enforcement Action with respect to the Equity Collateral for the related Junior Loan up to the applicable amount due such Junior Lender under applicable law in connection with such Equity Collateral Enforcement Action, so long as such action was commenced in accordance with the terms of this Agreement, and (ii) payments or proceeds generated from an Equity Collateral Enforcement Action with respect to the Separate Collateral for the related Junior Loan in accordance with this Agreement.

(g)     Notwithstanding anything to the contrary contained herein, each Junior Lender shall have the right, in connection with a Proceeding of Borrower or the Senior Junior Borrower, to exercise its right to bid on the equity or the assets of Borrower or Senior Junior Borrower if (i) the Proceeding is a reorganization under Chapter 11 of the U.S. Bankruptcy Code and (ii) one or more of the direct or indirect owners of Borrower or Senior Junior Borrower are going to continue to own a direct or indirect equity interest in Borrower or Senior Junior Borrower.

Section 11.    **Rights of Subrogation; Bankruptcy**.

(a)    Marshalling of Assets and Information.  Senior Lender and Junior Lenders each hereby waives any requirement for marshaling of assets in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Junior Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of the Junior Lenders and Senior Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of Borrower and each Junior Borrower, the condition of the Senior Loan Collateral and, in the case of each Junior Lender, such Junior Lender's Separate Collateral, and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender nor any Junior Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the others relative to such condition, business, assets, operations or other circumstances.

(b)    No Fiduciary Duties.  Each Junior Lender agrees that Senior Lender owes no fiduciary duty to any Junior Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and each Junior Lender agrees not to assert any such claim.  Senior Lender agrees that none of the Junior Lenders owes a fiduciary duty to Senior Lender in connection with the administration of the Junior Loans and the Junior Loan Documents and Senior Lender agrees not to assert any such claim.  Each Junior Lender agrees that none of the other Junior Lenders owes any fiduciary duty to the other Junior Lenders in connection with the administration of a Junior Loan and the related Junior Loan Documents and each Junior Lender agrees not to assert any such claim.

(c)    Payments, Distributions and Protective Advances.  Except as expressly provided in Section 6(b), no payment or distribution to Senior Lender pursuant to the provisions of this Agreement and no Protective Advance by a Junior Lender shall entitle such Junior Lender to exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Loan Liabilities, and each of the Junior Lenders agrees that, except with respect to the enforcement of its rights and remedies under the Junior Loan Documents related to the Junior Loan held by such Junior Lender permitted hereunder, prior to the satisfaction of all Senior Loan Liabilities, it shall not acquire, by subrogation or otherwise (except as expressly set forth in Section 6(b) hereof), any lien, estate, right or other interest in any portion of the Senior Loan Collateral or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.  Except as expressly set forth in Section 6(b), no payment or distribution to Senior Junior Lender pursuant to the provisions of this Agreement and no Protective Advance by Subordinate Junior Lender shall entitle Subordinate Junior Lender to exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Junior Loan Liabilities, and Subordinate Junior Lender agrees that, except with respect to the enforcement of its rights and remedies under the Subordinate Junior Loan Documents permitted hereunder, prior to the satisfaction of all applicable Senior Junior Loan Liabilities, it shall not acquire, by subrogation or otherwise (except as expressly set forth in Section 6(b) hereof), any lien, estate, right or other interest in any portion of the Premises, the Separate Collateral of Senior Junior Lender or any other collateral now securing the Senior Loan or Senior Junior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Junior Loan Documents or the Senior Loan Documents or the liens, rights, estates and other interests created thereby.

(d)     Bankruptcy.

(i)     Subject to Section 18(m), the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action by or against Borrower or any Junior Borrower under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors (as to Borrower or any Junior Borrower or any other Person, a "**Proceeding**").

(ii)     For as long as the Senior Loan shall remain outstanding, none of the Junior Lenders shall direct or cause, and none of them shall solicit any Person to direct or cause, Borrower or any Person which controls Borrower (the "**Borrower Group**") to: (1) commence any Proceeding against Borrower; (2) institute proceedings to have Borrower adjudicated a bankrupt or insolvent; (3) consent to, or affirmatively acquiesce in, the institution of any Proceeding against Borrower; (4) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower; (5) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower, the Senior Loan Collateral or any portion thereof; (6) make an assignment for the benefit of any creditor of Borrower; (7) seek to consolidate the Premises or any other assets of Borrower with the assets of any Junior Borrower or any member of the Borrower Group in any Proceeding; or (8) affirmatively take any action in furtherance of any of the foregoing.  The terms and provisions of this Section 11(d) apply to each Junior Lender solely in its respective capacity as a Junior Lender.  If any Junior Lender commences an Equity Collateral Enforcement Action against its Junior Borrower, and pursuant to such Equity Collateral Enforcement Action, such Junior Lender takes title to the Equity Collateral of such Junior Borrower, from and after the date and time title to such Equity Collateral is vested in such Junior Lender, such Junior Lender shall be bound by the terms and provisions of the respective organizational documents of Borrower and, in the case of the Subordinate Junior Lender, Senior Junior Borrower, regarding bankruptcy and all matters requiring the vote of the independent directors/managers/members of Borrower and Senior Junior Borrower and not by the terms of this Section 11(d).

(iii)     In the event that a Junior Lender is deemed to be a creditor of Borrower in any Proceeding:  (1) each of the Junior Lenders hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against Borrower without the prior written consent of Senior Lender, except to the extent necessary to preserve or realize upon such Junior Lender's interest in any Separate Collateral pledged to such Junior Lender pursuant to the Junior Loan Documents related to the Junior Loan held by such Junior Lender; provided, however, that any such action or filing shall not be as a creditor of Borrower unless necessary to permit such action or filing; (2) Senior Lender may vote in any such Proceeding any and all claims of such Junior Lender against Borrower (including any consolidated entity that includes Borrower), and each of the Junior Lenders hereby appoints Senior Lender as its agent, and grants to Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to such Junior Lender in connection

with any case by or against Borrower in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, or to make any election under Section 1111(b) of the U.S. Bankruptcy Code, provided, however, that with respect to any proposed plan of reorganization including Borrower (including any consolidated entity that includes Borrower) in respect of which creditors are voting, Senior Lender may vote on behalf of such Junior Lender only if the proposed plan would result in Senior Lender being "impaired" (as such term is defined in the U.S. Bankruptcy Code); (3) no Junior Lender shall challenge the validity or amount of any claim against Borrower (including any consolidated entity that includes Borrower) submitted in such Proceeding by Senior Lender in good faith or any valuations of the Senior Loan Collateral, or any portion thereof, submitted by Senior Lender in good faith in such Proceeding or take any other action in such Proceeding which is adverse to Senior Lender's enforcement of its claim or receipt of "adequate protection" (as that term is defined in the U.S. Bankruptcy Code); (4) such Junior Lender waives any right to object to, and shall be deemed to have consented to:  (A) Borrower's use of any cash collateral to the extent of any consent thereto given by Senior Lender, (B) any request by Senior Lender for "adequate protection" (as that term is defined in the U.S. Bankruptcy Code), (C) any debtor-in-possession financing provided to Borrower by Senior Lender, by any Affiliate of Senior Lender, or by any third party with Senior Lender's consent, (D) any motion by Senior Lender for dismissal of the Proceeding or for relief from the "automatic stay" (as defined in the U.S. Bankruptcy Code), (E) any request by Senior Lender for post-petition interest, and (F) any sale of Borrower's assets to the extent that Senior Lender has consented thereto; and (5) without Senior Lender's consent, such Junior Lender shall not, and waives any and all rights to: (u) request "adequate protection" (as that term is defined in the U.S. Bankruptcy Code) (and in the event any such adequate protection is awarded to such Junior Lender, any adequate protection in the form of cash is hereby assigned to Senior Lender and any adequate protection in the form of a lien on or security interest in the Senior Loan Collateral is hereby subordinated to all of Senior Lender's rights, liens, or security interests in or to Senior Loan Collateral), (v) provide debtor-in-possession financing to Borrower (unless such debtor-in-possession financing shall pay the Senior Loan in full), (w) file or support any motion for dismissal of the Proceeding or relief from the "automatic stay" (as defined in the U.S. Bankruptcy Code), (x) request any post-petition interest, (y) request any sale of Borrower's assets, or (z) file, propose, support, accept, or reject any plan of reorganization including Borrower (including any consolidated entity that includes Borrower).  The terms and provisions of this <u>Section 11(d)</u> apply to each Junior Lender solely in its capacity as a Junior Lender.  If Senior Lender is an Affiliate of Borrower, then Senior Lender shall not have the rights provided in this <u>Section 11(d)(iii)</u>; provided that the foregoing shall not be construed to grant any right of Senior Lender to transfer its interests to an Affiliate of Borrower.

(iv)    For as long as the Senior Junior Loan shall remain outstanding, Subordinate Junior Lender shall not, and shall not solicit any Person to, and shall not direct or cause Subordinate Junior Borrower to direct or cause Subordinate Junior Borrower or any Person which controls Subordinate Junior Borrower (as applicable, "**<u>Junior Borrower Group</u>**") to:    (1) commence any Proceeding against Senior Junior Borrower; (2) institute proceedings to have Senior Junior Borrower adjudicated a bankrupt or insolvent; (3) consent to, or affirmatively acquiesce in, the institution of any Proceedings against

Senior Junior Borrower; (4) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Senior Junior Borrower; (5) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Senior Junior Borrower, Separate Collateral for the Senior Junior Loan (or any portion thereof) or any other collateral securing the Senior Junior Loan (or any portion thereof); (6) make an assignment for the benefit of any creditor of Senior Junior Borrower; (7) seek to consolidate the Separate Collateral for the Senior Junior Loan (or any portion thereof) or any other assets of Senior Junior Borrower with the assets of Subordinate Junior Borrower or any member of the Junior Borrower Group in any Proceeding; or (8) affirmatively take any action in furtherance of any of the foregoing.  The terms and provisions of this Section 11(d) apply to each Junior Lender in its capacity as a Junior Lender.

(v)     In the event that Subordinate Junior Lender is deemed to be a creditor of Senior Junior Borrower in any Proceeding:  (1) Subordinate Junior Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against Senior Junior Borrower without the prior written consent of the Senior Junior Lender, except to the extent necessary to preserve or realize upon its interest in any Separate Collateral securing the Subordinate Junior Loan; provided, however, that any such action or filing shall not be as a creditor of Senior Junior Borrower unless necessary to permit such action or filing; (2) the Senior Junior Lender may vote in any such Proceeding against Senior Junior Borrower (including any consolidated entity that includes Senior Junior Borrower) any and all claims of Subordinate Junior Lender, and Subordinate Junior Lender hereby appoints the Senior Junior Lender as its agent, and grants to the Senior Junior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Senior Junior Lender in connection with any case by or against the Senior Junior Borrower in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, or to make any election under Section 1111(b) of the U.S. Bankruptcy Code, provided, however, that with respect to any proposed plan of reorganization including Senior Junior Borrower (including any consolidated entity that includes Senior Junior Borrower) in respect of which creditors are voting, the Senior Junior Lender may vote on behalf of such Junior Lender only if the proposed plan would result in Senior Junior Lender being "impaired" (as such term is defined in the U.S. Bankruptcy Code) with respect to Senior Junior Borrower (or any consolidated entity including Senior Junior Borrower); (3) Subordinate Junior Lender shall not challenge the validity or amount of any claim against the Senior Junior Borrower submitted in such Proceeding by any Senior Junior Lender in good faith or any valuations of the Separate Collateral for the Senior Junior Loan or other collateral for the Senior Junior Loan, or any portion thereof, submitted by Senior Junior Lender in good faith in such Proceeding or take any other action in such Proceeding which is adverse to enforcement by Senior Junior Lender of its claim with respect to Senior Junior Borrower (or any consolidated entity including Senior Junior Borrower) or receipt of "adequate protection" (as that term is defined in the U.S. Bankruptcy Code); (4) Subordinate Junior Lender waives any right to object to, and shall be deemed to have consented to:  (A) the Senior Junior Borrower's use of any cash

collateral to the extent of any consent thereto given by the Senior Junior Lender, (B) any request by the Senior Junior Lender for "adequate protection" (as that term is defined in the U.S. Bankruptcy Code), (C) any debtor-in-possession financing provided to the Senior Junior Borrower by the Senior Junior Lender, by any Affiliate of the Senior Junior Lender, or by any third party with the Senior Junior Lender's consent, (D) any motion by the Senior Junior Lender for dismissal of the Proceeding or for relief from the "automatic stay" (as that term is defined in the U.S. Bankruptcy Code), (E) any request by the Senior Junior Lender for post-petition interest, and (F) any sale of the Senior Junior Borrower's assets to the extent that the Senior Junior Lender has consented thereto; and (5) without the Senior Junior Lender's consent, the Subordinate Junior Lender shall not, and waives any and all rights to:  (A) request "adequate protection" (as that term is defined in the U.S. Bankruptcy Code) (and in the event any such adequate protection is awarded to the Subordinate Junior Lender, any adequate protection in the form of cash is hereby assigned to the Senior Junior Lender and any adequate protection in the form of a lien on or security interest in the Senior Loan Collateral or the Separate Collateral for the Senior Junior Loan or any other collateral for the Senior Junior Loan is hereby subordinated to all of the Senior Junior Lender's rights, liens, or security interests (if any) in or to the Senior Loan Collateral and the Separate Collateral for the Senior Junior Loan and such other collateral for the Senior Junior Loan), (B) provide debtor-in-possession financing to the Senior Junior Borrower (unless such debtor-in-possession financing shall pay the Senior Junior Loan in full), (C) file or support any motion for dismissal of the Proceeding or relief from the "automatic stay" (as that term is defined in the U.S. Bankruptcy Code), (D) request any post-petition interest, (E) request any sale of the Senior Junior Borrower's assets, or (F) file, propose, support, accept, or reject any plan of reorganization including the Senior Junior Borrower (including any entity consolidated with the Senior Junior Borrower).  The terms and provisions of this Section 11(d) apply to any Junior Lender solely in its capacity as a Junior Lender.  If Senior Junior Lender is an Affiliate of Borrower, then Senior Junior Lender shall not have the rights provided in this Section 11(d)(v); provided that the foregoing shall not be construed to grant any right of Senior Junior Lender to transfer its interests to an Affiliate of Borrower.

