## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GVS Portfolio I B, LLC,[1] | Case No. 21-10690 (CSS) |
| Debtor. | **Re: D.I. 8 & 9** |

### DEBTOR'S PRELIMINARY OBJECTION TO PORTION OF
### RREF III STORAGE LLC'S MOTION FOR ENTRY OF AN ORDER
### DISMISSING THE DEBTOR'S CHAPTER 11 CASE WITH PREJUDICE
### AND GRANTING RELIEF FROM THE AUTOMATIC STAY

GVS Portfolio I B, LLC, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case, by its proposed undersigned counsel, hereby objects (this "Objection") to *RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* [D.I. 8] (the "Motion to Dismiss"). In support of this Objection, the Debtor submits the *Declaration of Jeremy Stoler in Support of Debtor's Preliminary Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* (the "Stoler Declaration") attached hereto as **Exhibit A**, and respectfully states as follows:

### PRELIMINARY STATEMENT[2]

This case was filed to preserve significant enterprise value in the face of a value destructive process for which the only remedy was to resort to federal bankruptcy law for the very purposes the law was created- a breathing spell and a chance to reorganize. The Debtor believes there is

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, is as follows: GVS Portfolio I B, LLC (7171). The mailing address for the Debtor, solely for purposes of notices and communications, is: 814 Lavaca Street, Austin, TX 78701.

[2] As context requires, capitalized terms used in this preliminary statement have the meaning given to such terms in the body of the Objection.

significant value here to preserve and that protection under the Bankruptcy Code is required to facilitate a restructuring. Indicators of value to date include an unsolicited offer over $75 million in excess of the combined debt within the stack (by RREF's joint venture partner), appraisals conducted for RREF's predecessor that show an equity cushion of not less than $75 million, and general information available in the market as to comparable stock prices and transaction values in this space. Indeed, RREF admits that the value of the collateral exceeds the debt and an equity cushion exists. That is why RREF is laser focused on obtaining the equity in the debtor's business, not repayment of the debt it purchased *only weeks ago*. The Debtor agrees there is substantial equity value, but believes the equity cushion is significantly more than that admitted by RREF and is increasing. RREF would have the Court believe that the Debtor exists in insolation and because the Debtor itself is not an operating entity that it cannot have a valid reorganization objective. This is demonstrably untrue as a matter both as a matter of law and fact.

The facts of this case will show very clearly that the Debtor acted upon direction from its board (including two independent directors) in good faith to preserve value. The Motion to Dismiss presents the Court with the issue of whether, notwithstanding the Debtor's genuine subjective good faith and the objectively proven actual ability to reorganize (as it expects to show at the hearing), the filing of the petition should be deemed as having been made in bad faith. The Court's task is not formulaic. Instead, the facts and circumstances of each case must be examined, as Third Circuit precedent makes clear. While the Debtor must prove its good faith, ironically, the Third Circuit precedent focuses primarily on what constitutes the absence of good faith, not what constitutes good faith. The dynamic of this approach and a formulaic application of enumerated indicia of bad faith can create perverse results. To avoid that result, *this* Court must look at *this* case holistically and in context. Where, as here, there is actual good faith and a reasonable

objective basis for the debtor's good faith belief that a Chapter 11 bankruptcy case would permit a restructuring and avoid a forfeiture of substantial value there can be no "bad faith." This debtor seeks to use the Bankruptcy Code for its intended purpose as enacted by Congress; the Motion to Dismiss should be denied.

## BACKGROUND

### A.    The Portfolio

1.    At issue here is a portfolio of Great Value Storage branded self-storage facilities beneficially owned by the Debtor (the "GVS Portfolio"). Great Value Storage offers secure storage units with 24-hour security systems, both climate controlled and non-climate controlled, RV, car, and boat parking, moving and storage supplies and moving truck rental. It caters to personal and business storage needs. The GVS Portfolio consists of 64 facilities in Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, Tennessee, and Texas. The GVS Portfolio, which includes more than just self-storage facilities, took ten years to amass at a cost of approximately $300 million. *See* Stoler Declaration at ¶ 4. Importantly, Great Value Storage is a successful business that employs workers at each of its locations, including resident managers who live at each of the Properties, often with their families. Indeed, the GVS Portfolio is more than just a collection of properties; it is an ongoing business. The GVS Portfolio is unique; it was painstakingly assembled via a series of acquisitions over a decade and is in light of that, is difficult if not impossible to replace. *Id*.

2.    This portfolio of 64 properties is not only valuable, but highly desirable and virtually impossible to replicate without significant effort expended over the course of many years. *See* Stoler Declaration at ¶ 5. This is largely because the self-storage industry is highly fragmented, dominated by many private "mom and pop" owners. *See* Alexander Harris, *U.S. Self-Storage*

*Industry Statistics*, SPAREFOOT (Jan. 27, 2021) https://www.sparefoot.com/self-storage/news/1432-self-storage-industry-statistics/. The largest owner of self-storage facilities, Public Storage, Inc., ("Public Storage"), owns 2,844 facilities out of more than 49,000 nationwide, or about 5% of total inventory. *Id*. This industry fragmentation is reflected in the following comment: "Industry ownership is fragmented, with 31.2% of self-storage space (by rentable square footage) owned by six public companies, 16.5% owned by the next top 94 operators, and 52.3% owned by small operators." *Id*. Thus, portfolios of self-storage properties of this size and geography are highly desirable for institutional real estate investors and are in limited supply. Stoler Declaration, at ¶ 5.

### B.    The Loan Facilities

3.     On or about November 30, 2018, the original lender, UBS AG ("UBS") made three loans related to the GVS Portfolio including a $110 million mortgage facility at the property entity level serviced by PNC/Midland (the "Mortgage Loan"), a $103 million mezzanine loan (the "Mezz 1 Loan") to GVS Portfolio I, LLC now held by ESS-GV Holdings LLC (also a competitor of GVS), and the consolidated mezzanine facility of $82 million in principal (the "Mezz 2 Loan") now held by RREF. Motion to Dismiss at ¶¶ 16-19. The Mortgage Loan and Mezz 1 Loan are performing and are not at issue in this case. RREF's predecessor, TIAA, acquired the facility in November 2018 and continuously held it until the evening of March 8, 2021—2 days prior to the date set for a sale of the collateral by auction. Motion to Dismiss at ¶ 22.

4.     UBS and its successor lenders were aware of the cohesiveness of this corporate structure and took that uniqueness into account in structuring the cash management system. Under the system, PNC/Midland as mortgage servicer for the securitized CMBS Mortgage Loan collects rent and other payments through a lockbox account in the name of GVS Texas Holdings I, LLC.

*See* Stoler Declaration at ¶ 7.  Each month, PNC then pays the interest, fees, and expenses on its facility, reserves for escrows, etc., and then transfers cash first to a subaccount for the Mezz 1 Loan and then to a subaccount for the Mezz 2 Loan (the "Mezz 2 Account").  *Id.*  Notably, the Mezz 2 Account is a subaccount maintained on a ledger entry basis only under the cash management account in the name of GVS Texas Holdings I, LLC.  *See* Cash Management Agreement, O'Toole Decl. Exhibit 9, sections 2.1, 2.3.  Assuming no event of default, the cash management bank then remits funds from the subaccount of GVS Texas Holdings I, LLC to the lender under the Mezz 2 Loan.  Although these amounts are deemed distributions from the Debtor pursuant to the PNC Facility documents, in fact PNC pays this cash directly to RREF.  *See* Stoler Declaration, at ¶ 7.