(vi)    To the extent any payment under the Junior Loan Documents (whether by or on behalf of the related Junior Borrower, as proceeds of security or enforcement of any right of setoff or otherwise) is declared to be fraudulent or preferential, set aside or required to be paid to a trustee, receiver or other similar party under any bankruptcy, insolvency, receivership or similar law, the related Junior Loan or part thereof originally intended to be satisfied shall for all purposes of this Agreement be deemed to be reinstated and outstanding as if such payment had not occurred.

## Section 12.    <u>Rights of Cure</u>.

(a)    <u>Notice of Senior Loan Default</u>.    Prior to accelerating the Senior Loan or commencing any other Enforcement Action by reason of an Event of Default under the Senior Loan Documents, Senior Lender shall provide written notice of the default which would permit Senior Lender to accelerate the Senior Loan and/or commence such other Enforcement Action to each of the Junior Lenders and any Loan Pledgees entitled to notice thereof pursuant to Section 16 of this Agreement, whether or not Senior Lender is obligated to give notice thereof to any Borrower

Party (each, a "**Senior Loan Default Notice**").  In the event Senior Lender has delivered a Senior Loan Default Notice that has not been cured by a Junior Lender pursuant to Section 12, Senior Lender shall provide the Junior Lenders, at each Junior Lenders' respective sole cost and expense, with copies of any and all material notices relating to such Event of Default, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Enforcement Action and otherwise keep the Junior Lenders reasonably apprised as to the current status of any Enforcement Action.  Except in connection with Borrower's failure to repay the Senior Loan in full on the maturity date thereof, Senior Lender shall permit the Junior Lenders an opportunity to cure such default in accordance with the provisions of this Section 12 and shall not accelerate the Senior Loan (other than pursuant to any automatic acceleration provided for in the Senior Loan Documents) or commence an Enforcement Action on account of such default unless such cure is not effectuated within the applicable cure periods provided for in Section 12(b) or (c).  In the event Borrower fails to repay the Senior Loan in full on the maturity date thereof, each of the Junior Lenders shall have the right to purchase the Senior Loan (and all rights thereunder, including the right to extend the Senior Loan) pursuant to the terms, and subject to the conditions, provided in Section 14(a).  Prior to or concurrently with undertaking any curative action with respect to the Senior Loan, a Junior Lender shall provide Senior Lender and Senior Junior Lender (if applicable) with written notice thereof.

(b)      **Senior Loan Monetary Cure Period**.  If the default identified in a Senior Loan Default Notice is a monetary default relating to a liquidated sum of money, each Junior Lender shall have until ten (10) Business Days after the later of (A) the receipt by it from Senior Lender of the Senior Loan Default Notice and (B) the expiration of Borrower's cure period provided in the Senior Loan Documents, if any, to cure such monetary default (the "**Monetary Cure Period**"). In the event a Junior Lender elects to cure any such monetary default, such Junior Lender shall (x) reimburse Senior Lender for any interest charged by Senior Lender or any servicer on any required (pursuant to an applicable trust and servicing agreement or pooling and servicing agreement in connection with a Securitization) advances for the Senior Loan (including Protective Advances) for amounts which Borrower would be obligated to pay under the Senior Loan Documents together with payment of all other amounts then due under the Senior Loan Documents (excluding any late charges, late fees and default interest), and (y) with respect to any liquidated sum of money due with respect to such monetary default first due and payable pursuant to the Senior Loan Documents after the delivery of a Senior Loan Default Notice, such Junior Lender shall pay or cause to be paid such sum, in the amount notified to such Junior Lender by Senior Lender, not more than five (5) Business Days after receipt of such notice from Senior Lender, in accordance with the Senior Loan Documents, subject only to any grace period with respect to such amount provided in the Senior Loan Documents and without the additional grace period applicable to such Junior Lender with respect to the initial monetary default pursuant to this Section 12(b), but subject to any notice requirements under the Senior Loan Documents with respect to such liquidated sum of money (and the receipt by such Junior Lender of such notice).  The Junior Lenders shall, individually, not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan more than six (6) times in any consecutive twelve (12) month period unless the Junior Lender making such cure payments has commenced and is continuing to diligently pursue its rights against such Junior Lender's Equity Collateral.  In the event more than one Junior Lender cures any monetary default in accordance with the terms of this Section 12(b), Senior Lender hereby agrees (x) to accept the cure from Subordinate Junior Lender and (y) to return to Senior Junior Lender within three (3) Business Days of accepting such cure from Subordinate

Junior Lender any funds tendered by Senior Junior Lender. The cure period for a Junior Lender with respect to a monetary default shall run concurrently with the cure period for the other Junior Lenders with respect to such monetary default and in no event shall such cure periods run sequentially. Notwithstanding the foregoing, if a Junior Lender elects to pursue such cure of defaults involving monthly scheduled debt service payments as set forth above and thereafter either fails to make the required cure payments or fails to diligently pursue its rights against such Junior Lender's Equity Collateral as required above, then, notwithstanding any earlier election of any other Junior Lender not to cure the defaults involving monthly scheduled debt service payments, such other Junior Lenders shall be entitled to succeed to all such cure rights, upon written notice to Senior Lender, so long as such other Junior Lender promptly commences and thereafter diligently pursues its rights against its Equity Collateral as required above and otherwise satisfies the provisions of this Section 12(b). If the monetary default referenced in a Senior Loan Default Notice has been cured such that there is no longer an Event of Default under the Senior Loan Documents, the Junior Lenders shall have the right to cure any subsequent monetary default as hereinabove set forth. Senior Lender shall provide written notice to each Junior Lender following receipt of any payment received by Senior Lender that cures any outstanding Event of Default. Notwithstanding anything to the contrary contained herein, with respect to any cure of a Senior Loan effectuated by a Junior Lender in which such Junior Lender was not obligated to pay default interest and/or late fees, if such Junior Lender subsequently completes a foreclosure of its Junior Loan, Borrower (subsequent to the completion of such foreclosure) shall not be required to pay default interest or late fees as they relate to any default so cured.

(c)     Senior Loan Non-Monetary Cure Period. If the default identified in the Senior Loan Default Notice is of a non-monetary nature, the Junior Lenders shall have the following cure periods (the "**Non-Monetary Cure Period**"):

(i)     Mezzanine 2 Lender shall have until the later of (A) ten (10) Business Days after the receipt by Mezzanine 2 Lender of a Senior Loan Default Notice and (B) twenty (20) Business Days after the expiration of Borrower's cure period, if any, for such non-monetary default provided in the Senior Loan Documents, to cure such non-monetary default; and

(ii)     if Mezzanine 2 Lender does not exercise the cure rights pursuant to clause (i) above, then Mezzanine 1 Lender shall have until the later of (A) ten (10) Business Days after the receipt by Mezzanine 1 Lender from Senior Lender of notice that Mezzanine 2 Lender failed to exercise the right to cure the default specified in a Senior Loan Default Notice and (B) thirty (30) Business Days after the expiration of Borrower's cure period, if any, for such non-monetary default provided in the Senior Loan Documents, to cure such non-monetary default.

Notwithstanding the applicable Non-Monetary Cure Period with respect to each Junior Lender, if (i) a non-monetary default identified in a Senior Loan Default Notice is susceptible of cure (prior to or after completion of an Equity Collateral Enforcement Action) but cannot reasonably be cured within such applicable Non-Monetary Cure Period or, if not susceptible of cure without foreclosure of the Equity Collateral or not susceptible to cure at all, a Junior Lender has commenced and is continuing to diligently pursue foreclosure of its Equity Collateral (subject to any applicable stay), and (ii) curative action (which may include, in the case of a non-monetary

default that is not susceptible of cure during the applicable Non-Monetary Cure Period, an Equity Collateral Enforcement Action) was promptly commenced and is being diligently pursued by a Junior Lender (subject to any applicable stay) (provided, that, in the case of a non-monetary default that is not reasonably susceptible of cure within such applicable Non-Monetary Cure Period, not reasonably susceptible of cure without foreclosure of the Equity Collateral or not susceptible of cure at all, delivery of written notice to Senior Lender by such Junior Lender that such Junior Lender intends to attempt in good faith to take curative action and/or commence an Equity Collateral Enforcement Action shall be sufficient for the purposes of clauses (i) and (ii), as applicable, if delivered during the applicable Non-Monetary Cure Period and for so long as such Junior Lender is continuously (subject to any applicable stay) and diligently pursuing such curative action or Equity Collateral Enforcement Action), such Junior Lender shall be given such additional period of time as is reasonably necessary for such Junior Lender in the exercise of due diligence to cure such non-monetary default (or to complete a foreclosure if the non-monetary default is not susceptible of cure without foreclosure of the Equity Collateral, or not susceptible to cure at all) for so long as (A) Borrower or such Junior Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal (if any) and interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents (other than any late charges, late fees and default interest accruing other than by reason of any failure by a Junior Lender to make such regularly scheduled monthly principal and/or interest payments in a timely manner), (B) such additional period of time does not exceed ninety (90) days, unless such non-monetary default is of a nature that cannot be cured within such ninety (90) days, in which case, such Junior Lender shall have such additional time as is reasonably necessary to cure such non-monetary default, provided that such Junior Lender is continuously and diligently pursuing a cure of such non-monetary default, (C) such default is not caused by a Proceeding of any Borrower Party and (D) during such applicable Non-Monetary Cure Period or any extension thereof pursuant to this sentence, there is no material impairment to the value, use or operation of the Premises taken as a whole as reasonably determined by Senior Lender in good faith as a result of such non-monetary default that is not cured by such Junior Lender within five (5) Business Days after receipt of written notice from Senior Lender describing such material impairment in reasonable detail (the conditions described in clauses (A) through (D) above being referred to herein as the "**Non-Monetary Cure Period Extension Conditions**").  In the event more than one Junior Lender cures any non-monetary default in accordance with the terms of this Section 12(c), Senior Lender hereby agrees to accept the cure from the Subordinate Junior Lender.  If Subordinate  Junior Lender has commenced exercising any such cure right during a Non-Monetary Cure Period and elects not to proceed with such cure, Subordinate Junior Lender shall promptly notify Senior Lender and Senior Junior Lender, and Senior Junior Lender shall be deemed in compliance with the terms hereof if it commences curing the applicable non-monetary default (which may include, in the case of a non-monetary default that is not susceptible to cure during the applicable Non-Monetary Cure Period, commencing an Equity Collateral Enforcement Action) within the later of (1) the applicable Non-Monetary Cure Period and (2) five (5) Business Days following receipt of written notice of such election not to proceed with such cure by the Subordinate Junior Lender that precedes it in priority of cure right pursuant to this Section 12(c) and otherwise complies with the provisions of the immediately preceding sentence.  If a Junior Lender is exercising its cure right, it shall keep the Senior Lender and, if applicable, Senior Junior Lender reasonably informed as to its progress, and if requested by Senior Lender or, if applicable, Senior Junior Lender, and at such Junior Lender's sole cost and expense, such Junior Lender shall provide Senior Lender and, if applicable, Senior

Junior Lender with copies of any and all material notices relating to the applicable non-monetary default, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action.  The Non-Monetary Cure Period and any additional cure period granted hereunder to a Junior Lender electing to cure a non-monetary default of Borrower shall automatically terminate upon (x) the commencement of a voluntary Proceeding involving any Borrower Party, (y) a consent to an involuntary Proceeding by any Borrower Party, (z) the failure of any Borrower Party to have an involuntary Proceeding against it discharged, stayed or dismissed within ninety (90) days of filing thereof, unless the Proceeding is subsequently dismissed not later than one hundred twenty (120) days after the filing thereof, in which case each Junior Lender's cure right will be deemed reinstated from and after such dismissal to the extent the other conditions of this <u>Section 12(c)</u> are satisfied.

(d)     <u>Senior Junior Loan Default Notice</u>.  Prior to accelerating the Senior Junior Loan or commencing any other Equity Collateral Enforcement Action by reason of an Event of Default under the Senior Junior Loan Documents, Senior Junior Lender shall provide written notice of the default which would permit Senior Junior Lender to accelerate the Senior Junior Loan or commence such other Equity Collateral Enforcement Action to the Subordinate Junior Lender and any Loan Pledgees entitled to notice thereof pursuant to <u>Section 16</u> of this Agreement, whether or not Senior Junior Lender is obligated to give notice thereof to the Senior Junior Borrower (each, a "**Junior Loan Default Notice**").  In the event Senior Junior Lender has delivered a Junior Loan Default Notice that has not been cured by Subordinate Junior Lender in accordance with this <u>Section 12</u>, Senior Junior Lender shall provide the Subordinate Junior Lender, at the Subordinate Junior Lender's sole cost and expense, with copies of any and all material notices relating to such Event of Default, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action and otherwise keep the Subordinate Junior Lender reasonably apprised as to the current status of any Equity Collateral Enforcement Action. Except in connection with Senior Junior Borrower's failure to repay the Senior Junior Loan in full on the maturity date thereof, the Senior Junior Lender shall permit Subordinate Junior Lender an opportunity to cure such default in accordance with the provisions of this <u>Section 12</u> and shall not accelerate the Senior Junior Loan (other than pursuant to any automatic acceleration provided for in the Senior Junior Loan Documents) or commence any Equity Collateral Enforcement Action on account of such default unless such cure is not effectuated within the applicable cure period provided for in <u>Section 12(e)</u> or <u>12(f)</u> below.  In the event Senior Junior Borrower fails to repay the Senior Junior Loan in full on the maturity date thereof, the Subordinate Junior Lender shall not have a right of cure, but shall have the right to purchase the Senior Junior Loan (and all rights thereunder, including the right to extend the Senior Junior Loan) pursuant to the terms, and subject to the conditions, provided in <u>Section 14</u>.  Prior to or concurrently with undertaking any curative action with respect to the Senior Junior Loan, Subordinate Junior Lender shall provide the Senior Junior Lender with written notice thereof.