### C.    The Spiraling, but Cured, Defaults

5.    The defaulted status of the Mezz 2 loan resulted from a single late payment under the Mortgage Loan, which was quickly covered.  *See* Stoler Declaration, at ¶ 8.  This late payment set off a cascade of events, ultimately resulting in TIAA allegedly accelerating its $82 million of junior debt under the Mezz 2 Loan.  *Id.*  After the late payment, PNC/Midland stopped the flow of property revenue, trapping all rents in a lockbox.  *Id.* Trapped in a lockbox, the property revenue was not available for the next monthly interest payment on the Mezz 1 Loan of $472,083, due on December 6, 2019.  *Id.*  At this point, a total of $1,119,153 in property revenue was available and could have amply covered the missed interest payment, but because of unresolved administrative issues in the cash management protocols, PNC/Midland did not release the funds.  *Id.*  Thereafter, TIAA issued a notice purporting to accelerate the Mezz 2 Loan on December 6, 2019.  *Id.*

6.    With the funds in the lockbox, and while the mortgage borrowers and PNC/Midland worked to resolve the administrative issues, on December 10, 2019, TIAA cured the missed November 6, 2019 interest payment of $487,819 on the Mezz 1 Loan, which the borrower

thereunder rectified on December 13, 2020 by reimbursing TIAA.  *See* Stoler Declaration, at ¶ 9. On December 20, 2019, while the lockbox funds were trapped by PNC/Midland, TIAA advanced the delayed payment to the Mezz 1 Loan lender as well, while it awaited release of funds from the lockbox.  *Id*. This advance was also subsequently cured when PNC/Midland finally released the lockbox funds, as set forth below.  *Id*.  The Debtor then promptly reimbursed TIAA for these payments. *Id*.

7.     On January 15, 2020, PNC/Midland released $2,417,721.94 in property revenue, but directed $1,067,902 of that revenue to the First Mezzanine Lender.  *See* Stoler Declaration, at ¶ 10.  More than half of that amount – $580,082 – was applied to default and late fees to the first mezzanine lender arising from the unreleased funds in December 2019.  *Id*.  The Debtor protested this improper application with the lender group.  *Id*.  Had those default and late fees not been routed to the First Mezzanine Lender, TIAA would have received sufficient funds to satisfy its regular debt service payment.  *Id*.

8.     In January 2020, despite the Debtor's efforts to resolve the foregoing issues and work to a resolution, TIAA asked that the Debtor hold off on any resolution discussions with TIAA until the administrative cash management set up was complete.  *See* Stoler Declaration, at ¶ 11. The next month, in February 2020, an additional $63,667.90 in remaining default and late fees from the prior month were applied to the Mezz 1 Loan (along with its regular monthly debt service), and then remaining property revenues in the amount of $1,339,993 were paid to TIAA. *Id*.  However, rather than applying those funds to repaying any protective advances TIAA made, and the regular interest it would have received but for the cash management set up issues, TIAA instead applied these funds to loan principal, on account of TIAA's needless acceleration of the Loan. *Id*.

9.      To add insult to injury, in March 2020, PNC/Midland realized it had mistakenly miscalculated the amounts needed for property taxes and increased the tax escrow from $160,000 to $411,481.  *See* Stoler Declaration, at ¶ 12.  Increasing this escrow by nearly $300,000 resulted in another shortfall on the monthly payment to TIAA.  *Id*.  TIAA received $354,196.04 in the March 2020 waterfall, but had the tax escrow mistake not adversely impacted the March waterfall, there again would have been sufficient funds to cover TIAA's regular monthly interest payment. *Id*.  During the period from December to March, but for the administrative cash management issues, application of incorrect default fees, late fees, and tax escrow mistake, TIAA would have timely received its regular monthly debt service payments.  *Id*.

10.      In March 2020, COVID-19 had fully taken hold causing widespread economic calamity.  The Debtor's business was not immune, and negotiations completely stalled once the pandemic was in full swing.  The Debtor continued to focus its attention on ensuring portfolio performance in light of the pandemic and also clarifying the protective advances, repayments, and interest rates with both mezzanine lenders.  *See* Stoler Declaration, at ¶ 13.  The Debtor did not receive the clarifying information from both lenders until May 20, 2020.  *Id*.  During this time period, the Debtor continued to work with TIAA and communicated with the entire lender group every month on the payment date to ensure cash management was functioning appropriately and to ensure that no further protective advances would be needed.  *Id*.  The Debtor provided a written proposal on May 21, 2020 to TIAA to address open issues, which proposal was ultimately not responded to by TIAA.  *Id.*

11.      The parties continued to work together each month and the Debtor was encouraged by these discussions and believed that a resolution could be possible.  *See* Stoler Declaration, at ¶ 14. Then in July, the Debtor abruptly received a July 17, 2020 Notice of Disposition of Collateral

from TIAA.  *Id*.

### D. The State Court Action

12.    The Debtor commenced an action in the New York Supreme Court (the "NY Court") on August 27, 2020, to enjoin a commercially unreasonable sale of the Collateral scheduled by TIAA that was noticed to occur on September 3, 2020, during the Labor Day Holiday week (the "First Sale").  Following full briefing and argument, on September 18, 2020, the NY Court granted GVS's motion for a preliminary injunction finding that the First Sale was commercially unreasonable. *See* O'Toole Declaration, at Exhibit 20 (*Decision and Order*, dated September 18, 2020 ("Decision").  In the Decision, the NY Court instructed the parties to meet and confer as to the notice of the sale and terms of sale and submit a stipulation to the NY Court setting forth areas of agreement.  O'Toole Declaration, at Exhibit 20.  The NY Court further instructed the parties to submit letters to the NY Court identifying any remaining areas of disagreement. *Id*.

13.    On October 5, 2020, the parties submitted a stipulation to the NY Court setting forth an agreement as to certain requirements of the Notice of Sale and the Terms of Sale, which the NY Court so-ordered.  *See* O'Toole Declaration, at Exhibit 21 (*Stipulation Regarding Terms of UCC Sale, Notice of UCC Sale and Confidentiality Agreement* ("UCC Sale Stipulation")).  On October 23, 2020, the NY Court issued a Supplemental Decision and Order, setting a Sale date of March 10, 2021.  Stoler Declaration, at ¶ 16.

14.    Among other things, the UCC Sale Stipulation provided: (i) that the Sale would be in conformity with the agreed upon UCC Public Sale Notice, Notice of Undertaking and Confidentiality Agreement, and the Terms of Sale; and (ii) for access to the Properties by prospective bidders consistent with applicable state, city and local ordinances governing travel and

access to facilities in light of the ongoing Covid-19 pandemic.  *See* O'Toole Declaration, at Exhibit 21.  Importantly, the parties further made clear that nothing in the UCC Sale Stipulation "negat[ed], modifi[ed] or affect[ed] in any way Lender's obligation pursuant to Section 9-610 of New York's Uniform Commercial Code, to conduct all aspects of the sale and/or disposition of the Collateral in a commercially reasonable manner."  *Id*.

15.    Further, the agreed upon UCC Public Sale Notice identified the Seller of the Collateral in all capital letters as Defendant TIAA:

UCC PUBLIC SALE NOTICE

> PLEASE TAKE NOTICE THAT Jones Lang LaSalle, on behalf of TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a New York corporation, for the benefit of the Separate Real Estate Account ("Secured Party") will offer for sale at public auction 100% of the limited liability company membership interests (the "Membership Interests") in GVS PORTFOLIO I, LLC, a Delaware limited liability company (the "Pledged Entity"), together with certain rights and property representing, relating to, or arising from the Membership Interests (collectively, the "Collateral").