(e)     <u>Junior Loan Monetary Cure Period</u>.  If the default identified in a Junior Loan Default Notice is a monetary default relating to a liquidated sum of money, including any scheduled monthly debt service payment, (i) Subordinate Junior Lender shall have until ten (10) Business Days after the later of (A) the giving by the Senior Junior Lender of the Junior Loan Default Notice and (B) the expiration of the Senior Junior Borrower's cure period, if any, for such monetary default provided in the Senior Junior Loan Documents, to cure such monetary default (such period, the "**Junior Loan Monetary Cure Period**").  In the event that Subordinate Junior

Lender elects to cure a monetary default under the Senior Junior Loan, Subordinate Junior Lender shall (x) reimburse the Senior Junior Lender for any interest or other amounts charged by Senior Junior Lender on any required (pursuant to applicable trust and servicing agreement or pooling and servicing agreement or equivalent agreement) advances for the Senior Junior Loan (including Protective Advances) for amounts which the Senior Junior Borrower would be obligated to pay under the Senior Junior Loan Documents together with payment of all other amounts then due under the Senior Junior Loan Documents (excluding any late charges, late fees and default interest), and (y) with respect to any liquidated sum of money due with respect to such monetary default first due and payable pursuant to the Senior Junior Loan Documents after the delivery of a Junior Loan Default Notice, Subordinate Junior Leader shall pay or cause to be paid such sum, in the amount notified to Subordinate Junior Lender not more than five (5) Business Days after receipt of such notice from Senior Junior Lender in accordance with the Senior Junior Loan Documents, subject only to any grace period with respect to such amount provided in the Senior Junior Loan Documents and without the additional grace period applicable to Subordinate Junior Lender with respect to the initial monetary default pursuant to this <u>Section 12(e)</u>, but subject to any notice requirements under the Senior Junior Loan Documents with respect to such liquidated sum of money (and the receipt by Subordinate Junior Lender of such notice).  Subordinate Junior Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Junior Loan more than six (6) times in any consecutive twelve (12) month period unless the Subordinate Junior Lender has commenced and is continuing to diligently pursue its rights against Subordinate Junior Lender's Equity Collateral.  If the monetary default referenced in a Junior Loan Default Notice has been cured such that there is no longer an Event of Default under the Senior Junior Loan Documents, the Subordinate Junior Lender shall have the right to cure any subsequent monetary default as hereinabove set forth.  The Senior Junior Lender shall provide written notice to Subordinate Junior Lender following receipt of any payment received by Senior Junior Lender that cures any such Event of Default.  Notwithstanding anything to the contrary contained herein, with respect to any cure of the Senior Junior Loan effectuated by Subordinate Junior Lender in which Subordinate Junior Lender was not obligated to pay default interest and/or late fees, if Subordinate Junior Lender subsequently completes a foreclosure of the Senior Junior Loan, the Senior Junior Borrower (subsequent to the completion of such foreclosure) shall not be required to pay default interest or late fees as they relate to any default so cured.

(f)    <u>Junior Loan Non-Monetary Cure Period</u>.  If the default identified in the Junior Loan Default Notice is of a non-monetary nature, the Subordinate Junior Lender shall until ten (10) Business Days after the later of (i) receipt by the Subordinate Junior Lender of a Junior Loan Default Notice from Senior Junior Lender and (ii) the expiration of Senior Junior Borrower's cure period (the "**Junior Loan Non-Monetary Cure Period**").  Notwithstanding the applicable Junior Loan Non-Monetary Cure Period, (x) if such non-monetary default is susceptible of cure (prior to or after completion of an Equity Collateral Enforcement Action) but cannot reasonably be cured within such Junior Loan Non-Monetary Cure Period or, if not susceptible of cure without foreclosure of the Equity Collateral or not susceptible to cure at all, Subordinate Junior Lender has commenced and is continuing to diligently pursue foreclosure of its Equity Collateral (subject to any applicable stay), and (y) curative action (which may include, in the case of a non-monetary default that is not susceptible of cure during the applicable Junior Loan Non-Monetary Cure Period, an Equity Collateral Enforcement Action) was promptly commenced and is being diligently pursued by Subordinate Junior Lender (subject to any applicable stay), Subordinate Junior Lender shall be given such additional period of time as is reasonably necessary for

Subordinate Junior Lender in the exercise of due diligence to cure such non-monetary default (or to complete a foreclosure if the non-monetary default is not susceptible of cure without foreclosure of the Equity Collateral or not susceptible to cure at all) for so long as (A) the Senior Junior Borrower or Subordinate Junior Lender makes or causes to be made timely payment of the Senior Junior Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Junior Loan and any other amounts due under the Senior Junior Loan Documents (other than any late charges, late fees and default interest accruing other than by reason of any failure by Subordinate Junior Lender to make such regularly scheduled monthly principal and/or interest payments in a timely manner), (B) such additional period of time does not exceed ninety (90) days, unless such non-monetary default is of a nature that cannot be cured within such ninety (90) days, in which case, Subordinate Junior Lender shall have such additional time as is reasonably necessary to cure such non-monetary default, provided that Subordinate Junior Lender is continuously and diligently pursuing a cure of such non-monetary default, (C) such default is not caused by a Proceeding of the Borrower or the Senior Junior Borrower and (D) during such Junior Loan Non-Monetary Cure Period or any extension thereof pursuant to this sentence, there is no material impairment to the value of the Equity Collateral taken as a whole as reasonably determined by the Senior Junior Lender in good faith as a result of such non-monetary default (the conditions described in clauses (A) through (D) above being referred to herein as the "**Junior Loan Non-Monetary Cure Period Extension Conditions**").  If Subordinate Junior Lender is exercising its cure right, it shall keep the Senior Junior Lender reasonably informed as to its progress, and if requested by the Senior Junior Lender, and at Subordinate Junior Lender's sole cost and expense, Subordinate Junior Lender shall provide the Senior Junior Lender with copies of any and all material notices relating to the applicable non-monetary default, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action.

(g)     No Senior Loan Event of Default.  So long as no Continuing Event of Default under the Senior Loan Documents exists, all funds held and applied pursuant to the Cash Management Agreement and Senior Loan Agreement shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay the outstanding principal balance of the Senior Loan other than the application of such funds to the amortization of the Senior Loan as contemplated by the terms and provisions of the Senior Loan Documents and this Agreement.

(h)     Copies of Default Notices.  Senior Lender shall deliver to each Junior Lender a copy of any notice of an Event of Default under the Senior Loan Documents, transfer of the Senior Loan to "special servicing" and/or the commencement of an Enforcement Action under the Senior Loan Documents, simultaneously with the delivery of such notice to Borrower or with the occurrence of such event, as the case may be.  Senior Junior Lender shall deliver to Subordinate Junior Lender a copy of any notice of an Event of Default under the Senior Junior Loan Documents, transfer of the Senior Junior Loan to "special servicing" and/or the commencement of an Equity Collateral Enforcement Action under the Senior Junior Loan Documents simultaneously with the delivery of such notice to the Senior Junior Borrower.

(i)     Simultaneous Cure of Senior Junior Loan.  Notwithstanding anything to the contrary herein, in the event that Subordinate Junior Lender shall exercise its right under this Section 12 to cure any default (whether monetary or non-monetary) under the Senior Loan and at the time of such cure an Event of Default with respect to the Senior Junior Loan shall be

continuing, then Subordinate Junior Lender shall also be required to concurrently cure (or, in the case of a non-monetary default, commence and diligently pursue a cure of) each Event of Default (whether monetary or non-monetary) under the Senior Junior Loan in accordance with the terms of this Section 12.

(j)    In the event that a Junior Lender makes any cure payment in accordance with this Section 12 with respect to a monetary Event of Default under the Senior Loan and all or any portion of such amount is paid by Borrower or any other Person on Borrower's behalf to Senior Lender, and so long as no other monetary Event of Default under the Senior Loan then exists, Senior Lender shall promptly remit such payment (or such portion of such payment up to the amount paid by such Junior Lender in connection with the applicable cure to the extent such amount is not required to effectuate the cure of the Senior Loan monetary Event of Default (taking into account the amount so paid by Borrower or other Person on Borrower's behalf) to such Junior Lender.

(k)    In the event that Subordinate Junior Lender makes any cure payment in accordance with this Section 12 with respect to a monetary Event of Default under the Senior Junior Loan and all or any portion of such amount is paid by the Senior Junior Borrower or any other Person on Senior Junior Borrower's behalf to the Senior Junior Lender, and so long as no other monetary Event of Default under the Senior Junior Loan then exists, the Senior Junior Lender shall promptly remit such payment (or such portion of such payment up to the amount paid by Subordinate Junior Lender in connection with the applicable cure to the extent such amount is not required to effectuate the cure of the Senior Junior Loan monetary Event of Default (taking into account the amount so paid by Senior Junior Borrower or other Person on Senior Junior Borrower's behalf) to Subordinate Junior Lender.

(l)    Notwithstanding anything contained in this Agreement or in the Senior Loan Documents to the contrary, Junior Lender shall have no obligation to cure any default (and the same shall be deemed to be a default that is not susceptible of cure by Junior Lender) to the extent that any such default would have been cured by (A) the disbursement of any Reserve Funds, and/or (B) the disbursement of funds in accordance with, and in the priority set forth in, Section 2.7.2 of the Senior Loan Agreement, and, in each case, despite all conditions and prerequisites to Senior Lender's obligation to disburse such funds being satisfied in accordance with the terms of the Senior Loan Agreement, Senior Lender fails to disburse such Reserve Funds or funds as and when required pursuant to the terms of the Senior Loan Documents.

**Section 13.    Replacement of Manager**.    (a) Senior Lender consents to the Junior Lenders' rights pursuant to the Junior Loan Documents, and each Junior Lender consents to Senior Lender's right pursuant to the Senior Loan Documents and the other Junior Lenders' right pursuant to the applicable Junior Loan Documents, to cause the termination of the Property Manager, and the exercise of (or election not to exercise) such right (and any manager replacement right exercised or elected not to be exercised pursuant to the terms of this Section 13 below) shall not (in and of itself) permit Senior Lender or the Junior Lenders to declare an Event of Default under the Senior Loan Documents or Junior Loan Documents or take any Enforcement Action or Equity Collateral Enforcement Action.  In the event Senior Lender and one or more Junior Lenders shall have the right to so terminate the Property Manager, and Senior Lender shall fail to exercise (or shall elect not to exercise) such rights, the Junior Lenders may exercise such rights, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant

to the Senior Loan Documents (and, in the case of any exercise of such rights by the Subordinate Junior Lender, by any subsequent exercise of such rights by the Senior Junior Lender).  Upon the occurrence of any event which would entitle a Junior Lender to cause the termination of the Property Manager pursuant to the Junior Loan Documents, such Junior Lender shall have the right to select, or cause the selection of, a replacement property manager, asset manager or leasing agent for the Premises, which replacement manager, asset manager and/or leasing agent for the Premises shall either (a) if such replacement shall not be a Qualified Manager, be subject to Senior Lender's (and, in the case of a selection by Subordinate Junior Lender, the Senior Junior Lender's) reasonable approval and, if any Certificates are then outstanding and rated by any Rating Agency, be subject to a Rating Agency Confirmation or (b) be a Qualified Manager.

(b)    Notwithstanding anything in this <u>Section 13</u> to the contrary, (x) if an Event of Default under the Senior Loan then exists or any other event shall have occurred (in each case which is not in the process of being cured by a Junior Lender in accordance with this Agreement) pursuant to which Senior Lender has the right to select any replacement manger, asset manager and/or leasing agent pursuant to the Senior Loan Documents (or, at Senior Lender's option, to elect not to exercise such right and to retain the then-current Property Manager), Senior Lender shall have the sole right to elect (i) not to exercise such right and to retain the then-current Property Manager (and in such case shall notify each Junior Lender of such election) or (ii) to select any replacement manager, asset manager and/or leasing agent which is a Qualified Manager, whether or not a new manager, asset manager or leasing agent was retained by a Junior Lender, provided that Senior Lender agrees to consult on a non-binding basis with the Junior Lenders before making any such election.

(c)    Notwithstanding anything in this <u>Section 13</u> to the contrary but subject to Senior Lender's rights and the other terms and conditions of <u>Section 13(a)</u> and <u>Section 13(b)</u> above, if an Event of Default under the Senior Junior Loan then exists or any other event shall have occurred (in each case which is not in the process of being cured by Subordinate Junior Lender as permitted hereby) pursuant to which the Senior Junior Lender has the right to select any replacement manager, asset manager and/or leasing agent pursuant to the Senior Junior Loan Documents (or, at Senior Junior Lender's option, to elect not to exercise such right and to retain the then-current Property Manager), Senior Junior Lender shall have the sole right vis-à-vis Subordinate Junior Lender (but subject to the rights of the Senior Lender under this <u>Section 13</u>) to elect (i) not to exercise such right and to retain the then-current Property Manager (and in such case shall notify Senior Lender and the Subordinate Junior Lender of such election) or (ii) to select any replacement manager, asset manager and/or leasing agent which is a Qualified Manager, whether or not a new manager, asset manager or leasing agent was retained by Subordinate Junior Lender, provided that Senior Junior Lender agrees to consult on a non-binding basis with the Subordinate Junior Lender before making any such election.

(d)    Notwithstanding anything contained in this <u>Section 13</u> to the contrary, (i) Senior Lender shall not exercise its right to cause the termination of the Property Manager under the Senior Loan Documents unless a Continuing Event of Default shall have occurred and be continuing with respect to the Senior Loan and (ii) Senior Junior Lender shall not exercise its right to cause the termination of the Property Manager under the Senior Junior Loan Documents unless a Continuing Event of Default shall have occurred and be continuing with respect to the Senior Junior Loan.