*See* Stoler Declaration, at Exhibit 1.  The Notice of Undertaking and Confidentiality Agreement likewise identified the Seller of the Collateral, Secured Party, and counterparty to the confidentiality agreement as TIAA.  *See* Stoler Declaration, at Exhibit 2.  The Terms of Sale further identified the Secured Party and seller of the Collateral as TIAA: "'Secured Party' means Teachers Insurance and Annuity Association of America, a New York corporation, for the benefit of the Separate Real Estate Account."  *See* Stoler Declaration, at Exhibit 3.

16.    Two days prior to the scheduled sale, however, the "Secured Party" changed when TIAA sold the Loan to RREF for an undisclosed amount and without notice to GVS or any other bidders who had registered to bid at the auction.  *See* Stoler Declaration, at ¶ 19.  No notice was provided to the market that at the time of the auction, the Loan would be held by a different seller.

*Id.*

17.    Following these events, the Debtor obtained a temporary restraining order from the NY Court enjoining the auction from proceeding.  *See* Stoler Declaration, at ¶ 20.  Following briefing and argument, the NY State Court declined to issue a preliminary injunction, finding the process presumptively reasonable given the prior stipulation and without concern for intervening events or loss of value.  *See* O'Toole Declaration, at Exhibit 22.  Importantly, however, the task of the NY Court was to oversee a commercially reasonable sale, not to ensure that value was maximized for the benefit of all constituents, as is the objective in bankruptcy.

E.    **The Debtor Files this Case to Maximize Value**

18.    Preserving and maximizing value was, however, the Debtor's aim in filing this proceeding.  *See* Stoler Declaration, at ¶ 21.  The Debtor firmly believes that there is significant value in the GVS Portfolio that reaches far beyond the RREF loan.  *Id.*  The Debtor's belief is grounded in reality and is not a speculative pipe dream.  Indeed, RREF's own motion admits there is an equity cushion.  Motion to Dismiss at ¶ 45.  The Debtor believes that equity cushion is well in excess of the cushion RREF already admits.  In comparison to the approximately $300 million in combined principal debt, an appraisal completed in 2018 by CBRE in accordance with the Uniform Standards of Professional Appraisal Practice valued the GVS Portfolio as of October 10, 2018 at $375 million with a stabilized value of $392 million expected by October 10, 2019.  *See* Stoler Declaration, at Exhibit 4.  Further, an appraisal conducted by Newmark Knight Frank Valuation & Advisory, LLC ("NFK") for TIAA dated December 2, 2019 values the GVS Portfolio at a fair market value of $393,600,000.  *See* Stoler Declaration, at Exhibit 5.  In addition, in March of 2020, the Debtor received an unsolicited offer from SROA Acquisitions, LLC with a purchase price of $375 million for the GVS Portfolio.  *See* Stoler Declaration, at Exhibit 5.  SROA now

appears to be affiliated with RREF and is jointly represented by the same counsel in these proceedings.

19.     The limited supply of portfolios of self-storage properties, the difficulty assembling them, and the significance to investors of being able to acquire a portfolio are discussed by CBRE in its appraisal.  *See* Stoler Declaration, at Exhibit 4.  In its appraisal, CBRE states that it interviewed market participants concerning "portfolio premiums" associated with the sale of self-storage portfolios:

> Joe Margolis, CEO of Extra Space (NYSE:EXR) … said self-storage portfolios command lower cap and yield rates [thus higher prices] than individual assets because of the ability to place a large amount of capital in one transaction and risk diversification. He also noted that as portfolios available to purchase have declined over the past year (after several years of robust activity), the market for portfolios remains frothy.

Stoler Declaration, at Exhibit 4, pg. 25.

> "Christopher P. Marr, CEO of publicly traded Cubesmart: in a separate convsation [sic] told us they would like to internally value the individual assets and apply a premium in the form of cap/yield rates, but there is insufficient time during the deal cycle. As a result, he said they do 'like everybody else' and roll up the financials and apply a portfolio cap/yield rates, that are lower than individual assets. He also noted that with the number of new players seeking to store capital in the sector, including hedge funds like Carlyle, Brookfield and TPG, that 'everybody' wants to buy portfolios.

*Id*.

20.     There are other market indications of value which the Debtor believes supports its conclusion that RREF is comfortably oversecured.  Just in December 2020, Brookfield Asset Management sold Simply Self Storage to Blackstone Real Estate Income Trust for $1.3 billion.[3] At this valuation, the GVS Portfolio would be worth somewhere between $450 million (if the same

---

[3] See https://www.blackstone.com/press-releases/article/blackstone-real-estate-income-trust-completes-acquisition-of-simply-self-storage-for-approximately-1-2-billion/.

cap rate is applied) and $495 million (if the price per square foot is applied).  *See Stoler Declaration*, at ¶ 24.  Even assuming a significant adjustment to the assumptions for the Simply Self Storage portfolio versus the GVS Portfolio, there is still ample equity above the combined outstanding debt, and RREF is clearly fully secured in its position as evidenced by this market comparable.  *Id.*

## ARGUMENT

## I.    THE DEBTOR'S CHAPTER 11 CASE WAS FILED IN GOOD FAITH

21.    There is no basis in fact or law to dismiss this Chapter 11 case.  As detailed below, each of RREF's arguments fail and the Motion to Dismiss should be denied.

22.    The Debtor filed this case with the intention of maximizing the value of its estate by providing it with a breathing spell to preserve the significant value of the GVS Portfolio and facilitate a restructuring.  *See* Stoler Declaration, at ¶¶ 21-28.  There is nothing in the Bankruptcy Code that makes its protections unavailable to a company with the attributes of this Debtor or a company facing enforcement actions by its lenders.  Indeed, there is nothing in the Bankruptcy Code itself that defines what constitutes good faith.

23.    To fill this void, courts have developed a multi-factor framework to assess good faith, moreover, this case law recognizes that the Court must assess the specific Debtor before it and in the specific circumstances at play.  *See, e.g., NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),* 384 F.3d 108, 120 (3d Cir. 2004) ("Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of the facts and circumstances' . . . .") (citing *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),* 200 F.3d 154, 162 (3d Cir. 1999)); *In re Primestone Investment Partners L.P.,* 272 B.R. 554, 558 (D. Del. 2002) (reviewing the "totality

of the facts and circumstances *of record*" to hold that dismissal of Primestone's petition did not constitute an abuse of discretion) (emphasis added).

24.    Like any multi-factor test, the *Primestone* Factors (defined below) do not provide a one-size fits all answer and whether one or some of the factors are met is not case dispositive. *Primestone*, 272 B.R. at 558 (Holding that "no single factor is determinative of a lack of good standing in filing a petition."). The Court should not fall into the trap of formulaically counting the factors on a scorecard, instead, they are guideposts to answer the fundamental question: did the Debtor file this bankruptcy case to achieve a legitimate purpose under the Bankruptcy Code? The answer here is a resounding yes.

25.    RREF's theory of this case rests nearly entirely on the assertion that the "Debtor's filing of the chapter 11 petition for the purpose of triggering an automatic stay is nothing more than a naked attempt to misuse the bankruptcy process." Motion to Dismiss, at ¶ 2. But it is not a misuse of the bankruptcy process to seek a neutral space to permit this Debtor to maximize value, nor is it novel or remarkable for the Debtor to choose this avenue. Outside of this Court, no avenue exists to permit a fair process. It was without question to this Debtor when it filed its petition that if the proposed foreclosure sale were to be run at the last minute by an aggressive competitor, it would forfeit significant value.