**Section 14.**     <u>Right to Purchase Senior Loan and the Senior Junior Loan</u>.

(a)    If an Event of Default has occurred under the Senior Loan, the Senior Loan has been accelerated, any Enforcement Action has been commenced under the Senior Loan Documents, a Proceeding has been commenced against Borrower, or the Senior Loan is a "specially serviced mortgage loan" under the applicable trust and servicing agreement or pooling and servicing agreement as a result of an Event of Default under the Senior Loan (each of the foregoing, a "**Purchase Option Event**"), Senior Lender shall provide prompt written notice of the existence of a Purchase Option Event to the Junior Lenders (the "**Purchase Notice**") (provided that, in no case shall Senior Lender be obligated to send more than one (1) Purchase Notice to each Junior Lender in respect of any single event or occurrence as to which such Purchase Option Event relates), and upon ten (10) Business Days' prior written notice to Senior Lender and each other Junior Lender (a "**Purchase Election Notice**"), each Junior Lender shall have the right to purchase at any time for cash, in whole but not in part, the Senior Loan for a price equal to the sum of (at the time of purchase and without duplication) the outstanding principal balance thereof, together with all accrued and unpaid interest, and all other amounts due thereon (including, without limitation, (i) any unreimbursed required (pursuant to an applicable trust and servicing agreement or pooling and servicing agreement in connection with a Securitization) advances (including Protective Advances) made by Senior Lender or any servicer for amounts which Borrower is obligated to pay under the Senior Loan Documents, (ii) post-petition interest, (iii) any interest charged by Senior Lender or any servicer on any required (pursuant to an applicable trust and servicing agreement or pooling and servicing agreement in connection with a Securitization) advances for amounts which Borrower is obligated to pay under the Senior Loan Documents, (iv) any workout fee, special servicing fee or liquidation fee payable to the special servicer pursuant to a pooling and servicing agreement or trust and servicing agreement in connection with a Securitization, provided, that (A) the special servicing fee rate shall not exceed twenty five basis points per annum (0.25%) of the outstanding principal balance of the Senior Loan, (B) the aggregate workout fee rate shall not exceed one hundred basis points (1.00%) of each collection of interest and principal received on the Senior Loan; (C) the liquidation fee rate shall not exceed one hundred basis points (1.00%) of any liquidation proceeds received on the Senior Loan, (D) in no event shall both a workout fee and a liquidation fee be payable on the same principal payment; and (E) any such workout fee or liquidation fees shall be excluded if the Senior Loan is purchased within ninety (90) days of the date on which the applicable Purchase Notice was given to the applicable Junior Lender, and (v) all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) actually incurred by Senior Lender in enforcing the terms of the Senior Loan Documents), but in all events excluding any yield maintenance premiums and prepayment fees or premiums, any exit fees, any liquidated damage amount, any spread maintenance charges, any late charges or any default interest (the "**Loan Purchase Price**"). Notwithstanding the foregoing but subject to the terms of the last sentence of this <u>Section 14(a)</u>, the failure of Senior Lender to timely provide a Purchase Notice to any Junior Lender of the occurrence of a Purchase Option Event shall have no adverse effect on Senior Lender other than the resulting extension of the time in which the Purchase Election Notice may be given.  In the event that more than one Junior Lender elects to purchase the Senior Loan pursuant to this <u>Section 14(a)</u>, the Subordinate Junior Lender shall have the exclusive right to so purchase the Senior Loan, provided that Subordinate Junior Lender shall also be required to concurrently purchase the Senior Junior Loan from the Senior Junior Lender for a price equal to the sum of (at the time of purchase and without duplication) the outstanding principal balance thereof, together

with all accrued and unpaid interest, and all other amounts due thereon (including, without limitation, (i) any unreimbursed required (pursuant to an applicable trust and servicing agreement or pooling and servicing agreement or equivalent agreement) advances (including Protective Advances) made by Senior Junior Lender or any servicer for amounts which the Senior Junior Borrower is obligated to pay under the Senior Junior Loan Documents and post-petition interest, (ii) any interest charged by Senior Junior Lender or any servicer on any advances on the Senior Junior Loan for amounts which the Senior Junior Borrower would be obligated to pay under the Senior Junior Loan Documents, and (iii) all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) actually incurred by Senior Junior Lender in enforcing the terms of the Senior Junior Loan Documents, but excluding any yield maintenance premiums and prepayment fees or premiums, any exit fees, any liquidated damage amount, any spread maintenance or yield maintenance charges, any late charges or any default interest (the "**Senior Junior Loan Purchase Price**").  Subordinate Junior Lender may not close the purchase of the Senior Loan without concurrently closing the purchase of the Senior Junior Loan in accordance with the terms of this <u>Section 14</u>.  If Subordinate Junior Lender has elected to purchase the Senior Loan and fails to complete such purchase within ten (10) Business Days after delivery of a Purchase Election Notice (other than as a result of a default or breach by the seller of the Senior Loan) or fails to concurrently purchase the Senior Junior Loan as required hereunder (other than as a result of a default or breach by the seller of any the Senior Junior Loan), then such Purchase Election Notice shall be deemed invalid, Subordinate Junior Lender shall cease to have any right to purchase the Senior Loan (and the Senior Junior Loan) in connection with the applicable Purchase Option Event and the Senior Junior Lender shall thereafter be entitled to exercise its purchase rights under, and in accordance with, this <u>Section 14(a)</u>.  Concurrently with payment to Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered to the Junior Lender exercising the purchase right hereunder all (i) Senior Loan Documents, (ii) copies of all title policies, opinion letters, organizational documents and borrower certificates to the extent not already delivered to such Junior Lender and (iii) all other loan file documents and materials associated exclusively with the Senior Loan to the extent readily available (excluding any confidential or proprietary information of Senior Lender) held by or on behalf of Senior Lender and will execute in favor of such Junior Lender or its designee assignment documentation, in form and substance reasonably acceptable to such Junior Lender, at the sole cost and expense of such Junior Lender to assign the Senior Loan and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan (including principal and accrued but unpaid interest), as to the Senior Lender's power and authority to enter into the applicable assignment documentation and as to Senior Lender's ownership free and clear of all liens or encumbrances and not having previously Transferred its rights in the Senior Loan as of the consummation of the assignment of the Senior Loan).  Concurrently with payment to Senior Junior Lender of the Senior Junior Loan Purchase Price for the Senior Junior Loan, Senior Junior Lender shall deliver or cause to be delivered to the Subordinate Junior Lender all Senior Junior Loan Documents held by or on behalf of the Senior Junior Lender and will execute in favor of Subordinate Junior Lender assignment documentation, in form and substance reasonably acceptable to Subordinate Junior Lender, at the sole cost and expense of Subordinate Junior Lender to assign the Senior Junior Loan and its rights under the Senior Junior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Junior Loan (including principal and accrued but unpaid interest), as to the Senior Junior Lender's power and

authority to enter into the applicable assignment documentation and as to the Senior Junior Lender's ownership and not having previously Transferred its rights in the Senior Junior Loan as of the consummation of the assignment of the Senior Junior Loan, other than for participations or Loan Pledges being paid off in full on or before the purchase and sale of the Senior Junior Loan). Following the occurrence of a Purchase Option Event, each Junior Lender shall keep the other Junior Lender informed as to such Junior Lender's intention to exercise any of its respective rights in connection with the Purchase Option Event.  The right of each Junior Lender to purchase the Senior Loan (and, in the case of Subordinate Junior Lender, the Senior Junior Loan) shall automatically terminate (x) to the extent such right arose with respect to a specific Purchase Option Event, if such Purchase Option Event ceases to exist, or (y) upon a Transfer of the Premises by foreclosure sale, sale by power of sale or delivery of a deed in lieu of foreclosure in accordance with Section 14(b) below; provided, however, that, with respect to this clause (y), in no event shall any Junior Lender have less than thirty (30) days following receipt of a Purchase Notice to deliver a Purchase Election Notice and ten (10) Business Days thereafter to close, it being acknowledged and agreed that any Junior Lender shall be entitled to bid at foreclosure as permitted by applicable law.

(b)    Notwithstanding anything to the contrary contained herein, but subject to the last sentence of this Section 14(b), Senior Lender and the Junior Lenders agree that:

(i)    Senior Lender shall not accept (or cause any nominee or designee to accept) a deed-in-lieu of foreclosure without first providing each Junior Lender with at least twenty-five (25) Business Days' prior written notice (a "**DIL Notice**") of Senior Lender's good faith intention to accept a deed-in-lieu within the forty-five (45) day period following delivery of such DIL Notice, provided, however, a DIL Notice may not be issued by Senior Lender prior to the occurrence of a Purchase Option Event and delivery of a Purchase Notice;

(ii)    for fourteen (14) Business Days following the delivery of a DIL Notice, a Junior Lender or its designee shall have the right, upon notice to Senior Lender, to simultaneously purchase (x) the Senior Loan for the Loan Purchase Price and otherwise in accordance with the above provisions of this Section 14, and (y) the Senior Junior Loan (if any) for the Senior Junior Loan Purchase Price, in each case, regardless of whether a Purchase Notice has been given;

(iii)    if both Junior Lenders give notice to Senior Lender pursuant to the immediately preceding subparagraph (ii) following delivery of a DIL Notice (and regardless of which Junior Lender is the first to give such notice), then the Subordinate Junior Lender shall have the exclusive right, during the twelve (12) Business Days following Subordinate Junior Lender's notice, to purchase the Senior Loan for the Loan Purchase Price and the Senior Junior Loan for the Senior Junior Loan Purchase Price, and otherwise in accordance with the provisions of Section 14(a) above (it being agreed that in no event shall Senior Junior Lender close its purchase of the Senior Loan prior to the date that is the earlier of (I) the fourteenth (14th) Business Day following delivery of a DIL Notice and (II) thirty (30) days after delivery of the applicable Purchase Notice, and then may do so only if Subordinate Junior Lender, to the extent it has given notice pursuant to the immediately preceding subparagraph (ii), fails to purchase the Senior Loan and the

Senior Junior Loan prior to such date, other than by reason of the default of the Senior Lender or Senior Junior Lender, as applicable);

(iv)    if neither Junior Lender consummates the purchases described in the immediately preceding subparagraphs (ii) and (iii), respectively, within the respective periods of time provided in such subparagraphs (other than by reason of the default of Senior Lender), Senior Lender shall have the right, for thirty (30) days after the expiration of such twenty-five (25) Business Day period, to accept such deed-in-lieu of foreclosure; and

(v)    if Senior Lender does not accept such deed-in-lieu of foreclosure prior to the expiration of such thirty (30) day period described in the immediately preceding subparagraph (iv), Senior Lender shall thereafter not accept a deed-in-lieu of foreclosure without again complying with all of the provisions of this Section 14(b).

Notwithstanding anything to the contrary in the foregoing, (A) Senior Lender may not give a DIL Notice during any Monetary Cure Period or Non-Monetary Cure Period, (B) if Senior Lender delivers a DIL Notice following the date on which it sends to Junior Lenders a Purchase Notice, then the provisions of this Section 14(b) shall govern (in lieu of any provisions in Section 14(a) above) until the expiration of the twenty-five (25) Business Day period referred to in this Section 14(b), and (C) if no Junior Lender has effected a purchase as described in this Section 14(b) by the close of business on the twenty-fifth (25th) Business Day period referred to in this Section 14(b), then the provisions of Sections 14(a) and 14(b) shall once again apply for so long as Senior Lender has not accepted (or caused any nominee or designee to accept) a deed-in-lieu of foreclosure in accordance with this Agreement.  In the event that Senior Lender is permitted pursuant to this Agreement to accept (or cause any nominee or designee to accept) a conveyance-in-lieu of foreclosure, each Junior Lender agrees that it shall not assert that such conveyance shall result in any recourse under the Junior Loan Documents.  Upon Senior Lender's request, each Junior Lender shall confirm the preceding sentence in writing to the applicable Junior Borrower.

(c)    If a Continuing Event of Default has occurred under the Senior Junior Loan, the Senior Junior Loan has been accelerated, any Equity Collateral Enforcement Action has been commenced under the Senior Junior Loan Documents, or a Proceeding has been commenced against the Senior Junior Borrower (a "**Junior Loan Purchase Option Event**"), the Senior Junior Lender shall provide prompt written notice of the existence of a Junior Loan Purchase Option Event to Subordinate Junior Lender (the "**Junior Purchase Notice**") (provided that, in no case shall Senior Junior Lender be obligated to send more than one (1) Junior Purchase Notice to Subordinate Junior Lender in respect of any single event or occurrence as to which such Junior Loan Purchase Option Event relates), and upon ten (10) Business Days' prior written notice to Senior Junior Lender (a "**Junior Purchase Election Notice**"), Subordinate Junior Lender shall have the right to purchase for cash, in whole but not in part, the Senior Junior Loan for the Senior Junior Loan Purchase Price.  Notwithstanding the foregoing, but subject to the terms of the last sentence of this Section 14(c), the failure of Senior Junior Lender to timely provide notice to Subordinate Junior Lender of the occurrence of a Junior Loan Purchase Option Event shall have no adverse effect on Senior Junior Lender other than the resulting extension of the time in which

the Junior Purchase Election Notice may be given.  If Subordinate Junior Lender has elected to purchase the Senior Junior Loan but fails to complete such purchase within ten (10) Business Days of delivery of a Junior Purchase Notice (other than as a result of a default or breach by Senior Junior Lender), then such Junior Purchase Election Notice shall be deemed invalid, and Subordinate Junior Lender shall cease to have any right to purchase the Senior Junior Loan in connection with the applicable Junior Loan Purchase Option Event.  Concurrently with payment to Senior Junior Lender of the Senior Junior Loan Purchase Price, Senior Junior Lender shall deliver or cause to be delivered to the Subordinate Junior Lender all Senior Junior Loan Documents held by or on behalf of Senior Junior Lender and will execute in favor of Subordinate Junior Lender assignment documentation, in form and substance reasonably acceptable to Subordinate Junior Lender, at the sole cost and expense of Subordinate Junior Lender, to assign Senior Junior Loan and its rights under the Senior Junior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Junior Loan, as to the Senior Junior Lender's power and authority to enter into the applicable assignment documentation and as to Senior Junior Lender's ownership and not having previously Transferred its rights in the Senior Junior Loan as of the consummation of the assignment of the Senior Junior Loan other than for participations or Loan Pledges being paid off in full on or before the purchase and sale of the Senior Junior Loan).  The right of Subordinate Junior Lender to purchase the Senior Junior Loan shall automatically terminate (x) to the extent such right arose with respect to a specific Junior Loan Purchase Option Event, if such Junior Loan Purchase Option Event ceases to exist (including, if the Senior Junior Lender terminated its Equity Collateral Enforcement Action and no other Junior Loan Purchase Option Event then exists), or (y) upon a Transfer of the Equity Collateral covered by the Senior Junior Loan Documents pursuant to any Equity Collateral Enforcement Action; provided, however, that, with respect to this <u>clause (y)</u>, in no event shall Subordinate Junior Lender have less than thirty (30) days following receipt of a Junior Purchase Notice to deliver a Junior Purchase Election Notice and ten (10) Business Days thereafter to close, it being acknowledged and agreed that Subordinate Junior Lender shall be entitled to bid at foreclosure as permitted by applicable law.