26.    Contrary to RREF's unfounded assertion that dismissal would better serve the interests of the Debtor and its creditors, dismissal of this case would invariably result in a devastating dissipation of value to the detriment of every single interested party—other than RREF who would take this value for its own. The simple fact, oft repeated in the Motion to Dismiss, that the Debtor owns a single asset does not alone justify dismissal. *See Primestone*, 272 at 558 ("there is nothing inherently improper in a single asset debtor filing a Chapter 11 Petition for

Reorganization, even shortly before or after a foreclosure proceeding has commenced."). Indeed, by choosing to maximize the value of its asset through the bankruptcy process, the Debtor acted in good faith. *See In re Crown Village Farm, LLC*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) ("The overarching reality is that Debtor had two choices, either abandon its sole asset or seek to maximize the value of its asset through the bankruptcy process. In choosing the latter, Debtor acted in good faith.").

27.     Contrary to RREF's refusal to permit the Motion to Dismiss to be heard on a rational timeframe with sufficient fact and expert discovery, determining good faith is a necessarily fact intensive inquiry focused on (a) whether the petition "serves a valid bankruptcy purpose" by "preserving a going concern or maximizing the value of the debtor's estate," and (b) whether the petition "was filed *merely* to obtain a tactical litigation advantage." *Integrated Telecom Express, Inc.,* 384 F.3d at 120 (emphasis added). Moreover, as this court has recognized, "'a valid bankruptcy purpose and whether the filing was made as a litigation tactic is not intended to limit consideration of other facts and circumstances. Indeed, no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith.'" *In re Energy Future Holdings Corp.*, 561 B.R. 630, 639 (Bankr. D. Del. 2016) (quoting *15375 Mem'l Corp.v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 n.8 (3d Cir. 2009)).

28.     RREF relies heavily on Judge Walrath's *Jameson* decision, which is distinguishable from the facts of this case alleged in the Motion to Dismiss. *See* Motion to Dismiss at ¶¶ 56-58. In *Jameson*, the debtor was a middle mezzanine entity in a corporate family of four mezzanine entities and two lower operating companies who owned and operated a chain of economy hotels. *See In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 295-96 (Bankr. D. Del. 2011). The entities were all formed as a part of a transaction to purchase the hotel chain,

at which time debt was placed at all five levels up the corporate ladder. *See id.* Wells Fargo held

the debt and mortgages at the property level. *See id.* at 295. Two affiliated lenders held the debt

at the first and second mezzanine levels (the "Mezz 1 Lenders") and two other lenders held the

debt at the third and fourth mezzanine levels (the "Mezz 2 Lenders"). *Id.* at 296.

29.    The debt on all of the companies matured in 2008, which maturity was extended

three times to August 2011. *Id.* At that time, all entities were unable to pay their debts and all of

their lenders began taking enforcement actions. *Id.* The mortgage lender filed foreclosure

proceedings against the operators, the Mezz 1 Lenders issued a notice of intent to auction the

Jameson debtor's assets, and the Mezz 2 Lenders exercised their right to replace the non-

independent director of the mezzanine entities at the second, third and fourth levels. *JER/Jameson¸*

461 B.R. at 296. This further allowed the Mezz 2 Lenders to appoint the same director, James

Gregory, to control the first mezzanine level entity and the operating companies. *Id.*

30.    In fact, Gregory was nothing more than a puppet carrying out the will of the

controlling and managing Mezz 2 Lender to force the *Jameson* debtor into bankruptcy to gain an

advantage over the other lenders. *See id.* at 300-01. Gregory—a former employee of the

controlling Mezz 2 Lender and long-time friend of the controlling Mezz 2 Lender's chief legal

officer—admitted that he was installed to get the attention of the other lenders and that his

appointment was a means to present the controlling Mezz 2 Lender's opinion. Mezz 1 Lenders'

Pre-Hr'g Br. at 25, *JER/Jameson* D.I. 201; *see also JER/Jameson¸* 461 B.R. at 300. The *Jameson*

Court also found evidence that Gregory received at least $800,000 from the controlling Mezz 2

Lender to pay various fees and took direction from (and gave information to) the controlling Mezz

2 Lender throughout the process. *JER/Jameson¸* 461 B.R. at 300. Thus, it was really the

controlling Mezz 2 Lender—not Gregory—that directed the *Jameson* debtor to file its petition and

later the operating companies to file their own petitions. *See id.* The Mezz 1 Lenders filed a motion to dismiss and for stay relief. *Id.* at 297. At bottom, the matter before Judge Walrath was an inter-creditor dispute as to which lender should be able to control the debtor and whether the petition was filed to increase negotiation leverage between the creditors. In addition, all of the facilities in the combined debt stack had matured years prior to the petition, subject to certain extension options.

31.     This case is a far cry from the facts of *Jameson*. The Debtor here is part of a corporate family where the lower-level debt facilities are performing and are 2 years away from maturity of their debt facilities. *See* Stoler Declaration, at ¶¶ 4-5; O'Toole Declaration, at Exhibit 1. As explained above, the Debtor only finds itself in its present state due to an unfortunate series of events emanating from one late, but quickly cured, payment followed by the global COVID-19 pandemic. Unlike in *Jameson*, other lenders at the lower levels have not taken enforcement actions and there are no inter-creditor disputes. Moreover, the record in *Jameson*, showed that the debtor did not filed for chapter 11 with clean hands. To the contrary, the Mezz 2 Lenders planted a mole on the debtor's board to gather information and only make decisions that were consistent with the controlling Mezz 2 Lender's agenda. As a result, it was nearly impossible for the *Jameson* Court to hold that the debtor entered chapter 11 with a valid bankruptcy purpose in mind.

32.     Additionally, the Jameson debtor's only unsecured creditors were professionals hired before the filing that were either paid by the debtors or obtained by retainers. *JER/Jameson* 461 B.R. at 299. Here, as evidenced by the Debtor's amended petition [D.I. 3], the claims register, and the to-be filed schedules of assets and liabilities, the Debtor has several creditors and none of these creditors are professionals in connection with this Chapter 11 case.

33.      Further, the Debtor's board consists of Mr. Paul and two independent directors, and has since inception of the Company.  Notably, the independent directors were appointed at the direction of the Debtor's initial lenders, as required by the loan documents.  Both Mr. Paul and one of the independent directors have been on the Debtor's board since the Debtor's formation in November 2018.  All directors approved the filing based on the facts presented and the unfolding and highly problematic foreclosure process where RREF—a competitor of the Debtor who has paired with a party previously seeking to purchase the GVS Portfolio and previously registered as a separate bidder—would be the seller of the Collateral.

34.      Understood in its context, *Jameson* is wholly distinguishable.  In addition, *Jameson* is not binding on this Court and the Debtor respectfully disagrees with its holdings to the extent they even could be persuasive outside of its factual backdrop.