(d)    Notwithstanding anything to the contrary contained herein, but subject to the last sentence of this <u>Section 14(d)</u>, Senior Junior Lender and the Subordinate Junior Lender agree that:

(i)    Senior Junior Lender shall not accept (or cause any nominee or designee to accept) a conveyance of any Equity Collateral in lieu of foreclosure without first providing Subordinate Junior Lender with at least twenty (20) Business Days' prior written notice (a "**CIL Notice**") of Senior Junior Lender's good faith intention to accept a conveyance-in-lieu within the forty-five (45) day period following such notice, provided, however, a CIL Notice may not be issued by Senior Junior Lender prior to the occurrence of a Junior Purchase Option Event and the delivery of a Junior Purchase Notice;

(ii)    for fourteen (14) Business Days following the delivery of a CIL Notice, Subordinate Junior Lender or its designee shall have the right, upon notice to the Senior Junior Lender, to purchase the Senior Junior Loan for the Senior Junior Loan Purchase Price and otherwise in accordance with the above provisions of this <u>Section 14</u> regardless of whether a Junior Purchase Notice has been given;

(iii)    intentionally omitted;

(iv)    if Subordinate Junior Lender fails to consummate such purchases described in the immediately preceding subparagraph (ii) within the period of time provided in such subparagraph (other than by reason of the default of the Senior Junior Lender), Senior Junior Lender shall have the right, for thirty (30) days after the expiration of such the twenty (20) Business Day period, to accept such conveyance-in-lieu of foreclosure; and

(v)    if Senior Junior Lender does not accept such conveyance-in-lieu of foreclosure prior to the expiration of such forty-five (45) day period described in the immediately preceding subparagraph (iv), Senior Junior Lender shall thereafter not accept a conveyance-in-lieu of foreclosure without again complying with all of the provisions of this Section 14(d).

Notwithstanding anything to the contrary in the foregoing, (A) Senior Junior Lender may not give a CIL Notice during any Junior Loan Monetary Cure Period or Junior Loan Non-Monetary Cure Period, (B) if Senior Junior Lender delivers a CIL Notice following the date on which it sends to the Subordinate Junior Lender a Junior Purchase Notice, then the provisions of this Section 14(d) shall govern (in lieu of any provisions in Section 14(c) above) until the expiration of the twenty (20) Business Day period referred to in this Section 14(d), and (C) if Subordinate Junior Lender has not effected a purchase as described in this Section 14(d) by the close of business on the twenty (20) Business Day period referred to in this Section 14(d), then the provisions of Sections 14(c) and 14(d) shall once again apply for so long as Senior Junior Lender has not accepted (or caused any nominee or designee to accept) a conveyance-in-lieu of foreclosure in accordance with this Agreement.  Subordinate Junior Lender agrees that it shall not assert that such conveyance shall result in any recourse under the Subordinate Junior Loan Documents.  Upon Senior Junior Lender's request, Subordinate Junior Lender shall confirm the preceding sentence in writing to the Senior Junior Borrower.

(e)    Each Junior Lender covenants not to enter any agreement with Borrower or any Junior Borrower or any respective Affiliate of any of the foregoing to purchase the Senior Loan or the Senior Junior Loan pursuant to this Section 14 or in connection with any refinancing of the Senior Loan or the Senior Junior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents or the Senior Junior Loan Documents relating to the payment of a prepayment fee, exit fee, late charge, default interest, liquidated damages or yield maintenance charge in connection with a prepayment or repayment of the Senior Loan or the Senior Junior Loan.

(f)    If a Purchase Election Notice has been timely given by a Junior Lender, the ten (10) Business Day period following delivery of the Purchase Election Notice during which a purchasing Junior Lender is required to consummate such purchase shall be extended:

(i)    for an additional thirty (30) days beyond the initial ten (10) Business Day period, upon payment to Senior Lender of a non-refundable (unless the transferring Senior Lender defaults in its obligation or is unable to Transfer the Senior Loan) cash deposit in an amount equal to five percent (5%) of the Loan Purchase Price, which cash deposit shall be paid within the ten (10) Business Day period following delivery of the related Purchase Election Notice; and

(ii)    solely to the extent that the Purchase Election Notice relates to an Event of Default under the Senior Loan that is a maturity default, for an additional thirty (30) days beyond the initial thirty (30) day extension period described in <u>clause (i)</u> above upon (x) payment to Senior Lender of an additional non-refundable (unless the transferring Senior Lender defaults in its obligation or is unable to Transfer the Senior Loan) cash deposit in an amount equal to five percent (5%) of the Loan Purchase Price, which cash deposit shall be paid within the initial thirty (30) day period described in <u>clause (i)</u> above, and (y) delivery of a term sheet or summary of terms and other evidence, reasonably acceptable to Senior Lender, that such Junior Lender is diligently and continuously seeking a capital source to fund the purchase of the Senior Loan, which reasonably acceptable evidence may, but is not required to, include correspondence regarding capital sources with brokers or debt or equity financing sources, or copies of term sheets, letters of intent or other similar expressions of potential terms for such debt or equity capital.

Notwithstanding anything to the contrary in the foregoing, Senior Lender may not give a DIL Notice, complete an Enforcement Action, or accept a deed-in-lieu of foreclosure during the ten (10) Business Day period following delivery of the Purchase Election Notice (or, if such ten (10) Business Day period is extended for additional periods in strict accordance with this Section, during any such properly exercised extension period).

(g)    If a Junior Purchase Election Notice has been timely given by Subordinate Junior Lender, the ten (10) Business Day period following delivery of the Junior Purchase Election Notice during which Subordinate Junior Lender is required to consummate such purchase shall be extended for an additional thirty (30) days beyond the initial ten (10) Business Day period, upon payment to Senior Junior Lender of a non-refundable (unless the transferring Senior Junior Lender defaults in its obligation or is unable to Transfer the Senior Junior Loan) cash deposit in an amount equal to ten percent (10%) of the Senior Junior Loan Purchase Price, which cash deposit shall be paid within the ten (10) Business Day period following delivery of the related Junior Purchase Election Notice.

Notwithstanding anything to the contrary in the foregoing, Senior Junior Lender may not give a CIL Notice, complete an Equity Collateral Enforcement Action, or accept a conveyance-in-lieu of foreclosure during the ten (10) Business Day period following delivery Junior Loan Purchase Election Notice (or, if such ten (10) Business Day period is extended in strict accordance with this Section, during such extension period).

**Section 15.    <u>Additional Understanding</u>**.    For as long as a Junior Loan remains outstanding:

(a)    <u>Notices of Transfer</u>.  Senior Lender shall promptly notify Junior Lenders, and each Junior Lender shall promptly notify Senior Lender and the other Junior Lender, if Borrower or any Junior Borrower seeks or requests from such Person a release of any lien arising pursuant to any of the Senior Loan Documents or Junior Loan Documents or seeks or requests such Person's consent to, or takes any action in connection with or in furtherance of, a Transfer of the Premises or any portion thereof, the granting of a further mortgage, pledge or other similar encumbrance against the Premises or any related Separate Collateral, a Transfer of any interest in Borrower or any Junior Borrower, or a prepayment or refinancing of the Senior Loan or the Senior Junior Loan.

In connection with any sale of the Premises or any portion thereof or any sale of any interest in Borrower or any Junior Borrower by Borrower or any Junior Borrower after the occurrence of an Event of Default under the Senior Loan or the Senior Junior Loan, as applicable, Senior Lender and Senior Junior Lender will cause, to the extent it has such rights under the Senior Loan Documents or the Senior Junior Loan Documents, and if required by the terms of any of the Junior Loan Documents, all amounts in excess of amounts due on the Senior Loan held by Senior Lender or the Senior Junior Loan held by Senior Junior Lender, as applicable, to be applied toward amounts outstanding under the Junior Loans, in the order of priority of the outstanding Junior Loans. In the event of a request by Borrower or any Junior Borrower for Senior Lender's or any Junior Lender's consent to either (i) the sale or Transfer of all or any material portion of the Premises or any interest in Borrower or any Junior Borrower, (ii) the granting of a further mortgage, deed of trust or other similar encumbrance against the Premises or any of the Equity Collateral, or (iii) the incurrence of any additional indebtedness by Borrower or a Junior Borrower, such Person from whom such consent has been requested shall, as long as no Event of Default has occurred under the Senior Loan or the Junior Loan held by such Person, as applicable, if such Person has the right to consent under the Senior Loan Documents or Junior Loan Documents relating to the Senior Loan or the Junior Loan held by such Person, as applicable, or such consent is otherwise requested from such Person, obtain the prior written consent of the Senior Lender or the Junior Lenders, as the case may be, prior to such Person granting its consent thereto. Nothing in this Section 15(a) shall limit any consent rights of Senior Lender or any Junior Lender with respect to Transfers under the Senior Loan Documents or Transfers (as respectively defined in each Junior Loan Agreement) under the applicable Junior Loan Documents, as applicable.

(b) Annual Budget. Subject to the terms of the applicable Junior Loan Documents, each Junior Lender shall have the right to reasonably approve the annual budget for the Premises in accordance with the terms of the applicable Junior Loan Documents. Notwithstanding anything contained herein or in the Senior Loan Documents or the Junior Loan Documents, each Junior Lender may require the submission of the annual budget to such Junior Lender for approval prior to any submission to Senior Lender or the Senior Junior Lender. Upon a Junior Lender's approval, such Junior Lender shall submit the approved annual budget to Senior Lender and the other Junior Lender for their approval and consult on a non-binding basis with Senior Lender and the other Junior Lender with respect to such matters. Subordinate Junior Lender shall not unreasonably withhold its consent to any changes in the annual budget reasonably requested by Senior Lender or the Senior Junior Lender. In the event that the approval of any Junior Lender is not obtained on a timely basis, but subject to the terms of the Senior Loan Documents and the applicable Junior Loan Documents, the then current existing approved annual budget shall remain in effect, provided that such annual budget shall be adjusted to reflect actual increases in non-discretionary expense items. The provisions of this Section 15(b) shall not limit or alter the rights of Senior Lender with respect to Borrower pursuant to the Senior Loan Documents or any Junior Lender with respect to its respective Junior Borrower pursuant to the applicable Junior Loan Documents.

(c) Consent Rights of Junior Lenders. Each Junior Lender shall have the right to reasonably approve Major Leases (including any termination or modification of any Major Leases) at the Premises, alterations to the Premises and the use of casualty and condemnation proceeds for restoration of the Premises subject, in each case, to the terms of the Senior Loan Documents and the Junior Loan Documents. Subject to the terms of the Senior Loan Documents and the Junior Loan Documents, each Junior Lender may require the submission of requests for approval of Major

Leases or terminations or surrenders of or modifications to Major Leases at the Premises, alterations to the Premises or the use of casualty and condemnation proceeds to such Junior Lender for approval prior to any submission to Senior Lender or the Senior Junior Lender. Upon a Junior Lender's approval, such Junior Lender shall submit the applicable Major Lease, alteration or proceeds request to Senior Lender and the Senior Junior Lender, if applicable, for its approval and consult on a non-binding basis with Senior Lender and the Senior Junior Lender, if applicable, with respect to such matters. Subject to the terms of the Senior Loan Documents and the applicable Junior Loan Documents, each Junior Lender shall not unreasonably withhold its consent to any changes in the proposed alteration or use of proceeds reasonably requested by Senior Lender or the Senior Junior Lender, if applicable. Any such use or application of casualty or condemnation proceeds for restoration of the Premises shall be made subject to and in accordance with the terms and requirements of the Senior Loan Documents and, if applicable, Senior Junior Loan Documents, including, without limitation, any mandatory amortization or prepayment obligations provided therein. The provisions of this Section 15(c) shall not limit or alter the rights of Senior Lender with respect to Borrower pursuant to the Senior Loan Documents or any Junior Lender with respect to its respective Junior Borrower pursuant to the applicable Junior Loan Documents (it being specifically agreed that, to the extent any Junior Lender has a consent right under the related Junior Loan Documents, any consent by Senior Lender shall not be binding upon such Junior Lender and such Junior Lender shall have the right to grant or withhold any such consent in accordance with the terms and provisions of the related Junior Loan Documents).

(d)    Notices.

(i)    Senior Lender shall provide each Junior Lender with prompt notice of (a) any change to the identity of the servicer of the Senior Loan, and (b) any change to the identity of Clearing Bank and/or Cash Management Bank (as such terms are defined in the Senior Loan Agreement).

(ii)    Senior Lender shall provide Junior Lenders any financial and/or operating statements delivered to the Senior Lender (and not Junior Lenders) by the Borrower and/or any Guarantor with respect to the Senior Loan pursuant to the Senior Loan Documents ("**Statements**"), provided that (A) such Statements shall actually be in the possession of Senior Lender (or Servicer); (B) Junior Lenders shall have paid Senior Lender (or Servicer) for any actual, out-of-pockets costs and expenses incurred in connection with obtaining and providing such Statements, as well as for any reasonable fee charged by Senior Lender (or Servicer) in connection with obtaining and providing such Statements; and (C) Senior Lender's (or Servicer's) failure to deliver any such Statements shall not impair or affect any of Senior Lender's rights under this Agreement or constitute a default by Senior Lender under this Agreement or affect each Junior Lender's obligations under this Agreement.

(iii)    In order to effectuate the foregoing clause (ii), Senior Lender agrees to use commercially reasonable efforts to implement a protocol with the Junior Lenders with respect to the delivery of the Statements.