### A.    This Chapter 11 Case was Filed for a Valid Bankruptcy Purpose

35.      The Debtor plainly commenced this case "for a valid bankruptcy purpose."  RREF's focus on the single-asset nature of the Debtor in isolation is misplaced.  It is a red herring. According to RREF, because the Debtor itself is not the operating entity, this case cannot have a valid reorganization objective.  But this is demonstrably untrue.  *See, e.g.*, *Primestone*, 272 at 558 ("[T]here is nothing inherently improper in a single asset debtor filing a Chapter 11 Petition for Reorganization") (quoting *In re Tiffany Square Assocs., Ltd.*, 104 B.R 438, 441 (Bank. M.D. Fla. 1989); *Crown Village*, 415 B.R. at 98 (denying a motion to dismiss in a single asset real estate case).  In addition to the substantial benefits of ceasing the pending foreclosure action, this Debtor intends to use the bankruptcy process to preserve its business and maximize the value of the GVS Portfolio and the membership interest through the chapter 11 process.  It is not a mere wind-down entity that seeks to remain in business solely "for the handling of litigation" that is often a key

factor in cases that are dismissed on bad faith grounds.  *See, e.g.*, *In re 15375 Mem'l Corp.*, 589 F.3d at 619.

36.    The Debtor intends to show that its petition served a valid bankruptcy purpose to maximize value, as indeed, even a liquidation under Chapter 11 maximizes value where "there is some value that otherwise would be lost outside of bankruptcy."  *In re Energy Future Holdings Corp.*, 561 B.R. 630, 639-40 (Bankr. D. Del. 2016) (citing *In re 15375 Mem'l Corp.,* 589 F.3d at 618); *see also Crown Village*, 415 B.R. at 92 ("[C]ourts in this Circuit have made clear that even where the debtors are not attempting to preserve going concern, for example when a liquidation plan will be filed, they can still satisfy the good faith requirement, provided that the filing preserves 'some value that otherwise would be lost outside of bankruptcy.'") (citing *In re 15375 Mem'l Corp.*, 400 B.R. 420, 427 (D. Del. 2009).

37.    In *Crown Village*, Judge Gross refused to dismiss a single asset real estate case with no employees or operations where the debtor intended to market its sole asset—undeveloped land—for sale to the highest bidder.  *Crown Village*, 415 B.R. at 91-93.  There, Judge Gross held that a bankruptcy strategy to maximize the value of the debtor's sole asset was a valid bankruptcy purpose.  *Id*. at 93.  Here too, the Debtor should be provided the opportunity to maximize the significant value held in the GVS Portfolio and membership interest.  The only reason the Debtor has not caused its indirect subsidiaries to also file Chapter 11 petitions is because that has not been necessary to preserve value as they are performing obligors and no prospective buyer or investor or lender (to take out RREF's loan) has yet indicated that such a filing would be necessary.

38.    At the time of filing this Chapter 11 case, the Debtor firmly believed that there was significant value in the GVS Portfolio that reaches far beyond the RREF loan.  *See* Stoler Declaration, at ¶¶ 22-24.  This belief continues today and is indeed fortified and confirmed by

interest the Debtor has received since the filing—interest that the Debtor believes would not exist in a foreclosure process run by its competitor.  The Debtor's belief was grounded in a prepetition valuation of the GVS Portfolio in excess of $375 million.  Indeed, RREF's own motion admits there is an equity cushion of $75 million even at the depressed value ($325 million) on which it relies.  The Debtor believes that equity cushion is well in excess of RREF's own calculation, based on, among other things, CBRE's 2018 appraisal, NFK's 2019 appraisal, and the other market indications, including the $375 million offer received from SROA, and the $1.3 billion sale price of Simply Self Storage in December 2020.  *See* Stoler Declaration, at ¶¶ 20-24.  Thus, the Debtor's asset clearly has significant value that is more than sufficient to reach past RREF and allow recoveries to its unsecured creditors and equity.

39.    The Debtor has been working tirelessly to determine the best path forward to effectuate a reorganization and to maximize the value of the estate.  Currently, the Debtor is working to obtain a new capital infusion (either as debtor in possession financing or exit financing or both) that will allow it to effectuate a reorganization.  *See* Stoler Declaration, at ¶ 26.  The Debtor has engaged Alan Tantleff, of FTI Consulting, Inc. ("FTI") as Chief Restructuring Officer to assist with this process.  *Id*.  Moreover, the Debtor believes it is imperative that this process occur under this Court's supervision to provide fair and adequate notice to all constituents and protect their rights.

**B.    The Petition Was Not Filed as a Mere Litigation Tactic**

40.    The Debtor did not commence this case, as RREF alleges, merely to gain a litigation advantage over RREF, or anyone else for that matter.  The Debtor, of course, perceived benefit in filing its petition, but this is not surprising, malevolent, or case dispositive.  As Judge Posner once aptly noted, "[i]t is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?"  *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992); *see*

*also In re Cadwell's Corners P'Ship*, 174 B.R. at 746 ("A property owner certainly has every right to engage in litigious actions to avoid foreclosure, and the Debtor's adverse attempts to put off foreclosure are not proof of a bad faith filing. If there is a reasonable chance for an effective reorganization, a debtor has every right to file for bankruptcy in the midst of a foreclosure action."). Here, the foreclosure sale was scheduled but there was no pending litigation on the verge of judgment or other litigation related reason for the filing.

41.      In determining good faith in cases where a chapter 11 filing was driven in material part by pending litigation, the Third Circuit has looked to whether the Debtor was a viable business experiencing financial "difficulties" as of the date the petition was filed. *SGL Carbon*, 200 F.3d at 156 (finding a lack of good faith in light of "a financially healthy company" with no need to reorganize other than litigation); *Integrated Telecom*, 384 F.3d at 120 (finding a lack of good faith in light of a company "unquestionably 'out of business,' and therefore with no going concern value to preserve in Chapter 11 through reorganization or liquidation under the Bankruptcy Code").

42.      RREF cites to *SGL Carbon* and *Rent-A-Wreck* in support of its argument that the Debtor's case was commenced primarily to obtain a tactical litigation advantage, however, both cases are distinguishable from the facts of this case. In *Rent-A-Wreck*, Judge Silverstein held that the primary purpose of the bankruptcy filing was to reject a franchise agreement so the debtors could open a location in a territory it had been attempting to capture for over nine years. *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 382-83 (Bankr. D. Del. 2018) ("After nine years of litigation, two trips to the Fourth Circuit, and $2.7 million in attorneys' fees and costs . . . [the] Debtors now turn to this forum to reject [the] agreement."). It was also fundamental to Judge Silverstein's decision in *Rent-a-Wreck* that the debtors there could not provide credible evidence they were in "financial distress," which the court held "is a part of—if not itself a predicate to—a

good faith analysis." *Id*. at 375.  Thus, Judge Silverstein held that the "bankruptcy petitions [fell] on the dark side of the spectrum ranging from the clearly acceptable to the patently abusive" where the petitions were "just another chapter in the attempt to terminate Mr. Schwartz's franchise." *Id*. at 388.

43.    In *SGL Carbon*, the evidence presented included, among other things, testimony from the debtors' vice president "[a]cknowledging that [the] bankruptcy protection was the 'sole reason' [the debtor's] Executive Committee had authorized the Chapter 11 petition" and that "he believed filing for Chapter 11 would 'change the negotiating platform' with plaintiffs and 'increase the pressure on . . . plaintiffs to settle.'" *SGL Carbon*, 200 F.3d at 158.  Moreover, and as in *Rent-a-Wreck*, the Debtor in *SGL Carbon* had "no defaults nor any financial distress when it filed for Chapter 11." *Id*. at 166.  In holding that SGL Carbon's chapter 11 petition lacked good faith, the Third Circuit Court highlighted the fact that SGL's "officers expressly and repeatedly acknowledged [the] Chapter 11 petition was filed *solely* to gain tactical litigation advantages." *Id*. at 167 (emphasis in original).