(iv)    Each Junior Lender and Senior Lender shall endeavor to provide the others with copies of all notices of default and/or acceleration delivered by such party to any

member of the Borrower Group in connection with, or related to, a Junior Loan or the Senior Loan, as applicable, as well as all material written correspondence related thereto.

(e)      Junior Loan Monthly Payment Notices.

(i)      Each Junior Lender acknowledges that (A) Senior Lender is not acting as agent for any Junior Lender, (B) Senior Lender is not collecting any amounts on behalf of any Junior Lender and (C) Senior Lender's sole responsibility with respect to any amounts received pursuant to the Cash Management Agreement shall be to disburse such amounts pursuant to the Cash Management Agreement, the other Senior Loan Documents and this Agreement.  So long as a Cash Management Trigger Event Period or a Cash Sweep Trigger Event Period (as defined in the Senior Loan Agreement) exists, not less than three (3) Business Days prior to each Monthly Payment Date (as defined in the Senior Loan Agreement), each Junior Lender shall deliver to Senior Lender (or, if directed by Senior Lender, to the Servicer (as defined in the Senior Loan Agreement) or the Cash Management Bank) a written notice (which may be via email if accepted by the Servicer or the Cash Management Bank, as applicable) setting forth the current debt service due on such Monthly Payment Date with respect to the applicable Junior Loan (each, a "**Junior Lender Monthly Payment Notice**").  Each Junior Lender acknowledges that Senior Lender shall have the right to rely on any such Junior Lender Monthly Payment Notice and that Senior Lender shall have no responsibility to verify or correct any amounts set forth in any Junior Lender Monthly Payment Notice and no liability to any Junior Lender if the amount set forth in any Junior Lender Monthly Payment Notice is incorrect.  Senior Lender's sole responsibility shall be to apply (or to direct the Cash Management Bank to apply) the amount set forth in each Junior Lender Monthly Payment Notice in accordance with the terms of the Cash Management Agreement, the other Senior Loan Documents and this Agreement.

(ii)      Junior Lenders acknowledge that in the event that, during a Cash Management Trigger Event Period or a Cash Sweep Trigger Event Period, any Junior Lender shall fail to give Senior Lender its Junior Lender Monthly Payment Notice at least three (3) Business Days prior to any Monthly Payment Date, Senior Lender shall include the amount identified in the most recently received Junior Lender Monthly Payment Notice that was delivered by such Junior Lender (such amount, a "**Prior Payment Amount**") as the amount due to such Junior Lender on such Monthly Payment Date.  Senior Lender shall have no liability to any Junior Lender for including a Prior Payment Amount as being the amount due to a Junior Lender that failed to deliver a Junior Lender Monthly Payment Notice, shall have no obligation to notify any Junior Lender of the failure of Senior Lender to receive a Junior Lender Monthly Payment Notice and shall have no obligation with respect to pursuing the collection of any amounts owing to any Junior Lender.  If a Prior Payment Amount for any Junior Lender is paid to such Junior Lender in accordance with the foregoing, any Junior Lender that failed to deliver a Junior Lender Monthly Payment Notice to Senior Lender shall make prompt demand on the applicable Junior Borrower for payment of any shortfall due to such Junior Lender as of such Monthly Payment Date.  Any Junior Lender making a demand to its Junior Borrower agrees that the payment default resulting from any such shortfall shall not be deemed to be or permit the declaration of an Event of Default under the applicable Junior Loan Documents, and such Junior Lender

shall not demand or collect late charges or default interest or take any enforcement action pursuant to its Junior Loan Documents unless the applicable Junior Borrower fails to remit such funds within two (2) Business Days after delivery of such demand.

(iii)    If a Junior Lender receives a Prior Payment Amount as a result of failing to deliver a Junior Lender Monthly Payment Notice, such Junior Lender shall promptly recalculate the correct amount that was due to such Junior Lender pursuant to its Junior Loan Documents and shall promptly notify Senior Lender of such correct amount.  If a Prior Payment Amount disbursed to a Junior Lender exceeded the scheduled monthly amount actually due on such Junior Lender's Junior Loan on the applicable Monthly Payment Date, such Junior Lender shall promptly remit such excess funds to the Clearing Account (as defined in the Senior Loan Documents).

(f)    <u>Mezzanine Endorsement to Title Policy</u>.  Junior Lenders hereby acknowledge that their respective rights pursuant to the endorsements, loss payee letters and assignment of title insurance proceeds to such Junior Lender relating to Borrower's title insurance policies to Junior Lenders obtained in connection with the Junior Loans shall be in the following order of priority: (i) first, Mezzanine 1 Lender, and (ii) second, Mezzanine 2 Lender.  Senior Lender acknowledges that the obtaining by a Junior Lender of such endorsement, loss payee letter and assignment of title insurance proceeds relating to Borrower's title insurance policies, and the receipt of any payments by the insurer made thereon, shall not constitute a violation of any representation, warranty or covenant of such Junior Lender hereunder nor be barred or limited by any provision of <u>Section 10</u>.

(g)    <u>Trigger Periods</u>.  Senior Lender shall consult with each Junior Lender on a non-binding basis with respect to a determination that (i) a Cash Management Trigger Event Period or a Cash Sweep Trigger Event Period is in effect or (ii) a Cash Management Trigger Event Period or a Cash Sweep Trigger Event Cure has occurred in accordance with the provisions of the Senior Loan Agreement (whether the related Cash Management Trigger Event Period or Cash Sweep Trigger Event Period was initially determined to have occurred by Senior Lender or a Junior Lender).  Each Junior Lender shall have the right to give notice to Senior Lender that such Junior Lender has determined, in its reasonable judgment made in accordance with the terms of the Senior Loan Documents, that a Cash Management Trigger Event Period or a Cash Sweep Trigger Event Period is in effect or that a Cash Management Trigger Event Period or a Cash Sweep Trigger Event Cure has not occurred, provided that no such determination shall be binding on Senior Lender's determination thereof.

(h)    <u>Uncross of Individual Properties</u>.  Each Junior Lender acknowledges that Senior Lender has the right, pursuant to Section 11.27 of the Senior Loan Agreement, to remove certain Individual Properties (as defined in the Senior Loan Agreement) (each, an "**Affected Property**") as collateral for the Senior Loan after a Securitization of the Senior Loan in connection with (A) a default under the Senior Loan due to certain document defects or (B) a breach of a loan seller representation and warranty delivered or given, as applicable, in connection with the Securitization related to such Affected Property.  Any such Affected Properties may be so removed from the Securitization and uncrossed from the Senior Loan pursuant to the terms of Section 11.27 of the Senior Loan Agreement (pursuant to which the Senior Loan will be severed).  Notwithstanding any such uncrossing of the Senior Loan, in no event shall a Junior Lender be required to sever or otherwise modify its Junior Loan, and each Junior Loan shall be cross-defaulted with any senior

debt allocated to the Affected Property. Senior Lender and each Junior Lender shall mutually agree upon the structure and documentation required to effectuate such uncrossing of any Affected Property, and Senior Lender and each Junior Lender shall enter into such amendments of this Agreement as are necessary to effectuate such cross-default and to preserve the rights of each Junior Lender as set forth herein, all at Senior Lender's sole cost and expense (including reasonable attorney's fees). Any request by Senior Lender that a Junior Lender sever or otherwise modify its Junior Loan shall be subject to the consent of the applicable Junior Lender, which consent may be granted or denied in such Junior Lender's sole discretion. In the event of any inconsistencies between the provisions of this Agreement on the one hand and the Senior Loan Agreement or any Junior Loan Agreement on the other hand with respect to the uncrossing of Affected Properties, the provisions of this Agreement shall control.

      (i)     <u>Loan Components/Prepayment</u>.

      (i)     In furtherance of and not in limitation to the provisions of <u>Section 15(j)</u> below, each Junior Lender hereby acknowledges and agrees that notwithstanding anything to the contrary contained herein, at any time prior to the Securitization of the entire Senior Loan, subject to the applicable terms and conditions of the Senior Loan Documents, Senior Lender may create components of the Senior Loan, change the balances, amortization and interest rate of the Senior Loan (and of any components thereof that may be created by Senior Lender), in each case without the consent of any Junior Lender, provided that the initial weighted average interest rate, monthly amortization in the aggregate among the components of the Senior Loan and the aggregate principal balance of the Senior Loan shall remain the same and, except for any rate creep that may occur as a result of the application of payments among the components of the Senior Loan after an Event of Default or in connection with the application of casualty insurance proceeds or condemnation awards, there shall be no adverse economic or other adverse effect to more than a de minimis extent on any Junior Loan, no increase to more than a de minimis extent in any Junior Borrower's obligations under the related Junior Loan Documents and no decrease to more than a de minimis extent in any Junior Lender's rights, remedies or protections thereunder, in each case, as a result of any such modifications of the Senior Loan. Senior Lender shall reimburse Junior Lenders for all reasonable out-of-pocket expenses incurred by Junior Lenders in connection with the creation of any components of the Senior Loan.

      (ii)     Senior Lender and each other Junior Lender hereby acknowledges and agrees that notwithstanding anything to the contrary contained herein, but subject to the applicable terms and conditions of the applicable Junior Loan Documents, a Junior Lender may create components of the applicable Junior Loan, change the balances, amortization and interest rate of such Junior Loan (and of any components thereof that may be created by such Junior Lender), in each case without the consent of Senior Lender or the other Junior Lender, provided that the initial weighted average interest rate, monthly amortization in the aggregate among the components of such Junior Loan and the aggregate principal balance of such Junior Loan shall remain the same and, except for any rate creep that may occur as a result of the application of payments among the components of the such Junior Loan after an Event of Default or in connection with the application of casualty insurance proceeds or condemnation awards, there shall be no adverse economic or other

adverse effect to more than a de minimis extent on the Senior Loan and the other Junior Loan, no increase to more than a de minimis extent in Borrower's obligations under the Senior Loan Documents or the other Junior Borrower's obligations under Junior Loan Documents with respect to the other Junior Loan, and no decrease to more than a de minimis extent  in Senior Lender's or the other Junior Lender's rights, remedies or protections thereunder, in each case, as a result of any such modifications of such Junior Loan.  Such Junior Lender shall reimburse Senior Lender and the other Junior Lender for all reasonable out-of-pocket expenses incurred by Senior Lender and the other Junior Lender in connection with the creation of any components of such Junior Loan.

(j)      Cooperation.  At the request of Senior Lender, prior to the Securitization of the entire Senior Loan, subject to the applicable terms of the Senior Loan Documents and the applicable Junior Loan Documents, Junior Lenders shall use reasonable efforts, at Senior Lender's sole cost and expense, to satisfy, and to cooperate with Senior Lender in attempting to cause Borrower and Junior Borrowers to satisfy, the market standards to which Senior Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any Securitization of the Senior Loan (or any portion thereof or interest therein), including, entering into (or consenting to, as applicable) any modifications to this Agreement or the Senior Loan Documents or Junior Loan Documents, and to cooperate with Senior Lender in attempting to cause Borrower and Junior Borrowers to execute such modifications to the Senior Loan Documents and Junior Loan Documents, in any such case, as may be reasonably requested by the Rating Agencies to effect the Securitization; provided, however, no Junior Lender shall be required to modify or amend this Agreement or any Senior Loan Documents or any Junior Loan Documents (or consent to such modification or amendment of the Senior Loan Documents or any Senior Junior Loan Documents, as applicable), if such modification or amendment would (I) increase or alter (in each case to more than a de minimis extent) any non-economic obligations or increase any economic obligations of the applicable Junior Borrower under the related Junior Loan Documents or (II) decrease or alter (in each case to more than a de minimis extent) such Junior Lender's rights, remedies or protections thereunder or under this Agreement or (III) otherwise have any adverse economic effect to more than a de minimis extent or any other adverse effect on the related Junior Loan to more than a de minimis extent.  No Senior Loan Modification or Junior Loan Modification requiring the consent of any Junior Lender may be entered into without the prior written consent of each Junior Lender whose consent is required pursuant to Section 8(a) or Section 8(b) hereof, and no modification or amendment in any material respect of any non-economic terms of any Subordinate Junior Loan Documents and no modification or amendment of any economic terms of any Subordinate Junior Loan Documents, in each case pursuant to this Section 15(j) shall be effective without the consent of Senior Junior Lender, which consent shall not be unreasonably withheld, conditioned or delayed.  In connection with any Securitization of the Senior Loan (or any portion thereof or interest therein), upon Senior Lender's written request and at Senior Lender's sole cost and expense, each Junior Lender agrees to provide for inclusion in any disclosure document relating to such Securitization such non-confidential and non-proprietary information concerning such Junior Lender as Senior Lender reasonably determines to be necessary or appropriate.  Each Junior Lender agrees that if the Senior Loan (or any portion thereof or any interest therein) is to be included as an asset of a Securitization, such Junior Lender shall, at Senior Lender's request and at Senior Lender's sole cost and expense, reasonably cooperate with the reasonable requests of any Rating Agency and Senior Lender in connection with such Securitization, subject to the limitations

above regarding modifications to this Agreement, the Senior Loan Documents and the Junior Loan Documents. Senior Lender shall reimburse each Junior Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by such Junior Lender in considering, responding to, negotiating and implementing any cooperation, modifications or other actions requested by Senior Lender in connection with this Section 15(j). Notwithstanding the foregoing, the obligations and rights of Senior Lender set forth in this Section 15(j) with respect to its respective Senior Note are limited to the applicable initial named Senior Lender hereunder and its Affiliates holding such Senior Note, and no successors or assigns of any such initial named Senior Lender hereunder or its Affiliates shall have any obligations or rights under this Section 15(j). For the avoidance of doubt, the parties agree that Borrower's or any Junior Borrower's obligation to enter into any amendment or modification to the Senior Loan Documents or any related Junior Loan Documents shall be subject to the obtaining of any consent of the applicable Junior Lender that is required hereunder, and no Borrower or Junior Borrower shall be in default of its obligations under any of the Senior Loan Documents or related Junior Loan Documents to enter into any amendment or modification if the consent of an applicable Junior Lender required hereunder is not obtained. Notwithstanding anything to the contrary contained in this Section 15(j) or otherwise, no Junior Lender shall be required to provide any information with respect to any direct or indirect investors in such Junior Lender or any Affiliates of such Junior Lender (or any direct or indirect investors in any such Affiliates), unless providing such information is required by applicable law.