44.    Although staying a foreclosure and obtaining a litigation advantage are not one and the same, the Debtor's intent in filing the petition was and continues to be the valid bankruptcy purpose of preserving its business and maximizing the value of the GVS Portfolio and the membership interest through the chapter 11 process.  There is nothing in the record to suggest otherwise.  Moreover, and unlike the debtors in *Rent-a-Wreck* and *SGL Carbon*, this Debtor filed this case to preserve that value in the face of significant economic distress.  In fact, it was TIAA's and RREF's prepetition value destructive conduct that created the economic distress that forced the Debtor into bankruptcy.  Now RREF seeks permission to benefit from its conduct and acquire

the Debtor's assets for a song.  Thus, the Debtor does not dispute the fact that this Chapter 11 case was filed on the eve of foreclosure.  However, the context of that timing is significant.

45.     The foreclosure sale that was contemplated between the Debtor and TIAA when stipulating in 2020 was not the value destructive process about to unfold at the combined hands of a competitor of the Debtor and a second potential bidder, SROA.  Stoler Declaration, at ¶¶ 27-28.  There, prospective bidders learned at the last moment that RREF was acting as seller and registered bidder with the power to make a cash bid, credit bid, and select the winning bidder.  Indeed, under the proposed foreclosure sale, RREF has wide latitude to select the winning bidder.  For example, the Terms of Sale note provide that "[RREF] reserves the right to (i) accept a lower bid, if the bid is on terms that offer a more certain likelihood of execution."  *See* Stoler Declaration, at Exhibit 3.  Moreover, bidders, many of whom may be in the storage market already, may have been dissuaded by participating in a process where they were required to share their financials with RREF, another market actor.  *See* Terms of Sale, section 3(b) ("Each prospective bidder must demonstrate its financial ability to tender the purchase price for the Collateral, by submitting to [RREF] . . . a certified balance sheet or other certified financial information.").  Stoler Declaration, at Exhibit 3.  As a result, the Debtor believed that prospective bidders could presuppose that their bids would be unlikely to be treated fairly because put simply, the "deck was stacked against them."

46.     The Debtor also believed that the foreclosure sale was tainted when RREF replaced TIAA because a sale by a disinterested financial buyer, such as TIAA, suggests that bidders will be treated fairly, thus prompting prospective bidders to undertake the expensive and time-consuming analysis to construct a bid.  Instead, RREF came in only days before the scheduled sale

as the seller and competitor, with access to all of the bids and bid submissions, and the ultimate decision-maker on accepting a bid.

47.     Bidders must be assured that their offers will be considered fairly, and that no bidder is unfairly advantaged.  The expectation is that the process is fair and that bidders that put forth *bona fide* offers will be honestly evaluated and treated fairly.  The unsettling facts surrounding the proposed foreclosure sale administered by RREF ran counter to that – it suggested a process where one bidder *will* be treated differently, and such bidder *has* an unfair advantage. Evidence of collusion, or even when collusion is suspected, can deter prospective investors and chill bidding.

48.     It does not appear that the NY Court considered the impact on value from these events and it was uncertain (if not unlikely) that the Debtor's value would be preserved in the foreclosure sale where the focus was commercial reasonableness.  In contrast to the proposed UCC foreclosure sale administered by RREF, this Chapter 11 case will ensure that value is preserved and maximized for all stakeholders—not only RREF.  Now the Debtor and its stakeholders can rest assured that the estate will be administered in a forum designed to preserve and maximize the significant value that the Debtor's portfolio has.  Thus, the totality of the circumstances here show that the Debtor filed this case with a valid bankruptcy purpose in mind and not merely as a litigation tactic.

**C.     The *Primestone* Factors Weigh in Favor of a Finding of Good Faith**

49.     While the Motion to Dismiss focuses largely on the timing of the Petition Date and the pending foreclosure, in determining "good faith" for filing a petition, courts in this district have identified a dozen other factors that they consider in making that determination (collectively, the "*Primestone* Factors").  *See Primestone*, 272 B.R. at 557.  The *Primestone* Factors consider whether any of the following are present: (a) Single asset case; (b) Few unsecured creditors; (c)

No ongoing business or employees; (d) Petition filed on the eve of foreclosure; (e) Two party dispute which can be resolved in pending state court action; (f) No cash or income; (g) No pressure from non-moving creditors; (h) Previous bankruptcy petition; (i) Prepetition conduct was improper; (j) No possibility of reorganization; (k) Debtor formed immediately prepetition; (l) Debtor filed solely to create automatic stay; and (m) Subjective intent of the debtor. *Id.*

50.     In applying these factors, the court must examine the "totality of the circumstances" and determine where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Integrated Telecom*, 384 F.3d at 118. "[N]o single factor is determinative of a lack of good faith in filing a petition." *Id.* Application of the *Primestone* Factors to this case demonstrates the Debtor's "good faith" in filing the petition as all of the following factors weigh in the Debtor's favor or are neutral at worst:

a. **Single asset case**: On paper the Debtor's only asset is its membership interest in the Mezz 1 Borrower, however, taken holistically with its entire capital stack and the operating entities, the Debtor is part of a larger enterprise through which the value of the Debtor's asset truly lies. *In re Gen. Growth, Props, Inc.*, 409 B.R. 43, (Bankr. S.D.N.Y. 2009) (refusing to dismiss special purpose entity debtors which had been formed as part of funding enterprise owning more than 200 shopping malls and other related businesses); *Jameson Mezz*, 461 B.R. at 301 ("the Court concludes it must consider the Debtors holistically in order to determine if there is a realistic possibility that Mezz II can be rehabilitated").

b. **Few unsecured creditors**: Unlike in *Jameson Mezz*, where the debtors' only unsecured creditors were professionals hired before the filing that were either paid by or obtained by retainers, here the Debtor has identified two unsecured creditors and a third creditor has already filed a claim in the case. No claims process has occurred in this case yet and it is unclear whether other creditors will emerge.

c. **No ongoing business or employees**: While the Debtor has no employees, the Debtor has ongoing cash flow moving up the waterfall from its portfolio of self-storage facilities that are operating businesses and generating significant income, as shown in its initial monthly operating report. *See* D.I. 23. The Debtor was never intended to be a liquidating limited liability company, but is part of a vibrant cash-flowing business.

d. **Petition filed on the eve of foreclosure**:  While the petition was filed on the eve of a foreclosure sale, courts have held that that is not a *per se* basis to find bad faith.  *See In re The Sunshine Group, LLC,* Case No. CC-19-1105-GSL, 2020 WL 1846940, at *7 (B.A.P. 9th Cir. Apr. 10, 2020); *Matter of Ofty Corp.*, 44 B.R. 479, 482 (Bankr. D. Del. 1984) ("The filing of a petition to avoid liquidation does not always constitute grounds for dismissal.").  Further, the foreclosure sale process that the Debtor stipulated to with TIAA was very different up until two days prior to the sale when RREF swooped in for an undisclosed amount and without notice to the Debtor or any potential bidders.

e. **Two party dispute which can be resolved in pending state court action**: While the core allegation of the Motion to Dismiss is that this is mere a two-party dispute, the Debtor has identified further non-litigation bases for the commencement of this case.  In addition, the Debtor's ability to maximize value and conduct a fair process can only be accomplished in this Court given the dual-position of RREF as lender, bidder, and competitor.

f. **No cash or income**:  Through the cash management system described above, after application of the waterfall, cash is available each month to service the debt held by RREF.  *See* Stoler Declaration, at ¶¶ 10-12.  In fact, as reflected in the Debtor's initial operating report, it is anticipated that any money coming in will flow to RREF.  *See* D.I. 23.