(k)     Requests for Disbursements. Senior Lender hereby agrees promptly following written request from any Junior Lender to (x) notify such Junior Lender of any requests by Borrower for disbursements of funds from the Reserve Funds or a release of Net Proceeds, and (y) provide such Junior Lender with any documentation delivered by Borrower to Senior Lender with respect to any such request by Borrower for a disbursement of funds from the Reserve Funds or release of Net Proceeds (provided that in no event shall failure by Senior Lender to provide such notice or documentation to any Junior Lender impose any liability on Senior Lender).

(l)     Certain Letter of Credit Matters. With respect to any Letter of Credit given as security for the Senior Loan, if at any time Senior Lender has the right to draw upon such Letter of Credit in accordance with the terms and conditions of the Senior Loan Documents, Senior Lender shall consult (on a non-binding basis) with the Junior Lenders to determine whether to draw upon such Letter of Credit as permitted under the terms of the Senior Loan at least five (5) Business Days prior to the date that draws are no longer permitted under such Letter of Credit if such right to draw is due, in whole or part, to Borrower failing to extend the expiration date of such Letter of Credit or to provide a replacement Letter of Credit. To the extent Senior Lender draws on any such letter of credit, Senior Lender shall apply the proceeds from such draw to the Senior Loan Liabilities to the extent Senior Lender is permitted to do so pursuant to the terms of the Senior Loan Documents.

(m)     New Mezzanine Loan. Senior Lender and each Junior Lender hereby acknowledge and agree that, notwithstanding any provision of the Senior Loan Documents or the Junior Loan Documents that contemplates the creation of a "new mezzanine loan", in no event shall a reallocation of the Senior Loan or any Junior Loan and the creation of a "new mezzanine loan" (whether senior or junior to any then existing Junior Loan) be made without the party intending to

exercise such right obtaining the prior written consent from Senior Lender and each Junior Lender, as applicable.

**Section 16.**  **Financing of Junior Loans**.

(a)  Notwithstanding any other provision herein to the contrary, Senior Lender and each Junior Lender consents to any Junior Lender's sale in connection with a repurchase agreement facility or pledge (each, a "**Pledge**") of its respective Junior Loan (or any interest therein) and its Separate Collateral to any entity which has extended a credit facility, including, without limitation, credit in the form of a repurchase agreement facility, to such Junior Lender and would otherwise satisfy the requirements of a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by each Rating Agency and which, in each case, is not Borrower, a Junior Borrower or an Affiliate of Borrower or a Junior Borrower (a "**Loan Pledgee**"), on the terms and conditions set forth in this Section 16.  It is also agreed that the sale by any Junior Lender of its Junior Loan to a Qualified Transferee and the simultaneous agreement by such Junior Lender to repurchase its Junior Loan under an arrangement documented as a repurchase agreement shall qualify as a Pledge, provided all applicable terms and conditions of this subsection (a) are complied with, provided, further, that (x) a Loan Pledgee which is not a Qualified Transferee may not take title to the Equity Collateral without a Rating Agency Confirmation and (y) a Loan Pledgee which is a Prohibited Entity may not take title to any Junior Loan or, together with any other Loan Pledgee which is a Prohibited Entity, more than a 49% interest in a Junior Loan.  Upon written notice by a Junior Lender to Senior Lender and the other Junior Lenders that the Pledge has been effected and the address for notice purposes of the Loan Pledgee, Senior Lender and each other Junior Lender agree to acknowledge receipt of such notice and thereafter agree:  (i) to give Loan Pledgee written notice of any default by the applicable Junior Lender under this Agreement of which default Senior Lender or such Junior Lender, as applicable, has actual knowledge; (ii) to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a non-monetary default) to cure a default by the applicable Junior Lender in respect of its obligations to Senior Lender or such Junior Lender hereunder, but Loan Pledgee shall not be obligated to cure any such default; (iii) that no amendment or modification of this Agreement which adversely affects the rights or obligations of the applicable Junior Lender which has made a Pledge to such Loan Pledgee, and no waiver or termination of this Agreement, shall be effective against such Loan Pledgee without the written consent of such Loan Pledgee, which consent shall not be unreasonably withheld, conditioned or delayed; (iv) that Senior Lender shall give to Loan Pledgee copies of any Senior Loan Default Notice and each Junior Lender shall give to Loan Pledgee copies of any Junior Loan Default Notice issued by such Junior Lender simultaneously with the giving of same to the applicable Junior Lender and accept any cure thereof by Loan Pledgee made in accordance with the provisions of Section 12 of this Agreement as if such cure were made by the applicable Junior Lender; (v) that Senior Lender and each Junior Lender shall deliver to such Loan Pledgee such estoppel certificate(s) as such Loan Pledgee shall reasonably request, provided that any such estoppel certificate(s) shall be in the form contemplated by Section 18(b) or such other form reasonably acceptable to Senior Lender and such Junior Lender; and (vi) that, upon written notice to Senior Lender or a Junior Lender by Loan Pledgee that the applicable Junior Lender is in default beyond applicable cure periods under such Junior Lender's obligations to Loan Pledgee pursuant to the applicable credit agreement between the applicable Junior Lender and Loan Pledgee (which notice need not be joined in or confirmed by the applicable Junior Lender), or upon a written notice jointly

given by the applicable Junior Lender and Loan Pledgee directing that payments otherwise due such Junior Lender pursuant to this Agreement be made to or as directed by Loan Pledgee (either, a "**Redirection Notice**"), Senior Lender and the other Junior Lenders shall remit to such Loan Pledgee and not to the applicable Junior Lender, any payments that Senior Lender or such other Junior Lender would otherwise be obligated to pay to the applicable Junior Lender from time to time pursuant to this Agreement, any Senior Loan Document, any Junior Loan Document or any other agreement between Senior Lender or any Junior Lender or between Junior Lenders that relates to the Senior Loan or a Junior Loan.  Each Junior Lender hereby unconditionally and absolutely releases Senior Lender and the other Junior Lenders from any liability to such Junior Lender on account of Senior Lender's or such other Junior Lender's compliance with any Redirection Notice reasonably believed (without any duty of inquiry of any kind) by Senior Lender or such other Junior Lender to have been delivered by such Junior Lender's Loan Pledgee.  Loan Pledgee shall be permitted to fully exercise its rights and remedies against the applicable Junior Lender, and realize on any and all collateral granted by the applicable Junior Lender to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with this Agreement and applicable law.  In such event, Senior Lender and each of the other Junior Lenders shall recognize Loan Pledgee (and any assignee or transferee which is also a Qualified Transferee and which is not Borrower, a Junior Borrower or an Affiliate of Borrower or a Junior Borrower at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to the applicable Junior Lender's rights, remedies and obligations under this Agreement and the related Junior Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in the writing (for the benefit of Senior Lender, the other Junior Lender and their respective successors and assigns) the obligations of the applicable Junior Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof (it being agreed that, notwithstanding anything to the contrary contained herein, such Loan Pledgee shall not be required to so assume the applicable Junior Lender's obligations hereunder prior to such realization on such collateral).  The rights of Loan Pledgee under this Section 16 shall remain effective unless and until Loan Pledgee shall have notified Senior Lender and the other Junior Lenders in writing that its interest in the applicable Junior Loan has terminated.

(b)     Notwithstanding any provisions herein to the contrary, if a conduit ("**Conduit**") which is not a Qualified Transferee provides financing to a Junior Lender, then such Conduit will be a permitted "Loan Pledgee" despite the fact it is not a Qualified Transferee if the following conditions are satisfied:

(i)     The loan (the "**Conduit Inventory Loan**") made by the Conduit to such Junior Lender to finance the acquisition and holding of its interest in such Junior Lender's Junior Loan will require a third party (the "**Conduit Credit Enhancer**") to provide credit enhancement;

(ii)     The Conduit Credit Enhancer will be a Qualified Transferee;

(iii)     Junior Lender will pledge (or sell, transfer or assign as part of a repurchase facility) its interest in its Junior Loan to the Conduit as collateral for the Conduit Inventory Loan;

(iv)    The Conduit Credit Enhancer and the Conduit will agree that, if such Junior Lender defaults under the Conduit Inventory Loan, or if the Conduit is unable to refinance its outstanding commercial paper even if there is no default by such Junior Lender, the Conduit Credit Enhancer will purchase the Conduit Inventory Loan from the Conduit, and the Conduit will assign the pledge of such Junior Lender's interest in its Junior Loan (or all of its rights and obligations in connection with the applicable repurchase facility with respect thereto) to the Conduit Credit Enhancer; and

(v)    Unless the Conduit is in fact then a Qualified Transferee, the Conduit will not without obtaining a Rating Agency Confirmation from each Rating Agency have any greater right to acquire the interests in the Junior Loan pledged (or sold, transferred or assigned as part of a repurchase facility) by such Junior Lender, by foreclosure or otherwise, than would any other purchaser that is not a Qualified Transferee at a foreclosure sale conducted by a Loan Pledgee.

**Section 17.    <u>Obligations Hereunder Not Affected</u>**.

(a)    All rights, interests, agreements and obligations of Senior Lender and each Junior Lender under this Agreement shall remain in full force and effect irrespective of:

(i)    any lack of validity or enforceability of any of the Senior Loan Documents or the Junior Loan Documents or any other agreement or instrument relating thereto;

(ii)    any taking, exchange, release or non-perfection of any collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty or indemnity, for all or any portion of the Senior Loan or the Junior Loans;

(iii)    any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or any Junior Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or any Junior Loan or any other assets of Borrower, any Junior Borrower or any other Affiliates of Borrower or any Junior Borrower;

(iv)    any change, restructuring or termination of the corporate structure or existence of Borrower, any Junior Borrower or any other Affiliates of Borrower or any Junior Borrower; or

(v)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, any Junior Borrower or a subordinated creditor or a senior lender subject to the terms hereof.

(b)    This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan or a Junior Loan is rescinded or must otherwise be returned by Senior Lender or a Junior Lender upon the insolvency, bankruptcy or reorganization of Borrower or a Junior Borrower or otherwise, all as though such payment had not been made.

**Section 18.    <u>Miscellaneous</u>**.

- 80 -

      (a)   <u>Notices</u>.   All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 18</u>.  Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (i) upon receipt if mailed, (ii) on the date of sending by facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (iii) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (iv) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

          To Senior Lender:

                  UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York
                  1285 Avenue of the Americas
                  New York, New York  10019
                  Attention: Transaction Management – Henry Chung
                  Facsimile No.: 212.821.2943

          With a copy to:

                  Dechert LLP
                  1095 Avenue of the Americas
                  New York, New York  10010
                  Attention: Timothy A. Stafford, Esq.
                  Facsimile No.:  212.698.3599

          To Mezzanine 1 Lender:

                  UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York
                  1285 Avenue of the Americas
                  New York, New York  10019
                  Attention: Transaction Management – Henry Chung
                  Facsimile No.: 212.821.2943

          With a copy to:

                  Dechert LLP
                  1095 Avenue of the Americas
                  New York, New York  10010
                  Attention: Timothy A. Stafford, Esq.
                  Facsimile No.:  212.698.3599

To Mezzanine 2 Lender:

>UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York
>1285 Avenue of the Americas
>New York, New York  10019
>Attention: Transaction Management – Henry Chung
>Facsimile No.: 212.821.2943

With a copy to:

>Dechert LLP
>1095 Avenue of the Americas
>New York, New York  10010
>Attention: Timothy A. Stafford, Esq.
>Facsimile No.:  212.698.3599

(b)     Estoppel.

(i)     Each Junior Lender shall, within ten (10) Business Days following a request from Senior Lender or another Junior Lender, provide Senior Lender or such other Junior Lender with a written statement setting forth the then current outstanding principal balance of the Junior Loan held by such Junior Lender, the aggregate accrued and unpaid interest under the Junior Loan held by such Junior Lender, and stating whether to such Junior Lender's knowledge any default or Event of Default exists under the Junior Loan held by such Junior Lender or this Agreement.

(ii)     Senior Lender shall, within ten (10) Business Days following a request from a Junior Lender, provide such Junior Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan or this Agreement.

(iii)     Any statement provided pursuant to this Section 18(b) may be relied upon by, as applicable, any Loan Pledgee, any investor or participant in the Senior Loan or the applicable Junior Loan, or any purchaser of the Senior Loan or any Junior Loan (or of any interest or a participation interest therein), but may not be relied upon by any Borrower Party or any guarantor or indemnitor with respect to the Senior Loan or any Junior Loan.

(c)     Further Assurances.  So long as all or any portion of the Senior Loan or any Junior Loan remains unpaid and any Senior Loan Document encumbers the Senior Loan Collateral or a Junior Loan Document encumbers the related Equity Collateral, Senior Lender and Junior Lenders shall each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

(d)     <u>No Third Party Beneficiaries; No Modification</u>.  The parties hereto do not intend the benefits of this Agreement to inure to Borrower, any Junior Borrower, or any other Person not a party to this Agreement other than Loan Pledgees.  This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought.  If any Certificates are outstanding, this Agreement shall not be amended in a manner materially adverse to Senior Lender unless a Rating Agency Confirmation has been obtained with respect to such amendment.

(e)     <u>Successors and Assigns</u>.  This Agreement shall bind all successors and permitted assigns of Senior Lender and each Junior Lender and shall inure to the benefit of all successors and permitted assigns of Senior Lender and each Junior Lender.

(f)     <u>Counterpart Originals</u>.  This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic image scan transmission (such as a ".pdf" file) will be effective as delivery of an original manually executed counterpart of the Agreement.

(g)     <u>Legal Construction</u>.  In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

(h)     <u>No Waiver; Remedies</u>.  No failure on the part of Senior Lender or any Junior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(i)     <u>No Joint Venture</u>.  Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

(j)     <u>Captions</u>.  The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

(k)     <u>Conflicts</u>.  In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Junior Loan Documents, the terms and conditions of this Agreement shall control.