g. **No pressure from non-moving creditors**:  The Debtor is not presently experiencing pressure from non-moving creditors.

h. **Previous bankruptcy petition**:  This is the first time the Debtor has filed for bankruptcy protection.

i. **Prepetition conduct was improper**:  There is no basis on the record of this case to conclude that the pre-petition conduct of the Debtor, or for that matter its principals, was anything other than proper.

j. **No possibility of reorganization**:  As outlined in paragraph 39 above, the Debtor has demonstrated that it is in deep discussions with various parties regarding potential options to reorganize.  *See also* Stoler Declaration, at ¶ 26. Given the value of the GVS Portfolio and the Debtor's assets, the Debtor is confident that it will able to achieve a result that addresses the RREF debt and resolves this case.  Retention applications for various restructuring and real estate industry sale professionals are being prepared and filed.

k. **Debtor formed immediately prepetition**:  The Debtor is a Delaware limited liability company formed on November 19, 2018.  *See*  Stoler Declaration, at ¶ 3.

l.  **Debtor filed solely to create automatic stay**: As discussed at length herein, while the automatic stay is beneficial, this case was filed for a variety of reasons beyond the application of the automatic stay to pending litigation.

m.  **Subjective intent of the debtor**:  As discussed at length herein, the Debtor's genuine and earnest intent in filing this case is to utilize the protections of chapter 11 to maximize the value of its estate for the benefit of all stakeholders. *See* Stoler Declaration, at ¶¶ 21-28.  This factor weighs in favor of a finding of the Debtor's good faith.

51.    Accordingly, however they are weighted, the *Primestone* Factors point to the conclusion that the Debtor commenced this case in good faith.  This is also true of the Third Circuit's overarching considerations that the petition "not be filed merely to obtain a tactical litigation advantage" and that it "serve[] a valid bankruptcy purpose" by "maximizing the value of the debtor's estate." *Integrated Telecom*, 384 F.3d at 120.

52.    The Debtor's chapter 11 petition was filed in good faith and RREF's arguments to the contrary should be overruled.

**D.    There is No "Cause" for the Dismissal of the Debtor's Chapter 11 Case**

53.    RREF also asserts that there is "cause" to dismiss the case because of claimed "substantial and continuing loss to or diminution of the estate" and a claimed "absence of a reasonable likelihood of rehabilitation."   Motion to Dismiss, ¶ 77 (citing 11. U.S.C. § 1112(b)(4)(A)-(B)).  This argument also fails.

54.    Here, RREF has the burden of proof to show cause.  Courts have recognized that "dismissal of a chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature." *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995).  RREF fails to meet its heavy burden for all the reasons stated above which are incorporated herein.  Here, the Debtor's case is less than two months' old, all indicators

of value demonstrate that a reorganization will be possible, and the estate property is not being impacted by the administration of these cases.

55.     First, RREF's allegations that "the Debtor's estate faces a serious threat of loss or diminution resulting from the accrual of chapter 11 administrative expenses" and "the Debtor has no income, is likely balance-sheet insolvent, and has no 'going concern' to preserve in bankruptcy" are false and made without basis in fact.  Motion to Dismiss at ¶ 77.  These arguments related to lack of income, valuation and preservation of a going concern are addressed above in large part. The Debtor does not have operating expenses to diminish its estate and any cash that is available through the waterfall is not being utilized.  Although the Debtor is an integral part of the operating and profitable GVS Portfolio companies, as RREF points out, the Debtor is not an operating company and has no business operations or employees.  *Id.* at ¶ 3.  Accordingly, there can be no loss or diminution to the estate and RREF's motion to dismiss should be denied.  *See In re Gabriel Techs. Corp.*, No. BR 13-30340DM, 2013 WL 2318581, at *2–3 (Bankr. N.D. Cal. May 28, 2013) (denying motion for conversion in part –"[b]ecause the debtor has no tangible assets or realizable value and no operations, there has not been and is no "substantial" loss or diminution of the estate. Simply stated, there is nothing left to lose." and reasoning that the accrual of professional fees does not constitute a loss under section 1112).  Moreover, the Debtor intends to receive funding to pay the administrative expenses of its chapter 11 case that will be neutral to RREF.

56.     Second, there is indeed a "reasonable likelihood of rehabilitation" here based on the significant value of the GVS Portfolio.  But the Debtor needs more time (not much) to determine the best option to maximize value to the estate and exit the case.  Thus, the Motion to Dismiss is premature where, as here, the Debtor has not been given sufficient time to propose a

plan.  The exclusive period of time to propose a plan is still months away.[4]  *See, e.g.*, *Gen. Growth*, 409 B.R. at 65 (holding that "[t]here is no requirement in the Bankruptcy Code that a debtor must prove that a plan is confirmable in order to file a petition"); *In re Lizeric Realty Corp.*, 188 B.R. 499, 503-04 (Bankr. S.D.N.Y. 1995) (refusing to dismiss case for bad faith where the secured creditor conceded that it was premature to assess the debtor's ability to confirm a plan); *In re Toyota of Yonkers, Inc.*, 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1995) (concluding that "[t]he movants are premature in seeking to dismiss the debtor's Chapter 11 case at this time because the debtor should at least be afforded the 120-day exclusivity period permitted under 11 U.S.C. § 1121(b) to propose a Chapter 11 plan").  Similar to *Toyota of Yonkers*, the Debtor should be granted additional time to continue its efforts to pursue a sale process or obtain an infusion of new capital that would lead to a successful plan of reorganization.

57.    To argue that there is no ongoing rehabilitation or "going concern" to preserve, RREF claims, without elaboration, that "a chapter 11 plan cannot be confirmed over RREF's objection."  Motion to Dismiss at ¶ 78 (citing 11 U.S.C. § 1129(a)(10).  The Debtor is actively engaged with multiple parties regarding a potential sale process or influx of new capital that would allow the Debtor to pursue a plan of reorganization.  RREF's assertion that the Debtor could not confirm a plan over its objection is not accurate in all circumstances since a plan is not even needed to satisfy RREF's claim and in any event, it is premature to determine at this time.  Moreover, the Debtor is not without assets.  To the contrary, it has a substantial asset to protect.  RREF seems to take issue with the fact that the Debtor is a holding company with few "operations" in the traditional sense.  Despite this allegation, the Debtor is generating significant income through its

---

[4] Under section 1121(b) of the Bankruptcy Code, the initial exclusive period for the Debtor to file a plan expires on August 10, 2021.  *See* 11 U.S.C. § 1121(b).

portfolio companies which in turn means that the Debtor's interest the Mezz 1 Borrower has significant value.

58.     Indeed, RREF's own motion admits there is an equity cushion.  The Debtor believes that equity cushion is in excess of $75 million based on, among other things, CBRE's 2018 appraisal, NFK's 2019 appraisal, and the other market indications, including the $1.3 billion sale price of Simply Self Storage in December 2020.  As a result, there is no basis to dismiss this case. Moreover, despite the Debtor's position as a single link in the chain of this larger—and demonstrably profitable—enterprise, this Court regularly administers the affairs of entities whose primary, or entire, business is based upon holding equity interests of non-debtor subsidiaries or other investments for the benefit of its members or shareholders.  *See, e.g.*, *In re Zohar III, Corp., et al.*, Case No. 18-10512 (KBO), at D.I. 5 (First Day Affidavit) (Describing that debtors' primary assets consisted of loans to and "equity upside" interests in a variety of non-debtor "portfolio companies."); *In re Sand Spring Capital III, LLC, et al.*, Case No. 11-13393 (BLS), at D.I. 3 (First Day Affidavit) (Debtors were "investment vehicles that hold securities and other assets for investment purposes for the benefit of their membership interest holders … [or] their shareholders [as applicable.]").