(l)     <u>No Release</u>.  Nothing herein contained shall operate to (i) release Borrower or any guarantor or indemnitor from (A) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents to which it is a party or (B) any liability of Borrower or any guarantor or indemnitor under the Senior Loan Documents or (ii) release any Junior Borrower or any guarantor or indemnitor from (A) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements

contained in the related Junior Loan Documents or (B) any liability of a Junior Borrower or any guarantor or indemnitor under the related Junior Loan Documents.

(m)    <u>Continuing Agreement</u>.  This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (x) payment in full of the Senior Loan and all of the Junior Loans, (y) transfer of title to the Junior Lenders of their respective Equity Collateral (or conversion or exchange by all Junior Lenders of their entire Junior Loans into or for any other unsecured indebtedness or preferred equity or convertible indebtedness pursuant to, and subject to the terms and conditions (including the Conversion Conditions) of <u>Section 8(b)</u>) (provided, however, that, except to the extent expressly stated herein to survive, this Agreement shall solely terminate with respect to any Junior Lender who acquires title (in its own name or the name of a designee) to its respective Equity Collateral and to Subordinate Junior Lender) and (z) the transfer of the Premises by foreclosure of the Senior Loan Documents or the exercise of power of sale contained therein or by deed-in-lieu of foreclosure; provided, however, that (i) any rights or remedies of any party hereto arising out of any breach of any provision hereof occurring prior to the date and time of termination of this Agreement shall survive such termination and any provisions that by their terms are expressly stated to survive a termination shall survive such termination and (ii) if at any time any payment in full of the Senior Loan or any Junior Loan is rescinded in whole or in part or must be otherwise restored or returned in whole or in part upon the insolvency, bankruptcy or reorganization of Borrower or a Junior Borrower, as applicable, or otherwise then, upon the restoration or return of any portion of such payment in full, Senior Lender's or such Junior Lender's, as applicable, rights and obligations hereunder shall be reinstated as though such payment in full (or portion thereof so restored or returned, as the case may be) had not been made at such time.  In the event the Senior Loan is repaid in full, the Junior Lender with the highest priority Junior Loan shall have the right to exercise all of the rights granted to Senior Lender pursuant to this Agreement and shall thereafter be deemed to be the "Senior Lender" and to be the holder of the "Senior Loan" for all purposes without requiring the amendment of this Agreement and references thereafter to the Senior Loan Documents shall be deemed to be references to the Senior Junior Loan Documents.  Notwithstanding the foregoing provisions of this <u>Section 18(m)</u>, but subject to clause (ii) set forth above, in the event the Senior Loan or any Junior Loan is repaid in full or otherwise retired, cancelled or terminated, Senior Lender or a Junior Lender that was the holder of such repaid, retired, cancelled or terminated loan shall have no further rights or obligations under this Agreement, except those rights and obligations that expressly survive the expiration or termination of this Agreement.  The provisions of this <u>Section 18(m)</u> shall survive the expiration and termination of this Agreement with respect to any party hereto.

(n)    <u>Severability</u>.  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.  Furthermore, the parties shall in good faith endeavor to replace any provision held to be invalid or unenforceable with a valid and

enforceable provision which most closely resembles, and which has the same economic and substantive effect as, the provision held to be invalid or unenforceable.

(o) <u>Injunction</u>. Senior Lender and Junior Lenders each acknowledges (and waives any defense based on a claim) that monetary damages are not an entirely adequate remedy to redress a breach by any other hereunder and that a breach by any of Senior Lender or any Junior Lender hereunder would cause irreparable harm to the others. Accordingly, Senior Lender and Junior Lenders agree that upon a breach of this Agreement by any other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

(p) <u>Reciprocal Disclaimer</u>.

(i) Senior Lender and the Junior Lenders are all sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan or a Junior Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the related Junior Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and the Junior Lenders deem relevant. Each of Senior Lender and each of the Junior Lenders has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the related Junior Loan and the related Junior Loan Documents upon any oral or written information, representation, warranty or covenant from any other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties, if any, of any other contained herein and therein. Each of Senior Lender and each of the Junior Lenders further acknowledges that no employee, agent or representative of any other has been authorized to make, and that each of Senior Lender and each of the Junior Lenders has not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement. Without limiting the foregoing, each of Senior Lender and each of the Junior Lenders acknowledges that the others have made no representations or warranties (other than those specifically contained in this Agreement) as to the Senior Loan or the Senior Loan Collateral (including, without limitation, the cash flow of the Senior Loan Collateral, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Senior Loan Collateral, to pay all amounts which may become due from time to time pursuant to the Senior Loan) or any of the Junior Loans or any Separate Collateral.

(ii) Each of Senior Lender and each of the Junior Lenders acknowledges that the Senior Loan and the Senior Loan Documents and each of the Junior Loans and the related Junior Loan Documents are distinct, separate transactions and loans, separate and apart from each other. Each of Senior Lender and each of the Junior Lenders acknowledges that the others are distinct separate lenders with distinct and separate loans with various rights and remedies with respect to the Senior Loan Collateral or the Separate Collateral, as applicable, which are not in all respects aligned.

(q) <u>Consent and Approval Rights</u>. With respect to any provision hereof that requires the consent or approval of more than one Junior Lender to any action by Senior Lender, the

withholding of consent or disapproval of any such action by any one Junior Lender whose consent or approval is required shall preclude Senior Lender from taking the proposed action. Notwithstanding anything in this Agreement to the contrary, in the event at any time the Senior Loan or any Junior Loan is held by a Person that is an Affiliate of Borrower or any Junior Borrower, such Person shall have no consent or approval rights pursuant to this Agreement. Further, with respect to any provisions hereof that require the consent or approval of Senior Lender or another Junior Lender to any action by a Junior Lender, the withholding of consent or disapproval of any such action by Senior Lender or another Junior Lender, as applicable, shall preclude such Junior Lender from taking the proposed action. Notwithstanding the foregoing prohibition, Borrower or any Affiliate of Borrower may purchase Certificates in connection with a Securitization of the Senior Loan (or any portion thereof or interest therein) and no such purchase by Borrower or any Affiliate of Borrower shall cause the trustee of any Securitization of the Senior Loan or any portion thereof  or interest therein (or the Securitization Vehicle holding the Senior Loan or any portion thereof or interest therein) to be an Affiliate of Borrower so long as the applicable pooling and servicing agreement provides that once acquired by Borrower or any Affiliate of Borrower, such Certificates will be non-controlling Certificates with respect to the Senior Loan and in no event shall Borrower or any Affiliate of Borrower serve as "operating advisor," "directing holder" or in a similar capacity with respect to the Senior Loan, or be appointed as a special servicer for the Senior Loan.

(r)     Affiliated Junior Lender.  Notwithstanding anything in this Agreement to the contrary, in the event that at any time a Junior Loan (or any portion thereof or interest therein) is held by any Affiliated Mezzanine Lender, such Person shall have no rights under Sections 5 (except for the right to Transfer interests in the Junior Loan in accordance with the terms and conditions of such Section), 6, 8, 10, 11(d), 12, 13, 14, 15 or 16 hereof, may not take an Equity Collateral Enforcement Action and may not engage in a Junior Loan Modification of the related Junior Loan or the related Junior Loan Documents without Senior Lender's prior written consent and the other Junior Lenders' prior written consent), which may be withheld in its sole discretion.

(s)     Legal Matters.  Each party hereto irrevocably and unconditionally submits to the jurisdiction of the United States District Court for the Southern District of New York, any court in the State of New York located in the Borough of Manhattan in the City and County of New York, and any appellate court from any thereof, in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereunder, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereunder may be heard or determined in such New York State court or, to the extent permitted by law, in such federal court.

EACH PARTY HERETO AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND EACH WAIVES ANY RESPECTIVE RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD

OTHERWISE ACCRUE. EACH PARTY HERETO IS HEREBY RESPECTIVELY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH PARTY HERETO.

(t)    <u>Co-Lender Agreements</u>.  The rights and obligations of Junior Lenders in respect of a Junior Note relating to actions or inactions arising under this Agreement shall be governed by the provisions of any Co-Lender Agreement to which each such Junior Lender is a party.  The provisions of this <u>Section 18(t)</u> shall not imply or be deemed to imply that Senior Lender or Junior Lender has read, reviewed or approved any Co-Lender Agreement (other than any Co-Lender Agreement to which such Junior Lender is a party, in each case), but without limiting the provisions of <u>Section 18(t)</u> of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Senior Lender and Junior Lenders have executed this Agreement as of the date and year first set forth above.

**SENIOR LENDER:**

**UBS AG**

By: _____
Name:   Michael Mills
Title:   Associate Director

By: _____
Name:   Kathleen Donovan
Title:   Managing Director

**MEZZANINE 1 LENDER:**

**UBS AG**

By: _____

Name: 

Title: 

Michael Mills
Associate Director

Michael Mills
Associate Director

By: _____

Name:

Title:

Kathleen Donovan
Managing Director

**MEZZANINE 2 LENDER:**

**UBS AG**

By:
Name: Michael Mills
Title: Associate Director

By:
Name: Kathleen Donovan
Title: Managing Director

**EXHIBIT A**

**SENIOR LOAN DOCUMENTS**

**(ALL DOCUMENTS DATED AS OF THE CLOSING DATE, UNLESS OTHERWISE INDICATED.)**

1.      Senior Loan Agreement (as defined herein)

2.      Senior Note (as defined herein)

3.      Security Instrument (as in the Senior Loan Agreement)

4.      Cash Management Agreement (as defined herein)

5.      Assignment of Leases and Rents (as defined in the Senior Loan Agreement)

6.      Guaranty (as defined in the Senior Loan Agreement)

7.      Clearing Account Agreement (as defined in the Senior Loan Agreement)

8.      Environmental Indemnity (as defined in the Senior Loan Agreement)

9.      Assignment of Management Agreement (as defined in the Senior Loan Agreement)

10.     Borrower's Certificate executed by Borrower

11.     (a)      UCC-1 Financing Statements (against Borrower covering fixture filings for the county in which the Premises is located)

        (b)      UCC-1 Financing Statements (against Borrower in the Delaware Secretary of State's office)

14.     Post-Closing Agreement executed by Borrower and Senior Lender

## EXHIBIT B

## MEZZANINE 1 LOAN DOCUMENTS

## (ALL DOCUMENTS DATED AS OF THE CLOSING DATE, UNLESS OTHERWISE INDICATED.)

1.    Mezzanine 1 Loan Agreement (as defined herein)

2.    Mezzanine 1 Promissory Note (as defined herein)

3.    Mezzanine 1 Pledge and Security Agreement (as defined herein)

4.    Environmental Indemnity (as defined in the Mezzanine 1 Loan Agreement)

5.    Guaranty (as defined in the Mezzanine 1 Loan Agreement)

6.    Acknowledgement and Consent (Mezzanine 1) executed by Borrower

7.    Confirmation Statement and Instruction Agreement (Mezzanine 1) executed by Borrower

8.    Instruction to Register Pledge (Mezzanine 1) executed by Mezzanine 1 Borrower

9.    Limited Liability Company Certificate representing 100% of the interests in Borrower

10.    Subordination of Management Agreement (as defined in the Mezzanine 1 Loan Agreement)

11.    Borrower's Certification executed by Mezzanine 1 Borrower

12.    UCC-1 Financing Statement (naming Mezzanine 1 Borrower as debtor to be filed in the Delaware Secretary of State's office)

13.    Post-Closing Agreement executed by Mezzanine 1 Lender and Mezzanine 1 Borrower.

**EXHIBIT C**

**MEZZANINE 2 LOAN DOCUMENTS**

**(ALL DOCUMENTS DATED AS OF THE CLOSING DATE, UNLESS OTHERWISE INDICATED.)**

14.     Mezzanine 2 Loan Agreement (as defined herein)

15.     Mezzanine 2 Promissory Note (as defined herein)

16.     Mezzanine 2 Pledge and Security Agreement (as defined herein)

17.     Environmental Indemnity (as defined in the Mezzanine 2 Loan Agreement)

18.     Guaranty (as defined in the Mezzanine 2 Loan Agreement)

19.     Acknowledgement and Consent (Mezzanine 2) executed by Borrower

20.     Confirmation Statement and Instruction Agreement (Mezzanine 2) executed by Borrower

21.     Instruction to Register Pledge (Mezzanine 2) executed by Mezzanine 1 Borrower

22.     Limited Liability Company Certificate representing 100% of the interests in Mezzanine 1 Borrower

23.     Subordination of Management Agreement (as defined in the Mezzanine 2 Loan Agreement)

24.     Borrower's Certification executed by Mezzanine 2 Borrower

25.     UCC-1 Financing Statement (naming Mezzanine 2 Borrower as debtor to be filed in the Delaware Secretary of State's office)

26.     Post-Closing Agreement executed by Mezzanine 2 Lender and Mezzanine 2 Borrower.

# EXHIBIT D

# (PERMITTED FUND MANAGERS)

1. iStar Financial Inc.
2. Teachers Insurance and Annuity Association of America
3. Goldman, Sachs & Co.
4. The Blackstone Group International Ltd.
5. Apollo Global Management, Apollo Global Real Estate or Athene Asset Management LLC
6. Colony Capital, Inc.
7. Fortress Investment Group LLC
8. Lonestar Funds
9. Clarion Partners
10. Walton Street Capital, LLC
11. Starwood Capital Group/Starwood Property Trust
12. BlackRock, Inc.
13. Garrison Investment Group
14. LoanCore Capital
15. Rockpoint Group
16. Torchlight Investors
17. Westbrook Partners
18. The Macquarie Group
19. Och Ziff Capital Management.
20. AECOM
21. Ares Management
22. Brookfield Asset Management
23. Carlyle Group
24. CBRE Global Investors, LLC
25. Centerbridge
26. Deutsche Bank/DB Real Estate/RREEF
27. LaSalle Investment Management
28. Hudson Advisors L.P.
29. Mass Mutual
30. Mesa West
31. Met Life
32. Oaktree Capital Management
33. Paulson
34. PCCP
35. Pramerica Real Estate Investors / Prudential Financial Inc.
36. Square Mile
37. SL Green Realty Corp.
38. Tishman Speyer
39. TPG
40. Transwestern
41. Whitehall Street Real Estate Fund, L.P. / Goldman Sachs Real Estate