59.     As discussed above, the Debtor sees a clear—and, far from speculative—path toward successfully emerging from chapter 11.  The Debtor is making every reasonable effort to do so with alacrity.  Dismissing this chapter 11 case now, which would result in significant, irreparable harm to the Debtor's business and all stakeholders – other than RREF.  RREF has the burden to establish ***both*** "substantial or continuing loss to or diminution of the estate ***and*** the absence of a reasonable likelihood of rehabilitation" to show "cause" for dismissal under section 1112(b)(4)(A).  11 U.S.C. § 1112(b)(4)(A) (emphasis added); *In re Unique Tool & Mfg. Co., Inc.*,

No. 19-32356, 2019 WL 5589085, at *9 (Bankr. N.D. Ohio Oct. 25, 2019) (holding that both requirements must be shown because section 1112(b)(4)(A) is written in the conjunctive); *In re 412 Boardwalk, Inc.*, 520 B.R. 126, 135 (Bankr. M.D. Fla. 2014) (holding that "[s]ection 1112(b)(4)(A) 'is written in the conjunctive; therefore, it requires both a loss to or diminution of the estate and an absence of a reasonable likelihood of rehabilitation.'") (quoting *In re Motel Props, Inc.*, 314 B.R. 889, 895 (Bankr. S.D. Ga. 2004)).[5]   The Motion to Dismiss establishes neither.  Thus, it should be denied.

### E.    Abstention Under Section 305(a) is Not Appropriate.

60.    The Motion to Dismiss also perfunctorily, by mere inclusion of a footnote, seeks abstention and dismissal under section 305(a) of the Bankruptcy Code.  Motion to Dismiss, ¶ 81, n.20 (citing 11 U.S.C. § 305(a)).  Courts are in "general agreement that abstention in a properly filed bankruptcy case is an extraordinary relief."  *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Aerovias Nacionales de Colombia S.A. Avianco*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003) (noting that dismissal or suspension under section 305(a) is "extraordinary relief.").  Given that it is an extraordinary remedy, RREF has the burden of proof and must show that abstention or dismissal under section 305(a) of the Bankruptcy Code would benefit the interests of the debtor and the creditors.  *Id.* at 488.

61.    Further, dismissal under section 305(a) is only appropriate where the "court finds **both** the 'creditors and debtor would be 'better served' by a dismissal.  *AMC Investors*, 406 B.R.

---

[5] Even if, as RREF asserts, section 1112(b)(4)(A) of the Bankruptcy Code does not require both a loss to or diminution of the estate and an absence of a reasonable likelihood of rehabilitation (which it does), RREF cannot establish loss or diminution to the estate.  As RREF points out, the Debtor is not an operating company and has no business operations or employees.  Motion to Dismiss at ¶ 3.  Accordingly, there can be no loss or diminution to the estate where there are no tangible assets, or realizable value and no operations.  *See In re Gabriel Techs. Corp.,* No. BR 13-30340DM, 2013 WL 2318581, at *2–3 (Bankr. N.D. Cal. May 28, 2013) ("Because the debtor has no tangible assets or realizable value and no operations, there has not been and is no "substantial" loss or diminution of the estate. Simply stated, there is nothing left to lose.").

at 488 (emphasis added) (citing *In re Eastman*, 188 B.R. 621, 624 (9th Cir. BAP 1995)). "Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief." *Id.* (quoting *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008)).

62.     RREF's treatment of section 305(a) in a footnote is insufficient to meet this burden. Indeed, it rests entirely on the same allegations for which it asserts the chapter 11 case was not filed in good faith, namely that this case is a two-party dispute and that the Debtor is not able to confirm a plan.  Motion to Dismiss, ¶ 81, n.20 (citing *Steinman v. Spencer (In re Argus Group 1700, Inc.)*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996)).  As discussed above in detail, this is not a mere "two-party dispute" and, even if it were, that is not the standard.  "Even in a two-party dispute case, the court should consider whether dismissal would be in the interest of both the debtor and the creditor."  2 COLLIER ON BANKRUPTCY ¶ 305.02[2][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing *Etter v. LLC 1 07CH12487*, 593 B.R. 315, 321 (N.D. Ill. 2018) and *In re Sky Country Estates, LLC*, 2018 WL 3872109 (Bankr. D.N.M. 2018)).

63.     In addition to failing to address the requirement that abstention benefit both the debtor and the creditors, *Argus Group* is plainly distinguishable from the case here.  In that case, the court *sua sponte* found that the debtor filed in bad faith because "the Debtor's financial condition did not need to utilize the bankruptcy system in order to obtain a breathing spell and reorganize their debts."  *Id*. at 754.  Important to the court was the fact that, other than litigation, the debtor's schedules listed only one secured lender, with whom its obligations were current, and an unsecured obligation to its current counsel.  *Id*.  Here, in addition to RREF as a secured creditor, the Debtor has at least two or three unsecured creditors to consider.  Moreover, in contrast to *Argus*

*Group*, there is no doubt that the Debtor needed to utilize the bankruptcy system in order to obtain a breathing spell to provide it with the necessary time to determine the best way to maximize value for its estate.

64.    RREF has not met its substantial burden to invoke the extraordinary relief of abstention and dismissal under section 305(a).  In any event, as outlined in detail in sections A and B, above, it is abundantly clear that the best interests of both the Debtor and all of its creditors are better served by remaining in chapter 11 before this Court.  In *Crown Village*, this Court declined to dismiss the case or to abstain because dismissal or abstention "would harm the administration or preservation of Debtor's estate."  *Crown Village*, 415 B.R. at 96.  For the reasons set forth above, the result should be the same here and RREF's request that the Court should abstain should also be denied.

## II.    THE DEBTOR RESERVES ALL RIGHTS WITH RESPECT TO ON-GOING DISCOVERY AND THE BIFURCATED PORTION OF THE MOTION

65.    As a practical matter, given the expedited timing of this matter, discovery is on-going between the parties.  The Debtor would have preferred to file this Objection after the evidence became available but could not negotiate that schedule.  At the time of this filing, documents have not been produced, other discovery has not been provided, and depositions have not occurred.  The Debtor fully reserves its rights to supplement this Objection and raise any and all arguments at the hearing on the Motion.  Further, consistent with the Court's oral ruling at the May 12, 2021 status conference, the Debtor has not addressed any arguments related to the bifurcated stay relief portion of the Motion and reserves all rights regarding the same and to seek additional discovery in this contested matter or otherwise under applicable Bankruptcy Rules.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court enter an order (i) sustaining this Objection and denying the Motion to Dismiss in its entirety; and (ii) granting the Debtor any such further relief as it deems just and proper.

Dated: May 17, 2021
      Wilmington, Delaware

                        BAYARD, P.A.

                        */s/ Erin R. Fay*
                        Neil B. Glassman (No. 2087)
                        Erin R. Fay (No. 5268)
                        Gregory J. Flasser (No. 6154)
                        600 N. King Street, Suite 400
                        Wilmington, Delaware 19801
                        Phone: (302) 655-5000
                        Email: nglassman@bayardlaw.com
                                  efay@bayardlaw.com
                                  gflasser@bayardlaw.com

                        *Proposed Counsel for the Debtor and Debtor in Possession*