# EXHIBIT A

**Stoler Delcaration**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GVS Portfolio I B, LLC,[1] | Case No. 21-10690 (CSS) |
| Debtor. | |

### DECLARATION OF JEREMY STOLE IN SUPPORT OF DEBTOR'S OBJECTION TO PORTION OF RREF III STORAGE LLC'S MOTION FOR ENTRY OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE WITH PREJUDICE AND GRANTING RELIEF FROM THE AUTOMATIC STAY

Pursuant to 28 U.S.C. § 1746, I, Jeremy Stoler, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am employed as the Executive Vice President & Head of Capital Markets at an affiliate of GVS Portfolio I B, LLC (the "Debtor" or "GVS").  I am familiar with the Debtor's history, financial affairs, and books and records.

2.      I submit this declaration in support of the *Debtor's Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* (the "Objection") filed contemporaneously herewith.

3.      The Debtor is a Delaware limited liability company that was formed on November 19, 2018.  The Debtor's board consists of Mr. Paul and two independent directors, and has since inception of the Company.  Notably, the independent directors were appointed at the direction of the Debtor's initial lenders, as required by the loan documents.  Both Mr. Paul and one of the

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, is as follows: GVS Portfolio I B, LLC (7171).  The mailing address for the Debtor, solely for purposes of notices and communications, is: 814 Lavaca Street, Austin, TX 78701.

independent directors have been on the Debtor's board since the Debtor's formation in November 2018.

4.     The Great Value Storage branded self-storage facilities, beneficially owned by the Debtor (the "GVS Portfolio"), offer secure storage units with 24-hour security systems, both climate controlled and non-climate controlled, RV, car, and boat parking, moving and storage supplies and moving truck rental. It caters to personal and business storage needs.  The GVS Portfolio consists of 64 facilities in Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, Tennessee, and Texas.  The GVS Portfolio, which includes more than just self-storage facilities, took ten years to amass at a cost of approximately $300 million.  Great Value Storage is a successful business that employs workers at each of its locations, including resident managers who live at each of the properties, often with their families.  The GVS Portfolio is more than just a collection of properties; it is an ongoing business.  The GVS Portfolio is unique; it was painstakingly assembled via a series of acquisitions over a decade and is in light of that, is difficult if not impossible to replace.

5.     This portfolio of 64 properties is not only valuable, but highly desirable and virtually impossible to replicate without significant effort expended over the course of many years. This is largely because the self-storage industry is highly fragmented, dominated by many private "mom and pop" owners.  The largest owner of self-storage facilities, Public Storage, Inc., ("Public Storage"), owns 2,844 facilities out of an estimated 49,000 to 60,000 nationwide, or about 5% of total inventory.  *See* Alexander Harris, *U.S. Self-Storage Industry Statistics*, SPAREFOOT (Jan. 27, 2021)  https://www.sparefoot.com/self-storage/news/1432-self-storage-industry-statistics/.  This industry fragmentation is reflected in the following comment: "Industry ownership is fragmented, with 31.2% of self-storage space (by rentable square footage) owned by six public companies, 16.5% owned by the next top 94 operators, and 52.3% owned by small operators." *Id*.  Thus,

portfolios of self-storage properties of this size and geography are highly desirable for institutional real estate investors and are in limited supply.

### B.    The Loan Facilities

6.      On or about November 30, 2018, the original lender, UBS AG ("UBS") made three loans related to the GVS Portfolio including a $110 million mortgage facility at the property entity level serviced by PNC/Midland (the "Mortgage Loan"), a $103 million mezzanine loan (the "Mezz 1 Loan" to GVS Portfolio I, LLC now held by ESS-GV Holdings LLC (also a competitor of GVS), and the consolidated mezzanine facility of $82 million in principal (the "Mezz 2 Loan") now held by RREF. The Mortgage Loan and Mezz 1 Loan are performing and are not at issue in this case. RREF's predecessor, TIAA, acquired the facility in November 2018 and continuously held it until the evening of March 8, 2021—2 days prior to the date set for a sale of the collateral by auction.

7.      UBS and its successor lenders were aware of the cohesiveness of the corporate structure in structuring the cash management system. Under such system, PNC/Midland as mortgage servicer collects rent and other payments through a lockbox account in the name of GVS Texas Holdings I, LLC.  Each month, PNC then pays the interest, fees, and expenses on its facility, reserves for escrows, etc. and then transfers cash first to a subaccount for the Mezz 1 Loan and then to a subaccount for the Mezz 2 Loan (the "Mezz 2 Account"). The Mezz 2 Account is a subaccount maintained on a ledger entry basis only under the cash management account in the name of GVS Texas Holdings I, LLC.  Assuming no event of default, the cash management bank then remits funds from the subaccount of GVS Texas Holdings I, LLC to the lender under the Mezz 2 Loan. Although these amounts are deemed distributions from the Debtor pursuant to the PNC Facility documents, in fact PNC pays this cash directly to RREF.

C.      **The Cured Defaults**

8.      The defaulted status of the loan resulted from a single late payment under the Mortgage Loan, which was quickly covered. This late payment set off a cascade of events, ultimately resulting in TIAA allegedly accelerating its $82 million of junior debt. After the late payment, PNC/Midland stopped the flow of property revenue, trapping all rents in a lockbox for the implementation of cash management.  Trapped in a lockbox, the property revenue was not available for the next monthly interest payment on the Mezz 1 Loan of $472,083, due on December 6, 2019.  At this point, a total of $1,119,153 in property revenue was available and could have amply covered the missed interest payment, but because of unresolved administrative issues in the set-up of cash management protocols, PNC/Midland did not release the funds.  Thereafter, TIAA issued a notice purporting to accelerate the Mezz 2 Loan on December 6, 2019.

9.      With the funds in the lockbox, and while the mortgage borrowers and PNC/Midland worked to resolve the administrative issues, on December 10, 2019, TIAA cured the missed November 6, 2019 interest payment of $487,819 on the Mezz 1 Loan, which the borrower thereunder rectified on December 13, 2020. On December 20, 2019, while the lockbox funds were trapped by PNC/Midland, TIAA advanced the delayed payment to the Mezz 1 Loan lender as well, while it awaited release of funds from the lockbox.  This advance was also subsequently cured when PNC/Midland finally released the lockbox funds, as set forth below.  The Debtor then promptly reimbursed TIAA for these payments.

10.     On January 15, 2020, PNC/Midland released $2,417,721.94 in property revenue, but directed $1,067,902 of that revenue to the First Mezzanine Lender. More than half of that amount – $580,082 – was applied to default and late fees to the first mezzanine lender arising from the unreleased funds in December 2019. The Debtor protested this improper application with the

lender group.  Had those default and late fees not been routed to the First Mezzanine Lender, TIAA would have received sufficient funds to satisfy its regular debt service payment.

11.     In January 2020, despite the Debtor's efforts to resolve the foregoing issues and work to a resolution, TIAA asked that the Debtor hold off on any resolution discussions with TIAA until the administrative cash management set up was complete.  The next month, in February 2020, an additional $63,667.90 in remaining default and late fees from the prior month were applied to the Mezz 1 Loan (along with its regular monthly debt service), and then remaining property revenues in the amount of $1,339,993 were paid to TIAA.  However, rather than applying those funds to repaying any protective advances TIAA made, and the regular interest it would have received but for the cash management set up issues, TIAA instead applied these funds to loan principal, on account of TIAA's needless acceleration of the Loan.

12.     In March 2020, PNC/Midland realized it had mistakenly miscalculated the amounts needed for property taxes, and increased the tax escrow from $160,000 to $411,481. Increasing this escrow by nearly $300,000 resulted in another shortfall on the monthly payment to TIAA. TIAA received $354,196.04 in the March waterfall, but had the tax escrow mistake not adversely impacted the March waterfall, there again would have been sufficient funds to cover TIAA's regular monthly interest payment. During the period from December to March, but for the administrative cash management issues, application of incorrect default fees, late fees, and tax escrow mistake, TIAA would have timely received its regular monthly debt service payments.

13.     In March 2020, COVID-19 had fully taken hold causing widespread economic calamity.  The Debtor's business was not immune, and negotiations completely stalled once the pandemic was in full swing.  The Debtor continued to focus its attention on ensuring portfolio performance in light of the pandemic and also clarifying the protective advances, repayments, and interest rates with both mezzanine lenders.  The Debtor did not receive the clarifying information

from both lenders until May 20, 2020. During this time period, the Debtor continued to work with TIAA and communicated with the entire lender group every month on the payment date to ensure cash management was functioning appropriately and to ensure that no further protective advances would be needed. The Debtor provided a written proposal on May 21, 2020 to TIAA to address open issues, which proposal was ultimately not responded to by TIAA.

14.     The parties continued to work together each month and the Debtor had been encouraged by these discussions and believed that a resolution could be possible. Then in July, the Debtor abruptly received a July 17, 2020 Notice of Disposition of Collateral from TIAA.

**D.     The State Court Action**

15.     On August 27, 2020, the Debtor commenced an action in the New York Supreme Court (the "<u>NY Court</u>") to enjoin a commercially unreasonable sale of the Collateral scheduled by TIAA that was noticed to occur on September 3, 2020, during the Labor Day Holiday week (the "<u>First Sale</u>"). Following full briefing and argument, on September 18, 2020, the NY Court granted GVS's motion for a preliminary injunction finding that the First Sale was commercially unreasonable. *See* O'Toole Declaration, at Exh. 20. In the Decision, the NY Court instructed the parties to meet and confer as to the notice of the sale and terms of sale and submit a stipulation to the NY Court setting forth areas of agreement. O'Toole Declaration, at Exh. 20. The NY Court further instructed the parties to submit letters to the NY Court identifying any remaining areas of disagreement. *Id*.

16.     On October 5, 2020, the parties submitted a stipulation to the NY Court setting forth an agreement as to certain requirements of the Notice of Sale and the Terms of Sale, which the NY Court so-ordered. *See* O'Toole Declaration, at Exh. 21 (*Stipulation Regarding Terms of UUC Sale, Notice of UCC Sale and Confidentiality Agreement* ("<u>UCC Sale Stipulation</u>")). On

October 23, 2020, the NY Court issued a Supplemental Decision and Order, setting a Sale date of March 10, 2021.

17.     Among other things, the UCC Sale Stipulation provided: (i) that the Sale would be in conformity with the agreed upon UCC Public Sale Notice, Notice of Undertaking and Confidentiality Agreement, and the Terms of Sale; and (ii) for access to the properties by prospective bidders consistent with applicable state, city and local ordinances governing travel and access to facilities in light of the ongoing Covid-19 pandemic.  Copies of the UCC Public Sale Notice, Notice of Undertaking and Confidentiality Agreement, and Terms of Sale are attached hereto as **Exhibits 1**, **2**, and **3**, respectively.  Importantly, the parties further made clear that nothing in the UCC Sale Stipulation "negat[ed], modifi[ed] or affect[ed] in any way Lender's obligation pursuant to Section 9-610 of New York's Uniform Commercial Code, to conduct all aspects of the sale and/or disposition of the Collateral in a commercially reasonable manner."   O'Toole Declaration, at Exh. 21.

18.     Further, the agreed upon UCC Public Sale Notice, identified the Seller of the Collateral in all capital letters as Defendant TIAA:

UCC PUBLIC SALE NOTICE

> PLEASE TAKE NOTICE THAT Jones Lang LaSalle, on behalf of TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a New York corporation, for the benefit of the Separate Real Estate Account ("Secured Party") will offer for sale at public auction 100% of the limited liability company membership interests (the "Membership Interests") in GVS PORTFOLIO I, LLC, a Delaware limited liability company (the "Pledged Entity"), together with certain rights and property representing, relating to, or arising from the Membership Interests (collectively, the "Collateral").

*See* **Exhibit 1**. The Notice of Undertaking and Confidentiality Agreement likewise identified the Seller of the Collateral, Secured Party and counterparty to the confidentiality agreement as TIAA.

*See* **Exhibit 2**.  The Terms of Sale further identified the Secured Party and seller of the Collateral

as TIAA: "'Secured Party' means Teachers Insurance and Annuity Association of America, a New York corporation, for the benefit of the Separate Real Estate Account." *See* **Exhibit 3**.

19.     Two days prior to the scheduled sale, however, the "Secured Party" changed when TIAA sold the Loan to RREF for an undisclosed amount and without notice to GVS or any other bidders who had registered to bid at the auction. No notice was provided to the market that, at the time of the auction, the Loan would be held by a different seller.

20.     Following these events, the Debtor obtained a temporary restraining order from the NY Court enjoining the auction from proceeding.  Following briefing and argument, the NY State Court declined to issue a preliminary injunction, finding the process presumptively reasonable given the prior stipulation and without concern for intervening events or loss of value.  *See* O'Toole Declaration, at Exh. 22.  The task of the NY Court, however, was to oversee a commercially reasonable sale, not ensure that value was maximized for the benefit of all constituents, as is the objective in bankruptcy.

**E.     The Debtor Files this Case to Maximize Value**

21.     Preserving and maximizing value was, however, the Debtor's aim in filing this proceeding.  The Debtor's directors made the decision to file for Chapter 11 protection so the Debtor could, among other things, be provided the opportunity to market its asset and explore its options to run a sale process or obtain a new capital infusion.  If the proposed foreclosure sale was to be run at the last minute by an aggressive competitor, the Debtor believes it would have forfeited significant value.

22.     The Debtor firmly believes there is significant value in the GVS Portfolio that reaches far beyond the RREF loan. The Debtor's belief is grounded in reality and is not a speculative pipe dream.  Indeed, RREF's own motion admits there is an equity cushion.  The Debtor believes that equity cushion is well in excess of the cusion RREF already admits. In

comparison to the approximately $300 million in combined principal debt, an appraisal completed in 2018 by CBRE in accordance with the Uniform Standards of Professional Appraisal Practice valued the GVS Portfolio as of October 10, 2018 at $375 million with a stabilized value of $392 million expected by October 10, 2019.  A copy of CBRE's appraisal is attached hereto as **Exhibit 4**.  Further, an appraisal conducted by Newmark Knight Frank Valuation & Advisory, LLC ("NFK") for TIAA, dated December 2, 2019, values the GVS Portfolio at a fair market value of $393,600,000.  A copy of NFK's appraisal is attached hereto as **Exhibit 5**.  In addition, in March of 2020, the Debtor received an unsolicited offer from SROA Acquisitions, LLC with a purchase price of $375 million for the GVS Portfolio.  SROA now appears to be affiliated with RREF and is jointly represented by the same counsel in these proceedings.  A copy of SROA's Purchase Offer is attached hereto as **Exhibit 6**.

23.    The limited supply of portfolios of self-storage properties, the difficulty assembling them, and the significance to investors of being able to acquire a portfolio are discussed by CBRE in its appraisal.  *See* **Exhibit 4**.  In its appraisal, CBRE states that it interviewed market participants concerning "portfolio premiums" associated with the sale of self-storage portfolios:

> Joe Margolis, CEO of Extra Space (NYSE:EXR) … said self-storage portfolios command lower cap and yield rates [thus higher prices] than individual assets because of the ability to place a large amount of capital in one transaction and risk diversification. He also noted that as portfolios available to purchase have declined over the past year (after several years of robust activity), the market for portfolios remains frothy.

*Id*.

> "Christopher P. Marr, CEO of publicly traded Cubesmart: in a separate convsation  [sic] told us they would like to internally value the individual assets and apply a premium in the form of cap/yield rates, but there is insufficient time during the deal cycle. As a result, he said they do 'like everybody else' and roll up the financials and apply a portfolio cap/yield rates, that are lower than individual assets. He also noted that with the number of new players seeking to

store capital in the sector, including hedge funds like Carlyle,
Brookfield and TPG, that 'everybody' wants to buy portfolios.

*Id*.

24.     There are other market indications of value which the Debtor believes supports its

conclusion that RREF is comfortably over secured.  For example, in December 2020, Brookfield

Asset Management sold Simply Self Storage to Blackstone Real Estate Income Trust for $1.3

billion.    *See*   https://www.blackstone.com/press-releases/article/blackstone-real-estate-income-

trust-completes-acquisition-of-simply-self-storage-for-approximately-1-2-billion/.          At  this

valuation, the GVS Portfolio would be worth somewhere between $450 million (if the same cap

rate is applied) and $495 million (if the price per square foot is applied).  Even assuming a

significant adjustment to the assumptions for the Simply Self Storage portfolio versus the GVS

Portfolio, there is still ample equity above the combined outstanding debt, and RREF is clearly

fully secured in its position as evidenced by this market comparable.

25.     As set forth above, at the time of the filing of this Chapter 11 case, the Debtor firmly

believed that there was significant value in the GVS Portfolio that reaches far beyond RREF's

loan.  This belief continues today and is confirmed by interest the Debtor has received since filing

the petition.  The Debtor believes such interest would not exist in a foreclosure process run by its

competitor.

26.     Since filing this case, the Debtor has been working tirelessly to determine the best

path forward to effectuate a reorganization and to maximize the value of the estate.  The Debtor

has engaged Alan Tantleff, of FTI Consulting, Inc. ("FTI") as Chief Restructuring Officer to assist

with this process.  Currently, FTI and the Debtor are working to obtain a new capital infusion

(either as debtor in possession financing or exit financing or both) that will allow it to effectuate a

reorganization.  The Debtor believes it is imperative that this process occur under this Court's

supervision to provide fair and adequate notice to all constituents, protect their rights, and preserve the value of the estate.

27.     Moreover, the Debtor believes that filing the Chapter 11 case was, and is, the best way to preserve the significant value of its asset in light of the looming value destructive foreclosure sale.  Indeed, the foreclosure sale that was contemplated between the Debtor and TIAA when stipulating in 2020 was not the value destructive process about to unfold at the combined hands of a competitor of the Debtor and a second potential bidder, SROA.  Prospective bidders learned at the last moment that RREF was acting as seller and registered bidder with the power to make a cash bid, credit bid, and select the winning bidder.  Under the proposed foreclosure sale, RREF has wide latitude to select the winning bidder.  The Terms of Sale provide that "[RREF] reserves the right to (i) accept a lower bid, if the bid is on terms that offer a more certain likelihood of execution."  *See* **Exhibit 3**, at ¶ 5(b).  Moreover, bidders, many of whom may be in the storage market already, may have been dissuaded by participating in a process where they were required to share their financials with RREF, another market actor.  *See* Terms of Sale, section 3(b) ("Each prospective bidder must demonstrate its financial ability to tender the purchase price for the Collateral, by submitting to [RREF] . . . a certified balance sheet or other certified financial information.").  *See* **Exhibit 3**, at ¶ 3(b).  Given these disclosure requirements and RREF's entanglement with the foreclose sale process as seller and registered bidder with the ability to select the winning bid, the Debtor believed that prospective bidders could presuppose that their bids would not be treated fairly.

28.     The Debtor also believed that the foreclosure sale was tainted when RREF replaced TIAA because a sale by a disinterested financial buyer, such as TIAA, suggests that bidders will be treated fairly, thus prompting prospective bidders to undertake the expensive and time-consuming analysis to construct a bid.  Instead, RREF came in only days before the scheduled sale

as the seller and competitor, with access to all of the bids and bid submissions, and the ultimate

decision-maker on accepting a bid.  In stark contrast to the unsettling circumstances surrounding

the proposed foreclosure sale at the hands of a competitor, this Chapter 11 case will ensure that

value is preserved and maximized for all stakeholders—not just RREF.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 17, 2021

*/s/ Jeremy Stoler*
Jeremy Stoler

## **EXHIBIT 1**

**UCC Public Sale Notice**

# EXHIBIT A

Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 16 of 184

## UCC PUBLIC SALE NOTICE

PLEASE TAKE NOTICE THAT Jones Lang LaSalle, on behalf of TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a New York corporation, for the benefit of the Separate Real Estate Account ("**Secured Party**") will offer for sale at public auction 100% of the limited liability company membership interests (the "**Membership Interests**") in GVS PORTFOLIO I, LLC, a Delaware limited liability company (the "**Pledged Entity**"), together with certain rights and property representing, relating to, or arising from the Membership Interests (collectively, the "**Collateral**").

Based upon information provided by GVS PORTFOLIO I B, LLC, a Delaware limited liability company ("**Debtor**") and its affiliates, it is the understanding of Secured Party (but without any recourse to, or representation or warranty of any kind by, Secured Party as to the accuracy or completeness) that (i) the Membership Interests constitute the principal asset of Debtor, (ii) the Pledged Entity owns 100% of the limited liability company membership interests in each of GVS Colorado Holdings I, LLC, GVS Illinois Holdings I, LLC, GVS Indiana Holdings I, LLC, GVS Missouri Holdings I, LLC, WC Mississippi Storage Portfolio I, LLC, GVS Nevada Holdings I, LLC, GVS New York Holdings I, LLC, GVS Ohio Holdings I, LLC, GVS Ohio Holdings II, LLC, GVS Tennessee Holdings I, LLC, GVS Texas Holdings I, LLC and GVS Texas Holdings II, LLC, each a Delaware limited liability company (collectively, the "**Property Owners**"), (iii) the Property Owners own a portfolio of 64 self-storage facilities located Colorado, Illinois, Indiana, Missouri, Mississippi, Nevada, New York, Ohio, Tennessee and Texas (the "**Properties**"), (iv) the Pledged Entity is a debtor under a mezzanine loan in the original principal amount of $103,000,000 (the "**Senior Mezzanine Loan**"), and (v) the Property Owners, jointly and severally, are debtors under a securitized portfolio mortgage loan in the original principal amount of $110,000,000 (the "**Mortgage Loan**").

**The sale will take place on [_____] at 10:00 a.m. Eastern Time in compliance with New York Uniform Commercial Code Section 9-610 (the "*Sale*").  In recognition of the COVID-19 pandemic and related limitations on public assemblies, the Sale will be conducted virtually via online video conference, provided, however, that if, at the time of sale, applicable state and city laws and rules permit the sale to be conducted in-person, and if relevant building management rules permit the same, then Secured Party will conduct the sale both virtually and in-person at a location in New York City.  The URL address and password for the online video conference, and, if applicable, the address of the in-person location of the public sale, will be provided to all confirmed participants that have properly registered pursuant to these Terms of Sale.**

The Collateral will be sold as a single unit and is offered **AS IS, WHERE IS, WITH ALL FAULTS**. Secured Party makes no guarantee, representation or warranty, express or implied, as to any matter pertaining to the Collateral, and the sale of the Collateral will be made without recourse to, and without representation or warranty by, Secured Party.  The Collateral includes unregistered securities under the Securities Act of 1933, as amended (the "**Securities Act**"), and Secured Party reserves the right to restrict participation in the Sale to prospective bidders that represent that the Collateral will not be sold, assigned, pledged, disposed of, hypothecated or otherwise transferred without the prior registration in accordance with the Securities Act and the securities laws of all other applicable jurisdictions, unless an exemption from such registration is available.

PLEASE TAKE NOTICE that there are specific requirements for any potential bidder in connection with obtaining information, bidding on the Collateral and purchasing the Collateral (collectively, the "**Requirements**"), including without limitation (1) complying with the requirements applicable to the sale of the Collateral set forth in the Intercreditor Agreement dated as of November 30, 2018 (the "**ICA**"), among Secured Party and the holders of the Senior Mezzanine Loan and the Mortgage Loan, including, but not limited to, that such bidder must be a Qualified Transferee (defined in the ICA), and the winning bidder must deliver replacement guarantees from a Substitute Third Party Obligor (defined in the ICA), (2) complying with the Pledged Entity's governing documents and the documents governing the Senior

1

Mezzanine Loan and the Mortgage Loan, and (3) complying with the other qualifications and requirements set forth in the Terms of Sale relating to the sale of the Collateral (the "**Terms of Sale**").

An online datasite for the Sale (the "**Datasite**") is available at http://www.GreatValueStorageUCCForeclosure.com, which will include certain relevant information that Secured Party possesses concerning the Pledged Entity, the ICA, the Senior Mezzanine Loan, the Mortgage Loan, the Property Owners, and the Properties (collectively, the "**Disclosed Materials**") as well as the Terms of Sale. Access to such information will be conditioned upon execution of a confidentiality agreement which can be found on the Datasite. To participate in the auction, prospective bidders must confirm their ability to satisfy the Requirements in the manner described in the Terms of Sale, and following such confirmation, such qualified participants will be provided a URL and password enabling access to the video conference for the Sale. No information provided, whether in the Datasite or otherwise, shall constitute a representation or warranty of any kind with respect to such information, the Collateral or the Sale. Participants are encouraged to review all Disclosed Materials and perform such due diligence as they deem necessary in advance of the Sale.

Secured Party reserves the right to credit bid or set a minimum reserve price, without further notice. The successful bidder must deliver immediately available good funds (1) for the Required Deposit (as defined in the Terms of Sale) on the date of the Sale, and (2) for the balance of the purchase price for the Collateral on the closing date prescribed by the Terms of Sale. The winning bidder must pay all transfer taxes, stamp duties and similar taxes, and any other fees or costs incurred in connection with the purchase of the Collateral.

Questions may be directed to Brett Rosenberg at +1 212-812-5926 or brett.rosenberg@am.jll.com.

122592759.9

**<u>EXHIBIT 2</u>**

**Notice of Undertaking and Confidentiality Agreement**

# EXHIBIT B

<u>BY CLICKING THE "EXECUTE" BUTTON WHERE INDICATED, YOU AND YOUR INSTITUTION AGREE (AND REAFFIRM) EACH TIME THAT YOU OR YOUR REPRESENTATIVES (AS DEFINED BELOW) ENTER THE ELECTRONIC WORKSPACE (THE "WORKSPACE") CONTAINING INFORMATION RELATING TO THE LOAN (AS HEREINAFTER DEFINED) AS FOLLOWS:</u>

## NOTICE TO AND UNDERTAKING BY RECIPIENTS
("Notice and Undertaking")

ENTERING THE WORKSPACE CONSTITUTES AN AGREEMENT TO BE BOUND BY THE TERMS OF THE CONFIDENTIALITY AGREEMENT SET FORTH BELOW (THE "AGREEMENT"). IF YOU OR YOUR REPRESENTATIVES ARE NOT WILLING TO ACCEPT THE CONFIDENTIAL INFORMATION (AS DEFINED IN THE AGREEMENT) ON THE TERMS SET FORTH IN THE AGREEMENT, YOU (AND THEY) MUST EXIT THE WORKPLACE AND NOT REVIEW ANY CONFIDENTIAL INFORMATION.

By clicking the "EXECUTE" button on the Workspace, you acknowledge and agree that you are legally able to receive Confidential Information and that you are legally bound by the Agreement.

You further agree (i) to use all information on this Workspace in accordance with all applicable laws, including without limitation United States Federal or State securities and 'blue sky' laws, (ii) to, subject to the terms of this Notice and Undertaking and the Agreement, use such information in accordance with your compliance policies and any other contractual obligations to which you may be subject and (iii) if at any time you are no longer considering engaging in the Transaction (as defined in the Agreement), or are no longer a Representative (as defined in the Agreement) of the prospective purchaser, you shall not access or permit access to, and shall cease and cause others, including all other related Representatives, to cease to use, as applicable, the Workspace and the Confidential Information.

## Confidentiality Agreement

Ladies and Gentlemen:

Reference is made to (i) that certain Mezzanine 2 Loan Agreement dated as of November 30, 2018 and amended by that certain Omnibus Amendment to Mezzanine 2 Loan Documents dated as of January 7, 2019 (as amended, the "<u>Loan Agreement</u>") by and between TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a New York corporation, for the benefit of the Separate Real Estate Account (as successor-in-interest to UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, the "<u>Secured Party</u>"), and GVS PORTFOLIO I B, LLC, a Delaware limited liability company (the "<u>Debtor</u>") pursuant to which Secured Party made loans to Debtor in the aggregate principal amount of $82,000,000.00 (collectively, the "<u>Loan</u>"), (ii) that certain Pledge and Security Agreement (Mezzanine 2 Loan) dated as of November 30, 2018 and amended by that certain Omnibus Amendment to Mezzanine 2 Loan Documents dated as of January 7, 2019 (as amended, the "<u>Pledge Agreement</u>") pursuant to which Debtor pledged its 100% membership interest in GVS PORTFOLIO I, LLC, a Delaware

limited liability company, to Secured Party and certain related rights and property relating thereto, to secure the Loan, all as more particularly described on <u>Exhibit A</u> (collectively, the "<u>Collateral</u>").

In connection with your consideration of the potential purchase of the right, title and interest in the Collateral from Secured Party at a public sale in accordance with Section 9-610 of the Uniform Commercial Code to be held on [_____] (the "<u>Transaction</u>"), by you or one of your affiliates, Secured Party is prepared to make available to you certain non-public, proprietary information with respect to the Transaction (the "<u>Confidential Information</u>").  As a condition to such Confidential Information being furnished to you, your affiliates and your affiliates' respective directors, officers, employees, agents, or advisors, including, without limitation, attorneys, accountants, consultants, financial advisors and potential sources of equity capital or debt financing (collectively, "<u>Representatives</u>"), you agree to treat any such Confidential Information (whether prepared or provided by or for Secured Party or Debtor, or any of its advisors, representatives, attorneys, partners or otherwise and irrespective of the form of communication) in accordance with the provisions of this Confidentiality Agreement (this "<u>Agreement</u>"), and to take or abstain from taking certain other actions hereinafter set forth.

The term "<u>Confidential Information</u>" shall be deemed to include all notes, analyses, compilations, studies, interpretations, self-generated computer records, or other documents prepared or disseminated by you or your Representatives which are not within the terms of the following sentence.  The term "<u>Confidential Information</u>" does not include information which (a) is or becomes generally available to the public other than as a result of a disclosure by you or your Representatives, (b) was within your possession prior to it being furnished to you by or on behalf of Secured Party pursuant hereto, provided that the source of such information was not known by you to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to Secured Party or any other party with respect to such information or (c) becomes available to you on a non-confidential basis from a source other than Secured Party, provided that such source is not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to Secured Party or any other party with respect to such information.  You agree that you and your Representatives shall use the Confidential Information solely for the purposes of evaluating the Transaction on your own behalf, and not as an agent, representative, finder or broker for any undisclosed or other party, and that the Confidential Information will be kept confidential; <u>provided</u>, <u>however</u>, that you may disclose such information to (i) your Representatives who need to know such information for the sole purpose of evaluating the Transaction, who agree to keep such information confidential and who are provided with a copy of this Agreement and agree to be bound by the terms hereof to the same extent as if they were parties hereto, and (ii) any other person provided you obtain Secured Party's prior written consent to such disclosure which consent can be granted or denied in Secured Party's sole and absolute discretion.  In any event, you shall be responsible and liable for any breach or violation of this Agreement by any person to whom you disclose Confidential Information, and you agree, at your sole cost and expense, to take all reasonable measures (including, but not limited to, appropriate legal proceedings) to restrain all such persons from prohibited or unauthorized disclosure or use of the Confidential Information.  You agree that all right, title, and interest in and to the Confidential Information will remain vested in Secured Party, and Secured Party has not granted you any license, copyright, or similar right with respect to any of the Confidential Information or any other information provided to you by Secured Party or its Representatives. You agree that you are obtaining the Confidential Information solely for your own use and not

2

with a view to distribution to any other person; and you further agree that, without the prior written consent of Secured Party, you and your Representatives will not disclose to any other person any of the terms, conditions or other facts with respect to your specific negotiations as to the Transaction or this Agreement, including the existence thereof. The foregoing notwithstanding, this Agreement shall not prohibit you from discussing the Confidential Information with the Debtor or its representatives.

In the event that you or any of your Representatives are legally required (by deposition, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Confidential Information including the existence and negotiations with respect to the Transaction, you shall provide to Secured Party with prompt written notice of any such request or requirement so that Secured Party may seek a protective order or other appropriate remedy (at Secured Party's sole cost and expense) and/or waive compliance with the provisions of this Agreement. In the event that a protective order or other remedy is not obtained, or that Secured Party waives compliance with the provisions hereof, you or your Representatives shall only furnish that portion of the Confidential Information to the extent Secured Party has waived the provisions hereof or which you or your Representative, in good faith and on the advice of counsel, are legally required to furnish. You agree on behalf of yourself and your Representatives to cooperate with Secured Party to obtain a protective order and otherwise exercise commercially reasonable efforts to obtain assurances that confidential treatment will be accorded to the Confidential Information.

If you decide that you will not proceed with the Transaction, you will promptly inform Secured Party in writing of that decision. In that case, or at any time upon the written request of Secured Party for any reason, you or your Representative shall promptly return to Secured Party or certify the destruction of all written, electronic or tangible documents (and all copies thereof) containing Confidential Information furnished to you or your Representatives, and will destroy all copies of any analysis, compilations, studies or other documents prepared by you or your Representatives. Notwithstanding the return or destruction of the Confidential Information, you and your Representatives will continue to be bound by your obligations of confidentiality and other obligations hereunder. You understand and acknowledge that neither Secured Party nor any of its Representatives make any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information or the source(s) thereof, or the information contained therein. The Confidential Information is not purported to be all-inclusive or to contain all of the information that may be material in deciding whether to participate in the Transaction. The Confidential Information may include, for illustrative purposes, reports from third parties, estimates and projections from Secured Party, its Representatives or other third parties, which may reflect various assumptions concerning anticipated results. Actual results may vary materially from the projected results contained therein and the assumptions may or may not be correct. Each recipient of the Confidential Information should perform its own independent investigation and analysis of the Transaction including conducting whatever due diligence you deem appropriate and independent analysis with respect to the accuracy of the Confidential Information. You agree that neither Secured Party nor any of its Representatives shall have any liability to you or any of your Representatives for any loss, costs, expenses, injuries or damages of any nature or kind (whether direct, indirect, incidental, consequential or special damages including, but not limited to, damages to business reputation, lost business or lost profits), whether foreseeable or unforeseeable and however caused, relating to or resulting from, in whole or in part, the use of the

3

Confidential Information or any acts, errors or omissions of Secured Party or any of its Representatives, whether negligent or otherwise, in procuring, compiling, gathering, formatting, interpreting, reporting, communicating or delivering the Confidential Information.

You agree that unless and until you are selected as the successful bidder (or, if applicable, back up bidder) at the contemplated public auction sale of the Collateral, neither Secured Party nor you will be under any legal obligation of any kind whatsoever with respect to the Transaction by virtue of this Agreement except for the matters specifically agreed to herein.  This Agreement shall not create or recognize any business relationship between the parties, nor shall it imply any obligation upon the parties to make or entertain any offer to consummate the Transaction, nor to enter into or continue negotiations therefor.

It is understood and agreed that no failure or delay by Secured Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

You acknowledge and agree that Secured Party and the holders of the Loan would suffer irreparable damage upon any breach or violation of this Agreement by you or your Representatives, that money damages would not be a sufficient remedy for such breach or violation, and that Secured Party shall be entitled to equitable relief, including injunction and specific performance, in connection with any actual or threatened breach or violation of this Agreement by you or any of your Representatives, and that no showing of actual damage or posting of any bond or other security shall be required in connection therewith.  Such remedies shall not be deemed to be the exclusive rights or remedies arising from a breach or violation by you or your Representative of this Agreement but shall be in addition to all other rights and remedies available at law or equity to Secured Party with you being liable for any losses, costs, expenses and damages for any breach or violation of this Agreement.  In the event of litigation relating to this Agreement and the matters contained herein, if a court of competent jurisdiction determines in a final non-appealable judgment that this Agreement has been breached or violated, the non-prevailing party in such litigation shall be liable and pay to the prevailing party the reasonable legal fees incurred by the prevailing party in connection with such litigation.

You represent and warrant that you are acting as a principal in the Transaction, and are not represented by any broker or similar party.  You agree to indemnify and hold harmless Secured Party, its affiliates, assigns, successors from and against any claim, loss, liability, cost or expense (including reasonable attorneys' fees and disbursements) arising from or related to claims by any broker or similar party for commissions, fees and other compensation relating to the Transaction.

The validity and interpretation of this Agreement shall be governed by the internal laws of the State of New York.  You irrevocably submit to the jurisdiction of any New York state or federal court, at Secured Party's election, sitting in the County of New York with respect to any claim, action or proceeding arising out of or relating to this Agreement.  You irrevocably agree that any such claim, action or proceeding must be heard and determined in such New York state or federal court, and you irrevocably waive, to the fullest extent you may effectively do so, the defense of an inconvenient forum.  This consent to jurisdiction is made pursuant to New York General Obligations Law Section 5-1402.

122630153.6

EACH PARTY HEREBY IRREVOCABLY AGREES, ON THEIR OWN BEHALF AND ON BEHALF OF THEIR REPRESENTATIVES, NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE ACCRUE.

This Agreement contains the entire understanding between and among the parties concerning the matters herein, and supersedes any prior understandings and agreements whether written or oral between and among them respecting the subject matter of this Agreement.

All obligations hereunder shall be binding upon you and your successors, your affiliates, subsidiaries and any other related party that has access to or receives the Confidential Information.

No modifications or amendments of this Agreement, or waiver of the terms and conditions contained herein, shall be effective unless made in writing and signed by each party.

[Remainder of page intentionally left blank; signature page follows]

5

122630153.6

## Acknowledgment and Consent

The undersigned hereby accepts and agrees to every term, condition and restriction contained in the Confidentiality Agreement as of the _____ day of _____, 2020.


[_____]


By:_____
Name:_____
Title:_____

Address:  [_____]
          [_____]

## Exhibit A

"**Collateral**" means Debtor's right, title and interest in and to the following, and all other collateral pledged by Debtor to Secured Party pursuant to the Pledge Agreement:

(a)    The Pledged Interests.

(b)    All securities, moneys or property representing dividends or interest on any of the Pledged Interests, or representing a distribution in respect of the Pledged Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Interests; in all cases to the extent first paid or issued on or after the closing of the public sale.

(c)    All right, title and interest of Debtor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Interests and any other Collateral; in all cases to the extent first paid or issued on or after the closing of the public sale.

(d)    All "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the UCC) constituting or relating to the foregoing.

(e)    All Proceeds of any of the foregoing property of Debtor (including, without limitation, any proceeds of insurance thereon, all "accounts", "general intangibles", "instruments" and "investment property", in each case as defined in the UCC, constituting or relating to the foregoing).

The following terms used in this Exhibit shall have the meanings ascribed to them, as follows:

"**Pledged Entity**" means GVS Portfolio I, LLC, a Delaware limited liability company.

"**Pledged Interests**" means, collectively, Debtor's 100% limited liability company membership in the Pledged Entity, together with all stock, limited liability company membership or partnership interest certificates, options or rights of any nature whatsoever which may have been issued or granted by the Pledged Entity to Debtor on and after November 30, 2018.

"**Proceeds**" means Debtor's share, right, title and interest in and to all distributions, monies, fees, payments, compensations and proceeds becoming due and payable to Debtor by the Pledged Entity with respect to the Pledged Interests on or after the closing of the public sale, whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and

Ex. A-1

"**UCC**" means the Uniform Commercial Code, as adopted and in effect in the State of New York.

Ex. A-2

## **EXHIBIT 3**

**Terms of Sale**

# EXHIBIT C

Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 30 of 184

## TERMS OF SALE FOR PUBLIC AUCTION

### 100% OF THE MEMBERSHIP INTERESTS IN
### GVS PORTFOLIO I, LLC

A public sale of the below-described collateral will be held in accordance with Section 9-610 of the Uniform Commercial Code in effect in the State of New York (the "**UCC**") at 10:00 a.m. Eastern Time on [_____]. The terms of sale (these "**Terms of Sale**") are as follows:

1.  <u>Definitions</u>.  Capitalized terms used in these Terms of Sale shall have the definitions ascribed to them as set forth in <u>Exhibit A</u> attached hereto.

2.  <u>Time and Location of Sale</u>.  The public sale will commence at 10:00 a.m. Eastern Time on [_____].  In recognition of the COVID-19 pandemic and related limitations on public assemblies, the sale will be conducted virtually via online video conference, provided, however, that if, at the time of sale, applicable state and city laws and rules permit the sale to be conducted in-person, and if relevant building management rules permit the same, then Secured Party will conduct the sale both virtually and in-person at a location in New York City. The URL address and password for the online video conference will be provided to all confirmed participants that have properly registered pursuant to these Terms of Sale.  If applicable, the Secured Party will provide the address of the in-person location to all confirmed participants that have properly registered pursuant to these Terms of Sale, not less than five (5) days in advance of the sale.

3.  <u>Qualification to Participate in Public Sale</u>.  Only Qualified Participants (and their agents and representatives disclosed in a Participation Statement) may participate in the public sale.  A "**Qualified Participant**" is an entity that satisfies the following conditions precedent to participation:

    (a)     Each prospective bidder must be registered with Jones Lang LaSalle Americas, Inc., through submission of (i) a statement in the form attached as Exhibit B hereto (a "**Participation Statement**"), (ii) an Internal Revenue Service form W-9, and (iii) a KYC Letter.  Such Participation Statement shall be submitted via email to Brett Rosenberg, Managing Director, JLL Capital Markets, at brett.rosenberg@jll.am.com prior to 5:00 p.m. Eastern Time at least two weeks prior to the sale date.  Secured Party shall be entitled to seek additional information from any prospective bidder to confirm the information set forth in its Participation Statement.  Secured Party agrees to notify each prospective bidder if its Participation Statement has been accepted within seven (7) days of submission.

    (b)     Each prospective bidder must demonstrate its financial ability to tender the purchase price for the Collateral, by submitting to the Secured Party (via email to Brett Rosenberg, Managing Director, JLL Capital Markets, at brett.rosenberg@jll.am.com), on or before the date of the public sale: (i) a certified balance sheet or other certified financial information (including publicly available reports posted on EDGAR) evidencing the prospective bidder's total assets under

management, capital/statutory surplus or partners' equity and market capitalization, or (ii) specific identification of the source of equity capital or loan commitments necessary to be utilized by the prospective bidder for the closing of the potential acquisition.

(c)    At least one day before the date of the public sale, each prospective bidder shall submit via email to Brett Rosenberg, Managing Direct, JLL Capital Markets, at brett.rosenberg@jll.am.com, an organizational chart, depicting each party that will, directly or indirectly, own ten percent (10%) or more of the Collateral upon closing of the potential acquisition (provided the same shall not be required from any prospective bidder sponsored by a publicly traded company or a national banking association).

The foregoing requirements shall not apply to Secured Party or its affiliates, each of which is stipulated to be a Qualified Participant.

4.    <u>The Collateral</u>.

(a)    Secured Party will provide to prospective bidders, upon the execution of a confidentiality agreement available from Jones Lang LaSalle Americas, Inc., online access to copies of relevant information that Secured Party possesses concerning the Debtor and the Collateral, copies of the applicable agreements and other documents evidencing or relating to the Debt and certain other related documents and information in Secured Party's possession. Such information will include copies of the Mortgage Loan Documents, the Mezzanine 1 Loan Documents and the Mezzanine 2 Loan Documents for informational purposes only. The sale of the Collateral is not a sale of the Mezzanine 2 Loan, and does not include any rights under any of the Mezzanine 2 Loan Documents or any guaranty or indemnity delivered in connection therewith. Such information is provided solely as a courtesy to prospective bidders, and Secured Party makes no representations or warranties as to its accuracy or completeness.

(b)    The Pledged Interests are deemed to be securities and have not been registered under the Securities Act of 1933 (the "**Securities Act**"). Because of this, the Winning Bidder must confirm that the Pledged Interests will not be sold, assigned, pledged, disposed of, hypothecated or otherwise transferred without the prior registration in accordance with the Securities Act and the securities laws of all other applicable jurisdictions, unless an exemption from such registration is available. The Collateral will be appropriately conveyed pursuant to a Transfer Statement, which will bear an appropriate legend to the effect that the Collateral may not be sold or transferred without registration under the Securities Act and the securities laws of all other applicable jurisdictions or the availability of a valid exemption from such registration.

(c)    The Collateral is offered **AS IS, WHERE IS, WITH ALL FAULTS**, and the Secured Party makes no guarantee, representation or warranty (including, without

122549278.10

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 32 of 184

limitation, any representation or warranty of merchantability or fitness), express or implied, as to: the existence or nonexistence of other liens or liabilities; the quantity, quality, condition or description of the Collateral, the Properties or the direct or indirect owners thereof, the value of the Collateral, the Debtor's direct or indirect right in or title to the Collateral or the Properties, the Pledged Entity's direct or indirect rights in or title to the Properties, or the owners of the Properties' direct rights in or title to the Properties. The transfer will be made without recourse and without representation or warranty by the Secured Party, and subject to all defenses by the Secured Party and all liabilities affecting the Pledged Entity, the owners of the Properties and the Properties including, without limitation, the Senior Loans.

(d)     Prospective bidders are hereby advised that (i) although Secured Party will provide online access to certain information regarding the Collateral, there may be information that the Secured Party is contractually or legally prohibited from providing to potential bidders due to restrictions in confidentiality agreements or otherwise, and (ii) it will be the sole responsibility of the Winning Bidder to satisfy the conditions for acquisition of the Collateral pursuant to the Mortgage Loan Documents, the Mezzanine 1 Loan Documents and the Mezzanine 2 Loan Documents.

(e)     For the avoidance of doubt, prospective bidders are hereby advised that (i) such prospective bidder may obtain financing or other sources of capital in order to acquire the Collateral, provided that no financing contingency applies if such prospective bidder is identified as the Winning Bidder, (ii) prospective bidders are encouraged to discuss the Collateral with Debtor and inspect the same by sending communications and inquiries to request@greatvaluestorage.com, and (iii) the Debtor is entitled to participate in the public sale.

5.     <u>Method of Public Sale</u>.

(a)     The public sale shall be conducted by auction administered by auctioneer licensed in the State of New York. Subject to Secured Party's rights described in Section 5(b), Secured Party shall sell the Collateral to the Qualified Participant posting the highest and best bid. The Collateral will be sold as a single unit, and shall not be divided or sold in separate units. Minimum bidding increments will be $100,000.00 or such other amount as Secured Party may announce at the auction. Secured Party will be permitted to bid at the public sale and may credit bid all or any portion of the outstanding balance of the amounts due under the Mezzanine 2 Loan Documents (collectively, the "**Debt**"). The auction shall conclude when bidding ends and Secured Party has selected the highest and best bid from a Qualified Participant (the "Winning Bid"), and such Qualified Participant immediately executes and delivers a Memorandum of Sale in the form attached as <u>Exhibit C</u> to the Secured Party (the Qualified Participant with the Winning Bid shall hereinafter be referred to as the "**Winning Bidder**"). The foregoing notwithstanding, Secured Party shall not be required to execute a Memorandum of Sale if it is the Winning Bidder.

122549278.10

(b)     Secured Party reserves the right to (i) accept a lower bid, if the bid is on terms that offer a more certain likelihood of execution and it is reasonable to do so (for example, without limitation, from a bidder that does not require Rating Agency Confirmation), (ii) postpone the public sale to a future date and time as Secured Party may deem proper, (iii) continue the public sale at a future date and time as Secured Party may deem proper, and (iv) terminate the public sale prior to consummation thereof.  In the event that the Secured Party accepts a bid that is not the highest bid, the Secured Party shall set forth in writing the reason for its rejection of each higher bid in favor of a lower bid. Such written explanation shall be provided to Debtor within three (3) business days of the acceptance of a bid that is not the highest bid.

(c)     As a condition of being selected, the Winning Bidder will be required to wire transfer a deposit of $8,200,000 (the "**Required Deposit**") in immediately available federal funds, to a national business unit of a reputable title company or other escrow agent designated by Secured Party (the "**Escrow Agent**"), by 3:00 p.m. Eastern Time on the date of the public sale.  However, if Secured Party is the Winning Bidder, then no deposit shall be required.  The Required Deposit shall be non-refundable, unless either (i) the Winning Bidder, if applicable, is unable to obtain Rating Agency Confirmation to confirm its status as a Qualified Transferee; (ii) the Winning Bidder is otherwise not approved as a Qualified Transferee or (iii) Secured Party terminates the sale of the Collateral to the Winning Bidder pursuant to Section 6(a) below.  Except in such circumstances, Secured Party shall be entitled to retain the Required Deposit as liquidated damages if the Winning Bidder does not consummate its acquisition of the Collateral on the terms and conditions herein contained, time being of the essence.  By submitting a bid, a Qualified Participant agrees that Secured Party's damages will be difficult to ascertain if it becomes the Winning Bidder and fails to consummate the acquisition of the Collateral, and the Required Deposit represents reasonable liquidated damages for such failure.

(d)     Secured Party reserves the right to designate one or more back-up bidders (each, a "**Back-Up Bidder**"), who shall be the next highest and best bidder, based on the bids and terms offered at the public sale (each, a "Back-Up Bid").  If the Winning Bidder fails to timely close on its acquisition of the Collateral pursuant to Section 6(a) herein, and otherwise satisfy all terms and conditions contained herein, Secured Party shall have no obligation to sell the Collateral to such Winning Bidder, and Secured Party may elect to sell the Collateral to the Back-Up Bidder. In such case, the Back-Up Bidder shall have five (5) business days after Secured Party notifies it of the opportunity to proceed with its Back-Up Bid, to elect whether or not to proceed with acquisition of the Collateral pursuant to its Back-Up Bid. If the Back-Up Bidder elects to proceed with acquisition of the Collateral pursuant to its Back-Up Bid, it shall execute a Memorandum of Sale and deposit the Required Deposit with the Escrow Agent on or before the conclusion of such five (5) business day period, at which point the Back-Up Bidder shall have all rights and obligations of the Winning Bidder (provided, however, to the extent any time periods pertaining to the acquisition of the Collateral relate to the date of the public sale,

Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 34 of 184

such time periods shall instead be determined from the date such Back-Up Bidder delivers the Memorandum of Sale and Required Deposit). If a Back-Up Bidder has not delivered the Memorandum of Sale and Required Deposit by the end of such five (5) business day period, then such Back-Up Bidder shall have no right to acquire the Collateral, and Secured Party may attempt to sell the Collateral to another Back-Up Bidder in the manner stated above. In no event shall Secured Party's sale of the Collateral to a Back-Up Bidder entitle a Winning Bidder or other Back-Up Bidder to a return of the Required Deposit, except as expressly set forth herein.

6.    Consummation of Sale.

(a)    The Winning Bidder shall pay the full amount of its bid as the purchase price for the Collateral, after deduction for the Required Deposit, by wire transfer of immediately available federal funds, no later than 3:00 p.m. Eastern Time on either (i) the tenth (10th) day after the date of the public sale, in the event the Winning Bidder is a Qualified Transferee without needing to obtain Rating Agency Confirmation or other third-party approval pursuant to the Intercreditor Agreement, or (ii) the third (3rd) business day after Rating Agency Confirmation is obtained, in the event the Winning Bidder requires Rating Agency Confirmation to be a Qualified Transferee pursuant to the Intercreditor Agreement. Time is of the essence with respect to each of the foregoing periods. The sale of the Collateral will be consummated immediately upon receipt of such payment by Secured Party. If the Winning Bidder is the Secured Party, then the foregoing requirements will not apply, and the purchase price shall be paid by applying the Debt (or the portion thereof that Secured Party credit bid) against the purchase price, and any amount bid by Secured Party in excess of the Debt shall be paid no later than 3:00 p.m. Eastern Time on or before the third (3rd) calendar day after the date of the public sale, time being of the essence. If such Winning Bidder requires Rating Agency Confirmation or other third-party approval to be a Qualified Transferee pursuant to the Intercreditor Agreement, Secured Party shall be entitled to terminate the sale of the Collateral to such Winning Bidder at any time if such Winning Bidder shall have been unable to obtain necessary approvals or Rating Agency Confirmation within thirty (30) calendar days since the date of the public sale. Debtor's right, title and interest in the Collateral will be conveyed by an appropriate transfer statement (the "**Transfer Statement**"), pursuant to Section 9-619(a) of the UCC and in the form attached as Exhibit D, on an **AS IS, WHERE IS, WITH ALL FAULTS** basis and without recourse and without representations or warranties of any kind or nature whatsoever, and subject to all defenses and liabilities. In addition, the Winning Bidder shall execute and deliver all necessary documents required pursuant to the Mezzanine 2 Loan Documents and any additional certificates and documents relating to the sale, in form and substance satisfactory to Secured Party and the lenders and servicers of the Senior Loans.

(b)    It shall be the sole responsibility of the Winning Bidder, and not that of Secured Party, to ensure that the Winning Bidder acquires the Collateral in conformance

-5-

with the terms of all applicable governing documents, including without limitation the Mortgage Loan Documents, the Mezzanine 1 Loan Documents, the Mezzanine 2 Loan Documents and the Pledged Entity's operating agreement. Without limiting the scope and intent of the foregoing, it shall be the sole responsibility of the Winning Bidder, and not that of Secured Party, to obtain a new membership interest certificate evidencing the transfer of ownership of the Pledged Interests to the Winning Bidder.

(c)    If the Winning Bidder does not consummate its acquisition of the Collateral in the time and manner required hereby, time being of the essence, Secured Party may offer to sell the Collateral to another Qualified Participant in order of highest and best bids made at the public sale, but subject to Secured Party's rights pursuant to Sections 5(b) and 5(d), in each case without advertising or conducting a supplemental public sale.

(d)    In the event Secured Party is unable, for any reason, to consummate the sale of the Collateral to the Winning Bidder, Secured Party's sole obligation to the Winning Bidder shall be the return of Required Deposit, without interest, within ten (10) business days after the event giving rise to the Secured Party's inability to consummate the sale.

7.    <u>Modification of Terms</u>. Secured Party reserves the right to amend, modify, supplement, restate or otherwise alter these Terms of Sale by announcement made prior to or at the time of the public sale. Notwithstanding the foregoing, Secured Party shall provide Debtor at least five (5) business days' notice prior to making any such amendment, modification, supplementation or other change to the Terms of Sale.

122549278.10

# EXHIBIT A

## DEFINITIONS

"**Collateral**" means Debtor's right, title and interest in and to the following, and all other collateral pledged by Debtor to Secured Party pursuant to the Mezzanine 2 Loan Documents:

(a)    The Pledged Interests.

(b)    All securities, moneys or property representing dividends or interest on any of the Pledged Interests, or representing a distribution in respect of the Pledged Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Interests; in all cases to the extent first paid or issued on or after the closing of the public sale.

(c)    All right, title and interest of Debtor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Interests and any other Collateral; in all cases to the extent first paid or issued on or after the closing of the public sale.

(d)    All "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the UCC) constituting or relating to the foregoing.

(e)    All Proceeds of any of the foregoing property of Debtor (including, without limitation, any proceeds of insurance thereon, all "accounts", "general intangibles", "instruments" and "investment property", in each case as defined in the UCC, constituting or relating to the foregoing).

Based solely upon information from Debtor and its affiliates, and without any representation or warranty with respect to accuracy or completeness of this information, it is Secured Party's understanding that the Pledged Entity directly or indirectly owns the assets described on Exhibit E.

"**Debt**" is defined in Section 5(a).

"**Debtor**" means GVS Portfolio I B, LLC, a Delaware limited liability company.

"**Escrow Agent**" is defined in Section 5(c).

"**KYC Letter**" means a letter, from a nationally recognized major bank or major law firm, regulated and operating in the United States and subject to the anti-money laundering regime of the United States, stating that (a) it has a relationship with the prospective bidder and has had such for at least two years prior thereto, (b) the prospective bidder is in good standing with it, (c) it has obtained satisfactory evidence of the identity of the prospective bidder in accordance with applicable anti-money laundering requirements, (d) it will provide a copy of the evidence of the

identity of the prospective bidder upon Secured Party's request, (e) it is not aware that the prospective bidder has been found to be or has been suspected of activity that would presently constitute a money laundering offense, and (f) it is compliant with the anti-money laundering requirements of the United States.

"**Memorandum of Sale**" is defined in Section 5(a).

"**Mezzanine 1 Loan**" means the $103,000,000 senior mezzanine loan evidenced and governed by the Mezzanine 1 Loan Documents.

"**Mezzanine 1 Loan Documents**" means those documents, instruments and other agreements identified on Exhibit F as pertaining to the Mezzanine 1 Loan attached hereto.

"**Mezzanine 2 Loan**" means the $82,000,000 junior mezzanine loan evidenced and governed by the Mezzanine 2 Loan Documents.

"**Mezzanine 2 Loan Documents**" means those documents, instruments and other agreements identified on Exhibit F as pertaining to the Mezzanine 2 Loan attached hereto.

"**Mortgage Loan**" means the $110,000,000 mortgage loan evidenced and governed by the Mortgage Loan Documents.

"**Mortgage Loan Documents**" means those documents, instruments and other agreements identified on Exhibit F as pertaining to the Mortgage Loan attached hereto.

"**Pledged Entity**" means GVS Portfolio I, LLC, a Delaware limited liability company.

"**Pledged Interests**" means, collectively, Debtor's 100% limited liability company membership interest in the Pledged Entity, together with all stock, limited liability company membership or partnership interest certificates, options or rights of any nature whatsoever which may have been issued or granted by the Pledged Entity to Debtor on and after November 30, 2018.

"**Participation Statement**" is defined in Section 3(a).

"**Proceeds**" means Debtor's share, right, title and interest in and to all distributions, monies, fees, payments, compensations and proceeds becoming due and payable to Debtor by the Pledged Entity with respect to the Pledged Interests on or after the closing of the public sale, whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Debtor relating to the foregoing; and (iii) all cash or non-cash proceeds of any of the foregoing.

"**Properties**" is defined on Exhibit E hereto.

"**Qualified Participant**" is defined in Section 3.

"**Qualified Transferee**" is defined in the Intercreditor Agreement.

122549278.10

"**Rating Agency Confirmation**" is defined in the Intercreditor Agreement.

"**Required Deposit**" is defined in Section 5(c).

"**Secured Party**" means Teachers Insurance and Annuity Association of America, a New York corporation, for the benefit of the Separate Real Estate Account.

"**Senior Loans**" means, collectively, the Mortgage Loan and the Mezzanine 1 Loan.

"**Terms of Sale**" is defined in the preamble hereof.

"**Transfer Statement**" is defined in Section 6(b).

"**UCC**" is defined in the preamble hereof.

"**Winning Bidder**" is defined in Section 5(a).

122549278.10

## EXHIBIT B

## PARTICIPATION STATEMENT

**Name of Prospective Bidder:** _____

**Contact Information:** _____

_____

_____

**Tel:** _____

**Email:** _____

      This Participation Statement is submitted pursuant to the Terms of Sale governing the public sale described in the notice attached hereto. Capitalized terms used but not otherwise defined in this Participation Statement shall have the meaning set forth in the Terms of Sale. The undersigned prospective bidder ("**Bidder**") covenants, agrees and certifies to Teachers Insurance and Annuity Association of America, a New York corporation, for the benefit of the Separate Real Estate Account ("**Secured Party**"), as follows:

      1.     Bidder is submitting this Participation Statement with the intention of participating in the public sale referenced in the notice attached hereto, with the understanding that Secured Party and its consultants, brokers, agents, counsel and advisors are relying on the truth, accuracy and completeness of the information provided herein and on Bidder's covenants and agreements made herein in order for Secured Party to confirm that Bidder is qualified to so participate in conformance with all applicable laws, regulations, contracts and agreements pertaining to such public sale.

      2.     Bidder has received the Terms of Sale and all exhibits and schedules thereto, and fully understands and accepts the terms, conditions and provisions set forth therein.

      3.     Bidder hereby certifies that: (a) if it is the Winning Bidder, Bidder will be acquiring the Collateral for investment purposes, solely for Bidder's own account and not for the purpose of distribution or resale within the meaning of Section 2(a)(11) of the Securities Act; (b) Bidder is an accredited investor within the meaning of the applicable securities laws; (c) Bidder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Collateral; (d) Bidder will not resell or otherwise hypothecate the Pledged Interests without a valid registration the securities laws of all applicable jurisdictions, including, without limitation, the Securities Act, or an available exemption therefrom. The cost, expense and risk of satisfying any of the foregoing requirements shall be solely the responsibility of Bidder. Upon Secured Party's request, Bidder will provide evidence reasonably demonstrating that, if it is the Winning Bidder, Bidder will be able to purchase the Collateral in compliance with the securities laws of all applicable jurisdictions.

122549278.10

4. Bidder is not a Prohibited Entity or a Prohibited Person, each within the meanings ascribed to such terms as set forth in the Intercreditor Agreement referenced in the list of Mezzanine 2 Loan Documents on Exhibit F of the Terms of Sale (the "**Intercreditor Agreement**"). Upon Secured Party's request, Bidder will provide evidence reasonably demonstrating the same.

5. Bidder has received copies of the Mortgage Loan Documents, the Mezzanine 1 Loan Documents and the Mezzanine 2 Loan Documents and fully understands the terms, conditions and provisions set forth therein. If Bidder is the Winning Bidder, Bidder shall consummate its acquisition of the Collateral in full compliance with such terms, conditions and provisions, and agrees that such compliance shall be the sole responsibility of Bidder and not that of Secured Party. Without limiting the scope or effect of the foregoing, Bidder represents, warrants and certifies to Secured Party that (a) Bidder is a Qualified Transferee (as defined in the Intercreditor Agreement), or intends to (i) seek approval to be deemed a Qualified Transferee or (ii) obtain Rating Agency Confirmation (within the meaning of the Intercreditor Agreement) if chosen as the Winning Bidder, (b) _____ is an individual or entity that meets the criteria of a Substitute Third Party Obligor (within the meaning of the Intercreditor Agreement), and if Bidder is the Winning Bidder, such individual or entity will be irrevocably committed to execute any necessary Third Party Agreement (as defined in the Intercreditor Agreement) and otherwise satisfy the obligations of a Substitute Third Party Obligor under the Intercreditor Agreement which are conditions to the sale of the Collateral, and (c) if Bidder is the Winning Bidder, Bidder intends to cause the owners of the Properties to engage _____ as the Qualified Manager (within the meaning of the Intercreditor Agreement) for the Properties, within the time and subject to the terms and conditions, of the Mortgage Loan Documents and the Mezzanine 1 Loan Documents. The cost, expense and risk of satisfying any of the foregoing requirements shall be solely the responsibility of Bidder. Upon Secured Party's request, Bidder will provide evidence reasonably demonstrating that, if it is the Winning Bidder, Bidder will be able to purchase the Collateral in compliance with the foregoing.

6. Bidder received copies of the operating agreement and other organizational documentation relating to the Pledged Interests to its satisfaction, and agrees that if it is the Winning Bidder, it will be solely responsible to comply with any and all requirements thereunder relating to the acquisition of the Collateral.

7. Bidder acknowledges and agrees that if Bidder is the Winning Bidder, Bidder will have made such investigations to become familiar with all aspects of the Collateral in a manner to make an informed decision to acquire the same. Bidder acknowledges that the Collateral is being sold in an **AS IS, WHERE IS, WITH ALL FAULTS** condition, and that neither Secured Party nor any of its representatives, agents, employees, brokers, attorneys or other advisors have given any written or oral representations or warranties or other statements relating to the Collateral, and Bidder's decision to purchase the Collateral will be based solely on Bidder's own due diligence review and independent evaluation of the Collateral. Bidder is a sophisticated purchaser, with experience in owning and holding assets and investments in the nature of the Collateral. Bidder is

122549278.10

familiar with the risks associated with acquisitions of mezzanine loan collateral, which involve purchases based on limited information, disclosures and representations and warranties. Bidder recognizes the special nature of the transaction that is the subject of the Terms of Sale and this Participation Statement, understands and is freely taking all risks involved in connection with the transaction and acknowledges that the nature and risks are reflected in the amount bid by Bidder. No representative, agent, employee, broker, attorney or other advisor of Secured Party has been authorized to make, and Bidder has not relied on, any statements, representations or warranties relating to the Collateral. If Bidder is the Winning Bidder, Bidder will not be relying on any continued actions or efforts on the part of Secured Party or Secured Party's representatives, agents, employees, brokers, attorneys or other advisors with respect to the Collateral. After the date on which the sale of the Collateral is consummated, Secured Party will retain no further interest in such Collateral, and will owe no ongoing duty to Bidder. Secured Party has not guaranteed and does not guarantee the condition, performance, rate of return, value or yield of the Collateral.

8.    Bidder acknowledges that the following individuals are entitled to participate in the public sale on behalf of Bidder, and none other:

Name: _____     Email: _____

Company: _____     Tel: _____

Name: _____     Email: _____

Company: _____     Tel: _____

*[attach a schedule if more individuals need to be identified]*

9.    In addition to all rights and remedies of Secured Party set forth in the Terms of Sale or available at law or in equity, Bidder shall indemnify, hold harmless and defend Secured Party and Secured Party's directors, officers, investors, representatives, agents, employees, brokers, attorneys and other advisors (the "**Indemnified Parties**") for, from and against any and all claims, causes of actions, damages, demands, legal proceedings, costs, damages and other liabilities suffered by the Indemnified Parties (or any of them) resulting from any breach of Bidder's representations, warranties, certifications, covenants and agreements in this Participation Statement or resulting from a breach of any of the Terms of Sale.

By: _____

Name: _____

Title: _____

*[ATTACH KYC LETTER]*

Exhibit B, Page 3

122549278.10

## EXHIBIT C

## MEMORANDUM OF SALE

In reference to the public sale described in the attached notice, and the Terms of Sale governing the same, the undersigned covenants and agrees that it is the Winning Bidder and is bound and obligated to purchase the Collateral for the purchase price of _____ AND 00/100 DOLLARS ($_____.00) Dollars, and hereby promises and agrees to comply with the forgoing Terms of Sale and the Participation Statement executed and delivered by the undersigned in connection with such public sale, the term of which are incorporated by reference hereby.

Dated: _____, 2020

_____

*WINNING BIDDER*

By: _____
Name: _____
Title: _____

In reference to the public sale described in the attached notice, and the Terms of Sale governing the same, the undersigned confirms receipt of the sum of EIGHT MILLION TWO HUNDRED THOUSAND AND 00/100 DOLLARS ($8,200,000.00) as the Required Deposit referenced in said Terms of Sale.

Dated: _____, 2020

_____

*ESCROW AGENT*

By: _____
Name: _____
Title: _____

*[ATTACH NOTICE OF SALE]*

Exhibit C, Page 1

122549278.8

122549278.10

## EXHIBIT D

## TRANSFER STATEMENT

Pursuant to the provisions of Section 9-619 of the Uniform Commercial Code as adopted and in effect in the State of New York, **TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA**, a New York corporation, for the benefit of the Separate Real Estate Account ("**Secured Party**"), a secured party under that certain Pledge and Security Agreement dated as of November 30, 2018, as amended, with **GVS PORTFOLIO I B, LLC**, a Delaware limited liability company with ("**Debtor**"), hereby states as follows:

1.      Debtor has defaulted in connection with an obligation secured by the collateral described on <u>Schedule 1</u> attached hereto (collectively, the "**Collateral**").

2.      Secured Party has exercised its post-default remedies with respect to the Collateral.

3.      That, by reason of said exercise, _____ ("**Transferee**") has acquired the rights of the Debtor in the Collateral.

4.      The following are the names and addresses of the aforementioned parties:

| | |
|---|---|
| **Debtor**: | GVS Portfolio I B, LLC, a Delaware limited liability company |
| **Address**: | c/o Great Value Storage |
| | 401 Congress Avenue, 33rd Floor |
| | Austin, TX 78701 |
| | |
| **Secured Party**: | Teachers Insurance and Annuity Association of America, |
| | a New York Corporation, |
| | for the benefit of the Separate Real Estate Account |
| **Address**: | c/o Nuveen Real Estate |
| | 730 Third Avenue |
| | New York, NY 10017 |
| | |
| **Transferee**: | _____, a _____ |
| **Address**: | _____ |
| | _____ |
| | _____ |

Executed as of _____, 2020.

Exhibit C, Page 1

122549278.8

122549278.10

## SCHEDULE 1
## COLLATERAL

Debtor's right, title and interest in and to the following, and all other collateral pledged by Debtor to Secured Party pursuant to the Mezzanine 2 Loan Documents:

(a)     The Pledged Interests.

(b)     All securities, moneys or property representing dividends or interest on any of the Pledged Interests, or representing a distribution in respect of the Pledged Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Interests; in all cases to the extent first paid or issued on or after the closing of the public sale.

(c)     All right, title and interest of Debtor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Interests and any other collateral; in all cases to the extent first paid or issued on or after the closing of the public sale.

(d)     All "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the UCC) constituting or relating to the foregoing.

(e)     All Proceeds of any of the foregoing property of Debtor (including, without limitation, any proceeds of insurance thereon, all "accounts", "general intangibles", "instruments" and "investment property", in each case as defined in the UCC, constituting or relating to the foregoing).

As used herein, the following terms have the following ascribed meanings:

"Mezzanine 2 Loan" means the $82,000,000 junior mezzanine loan evidenced and governed by the Mezzanine 2 Loan Documents.

"Mezzanine 2 Loan Documents" are all loan documents relating to or evidencing the Mezzanine 2 Loan, including but not limited to:

(i)     Mezzanine 2 Loan Agreement dated as of November 30, 2018
(ii)    Promissory Note (Mezzanine 2 Loan) dated as of November 30, 2018
(iii)   Supplemental Promissory Note (Mezzanine 2 Loan) dated as of January 7, 2019
(iv)    Pledge and Security Agreement (Mezzanine 2 Loan) dated as of November 30, 2018
(v)     Certificate for Limited Liability Company Interests in GVS Portfolio I, LLC with assignment endorsed in blank
(vi)    Instruction to Register Pledge dated as of November 30, 2018

Exhibit C, Page 1

(vii) Confirmation Statement and Instruction Agreement dated as of November 30, 2018

(viii) Acknowledgement and Consent by GVS Portfolio I, LLC dated as of November 30, 2018

(ix) Guaranty of Recourse Obligations (Mezzanine 2 Loan) dated as of November 30, 2018

(x) Environmental Indemnity Agreement (Mezzanine 2 Loan) dated as of November 30, 2018

(xi) Subordination of Management Agreement (Mezzanine 2 Loan) dated as of November 30, 2018

(xii) Borrower's Certification dated as of November 30, 2018

(xiii) Mezzanine Post-Closing Obligations Agreement (Mezzanine 2 Loan) dated as of November 30, 2018

(xiv) UCC-1 Financing Statement filed with DE Department of State on November 30, 2018 as Filing No. 2018 8308476, as amended by UCC-3 Financing Statement Amendment

(xv) Mezzanine Loan Purchase and Sale Agreement (Mezzanine 2 Loan) dated as of December 3, 2018

(xvi) Mezzanine Assignment and Assumption Agreement (Mezzanine 2 Loan) dated as of December 3, 2018

(xvii) Note Allonge dated as of December 3, 2018

(xviii) Omnibus Amendment to Mezzanine 2 Loan Documents dated as of January 7, 2019

(xix) Acknowledgment and Consent to Omnibus Amendment to Mezzanine 2 Loan Documents dated as of November 30, 2018

(xx) Intercreditor Agreement dated as of November 30, 2018

"Pledged Entity" means GVS Portfolio I, LLC, a Delaware limited liability company.

"Pledged Interests" means, collectively, Debtor's 100% limited liability company membership in the Pledged Entity, together with all stock, limited liability company membership or partnership interest certificates, options or rights of any nature whatsoever which may have been issued or granted by the Pledged Entity to Debtor on and after November 30, 2018.

"Proceeds" means Debtor's share, right, title and interest in and to all distributions, monies, fees, payments, compensations and proceeds becoming due and payable to Debtor by the Pledged Entity with respect to the Pledged Interests on or after the closing of the public sale, whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Debtor relating to the foregoing; and (iii) all cash or non-cash proceeds of any of the foregoing.

"UCC" means the Uniform Commercial Code in effect in the State of New York

122549278.8

122549278.10

## EXHIBIT E

### DESCRIPTION OF PLEDGED ENTITY'S ASSETS

Based solely upon information from Debtor and its affiliates, and without any representation or warranty with respect to the accuracy of the following, it is Secured Party's understanding that:

- The Pledged Entity owns 100% of the limited liability company membership interests in the following entities, and such entities own various pieces or parcels of real estate with improvements thereon (collectively, the "**Properties**"), all as follows :

  - GVS Colorado Holdings I, LLC
    - 7273 Kearney Street, Commerce City, Colorado
    - 443 Laredo St, Aurora, Colorado

  - GVS Illinois Holdings I, LLC
    - 1710 N Cunningham, Urbana, Illinois
    - 2202 N Market St, Champaign, Illinois

  - GVS Indiana Holdings I, LLC
    - 3380 N Post Rd, Indianapolis, Indiana

  - GVS Missouri Holdings I, LLC
    - 9600 Marion Ridge, Kansas City, Missouri

  - WC Mississippi Storage Portfolio I, LLC
    - 1661 W Government Cove, Brandon, Mississippi
    - 2033 Oak Grove Rd, Hattiesburg, Mississippi
    - 111 N Layfair Dr, Flowood, Mississippi

  - GVS Nevada Holdings I, LLC
    - 1441 N Nellis Blvd, Las Vegas, NV

  - GVS New York Holdings I, LLC
    - 1582 Route 9g, Hyde Park, New York
    - 765 South Street, Newburgh, New York

122549278.10

- GVS Ohio Holdings I, LLC
  - 3785 Shiloh Springs Rd, Trotwood, Ohio
  - 426 N Smithville Rd, Dayton, Ohio
  - 60 Westpark Dr, Centerville, Ohio
  - 435 Congress Park Drive, Centerville, Ohio
  - 8501 Springboro Pike, Miamisburg, Ohio
  - 4145 State Route 741 S, Mason, Ohio
  - 7986 Southern Blvd, Boardman, Ohio
  - 123 S Meridian Rd, Youngstown, Ohio
  - 7821 Taylor Road SW, Reynoldsburg, Ohio

- GVS Ohio Holdings II, LLC
  - 1585 Lexington Avenue, Mansfield, Ohio
  - 9984 Old State Rd, Lewis Center, Ohio
  - 5199 Westerville Rd, Columbus, Ohio
  - 7200 Tussing Rd, Reynoldsburg, Ohio
  - 5301 E Tamarack Circle, Columbus, Ohio
  - 580 East Dublin-Granville Rd, Worthington, Ohio
  - 1330 Georgesville Rd, Columbus, Ohio

- GVS Tennessee Holdings I, LLC
  - 1961 Covington Pike, Memphis, Tennessee
  - 3951 Lamar Ave (US Hwy 78), Memphis, Tennessee

- GVS Texas Holdings I, LLC
  - 13825 FM 306, Canyon Lake, Texas
  - 16905 Indian Chief Drive, Cedar Park, Texas
  - 2407 S. 183, Leander, Texas
  - 7116 S I H 35, Austin, Texas
  - 1151 E Expressway 83, San Benito, Texas
  - 613 North Fwy, Fort Worth, Texas
  - 4901 South Fwy, Fort Worth, Texas
  - 3412 Garth, Baytown, Texas
  - 11702 Beechnut St., Houston, Texas
  - 10601 W. Fairmont Parkway, La Porte, Texas
  - 2150 Wirt Rd., Houston, Texas
  - 8320 Alabonson Road, Houston, Texas
  - 941 Fairmont Parkway, Pasadena, Texas
  - 4806 Marie Lane, Deer Park, Texas
  - 5811 North Houston Rosslyn Road, Houston, Texas
  - 632 Timkin Road, Tomball, Texas
  - 16530 West Hardy Street, Houston, Texas
  - 4641 Production Dr, Dallas, Texas
  - 2502 Bay Street, Texas City, Texas
  - 1910 25th Ave N, Texas City, Texas

122549278.10

- o GVS Texas Holdings II, LLC
  - 9530 Skillman Street, Dallas, Texas
  - 920 Highway 80 East, Mesquite, Texas
  - 4311 Samuell Blvd, Dallas, Texas
  - 6250 Westward St, Houston, Texas
  - 8801 Boone Rd, Houston, Texas
  - 8450 Cook Rd, Houston, Texas
  - 9951 Harwin Rd, Houston, Texas
  - 9010 E.F. Lowry Expressway, Texas City, Texas
  - 410 North IH-45/Gulf Fwy, Texas City, Texas
  - 5550 Antoine Dr, Houston, Texas
  - 10640 Hempstead Rd, Houston, Texas
  - 14318 Highway 249, Houston, Texas
  - 15300 Kuykendahl, Houston, Texas
  - 10013 RR FM 620 N, Austin, Texas

- The Pledged Entity is an obligor under the Mezzanine 1 Loan.

- The entities owning the Properties, jointly and severally, are obligors under the Mortgage Loan.

Exhibit E, Page 3

# EXHIBIT F

## LOAN DOCUMENTS

### MEZZANINE 2 LOAN DOCUMENTS

All documents relating to the Mezzanine 2 Loan, including but not limited to:

- Mezzanine 2 Loan Agreement dated as of November 30, 2018
- Promissory Note (Mezzanine 2 Loan) dated as of November 30, 2018
- Supplemental Promissory Note (Mezzanine 2 Loan) dated as of January 7, 2019
- Pledge and Security Agreement (Mezzanine 2 Loan) dated as of November 30, 2018
- Certificate for Limited Liability Company Interests in GVS Portfolio I, LLC with assignment endorsed in blank
- Instruction to Register Pledge dated as of November 30, 2018
- Confirmation Statement and Instruction Agreement dated as of November 30, 2018
- Acknowledgement and Consent by GVS Portfolio I, LLC dated as of November 30, 2018
- Guaranty of Recourse Obligations (Mezzanine 2 Loan) dated as of November 30, 2018
- Environmental Indemnity Agreement (Mezzanine 2 Loan) dated as of November 30, 2018
- Subordination of Management Agreement (Mezzanine 2 Loan) dated as of November 30, 2018
- Borrower's Certification dated as of November 30, 2018
- Mezzanine Post-Closing Obligations Agreement (Mezzanine 2 Loan) dated as of November 30, 2018
- UCC-1 Financing Statement filed with DE Department of State on November 30, 2018 as Filing No. 2018 8308476, as amended by UCC-3 Financing Statement Amendment
- Mezzanine Loan Purchase and Sale Agreement (Mezzanine 2 Loan) dated as of December 3, 2018
- Mezzanine Assignment and Assumption Agreement (Mezzanine 2 Loan) dated as of December 3, 2018
- Note Allonge dated as of December 3, 2018
- Omnibus Amendment to Mezzanine 2 Loan Documents dated as of January 7, 2019
- Acknowledgment and Consent to Omnibus Amendment to Mezzanine 2 Loan Documents dated as of November 30, 2018
- Intercreditor Agreement dated as of November 30, 2018

### MEZZANINE 1 LOAN DOCUMENTS

All documents relating to the Mezzanine 1 Loan, including but not limited to:

122549278.10

- Mezzanine 1 Loan Agreement dated as of November 30, 2018
- Promissory Note A-1 (Mezzanine 1 Loan) dated as of November 30, 2018
- Promissory Note A-2 (Mezzanine 1 Loan) dated as of November 30, 2018
- Promissory Note A-3 (Mezzanine 1 Loan) dated as of November 30, 2018
- Promissory Note A-4 (Mezzanine 1 Loan) dated as of November 30, 2018
- Promissory Note A-5 (Mezzanine 1 Loan) dated as of November 30, 2018
- Promissory Note A-6 (Mezzanine 1 Loan) dated as of November 30, 2018
- Promissory Note A-7 (Mezzanine 1 Loan) dated as of November 30, 2018
- Promissory Note A-8 (Mezzanine 1 Loan) dated as of November 30, 2018
- Certificate for Limited Liability Company Interests in the Mortgage Borrowers with assignments endorsed in blank
- Acknowledgment and Consent dated as of November 30, 2018
- Confirmation Statement and Instruction Agreement dated as of November 30, 2018
- Instruction to Register Pledge dated as of November 30, 2018
- Guaranty of Recourse Obligations (Mezzanine 1 Loan) dated as of November 30, 2018
- Environmental Indemnity Agreement (Mezzanine 1 Loan) dated as of November 30, 2018
- Mezzanine Post-Closing Obligations Agreement (Mezzanine 1 Loan) dated as of November 30, 2018
- Subordination of Management Agreement (Mezzanine 1 Loan) dated as of November 30, 2018
- UCC-1 Financing Statement filed with DE Department of State on November 30, 2018 as Filing No. 2018 8308427 and amended by multiple UCC-3 Financing Statement Amendments
- Mezzanine Loan Purchase and Sale Agreement (Mezzanine 1 Loan) dated as of December 3, 2018
- Mezzanine Assignment and Assumption Agreement Note A-1, Note A-3, and Note A-4 (Mezzanine 1 Loan) dated as of December 3, 2018
- Mezzanine Assignment and Assumption Agreement Note A-5 (Mezzanine 1 Loan) dated as of December 3, 2018
- Note Allonge to the Promissory Note A-1 (Mezzanine 1 Loan) dated as of December 3, 2018
- Note Allonge to the Promissory Note A-2 (Mezzanine 1 Loan) dated as of December 3, 2018
- Note Allonge to the Promissory Note A-3 (Mezzanine 1 Loan) dated as of December 3, 2018
- Note Allonge to the Promissory Note A-4 (Mezzanine 1 Loan) dated as of December 3, 2018

- Note Allonge to the Promissory Note A-5 (Mezzanine 1 Loan) dated as of December 3, 2018
- Note Allonge to the Promissory Note A-6 (Mezzanine 1 Loan) dated as of December 3, 2018
- Note Allonge to the Promissory Note A-7 (Mezzanine 1 Loan) dated as of December 3, 2018
- Note Allonge to the Promissory Note A-8 (Mezzanine 1 Loan) dated as of December 3, 2018
- Mezzanine 1 Co-Lender Agreement dated as of December 3, 2018
- Mezzanine 1 Loan Assignment and Assumption Agreement (Note A-2) dated as of June 6, 2019
- Allonge to Promissory Note A-2 (Mezzanine 1 Loan) dated as of June 6, 2019
- First Amendment to Mezzanine 1 Loan Agreement dated as of November 30, 2018
- Acknowledgement and Consent to First Amendment to Mezzanine 1 Loan Agreement dated as of November 30, 2018
- Intercreditor Agreement dated as of November 30, 2018

## MORTGAGE LOAN DOCUMENTS

All documents relating to the Mortgage Loan, including but not limited to:

- Loan Agreement dated as of November 30, 2018
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 (Colorado – Adams County) from GVS Colorado Holdings I, LLC
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Colorado – Arapahoe County) dated as of November 30, 2018 from GVS Colorado Holdings I, LLC
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Tennessee Holdings I, LLC
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings II, LLC (filed in Dallas County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings II, LLC (filed in Galveston County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings II, LLC (filed in Harris County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings II, LLC (filed in Travis County, TX)

- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Cameron County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Comal County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Dallas County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Galveston County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Harris County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Tarrant County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Travis County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Texas Holdings I, LLC (filed in Williamson County, TX)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Nevada Holdings I, LLC
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from WC Mississippi Storage Portfolio I, LLC (Lamar County, MS)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from WC Mississippi Storage Portfolio I, LLC (Rankin County, MS)
- Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Missouri Holdings I, LLC
- Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Illinois Holdings I, LLC
- Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Indiana Holdings I, LLC
- Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS New York Holdings I, LLC (filed in Dutchess County)
- Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS New York Holdings I, LLC (filed in Orange County)

INDEX NO. 654095/2020

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 53 of 184

RECEIVED NYSCEF: 10/05/2020

- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Licking County, Ohio)
- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Mahoning County, Ohio)
- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Montgomery County, Ohio)
- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Warren County, Ohio)
- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Delaware County, Ohio)
- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Fairfield County, Ohio)
- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Franklin County, Ohio)
- Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 30, 2018 from GVS Ohio Holdings I, LLC (filed in Richland County, Ohio)
- Environmental Indemnity Agreement dated as of November 30, 2018
- Deposit Account Control Agreement dated as of November 30, 2018
- Deposit Account Control Agreement dated as of February 10, 2020
- Cash Management Agreement dated as of November 30, 2018
- Amendment to Cash Management Agreement dated as of January 8, 2020
- Assignment of Management Agreement and Subordination of Management Fees dated as of November 30, 2018
- First Amendment to Loan Agreement dated as of December 27, 2018
- Acknowledgment and Consent to First Amendment to Loan Agreement dated as of December 27, 2018
- Pooling and Servicing Agreement dated as of May 1, 2019 for the Commercial Mortgage Pass-Through Certificates Series 2019-C50
- Pooling and Servicing Agreement dated as of April 1, 2019 for the Commercial Mortgage Pass-Through Certificates Series 2019-C16
- Pooling and Servicing Agreement dated as of December 1, 2018 for the Commercial Mortgage Pass-Through Certificates Series 2018-C15
- Intercreditor Agreement dated as of November 30, 2018

Exhibit F, Page 5

*Note:*

*Secured Party believes that the following documents were executed in conjunction with the Mortgage Loan, but copies of the same are not in Secured Party's possession:*

- *Various promissory notes*
- *Guaranty of Recourse Obligations from Natin Paul*
- *Post-Closing Obligations Agreement*
- *UCC-1 Financing Statement*
- *Various assignments prepared in connection with the securitizations of the Mortgage Loan*

122549278.10

**<u>EXHIBIT 4</u>**

**CBRE 2018 Appraisal**

# EXHIBIT 6

# APPRAISAL REPORT

GREAT VALUE SELF STORAGE
PORTFOLIO VALUATION OF SIXTY-FOUR SELF STORAGE FACILITIES
CBRE, Inc. File No.  18-361HO-6216-36

*UBS INVESTMENT BANK*
*1285 Avenue of the Americas- 11th Floor*
*New York, New York 10019*

www.cbre.com/valuation

**CBRE**



VALUATION & ADVISORY SERVICES



2800 Post Oak Blvd. Ste. 500
Houston, TX 77056
T 713-840-6620
F 713-840-6649
www.cbre.com

November 9, 2018

UBS INVESTMENT BANK
1285 Avenue of the Americas- 11th Floor
New York, New York 10019

RE:    Appraisal of the Great Value Self Storage Portfolio
       CBRE, Inc. File No. 18-361HO-6216-36

To Ms. Kathleen Donovan:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the portfolio referenced above. Our analysis is presented in the following Appraisal Report.

This Appraisal Report is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated in the following pages.

Based on the agreed Scope of Work, and as outlined in the report, we have developed an opinion of the Market Value of the Leased Fee Estate of the subject portfolio, subject to the assumptions and limiting conditions, certification, extraordinary and hypothetical conditions, if any and definitions, "As-Is" on October 10, 2018 :

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Estate | October 10, 2018 | $ 375,000,000 |
| As Stabilized | Leased Fee Estate | October 10, 2019 | $ 392,000,000 |
| Compiled by CBRE | | | |

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP),

© 2018 CBRE, Inc.

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 59 of 184

Ms. Kathleen Donovan
November 9, 2018
Page 2

the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.  It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and CBRE will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety.

It has been a pleasure to assist you in this assignment.  If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

Mike Miggins, MAI
Director
Texas 1332764-G _
Phone:   713 577 1895
Email:    mike.miggins@cbre.com

© 2018 CBRE, Inc.



# Certification

We certify to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

4.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

5.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

6.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

7.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

9.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. As of the date of this report, Michael Miggins, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

11. Property inspections and single asset appraisals were completed by the CBRE appraisers in June 2018:

12. No one provided significant real property analytical assistance to the person(s) signing this report. Jonathan Lang is a Vice President with CBRE, Inc.

13. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.



14. Michael Miggins, MAI has provided services, as an appraiser, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. The services performed were in the form of a prior appraisal for a different client in June of 2018.

Mike Miggins, MAI
Texas 1332764-G

## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assumption directly related to a specific assignment, as of the effective date of the assignment results, which if found to be false, could alter the appraiser's opinions or conclusions." [1]

- It is an extraordinary assumption that the reported financials from the individual property appraisals completed by CBRE are correct.  Any revisions to the data would result in a revision to the portfolio valuation.
- The subject self-storage facilities are analyzed and valued as a portfolio. It is an extraordinary assumption that our opinion of value assumes the individual properties would be sold as part of a multi-property self-storage portfolio.
- It is also an extraordinary assumption that there have been no physical changes to the property or trade area since the date of inspection.

## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purposes of analysis." [2]

- None noted

---

[1] The Appraisal Foundation, *USPAP, 2016-2017* ed., 3.

[2] The Appraisal Foundation, *USPAP, 2016-2017* ed., 3.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM INDEX NO. 654095/2020
NYSCEF DOC. NO. 9       Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 62 of 184 RECEIVED NYSCEF: 08/27/2020

Introduction

# Table of Contents

Certification ............................................................................................................. i

Table of Contents ..................................................................................................... 1

Introduction ............................................................................................................. 2

Scope of Work .......................................................................................................... 6

Market Analysis ....................................................................................................... 8

Highest and Best Use ............................................................................................ 24

Appraisal Methodology ........................................................................................ 25

Income Capitalization Approach ......................................................................... 26

Reconciliation of Value ........................................................................................ 40

Assumptions and Limiting Conditions ................................................................ 42

ADDENDA

Letter Of Engagement
Qualifications Of Appraiser

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM    INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 63 of 184    RECEIVED NYSCEF: 08/27/2020

Introduction

# Introduction

## OWNERSHIP AND PROPERTY HISTORY

The subject portfolio operates as Great Value Storage which is owned by World Class Capital Group (WCCG). Founded in 2008, Great Value Storage ("GVS") is a national operator of self storage and a wholly owned subsidiary of WCCG. It currently operates 83 self-storage facilities containing approximately 6.5 million square feet of rentable space in California, Texas, Ohio, Colorado, Tennessee, Nevada, Mississippi, Missouri, New York, Illinois, and Indiana.



Details regarding the purchase were not provided to the appraiser. To the best of our knowledge, there has been no other ownership transfer of the property during the previous three years. To the best of our knowledge, the property is not under contract of sale nor is it being marketed for sale.

## INTENDED USE OF REPORT

This appraisal is to be used for any internal purpose deemed appropriate by the Lender, and no other use is permitted. There are no other Intended Uses beyond the Lender's internal use.

## INTENDED USER OF REPORT

This appraisal is to be used by UBS Investment Bank, and no other user may rely on our report unless as specifically indicated in the report.

> Intended Users - the intended user is the person (or entity) who the appraiser intends will use the results of the appraisal. The client may provide the appraiser with information about other potential users of the appraisal, but the appraiser ultimately determines who the appropriate users are given the appraisal problem to be solved. Identifying the intended users is necessary so that the appraiser can report the



opinions and conclusions developed in the appraisal in a manner that is clear and understandable to the intended users. Parties who receive or might receive a copy of the appraisal are not necessarily intended users. The appraiser's responsibility is to the intended users identified in the report, not to all readers of the appraisal report. [3]

## ADDITION RELIANCE LANGUAGE

This report is addressed to UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, such other persons as may be designated by UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, and their respective successors and/or assigns.

This report and the information contained herein (i) may be relied upon by UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York in determining whether to make a loan secured by the Property and/or one or more loans secured by interests therein (each individually, a "Loan"), (ii) may be relied upon by any potential purchaser in determining whether to purchase any Loan, an interest in any Loan, or any securities backed or secured, in whole or in part, by any Loan or an interest in any Loan, (iii) may be relied upon by any rating agency rating securities representing an interest in any Loan or backed or secured, in whole or in part, by any Loan or an interest in any Loan, (iv) may be referred to in and included, in whole or in part, with materials offering for sale any Loan, an interest in any Loan or any securities backed or secured, in whole or in part, by any Loan or an interest in any Loan and (v) speak only as of the date of this report in the absence of a specific written update

## PURPOSE OF THE APPRAISAL

The purpose of this assignment is to develop an opinion of the "As Is" and As Stabilized market value of the Leased Fee Estate of the  portfolio as of the effective date of the appraisal, October 10, 2018.

## DEFINITION OF VALUE

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

    1.  buyer and seller are typically motivated;

---

[3] Appraisal Institute, The Appraisal of Real Estate, 14th ed. (Chicago: Appraisal Institute, 2013), 50.

© 2018 CBRE, Inc.          3



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM    INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 65 of 184    RECEIVED NYSCEF: 08/27/2020

Introduction

2. both parties are well informed or well advised, and acting in what they consider their own best interests;

3. a reasonable time is allowed for exposure in the open market;

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

EXPOSURE/MARKETING TIME

The exposure/marketing time is a function of price, time, and use.  It is not an isolated estimate of time alone.  In consideration of these factors, we have analyzed the following:

| EXPOSURE/MARKETING TIME DATA | | |
|---|---|---|
| Investor Surveys | Exposure/Mktg. (Months) Range | Average |
| PwC Real Estate Investor Survey: 4th Qtr. 2014 | 2.0 - 6.0 | 3.0 |
| CBRE Self Storage Investor Survey:  4th Qtr. 2015 | 2.0 - 6.0 | 3.5 |
| CBRE Self Storage Investor Survey:  1st Qtr. 2016 | 2.0 - 6.0 | 3.3 |
| CBRE Self Storage Investor Survey:  3rd Qtr. 2016 | 2.0 - 6.0 | 4.0 |
| CBRE Self Storage Investor Survey:  3rd Qtr. 2017 | 2.0 - 6.0 | 3.7 |
| CBRE Self Storage Investor Survey:  3rd Qtr. 2018 | 2.0 - 6.0 | 4.2 |
| **CBRE Exposure Time Estimate** | **4 Months** | |
| **CBRE Marketing Period Estimate** | **4 Months** | |
| Various sources compiled by CBRE | | |

Based on the subject portfolio location and quality we estimate marketing and exposure time at months. Brokers report increased activity in the sector results in longer closing times due to "intense" negotiations among final offers.

INTEREST APPRAISED

The value estimated represents the Leased Fee Estate which is defined as follows:

Leased Fee Interest - A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease). [5]

---

[4] Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472.

[5] Dictionary of Real Estate Appraisal, 78.

© 2018 CBRE, Inc.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 66 of 184    RECEIVED NYSCEF: 08/27/2020

Introduction

## PROPERTY DESCRIPTION

The subject of this appraisal report is the Great Value Storage, a sixty-four property portfolio, properties are listed below:

| Address | City | State | Zip Code | Self Storage NRA (SF) | No. of Self Storage Units | Self Storage Physical Occupancy |
|---|---|---|---|---|---|---|
| Timkin Road | Tomball | TX | 77375 | 45,719 | 193 | 92.60% |
| Marion Ridge | Kansas City | MI | 64137 | 70,000 | 458 | 88.00% |
| Bay Street | Texas City | TX | 77590 | 93,150 | 338 | 80.00% |
| Wirt Road | Houston | TX | 77055 | 70,100 | 370 | 93.40% |
| Gulf Freeway | Texas City | TX | 77591 | 56,000 | 497 | 80.10% |
| Highway 78 | Memphis | TN | 38118 | 59,550 | 468 | 85.00% |
| Covington Pike | Memphis | TN | 38128 | 35,225 | 275 | 94.40% |
| 25th Avenue North | Texas City | TX | 77590 | 38,257 | 414 | 79.40% |
| Emmett F Lowry Expressway | Texas City | TX | 77591 | 55,550 | 465 | 88.60% |
| Westward Lane | Houston | TX | 77081 | 124,772 | 1,101 | 82.41% |
| Fairmount Parkway | Pasadena | TX | 77504 | 34,500 | 283 | 82.90% |
| Marie Lane | Deer Park | TX | 77536 | 25,800 | 209 | 89.60% |
| West Fairmout Parkway | La Porte | TX | 77571 | 45,050 | 399 | 86.00% |
| Beechnut Street | Houston | TX | 77072 | 100,560 | 609 | 81.60% |
| Garth Road | Baytown | TX | 77521 | 39,150 | 296 | 85.70% |
| Hempstead Road | Houston | TX | 77092 | 96,825 | 757 | 86.80% |
| Harwin Road | Houston | TX | 77036 | 76,197 | 604 | 84.80% |
| Cook Road | Houston | TX | 77072 | 60,275 | 484 | 81.50% |
| Boone Road | Houston | TX | 77099 | 46,300 | 369 | 82.20% |
| North Market Street | Champagne | IL | 61822 | 83,060 | 701 | 62.90% |
| North Cunningham Avenue | Urbana | IL | 61802 | 80,884 | 631 | 62.70% |
| Oak Grove Road | Hattiesburg | MS | 39402 | 76,755 | 645 | 78.20% |
| North Layfair Drive | Flowood | MS | 39232 | 83,150 | 586 | 91.50% |
| W Government Street | Brandon | MS | 39042 | 76,450 | 564 | 79.10% |
| Taylor Road | Reynoldsburg | OH | 43068 | 80,288 | 350 | 86.00% |
| North Springboro Pike | Miamisburg | OH | 45342 | 57,150 | 416 | 88.60% |
| State Route 741 | Mason | OH | 45040 | 34,025 | 277 | 98.40% |
| Congress Park Drive | Dayton | OH | 45459 | 80,890 | 614 | 85.40% |
| North Smithville Road | Dayton | OH | 45431 | 43,300 | 335 | 89.60% |
| Westpark Road | Dayton | OH | 45459 | 43,500 | 291 | 75.10% |
| South Meridian Road | Youngstown | OH | 44509 | 66,150 | 522 | 89.60% |
| Shiloh Springs Road | Dayton | OH | 45426 | 48,349 | 376 | 86.00% |
| East Dublin Granville Road | Worthington | OH | 43085 | 54,081 | 406 | 93.40% |
| Georgesville Road | Columbus | OH | 43228 | 65,050 | 597 | 93.80% |
| Tamarack Circle East | Columbus | OH | 43229 | 49,575 | 456 | 96.80% |
| Tussing Road | Reynoldsburg | OH | 43068 | 56,888 | 542 | 85.90% |
| Westerville Road | Columbus | OH | 43231 | 65,585 | 523 | 94.20% |
| South Old State Road | Lewis Center | OH | 43035 | 74,837 | 522 | 94.00% |
| Lexington Avenue | Manfield | OH | 44907 | 41,402 | 343 | 99.00% |
| Southern Boulevard | Boardman | OH | 44512 | 64,175 | 489 | 81.50% |
| Kearney Street | Commerce City | CO | 80022 | 61,330 | 393 | 96.70% |
| Laredo Street | Aurora | CO | 80011 | 42,190 | 307 | 81.30% |
| FM 620 | Austin | TX | 78726 | 24,120 | 198 | 85.50% |
| South US Highway 183 | Leander | TX | 78641 | 39,880 | 301 | 84.30% |
| Route 9G | Hyde Park | NY | 12538 | 27,725 | 241 | 87.90% |
| South Street | Newburgh | NY | 12550 | 61,637 | 471 | 89.40% |
| FM 306 | Canyon Lake | TX | 78133 | 58,695 | 390 | 80.30% |
| East Expressway 77/83 | San Benito | TX | 78586 | 46,000 | 341 | 86.00% |
| Highway 249 | Houston | TX | 77086 | 54,894 | 504 | 77.70% |
| North Houston Rosslyn Road | Houston | TX | 77097 | 62,978 | 264 | 91.50% |
| Kuykendahl Road | Houston | TX | 77090 | 101,400 | 698 | 85.50% |
| West Hardy Road | Houston | TX | 77060 | 32,300 | 266 | 93.80% |
| Antoine Drive | Houston | TX | 77091 | 74,185 | 605 | 87.40% |
| Indian Chief Drive | Cedar Park | TX | 78613 | 29,390 | 160 | 88.90% |
| South IH-35 Frontage Road | Austin | TX | 78745 | 13,700 | 89 | 91.10% |
| North Nellis Boulevard | Las Vegas | NV | 89110 | 131,744 | 638 | 97.00% |
| Skillman Street | Dallas | TX | 75243 | 119,935 | 1,034 | 84.60% |
| Highway 80 East | Mesquite | TX | 75149 | 62,175 | 575 | 89.80% |
| Samuell Boulevard | Dallas | TX | 75228 | 76,100 | 758 | 90.20% |
| North Freeway | Fort Worth | TX | 76102 | 79,534 | 531 | 91.10% |
| South Freeway | Fort Worth | TX | 76115 | 78,318 | 685 | 87.00% |
| Production Drive | Dallas | TX | 75235 | 102,922 | 60 | 96.40% |
| North Post Road | Indianapolis | IN | 46226 | 72,914 | 714 | 79.00% |
| Alabonson Road | Houston | TX | 77088 | 50,230 | 348 | 89.60% |
| | | | | 4,002,820 | 29,346 | 86.33% |

Compiled by CBRE

CBRE

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM INDEX NO. 654095/2020
NYSCEF DOC. NO. 9 RECEIVED NYSCEF: 08/27/2020
Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 67 of 184

Scope of Work

# Scope of Work

This Appraisal Report is intended to comply with the reporting requirements set forth under Standards Rule 2 of USPAP. The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered and analysis is applied. CBRE, Inc. completed the following steps for this assignment:

Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and generally accepted appraisal methodology to develop a portfolio market value via the Income Capitalization Approach. For this portfolio, the scope of this appraisal relies on the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that the cost approach is not applicable to this property. As a test of reasonableness, we have compared portfolio transactions to the conclusions of the report based on the Income Capitalization Approach. Investors in the self storage asset class focus on cash flow characteristics of the property with limited consideration given to the other approaches, particularly for portfolios. Therefore, only the Income Capitalization Approach is considered meaningful and applicable in developing a credible value conclusion. For the Income Capitalization Approach, key metrics are summarized as follows:

- The Income Capitalization Approach is a method of converting the anticipated economic benefits of owning property into a value through the capitalization process. The principle of "anticipation" underlies this approach in that investors recognize the relationship between an asset's income and its value. In order to value the anticipated economic benefits of a particular property, potential income and expenses must be projected, and the most appropriate capitalization method must be selected.

- The two most common methods of converting net income into value are Direct Capitalization and Discounted Cash Flow. In direct capitalization, net operating income is divided by an overall capitalization rate to indicate an opinion of market value. In the discounted cash flow method, anticipated future cash flows and a reversionary value are discounted to an opinion of net present value at a chosen yield rate (internal rate of return). Investors acquiring this type of asset will typically look at year one returns, but must also consider long-term strategies. Hence, depending on certain factors, both the direct capitalization and discounted cash flow techniques have merit.

- As an asset class, self storage is now being considered as institutional grade or a "core" asset class. Therefore, investors are increasingly relying on discounted cash flow analysis for self storage. Considering all of the aspects that would influence an investment decision in the subject portfolio, we conclude that both methods are appropriate in this assignment.

© 2018 CBRE, Inc.

6



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM          INDEX NO. 654095/2020
NYSCEF DOC. NO. 9      Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 68 of 184    RECEIVED NYSCEF: 08/27/2020

Scope of Work

- The potential gross income for self-storage facilities consists of rental income, other rental income and ancillary income. Rental income is primarily derived from the self-storage units. Other rental income can be generated by outdoor vehicle storage, rent of retail or office space, as well as cell tower and billboard income. Ancillary income includes late fees and retail sales of storage, moving and packaging supplies. The PGI analysis is a function of the combination of actual rent in place for occupied units and asking rent on vacant units, based on the rent roll provided by the client and survey research.

- Physical occupancy is the amount of area rented (in terms of rentable square feet), determined by the actual rent roll provided by the client. Due to the wide range in unit sizes, rentable square feet are the best method in analyzing physical occupancy.

- Economic occupancy reflects the actual cash flow received compared to potential gross income. The economic occupancy reflects a combination of concessions, revenue enhancement and physical occupancy. As a result, the effective gross income may reflect economic occupancy higher or lower than the actual physical occupancy. Economic occupancy is the primary metric used in analyzing a self storage facility because it represents the actual cash flow characteristics of the property. Economic occupancy is calculated by dividing effective gross income into the potential gross income of the subject property. Analyzing the current pattern of EGI, compared to the trailing pattern of EGI, is utilized most often in portfolio analytics.

- Based on the scope of this assignment we have combined data from the individual appraisals completed in October 2018. This includes historical and forecast data. Market participants rely on the trailing three-year pattern of EGI and financials.

- Projected NOI is rarely consistent with the financial history or budget. Buyers and investors in the market will project EGI and adjusted expenses (such as real estate taxes) to market. Consequently, in transactions, the trailing NOI is not consistent with the year one forecast NOI. Therefore, our projected NOI is consistent with market behavior of portfolio investors as presented in the revenue and expense analysis section of this report.

- Capital reserves are calculated at one percent of effective gross revenue, shown in the cash flow as a price per square foot (consequently, the cap ex per square foot varies per asset based on the EGI). In general, the impact of the capital expenditures is reflected in cash flow over the following four quarters. Cap ex can be bifurcated among deferred maintenance and improvements to assist cash flow. In the market, with the emphasis on cash flow performance, the sentiment is that cap ex will show improvement in the cash flow of the asset. This market sentiment is inherently considered in our analysis of quarterly and annual performance in our cash flow forecast going forward.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 08/27/2020

Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 69 of 184

Market Analysis

# Market Analysis

The term market analysis is used broadly in economics but has more specific meaning within the appraisal discipline. Self storage market analysis is focused on macro conditions for the sector, leading to greater granularity in identifying and analyzing the subject trade area. Critical to this asset class are the conclusions of market conditions: equilibrium, over-supplied or under-supplied. These analyses are important to highest and best use and form the basis of valuation conclusions.

Self storage is a unique asset class. It provides relatively high returns in terms of cap and yield rates compared to other real estate. Yet, it has proven to be resistant to recession with lower declines and default ratios compared to other real estate. A relatively new industry, there are opportunities for consolidation resulting in portfolio accretion from management efficiencies. Wise operators understand the key to self storage performance is in understanding market conditions in the local trade area.

As outlined in the Appraisal Institute book *Self Storage Economics and Appraisal,* Self storage is essentially the concept of storing possessions. Over the last 75 years, self storage has become a $27 billion industry, with more than 50,000 self storage facilities existing in the United States. Self storage is also an export industry, with hundreds of facilities developed in Europe over the last 10 years. More recently, Asian markets have begun developing self storage facilities. While the business of simply storing "stuff" may seem odd, investors are clearly storing capital in self storage real estate.

The Self Storage Association defines self storage as a "term applied to facilities offering rental on a month-to-month basis where the tenant applies the lock and has sole access to the unit. No bailment is created by the facility (no care, custody, or control). It is the rental of 'air space,' not physical boundaries." In other words, a self storage property is more than just a box for unused possessions; it is a specialized type of property with unique legal and economic characteristics.

| **SELF STORAGE FACILITY GROWTH** | | | |
|---|---|---|---|
| Year | Facilities | Annual Growth | Annual % Growth |
| 2018 est | 52,747 | 550 | 1.1% |
| 2017 | 52,197 | 910 | 1.8% |
| 2016 | 51,287 | 601 | 1.2% |
| 2015 | 50,686 | 304 | 0.6% |
| 2014 | 50,382 | 120 | 0.2% |
| 2013 | 50,262 | 112 | 0.2% |
| 2012 | 50,150 | 102 | 0.2% |
| 2011 | 50,048 | 692 | 1.4% |
| 2010 | 49,356 | 635 | 1.3% |
| 2009 | 48,721 | 1,207 | 2.5% |
| 2008 | 47,514 | 2,540 | 5.6% |
| 2007 | 44,974 | 2,007 | 4.7% |
| 2006 | 42,967 | 1,845 | 4.5% |
| 2005 | 41,122 | 2,305 | 5.9% |
| 2004 | 38,817 | 1,806 | 4.9% |
| 2003 | 37,011 | 1,835 | 5.2% |
| 2002 | 35,176 | 1,343 | 4.0% |
| 2001 | 33,833 | 1,886 | 5.9% |
| 2000 | 31,947 | 1,992 | 6.6% |
| 1999 | 29,955 | 2,420 | 8.8% |
| 1998 | 27,535 | 2,355 | 9.4% |
| 1997 | 25,180 | 1,208 | 5.0% |
| 1996 | 23,972 | | |
| **20 Year Average (1997 - 2017)** | | **1,344** | **3.8%** |

*Source:*   *Self Storage Almanac (1996-2011)*
       *CBRE (2012 - onwards)*

© 2018 CBRE, Inc.



Self storage development began in the United States after World War II as a means of land banking or an interim use pending feasible alternative development. (Some reports indicate that the first modern self storage facility appeared in Corpus Christi, Texas, in the 1960s.) Over the last 60 years, the industry has grown into a sophisticated asset class with appeal to individual investors, regional and national operators, and Wall Street investment (e.g., real estate investment trusts).

With the growth in the number of self storage facilities and related advertising, Americans began to get used to the idea of self storage. Lifestyle changes such as marriage, death, or moving to a new residence can also promote the use of self storage facilities. Most people expect to use a self storage unit for a short period of time. (Units typically range in size from 25 square feet to 400 square feet.) Residential users make up approximately 76.9% of all those who use self storage units. Once a unit is rented, the average stay for residential customers is 12 to 18 months."

NATIONAL TRENDS

Comparatively high returns have led to an increase in capital flow to real estate, both equity and debt (private and public). Moreover, the appeal of self storage over other types of real estate investments is that costs tend to be lower and operating results demand a lower yield. For example, the breakeven occupancy rate for a self storage facility is approximately 40% to 45%, as compared to 60% or more for apartments. Consequently, self storage facilities tend to hold value better and recover faster than other assets when real estate markets sour. In addition, self storage had the highest total annual returns over 10- and 15-year averages in an analysis of five different property sectors, according to NAREIT data:  The results of 2017 demonstrate that self storage continues to offer steady returns, even as significant new supply came to market.

© 2018 CBRE, Inc.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 71 of 184
RECEIVED NYSCEF: 08/27/2020

Market Analysis

## TOTAL ANNUAL RETURNS BY PROPERTY SECTOR

### (Returns in Percent)

|  | Office | Industrial | Retail | Apartments | Self Storage |
|---|---|---|---|---|---|
| 1994 | 2.86 | 18.67 | 2.98 | 2.19 | 8.90 |
| 1995 | 38.80 | 16.21 | 5.10 | 12.26 | 34.40 |
| 1996 | 51.80 | 37.22 | 34.60 | 28.93 | 42.84 |
| 1997 | 29.01 | 19.02 | 16.95 | 16.04 | 3.41 |
| 1998 | -17.35 | -11.74 | -4.94 | -8.77 | -7.20 |
| 1999 | 4.25 | 3.90 | -11.77 | 10.73 | -8.04 |
| 2000 | 35.46 | 28.62 | 17.97 | 35.53 | 14.69 |
| 2001 | 6.65 | 7.42 | 30.42 | 8.66 | 43.24 |
| 2002 | -6.82 | 17.32 | 21.07 | -6.15 | 0.56 |
| 2003 | 34.01 | 33.14 | 46.77 | 25.49 | 38.14 |
| 2004 | 23.28 | 34.09 | 40.23 | 34.71 | 29.70 |
| 2005 | 13.11 | 15.42 | 11.80 | 14.65 | 26.55 |
| 2006 | 45.22 | 28.92 | 29.01 | 39.95 | 40.95 |
| 2007 | -18.96 | 0.38 | -15.77 | -25.43 | -24.82 |
| 2008 | -41.07 | -67.47 | -48.36 | -25.13 | 5.05 |
| 2009 | 35.55 | 12.17 | 27.17 | 30.40 | 8.37 |
| 2010 | 18.41 | 18.89 | 33.41 | 47.04 | 29.29 |
| 2011 | -0.76 | -5.16 | 12.20 | 15.37 | 31.62 |
| 2012 | 14.15 | 31.28 | 26.74 | 6.93 | 19.94 |
| 2013 | 5.57 | 7.40 | 1.86 | -6.20 | 9.49 |
| 2014 | 25.86 | 21.00 | 27.62 | 39.62 | 31.44 |
| 2015 | 0.29 | 2.64 | 4.56 | 16.45 | 40.65 |
| 2016 | 13.17 | 30.72 | 0.95 | 2.86 | -8.14 |
| 2017 | 5.25 | 20.58 | -4.77 | 3.72 | 3.74 |

*Source Data: NAREIT / Compiled By: CBRE*

| Analysis - Calculated Based on NAREIT Data | | | | | |
|---|---|---|---|---|---|
| 5 yr Avg. Return '12-'16 | 10.03 | 16.47 | 6.04 | 11.29 | 15.44 |
| 5 yr Standard Deviation | 8.92 | 10.14 | 11.21 | 15.90 | 18.00 |
| 10 yr Avg. Return '07-'16 | 7.64 | 7.21 | 8.14 | 13.11 | 17.15 |
| 10 yr Standard Deviation | 19.51 | 27.23 | 22.82 | 20.58 | 14.91 |
| 15 yr Avg. Return '02-'16 | 11.54 | 12.27 | 12.89 | 14.70 | 18.80 |
| 15 yr Standard Deviation | 21.09 | 24.51 | 23.68 | 21.64 | 18.61 |

These characteristics were recognized by Wall Street REITs beginning in 1995. In the year 2000, REITs became eligible for Standard and Poor's indexes, increasing investors' exposure and lending credibility to the industry. Self storage returns (10 and 15-year average) consistently lead the market, yet have the lowest default rate of all asset classes.  Currently, both Public Storage and Extra Space are part of the S&P 500 index.  These trends demonstrate that institutional investors are seeking self storage properties as a viable alternative investment vehicle.  This can be demonstrated by the strong, long term performance of self-storage REIT stock:

**CBRE**

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020

NYSCEF DOC. NO. 9
Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 72 of 184
RECEIVED NYSCEF: 08/27/2020

Market Analysis

### SELF STORAGE REIT STATISTICS & PERFORMANCE

| Stock: | Ticker: | 1Q 2018 Price: | Dividend: | 4Q 2017 Price: | Dividend: | 4Q 2016 Price: | Dividend: | 4Q 2015 Price: | Dividend: |
|---|---|---|---|---|---|---|---|---|---|
| Public Storage, Inc. | PSA | $194.26 | 4.09% | $196.11 | 3.93% | $220.25 | 3.55% | $240.59 | 2.18% |
| Life Storage (Formerly Sovran) | LSI | $79.81 | 5.01% | $84.24 | 4.60% | $83.54 | 4.48% | $100.83 | 3.37% |
| CubeSmart | CUBE | $27.12 | 4.42% | $27.72 | 4.24% | $26.66 | 3.99% | $29.16 | 2.18% |
| Extra Space Storage, Inc. | EXR | $87.18 | 3.60% | $82.37 | 3.66% | $76.78 | 4.07% | $84.10 | 2.81% |
| Jernigan Capital | JCAP | $17.52 | 8.03% | $18.64 | 7.58% | $20.76 | 6.70% | | |
| National Storage Affiliates Trust | NSA | $24.86 | 4.55% | $26.01 | 4.26% | $22.34 | 4.22% | | |
| **Averages:** | | **$71.79** | **4.95%** | **$72.52** | **4.71%** | **$75.06** | **4.50%** | **$113.67** | **2.64%** |

| Stock: | Ticker: | 4Q 2014 Price: | Dividend: | 4Q 2013 Price: | Dividend: | 4Q 2013 Price: | Dividend: | 4Q 2012 Price: | Dividend: |
|---|---|---|---|---|---|---|---|---|---|
| Public Storage, Inc. | PSA | $186.76 | 2.88% | $162.06 | 3.49% | $162.06 | 3.49% | $146.22 | 2.98% |
| Sovran Self Storage | SSS | $89.09 | 3.27% | $67.91 | 3.06% | $67.91 | 3.06% | $61.30 | 3.12% |
| CubeSmart | CUBE | $22.08 | 2.74% | $16.40 | 2.51% | $16.40 | 2.51% | $14.63 | 2.41% |
| Extra Space Storage, Inc. | EXR | $58.64 | 3.01% | $42.59 | 3.72% | $42.59 | 3.72% | $37.33 | 2.32% |
| **Averages:** | | **$89.14** | **2.98%** | **$72.24** | **3.20%** | **$72.24** | **3.20%** | **$64.87** | **2.71%** |
| Compiled by CBRE | | | | | | | | | |

Self-storage REIT stock has flattened in the last 2 years, however over the past decade (between 2007 and 2017) the average share price for the sector has increased 284% (excluding JCAP & NSA since they do not have 10 years of history). This suggests market confidence in the sector. Data in the private sector show a decrease of transaction volume in 2017, as the rate of net operating income growth slows and cap rates stabilize. Portfolio volume decreased significantly primarily due to a lack of available product. Currently, fundamentals have generally peaked in self storage and pricing is stabilizing and transaction volume decreasing.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 08/27/2020

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 73 of 184

Market Analysis

Over 80% of self storage facilities are owned privately (not publicly traded companies). Most facilities are owned by small, local owner-operators. However, consolidation in the industry is a current ongoing trend, as operation costs tend to be lower for regional, multi-facility companies.

Today, the self-storage industry has evolved to include architecturally dynamic facilities with state-of-the-art management and security systems.  They offer a wide range of sought after specialty services, and are managed by well-trained professionals who are highly skilled in terms of customer service, marketing, and sales.  Just as facilities and managers have changed, so have the industry's operators.  In terms of ownership, self-storage has also evolved.

## CAPITAL MARKETS

Real estate economists argue about the greatest influence to real estate trends:  capital markets or fundamental market conditions in terms of supply and demand.  In this analysis, we examine both.  Capital markets on a national scale, and appropriate to the self-storage asset class we examine market conditions in the subject trade area.

Commercial real estate investment volume (single-asset, portfolio and entity-level transactions) totaled $122.3 billion in Q4 2017, a decrease of 12.6% from Q4 2016. Total investment for the year was $464.0 billion, a decrease of 6.7% from 2016. Declines in CBD office, retail center and multifamily investment were the primary drivers of the annual volume drop.

Pricing metrics for most property types are at or near all-time highs, with mild deceleration in recent months.  Overall, capital markets remain active even with slightly depressed investment levels.  Commercial mortgage production increased, as capital availability remained relatively high.  Specifically, CMBS activity increased by 25.4% year over year, and GSE lending increased by 24.3%.  However, CBRE's Lender Momentum Index fell by 15.9% year-over-year.  Concerns as of 1Q 2018 most often relate to exogenous factors such as political instability, or unforeseen shocks to the economy.

Market sentiment believes interest rates will rise for the sector in 2018 due to three, likely Fed increases to 10-Year Treasuries, a compressed spread between apartment and self storage cap rates, and a lower spread between self storage cap rates and 10 Year Treasuries.  Acquisition opportunities may expand, as private equity money with a short term horizon begins to exit the sector.

## CASH FLOW CHARACTERISTICS

Self storage investment decisions are primarily made on cash flow.  Self storage effective gross incomes (actual income) have been rising significantly, primarily due to revenue enhancement models.  Beginning in 2010, REITs began raising rental rates based on "Big Data" science resulting in algorithms that set rate increases while minimizing risk to occupancy.  This process if



**Market Analysis**

often referred to as revenue enhancement or revenue management models. The results have been remarkable. As a result, the model is now adopted by most operators in major markets.

Utilizing REIS data, the trends of both occupancy and income growth for the sector are shown in the following graph for the US and by NCREIF region. In 2011, REIS partnered with the Self Storage Association for industry data collection regarding income and expenses. REIS has grown considerably over the past five years in the sector, including data collection on over 10,000 facilities with approximately one-third of the facilities reporting directly to REIS (balance comes from survey research). Therefore, it is considered a reliable data source.

The National Council of Real Estate Investment Fiduciaries was established to serve the institutional real estate investment community as a non-partisan collector, processor, validator and disseminator of real estate performance information. We utilize the NCREIF Regions as outlined below. Following the map is a data table summarizing cash flow trends for industry nationally and by region, with a graph representing national trends.





**Market Analysis**

### OCCUPANCY TRENDS

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **East Region** | 83.22 | 85.02 | 87.06 | 87.78 | 88.58 | 88.51 | 88.78 | 88.43 | 88.02 | 86.63 |
| Mideast Division | 82.77 | 84.77 | 86.39 | 87.15 | 88.02 | 88.08 | 88.42 | 88.23 | 87.98 | 86.60 |
| Northeast Division | 83.49 | 85.16 | 87.47 | 88.15 | 88.92 | 88.76 | 89.00 | 88.55 | 88.04 | 86.64 |
| **Midwest Region** | 83.10 | 85.37 | 86.89 | 88.24 | 88.32 | 88.21 | 88.51 | 88.23 | 87.83 | 86.28 |
| East North Central Division | 82.75 | 85.32 | 86.88 | 88.23 | 88.50 | 88.46 | 88.68 | 88.20 | 87.74 | 86.17 |
| West North Central Divisio | 83.80 | 85.46 | 86.92 | 88.27 | 87.97 | 87.70 | 88.18 | 88.30 | 88.00 | 86.50 |
| **South Region** | 81.71 | 84.42 | 86.37 | 87.73 | 88.44 | 88.39 | 88.70 | 88.30 | 87.89 | 86.42 |
| Southeast Division | 79.81 | 82.77 | 85.44 | 87.60 | 89.30 | 89.35 | 89.44 | 88.99 | 88.26 | 86.69 |
| Southwest Division | 84.57 | 86.90 | 87.75 | 87.92 | 87.15 | 86.95 | 87.59 | 87.26 | 87.34 | 86.02 |
| **West Region** | 82.88 | 84.97 | 86.45 | 87.47 | 88.87 | 89.06 | 89.19 | 89.03 | 88.66 | 87.27 |
| Mountain Division | 81.48 | 83.54 | 85.50 | 86.18 | 87.47 | 87.88 | 88.10 | 87.85 | 87.85 | 86.45 |
| Pacific Division | 84.75 | 86.87 | 87.72 | 89.21 | 90.74 | 90.63 | 90.63 | 90.61 | 89.73 | 88.36 |
| **National** | 82.81 | 84.97 | 86.72 | 87.79 | 88.57 | 88.56 | 88.81 | 88.52 | 88.12 | 86.68 |

Source: REIS, Compiled by CBRE

### ASKING RENTS 10x10 NON_CLIMATE CONTROL TRENDS

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **East Region** | 127.47 | 129.17 | 131.44 | 135.55 | 140.33 | 145.21 | 149.68 | 153.04 | 155.38 | 157.27 |
| Mideast Division | 114.14 | 115.63 | 117.37 | 120.12 | 124.05 | 127.70 | 131.71 | 135.12 | 137.75 | 140.18 |
| Northeast Division | 135.46 | 137.29 | 139.88 | 144.80 | 150.10 | 155.72 | 160.46 | 163.80 | 165.96 | 167.53 |
| **Midwest Region** | 88.14 | 89.80 | 92.59 | 96.60 | 99.82 | 103.23 | 106.15 | 108.50 | 110.19 | 111.73 |
| East North Central Division | 86.58 | 88.14 | 90.52 | 93.90 | 96.92 | 100.06 | 102.85 | 104.99 | 106.50 | 107.84 |
| West North Central Divisio | 91.26 | 93.11 | 96.74 | 102.00 | 105.61 | 109.58 | 112.75 | 115.52 | 117.57 | 119.50 |
| **South Region** | 84.32 | 85.86 | 88.12 | 91.57 | 95.51 | 99.33 | 102.47 | 104.81 | 106.44 | 107.84 |
| Southeast Division | 90.02 | 91.37 | 93.00 | 96.48 | 100.95 | 105.35 | 108.63 | 110.82 | 112.18 | 113.27 |
| Southwest Division | 75.76 | 77.60 | 80.81 | 84.21 | 87.33 | 90.29 | 93.25 | 95.81 | 97.85 | 99.70 |
| **West Region** | 104.76 | 107.15 | 109.94 | 115.08 | 120.94 | 126.99 | 131.37 | 134.48 | 136.56 | 138.27 |
| Mountain Division | 91.00 | 92.73 | 95.78 | 100.34 | 105.43 | 110.36 | 114.11 | 116.62 | 118.17 | 119.37 |
| Pacific Division | 123.10 | 126.37 | 128.83 | 134.73 | 141.63 | 149.16 | 154.38 | 158.30 | 161.07 | 163.46 |
| **National** | 103.98 | 105.82 | 108.36 | 112.59 | 117.14 | 121.80 | 125.63 | 128.49 | 130.47 | 132.14 |

Source: REIS, Compiled by CBRE

### ASKING RENTS 10x10 CLIMATE CONTROL TRENDS

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **East Region** | 152.84 | 154.03 | 155.86 | 160.66 | 166.46 | 172.14 | 177.64 | 181.79 | 184.66 | 187.06 |
| Mideast Division | 143.05 | 143.86 | 145.51 | 149.18 | 153.40 | 157.76 | 162.92 | 167.39 | 170.89 | 174.15 |
| Northeast Division | 158.71 | 160.13 | 162.07 | 167.55 | 174.29 | 180.77 | 186.47 | 190.43 | 192.93 | 194.81 |
| **Midwest Region** | 119.88 | 123.49 | 126.47 | 130.70 | 134.53 | 138.28 | 142.15 | 145.31 | 147.65 | 149.83 |
| East North Central Division | 118.95 | 122.38 | 125.47 | 129.49 | 132.84 | 135.62 | 139.20 | 142.14 | 144.27 | 146.18 |
| West North Central Divisio | 121.74 | 125.71 | 128.46 | 133.13 | 137.89 | 143.60 | 148.05 | 151.65 | 154.42 | 157.13 |
| **South Region** | 115.57 | 118.07 | 120.73 | 125.76 | 131.82 | 137.49 | 142.37 | 145.90 | 148.31 | 150.34 |
| Southeast Division | 119.62 | 122.05 | 123.30 | 128.28 | 135.24 | 141.46 | 146.58 | 149.84 | 151.75 | 153.29 |
| Southwest Division | 109.49 | 112.10 | 116.87 | 121.98 | 126.67 | 131.52 | 136.04 | 139.99 | 143.15 | 145.92 |
| **West Region** | 127.45 | 129.87 | 133.10 | 137.51 | 142.46 | 147.36 | 151.68 | 155.13 | 157.66 | 159.78 |
| Mountain Division | 111.09 | 112.66 | 115.54 | 119.35 | 122.85 | 126.09 | 129.35 | 132.01 | 133.92 | 135.44 |
| Pacific Division | 149.26 | 152.82 | 156.52 | 161.73 | 168.60 | 175.73 | 181.46 | 185.96 | 189.32 | 192.25 |
| **National** | 131.23 | 133.56 | 136.19 | 140.80 | 145.96 | 150.99 | 155.68 | 159.29 | 161.86 | 164.06 |

Source: REIS, Compiled by CBRE

© 2018 CBRE, Inc.

**CBRE**

**Market Analysis**



The data indicates stable trends:  as asking rents increased approximately 2.74% per year, physical occupancy also increased from 82.81% nationally in 2011 to 88.81% in 2017 (data is compiled at year end, so 4Q data is currently unavailable).  These twin pillars of cash flow corroborate yield trends presented previously.  Clearly, self storage is viewed as a rising sector.  REIS econometric forecasting suggests stable to declining occupancy in 2018, but rates are forecast to increase through 2020.

NEW CONSTRUCTION

Many confuse planned projects with actual starts (a start is the actual development of a new facility).  Historically, only about one-third of planned facilities are actually constructed over the long run.  More recently, we have seen a significant increase in the number of planned facilities and the actual number of starts (start ratio of planned is the highest in ten years).

Nationwide, CBRE estimates approximately 600 facilities were constructed nationwide in 2016, and about 900 new starts in 2017.  Utilizing our Construction Report, there are 474 projects under construction (3Q, 2017) that represent about half the US population. That might suggest twice as many projects or 944 nationwide.  However, most new construction is in higher density and population Metros, suggesting slightly less than indicated by the arithmetic.  We note that the average facility size is increasing as well; indicating that more square footage will be developed.  However, if a natural refresh rate



is 1% of total stock, an average year should have approximately 500 new starts. Since that has only recently occurred, and there was limited new construction during the Great Recession, CBRE estimates supply and demand metrics should remain balanced for at least the next two years nationwide. Specific Metros are at risk as identified in our Construction Report.

### CONSTRUCTION REPORT

We assembled a new construction report from a wide variety of research sources as well as actual counts by brokers with Argus Self Storage Sales Network. Research sources include F.W. Dodge, STR, Big Byte Insights, the US Census, REIS, and the SSPQ in addition to the primary survey research performed by Argus. Not all the sources covered all Metros, and the scope and methods varied. The results vary widely because of the challenges in sorting out actual construction starts to planned projects. In Los Angeles, for example, sources indicate from 5 to 33 projects are either planned, under construction or in absorption phase (complete). In Phoenix, the range varied from 8 to 64. Part of the challenge for self storage is it is often improperly identified as industrial or by SIC code. Therefore, after reviewing all of the data, we gave 50% weighting to the average of all research sources, and 50% weighting the ARGUS data for our best estimate of new construction. The average indicated 879 projects and the weighted average 947 projects in the 35 Metros analyzed. The result was 947 projects this year in 35 metros (284 Planned / 474 Under-Construction & Pre-Certificate of Occupancy / 189 Completed), as shown below (compiled 3Q, 2017):

CBRE

**Market Analysis**

## NEW CONSTRUCTION REPORT - 3Q 2017

| Metro | Planned | Construction & Pre-Certificate of Occupancy | Lease Up |
|---|---|---|---|
| Atlanta | 15 | 24 | 10 |
| Austin | 13 | 22 | 9 |
| Baltimore | 1 | 2 | 1 |
| Boston | 8 | 14 | 6 |
| Charlotte | 10 | 17 | 7 |
| Chicago | 12 | 21 | 8 |
| Cincinnati | 2 | 3 | 1 |
| Cleveland | 1 | 2 | 1 |
| Columbus | 2 | 3 | 1 |
| Dallas | 49 | 82 | 33 |
| Denver | 14 | 24 | 10 |
| Detroit | 3 | 5 | 2 |
| Houston | 16 | 26 | 10 |
| Indianapolis | 0 | 1 | 0 |
| Kansas City | 1 | 2 | 1 |
| Las Vegas | 1 | 2 | 1 |
| Los Angeles | 6 | 11 | 4 |
| Miami | 21 | 35 | 14 |
| Minneapolis | 5 | 8 | 3 |
| Nashville | 12 | 20 | 8 |
| New York Metro | 16 | 27 | 11 |
| Oklahoma City | 5 | 9 | 4 |
| Orlando | 6 | 11 | 4 |
| Philadelphia | 5 | 8 | 3 |
| Phoenix | 13 | 22 | 9 |
| Portland | 9 | 16 | 6 |
| Sacramento | 4 | 7 | 3 |
| San Antonio | 6 | 10 | 4 |
| San Bernardino/Riverside | 7 | 11 | 4 |
| San Diego | 5 | 8 | 3 |
| San Francisco / San Jose | 3 | 5 | 2 |
| Seattle | 5 | 9 | 4 |
| St. Louis | 2 | 4 | 1 |
| Tampa-St. Petersburg | 5 | 9 | 3 |
| Total | 283 | 480 | 190 |

Compiled by CBRE & Argus Self Storage Sales Network

© 2018 CBRE, Inc.

**CBRE**

**Market Analysis**

## KEY NATIONAL OBSERVATIONS

- Cap rates have continue to remain flat, based on our 3Q 2017 Investor Survey. The average cap rate compressed only 4 bps over the past year to 5.60%, and have declined only 14 bps since 4Q 2015.

- Self storage cap rates spread to apartment cap rates has declined to only 33 bps, compared to an average spread of 45 bps over the past seven years.

- Market sentiment is that cap rates will remain level in the sector with a slight increase of 25 bps or less over the next year.

- Spreads over the 10-year U.S. Treasury Rate decreased 277 basis points as of 1Q18, below the 18-year sector average of 393 bps.  However, the spread remains higher than the 2006 low of 254 bps.  This suggests cap rates have stabilized for the sector and will begin to increase.



- Transaction volume was record setting 2015 with Costar reporting nearly 1,000 sale transactions.  The pace continued in 2016 with over 800 sales transactions. 2015 also had the third largest portfolio transaction in the self storage asset class history. In 2017 sales declined to a little over 600 transactions. Buyers are considering secondary markets, but generally within the top 100 MSAs.  Portfolio transaction volume has increased more for class B-C product than in prior years, because portfolio transaction volume has declined overall in 2017.  Market participants complain about the lack of product available for purchase.

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM    INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 80 of 184    RECEIVED NYSCEF: 08/27/2020

**Market Analysis**



- Continued strong returns in cash flow during sector expansion (new construction) have led to investors continuing to have high confidence in the sector. Supply and demand market fundamentals remain strong in self storage, resulting in continued, strong operating results. In terms of industry performance, year-over-year results for storage REITs show increases of 5.7% to 10.1% in same store net operating income.

## MARKET PARTICIPANT INTERVIEWS

Self storage market conditions are stable after a strong seven-year growth cycle in cash flow and appreciation for both public and private markets. Observations regarding key market players, and their general investment criteria, are summarized below:

- REITS – Self Storage now has five Real Estate Investment Trusts devoted to owning and operating property in the self storage asset class. U-Haul also owns and operates property, but has significant income from truck rental. A new REIT went public in 2016, National Storage Affiliates, but comprises an aggregation of owners with various operating platforms. REITs are seeking properties to purchase, generally in the sub 6% cap rate range in major metropolitan cities. Public Storage is also developing properties, while other REITs seek to acquire properties if at least 30% occupied.



Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 81 of 184

- Equity Funds – Established funds in other real estate sectors, such as Carlyle, Brookfield and TPG, invested in private self storage companies for growth. Most significantly was an $800 Million investment from Brookfield into Simply Self Storage for development, single asset and portfolio acquisitions. And these are new players. Funds such as Prudential, Heitman, and TIAA have been in the sector for years.

- National Operators – The William Warren Group, Devon, Metro Storage, US Storage, Amsdell and Storquest operate nationally as private companies. They can compete with REITs in the transaction market. Investment criteria is similar, but this causes pricing to rise and supported the trend of cap rate compression (cap rates are currently stabilizing). Brokers are reporting multiple offers on single assets with best and final offers that can be higher than the initial strike price. With the amount of capital and rising cash flow in the sector, many view self storage as a long run investment. The REITs, national, and regional companies combined are slowly consolidating the industry. However, with less than 20% of the asset class institutionally owned, this process could take decades.

- Family Owned Business – Most owner/operators of self storage have less than five facilities. Nevertheless, smaller family owned business have experienced robust activity in secondary and tertiary markets. Assets are generally class B-C and trade for less than $3,000,000 at a target cap rate of 6% or more. Funding for these projects is often a function of local lenders such as community banks, SBA loans and regional banks with a long term banking relationship with borrowers.

## INVESTMENT CLASS

The survey also includes a breakdown among sector Investment Classes: A, B, and C. Investment Class varies from construction cost class as defined in Marshall Valuation Cost Services. Investment Classes are identified by CBRE as follows:

- Class A is generally located in a top 50 MSA (urban to suburban) and has an NOI/SF of at least $10.00. Markets are under-supplied to equilibrium with high barriers to entry. Construction quality is high with state of the art security features. Projects are generally less than 15 years old and contain at least 75,000 rentable square feet.

- Class B can be located in the top 200 MSAs (suburban) and have an NOI/SF in a range of $6.00 - $10.00. Markets are generally equilibrium to slight over-supply with some risk of new construction. Construction quality is good with most security features. Projects are well-maintained, but may be 15 - 25 years old, and generally contain 50,000 to 75,000 rentable square feet

© 2018 CBRE, Inc.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM    INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 82 of 184    RECEIVED NYSCEF: 08/27/2020

Market Analysis

- Class C product often has a rural location with low barriers to entry (lots of land, less challenges to zoning and entitlements). They generally have an NOI/SF of less than $6.00. Markets are often over-supplied and rarely do class C facilities have occupancy higher than 85%. Facilities are generally 25 years old or older and may require capital expenditures for deferred maintenance. Projects are typically smaller than 50,000 square feet of rentable area.

TRADE AREA ANALYSIS

As outlined in "Self Storage Economics and Appraisal" published by the Appraisal Institute in 2012, self storage economics is the analysis of the market conditions that affect value using both qualitative and quantitative techniques. To evaluate the key market conditions for self storage, an appraiser must perform a series of related analyses:

1. An analysis of existing supply
2. A forecast of stabilized demand, resulting in a conclusion of the state of the trade area (oversupply, undersupply, or equilibrium)
3. An examination of the competitive position of a facility in relation to the competition

These conclusions of market conditions and competitive position are critical to the economics of a self storage facility. A review of rent comparables or a sample of the competition in the trade area would be insufficient analyses. Analyzing the entire supply in a trade area is critical to the market condition conclusion, which forms the basis of forecasting long-run rents, long-term or stabilized vacancy, net operating income, and capitalization and yield rate conclusions. Ultimately, the market condition conclusion is the foundation of the valuation conclusions. Fortunately, the dynamic economic and demographic data used in the analysis of self storage economics is readily available to appraisers in most markets.

A comparison of local, regional, and national supply data underscores the need for local trade area analysis to provide an accurate snapshot of the self storage market for a particular facility.

National market data and trends are useful tools in general, but local trade area analysis is the essential starting point for analyzing a self storage facility. For example, market equilibrium is measured in terms of a balance between supply and demand in each trade area.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM INDEX NO. 654095/2020
NYSCEF DOC. NO. 9 Case 21-10690-CSS Doc 53-1 Filed 05/17/21 Page 83 of 184 RECEIVED NYSCEF: 08/27/2020

Market Analysis

Determinants of the self storage market relate to the forces of supply and demand, as is the case with other types of real estate. The analysis of demand generators, however, is focused on four key variables:

- Population
- The percentage of renters
- Average household size
- Average household income

Similar to other types of trade areas, a self storage trade area is "the geographic area immediately adjacent to the property from which the retail establishment obtains 60% to 70% of its total customers."6 Such a detailed gravity model analysis is beyond the scope of most appraisal assignments, but these principles can be applied when determining the subject trade area.

A typical primary market is described by the population density and the proximity of existing supply. As for land use patterns, the availability of vacant land parcels for self storage development is limited in many cities. Furthermore, self storage developers may have difficulties obtaining entitlements because some planning and zoning authorities perceive the tax and job base to be relatively low. Cumulatively, these factors suggest that a review of several local trade areas is the best tool for measuring the market.

Under these parameters, analysts typically define the trade area of a self storage property using a series of rings with a radius of 2 to 5.5 miles as outlined in survey research. In some cases, a zip code study of existing tenancy may assist in defining the proper trade area. For the purposes of analysis, consider the typical trade area defined as the three-mile ring.

SUPPLY

Sources used in local trade area analysis include public records, telephone books (published and online), and primary survey research. The data sources vary in scope, method, and precise geography of research but are considered reasonable indicators of current trends and conditions in the subject trade area because the data has been supported by field research. For the subject, we utilized REIS data and primary survey research.

---

6 James D. Vernor, PhD, et al, *Shopping Center Appraisal and Analysis*, 2nd ed. (Chicago: Appraisal Institute, 2009), 48.

© 2018 CBRE, Inc.                    22                    

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
NYSCEF DOC. NO. 9
Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 84 of 184
INDEX NO. 654095/2020
RECEIVED NYSCEF: 08/27/2020

Market Analysis

## CONCLUSIONS

Self storage investment decisions are primarily made on cash flow.  The self storage industry experienced a prolonged growth phase leading into the Great Recession.  Self storage loan losses were the lowest of any sector tracked by Trepp, causing many to describe the sector as Recession Resistant.  Over the past five years, self storage has been a leader in economic recovery with significant growth in cash flow, significant appreciation for both stock and individual asset pricing.  Due to the amount of equity chasing yield in the sector, portfolios are particularly competitive.  Investors are storing capital in the self storage asset class.  The most probable buyer for the subject would be a REIT or private national operator due to the geographic diversity.  We estimate a marketing time and exposure time of four months.

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
NYSCEF DOC. NO. 9
Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 85 of 184

# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based.  The four criteria the highest and best use must meet are:

- legally permissible;
- physically possible;
- financially feasible; and
- maximally productive.

We evaluated the highest and best use both as currently improved and as vacant. In both cases, the highest and best use must meet four criteria: physically possible; legally permissible; financial feasible; and most profitable.

In conclusion, it is our opinion that the highest and best use of each site as vacant is for self storage development when market demand supports feasible new development. As improved, a continuation of self storage use was concluded for each property. It is clear the value of these properties is higher as a portfolio than the cumulative sum of each individual property value.



# Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available. In valuing the subject portfolio, the Income Capitalization Approach is most appropriate.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

A likely portfolio buyer is now viewing direct and yield capitalization comparably. Therefore, both analyzes are included in the appraisal. As a test of reasonableness, we have compared the metrics of the valuation of this portfolio to current market activity of self storage portfolios. Finally, due to the impact of financing in the current market, we have done a leveraged analysis that is typical of the viewpoint of a portfolio buyer.

## PORTFOLIO VALUATION

The Self Storage Valuation Group of CBRE completes over $2 Billion in quarterly, portfolio valuations for institutional investors including Prudential, TIAA, Heitman and Harrison Street. The methodology is primary reliance on cash flow utilizing rolled up financials and applying discounted cash flow and direct capitalization approaches to value, with a test of reasonableness based on actual portfolio sales.

Additionally, we interviewed the following market participants:

Joe Margolis, CEO of Extra Space (NYSE:EXR) told us they rely on cap and yield rates for portfolios. He said self storage portfolios command lower cap and yield rates than individual assets because of the ability to place a large amount of capital in one transaction and risk diversification. He also noted that as portfolios available to purchase have declined over the past year (after several years of robust activity), the market for portfolios remains frothy.

Christopher P. Marr, CEO of CubeSmart (NYSE: CUBE) in a separate convsation told us they would like to internally value the individual assets and apply a premium in the form of cap/yield rates, but there is insufficient time during the deal cycle. As a result, he said they do "like everybody else" and roll up the financials and apply a portfolio cap/yield rates, that are lower than individual assets. He also noted that with the number of new players seeking to store capital in the sector, including hedge funds like Carlyle, Brookfield and TPG, that "everybody" wants to buy portfolios.



# Income Capitalization Approach

Methodology

The income capitalization approach to value views the subject through the eyes of a typical investor. It is based on the premise that the higher the earnings for a property, the higher its value. This approach converts anticipated future benefits or dollar income to be derived from ownership into a present value estimated through the capitalization process. Application of the approach includes the following steps:

1.      Survey the rents of comparable properties to estimate an economic market rent for the subject property. For self storage, this step should include an analysis of each unit based on asking rent and actual rent to compare to market rent.

2.      Estimate operating expenses (including vacancy) applicable to the subject ownership, including an analysis of the trailing three-year financials to compare patterns in effective gross income and operating expenses.

3.      Derive net operating income for the subject property.

4.      Estimate the remaining economic life of the subject based on the market or the investor's holding period.

5.      Select the proper capitalization method and rate.

6.      Capitalize the net operating income into an indication of value.

There are two capitalization methods: direct capitalization and yield capitalization. Direct capitalization is relatively simple, and data for it is easily derived from the market. Yield capitalization, however, is based on conclusions of change over a projected time frame. While yield capitalization is more complex, it is also a powerful tool of understanding capitalization theories and techniques. Direct capitalization and yield capitalization are defined as follows:

•       Direct capitalization is a method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the income estimate by an appropriate income rate or multiplying the income estimate by an appropriate factor. Direct capitalization employs capitalization rates and multipliers extracted from the market data. Only one year's income is used. Yield and value change are implied, but not identified.

•       Yield capitalization is a method in which future benefits are converted into a value indication by discounting them at an appropriate yield rate (DCF analysis) or applying an overall rate that reflects the investment's income pattern, value change, and yield rate.

As an asset class, self storage was historically not considered institutional grade (although REITs are widely traded). Over the past five years, however, investment analytics for this sector have



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 08/27/2020

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 88 of 184

Portfolio – Income Capitalization Approach

increased significantly. Consequently, the investment market now relies on both direct and yield capitalization. Due to revenue enhancement, discounted cash flow is typically emphasized in the investment community. Considering all aspects that influence an investment decision for self storage, only the Direct capitalization method was analyzed in this appraisal.

## OPERATING HISTORY

The following table presents available operating data for the combined portfolio. This data was aggregated from the individual appraisals from October of 2018.

| NET OPERATING INCOME HISTORY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| YEAR | 2016 | | 2017 | | CBRE Year One Estimate | | CBRE Year Two Estimate | |
| | Total | $/SF | Total | $/SF | Total | $/SF | Total | $/SF |
| Net Operating Income | $18,602,711 | $ 4.50 | $19,845,336 | $ 4.80 | $20,626,344 | $ 4.99 | $21,526,400 | $ 5.21 |
| Source: Consolidated operating statements from the owner and CBRE reports from October 2018 | | | | | | | | |

### Operating Expense Analysis

### CBRE Self Storage Operating Expense Report – 1Q 2017

| CBRE SELF STORAGE OPERATING EXPENSE REPORT - 1Q 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | National | East | | Midwest | | South | | West | |
| Expense Category | | Mideast | Northeast | East North Central | West North Central | Southeast | Southwest | Mountain | Pacific |
| Real Estate Taxes | $1.48 | $1.46 | $2.32 | $1.41 | $1.60 | $1.28 | $1.18 | $0.77 | $1.25 |
| Property Insurance | $0.23 | $0.12 | $0.13 | $0.13 | $0.11 | $0.31 | $0.26 | $0.11 | $0.35 |
| Utilities | $0.31 | $0.30 | $0.42 | $0.24 | $0.34 | $0.33 | $0.23 | $0.26 | $0.28 |
| Repairs & Maintenance | $0.39 | $0.46 | $0.55 | $0.39 | $0.22 | $0.32 | $0.24 | $0.34 | $0.40 |
| Administration | $0.56 | $0.59 | $0.68 | $0.49 | $0.68 | $0.52 | $0.46 | $0.52 | $0.55 |
| Off-Site Management | $0.84 | $1.00 | $1.07 | $0.60 | $0.60 | $0.76 | $0.59 | $0.71 | $0.94 |
| On-Site Management | $1.16 | $1.22 | $1.29 | $1.07 | $1.09 | $1.08 | $1.03 | $1.11 | $1.23 |
| Advertising | $0.26 | $0.29 | $0.27 | $0.22 | $0.27 | $0.28 | $0.20 | $0.28 | $0.26 |
| Miscellaneous | $0.01 | $0.03 | $0.00 | $0.01 | $0.02 | $0.01 | $0.00 | $0.01 | $0.00 |
| Total Expenses (SF): | $5.25 | $5.45 | $6.74 | $4.55 | $4.94 | $4.88 | $4.19 | $4.11 | $5.26 |
| Effective Gross Income (SF): | $14.91 | $17.98 | $18.35 | $10.75 | $10.65 | $13.63 | $10.64 | $12.18 | $16.76 |
| Operating Expense Ratio: | 35.20% | 30.33% | 36.76% | 42.34% | 46.33% | 35.82% | 39.34% | 33.76% | 31.37% |
| Sample Size | 681 | 55 | 128 | 79 | 19 | 125 | 86 | 38 | 151 |
| Source: CBRE | | | | | | | | |

The expense forecast per property considers data compared to the subject operating history. Consistent with the market, expenses (including property taxes) are adjusted to the market. This methodology is consistent with investors and analysts for self storage portfolios.

## DIRECT CAPITALIZATION

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication. The following subsections represent different techniques for deriving an overall capitalization rate.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 08/27/2020

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 89 of 184

Portfolio - Income Capitalization Approach

Cap Rate Trends

The overall capitalization rate is calculated by dividing the net operating income by the sale price. Ideally, the sales price is selected from the market through sales of similar types of properties. As the subject is a portfolio, data from portfolio sales is summarized below:

Portfolio - Income Capitalization Approach

## SELF STORAGE PORTFOLIO SALES COMPARABLES

| No. | Name | Location | Date: | Sales Price | NRA | Price PSF | Pro Forma Cap Rate | TTM Cap Rate | NOI/SF |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Simply Self Storage - NSA | 112 Properties located in 17 states and Puerto Rico | Contract | $ 1,325,000,000 | 8,700,000 | $152.30 | 5.60% | 5.00% | $ 8.53 |
| 2 | PRISA 2 (Partial Sale of Portfolio) | 15 Properties (CA-3, MD-2, MI-2, PA-2, CT-1, IL-1, MA-1, NV-1, TX-1 & VA-1) | Jan-18 | $ 209,300,000 | 1,109,371 | $188.67 | 5.54% | 5.50% | $ 10.45 |
| 3 | Store Here LLC | 27 Properties (GA-13, LA-4, TX-4, KS-3, IN-2 & CO-1) | Oct-17 | $ 126,000,000 | 1,670,000 | $ 75.45 | 6.40% | 5.90% | $ 4.83 |
| 4 | TIAA - Project JAZZ | 36 Properties (NJ-6, CA-6, TN-6, PA-3, NY-2 & GA-1) | Oct-17 | $ 295,000,000 | 2,300,756 | $128.22 | 5.65% | 5.49% | $ 7.24 |
| 5 | Desert/Life Portfolio | 18 Properties (AZ-11; Las Vegas, NV-5 & Nashville, TN-2) | Jun-17 | $ 330,000,000 | 1,524,299 | $216.49 | 4.75% | 5.00% | $ 10.28 |
| 6 | Trojan Portfolio | 15 Properties (CA-10, MN-2,CO-2,Az-1) | Apr-17 | $ 242,600,000 | 1,378,726 | $175.96 | 4.92% | 4.51% | $ 8.66 |
| 7 | Casey Storage Solusions | 13 Properties in the New England region (MA-6, CT-3, RI-2 & VT-2) | Dec-16 | $ 100,000,000 | 700,000 | $142.86 | 5.50% | 5.25% | $ 7.86 |
| 8 | Kayne Anderson/National Storage | 26 Properties located in OH, IN, CA & FL | Nov-16 | $ 184,500,000 | 1,657,481 | $111.31 | 5.90% | 5.70% | $ 6.57 |
| 9 | Switzer's Locker Room | 11 Properties located in the Oklahoma | Oct-16 | $ 77,788,000 | 890,678 | $ 87.34 | 6.00% | 5.75% | $ 5.24 |
| 10 | iStorage | 66 Properties (FL-21, AL-11,NJ-10,CA-9 and others in 8 other states) | Sep-16 | $ 640,000,000 | 4,500,000 | $142.22 | 5.50% | 5.30% | $ 7.82 |
| 11 | Confidential | 22 Properties (FL-10, MD-1, NC-11) | Jul-16 | $ 373,162,000 | 1,511,027 | $246.96 | 5.20% | 4.70% | $ 12.84 |
| 12 | Life Storage | 81 Properties located in WI, UT, TX, IL, NV, MS, CA, CO, & FL | Jun-16 | $ 1,229,900,000 | 6,305,662 | $195.05 | 4.80% | 4.30% | $ 9.36 |
| 13 | WP Carey | 22 Properties located in CA | Apr-16 | $ 163,000,000 | 1,596,190 | $102.12 | 6.00% | 5.67% | $ 6.13 |
| 14 | Metro Storage LLC | 15 Properties located in Texas and Kansas | Apr-16 | $ 83,816,482 | 923,590 | $ 90.75 | 5.40% | 5.25% | $ 4.90 |
| 15 | CubeSmart | 30 Properties located in George, North & South Carolina. | Mar-16 | $ 112,800,000 | 894,002 | $126.17 | 5.60% | 5.40% | $ 7.07 |
| 16 | Magellan | 4 Properties in Southern CA | Mar-16 | $ 105,800,000 | 435,000 | $243.22 | 4.75% | 4.00% | $ 11.55 |
| 17 | Simply | 90 Properties located in MI, PR, OH, NJ, IL, MA, MN, GA, Other | Mar-16 | $ 828,500,000 | 6,851,703 | $120.92 | N/A | 6.10% | N/A |
| 18 | Harrison Street | 13 Properties (MCA-4, TX-3, NH-5, MA-1) | Jan-16 | $ 186,400,000 | 1,063,193 | $175.32 | 5.50% | 5.00% | $ 9.64 |
| 19 | Storage Pros | 37 Properties in TN, MI, FL, MA | Dec-15 | $ 242,000,000 | 1,800,000 | $134.44 | 5.75% | 5.50% | $ 7.73 |
| 20 | Smart Stop | 121 Properties in 21 States and Canada | Oct-15 | $ 1,400,000,000 | 9,027,785 | $155.08 | 5.15% | 4.85% | $ 7.99 |
| 21 | Extra Space Storage | 14 Storage / 1 Retail / 6 Land | Apr-15 | $ 177,000,000 | 1,116,108 | $158.59 | 6.00% | N/A | $ 9.52 |
| 22 | Fortress | 18 Properties located in IN, KY, PA , MD & NJ | Apr-15 | $ 106,500,000 | 1,140,698 | $ 93.36 | 6.50% | 6.00% | $ 6.07 |
| 23 | Sovran Self Storage | 4 Properties in NY & CT | Feb-15 | $ 120,000,000 | 580,661 | $ 81.79 | 5.00% | N/A | $ 4.09 |
| 24 | Simply Self Storage | 12 Properties in MI | Jan-15 | $ 61,300,000 | 749,436 | $ 81.79 | 6.50% | N/A | $ 5.32 |
| | Low | | | $ 61,300,000 | 435,000 | $ 75.45 | 4.75% | 4.00% | $ 4.09 |
| | High | | | $ 1,400,000,000 | 9,027,785 | $246.96 | 6.50% | 6.10% | $ 12.84 |
| | Average | | | $ 363,348,603 | 2,434,432 | $142.77 | 5.56% | 5.25% | $ 7.81 |

Compiled by CBRE

© 2018 CBRE, Inc.                                   29

CBRE

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM    INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 91 of 184    RECEIVED NYSCEF: 08/27/2020

Portfolio - Income Capitalization Approach

The sales data indicates a range from 4.75% to 6.50% with an average of 5.56%. The variance of 175 basis points is indicative of the variances in quality of the portfolio sales. Some of the lowest cap rates reflect value add opportunities through adsorption to stabilization. These variances demonstrate the significance of understanding the motivations and expectations involved in each transaction.

Broker Interviews

Nick Walker, Executive Vice President, Capital Markets Self Storage Group, CBRE- Mr. Walker runs the national brokerage practice at CBRE and is one of the most active brokers in the country in the sector, including portfolio sales.  He estimated a cap rate for a property of similar size and cash flow characteristics at a 5%.

Greg Wells, Senior Director, Self Storage Industry Group, Cushman & Wakefield – Mr. Wells heads the national practice and has brokered portfolios.  He estimated a cap rate in the 5.25% to 5.5% range for a portfolio like the subject.   He added that it could be lower given market demand for self storage portfolios.

Charles "Chico" LeClaire, Executive Managing Director, Self Storage Investments, Marcus & Millichap - Mr. LeClaire was listed as the broker of record that sold portions of this portfolio to the current owners and is very familiar with the subject properties.  He estimated a 5.25% - 5.50% cap rate for the subject, but noted if capital was expended there would be greater upside to the portfolio and "it (cap rate) could be lower".

Conclusion

Overall, these transactions of portfolios since 2015 and the brokers interviews provide support for the conclusions of the income capitalization approach. Cumulatively, these factors indicate market confidence in the asset class and subject portfolio cap rate conclusion of **5.50%**. Research for our 3Q 2018 Investor Survey indicate cap rates have flattened over the past year for single assets.  For portfolio's however, capital has been chasing the sector as deal opportunities have declined.  As a result, 2017 for portfolios continued to see some decrease in the first half of the year.  More recently, we believe even portfolio cap rates have stabilized.  Recent comparables reflect higher cap rates, but the cash flow characteristics of these portfolios are inferior to the subject.

In addition, the implied cap rate from the aggregate portfolio As Is Value is 6.34% (Yr1 NOI of $20,648,993 divided by aggregate Yr1 value of $325,775,000).  The concluded portfolio value represents an 84 bps portfolio premium which is supported by broker opinions and activities of buyers who desire large portfolios, like the subject.  Typically, the more properties in the portfolio, the more premium.  This subject portfolio is slightly above average in terms of size.

Capitalization Rate from Investor Surveys

We have considered data extracted from various Investor Surveys for competitive properties:



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM

INDEX NO. 654095/2020

NYSCEF DOC. NO. 9

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 92 of 184

RECEIVED NYSCEF: 08/27/2020

Portfolio - Income Capitalization Approach

| OVERALL CAPITALIZATION RATES | | |
|---|---|---|
| *Investor Surveys* | OAR Range | Average |
| PwC Real Estate Investor Survey: 1st Qtr. 2018 | 4.50% - 7.00% | 5.65% |
| CBRE Self Storage Investor Survey: 4th Qtr. 2015 | 5.00% - 8.25% | 5.74% |
| CBRE Self Storage Investor Survey: 1st Qtr. 2016 | 5.00% - 8.20% | 5.70% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2016 | 4.90% - 8.00% | 5.64% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2017 | 4.75% - 8.50% | 5.60% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2018 | 4.50% - 8.50% | 5.68% |
| **Indicated OAR:** | | **6.25%** |
| Compiled by: CBRE | | |

This demonstrates that investor's expectations are that cap rates are flattening with survey results showing a slight cap rate increase of 8 bps from 3Q 2017 to 3Q 2018, and only 6 bps since 4Q 2015.

Band of Investment

The band of the investment technique has been utilized as a crosscheck to the foregoing techniques. The Mortgage Interest Rate and the Equity Dividend Rate (EDR) are based upon current market yields for similar investments. The analysis is shown in the following table.

| BAND OF INVESTMENT - MORTGAGE AND EQUITY | | | |
|---|---|---|---|
| Mortgage Interest Rate | 5.00% | | |
| Mortgage Term (Amortization Period) | 30 Years | | |
| Mortgage Ratio (Loan-to-Value) | 70% | | |
| Mortgage Constant (monthly payments) | 6.44% | | |
| Equity Dividend Rate (EDR) | 3.25% | | |
| | | | |
| Mortgage Requirement | 70% x 6.44% = | 4.51% | |
| Equity Requirement | 30% x 3.25% = | 0.98% | |
| | 100% | 5.48% | |
| | | | |
| **Indicated OAR:** | | **5.48%** | |
| Compiled by: CBRE | | | |

Portfolio - Income Capitalization Approach

## Mortgage Equity Analysis

| MORTGAGE EQUITY ANALYSIS | |
| --- | --- |
| Interest Rate | 5.00% |
| Amortization Term | 30 Years |
| Loan-to-Value Ratio | 70% |
| Mortgage Constant | 6.44% |
| Equity Yield Rate $(Y_E)$ | 13.25% |
| | |
| Projection Period (n) | 10 Years |
| Compound Annual Appreciation/Depreciation | 3.5% per Year |
| Total Appreciation/Depreciation | 41.06% |
| Compiled by: CBRE | |

| MORTGAGE-EQUITY ANALYSIS - AKERSON FORMAT | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Loan Ratio x Annual Constant | = | | 70.00% x | 6.44% = | | 4.51% |
| Equity Ratio x Equity Yield Rate | = + | | 30.00% x | 13.25% = | | 3.98% |
| **Weighted Average** | | | | | | **8.48%** |
| | | | | | | |
| Less Credit for Equity Build-up | | | | | | |
| Loan Ratio x % Paid off in Projected Period x Sinking Fund Factor | = - | 70.00% x | 18.66% x | 5.36% = | | 0.70% |
| **Basic Rate** | | | | | | **7.78%** |
| | | | | | | |
| Less Appreciation / Plus Depreciation | | | | | | |
| Appreciation/Depreciation x Sinking Fund Factor | = +/- | | 41.06% x | 5.36% = | | 2.20% |
| **Overall Capitalization Rate** | | | | | | **5.58%** |
| | | | | | | |
| Compiled by: CBRE | | | | | | |

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
NYSCEF DOC. NO. 9
INDEX NO. 654095/2020
RECEIVED NYSCEF: 08/27/2020

Direct Capitalization Summary - As Is

A summary of the direct capitalization is illustrated in the following chart.

| DIRECT CAPITALIZATION SUMMARY | | |
|---|---|---|
| | | YEAR 1 |
| Net Operating Income | $5.16 | $20,648,993 |
| OAR | | 5.50% |
| Indicated As Is Value | | $375,436,236 |
| Rounded | | $375,000,000 |
| Value Per SF | | $93.68 |
| Compiled by CBRE | | |

Direct Capitalization Summary - As Stabilized

A summary of the direct capitalization is illustrated in the following chart.

| DIRECT CAPITALIZATION SUMMARY | | |
|---|---|---|
| | | YEAR 2 |
| Net Operating Income | $5.21 | $21,549,827 |
| OAR | | 5.50% |
| Indicated As Is Value | | $391,815,036 |
| Rounded | | $392,000,000 |
| Value Per SF | | $94.81 |
| Compiled by CBRE | | |

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM   INDEX NO. 654095/2020
NYSCEF DOC. NO. 9   Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 95 of 184   RECEIVED NYSCEF: 08/27/2020

Portfolio - Income Capitalization Approach

## PORTFOLIO SALES – TEST OF REASONABLENESS

### SELF STORAGE PORTFOLIO SALES COMPARABLES

| No. | Name | Location | Date: | Sales Price | NRA | Price PSF | Pro Forma Cap Rate | TTM Cap Rate | NOI/SF |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Simply Self Storage - NSA | 112 Properties located in 17 states and Puerto Rico | Contract | $ 1,325,000,000 | 8,700,000 | $152.30 | 5.60% | 5.00% | $ 8.53 |
| 2 | PRISA 2 (Partial Sale of Portfolio) | 15 Properties (CA-3, MD-2, MI-2, PA-2, CT-1, IL-1, MA-1, NV-1, TX-1 & VA-1) | Jan-18 | $ 209,300,000 | 1,109,371 | $188.67 | 5.54% | 5.50% | $ 10.45 |
| 3 | Store Here LLC | 27 Properties (GA-13, LA-4, TX-4, KS-3, IN-2 & CO-1) | Oct-17 | $ 126,000,000 | 1,670,000 | $ 75.45 | 6.40% | 5.90% | $ 4.83 |
| 4 | TIAA - Project JAZZ | 36 Properties (NJ-6, CA-6, TN-6, PA-3, NY-2 & GA-1) | Oct-17 | $ 295,000,000 | 2,300,756 | $128.22 | 5.65% | 5.49% | $ 7.24 |
| 5 | Desert/Life Portfolio | 18 Properties (AZ-11; Las Vegas, NV-5 & Nashville, TN-2) | Jun-17 | $ 330,000,000 | 1,524,299 | $216.49 | 4.75% | 5.00% | $ 10.28 |
| 6 | Trojan Portfolio | 15 Properties (CA-10, MN-2,CO-2,Az-1) | Apr-17 | $ 242,600,000 | 1,378,726 | $175.96 | 4.92% | 4.51% | $ 8.66 |
| 7 | Casey Storage Solusions | 13 Properties in the New England region (MA-6, CT-3, RI-2 & VT-2) | Dec-16 | $ 100,000,000 | 700,000 | $142.86 | 5.50% | 5.25% | $ 7.86 |
| 8 | Kayne Anderson/National Storage | 26 Properties located in OH, IN, CA & FL | Nov-16 | $ 184,500,000 | 1,657,481 | $111.31 | 5.90% | 5.70% | $ 6.57 |
| 9 | Switzer's Locker Room | 11 Properties located in the Oklahoma | Oct-16 | $ 77,788,000 | 890,678 | $ 87.34 | 6.00% | 5.75% | $ 5.24 |
| 10 | iStorage | 66 Properties (FL-21, AL-11,NJ-10,CA-9 and others in 8 other states) | Sep-16 | $ 640,000,000 | 4,500,000 | $142.22 | 5.50% | 5.30% | $ 7.82 |
| 11 | Confidential | 22 Properties (FL-10, MD-1, NC-11) | Jul-16 | $ 373,162,000 | 1,511,027 | $246.96 | 5.20% | 4.70% | $ 12.84 |
| 12 | Life Storage | 81 Properties located in WI, UT, TX, IL, NV, MS, CA, CO, & FL | Jun-16 | $ 1,229,900,000 | 6,305,662 | $195.05 | 4.80% | 4.30% | $ 9.36 |
| 13 | WP Carey | 22 Properties located in CA | Apr-16 | $ 163,000,000 | 1,596,190 | $102.12 | 6.00% | 5.67% | $ 6.13 |
| 14 | Metro Storage LLC | 15 Properties located in Texas and Kansas | Apr-16 | $ 83,816,482 | 923,590 | $ 90.75 | 5.40% | 5.25% | $ 4.90 |
| 15 | CubeSmart | 30 Properties located in George, North & South Carolina. | Mar-16 | $ 112,800,000 | 894,002 | $126.17 | 5.60% | 5.40% | $ 7.07 |
| 16 | Magellan | 4 Properties in Southern CA | Mar-16 | $ 105,800,000 | 435,000 | $243.22 | 4.75% | 4.00% | $ 11.55 |
| 17 | Simply | 90 Properties located in MI, PR, OH, NJ, IL, MA, MN, GA, Other | Mar-16 | $ 828,500,000 | 6,851,703 | $120.92 | N/A | 6.10% | N/A |
| 18 | Harrison Street | 13 Properties (MCA-4, TX-3, NH-5, MA-1) | Jan-16 | $ 186,400,000 | 1,063,193 | $175.32 | 5.50% | 5.00% | $ 9.64 |
| 19 | Storage Pros | 37 Properties in TN, MI, FL, MA | Dec-15 | $ 242,000,000 | 1,800,000 | $134.44 | 5.75% | 5.50% | $ 7.73 |
| 20 | Smart Stop | 121 Properties in 21 States and Canada | Oct-15 | $ 1,400,000,000 | 9,027,785 | $155.08 | 5.15% | 4.85% | $ 7.99 |
| 21 | Extra Space Storage | 14 Storage / 1 Retail / 6 Land | Apr-15 | $ 177,000,000 | 1,116,108 | $158.59 | 6.00% | N/A | $ 9.52 |
| 22 | Fortress | 18 Properties located in IN, KY, PA , MD & NJ | Apr-15 | $ 106,500,000 | 1,140,698 | $ 93.36 | 6.50% | 6.00% | $ 6.07 |
| 23 | Sovran Self Storage | 4 Properties in NY & CT | Feb-15 | $ 120,000,000 | 580,661 | $ 81.79 | 5.00% | N/A | $ 4.09 |
| 24 | Simply Self Storage | 12 Properties in MI | Jan-15 | $ 61,300,000 | 749,436 | $ 81.79 | 6.50% | N/A | $ 5.32 |
| | Low | | | $ 61,300,000 | 435,000 | $ 75.45 | 4.75% | 4.00% | $ 4.09 |
| | High | | | $ 1,400,000,000 | 9,027,785 | $246.96 | 6.50% | 6.10% | $ 12.84 |
| | Average | | | $ 363,348,603 | 2,434,432 | $142.77 | 5.56% | 5.25% | $ 7.81 |

Compiled by CBRE

© 2018 CBRE, Inc.                        34                        CBRE

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 08/27/2020
Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 96 of 184

Portfolio - Income Capitalization Approach

Sale 1 – Absolute details of this sale can not be confirmed until closing.  For example, reports of trailing cap rate ranged from 4.6% to 5%.  This suggests the year 1 forecast was robust, compared to historical financials and indicated NOI.  It was widely circulated to publicly traded REITs, national self storage firms, non publicly traded REITs and institutional investors.  One ot the challenges is that at this time, it is not clear if the current management will remain.  NSA, the buyer, is a unique REIT because they have different management company platforms.   In this regard, some said NSA was widely viewed as one of the only true potential buyers because other interested companies, except for institutional investors who passed on the deal, would require their own management platform.

Sale 2 - Prudential sold these 15 assets to their operating partner Extra Space from the 42 property Prisa II portfolio.  At the time of sale the portfolio was 89.9% physically occupied.  Extra Space had first right of refusal and the portfolio was not exposed to the open market or represented by independent brokerage.   However, the portfolio independently valued quarterly and market sentiment is that the deal was considered consistent with the market.

Sale 3 – The cap rate was verified with the chairman of the REIT as 5.90% on trailing income. He said there was tremendous upside due to management and capex and therefore expect a 50 bps lift on year one. The deal was done by HFF Barbara Guffey. Purchase price was confidential.

Sale 4 –  The owner on record for these properties varies, however the portfolio is named Project JAZZ.  The properties associated with this portfolio have been owned and operated by Extra Space Storage for an average of 11 years. Since 2010, $9.8 million has been invested in capital improvements with $4.3 million being spent in the last two years. This is a joint venture between TIAA (90% ownership) and Extra Space Storage (10% ownership). The contract price is $295 million for 100%. TTM cap rate calculated with adjusted expenses (TTM missing off-site).

Sale 5 - Life Storage acquired 18 properties through an existing joint venture in which Life Storage holds 20% ownership interest.  The properties will be managed by Life Storage and are 84% occupied (some assets are still in lease-up). They received 10-year debt at 3.8% on the portfolio.  This recent transaction demonstrates continued demand for portfolio product in the self storage sector.

Sale 6 – This portfolio was considered institutional quality with ten assets in California, a highly coveted market.  The buyer was Harrison Street, a long time investor in the sector.  There was considered some value add, and the purchase price was based in part on a year one earn out



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM    INDEX NO. 654095/2020
NYSCEF DOC. NO. 9     Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 97 of 184    RECEIVED NYSCEF: 08/27/2020

Portfolio - Income Capitalization Approach

that was achieved.  Trojan reportedly spent capital expenditures to assist in raising revenue and NOI.

Sale 7 – The portfolio was considered institutional quality. It was marketed unpriced and received multiple offers. They sold for nearly $100,000,000. The portfolio has more than 700,000 SF (5,800 units, nearly 25,000 SF RV/Boat parking).  NGKF selling broker, Aaron Swerdlin, said interest in the portfolio was deep, with multiple offers to work with allowing for an execution that met all parties' expectations.  Swerdlin also said that deal activity in the storage industry will remain strong in 2017 but expected fewer $100+ million transactions than in recent years, he believes the number of deals completed will be greater than in 2016.

Sale 8 – Purchased by National Storage Affiliates, the newest publicly traded REIT in the sector. This property was part of the Kayne Anderson Advisors, that had invested equity money to a platform that failed.  It was accretive to the buyer to bolster the REIT size.  Some of the locations were considered secondary, so some were surprised it was a public buyer.  NSA viewed the deal as having some value add relating to their revenue enhancement program.

Sale 9 – Named after University of Oklahoma former Head football coach Barry Switzer, Public Storage purchased the portfolio for cash.  Charles "Chico" LeClaire represented the seller, and said it was widely marketed with multiple offers.  Public Storage had a light footprint in the region and felt they could add value to the facilities by adding them to the platform.  It is interesting to note that more recent portfolio deals have not been in the top 50 MSA's, again showing the pattern that growth in secondary markets is acceptable in the market.

Sale 10 - The buyer is NSA in a joint venture with a state pension fund advised by Heitman. Ownership is 25% NSA and 75% Heitman. Purchase is $320M Cash ($240M from Heitman and $80M from NSA) and the balance with a mortgage of $320M. In addition, the buyers have committed another $100M equity for additional acquisitions for this joint venture.

Sale 11 - A confidential sale, it was marketed by Jeffries to top players in the self storage industry. This is common for large portfolios.  Twelve offers were received and best and finals were accepted for the top four offers.  Interested buyers included four of the five publicly traded REITs and other national buyers.  This acquisition price was approximately one million higher than the next highest bidder.  Portfolio transactions are accretive to national firms and are very popular with institutional investors as outlined in our market analysis.    Therefore, the transaction is considered to be at market.  It is interesting to note this portfolio has the highest rents and



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM INDEX NO. 654095/2020
NYSCEF DOC. NO. 9 RECEIVED NYSCEF: 08/27/2020
Case 21-10690-CSS Doc 53-1 Filed 05/17/21 Page 98 of 184

Portfolio - Income Capitalization Approach

NOI/SF of any recent portfolio sale. The investment market loves quality because it is more accretive than other portfolios that may be dilutive to an institutional investor.

Sale 12 – This corroborates the downward trend in portfolio cap/yield rate compression and pricing. It includes some properties in lease-up, but overall the NOI/SF was $8.13/SF. This demonstrates the popularity of quality portfolios in the sector. This portfolio was marketed directly to top players with wide market interest, multiple offers, and a best and final bidding war. Marketed by Eastdil, the eventual buyer was Sovran Self Storage, a public REIT. The properties include Class A and B product, in terms of construction and investment quality.

Sale 13 – The WP Carey portfolio represents a B-C portfolio with all properties located in California. The buyer was a REIT, suggesting expansion by buyers into secondary markets. In part, this is because of limited Class A-B portfolios available, and fierce competition to invest in the sector. The portfolio has been professionally managed and was considered a "coupon clipper", although with NOI/SF on the lower end of the range of portfolio sales. The property was listed by a self storage broker and marketed to top buyers. Therefore, it is considered a market sale.

Sale 14 – Metro Storage, LLC, sold the portfolio to Inland Private Capital Corporation, a relatively new player to the sector. The deal was financed with a by Barclays Bank with a note for $53,500,000 and was considered cash equivalent. Metro Storage, a national operator, desired to leave the Texas market due to concerns of over-building in the major cities. Market sentiment was that it was good timing on the part of Metro. The property was not listed on the market, but Metro did approach multiple "probable buyers". Considering all factors, the sale is considered at market.

Sale 15 – CubeSmart purchased 30 properties from American Storage LLC. The facilities were previously managed by CubeSmart and the sale was direct. Market sentiment is that the deal was at market, although not widely marketed. CubeSmart explains the significant level of due diligence in SEC filings. For REITs and companies that offer third party management, often deploy a strategy to acquire the facilities they manage. So, they are often the most probable buyer (as in this case).

Sale 16 – The Magellan portfolio consisted of only four properties, but pricing and marketing was as a portfolio due to the amount of total capital. Located in highly desirable Southern California with an NOI/SF of nearly $10.00 (for the stabilized assets), there was perceived upside in the market. According to the broker representing the sellers, there were many offers (over a dozen) and bidding increased through best and final offers. We spoke to several unsuccessful bidders, who thought they priced it to win and were surprised at not getting the deal. Considered a Class



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM   INDEX NO. 654095/2020
NYSCEF DOC. NO. 9       Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 99 of 184   RECEIVED NYSCEF: 08/27/2020

Portfolio - Income Capitalization Approach

A-B portfolio, this is a further illustration of capital chasing the sector. For example, one of the properties was just completed and empty. Another property was a leasehold interest. Although not without hair, market sentiment was that the cash flow characteristics were worth the pricing. The buyer was also a REIT.

Sale 17 - Simply 90 Portfolio sale represents an equity infusion of capital by Brookfield, a well-known hedge fund. Brookfield bifurcated approximately $800 million for dry powder acquisitions and development, and an equity addition and partial take-out of Simply's interest. Simply continues to manage the properties. The transaction was essentially based on a market purchase, according to confidential sources. Market sentiment is that this essentially was cash equivalent to a purchase.

Sale 18 – The Harrison Street portfolio was the equity for the sellers, consisting of several entities. It was marketed to top investors in the sector, but Sovran Self Storage (Uncle Bob's), a national REIT, was the successful bidder. Although bifurcated among multiple states, the NOI/SF was nearly $9.00/SF. Comprised primarily of B investment and construction quality product, sentiment was that a national buyer may find some upside. However, regional investors liked the stable cash flow characteristics of the portfolio. It was considered to be a stable portfolio at the time of sale.

Sale 19 – Storage Pros sold 37 properties to CubeSmart in December, 2015 for $242,000,000 or $134.44 per rentable square foot. The properties are located in TN, MI, FL and MA and represented a B quality portfolio with an NOI/SF of approximately $7.3. Included in this portfolio were three retail buildings and one warehouse property. The rentable area excludes 600,000 square feet of RV/Boat parking storage.

Sale 20 – The Smart Stop portfolio was announced in June and is now in the process of closing. Extra Space purchased the portfolio in a direct transaction, yet the other REITs competed for it through direct contact with CEO H. Michael Schwartz. The properties were amassed by Smart Stop (Strategic Storage Trust) over a nine-year period over 21 states. Considered to be primarily a B portfolio, the income characteristics suggest a B to B+ because of several trophy properties in California. After closing, Strategic will purchase back one California asset (Ladera Ranch), excess land in Orange County, CA, and the Canadian assets. It is not uncommon for large portfolio deals to be negotiated directly between buyer and seller. Market awareness was high that Smart Stop would either sell or go public. Given the cap rates on Net Asset Value for most of the REITS, a lower cap rate could be obtained by Smart Stop in a direct sale. Therefore, this is considered a market based transaction. Strategics remaining assets in REIT 2 and 3 will continue to be a part of Strategic Storage Trust, but property management will be by Extra Space. There are no non-

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 100 of 184
RECEIVED NYSCEF: 08/27/2020

Portfolio - Income Capitalization Approach

compete clauses, so Strategic will not focus on REIT 2 and 3, a growth and development fund respectively.

Sale 21 – Extra Space's purchased Assured Self Storage, a portfolio of 20+ properties for $177,000,000. According to Extra Space, this was a 6.0% target OAR. The actual OAR based on trailing is believed to be much lower.  Occupancy was in the high 70s, but included newer facilities in the absorption phase.  Since acquisition, Extra Space has raised portfolio occupancy to approximately 90%.

Sale 22 – The Fortress portfolio consists of a B-C portfolio of dated product, but still generated interest from national and regional players.  It has been managed by Extra Space, and EGI and NOI have been rising.  Investors did not see significant upside in the deal in terms of cash flow, but more of a longer term holds as a "coupon" clipper.  The interest level was very high with over a dozen qualified offers and over 100 investors looking into the deal.  This deal reflects market interest, as the buyer is relatively new to the sector (high net worth family).   The deal demonstrates that as available product has become more limited, buyers are looking to lower quality portfolios.

Sale 23 – Sovran Self Storage, Inc, acquired four class A self storage facilities from Arredondo Holdings of Tampa, Florida for $120 million. The portfolio consists of 580,661 rentable square feet with an NOI/SF of approximately $4.09. Since November, 2013 these facilities were operating as Uncle Bob's as part of a lease agreement between the two parties. On February 2, 2015, the company exercised its option to purchase the stores, so the transaction was not widely exposed to the market.  Based on transaction details, it appears to be a market oriented sale.

Sale 24 – This portfolio represents twelve properties in Michigan which were 85% occupied at the time of sale. The portfolio consists of nearly 750,000 rentable square feet with a sale price of $61,300,000 or $81.79 per square foot and an NOI/SF of $5.32.  Chico LeClaire a self storage broker with Marcus & Millichap, represented the seller. The overall rate was reportedly 6.50%. The average age of the properties was approximately 30 years.

## CONCLUSION

The transactions corroborate the trend of cap rate stabilization for portfolios, but also demonstrate the variance in rates/yields by investment quality of the portfolio.  Cumulatively, these factors indicate market confidence in the asset class and corroborate the subject portfolio cap and yield rate conclusions.  The subject is within the range in terms of cap rate and near the average of the 24 comparable portfolio sales.  Considering these factors, the valuation metrics conclusions are reasonable.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM          INDEX NO. 654095/2020
NYSCEF DOC. NO. 9          Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 101 of 184   RECEIVED NYSCEF: 08/27/2020

Portfolio - Reconciliation of Value

# Reconciliation of Value

The income capitalization approach is applicable to the subject since it is an income producing property. As self storage is a cash flow business, we have given most emphasis to the discounted cash flow. As shown by comparable sales, portfolio investment is robustly investing in self storage demonstrating a premium is warranted for the subject portfolio. As a test of reasonableness, the NOI/SF adjustment is analyzed. This technique compares each sale to the subject based on the NOI per rentable square foot. This results in an absolute difference, accounting for all the variables, in terms of one percentage adjustment. This absolute percentage variance is directly applied as a net adjustment to the price per rentable square foot of the subject. The analysis is summary as follows:

| | | NOI/SF ADJUSTMENT | | |
|---|---|---|---|---|
| No. | NOI/SF | Variance | Price/SF | Adjusted Price/SF |
| 1 | $8.53 | 38.91% | $152.30 | $93.04 |
| 2 | $10.45 | 50.15% | $188.67 | $94.04 |
| 3 | $4.83 | -7.90% | $75.45 | $81.41 |
| 4 | $7.24 | 28.08% | $128.22 | $92.21 |
| 5 | $10.28 | 49.34% | $216.49 | $109.68 |
| 6 | $8.66 | 39.82% | $175.96 | $105.89 |
| 7 | $7.86 | 33.69% | $142.86 | $94.73 |
| 8 | $6.57 | 20.67% | $111.31 | $88.31 |
| 9 | $5.24 | 0.58% | $87.34 | $86.83 |
| 10 | $7.82 | 33.39% | $142.22 | $94.73 |
| 11 | $12.84 | 59.43% | $246.96 | $100.19 |
| 12 | $9.36 | 44.35% | $195.05 | $108.54 |
| 13 | $6.13 | 14.97% | $102.12 | $86.83 |
| 14 | $4.90 | -6.31% | $90.75 | $96.48 |
| 15 | $7.07 | 26.26% | $126.17 | $93.04 |
| 16 | $11.55 | 54.90% | $243.22 | $109.68 |
| 17 | N/A | N/A | $120.92 | N/A |
| 18 | $9.64 | 45.97% | $175.32 | $94.73 |
| 19 | $7.73 | 32.61% | $134.44 | $90.61 |
| 20 | $7.99 | 34.76% | $155.08 | $101.17 |
| 21 | $9.52 | 45.25% | $158.59 | $86.83 |
| 22 | $6.07 | 14.15% | $93.36 | $80.15 |
| 23 | $4.09 | -27.40% | $81.79 | $104.20 |
| 24 | $5.32 | 2.00% | $81.79 | $80.15 |
| Low | $4.09 | -27.40% | $75.45 | $80.15 |
| High | $12.84 | 59.43% | $246.96 | $109.68 |
| Average | $7.81 | 27.29% | $142.77 | $94.50 |
| Compiled by CBRE | | | | |

CBRE

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 102 of 184    RECEIVED NYSCEF: 08/27/2020

Portfolio - Reconciliation of Value

Comparatively, the subject price per square foot is $93.68 or -0.87% more than the adjusted average. Based on the cumulative analyses, the value indications from the approaches to value are summarized as follows:

| INCOME CAPITALIZATION APPROACH VALUES | | |
|---|---|---|
| | As Is on October 10, 2018 | As Stabilized on October 10, 2019 |
| Direct Capitalization Method | $375,000,000 | $392,000,000 |
| Value Indication | $375,000,000 | $392,000,000 |
| Compiled by CBRE | | |

Based on the foregoing, the market value of the subject has been concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Estate | October 10, 2018 | $ 375,000,000 |
| As Stabilized | Leased Fee Estate | October 10, 2019 | $ 392,000,000 |
| Compiled by CBRE | | | |

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
NYSCEF DOC. NO. 9
INDEX NO. 654095/2020
RECEIVED NYSCEF: 08/27/2020

# Assumptions and Limiting Conditions

1. CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property. However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property. Therefore, no representation is made as to such matters.

2. The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date. The Report is subject to change as a result of fluctuations in any of the foregoing. CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.

3. Unless otherwise expressly noted in the Report, CBRE has assumed that:

   (i) Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property. Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

   (ii) Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements. CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of the improvements. CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible. It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

   (iii) Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

   (iv) Hazardous materials are not present on the subject property. CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

   (v) No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred. CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

   (vi) There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

   (vii) All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, nor national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

   (viii) The subject property is managed and operated in a prudent and competent manner, neither inefficiently or super-efficiently.

   (ix) The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

   (x) The subject property is in full compliance with the Americans with Disabilities Act (ADA). CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.

© 2018 CBRE, Inc.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM    INDEX NO. 654095/2020
NYSCEF DOC. NO. 9                                   RECEIVED NYSCEF: 08/27/2020

(xi) All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4. CBRE has assumed that all documents, data and information furnished by or behalf of the client, property owner, or owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5. CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including without limitation any termite inspection, survey or occupancy permit.

6. All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7. Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections.

8. The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decisions based upon the Report that the client, intended user, or any buyer, seller, investor, or lending institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9. No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10. CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.



FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM INDEX NO. 654095/2020
NYSCEF DOC. NO. 9    Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 105 of 184    RECEIVED NYSCEF: 08/27/2020

Assumptions and Limiting Conditions

13. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.

14. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.

15. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM

NYSCEF DOC. NO. 9

INDEX NO. 654095/2020

RECEIVED NYSCEF: 08/27/2020

Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 106 of 184

Addenda

ADDENDA

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
NYSCEF DOC. NO. 9

INDEX NO. 654095/2020

RECEIVED NYSCEF: 08/27/2020

Case 21-10690-CSS   Doc 53-1   Filed 05/17/21   Page 107 of 184

**Addenda**

Addendum A

# LETTER OF ENGAGEMENT



10/10/2018
**Bruce Bailey**
CBRE, Inc.
2800 Post Oak Boulevard, Suite 500
Houston TX,

RE: **Great Value Storage Portfolio**

Dear Bruce Bailey,

This letter confirms our arrangement retaining you to perform an appraisal on the above referenced property.

| | |
|---|---|
| Property Name: | Great Value Storage Portfolio |
| Property Address: | Various<br>Various , |
| Property Description: | The 65-property self storage portfolio is comprised of 30,478 units and totaling 4,134,454 sq. ft. The properties are located across 10 States with primary concentration in Texas and Ohio. The assets are operated by a Great Value Storage. |
| Acquisition: | No |
| Intended Use of the Appraisal: | Mortgage Financing Purposes |
| Interest Appraised: | Leased Fee |
| Values Needed: | As-Is,Insurable Value,Land Value |
| Approaches: | Income,Sales Comparison |
| Appraisal Fee: | $253,500.00 |
| Draft Report Due: | Draft reports by: 10/24/2018<br><br>Adherence to the due date is critical Please call property contact within 2 business days. Please notify Susan Kominski ASAP of any delivery delays |

| | |
|---|---|
| Property Description: | The 65-property self storage portfolio is comprised of 30,478 units and totaling 4,134,454 sq. ft. The properties are located across 10 States with primary concentration in Texas and Ohio. The assets are operated by a Great Value Storage. |
| Special Instructions: | **VALUES TO BE REPORTED PRIOR TO DUE DATE** The Commerce City, CO property is split into 2 locations. The 2 addresses are: 7273 Kearney St, Commerce City, CO 6345 E 78th Ave Commerce City, CO The borrower treats the 2 locations as a single business asset and hence one report will be needed for the two assets. Please provide a portfolio valuation. |
| Final Report Due Date: | Three business days after final review and authorization to deliver final reports |
| Deliverables: | PDF version of the draft report (which allows commenting) as well as invoice uploaded through the portal provided to you. PDF Final report when requested. |
| Property Contact: | Property Contact: Paul Koch Property Contact Phone: (512) 615-5407 Property Contact Email: pkoch@worldclassproperty.com |

**Report and Invoice To be addressed to:**

Kathleen Gleason Donovan

Managing Director

UBS Investment Bank

Real Estate Finance | Corporate Client Solutions

1285 Avenue of the Americas | 11th Floor | New York, NY 10019

The purpose of the appraisal is to estimate the market value of the Property. The report must be a narrative appraisal report, similar to what was previously known as a self-contained report. The appraiser preparing the report must have significant experience in appraising properties comparable to and located in the geographic area of the subject Property. The appraisal must be signed by an MAI designated appraiser that is state licensed or certified.

The appraiser must state that the appraisal conforms to USPAP and FIRREA. All reports require a land value and a Sales Comparison and Income Approach, as well as a insurable value. Insurable value estimates must be provided for each structure individually.

In addition, the following reliance language must be incorporated into the report:

This report is addressed to UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, such other persons as may be designated by UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York, and their respective successors and/or assigns.

This report and the information contained herein (i) may be relied upon by UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York in determining whether to make a loan secured by the Property and/or one or more loans secured by interests therein (each individually, a "Loan"), (ii) may be relied upon by any potential purchaser in determining whether to purchase any Loan, an interest in any Loan, or any securities backed or secured, in whole or in part, by any Loan or an interest in any Loan, (iii) may be relied upon by any rating agency rating securities representing an interest in any Loan or backed or secured, in whole or in part, by any Loan or an interest in any Loan, (iv) may be referred to in and included, in whole or in part, with materials offering for sale any Loan, an interest in any Loan or any securities backed or secured, in whole or in part, by any Loan or an interest in any Loan and (v) speak only as of the date of this report in the absence of a specific written update of this report signed and delivered by (CBRE, Inc. ).Indicate that the report is USPAP compliant.

Sincerely,

Susan Kominski, CRE
Senior Managing Director
skominski@bbgres.com
BBG, Inc.
on behalf of UBS

*By accepting the engagement online, you agree to the terms and scope of this assignment*
The engagement letter should be included as an exhibit to the appraisal report.
Statement of Work to follow

FILED: NEW YORK COUNTY CLERK 08/27/2020 04:30 PM
INDEX NO. 654095/2020
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 08/27/2020

Case 21-10690-CSS    Doc 53-1    Filed 05/17/21    Page 111 of 184

Addenda

Addendum B

# QUALIFICATIONS OF APPRAISER

*You may wish to laminate the pocket identification card to preserve it.*

The person named on the reverse is licensed by the Texas Appraiser Licensing and Certification Board.

Inquiry as to the status of this license may be made to:

Texas Appraiser Licensing and Certification Board
P.O. Box 12188
Austin, Tx 78711-2188
www.talcb.texas.gov
(512) 936-3001
Fax:(512) 936-3899

MICHAEL SEAN MIGGINS
10606 SHADY RIVER
HOUSTON, TX 77042

**Texas Appraiser Licensing and Certification Board**
P.O. Box 12188 Austin, Texas 78711-2188
**Certified General Real Estate Appraiser**

Number#: **TX 1332764    G**

Issued:    **04/09/2018**          Expires:    **11/30/2019**

Appraiser:  **MICHAEL SEAN MIGGINS**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Texas Occupations Code, Chapter 1103, is authorized to use this title, Certified General Real Estate Appraiser.

Douglas E. Oldmixon
Commissioner

---

**Texas Appraiser Licensing and Certification Board**
P.O. Box 12188 Austin, Texas 78711-2188
**Certified General Real Estate Appraiser**

Number:    **TX 1332764  G**

Issued:    **04/09/2018**          Expires:    **11/30/2019**

Appraiser:    **MICHAEL SEAN MIGGINS**

**Having provided** satisfactory evidence of the qualifications required by the **Texas Appraiser** Licensing and Certification Act, Texas Occupations Code, **Chapter 1103, is** authorized to use this title, Certified General Real Estate **Appraiser.**

Douglas E. Oldmixon
**Commissioner**

# Mike Miggins, MAI

*Director, Houston*

**CBRE**



T + 1 713 577 1895
M +1 713 817 8852
mike.miggins@cbre.com

2800 Post Oak Boulevard
Suite 500
Houston, TX 77056

## Clients Represented

- Atkins
- Bank of America
- Bank of Ozarks
- BOK Financial
- BBVA Compass
- Cadence Bank
- Chase Bank
- Citi Bank
- City of Houston
- City of Richmond
- CobbFendley
- Goldman Sachs
- Green Bank
- Key Bank
- Main Street Capital
- Morgan Stanley
- NorthMarq Capital
- Phillips 66
- Percheron
- Port of Houston
- Texas Attorney General
- TxDOT
- US Postal Service
- Wells Fargo

## Experience

Mike Miggins, MAI is currently a Director in the Houston Valuation and Advisory Services office and has over 17 years of real estate appraisal and consulting experience. A majority of Mr. Miggins' career has centered around litigation support. Mr. Miggins has also specialized in appraisal and consulting assignments involving self-storage assets. His team's primary focus is on Houston and the surrounding Gulf Coast markets, including Southern Louisiana.

Mr. Miggins has performed real estate valuations of fee simple, easement, leased fee and leasehold interests of existing and proposed developments including land, retail, restaurant, hotel, self-storage, office, industrial, medical buildings, mixed use-developments, single-family subdivisions, apartment projects, automotive dealership and service facilities. Properties were located in Arizona, Arkansas, California, Colorado, Florida, Louisiana, Massachusetts, New Mexico, Pennsylvania and Texas. Mr. Miggins regularly contributes as a writer and speaker at storage industry functions.

Mr. Miggins has worked extensively with large scale right-of-way infrastructure projects which include the valuation of fee simple and easement estates for proposed and existing roadway expansions, water canals and public utility lines. Notable right-of-way projects include:

- Luce Bayou Interbasin Transfer Project
- FM 1488 – Magnolia, TX
- Grand Parkway Segments F, G, H and I
- FM 1960 – Humble, TX
- State Highway 146 – Seabrook, TX
- IH 610 Loop South, Houston, TX

Mr. Miggins has consulted on and appraised property for litigation, specifically eminent domain proceedings and various tax purposes including estate planning, contribution into family limited partnerships and ad valorem. Mr. Miggins testified as an expert witness in Harris, Liberty, Bexar, Fort Bend and Travis counties in Texas.

## Professional Affiliations / Accreditations

- Appraisal Institute, Designated Member (MAI)
- General Certified Real Estate Appraiser – Texas
- General Certified Real Estate Appraiser – Louisiana
- Real Estate Broker - Texas
- International Right of Way Association
- Texas Self Storage Association
- USGBC – LEED Accredited Professional
- Houston Realty Business Coalition

## Education

- Southwestern University, BA Psychology

## EXHIBIT 5

**NFK 2019 Appraisal**

Appraisal of Real Property

# Great Value Self-Storage Portfolio Valuation

64 Locations Nationally
File Number: 19-0012562

Restricted Appraisal Report Prepared For:

Amin Shakya
Vice President / Nuveen Risk Management & Valuations
Teachers Insurance and Annuity Association of America

Effective Date of the Appraisal:

December 1, 2019

Report Format:

Appraisal Report – Restricted Format

Prepared By:

**Newmark Knight Frank**
Valuation & Advisory
117 E. Colorado Blvd, Suite 200
Pasadena, CA 91105



# Newmark
# Knight Frank



December 2, 2019

Mr. Amin Shakya
Vice President
Nuveen Risk Management Management & Valuations
Teachers Insurance and Annuity Association of America

SUBJECT:     Market Value Appraisal
             Great Value Self-Storage Portfolio Valuation
             64 Locations Nationally
             NKF File No. 19-0012562

Dear Mr. Shakya:

Newmark Knight Frank Valuation & Advisory, LLC (herein "Firm" or "NKF") is pleased to submit the accompanying appraisal of the referenced portfolio of properties. The purpose of the appraisal is to develop an opinion of the market value of the leased fee interest in the portfolio of properties. The client for the assignment is TIAA, certain affiliates of TIAA including, among others, TIAA's asset management subsidiary, Nuveen, LLC ("Nuveen"), and the Account's independent fiduciary, RERC, LLC.

The appraisal is intended to conform with the Uniform Standards of Professional Appraisal Practice (USPAP), the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, applicable state appraisal regulations. The appraisal is also prepared in accordance with the appraisal regulations issued in connection with the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA).

Our analysis is presented in the following Restricted Appraisal Report. As a Restricted Appraisal Report, it cannot be fully understood without our complete workfile, and the depth of our analysis and presentation is limited per the agreement with the client.

The client provided the following source documents which were also relied upon and used in the Argus models in terms of existing tenancy, vacancies and contract rent:

❖  Occupancy Reports Dated September 2019

❖  2016, 2017, 2018, and 2019 Annualized Income and Expenses

**117 E. Colorado Blvd., Suite 200, Pasadena, CA 91105**
**www.ngkf.com**

Mr. Amin Shakya
December 2, 2019
Page 2

❖ Portfolio Summary inclusive of year built, number of units, and rentable area

❖ A portfolio valuation report completed of the subject property by CBRE

❖ The portfolio appears to be operating at stabilized levels on an economic basis despite physical vacancy being slightly higher over the past 12 months.

Based on the valuation analysis in the accompanying report, and subject to the definitions, assumptions, and limiting conditions expressed in the report, our opinion of value is as follows:

| Value Conclusion | | | |
| --- | --- | --- | --- |
| Value Type | Property Rights | Date of Value | Value Conclusion |
| Market Value As Is | Leased Fee | December 1, 2019 | $393,600,000 |

**Extraordinary Assumptions**

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1. As part of the scope of the assignment, no inspection was required. We relied on property information contained in an appraisal report prepared by CBRE dated November 8, 2018. We assume no material change as reported in this report and have confirmed this assumption with the asset manager from TIAA.

2. Assume the individual properties comprising the subject property are sold as a single entity (portfolio) and not individually.

**Hypothetical Conditions**

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1. None



Mr. Amin Shakya
December 2, 2019
Page 3

If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

**Newmark Knight Frank**

Steven Johnson, MAI
Executive Vice President
Certified General Real Estate Appraiser
Telephone: (626) 204-3755
California #AG039077
Email: steve.johnson@ngkf.com



# Table of Contents

**General Information**                           **2**
Identification of Subject                          2
Sale History                                       3
Pending Transactions                               4
Purpose of the Appraisal                           4
Definition of Fair Value                           4
Intended Use and User                              5
Scope of Work                                      6
   Exposure and Marketing Times      8
Self-Storage Market Analysis                       9
Portfolio Valuation                               26
   Discounted Cash Flow Analysis    34
   Income Approach Value Conclusion  40
Reconciliation and Conclusion of Value            41
   Exposure Time                    41
   Marketing Time                   41

**Certification**                                **42**

**Assumptions and Limiting Conditions**          **44**

**Addenda**
A.  Appraiser Qualifications
B.  Definitions
C.  Engagement Letter



# General Information

## Identification of Subject

The subject property, known as the Great Value Self-Storage Portfolio, is comprised of 64 self-storage facilities totaling 4,133,145 square feet of rentable area demised into 30,812 units equating to an average unit size of 134 square feet. The building improvements were built from 1973 to 2013 with an average of 1988. The portfolip appears to be operating at stabilized levels. The following table identifies the individual properties comprising the subject property.

| # | Property Name | City | State | Market | Acq. Date | Year Built | # Units | NRSF |
|---|---|---|---|---|---|---|---|---|
| | **Great Value Portfolio Summary** | | | | | | | |
| 1 | Canyon Lake | Canyon Lake | TX | San Antonio | Sep-08 | 2010 | 403 | 58,695 |
| 2 | San Benito | San Benito | TX | San Antonio | Aug-10 | 1978 | 387 | 46,000 |
| 3 | Allsafe | Austin | TX | Austin | Mar-08 | 1983 | 107 | 13,700 |
| 4 | Texas Storage Park | Austin | TX | Austin | Jun-08 | 1998 | 465 | 121,488 |
| 5 | Cedar Park | Cedar Park | TX | Austin | Oct-08 | 1985 | 165 | 29,390 |
| 6 | Leander | Leander | TX | Austin | Nov-09 | 1995 | 337 | 39,880 |
| 7 | Fort Worth North | Fort Worth | TX | Dallas-Fort Worth | May-11 | 1973 | 550 | 79,534 |
| 8 | Forth Worth South | Fort Worth | TX | Dallas-Fort Worth | May-11 | 1974 | 705 | 78,318 |
| 9 | Skillman | Dallas | TX | Dallas-Fort Worth | Aug-12 | 1973-1974 | 1,034 | 119,935 |
| 10 | Mesquite | Mesquite | TX | Dallas-Fort Worth | Aug-12 | 1985 | 575 | 62,175 |
| 11 | Samuell | Dallas | TX | Dallas-Fort Worth | Aug-12 | 1974 | 758 | 76,100 |
| 12 | Production | Dallas | TX | Dallas-Fort Worth | Oct-15 | 1974 | 60 | 102,922 |
| 13 | Westward | Houston | TX | Houston | Aug-12 | 1979 | 1,153 | 124,772 |
| 14 | Boone | Houston | TX | Houston | Aug-12 | 1979 | 384 | 46,300 |
| 15 | Cook | Houston | TX | Houston | Aug-12 | 1985 | 488 | 60,275 |
| 16 | Harwin | Houston | TX | Houston | Aug-12 | 1992 | 604 | 76,197 |
| 17 | Lowry | Texas City | TX | Houston | Aug-12 | 2001 | 465 | 55,550 |
| 18 | Gulf Freeway | Texas City | TX | Houston | Aug-12 | 2002-2003 | 497 | 56,000 |
| 19 | Antoine | Houston | TX | Houston | Aug-12 | 1984 | 638 | 74,185 |
| 20 | Hempstead | Houston | TX | Houston | Aug-12 | 1974 | 791 | 96,807 |
| 21 | Highway 249 | Houston | TX | Houston | Aug-12 | 1984 | 505 | 55,294 |
| 22 | Garth | Baytown | TX | Houston | Mar-13 | 1993 | 352 | 39,150 |
| 23 | Beechnut | Houston | TX | Houston | Mar-13 | 1977 | 614 | 100,560 |
| 24 | Fairmont I | La Porte | TX | Houston | Mar-13 | 1984 | 426 | 45,050 |
| 25 | Wirt Rd | Houston | TX | Houston | Mar-13 | 1973 | 392 | 70,100 |
| 26 | Fairmont II | Pasadena | TX | Houston | Feb-14 | 1985 | 283 | 34,500 |
| 27 | Marie | Deer Park | TX | Houston | Feb-14 | 1985 | 209 | 25,800 |
| 28 | Alabonson | Houston | TX | Houston | Feb-14 | 1984 | 348 | 50,230 |
| 29 | Rosslyn | Houston | TX | Houston | Feb-14 | 1973 | 264 | 63,470 |
| 30 | Timkin | Tomball | TX | Houston | Feb-14 | 1986 | 212 | 45,719 |
| 31 | West Hardy | Houston | TX | Houston | Feb-14 | 1984 | 266 | 32,300 |
| 32 | Kukendahl | Houston | TX | Houston | Aug-14 | 1983 | 708 | 102,600 |
| 33 | Bay Street | Texas City | TX | Houston | Sep-16 | 1987 | 399 | 93,150 |
| 34 | Loop 197 | Texas City | TX | Houston | Sep-16 | 1982 | 414 | 38,257 |
| 35 | Trotwood | Dayton | OH | Dayton | Nov-12 | 1999 | 393 | 48,349 |
| 36 | Dayton | Dayton | OH | Dayton | Nov-12 | 1978 | 344 | 43,300 |
| 37 | Westpark | Centerville | OH | Dayton | Nov-12 | 1973-1975 | 303 | 43,500 |
| 38 | Congress Park | Centerville | OH | Dayton | Nov-12 | 1978 | 635 | 80,740 |
| 39 | Miamisburg | Miamiburg | OH | Dayton | Nov-12 | 1982 | 424 | 59,930 |
| 40 | Mason | Mason | OH | Cincinnati | Nov-12 | 1989 | 289 | 34,025 |



| 41 | Boardman | Boardman | OH | Cleveland | Nov-12 | 1990 | 514 | 65,695 |
| 42 | Youngstown | Youngstown | OH | Cleveland | Nov-12 | 1980 | 527 | 66,150 |
| 43 | Taylor Road | Reynoldsburg | OH | Columbus | Mar-14 | 2013 | 440 | 87,860 |
| 44 | Tussing Road | Reynoldsburg | OH | Columbus | Mar-14 | 2013 | 613 | 58,138 |
| 45 | Mansfield | Mansfield | OH | Columbus | May-15 | 1988 | 385 | 41,602 |
| 46 | Polaris | Lewis Center | OH | Columbus | May-15 | 2003 | 653 | 74,987 |
| 47 | Minerva Park | Columbus | OH | Columbus | May-15 | 1996 | 523 | 65,585 |
| 48 | Tamarack Circle | Columbus | OH | Columbus | May-15 | 1997 | 457 | 49,771 |
| 49 | Worthington | Worthington | OH | Columbus | May-15 | 2000 | 462 | 54,481 |
| 50 | Georgesville | Columbus | OH | Columbus | May-15 | 1997 | 599 | 65,290 |
| 51 | Brandon | Brandon | MS | Jackson | Sep-15 | 2003 | 575 | 77,350 |
| 52 | Hattiesburg | Hattiesburg | MS | Jackson | Sep-15 | 1994 | 586 | 83,150 |
| 53 | Flowood | Flowood | MS | Jackson | Sep-15 | 2008 | 646 | 76,755 |
| 54 | Hyde Park | Hyde Park | NY | New York | Aug-15 | 2007 | 251 | 27,725 |
| 55 | Newburgh | Newburgh | NY | New York | Aug-15 | 2005 | 481 | 63,162 |
| 56 | Convington Pike | Memphis | TN | Memphis | Nov-11 | 1984 | 297 | 49,025 |
| 57 | Lamar | Memphis | TN | Memphis | Oct-13 | 1973 | 470 | 59,550 |
| 58 | Commerce City | Commerce City | CO | Denver | Jun-17 | 1996-1997 | 404 | 61,530 |
| 59 | Aurora | Aurora | CO | Denver | Jun-17 | 1984 | 307 | 42,190 |
| 60 | Urbana | Urbana | IL | Chicago | Apr-15 | 2003 | 647 | 80,884 |
| 61 | Champaign | Champaign | IL | Chicago | Apr-15 | 2005 | 739 | 83,060 |
| 62 | Las Vegas | Las Vegas | NV | Las Vegas | Dec-12 | 1982 | 694 | 131,744 |
| 63 | Post Road | Indianapolis | IN | Indianapolis | Mar-13 | 1978 | 716 | 73,214 |
| 64 | Marion Ridge | Kansas City | MO | Kansas City | Jun-12 | 1997 | 480 | 70,000 |
| **Total/Avg** | | | | | | **1988** | **30,812** | **4,133,145** |

*Compiled by NKF*





## Sale History/Pending Transaction

Details regarding prior sales of the subject property were not provided to the appraiser. To the best of our knowledge, there has been no other ownership transfer of the property during the previous three years. To the best of our knowledge, the property is not under contract of sale nor is it being marketed for sale.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the market value of the leased fee interest in the portfolio of properties. The client for the assignment is TIAA, certain affiliates of TIAA including, among others, TIAA's asset management subsidiary, Nuveen, LLC ("Nuveen"), and the Account's independent fiduciary, RERC, LLC.

## Definition of Value

Market value is defined as:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)."*



## Appraisal Report

This appraisal is presented in the form of a restricted appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of USPAP. The use of this report is limited to the client and the intended user should note that the rationale for how the opinions and conclusions set forth in the report may not be understood properly without additional information in the appraiser's workfile.

## Definition of Property Rights Appraised

Leased fee interest is defined as, "A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease)."

*(Source: The Dictionary of Real Estate Appraisal, Fifth Edition, Appraisal Institute, Chicago, Illinois, 2010)*

## Intended Use and User

The intended use of the appraisal is to fulfill reporting requirements for the Account, as well as for asset management monitoring purposes. The intended users are TIAA, certain affiliates of TIAA including, among others, TIAA's asset management subsidiary, Nuveen, LLC ("Nuveen"), and the Account's independent fiduciary, RERC, LLC.

## Scope of Work

To determine the appropriate scope of work for the assignment, we considered the intended use of the appraisal, the needs of the user, the complexity of the property, and other pertinent factors. Our concluded scope of work is described below.

## Extent to Which the Property is Inspected

NKF did not inspect the subject property as part of this study.

## Highest and Best Use

### As Vacant Land

As vacant land, the highest and best use is for self-storage.

### As Improved

As improved, the highest and best use is for continued self-storage use.



## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.

In valuing the portfolio, we considered the applicability of all three commonly recognized approaches to value: Cost Approach, Income Capitalization Approach and the Sales Comparison Approach. Our valuation of the portfolio relied primarily upon the income approach with consideration to direct capitalization and discounted cash flow analyses. The conclusion derived using this approach was then tested for reasonableness using the sales comparison approach. Assets in our appraisal include land, land improvements, and building improvements.

The specific actions taken by NKF in valuing the portfolio of properties included the following:

• For the portfolio, NKF reviewed operating statements for years 2016 through September 2019 as well as an occupancy summary.

• Site inspections were not conducted on each facility within the portfolio.

• NKF has relied upon operating performance data from self-storage REITs as well as Trepp CRE Data to determine the competitiveness of the market conditions in market areas.

## Exposure and Marketing Times

Our estimates of exposure and marketing times are as follows:

| Exposure Time and Marketing Period | |
|---|---|
| Exposure Time (Months) | 6 |
| Marketing Period (Months) | 6 |

## Significant Appraisal Assistance

It is acknowledged Andrew Totaro provided significant professional contribution to this appraisal consisting of data collection, certain analytical processes, all under the supervision of the signing appraiser.



## Self Storage Market Analysis
## US Market Overview

Self-storage inventory has grown every year since the property sector's inception with healthy facility growth noted from 2015 to 2018. Due to the Great Recession, the number of facilities added to the market had decreased significantly from 2008 to 2014 with only 9.8% inventory growth during this time. The large amount of inventory added to the market just prior to the recession, coupled with the economic impacts of the recession, caused self-storage performance to decline.  The Great Recession marked the first time the storage industry saw wide scale decline in performance and revenue.

Many in the self-storage industry agree that the existing self-storage market nationally is not presently keeping up with current demand levels and can absorb new self-storage development in most metro areas. Several metro areas across the country are now seeing storage facilities coming on line or under construction. The Self Storage Almanac estimated that that 436 new facilities were constructed nationwide in 2016, with 2,270 facilities estimated to have been added in 2017 and 1,398 facilities added in 2018. Storage construction in all major markets is expected to continue throughout 2019 but will most likely be at lower levels in comparison to the past two years.

| National Self Storage Market Inventory | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| Total Facilities | 49,356 | 50,048 | 50,859 | 52,151 | 51,467 | 41,433* | 41,879 | 44,149 | 45,547 |
| Average SF Per Capita | 7.31 | 7.41 | 7.55 | 7.35 | 8.32 | 6.77 | 6.82 | 7.06 | 5.4 |

*Compiled by NKF*

*\* Since 2015, SS Almanac only reports facilities in which self-storage represents core business*

Source: Self-Storage Almanac

*Since 2015, and moving forward, the self storage almanac only reports facilities in which self-storage is the core business at the address.  The almanac adopted new guidelines for calculating the number of units, facilities, square footage in 2015, and therefore average rentable SF per capita.*

The amount of inventory per capita in any one market is not considered to be a benchmark of supply and demand to be used in every local market. Each market is unique and is impacted by various demand generators.  The inventory per capita in one market can be quite low but it may have vacancy which is high.  The opposite can be true for markets with very high inventory per capita.

Viewing inventory on a national level, Public Storage represents about 5.8% of the total number of facilities.  Per the current Self Storage Almanac, the six public companies control about 18% of the national inventory of total facilities.  The top 10

Great Value Self-Storage Portfolio Valuation



owned companies control 27% of the total facilities, with smaller companies still controlling the majority of facilities with a 73% ownership share. Therefore, it is evident that the majority of the self-storage market is still impacted significantly by smaller operators.

## REIT Performance

The following is a comparison of the 2015 through Q2 2019 performance of the five self-storage REITS: Public Storage, Extra Space Storage, Life Storage (Sovran), Cube Smart, and NSA.

### Self-Storage REIT Performance Trends

| Year | SF | Public Storage | Ann. % Chg. | Extra Space | Ann. % Chg. | Life Storage | Ann. % Chg. | Cube Smart | Ann. % Chg. | NSA | Ann. % Chg. | Combined | Ann. % Chg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | # Properties | 1,990 | | 564 | | 417 | | 353 | | | | 3,324 | |
| | Total SF | 127,000,000 | | 36,936,517 | | 26,812,000 | | 23,800,000 | | | | 214,548,517 | |
| | Avg. Occ % | 94.5% | 0.6% | 92.8% | 1.5% | 90.0% | 0.9% | 91.6% | 1.5% | | | 93.3% | 1.1% |
| | Ann. Rent Occ. SF | $15.77 | 5.9% | | | $12.94 | 6.1% | $14.63 | 5.7% | | | $14.45 | 5.9% |
| | Total Revenue $ | $1,987,725,000 | 6.4% | $662,213,000 | 9.3% | $340,749,000 | 6.2% | $415,343,000 | 7.3% | | | $3,406,030,000 | 7.3% |
| | Total Oper. Exp. | $514,237,000 | 1.8% | $187,939,000 | 3.1% | $106,030,000 | 2.3% | $127,209,000 | 2.3% | | | $935,415,000 | 2.4% |
| | Exp. Ratio % | 25.9% | -1.3% | 28.4% | -1.7% | 31.1% | -1.1% | 30.6% | -1.4% | | | 27.5% | -1.4% |
| | Net Operating Income | $1,473,488,000 | 8.5% | $474,274,000 | 11.9% | $234,719,000 | 7.9% | $288,134,000 | 9.6% | | | $2,470,615,000 | 9.5% |
| 2016 | # Properties | 2,000 | | 564 | | 417 | | 407 | | 222 | | 3,610 | |
| | Total SF | 127,000,000 | | 36,936,517 | | 27,800,000 | | 27,800,000 | | 12,300,000 | | 225,719,517 | |
| | Avg. Occ % | 94.5% | 0.0% | 91.5% | -0.8% | 90.4% | 0.4% | 91.8% | 0.2% | 89.9% | | 93.6% | -0.1% |
| | Ann. Rent Occ. SF | $16.54 | 5.6% | | | $13.35 | 3.7% | $15.48 | 6.4% | $11.02 | | $14.10 | 5.2% |
| | Total Revenue $ | $2,133,356,000 | 5.5% | $790,864,000 | 6.9% | $371,179,000 | 5.2% | $469,666,000 | 7.0% | $162,109,000 | | $3,927,174,000 | 6.2% |
| | Total Oper. Exp. | $540,524,000 | 2.5% | $223,173,000 | 1.1% | $118,888,000 | 1.9% | $135,366,000 | 4.3% | $52,034,000 | | $1,069,985,000 | 1.3% |
| | Exp. Ratio % | 25.3% | 1.1% | 28.2% | -1.6% | 32.0% | -1.0% | 28.8% | -2.1% | 32.1% | | 27.2% | -0.9% |
| | Net Operating Income | $1,592,832,000 | 6.6% | $567,691,000 | 9.2% | $252,291,000 | 6.7% | $334,300,000 | 10.2% | $110,075,000 | | $2,857,189,000 | 8.2% |
| 2017 | # Properties | 2,042 | | 701 | | 430 | | 432 | | 277 | | 3,882 | |
| | Total SF | 130,300,000 | | 35,856,150 | | 21,994,500 | | 29,600,000 | | 16,720,466 | | 234,471,116 | |
| | Avg. Occ % | 93.8% | -0.7% | 91.9% | 0.4% | 91.0% | 0.6% | 91.7% | -0.1% | 89.6% | -0.3% | 92.6% | 0.0% |
| | Ann. Rent Occ. SF | $17.19 | 3.9% | | | $13.31 | -0.4% | $16.48 | 4.3% | $11.16 | 5.8% | $14.66 | 3.4% |
| | Total Revenue $ | $2,196,373,000 | 3.0% | $831,453,000 | 5.1% | $377,491,000 | 1.7% | $490,421,000 | 4.4% | $171,326,000 | 5.7% | $4,067,064,000 | 4.0% |
| | Total Oper. Exp. | $558,939,000 | 3.4% | $224,353,000 | 0.5% | $123,710,000 | 4.1% | $139,092,000 | 2.8% | $53,045,000 | 1.9% | $1,099,139,000 | 2.5% |
| | Exp. Ratio % | 25.4% | -0.1% | 27.0% | 1.2% | 32.8% | 0.7% | 28.4% | -0.4% | 31.0% | -1.1% | 27.0% | 0.1% |
| | Net Operating Income | $1,637,434,000 | 2.8% | $607,100,000 | 6.9% | $253,781,000 | 0.6% | $351,329,000 | 5.1% | $118,281,000 | 7.5% | $2,967,925,000 | 4.6% |
| 2018 | # Properties | 2,046 | | 783 | | 521 | | 456 | | 376 | | 4,182 | |
| | Total SF | 131,000,000 | | 60,246,829 | | 33,304,329 | | 32,127,048 | | 20,949,334 | | 277,827,540 | |
| | Avg. Occ % | 93.2% | -0.6% | 91.8% | 0.1% | 90.4% | -1.0% | 92.7% | -0.2% | 89.0% | -0.2% | 92.3% | -0.4% |
| | Ann. Rent Occ. SF | $17.54 | 1.8% | | | $14.09 | 3.8% | $16.60 | 3.6% | $12.02 | 4.1% | $15.06 | 3.3% |
| | Total Revenue $ | $2,242,755,000 | 1.5% | $958,797,000 | 3.8% | $494,495,000 | 3.4% | $533,309,000 | 3.3% | $251,811,000 | 4.0% | $4,481,167,000 | 3.2% |
| | Total Oper. Exp. | $579,520,000 | 3.2% | $262,604,000 | 2.3% | $160,750,000 | 1.7% | $152,442,000 | 3.5% | $79,591,000 | 2.6% | $1,234,907,000 | 2.7% |
| | Exp. Ratio % | 25.8% | 0.4% | 27.4% | 0.4% | 32.5% | -0.5% | 28.6% | 0.1% | 31.6% | -0.5% | 27.6% | 0.0% |
| | Net Operating Income | $1,663,235,000 | 0.9% | $696,193,000 | 4.4% | $333,745,000 | 4.1% | $380,867,000 | 3.3% | $172,220,000 | 4.7% | $3,246,260,000 | 3.5% |
| 3Q 2019 | # Properties | 2,159 | | 821 | | 504 | | 467 | | 439 | | 4,390 | |
| | Total SF | 139,300,000 | | 60,246,829 | | 33,141,700 | | 32,400,000 | | 25,212,272 | | 290,300,801 | |
| | Avg. Occ % | 94.2% | 0.4% | 91.8% | 0.0% | 90.7% | -1.1% | 93.1% | -0.1% | 90.8% | 0.3% | 93.4% | -0.1% |
| | Ann. Rent Occ. SF | $17.82 | 0.7% | | | $14.82 | 2.8% | $17.15 | 1.1% | $12.06 | 3.3% | $15.44 | 2.0% |
| | Total Revenue $ | $611,227,000 | 1.1% | $262,739,000 | 3.3% | $122,790,000 | 1.9% | $143,266,000 | 1.5% | $76,015,000 | 3.7% | $1,216,037,000 | 2.3% |
| | Total Oper. Exp. | $170,865,000 | 5.1% | $73,731,000 | 6.6% | $40,043,000 | 0.2% | $41,454,000 | 5.3% | $22,595,000 | 2.7% | $348,688,000 | 4.0% |
| | Exp. Ratio % | 28.0% | 1.5% | 28.1% | 0.9% | 32.6% | -0.5% | 28.9% | 1.0% | 29.7% | 0.3% | 28.7% | 0.6% |
| | Net Operating Income | $440,362,000 | -0.9% | $189,008,000 | 2.1% | $82,747,000 | 2.6% | $101,812,000 | 0.1% | $53,420,000 | 4.2% | $867,349,000 | 1.6% |

*Percent-change figures based upon same quarter prior year change

*Compiled by NKF*

### Aggregate REIT Performance - Same Store Operation
### Public Storage, Extra Space, LifeStorage, CubeSmart & NSA

| Period | Facility Count | Occupancy Change | Revenue Change | Expense Change | NOI Change |
|---|---|---|---|---|---|
| 3Q19 | 4,390 | -0.1% | 2.3% | 4.0% | 1.6% |
| 2Q19 | 4,397 | -0.3% | 3.0% | 3.0% | 3.0% |
| 1Q19 | 4,414 | 0.1% | 3.1% | 2.3% | 3.5% |
| 4Q18 | 4,186 | -0.3% | 3.1% | 3.2% | 3.0% |
| 2018 | 4,182 | -0.4% | 3.2% | 2.7% | 3.5% |
| 2017 | 3,882 | 0.0% | 4.0% | 2.5% | 4.6% |
| 2016 | 3,610 | -0.1% | 6.2% | 1.3% | 8.2% |
| 2015 | 3,324 | 1.1% | 7.3% | 2.4% | 9.5% |
| 2014 | 3,154 | 1.5% | 6.9% | 3.0% | 8.7% |

*Compiled by NKF*

Great Value Self-Storage Portfolio Valuation



The data presented for these five REITs account for nearly 4,400 self-storage facilities nationwide. These facilities are typically above average quality investments in their respective markets.  The analysis of their performance gives an effective assessment of the overall trends in the self-storage industry. As can be seen in the tables above, a change began occurring starting the third quarter 2016, as the market reached stabilization after the previous recession.  Occupancy peaked, and revenue is increasing at a lower rate in comparison to the past four years.  Each passing quarter brings about slightly slower revenue growth, which is the case through the first two quarters of 2019.

All REITs combined experienced increasing square foot occupancy from 91.7% in 2014 to late 2016 in the 93% range.  When observing year over year data, occupancy continues to lower slightly with 2018 averaging 92.3%, 0.4% lower than the 2017 average. The most recent Third Quarter 2019 data represents slightly lower occupancy by -0.1% compared with the same quarter a year ago, averaging 93.4%.

Total revenue growth is up 2.3% year over year, the slowest observed in the past several years. Expenses were also up 4.0% this past year, up from the year prior at 2.7%.  This is a fairly significant increase, primarily due to property taxes. It is for this reason that NOI growth remains at only 1.6% year over year.  It is apparent that the slowing revenue trend continues through the most recent quarter and we anticipate this to continue on average across the nation, although it may be slowing, indicating a bottom may be in sight in the quarters ahead.

The self-storage industry appears to have reached a mature portion of its cycle and may be nearing the end of its expansion stage after several years of occupancy and revenue recovery.  As additional inventory is added to select markets, revenue growth will likely continue to slow (on a general basis nationally).  The development cycle began with deliveries in 2016, and these facilities are now reaching stabilization. Those built from 2017 to 2019 are currently in lease up, or at the end of lease up.  It is the consensus of the industry that there will be fewer deliveries in 2019 and 2020 than in 2018.  Therefore, the impact of slowing rent is likely going to continue into the coming year or two ahead.  However, population growth should balance the impact of new supply in the coming years.

Many market participants worry about a correction in the overall real estate market in the coming year or two.  Given that self-storage facilities have proven to perform better than any other asset class through a downturn, they have attracted a wide amount of interest since the Great Recession.  Storage continues to provide some of the top returns of any other property type over the past 25 years, and statistically has one of the lowest loan default rates.  Self-storage is and will continue to be a choice asset for investors to "park" capital in the years ahead.

Great Value Self-Storage Portfolio Valuation



## Occupancy Trends

The self-storage market is cyclical, and demand fluctuates throughout the year in the majority of markets.  It is typical for spring and summer months to generate the highest demand as this is when the highest volume of household transition occurs.

Shown below is a history of quarterly occupancy information for each region of the nation as well as the U.S. Average occupancy levels as provided through REIS.  This includes both REIT and non-REIT properties.

**OCCUPANCY TRENDS**

| Region | 3Q16 | 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 3Q16 | 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Southwest | 89.0% | 87.8% | 87.2% | 88.1% | 87.3% | 86.1% | 85.8% | 86.3% | 85.7% | 84.6% | 84.4% | 85.8% | 85.3% | -1.9% | -1.2% | -0.6% | 0.9% | -0.8% | -1.2% | -0.3% | 0.5% | -0.6% | -1.1% | -0.2% | 1.4% | -0.5% |
| South Atlantic | 90.2% | 89.5% | 88.9% | 90.2% | 89.6% | 88.0% | 87.5% | 88.3% | 87.4% | 85.5% | 85.5% | 86.8% | 86.1% | -1.0% | -0.7% | -0.6% | 1.3% | -0.6% | -1.6% | -0.5% | 0.8% | -0.9% | -1.9% | 0.0% | 1.3% | -0.7% |
| Northeast | 89.8% | 88.9% | 88.6% | 90.0% | 89.1% | 87.9% | 87.7% | 88.7% | 88.2% | 86.4% | 86.2% | 87.7% | 87.0% | -0.7% | -0.9% | -0.3% | 1.4% | -0.9% | -1.2% | -0.2% | 1.0% | -0.5% | -1.8% | -0.2% | 1.5% | -0.7% |
| Midwest | 90.0% | 88.8% | 88.4% | 89.6% | 89.1% | 87.6% | 87.5% | 88.1% | 87.7% | 86.2% | 86.3% | 87.0% | 87.0% | 0.0% | -1.2% | -0.4% | 1.2% | -0.5% | -1.5% | -0.1% | 0.6% | -0.4% | -1.5% | 0.1% | 0.7% | 0.0% |
| West | 91.7% | 91.1% | 91.0% | 91.8% | 91.8% | 91.3% | 89.9% | 90.5% | 90.0% | 88.7% | 88.5% | 89.0% | 88.8% | -0.3% | -0.6% | -0.1% | 0.8% | 0.0% | -0.5% | -1.4% | 0.6% | -0.5% | -1.3% | -0.2% | 0.5% | -0.2% |
| U.S. Average | 88.1% | 89.6% | 89.2% | 90.3% | 89.6% | 88.4% | 88.0% | 88.7% | 88.1% | 86.6% | 87.3% | 87.4% | 87.0% | -3.1% | 1.5% | -0.4% | 1.1% | -0.7% | -1.2% | -0.4% | 0.7% | -0.6% | -1.5% | 0.7% | 0.1% | -0.4% |

Source: REIS 3Q2019

*Compiled by NKF*



Occupancy generally decreases the first and fourth quarter in each area due to the storage market being cyclical.  It is common even in an upward-trending market to have some decreases in occupancy during these months as demand is cyclical. It is apparent that second quarter has represented the only quarter with occupancy increases in recent years, which is a sign of continued slow occupancy loss across the nation.

Softening occupancy in most areas of the country appears to be a direct result of increased competition entering the market (depending on the market).  The most sophisticated operators are raising and lowering their rates in response to occupancy on a weekly or even daily basis in order to counteract seasonal fluctuation and optimize operations. It is evident when observing the above data that occupancy has decreased on between 2.8% and 4.1% depending on the market the past few years, and about 1.1% this past year.



# Rental Rate Trends

The following rental rate data is provided by REIS and indicates historic changes in the average asking rental rates for both non-climate and climate-controlled units in each of the U.S. regions.

| ASKING RENT PSF TRENDS | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rental Rate Trends | | | | | | | | | | | | | Quarter to Quarter % Change | | | | | | | | | | | | |
| Region | 3Q16 | 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 3Q16 | 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 |
| **Non-Climate Controlled Space** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Southwest | $0.94 | $0.92 | $0.93 | $0.94 | $0.91 | $0.93 | $0.94 | $0.92 | $0.90 | $0.91 | $0.91 | $0.91 | $0.88 | -1.4% | -1.9% | 1.0% | 1.4% | -1.8% | -1.7% | 2.3% | 0.5% | -1.7% | -2.0% | 0.4% | 0.0% | -3.1% |
| South Atlantic | $1.07 | $1.05 | $1.07 | $1.09 | $1.08 | $1.06 | $1.08 | $1.10 | $1.08 | $1.06 | $1.07 | $1.08 | $1.05 | -1.0% | -1.7% | 1.6% | 2.3% | -1.5% | -1.5% | 2.1% | 1.3% | -1.6% | -1.9% | 1.2% | 0.1% | -2.3% |
| Northeast | $1.47 | $1.45 | $1.47 | $1.51 | $1.49 | $1.48 | $1.51 | $1.55 | $1.53 | $1.50 | $1.53 | $1.54 | $1.52 | -1.5% | -1.8% | 1.6% | 2.7% | -1.0% | -1.2% | 2.4% | 2.4% | -1.1% | -2.0% | 1.7% | 0.7% | -1.5% |
| Midwest Region | $0.99 | $0.97 | $0.98 | $1.01 | $1.00 | $0.98 | $1.00 | $1.02 | $1.00 | $0.98 | $1.00 | $1.01 | $0.99 | -0.9% | -1.9% | 1.2% | 2.5% | -1.3% | -1.3% | 2.2% | 1.4% | -1.4% | -2.2% | 1.7% | 1.0% | -1.6% |
| West | $1.41 | $1.39 | $1.42 | $1.45 | $1.43 | $1.42 | $1.46 | $1.48 | $1.46 | $1.43 | $1.46 | $1.48 | $1.45 | 0.3% | -1.2% | 2.1% | 2.2% | -1.4% | -1.1% | 3.0% | 1.2% | -1.3% | -1.7% | 2.0% | 0.9% | -1.7% |
| U.S. Average | $1.20 | $1.19 | $1.21 | $1.23 | $1.22 | $1.20 | $1.23 | $1.25 | $1.23 | $1.21 | $1.23 | $1.24 | $1.21 | -0.5% | -1.5% | 1.7% | 2.2% | -1.4% | -1.3% | 2.5% | 1.3% | -1.4% | -1.9% | 1.6% | 0.6% | -2.0% |
| **Climate Controlled Space** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Southwest | $1.35 | $1.31 | $1.32 | $1.34 | $1.32 | $1.34 | $1.30 | $1.27 | $1.27 | $1.27 | $1.27 | $1.27 | $1.24 | -1.7% | -2.7% | 0.5% | 1.8% | -1.4% | -2.3% | 1.9% | 1.2% | -2.6% | -2.7% | -0.1% | 0.3% | -3.0% |
| South Atlantic | $1.49 | $1.46 | $1.48 | $1.52 | $1.50 | $1.47 | $1.49 | $1.51 | $1.49 | $1.46 | $1.47 | $1.48 | $1.45 | -1.3% | -1.9% | 1.1% | 2.6% | -1.0% | -1.9% | 1.5% | 1.4% | -1.7% | -2.3% | 1.0% | 0.8% | -2.2% |
| Northeast | $1.96 | $1.91 | $1.94 | $1.99 | $1.97 | $1.93 | $1.99 | $2.03 | $2.00 | $1.95 | $1.96 | $1.98 | $1.96 | -1.4% | -2.5% | 1.5% | 2.6% | -1.0% | -2.0% | 2.6% | 2.1% | -1.4% | -2.5% | 0.5% | 0.6% | -0.9% |
| Midwest | $1.47 | $1.43 | $1.44 | $1.47 | $1.46 | $1.43 | $1.46 | $1.48 | $1.45 | $1.42 | $1.45 | $1.46 | $1.42 | 0.1% | -2.9% | 0.8% | 2.2% | -0.9% | -1.9% | 2.0% | 1.6% | -2.2% | -2.6% | 2.1% | 1.3% | -2.8% |
| West | $1.59 | $1.58 | $1.61 | $1.65 | $1.63 | $1.61 | $1.64 | $1.67 | $1.65 | $1.62 | $1.64 | $1.66 | $1.63 | 0.1% | -0.8% | 1.5% | 2.6% | -0.9% | -1.6% | 2.1% | 2.0% | -1.3% | -2.5% | 1.2% | 1.4% | -1.8% |
| U.S. Average | $1.55 | $1.52 | $1.54 | $1.58 | $1.56 | $1.53 | $1.56 | $1.59 | $1.56 | $1.52 | $1.54 | $1.55 | $1.52 | -1.0% | -2.1% | 1.1% | 2.4% | -1.1% | -1.9% | 1.9% | 1.6% | -1.7% | -2.4% | 0.9% | 0.8% | -2.0% |

Source: REIS 3Q

*Compiled by NKF*

On a national basis, asking rent changed 0.6% / -2.1% respectively from Third Quarter 2016 to Third Quarter 2019 for both non-climate-controlled and climate and space. Over the past year, asking rental rates have decreased (-1.6%) for non-climate-controlled space and decreased slightly (-2.6%) for climate controlled and space. Every market area across the country posted decreases during this period, similar to the same quarter in past years, just more to a higher degree.

# Non-Climate-Controlled Space



Non-climate controlled space peaked nationally in Second Quarter 2018 and has decreased slightly at a rate of -1.6% over the past twelve months. The highest rental rates are found in the Northeast and West Regions. The lowest rental rates are found in the Southwest and Midwest regions.



## Climate Controlled Space



Climate controlled asking rents also peaked nationally in Second Quarter 2018 and have decreased -2.6% over the past year. It is apparent that the market sentiment at the moment is that the future is likely more volatile than the past, both in regards to real estate and the stock market. These are two major influencing factors in overall personal wealth which impact consumer confidence.

## Rental Rate Conclusion Discussion

Rental rate increases have slowed over the past two years and have turned negative in all regions, at a pace this most recent quarter that is more amplified than during the same quarters in past years.  The market appears to have reached a peak in mid to late 2016 and has slowed since.  Inventory has been added to the market and over the past year, the stock market has become subject to greater fluctuation.  It should be noted the previous data tables represent asking rents only and differs from the indicators by the REIT data, as revenue data represents mainly contract income.  It is widely known that contract rent growth outpaces asking rental rate growth.

Overall, the trend is downward.  However, it is noted that the market is still very strong for self-storage. There is much demand for the product type, both by consumers and by investors.

## Self-Storage Market Activity

Brokers that specialize in self-storage properties continue to report a limited number of properties available.  The lack of available product has caused widespread capitalization rate compression to levels, which are historically low.  With revenue returning or surpassing pre-recession levels, and overall rates being at record lows, values are at or exceeding all-time highs.

The large ramp-up in occupancy and rental rates the past several years appears to have come to an end.  The shift began to occur in late 2016 / early 2017 with slower



growth being realized nearly each quarter since.   The average marketing and exposure time has decreased over the past three years from 3 to 9 months to about 2 to 6 months.  Well-priced and performing assets are requiring minimal marketing and exposure time and at times are shopped quietly to a select group of potential buyers.  Desirable properties are selling quickly and sometimes at prices at or above asking with multiple offers.

Most investors are differentiating between Class A properties and lower tier properties. This has caused capitalization rates for Class A properties to dip more significantly than other classes of properties, but all property classes have seen some level of downward movement in rates over the past two to three years. Class A properties typically exhibit the lowest capitalization rates not only because they are in the best markets and are most desirable, but also because of who is purchasing them. Typically these buyers have other facilities in the same market, which generates economies of scale in operation. This has some level of downward impact on capitalization rates. The prices paid for facilities in higher income and density areas of New York, San Francisco Bay, and Los Angeles are some of the highest on record for both per square foot cost and overall sale price.  A recent purchase in Los Angeles was in the $600 PSF+ range.

## Capitalization Rate Trend

Nationwide, the underlying fundamentals of self-storage remain strong and sales of non-Class A facilities continue to indicate average cap rates in the 5% to 6% range, on par with investor surveys and newsletters.  Buyers still anticipate future income and occupancy for good quality facilities to be increasing to some degree, leading to an expectation of real returns above near or above 6% to 6.5% within the first year after purchase.  Some recent purchases have resulted in overall rates in the mid 5% range or lower.  Many of these types of purchases are value-add deals where buyers recognize the lack of adequate management, rent increases and feel they can obtain greater performance.   Class A facilities which are truly investment grade are commanding the lowest rates, generally in the 4.5% - 5.5% range, or lower in the best markets.

Sometimes sales with low overall rates are portfolio transactions of high quality facilities which are geographically centered to take advantage of economies of scale in operation.  When these very low overall rates in the high 4% to 5% range are analyzed, many indicate they are not true market cap rates for stabilized properties. Many of these sales involve above average buyer motivation, expenses which are above market therefore indicating upside, or economies of scale in operation typically by purchasers who own multiple properties in the same market.



Overall rates in secondary and tertiary markets are being compressed to within 25 to 50 basis points of urban and higher density suburban areas. This is due in part to secondary market areas typically recovering later that the urban and high density suburban markets in key regions of the country. Most secondary markets across the country are trialing in terms of new constriction resulting in healthy levels of pent up demand and rental growth in some of these more outlying market areas.

## National Sales Activity Survey and Review

Overall rates have been relatively flat over the past 24+ months as demand for storage facilities has been tempered by significant new construction in most markets. Those facilities with overall rates which are above 7.5% are typically small, are located in secondary markets, and considered Class C properties.

Many in the industry agree that there is bifurcation in overall rates depending on the class of asset, but that bifurcation has narrowed in recent months. In our conversations with owners/operators, buyers, brokers, mortgage brokers, all agreed an acceptable range of overall rate for self-storage properties nationwide was as follows:

Class A: 4.5% - 5.25% (value-add deals have been seen under 5% in some areas)
Class B: 5.0%-6.75% (depending on location and amount of perceived upside by investors)
Class C: 5.5%-6.75%+
Class A facilities are the top performing assets located in high rent and occupancy markets. Most of these facilities are centered in high density locations within major MSA's. These are properties which are rarely offered on the market. When they are offered, most buyers are operators with large portfolios such as REITs. These facilities are owned by the most sophisticated operators who likely have other facilities in the same market and typically have economies of scale in their operation reflected in facility pricing. NOI per square foot is generally over $10.00.

Class B facilities perform well but are in more average markets in comparison with Class A locations. These facilities are typically adequately maintained and are purchased by local or national investors. NOI per square foot is generally between $5.00 and $10.00.

Class C facilities are the remaining facilities. These investments are typically located in lower density areas and can be in markets that have higher vacancy and competition levels. They often owned by less sophisticated operators that are sometimes referred to as "Ma and Pa" type of operations. NOI PSF is generally below $5.00.



## Summary:

-Overall, market sentiment is still quite strong despite measurable slowing.

-Those markets with no inventory additions should continue to perform at historically high levels.

-Overall capitalization rates are at record lows and appear to have reached a point of stabilization.

-Interest rates are key to future upward movement of capitalization rates.  Most in the industry were of the opinion that interest rates would increase through the end of 2019, but the opposite occurred. Therefore, additional inventory appears to be the greatest threat to investors in the near-term.

-There is still limited product available for sale, fueling investor demand.

-There is more money chasing storage today than at any time in history.

-Investors are more bullish in regards to entering secondary markets today than in the past due to strong performance and lack of available product.

-New storage construction continues in many of the Metro areas across the country, with some markets becoming oversupplied.

-Market participants are cautiously optimistic about the near term but are re-thinking their investment strategies.  Many of the primary fears (higher interest rates / risk of recession) have not come to fruition.

## Our Projections:

-Overall capitalization rates are expected to remain at historically low levels through the end of 2019 and into the start of 2020.  Investor rates of return will increase when interest rates increase.  This was thought to have occurred by now.  However, rates remain near historic lows.

-Occupancy stabilized and been decreasing slowly.  Rental rates are following a similar trend as the most recent data indicates general slowing year over year.  Therefore, we are likely to see slight decreasing revenue trends in the immediate future on a year over year percentage basis.

-Values will remain at historically high levels in the near term.

-New product deliveries may have peaked as the pace for the remainder of 2019 and start to 2020 is anticipated to be slower.

-Fewer sales are likely to occur the remainder of the year as there is still a divide between buyer and seller expectations.  There are currently more buyers than sellers.



-Markets with significant inventory expansion that are not being matched by high levels of population growth are likely to see revenue declines year over year, due to slight or moderate inventory imbalance.

-New projects added in 2016 and early 2017 are reaching stabilization while many projects added in 2018-2019 are still in lease up. In short, the market will be in a state of absorbing new space for at least another two to three years based on the trend of current and recent deliveries.



## Portfolio Sales

Below is a summary of portfolio sales transactions which have occurred since March 2012.

| No. | Name | Properties / Location | Sale Date | Price | Sq. Ft. | Price PSF | Pro Forma Cap Rate | Trailing Cap Rate | NOI PSF |
|---|---|---|---|---|---|---|---|---|---|
| | **Self Storage Portfolio Transactions** | | | | | | | | |
| 1 | CubeSmart | 50 Properties, 6 States | Jul-19 | $295,000,000 | 2,560,290 | $115.22 | 5.83% | 5.54% | $6.38 |
| 2 | Simply Self Storage | 105 Properties, 17 States | Mid 2018 | $1,261,000,000 | 8,107,290 | $155.54 | 5.54% | 5.00% | $8.62 |
| 3 | Prisa 2 (Partial Sale) | 15 Properties, 10 States | Jan-18 | $209,300,000 | 1,109,371 | $188.67 | 5.54% | 5.50% | $10.45 |
| 4 | Store Here | 27 Properties, 6 States | Oct-17 | $126,000,000 | 1,670,000 | $75.45 | 6.40% | 5.90% | $4.83 |
| 5 | TIAA Project Jazz | 36 Properties, 6 States | Oct-17 | $295,000,000 | 2,300,756 | $128.22 | 5.65% | 5.49% | $7.24 |
| 6 | Planet Self Storage | 14 Properties, 4 States | Aug-17 | $124,400,000 | 676,315 | $183.94 | 4.35% | 4.35% | $8.00 |
| 7 | Life Storage | 18 Properties, 3 States | Jun-17 | $330,000,000 | 1,524,299 | $216.49 | 4.75% | 5.00% | $10.28 |
| 8 | Trojan Portfolio | 15 Properties, 4 States | Apr-17 | $242,600,000 | 1,378,726 | $175.96 | 4.92% | 4.51% | $8.66 |
| 9 | Mindful Storage | 23 Properties, 3 States | Dec-16 | $371,290,000 | 1,568,469 | $236.72 | 5.32% | 5.32% | $12.59 |
| 10 | Casey Storage Solutions | 13 Properties, 4 States | Dec-16 | $100,000,000 | 700,000 | $142.86 | 5.50% | 5.25% | $7.86 |
| 11 | National Storage Affiliates | 26 Properties, 4 States | Nov-16 | $184,500,000 | 1,657,481 | $111.31 | 5.90% | 5.70% | $6.57 |
| 12 | I Storage | 66 Properties, 12 States | Sep-16 | $640,000,000 | 4,500,000 | $142.22 | 5.50% | 5.00% | $7.82 |
| 13 | Life Storage | 84 Properties, 9 States | Jul-16 | $1,300,000,000 | 6,500,000 | $200.00 | 4.80% | 4.30% | $9.60 |
| 14 | Magellan Storage | 4 Properties, California | Mar-16 | $105,500,000 | 439,521 | $240.03 | 5.10% | 5.10% | $12.24 |
| 15 | Storage Pros | 37 Properties, 4 states | Dec-15 | $242,000,000 | 1,800,000 | $134.44 | 5.75% | 5.50% | $7.73 |
| 16 | Extra Space / Smart Stop | 122 Owned, 43 Managed | Oct-15 | $1,400,000,000 | 9,027,785 | $155.08 | 6.00% | N/A | $9.30 |
| 17 | Extra Space Storage | 14 Storage, 1 Retail, 6 Land | Apr-15 | $177,000,000 | 1,116,108 | $158.59 | 6.00% | 6.00% | $9.52 |
| 18 | RPC Northeast | 18 Properties, 4 States | Apr-15 | $106,500,000 | 1,028,476 | $103.55 | 6.50% | 6.31% | $6.73 |
| 19 | Smart Stop Storage | 30 Properties, Various States | Feb-15 | $144,120,000 | 1,844,895 | $78.12 | 5.89% | 5.89% | $4.60 |
| 20 | Sovran Self Storage | 4 Properties, NY, CT | Feb-15 | $120,000,000 | 580,661 | $206.66 | 5.00% | 5.00% | $10.33 |
| 21 | Cubesmart-Harrison St. | 26 Properties, Various States | Nov-14 | $222,647,398 | 1,829,327 | $121.71 | N/A | N/A | N/A |
| 22 | Public Storage | 25 Properties, FL, MD, NJ, VA | Jul-14 | $240,000,000 | 1,965,441 | $122.11 | 5.50% | 5.50% | $6.72 |
| 23 | Public Storage | 44 Properties, Fl, VA, CO, GA | Dec-13 | $430,000,000 | 2,700,000 | $159.26 | 5.00% | 5.00% | $7.96 |
| 24 | Cubesmart | 36 Properties, TX | Dec-13 | $326,200,000 | 2,100,000 | $155.33 | N/A | N/A | N/A |
| 25 | Extra Space Storage | 20 Properties, 9 States | Nov-13 | $117,000,000 | 1,400,000 | $83.57 | 5.75% | 5.75% | $4.81 |
| 26 | Morningstar Storage | 43 Properties, GA, TX, NC, SC | Oct-13 | $315,000,000 | 2,902,789 | $108.52 | 5.25% | 5.25% | $5.70 |
| 27 | All Aboard / Extra Space | 19 Properties, CA | Aug-13 | $195,100,000 | 1,482,000 | $131.65 | 6.00% | 6.00% | $7.90 |
| 28 | Storage Post | 15 Properties, NY | Dec-12 | $293,900,000 | 1,100,000 | $267.18 | 5.50% | 5.50% | $14.70 |
| 29 | Cubesmart | 22 Properties, Various | Aug-12 | $560,000,000 | 1,600,000 | $350.00 | 5.70% | 5.70% | $19.95 |
| 30 | Extra Space Storage | 10 Properties, NJ, NY | Jul-12 | $108,200,000 | 763,400 | $141.73 | 6.75% | 6.75% | $9.57 |
| 31 | Extra Space Storage | 36 Properties, 19 States | Jul-12 | $300,000,000 | 2,386,357 | $125.71 | 5.95% | 5.95% | $7.48 |
| | **Low** | | | $100,000,000 | 439,521 | $75.45 | 4.35% | 4.30% | $4.60 |
| | High | | | $1,400,000,000 | 9,027,785 | $350.00 | 6.75% | 6.75% | $19.95 |
| | Average | | | $351,040,561 | 2,268,379 | $158.58 | 5.57% | 5.43% | $8.76 |

*Compiled by NKF*

Great Value Self-Storage Portfolio Valuation



The following are discussions of these portfolio sales:

**Portfolio Sale 1** consisted of 50 properties within six states, and transacted in July 2019. At over 2.5 million square feet, the price per square foot was $115.22. Proforma cap rate was 5.83% while OAR on trailing was slightly lower at 5.54%. NOI per square foot was slightly below the average shown for all sales at $6.38.

**Portfolio Sale 2** Simply Self Storage sold 105 properties to a JV between Heitman Capital Management and National Storage Affiliates Trust (NSA). NSA will operate the assets and intends to re-brand the assets as iStorage facilities. The total consideration was $1.261 billion and the overall rate was 5.54% based on trailing 12-month revenue. The purchase price equates to $155.54 PSF.

**Portfolio Sale 3** represents the purchase of 15 properties in 10 states. The purchase occurred in January 2018 and encompassed over 1.1 million square feet of space. The purchase price was $188.67 per square foot with proforma cap rate of 5.54%, and trailing of 5.50%. NOI per square foot was $10.45, making this a Class A portfolio transaction.

**Portfolio Sale 4** represents the purchase of 27 properties in 6 states. The purchase occurred in October 2017 and encompassed over 1.67 million square feet of space. The purchase price was $75.45 per square foot with proforma cap rate of 6.40%, and trailing of 5.90%. NOI per square foot was $4.83, making this a Class C portfolio transaction.

**Portfolio Sale 5** represents the purchase of 36 properties in 6 states. The purchase occurred in October 2017 and encompassed over 2.3 million square feet of space. The purchase price was $128.22 per square foot with proforma cap rate of 5.65%, and trailing of 5.49%. NOI per square foot was $7.45, making this a Class B portfolio transaction.

**Portfolio Sale 6** is Planet Self-Storage which included 14 locations to Prime Storage Group located in the Northeast submarket (CT, MA, NJ, and PA). The total consideration was $124.4 million and the overall rate was 4.35% based on trailing-12 -month revenue. The purchase price equates to $183.94 per square foot.

**Portfolio Sale 7** is 18 properties (roughly 1.5mm SF) in three states (AZ, NV & TN.) The purchase price was $330 million, or $216.49 PSF.

**Portfolio Sale 8** represents the purchase of 15 properties in 4 states. The purchase occurred in April, 2017 and encompassed over 1.378 million square feet of space. The purchase price was $175.96 per square foot with proforma cap rate of 4.92%,



and trailing of 4.51%. NOI per square foot was $8.66, making this a Class B portfolio transaction.

**Portfolio Sale 9** is the Mindful portfolio includes ten self-storage facilities in Florida, one in Maryland, and sixteen in North Carolina. Four of the North Carolina properties are unimproved land sites. These North Carolina properties had a management change in 2014 which resulted in sharp increases in performance leading up to the sale.

**Portfolio Sale 10** represents the purchase of 13 properties in 4 states. The purchase occurred in December 2016 and encompassed 700,000 square feet of space. The purchase price was $142.22 per square foot with proforma cap rate of 5.50%, and trailing of 5.25%. NOI per square foot was $7.86, making this a Class B portfolio transaction.

**Portfolio Sale 11** is the National Storage Affiliates Trust acquisition of 26 properties in four states: California (8), Florida (5), Indiana (8) and Ohio (7). Five of the properties are being expanded by 345,000 square feet (796 units). This asset improved their footprint in key markets.

**Portfolio Sale 12** is the iStorage acquisition of 66 properties across 12 states. The assets were purchased for $640 million which equates to $142 PSF and sold with an OAR of 5.50% proforma, and 5.0% on trailing.

**Portfolio Sale 13** is one of the largest storage transactions to occur, with 84 properties purchased for $1.3 billion. The reported overall rate was 4.8%, a reported premium of about 75 basis points per the CEO.  This purchase, along with the $1.4 billion Extra Space purchase of Smart Stop Storage, were the two largest storage transactions to occur in the past ten years.

**Portfolio Sale 14** is the Sovran Self Storage (dba Uncle Bob's Self Storage) of the four-property Magellan Storage Affiliates for $105M. The four facilities are in Los Angeles and Orange County California which comprise more than 450,000 rentable feet and over 3,700 units. Per the press release, "this portfolio offered an incredibly rare opportunity to acquire class-A, institutional-quality assets in the highly desirable Los Angeles and Orange County markets…The combination of the high-quality assets, locations with high barriers to entry and compelling demographics, provided Sovran Self Storage with an opportunity to expand on its recent entry into the Southern California market."

**Portfolio Sale 15** is Storage Pros. It includes 37 properties sold to Cubesmart on December 9, 2015 for $242 million. The assets are in TN, MI, FL and MA and include



three retail buildings and one warehouse property. The price per square foot implied by the square footage referenced in the press release is $134.44 PSF. This figure is based on a square footage which excludes 600,000 SF of RV storage space. There is no mention of occupancy of the portfolio and from the information reported, it appears to represent a "mixed bag" of properties ranging from Class A to C, averaging possibly B- quality.

**Portfolio Sale 16** is The Extra Space / Smart Stop acquisition which was quoted at $1.4 billion, or about $140 PSF. The sale included $1.31 billion cash and $90 million from the sale of certain assets by Smart Stop immediately prior to closing. The transaction included the complete ownership of 122 stores and management of 43 other Smart Stop facilities. According to the CEO of Smart Stop, Michael Schwartz, the shareholders of Smart Stop received $13.75 per share, which was approximately 27% above its most recently announced net asset value. There is no capitalization rate which has been reported and none could be derived.

**Portfolio Sale 17** is Extra Space's purchase of Assured Self-Storage, a 20+ property portfolio transaction for $177,000,000. According to Extra Space, this was a 6.0% target OAR. The actual OAR based on trailing is believed to be much lower. The portfolio was in the high 70% occupancy range, with many of the facilities being quite new. Within a very short time since the acquisition, Extra Space has reached occupancy in the 90% range on most of the assets.

**Portfolio Sale 18** includes 18 properties in five states. The portfolio includes 9,365 total storage units, 1,028,476 SF and sold for $106,500,000 or $103.55 PSF. The overall rate was 6.31%. Financing was provided by Wells Fargo with an interest rate of 3.88% (interest only loan). The portfolio was about 90% occupied at the time of sale.

**Portfolio Sale 19** includes 30-properties, half of which are in California. The portfolio closed in February 2015 and was purchased by Strategic Storage trust for $144,120,000, or $78.12 PSF. The average age of the properties is about 1985. All facilities are single-story and have realized very strong absorption the past 18 months. The portfolio needed about $3.0 million in capital expenditures due to a lack of maintenance. The OAR based on annualized six months of 2014 income was 5.89%. However, forward looking first year OAR was about 6.77%. The buyer anticipates significant upside based on recent performance and the lowering of many expenses which are above market. Most of the portfolio had been performing poorly for many years, then made some vast increases in occupancy the year prior to selling due to a change in management.



**Portfolio Sale 20** is the Sovren Self Storage (dba Life Storage) of four east coast facilities for $120M. The four facilities are Connecticut and New York. The buyer had leased the facilities in November 2013 and was already operating them under the Uncle Bob's brand. The acquisition occurred as they exercised the option to acquire the sites in the lease.

**Portfolio Sale 21** is an all cash deal between Harrison Street RE Capital and Cubesmart. The size of the portfolio is 26 storage facilities with 1,829,327 SF of rentable area for $222,647,398, or $121.71 PSF. The transaction reportedly included a 1.52-acre vacant site as well as a corporate center which was about $7.2 million of the total value. The location of the properties is scattered throughout CA, NV, FL, IL, NY, OH, and RI. There was no capitalization rate reported, and none could be confirmed.

**Portfolio Sale 22** is the Public Storage purchase of 25 self-storage facilities from Veritage Management Inc. The portfolio is centrally located with 19 properties in Florida and the remaining facilities in NJ, MD and VA. The portfolio had high occupancy averaging about 90% and there are more than 17,000 units. The past owner had passed away and the second generation did not want to continue the operation. The properties appear to be mostly 2000-2008-built. The reported cap rate was 5.5% on actual income in place. The forward looking overall rate was reported at about 6.0%.

**Portfolio Sale 23** is the December 2013 Public Storage acquisition of 44 properties located in four states (primarily the southeast) from Stor All for $430,000,000, or $159.26 PSF. The overall rate was confirmed by a reliable source as being below 5.0% based on trailing 12-month NOI. Moving forward, the overall rate will increase in the high 5% or possibly 6% due to economies of scale in operation. This is a geographically centered, high-quality asset portfolio.

**Portfolio Sale 24** is the December 2013 CubeSmart purchase of 36 properties from Clarion Partners for $326,200,000, or $155.33 PSF. The portfolio is geographically centered in Houston (28 properties) and Austin, with one in North Carolina.

**Portfolio Sale 25** is the November 4, 2013 Extra Space Properties Two, LLC purchase of 20 properties in nine states from WP Carey & Co, LLC for $117,000,000, or $83.57 PSF. The portfolio was assembled in 2009 and was distressed at the time. The overall rate associated with the portfolio according to Marcus & Millichap was 5.75% on actual trailing income. The occupancy of the portfolio was 85% at the time of sale.



**Portfolio Sale 26** is the October 2013 Public Storage purchase of 43 properties from Morningstar Mini Storage for $315,000,000, or $108.51 PSF. The portfolio was on average 81% occupied and consisted of good quality properties in four states. The portfolio sold with an overall rate on actual of about 5.25% with first year being 6.0%.

**Portfolio Sale 27** is the August 29, 2013 Extra Space Storage purchase of 19 California properties under the name of All Aboard Self-Storage for $195,100,000. The portfolio included 1,482,000 square feet of space which equates to $131.65 PSF. The portfolio was about 76% occupied and had $4.0 million in deferred maintenance. The Extra Space contact indicated there were no conditions which might have impacted the sale price. The actual cap rate based on trailing income was 6.0% and the Year 1 pro-forma cap rate was 6.5%.  Many of the facilities were built in the 1980's and 1990's.

**Portfolio Sale 28** is the December 2012 Storage Post purchase of fifteen facilities from Acadia Company for $293,900,000 or $267.18 PSF. All properties are in New York and it was about 93% occupied at the time of purchase. The portfolio included one manufacturing building and 14 storage facilities. The overall rate for this portfolio was 5.5%.

**Portfolio Sale 29** is the August 2012 CubeSmart acquisition of 22 Class A properties for $560 million with a reported overall rate of 5.7%. The portfolio included 1.6 million square feet of space. One reason the overall rate was low was because several properties were not operating at stabilized occupancy and had upside potential. The investors also placed pressure on the buyer to acquire more high-quality properties into its portfolio. The combination of non-stabilized occupancy and investor motivation resulted in the low overall rate. The average price per property equates to $350 PSF. This was an off-market deal.

**Portfolio Sale 30** is the July 2012, Extra Space Storage purchase of ten facilities in NJ and NY for $108,200,000, or $141.73 per square foot. The overall rate on the purchase was 6.75%. There was one leasehold interest in the grouping of properties which reportedly had an attractive purchase option. Occupancy of the portfolio was about 84% in aggregate. There were no conditions of sale which impacted sale price.

**Portfolio Sale 31** is the July 2012 portfolio transfer from ESS Prisa III Owner, LLC to Extra Space Properties Sixty-Three, LLC. This represents the transfer of a 94.9% interest in 36 properties located nationwide. There was an assumed loan in the amount of about $138 million (Prudential's share of the loan).  The remainder was paid in cash.  The full loan balance was $145 million.  Total purchase price was $300 million.  The overall rate associated with this sale was 5.95% based on trailing 12-month income. The buyer's rate was 6.5% based on their projection of expenses.

Great Value Self-Storage Portfolio Valuation



The average occupancy of the portfolio was reportedly 87.8%. The portfolio included 23,400 units and about 2.5 million square feet of space. This is not considered an arm's length transaction as it is between two related parties / joint ventures, and was not on the open market.  The sale price equates to an average sale price of $120 PSF per property.

## Portfolio Investment Overview

The self-storage market is a commercial real estate class which is impacted by relatively extensive portfolio activity. As shown, portfolio sales above $100 million and higher over the past six years indicate a typical range of cap rates between 5-6% on trailing 12 NOI. The pro-forma rates are generally higher as most buyers forecast an above-market increase in NOI either through rental rate increases or operational efficiencies, as well as a combination of both.

Regarding portfolio transactions, only those which are $100 million and higher are shown for comparison. The overall rate range of this data set (proforma) is from 4.35% to 6.75% with an average of 5.57%.  That same range on trailing is 4.30% to 6.75% with an average of 5.43%. It is our opinion the overall rate for the subject portfolio would be consistent with the averages. The overall rate of only those transactions to occur in 2016 and 2017 averages approximately 4.98%.  Since, there are three prominent transactions which range from about 5.0% to 5.54% on trailing. There are very few transactions such as the subject occurring making the subject portfolio desirable if placed on the market.

The portfolio has a consistent history of income growth in recent years and would be desirable to investors.  Considering all of the previous discussions, it is determined a reasonable overall rate for the subject portfolio is **5.50%**. We have projected income which is very similar to that which has recently been experienced. There have recently been a series of interest rate reductions, thus bringing interest rates back down to historic lows.

If offered on the market, the potential buyer of this portfolio would represent a small number of investors / operators and would likely consist of a storage REIT.  The portfolio is determined to represent a much stronger investor profile than if sold on an individual basis.



# OPERATING HISTORY & NKF PROJECTION

| Operational History and NKF Projections (Portfolio) | | | | |
|---|---|---|---|---|
| **Income** | Actual 2016 | Actual 2017 | Actual 2018 | Annualized 2019 | NKF Projection |
| Effective Rental Income | $27,389,116 | $28,905,097 | $30,660,925 | $29,927,228 | $30,700,000 |
| Ancillary Income | $3,810,864 | $3,889,986 | $4,133,934 | $3,704,517 | $4,067,750 |
| Effective Gross Income | $31,199,980 | $32,795,083 | $34,794,859 | $33,631,745 | $34,767,750 |
| *Monthly* | *$2,599,998* | *$2,732,924* | *$2,899,572* | *$2,802,645* | *$2,897,313* |
| **Expenses** | | | | | |
| Management Fee | $1,425,051 | $1,375,428 | $1,460,547 | $1,345,857 | $1,390,710 |
| Real Estate Taxes | $3,640,883 | $3,867,202 | $4,125,042 | $4,020,395 | $4,141,007 |
| Insurance | $1,188,101 | $1,226,074 | $1,402,468 | $1,257,785 | $1,295,519 |
| Utilities | $806,171 | $761,603 | $787,661 | $747,215 | $769,631 |
| Other Expenses | $5,537,062 | $5,719,440 | $5,557,987 | $5,242,779 | $5,400,062 |
| Total Expenses | $12,597,268 | $12,949,747 | $13,333,705 | $12,614,031 | $12,996,929 |
| **Net Operating Income** | **$18,602,712** | **$19,845,336** | **$21,461,154** | **$21,017,714** | **$21,770,821** |
| Operating Expense Ratio | 40.4% | 39.5% | 38.3% | 37.5% | 37.4% |

The estimate of net operating income is 3.6% above the annualized 2019 data and 1.4% above the 2018 year end data. Below is REIT data from same store operations for the (5) Self-Storage REITs. As shown in the table below, year over year NOI growth has slowed from a high point in 2015 – 2017 as the self-storage market as a whole has stabilized. Thus, it is prudent to forecast more normalized growth.

| Aggregate REIT Performance - Same Store Operation Public Storage, Extra Space, LifeStorage, CubeSmart & NSA | | | | |
|---|---|---|---|---|
| Period | Facility Count | Occupancy Change | Revenue Change | Expense Change | NOI Change |
| 3Q19 | 4,390 | -0.1% | 2.3% | 4.0% | 1.6% |
| 2Q19 | 4,397 | -0.3% | 3.0% | 3.0% | 3.0% |
| 1Q19 | 4,414 | 0.1% | 3.1% | 2.3% | 3.5% |
| 4Q18 | 4,186 | -0.3% | 3.1% | 3.2% | 3.0% |
| 2018 | 4,182 | -0.4% | 3.2% | 2.7% | 3.5% |
| 2017 | 3,882 | 0.0% | 4.0% | 2.5% | 4.6% |
| 2016 | 3,610 | -0.1% | 6.2% | 1.3% | 8.2% |
| 2015 | 3,324 | 1.1% | 7.3% | 2.4% | 9.5% |
| 2014 | 3,154 | 1.5% | 6.9% | 3.0% | 8.7% |

*Compiled by NKF*

Great Value Self-Storage Portfolio Valuation



| Historical EGI | | |
|---|---|---|
| Year | Income | % Change |
| 2016 | $31,199,980 | N/A |
| 2017 | $32,795,083 | 5.1% |
| 2018 | $34,794,859 | 6.1% |
| 2019 | $33,631,745 | -3.3% |
| NKF Est. | $34,767,750 | 3.4% |

The portfolio realized increasing consistently from 2016 to 2018. The annualized 2019 data is negative. However, annualized data can be misleading and greater weight is placed on the prior year historical trend. The NKF estimate of EGI is 3.4% above the most recent annualized collections through September 2019.

## Discussion of Expenses

The following outlines the expenses for the portfolio and change over time as well as the expense ratios for each year dating to 2016.

| Historical Expenses | | | |
|---|---|---|---|
| Year | Expenses | % Change | Exp Ratio |
| 2016 | $12,597,268 | N/A | 40.4% |
| 2017 | $12,949,747 | 2.8% | 39.5% |
| 2018 | $13,333,705 | 3.0% | 38.3% |
| 2019 | $12,614,031 | -5.4% | 37.5% |
| NKF Est. | $12,996,929 | 3.0% | 37.4% |

Expenses have increased at a slower pace than rental income. Expense ratios have ranged from 37.5% to 40.4% and has declined each year since 2016. The NKF estimate follows this trend with a slight decline below the 2019 annualized data. The average expense ratio nationally based on the data below from over 861 assets is 34.26%. The expense ratios range in each region from 29.96% to 40.99%. The NKF estimate at 37.4% is well within the range is considered reasonable.

| Self Storage Operating Expense Report | | | | | |
|---|---|---|---|---|---|
| | National | East | Midwest | South | West |
| Expense Category | | East Region | Midwest Region | South Region | West Region |
| Real Estate Taxes | $1.54 | $2.17 | $1.55 | $1.28 | $1.15 |
| Property Insurance | $0.18 | $0.13 | $0.11 | $0.20 | $0.25 |
| Utilities | $0.31 | $0.38 | $0.28 | $0.31 | $0.26 |
| Repairs & Maintenance | $0.42 | $0.51 | $0.36 | $0.33 | $0.43 |
| Administration | $0.64 | $0.71 | $0.56 | $0.61 | $0.63 |
| Off-Site Management | $0.85 | $0.95 | $0.70 | $0.74 | $0.90 |
| On-Site Management | $1.22 | $1.34 | $1.12 | $1.10 | $1.22 |
| Advertising | $0.31 | $0.32 | $0.34 | $0.34 | $0.28 |
| Miscellaneous | $0.01 | $0.01 | $0.00 | $0.00 | $0.00 |
| Total Expenses (SF): | $5.49 | $6.53 | $5.04 | $4.90 | $5.13 |
| Effective Gross Income (SF): | $16.01 | $18.58 | $12.30 | $13.43 | $17.11 |
| Operating Expense Ratio: | 34.26% | 35.16% | 40.99% | 36.51% | 29.96% |
| Sample Size | 861 | 254 | 104 | 238 | 265 |



## Direct Capitalization

As determined earlier in the report, the overall capitalization rate for the entire portfolio is 5.50%. This overall rate includes a premium above that which would be applicable if properties were sold individually. The premium accounts for lower expenses which occur when large groups of properties are operated as one economic entity. Insurance, advertising, and management costs become more efficient in a portfolio. The reduction in overall rate also accounts for the difference in investor profile, as large portfolios are purchased by very large institutional investors with superior access to capital and different return thresholds than single operators. When the portfolio is geographically centered, like many of the properties in the portfolio area, economies of scale are achievable. The subject is considered to have relatively good geographic centralization.

| Operational History and NKF Projections (Portfolio) | | | | |
|---|---|---|---|---|
| | Actual | Actual | Actual | Annualized | NKF |
| **Income** | **2016** | **2017** | **2018** | **2019** | **Projection** |
| Effective Rental Income | $27,389,116 | $28,905,097 | $30,660,925 | $29,927,228 | $30,700,000 |
| Ancillary Income | $3,810,864 | $3,889,986 | $4,133,934 | $3,704,517 | $4,067,750 |
| Effective Gross Income | $31,199,980 | $32,795,083 | $34,794,859 | $33,631,745 | $34,767,750 |
| *Monthly* | *$2,599,998* | *$2,732,924* | *$2,899,572* | *$2,802,645* | *$2,897,313* |
| **Expenses** | | | | | |
| Management Fee | $1,425,051 | $1,375,428 | $1,460,547 | $1,345,857 | $1,390,710 |
| Real Estate Taxes | $3,640,883 | $3,867,202 | $4,125,042 | $4,020,395 | $4,141,007 |
| Insurance | $1,188,101 | $1,226,074 | $1,402,468 | $1,257,785 | $1,295,519 |
| Utilities | $806,171 | $761,603 | $787,661 | $747,215 | $769,631 |
| Other Expenses | $5,537,062 | $5,719,440 | $5,557,987 | $5,242,779 | $5,400,062 |
| Total Expenses | $12,597,268 | $12,949,747 | $13,333,705 | $12,614,031 | $12,996,929 |
| **Net Operating Income** | **$18,602,712** | **$19,845,336** | **$21,461,154** | **$21,017,714** | **$21,770,821** |
| Operating Expense Ratio | 40.4% | 39.5% | 38.3% | 37.5% | 37.4% |
| Capitalization Rate (Portfolio Rate) | | | | | 5.50% |
| Indicated Value | | | | | $395,833,109 |
| **Rounded** | | | | | **$395,800,000** |

The value per square foot of the portfolio at $95.76 PSF is within the range formed by portfolio transactions occurring since March 2012. The range formed by these sales is between $78.00 and $350.00 with an average of $156.99 PSF.



Great Value Self-Storage Portfolio Valuation

## Discounted Cash Flow Analysis

To apply the discounted cash flow method, we develop a projection of periodic cash flows from the property over an anticipated investment holding period considering probable occupancy rates and anticipated changes rental rates and operating expenses. This analysis considers current market conditions and typical assumptions of market participants as summarized in the following table.

| Summary Of Growth Rates | | | | |
|---|---|---|---|---|
| | Rent Growth | | Expense Growth | |
| Investor Surveys | Rate Range | Average | Rate Range | Average |
| CBRE Self Storage Investor Survey: 4th Qtr. 2015 | 3.00% - 6.00% | 3.60% | 2.00% - 5.00% | 2.94% |
| CBRE Self Storage Investor Survey: 1st Qtr. 2016 | 3.00% - 6.00% | 3.55% | 2.00% - 5.00% | 3.02% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2016 | 3.00% - 6.00% | 3.56% | 2.00% - 5.00% | 3.01% |
| PwC Real Estate Investor Survey: 3rd Qtr. 2017 | 1.00% - 5.00% | 3.38% | 1.00% - 3.00% | 2.63% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2017 | 3.00% - 6.00% | 3.50% | 2.00% - 5.00% | 3.02% |
| PwC Real Estate Investor Survey: 1st Qtr. 2018 | 0.00% - 15.00% | 4.29% | 2.00% - 5.00% | 3.00% |
| PwC Real Estate Investor Survey: 3rd Qtr. 2018 | 0.00% - 15.00% | 4.29% | 2.00% - 5.00% | 3.00% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2018 | 3.00% - 6.00% | 3.50% | 2.00% - 5.00% | 3.00% |
| PwC Real Estate Investor Survey: 1st Qtr. 2019 | 0.00% - 15.00% | 4.29% | 2.00% - 5.00% | 3.00% |
| NKF Self Storage Investor Survey: 3rd Qtr. 2019 | 3.00% - 6.00% | 3.40% | 2.00% - 5.00% | 3.10% |

## Holding Period

A ten-year holding period is consistent with typical investor analysis.

## Replacement Reserves

This additional expense category in the DCF accounts for the cost of periodic replacement of capital items such as the roof, HVAC system. While this expense is not appropriate in the direct capitalization analysis, as a result of consistency with capitalization rate data, it is used by investors in the DCF analyses. This expense is projected at $0.15 per square foot.

## Financial Assumptions

⚒ Prominent self-storage investors and sales brokers offered NKF their opinions of investment parameters when asked the following questions late 2018 through mid 2019. The names of these market participant names have been kept confidential.

⚒ What spread are you seeing between cap rate and discount rate? Historically we have seen 150 – 300 basis points depending on the market and asset.

⚒ In the next 12 – 18 months, what are you projecting for market rent growth for the regional and super-regional areas that you work in?



- In the next 12 – 18 months, what are you projecting for market expense growth for the regional and super-regional areas that you work in?

- Confidential CEO of portfolio of 50-property Class A portfolio. His opinion of a large institutional portfolio premium above going in cap rate is approximately 50 to 100 basis points. His opinion of spread between cap rate and discount rate is about 150 – 200 BP. When asked how rent and expenses are projected to grow in the coming 12-24 months, the opinion was 3% rent growth, and 1.5% expense growth, with emphasis on utilities and labor costs increasing faster.

- A very prominent loan and sales broker with national self-storage coverage indicated his opinion of about a 50-basis point premium for portfolio premium in cap rate compared with single asset purchase, a 200-basis point spread between cap and discount rates, and relatively flat income and expense growth in the coming 12-24 months, mainly due to new construction.

- Confidential owner of 80+ property, generally Class A portfolio indicated the following comments:  He would pay about 0.5- 0.75% premium for a portfolio, as described. "If it was mainly A properties in A locations, and undermanaged, I might go to 1% higher.  I am typically using 200 bp spread in my markets between cap and discount rate, although have gotten push back in good locations to 175 bp.  We are expecting a 4-5% street rent growth per year, but due to higher concessions, the economic rent growth will be closer to 3 -3.5% per year.  Expenses are projected to increase 3.25% per year, excluding taxes, and capital improvements." Much weight is placed on this owner's comments due to the size of his portfolio, and over three decades of self-storage investment experience.

- Confidential CEO of a growing storage portfolio who was a part of ownership that sold a large portfolio within the past three years: He indicates an opinion of 150 basis point delta between cap and discount rate and a 100 basis point premium for a good quality geographically centered portfolio. They are projecting 3% rent increases depending on the supply, and flat to declining revenue if oversupplied.  Expense growth is likely between 2% and 3% the coming 12-24 months.

- Confidential: Top broker of self-storage facilities nationally with currently 80+ facilities listed for sale. His opinion is that a portfolio premium is between 50 and 100 basis points in major markets, and 25-35 in secondary markets. He thinks rent growth will be between 3% and 4%



with expenses in the 2% range, excluding taxes. He had no opinion of cap rate vs discount rate variance.

- Confidential owner / operator of a large portfolio of storage facilities in Class B+ / A markets indicated an opinion of a typical spread between going in and discount is 150 to 300 BP. Greg Houge, President of Storage Etc. indicates an opinion of spread from 150 to 300 basis points. "The discount will get higher as we continue into extra innings with rate growth flattening and risk of absorption increasing in some markets."

- Confidential Managing Director of the Self-Storage Specialty Group with a large brokerage office indicated a 200-350 basis point spread between going in rate and discount rate. Generally 7.0% to 9.0% range depending on location.  This market participant has 30 years of self-storage sales experience.

- The National Director of Self-Storage with a large brokerage firm indicated an opinion of 9%-11% range for internal rates of return over a 5-7 year hold.  He is utilizing 50 basis point spread between going in and reversion rates for most parts of the country, but he said it could be a quarter point or higher or lower depending on location appeal and market performance.

**Terminal Capitalization Rate Discussion/Conclusion**

Current survey data indicates a range of reversion capitalization rates of 5.0% to 7.5%, with an average of 6.04%.  For the subject, we conclude a reversion capitalization rate that represents a spread of 25 basis points over our concluded stabilized going-in rate, which appears to be within the range of market figures.

**Rental Growth / Expense Growth**

As referenced in the self storage market analysis section, revenues have generally been on a slow decline since 3rd Qtr 2016 (as the market has stabilized after the past recession).  Currently, rental growth is hovering between 3.0% and 4.0% when observing the large amount of same store data published by the self storage REITs. New inventory represents the largest risk in the near-term to revenue growth. The subject (and this is true across the portfolio being appraised) is located in markets with inventory added in the recent past. We apply a rate of revenue growth of 3.0% to the cash flow. Expenses are also grown at 3.0% as well as property taxes, given the upward trend in RE values.



**Discount Rate Discussion/Conclusion**

Current survey data indicates a range of discount rates of 5.0% to 11.0%, with an average of 7.43%, a spread of 177 basis points from the indicated average going in rate in the same survey. The PWC investor survey is catered toward institutional grade Class A assets in some of the top markets in the country. For the subject, we conclude a discount rate which is above this survey amount. It is indicated by NKF's survey of market participants that discount rates (IRR) are generally within the range of 7% to 11% depending on the asset, and within 200 to 300 basis points higher than the going in rate. In general, the discount rate conclusion follows the general rule of going in rate plus rate of growth, or between 275-300 basis points higher. The conclusion of discount rate is found in the discounted cash flow below.

| Discount Rates | | | |
|---|---|---|---|
| **Investor Surveys** | **Rate Range** | | **Average** |
| CBRE Self Storage Investor Survey: 4th Qtr. 2015 | 8.00% - | 10.75% | 8.75% |
| CBRE Self Storage Investor Survey: 1st Qtr. 2016 | 8.00% - | 10.70% | 8.72% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2016 | 7.75% - | 10.75% | 8.63% |
| PwC Real Estate Investor Survey: 3rd Qtr. 2017 | 5.00% - | 8.00% | 6.38% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2017 | 7.75% - | 10.75% | 8.75% |
| PwC Real Estate Investor Survey: 1st Qtr. 2018 | 5.00% - | 9.00% | 6.91% |
| PwC Real Estate Investor Survey: 3rd Qtr. 2018 | 5.00% - | 11.00% | 7.32% |
| CBRE Self Storage Investor Survey: 3rd Qtr. 2018 | 7.50% - | 11.00% | 8.73% |
| PwC Real Estate Investor Survey: 1st Qtr. 2019 | 5.00% - | 11.00% | 7.43% |
| NKF Self Storage Investor Survey: 3rd Qtr. 2019 | 7.50% - | 11.00% | 8.55% |

**Portfolio Sales Costs**

The cash flow schedule and present worth calculations are shown on the following pages. Sale costs are estimated at 1.0% in the portfolio valuation.

**Value Indication – Discounted Cash Flow Analysis**

The cash flow schedule and present value calculations are shown on the following page.



Great Value Storage Portfolio (Amounts in USD)
Dec, 2019 through Nov, 2030
12/2/2019 8:51:39 AM

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| For the Years Ending | Year 1 Nov-2020 | Year 2 Nov-2021 | Year 3 Nov-2022 | Year 4 Nov-2023 | Year 5 Nov-2024 | Year 6 Nov-2025 | Year 7 Nov-2026 | Year 8 Nov-2027 | Year 9 Nov-2028 | Year 10 Nov-2029 | Year 11 Nov-2030 | Total |
| **Multifamily Revenue** | | | | | | | | | | | | |
| Contract Plus Vacant @ Market | 30,700,000 | 31,621,000 | 32,569,630 | 33,546,719 | 34,553,120 | 35,589,714 | 36,657,406 | 37,757,128 | 38,889,841 | 40,056,537 | 41,258,233 | 393,199,328 |
| Total Multifamily Revenue | 30,700,000 | 31,621,000 | 32,569,630 | 33,546,719 | 34,553,120 | 35,589,714 | 36,657,406 | 37,757,128 | 38,889,841 | 40,056,537 | 41,258,233 | 393,199,328 |
| **Other Revenue** | | | | | | | | | | | | |
| Ancillary Income | 4,067,750 | 4,189,783 | 4,315,476 | 4,444,940 | 4,578,289 | 4,712,361 | 4,857,106 | 5,002,820 | 5,152,904 | 5,307,491 | 5,466,716 | 52,095,636 |
| Total Other Revenue | 4,067,750 | 4,189,783 | 4,315,476 | 4,444,940 | 4,578,289 | 4,712,361 | 4,857,106 | 5,002,820 | 5,152,904 | 5,307,491 | 5,466,716 | 52,095,636 |
| Potential Gross Revenue | 34,767,750 | 35,810,783 | 36,885,106 | 37,991,659 | 39,131,409 | 40,302,075 | 41,514,512 | 42,759,947 | 44,042,746 | 45,364,028 | 46,724,949 | 445,294,964 |
| Effective Gross Revenue | 34,767,750 | 35,810,783 | 36,885,106 | 37,991,659 | 39,131,409 | 40,302,075 | 41,514,512 | 42,759,947 | 44,042,746 | 45,364,028 | 46,724,949 | 445,294,964 |
| **Operating Expenses** | | | | | | | | | | | | |
| Utilities | 769,631 | 792,720 | 816,502 | 840,997 | 866,226 | 892,213 | 918,980 | 946,549 | 974,946 | 1,004,194 | 1,034,320 | 9,857,277 |
| Property Insurance | 1,295,519 | 1,334,385 | 1,374,416 | 1,415,649 | 1,458,118 | 1,501,862 | 1,546,917 | 1,593,325 | 1,641,125 | 1,690,358 | 1,741,069 | 16,592,743 |
| Off-Site Management | 1,390,710 | 1,432,431 | 1,475,404 | 1,519,666 | 1,565,256 | 1,612,214 | 1,660,580 | 1,710,398 | 1,761,710 | 1,814,561 | 1,868,998 | 17,811,930 |
| Real Estate Taxes | 4,141,007 | 4,265,237 | 4,393,194 | 4,524,990 | 4,660,740 | 4,800,562 | 4,944,579 | 5,092,916 | 5,245,704 | 5,403,075 | 5,565,167 | 53,037,172 |
| Other Expenses | 5,400,062 | 5,562,064 | 5,728,926 | 5,900,794 | 6,077,817 | 6,260,152 | 6,447,956 | 6,641,395 | 6,840,637 | 7,045,856 | 7,257,232 | 69,162,891 |
| Total Operating Expenses | 12,996,929 | 13,386,837 | 13,788,442 | 14,202,095 | 14,628,158 | 15,067,003 | 15,519,013 | 15,984,583 | 16,464,121 | 16,958,044 | 17,466,786 | 166,462,011 |
| Net Operating Income | 21,770,821 | 22,423,946 | 23,096,664 | 23,789,564 | 24,503,251 | 25,235,072 | 25,995,499 | 26,775,364 | 27,578,625 | 28,405,984 | 29,258,163 | 278,832,953 |
| **Capital Expenditures** | | | | | | | | | | | | |
| Reserves | 826,629 | 851,428 | 876,971 | 903,280 | 930,378 | 958,290 | 987,038 | 1,016,649 | 1,047,149 | 1,078,563 | 1,110,920 | 10,587,295 |
| Total Capital Expenditures | 826,629 | 851,428 | 876,971 | 903,280 | 930,378 | 958,290 | 987,038 | 1,016,649 | 1,047,149 | 1,078,563 | 1,110,920 | 10,587,295 |
| Total Leasing & Capital Costs | 826,629 | 851,428 | 876,971 | 903,280 | 930,378 | 958,290 | 987,038 | 1,016,649 | 1,047,149 | 1,078,563 | 1,110,920 | 10,587,295 |
| Cash Flow Before Debt Service | 20,944,192 | 21,572,518 | 22,219,693 | 22,886,284 | 23,572,873 | 24,276,783 | 25,008,461 | 25,758,715 | 26,531,476 | 27,327,420 | 28,147,243 | 268,245,657 |
| Cash Flow Available for Distribution | 20,944,192 | 21,572,518 | 22,219,693 | 22,886,284 | 23,572,873 | 24,276,783 | 25,008,461 | 25,758,715 | 26,531,476 | 27,327,420 | 28,147,243 | 268,245,657 |

Great Value Self-Storage Portfolio Valuation



Great Value Storage Portfolio (Amounts in USD)
12/2/2019 8:49:32 AM
Valuation (PV/IRR) Date: Dec, 2019
Discount Method: Annual

| Analysis Period | Period Ending | Cash Flow Before Debt Service | P.V. of Cash Flow @ 7.50% | P.V. of Cash Flow @ 7.75% | P.V. of Cash Flow @ 8.00% | P.V. of Cash Flow @ 8.25% | P.V. of Cash Flow @ 8.50% | NOI to Book Value |
|---|---|---|---|---|---|---|---|---|
| Year 1 | Nov-2020 | 20,944,192 | 19,482,969 | 19,437,765 | 19,392,770 | 19,347,983 | 19,303,403 | 2633.69% |
| Year 2 | Nov-2021 | 21,572,518 | 18,667,403 | 18,580,880 | 18,494,957 | 18,409,629 | 18,324,889 | 1336.30% |
| Year 3 | Nov-2022 | 22,219,693 | 17,885,977 | 17,761,769 | 17,638,709 | 17,516,783 | 17,395,978 | 903.97% |
| Year 4 | Nov-2023 | 22,886,284 | 17,137,262 | 16,978,768 | 16,822,102 | 16,667,239 | 16,514,154 | 687.90% |
| Year 5 | Nov-2024 | 23,572,873 | 16,419,888 | 16,230,284 | 16,043,301 | 15,858,897 | 15,677,031 | 558.33% |
| Year 6 | Nov-2025 | 24,276,783 | 15,730,421 | 15,512,702 | 15,298,491 | 15,087,723 | 14,880,335 | 471.95% |
| Year 7 | Nov-2026 | 25,008,461 | 15,073,972 | 14,830,849 | 14,592,197 | 14,357,923 | 14,127,938 | 410.41% |
| Year 8 | Nov-2027 | 25,758,715 | 14,442,969 | 14,177,053 | 13,916,632 | 13,661,581 | 13,411,776 | 364.26% |
| Year 9 | Nov-2028 | 26,531,476 | 13,838,379 | 13,552,078 | 13,272,343 | 12,999,010 | 12,731,916 | 328.40% |
| Year 10 | Nov-2029 | 27,327,420 | 13,259,098 | 12,954,655 | 12,657,883 | 12,368,573 | 12,086,519 | 299.76% |
| Totals | | 240,098,415 | 161,938,339 | 160,016,804 | 158,129,386 | 156,275,340 | 154,453,940 | |
| Property Resale @ 5.75% Cap Rate | | 503,749,243 | 244,416,074 | 238,804,012 | 233,333,369 | 228,000,268 | 222,800,943 | |
| Total Unleveraged Present Value | | | 406,354,414 | 398,820,816 | 391,462,755 | 384,275,608 | 377,254,883 | |

Percentage Value Distribution

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Income | | | 39.85% | 40.12% | 40.39% | 40.67% | 40.94% | |
| Net Sale Price | | | 60.15% | 59.88% | 59.61% | 59.33% | 59.06% | |
| | | | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | |

* Results displayed are based on Forecast data only



Great Value Storage Portfolio (Amounts in USD)
12/2/2019 8:52:18 AM

### Key Valuation Policies

| | |
|---|---|
| **Valuation (PV/IRR) Date:** | December, 2019 |
| **Date of Sale:** | November, 2029 |
| **Discount Method:** | Annual |
| **Period to Cap (at Sale):** | 12 Months After Sale |

### Value Matrix

| **Table Shows:** | 1) Unleveraged PV's | 1) Net Sale Price | 2) Exit Cap Rate | | |
|---|---|---|---|---|---|
| | 2) Unleveraged PV's/Unit | 551,725,362 | 526,646,936 | 503,749,243 | 482,759,691 | 463,449,304 |
| | 3) Going In Cap. Rates | 5.25% | 5.50% | 5.75% | 6.00% | 6.25% |
| 1) Cash Flow Discount Rate | **7.50%** | 429,632,135 | 417,464,235 | 406,354,414 | 396,170,410 | 386,801,128 |
| 2) Resale Discount Rate | **7.50%** | 429,632,135.08 | 417,464,235.07 | 406,354,413.60 | 396,170,410.18 | 386,801,127.61 |
| | | 5.07% | 5.22% | 5.36% | 5.50% | 5.63% |
| | **7.75%** | 421,564,055 | 409,675,543 | 398,820,816 | 388,870,648 | 379,716,495 |
| | **7.75%** | 421,564,054.87 | 409,675,543.25 | 398,820,815.53 | 388,870,648.05 | 379,716,494.54 |
| | | 5.16% | 5.31% | 5.46% | 5.60% | 5.73% |
| | **8.00%** | 413,684,981 | 402,068,817 | 391,462,755 | 381,740,531 | 372,796,086 |
| | **8.00%** | 413,684,980.98 | 402,068,817.38 | 391,462,755.23 | 381,740,531.20 | 372,796,085.66 |
| | | 5.26% | 5.41% | 5.56% | 5.70% | 5.84% |
| | **8.25%** | 405,989,919 | 394,639,256 | 384,275,608 | 374,775,597 | 366,035,587 |
| | **8.25%** | 405,989,919.34 | 394,639,256.48 | 384,275,608.04 | 374,775,596.59 | 366,035,586.59 |
| | | 5.36% | 5.52% | 5.67% | 5.81% | 5.95% |
| | **8.50%** | 398,474,021 | 387,382,199 | 377,254,883 | 367,971,510 | 359,430,808 |
| | **8.50%** | 398,474,020.63 | 387,382,198.59 | 377,254,883.07 | 367,971,510.14 | 359,430,807.58 |
| | | 5.46% | 5.62% | 5.77% | 5.92% | 6.06% |

### Sales Price Calculation

| | | | | | |
|---|---|---|---|---|---|
| **NOI To Capitalize** | 29,258,163 | 29,258,163 | 29,258,163 | 29,258,163 | 29,258,163 |
| Divided by Cap Rate | 5.25% | 5.50% | 5.75% | 6.00% | 6.25% |
| **Gross Sales Price** | 557,298,345 | 531,966,602 | 508,837,619 | 487,636,052 | 468,130,610 |
| Adjustments to Sale | 0 | 0 | 0 | 0 | 0 |
| **Adjusted Gross Sales Price** | 557,298,345 | 531,966,602 | 508,837,619 | 487,636,052 | 468,130,610 |
| Cost of Sales | -5,572,983 | -5,319,666 | -5,088,376 | -4,876,361 | -4,681,306 |
| **Net Sale Price** | 551,725,362 | 526,646,936 | 503,749,243 | 482,759,691 | 463,449,304 |

\* Results displayed are based on Forecast data only

Great Value Self-Storage Portfolio Valuation



## Income Approach Value Conclusion

The income capitalization approach results in the following value indication.

| Value Reconciliation | | |
|---|---|---|
| **Valuation Approach** | **Value Indicator** | **Rounded** |
| Direct Capitalization | $395,833,109 | $395,800,000 |
| Discounted Cash Flow | $391,462,755 | $391,500,000 |
| **Reconciled Value** | **$393,600,000** | **$393,600,000** |

Equal weight is given to each method.



## Reconciliation and Conclusion of Value

In this appraisal, we primarily focus on the income approach to value. We perform both a direct capitalization and discounted cash flow analysis. Portfolio sales transactions are referenced as support for our valuation. We conclude to a value nearly equal to the direct capitalization method in our final value estimate as this best represents market participant behavior for this property type. The value is supported by portfolio sales which have occurred both on a cap rate basis and price per square foot basis. The values indicated by our analyses are as follows:

| Value Conclusion | | | |
| --- | --- | --- | --- |
| Value Type | Property Rights | Date of Value | Value Conclusion |
| Market Value As Is | Leased Fee | December 1, 2019 | $393,600,000 |

**Extraordinary Assumptions**

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1. As part of the scope of the assignment, no inspection was required. We relied on property information contained in an appraisal report prepared by CBRE dated November 8, 2018. We assume no material change as reported in this report and have confirmed this assumption with the asset manager from TIAA.

2. Assume the individual properties comprising the subject property are sold as a single entity (portfolio) and not individually.

**Hypothetical Conditions**

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

None

## Exposure Time

Exposure time is the length of time the subject property would have been exposed for sale in the market had it sold on the effective valuation date at the concluded market value. Exposure time is always presumed to precede the effective date of the



appraisal. Based on our review of recent sales transactions for similar properties and our analysis of supply and demand in the local self-storage market, it is our opinion that the probable exposure time for the subject at the concluded market value stated previously is 6 months.

## Marketing Time

Marketing time is an estimate of the amount of time it might take to sell a property at the concluded market value immediately following the effective date of value. As we foresee no significant changes in market conditions in the near term, it is our opinion that a reasonable marketing period for the subject is likely to be the same as the exposure time. Accordingly, we estimate the subject's marketing period at 6 months.



# Certification

We certify that, to the best of our knowledge and belief:

| Certification | |
|---|---|
| No. | Statement |
| 1. | The statements of fact contained in this report are true and correct. |
| 2. | The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions. |
| 3. | We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved. |
| 4. | We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment. |
| 5. | Our engagement in this assignment was not contingent upon developing or reporting predetermined results. |
| 6. | Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal. |
| 7. | This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan. |
| 8. | Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the states which these properties are located. |
| 9. | The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute. |
| 10. | The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives. |
| 11. | As of the date of this report, Steven J. Johnson, MAI has completed the continuing education program for Designated Members of the Appraisal Institute. |
| 12. | Steven J. Johnson, MAI has not personally inspected the subject. |
| 13. | Andrew Totaro provided signficant real property appraisal assistance to the person signing this certification. |
| 14. | The Firm operates as an independent economic entity.  Although employees of other service lines or affiliates of the Firm may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest. |
| 15. | Within this report, "Newmark Knight Frank", "NKF Valuation & Advisory", "NKF, Inc.", and similar forms of reference refer only to the appraiser(s) who have signed this certification and any persons noted above as having provided significant real property appraisal assistance to the persons signing this report. |
| 16. | Steven J. Johnson, MAI has not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. |
| 17. | Steven J. Johnson, MAI has the knowledge, the experience, and geographic competency to complete this assignment, and has appraised this property type before. |



Steven Johnson, MAI
Certified General Real Estate Appraiser
CA Certificate # AG039077



# Assumptions and Limiting Conditions

The Appraisal contained in this Report (herein "Report") is subject to the following assumptions and limiting conditions:

1.  Unless otherwise stated in this report, title to the property which is the subject of this report (herein "Property") is assumed to be good and marketable and free and clear of all liens and encumbrances and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. No responsibility is assumed for the legal description, zoning, condition of title or any matters which are legal in nature or otherwise require expertise other than that of a professional real estate appraiser. This report shall not constitute a survey of the Property.

2.  Unless otherwise stated in this report, it is assumed: that the improvements on the Property are structurally sound, seismically safe and code conforming; that all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; that the roof and exterior are in good condition and free from intrusion by the elements; that the Property and improvements conform to all applicable local, state, and federal laws, codes, ordinances and regulations including environmental laws and regulations. No responsibility is assumed for soil or subsoil conditions or engineering or structural matters. The Property is appraised assuming that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report is based, unless otherwise stated. The physical condition of the Property reflected in this report is solely based on a visual inspection as typically conducted by a professional appraiser not someone with engineering expertise. Responsible ownership and competent property management are assumed.

3.  Unless otherwise stated in this report, this report did not take into consideration the existence of asbestos, PCB transformers or other toxic, hazardous, or contaminated substances or underground storage tanks, or the cost of encapsulation, removal or remediation thereof. Real estate appraisers are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials and substances may adversely affect the value of the Property. Unless otherwise stated in this report, the opinion of value is predicated on the assumption that there is no such material or substances at, on or in the Property.

4.  All statements of fact contained in this report as a basis of the analyses, opinions, and conclusions herein are true and correct to the best of the appraiser's actual knowledge and belief. The appraiser is entitled to and relies upon the accuracy of information and material furnished by the owner



of the Property or owner's representatives and on information and data provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by such members. Such information and data obtained from third party sources are assumed to be reliable and have not been independently verified. No warranty is made as to the accuracy of any of such information and data. Any material error in any of the said information or data could have a substantial impact on the conclusions of this Report.   The appraiser reserves the right to amend conclusions reported if made aware of any such error.

5.    The opinion of value stated in this report is only as of the date of value stated in this report. An appraisal is inherently subjective and the conclusions stated apply only as of said date of value, and no representation is made as to the effect of subsequent events.  This report speaks only as of the date hereof.

6.    Any projected cash flows included in the analysis are forecasts of estimated future operating characteristics and are predicated on the information and assumptions contained within this report.   Any projections of income, expenses and economic conditions utilized in this report are not predictions of the future.  Rather, they are estimates of market expectations of future income and expenses.  The achievement of any financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured.  Actual results may vary from the projections considered herein.  There is no warranty or assurances that these forecasts will occur.  Projections may be affected by circumstances beyond anyone's knowledge or control. Any income and expense estimates contained in this report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

7.    The analyses contained in this report may necessarily incorporate numerous estimates and assumptions regarding Property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by the analysis will vary from estimates, and the variations may be material.

8.    All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraphs, several events may occur that could substantially alter the outcome of the estimates such as, but not limited to changes in the economy, interest rates, capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc.  In making prospective estimates and forecasts, it is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

9.    The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used.  This report



shall be considered only in its entirety.  No part of this report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the Firm. Possession of this report, or a copy hereof, does not carry with it the right of publication.

11. Client and any other Intended User identified herein should consider this report and the opinion of value contained herein as only one factor together with its own independent considerations and underwriting guidelines in making any decision or investment or taking any action regarding the Property.  Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.  The use of this report and the appraisal contained herein by anyone other than an Intended User identified herein, or for a use other than the Intended Use identified herein, is strictly prohibited. No party other than an Intended User identified herein may rely on this report and the appraisal contained herein.

12. Unless otherwise stated in the agreement  to prepare this report, the appraiser shall not be required to participate in or prepare for or attend any judicial, arbitration, or administrative proceedings.

13. The Americans with Disabilities Act (ADA) became effective January 26, 1992. No survey or analysis of the Property has been made in connection with this report to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines.  No expertise in ADA issues is claimed, and the report renders no opinion regarding the Property's compliance with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

14. Acceptance and/or use of this report constitutes full acceptance of these Assumptions and Limiting Conditions and any others contained in this report, including any Extraordinary Assumptions and Hypothetical Conditions, and is subject to the terms and conditions contained in the agreement to prepare this report and full acceptance of any limitation of liability or claims contained therein.



# Addendum A

# Appraiser Qualifications





**STEVEN J. JOHNSON, MAI**

**Executive Vice President and Head, Self Storage**

CA Appraiser License #AG039077



Newmark Knight Frank
150 South Los Robles Avenue
Suite 850
Pasadena, CA 9110
steve.johnson@ngkf.com
T 626.204.3755
F 626.792.4180

**Years of Experience**
14 Years

**Areas of Specialization**
- Valuation & Advisory
- Self Storage

## Professional Background

Steve Johnson, MAI, serves as an executive vice president with Newmark Knight Frank Valuation & Advisory and heads its Self Storage practice. Based in the Pasadena office, Mr. Johnson is responsible for performing valuation and consulting assignments on a wide range of proposed and existing properties, specializing in self storage facilities on a national level. Other assignments include commercial, retail, industrial, residential income, vacant land and special purpose properties.

Additionally, Mr. Johnson is responsible for management of the Pasadena office, including the training of staff, bidding and reviewing of assignments and maintaining client relationships.

Mr. Johnson joined Newmark Knight Frank in 2018, when the firm acquired the Pasadena office of Integra Realty Resources. At the time of the acquisition, he had been with IRR for more than 14 years, most recently as a senior managing director.

## Licenses and Designations

- MAI designation, Appraisal Institute
- Certified general appraiser, states of Arizona, California, Colorado, Florida, Georgia, Nevada, Texas and Utah

## Education

Mr. Johnson earned his Bachelor of Arts degree from California State Polytechnic University, Pomona. He is currently certified under the Appraisal Institute's continuing education program.

Client Name or Logo



Business, Consumer Services & Housing Agency

BUREAU OF REAL ESTATE APPRAISERS
REAL ESTATE APPRAISER LICENSE

**Steven J. Johnson**

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    AG 039077

Effective Date:    December 14, 2017
Date Expires:    December 13, 2019

Jim Martin, Bureau Chief, BREA

3038041

Great Value Self-Storage Portfolio Valuation



**Addendum B**

**Definitions**



# Definitions

The source of the following definitions is *The Dictionary of Real Estate Appraisal, Fifth Edition,* Appraisal Institute, Chicago, Illinois, 2010, unless otherwise noted.

**As Is Market Value**
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.

**Class of Self-Storage Property**
For purposes of comparison, self-storage properties are grouped into three classes, generally defined as follows:

Class A properties have high-exposure locations in markets where rent levels are well above average for the regional area. Land prices and property values are usually high, which create formidable barriers to entry. The physical quality of the improvements is usually above average, with masonry exterior construction, good building layout, and easy access to units. Construction is new and well maintained. Occupancy is consistently high relative to competing properties.

Class B properties tend to be in secondary locations. The local market area has moderate land prices and property values compared with the regional area. Barriers to entry are moderate and there is usually a higher inventory of self-storage space. Rental rates are also moderate, based on competitive pricing. These properties are typically older, first or second generation facilities (1970s-1980s) that are operating well and have good occupancy, although subject to greater fluctuation. Construction type varies, and the properties are adequately maintained.

Class C properties represent the lower end of the self-storage market. The locations typically reflect areas where land is inexpensive and barriers to entry are low. Property values and appearances tend to be below average for the regional area. There is often a high inventory of space, and rents are below average for the regional area. The physical characteristics of the facility are below average and show signs of deferred maintenance and wear. These are often first or second generation facilities (1970s-1980s), and there may be some functional or external obsolescence.

**Deferred Maintenance**
Needed repairs or replacement of items that should have taken place during the course of normal maintenance.



**Depreciation**

A loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date.

**Discounted Cash Flow (DCF) Analysis**

The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analyst specifies the quantity, variability, timing, and duration of the income streams and the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate.

**Disposition Value**

The most probable price that a specified interest in real property should bring under the following conditions:

1.  Consummation of a sale within a future exposure time specified by the client.

2.  The property is subjected to market conditions prevailing as of the date of valuation.

3.  Both the buyer and seller are acting prudently and knowledgeably.

4.  The seller is under compulsion to sell.

5.  The buyer is typically motivated.

6.  Both parties are acting in what they consider to be their best interests.

7.  An adequate marketing effort will be made during the exposure time specified by the client.

8.  Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

9.  The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

**Effective Date of Appraisal**

The date on which the analyses, opinions, and advice in an appraisal, review, or consulting service apply.

**Entrepreneurial Profit**

1.  A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is



motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses.

2.   In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called entrepreneurial return or entrepreneurial reward.

**Excess Land; Surplus Land**

***Excess Land:*** Land that is not needed to serve or support the existing improvement. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land may have the potential to be sold separately and is valued independently.

***Surplus Land:*** Land that is not currently needed to support the existing improvement but cannot be separated from the property and sold off. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel.

**Exposure Time**
1.   The time a property remains on the market.
2.   The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.

**Fee Simple Estate**
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

**Floor Area Ratio (FAR)**
The relationship between the above-ground floor area of a building, as described by the building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area.

**Gross Building Area (GBA)**
Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the region.



**Highest and Best Use**
The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.

**Lease**
A contract in which rights to use and occupy land or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

**Leased Fee Interest**
A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e, a lease).

**Leasehold Interest**
The tenant's possessory interest created by a lease.

**Liquidation Value**
The most probable price that a specified interest in real property should bring under the following conditions:

1. Consummation of a sale within a short time period.

2. The property is subjected to market conditions prevailing as of the date of valuation.

3. Both the buyer and seller are acting prudently and knowledgeably.

4. The seller is under extreme compulsion to sell.

5. The buyer is typically motivated.

6. Both parties are acting in what they consider to be their best interests.

7. A normal marketing effort is not possible due to the brief exposure time.

8. Payment will be made in cash in U.S. dollars, or in terms of financial arrangements comparable thereto.

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

Great Value Self-Storage Portfolio Valuation



**Marketing Time**

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

**Market Rent**

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements.

**Market Value**

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- buyer and seller are typically motivated;

- both parties are well informed or well advised, and acting in what they consider their own best interests;

- a reasonable time is allowed for exposure in the open market;

- payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

**Prospective Opinion of Value**

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.



**Rentable Area (RA)**
The amount of space on which the rent is based, calculated according to local practice.

**Replacement Cost**
The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design and layout.

**Reproduction Cost**
The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, superadequacies, and obsolescence of the subject building.

**Stabilized Income**
Income at that point in time when abnormalities in supply and demand or any additional transitory conditions cease to exist and the existing conditions are those expected to continue over the economic life of the property; projected income that is subject to change, but has been adjusted to reflect an equivalent, stable annual income.



**Addendum C**

**Engagement Letter**



Addenda

---

**TIAA**

**Amin Shakya**
*VP | Nuveen Risk Management & Valuations*
Telephone: (704) 988-3284
Email: amin.shakya@nuveen.com

November 5, 2019

Raymond T. Cirz, MAI, CRE, FRICS
Newmark Knight Frank
125 Park Avenue,
New York, NY 10017

Re:     Identification #8726
        Great Value Self-Storage Portfolio (a 64-property self-storage portfolio)

Dear Mr. Cirz:

Teachers Insurance and Annuity Association of America ("TIAA"), on behalf of the TIAA Real Estate Account ("Account"), requests that you prepare an appraisal **(previously known as Restricted Format)** of the above referenced property ("Subject Property") on an annual basis over the next three years. The purpose of the appraisal is to provide an opinion of the market value of the **leased fee** interest in the Subject Property. The intended use of the appraisal is to fulfill reporting requirements for the Account, as well as for asset management monitoring purposes. The intended users are TIAA, certain affiliates of TIAA including, among others, TIAA's asset management subsidiary, Nuveen, LLC ("Nuveen"), and the Account's independent fiduciary, RERC, LLC. The effective date of value for the first appraisal should be **December 1, 2019 with the report due date of December 1, 2019.**

Appraisal related information to complete the assignment will be uploaded to the Source Files folder in DataExchange no later than 15 to 20 working days prior to the due date, so please make sure to check this folder. If further information is needed, we suggest that you contact the asset manager for this property.

        Asset Manager:   Adrienne Huffman (adrienne.huffman@nuveen.com) 704-988-1626

You are required to maintain complete confidentiality with regard to any information furnished to you by TIAA and its affiliates, including Nuveen. During and upon completion of the appraisal, neither the value conclusion nor any other aspect of the valuation should be released to anyone other than TIAA's review appraisers. The appraisal consultant shall not (during the course of this engagement) have direct or indirect contact with the Account's portfolio manager of any members of his or her team (collectively, the "Portfolio Management Team"), as this action would be in violation of TIAA's regulatory requirements set forth in the current valuation procedures that are applicable to the Account. Violation of this requirement will render this engagement letter null and void. Please feel free to contact us for further information regarding this issue.

Please note that only matters related to property data and related queries should be discussed with the Account's Portfolio Management Team. **Under no circumstances, should any aspect of the appraisal assumptions or conclusions be discussed with the Portfolio Management Team.**

We require that the appraisal be completed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) of The Appraisal Foundation (the "Standards"). Without limiting the generality of the foregoing, the appraisal report must comply in all respects with Standards Rule 2-1.

We request that you prepare and submit your real property appraisal in a written appraisal report format, as more particularly described in Standards Rule 2-2 of the 2018-2019 edition of USPAP. The appraisal report format requested for the appraisal is what was previously known as "**Restricted Format**".

Regarding the valuations, most items can be addressed in a short paragraph, table, or bullet point. The idea is to get the reader to understand the logic, reasoning and conclusions established in the appraisal report. The primary focus is to describe the changes that have occurred subsequent to the prior appraisal report. With regards to market conditions, give the reader an understanding of where the market was, where it is now, and where is it going. With regard to the Subject Property, give the reader an understanding of any physical changes (including future capital plans), as well as changes to the rent roll (early terminations, lease renewals, lease expansions/extensions, and new leases). Finally, address any changes to the capital markets and investor expectations (including capitalization and discount rates). The narrative portion of the valuation reports should not exceed 20 to 25 pages. Attached are the valuation guidelines, which can be used as an outline to the report.

We further require that the appraisal policies and guidelines set forth by TIAA in the addenda to this engagement letter must be followed (as those policies and guidelines apply to this assignment). Please take special note under the



Guidelines the requirement to use TIAA's chart of accounts. *We require the use of* **Argus Enterprise (any version of 11.7)** *for this assignment.*

Because of reporting restrictions, please do not deliver the report prior to the due dates outlined below. Due to the time-sensitive nature of this assignment, it is imperative that the appraisals be submitted on the due dates. If a delay is anticipated, you must contact the undersigned immediately to discuss a possible extension of the due date.

We agree to pay you a fee based on the following schedule. The invoice will be paid upon receipt and subsequent approval of your report.

| Appraisal Format | Appraisal Fee (each) | Effective Date of Value | Appraisal Preliminary Draft Due Date* |
|---|---|---|---|
| Restricted | $12,000 | December 1, 2019 | December 1, 2019 |
| Restricted | $12,000 | December 1, 2020 | December 1, 2020 |
| Restricted | $12,000 | December 1, 2021 | December 1, 2021 |

*\* If the due date falls on a weekend or holiday, the report is due the following business day*

TIAA may terminate this Agreement for its convenience, without cause, at any time without further charge or expense upon at least thirty (30) calendar days prior written notice.

Please provide me with a copy of your information request letter/email to the asset manager contact (and other relevant communications). Immediately notify me if your letter is not acknowledged in a timely manner or if you have any questions with respect to this assignment. Furthermore, please contact me expeditiously if you are denied pertinent information.

We require delivery of the appraisal report, Excel file with TIAA's Summary of Salient Data and Conclusions, and Argus file(s) via Altus' DataExchange website. Please note the appraisal report is to be delivered in its final PDF format with signatures and a copy of the signed engagement letter (see addenda for detailed electronic submission instructions).

This engagement letter shall be governed by and construed in accordance with the laws of the State of New York, regardless of the principles of the conflicts of law. Subject to the requirements for an action to be heard in the Commercial Division, the parties hereto agree to submit to the exclusive jurisdiction of the Commercial Division, New York State Supreme Court, and to the application of the Court's accelerated procedures, in connection with any dispute related in any way to the services hereunder or this engagement letter. In the event such a dispute does not satisfy the requirements to be heard in the Commercial Division, the parties agree to waive unconditionally their respective rights to trial by jury and submit to the exclusive jurisdiction of the New York State Supreme Court.

Kindly acknowledge your acceptance of this engagement letter by signing one (1) copy of this letter and uploading it to the respective property Engagement File in DataExchange.

Sincerely,

Digitally signed by shakya
Date: 2019.11.05 13:53:50
-05'00'

Amin Shakya
Vice President | Nuveen Risk Management & Valuations
Teachers Insurance and Annuity Association of America

I have read this engagement letter, along with the attachments, and agree with the terms and conditions herein:

BY: _Raymond T. Cirz_____    Dated: _11/7/19_____
        Raymond T. Cirz, MAI, CRE, FRICS
        Newmark Knight Frank



Great Value Self-Storage Portfolio Valuation

***ADDENDA TO***
***TIAA ENGAGEMENT LETTER***

**APPRAISAL POLICIES AND GUIDELINES**

**Electronic Report Submission**

All appraisal reports prepared for TIAA are to be submitted electronically to Altus' DataExchange website. Electronic submission is the placing of the completed appraisal file, including all photographs, facing pages, graphics (scanned or integrated) and exhibits into the DataExchange website under the respective property folder. The electronic appraisal is to be a single, integrated file in Adobe Acrobat (PDF) format, providing the complete report. Reports sent in sections or any portions of reports requiring re-assembly by TIAA are not acceptable. Our strong preference is that the reports be bookmarked for ease of reading by the reviewer. Argus Enterprise models should be uploaded as separate files, but the outputs/printouts of these, as they pertain to the report, are required to be part of the appraisal document as submitted in the PDF format. The Excel file with TIAA's Summary of Salient Data and Conclusions should also be uploaded as a separate document.

Unlike email transmission of reports, there are no limitations on the size of the file to be placed on the site. Please check with your Internet provider to assure that there are no limitations on your capability to send files. The web site address is www.altusdataexchange.com. All files are to be placed into the respective property folder with the following naming convention.

**File Naming Convention**

| Document | File Name |
|---|---|
| *Type of Document or File* | *4-Digit Asset ID_Abbreviated Property Name_Type of Document_MoYr* |
| Annual Appraisal Report | 8077_Castro Station_A_Appraisal_1117 |
| Quarterly Valuation Report | 8077_Castro Station_Q_Appraisal_0218 |
| Interim Valuation Report | 8077_Castro Station_I_Appraisal_0118 |
| Semi-Annual Appraisal Report | 8077_Castro Station_S_Appraisal_0618 |
| TIAA Summary Excel File | 8077_Castro Station_Salient Data_1117 |

**Naming Convention for Argus Enterprise**

| Scenario # | # of ARGUS models | # of buildings | ARGUS Enterprise file name |
|---|---|---|---|
| 1. | 1 | 1 | 591301_0917 |
| 2. | 1 | 2 | 591301_0917 |
| 3. | 2 | 2 | 591301_0917 and 591302_0917 |
| 4. | 2 | 5 | 591301_0917 and 591303_0917, or 591301_0917 and 591304_0917<br>(depending on how the properties are set up in Yardi) |
| 5. | 2 | 1 | ca591301_0917 for retail component and ra591301_0917 for apartment component |

(depending on how the properties are set up in Yardi; c = commercial, r = residential; Funds are as follows: a = general account, b = real estate account, c = core property fund, d = Canadian pension plan, e = penn muni, h = future fund, i = APG super regional mall fund, j = norges)

A password to access the site is issued to each approved appraiser. If a password was not issued to you, please email a request to dataexchange@altusgroup.com.

3



**Subcontractors**

TIAA has engaged the Consultant and his/her firm for the assignment. The report is to be completed by the consultant, or by members of his/her staff who are employees of the Consultant's firm under the Consultant's direct supervision. Any use of subcontractors must be approved by TIAA or certain of its affiliates prior to the commencement of the assignment. (If permission to use subcontractors is granted, TIAA appraisal staff will provide a supplement to this engagement letter outlining further requirements.)

**Guidelines for Valuations (Restricted Format) – All Property Types (If appropriate, or applicable)**

The TIAA review appraiser will focus on the following items, which must be presented in order and adequately covered in the appraisal. Please note the intent of the report is to be presented in a restricted format, meaning some of the items below can be in statement or bullet point format.

1.  Letter of Transmittal – should include the following at a minimum:
    a.  Effective date of appraisal
    b.  Property rights appraised
    c.  Purpose of appraisal
    d.  Type of report format and reference to appropriate Standards Rule
    e.  Statement of conformity to USPAP, Code of Professional Ethics and Standards of the Appraisal Institute, TIAA guidelines and FIRREA
    f.  Brief description of Subject Property
    g.  Value conclusion
    h.  Statement to the degree of reliability of the value conclusion given current market conditions
    i.  Comparison of the current value to the prior annual and previous valuation (include dollar amount of the difference and percent change, and reason why there are changes)
    j.  Comment on extraordinary assumptions and/or hypothetical conditions

2.  Certification

3.  Assumptions and Limiting Conditions

4.  TIAA's Summary of Salient Facts
    Rotation schedule for column headings:
    Prior Annual        Current Annual

5.  Identification of the Subject Property
    One paragraph describing the building improvements and site

6.  Ownership and Property History (bullet point, can reference the annual appraisal)

7.  Relevant Dates (bullet point format)
    a.  Date of Inspection (Not required)
    b.  Date of Value
    c.  Date of Report

8.  Purpose of the Appraisal – include the definition of market value in this section

9.  Intended Use and User of the Report
    Must incorporate the statement of use from the engagement letter

10. Property Rights Appraised – include the definition, also

11. Scope of Work (can be in a table or bullet point format)
    Comment on what steps were taken to arrive at a credible value estimate. Comment on what procedures and analyses were included or excluded to the extent that they were requested by the client, and how these inclusions or exclusions prevented (or did not prevent) a credible value estimate from being estimated or reported.

4

Great Value Self-Storage Portfolio Valuation



12. Economic update of the metropolitan area. This should be short (two to three paragraphs). Sources that can be used for this section include Economy.com, Torto Wheaton Research, or any others that report on economic conditions for the area.

13. Market Update (supporting charts/tables can be incorporated in the text or addendum)
    This is the section where current market conditions and trends are addressed. It should include one or two paragraphs regarding the metropolitan analysis. The submarket analysis should be discussed and analyzed in more detail. The idea is to give the reader an understanding of where the market was, where it is now, and where is it going. Topics to discuss include vacancy trends (what is causing it), absorption, construction activity, concessions, market rental rates, and market rent growth rates. The most important feature of this section is the conclusion.

14. Real Estate Taxes
    This section only needs to be a sentence if there is no change from the previous analysis. However, when the assessments or taxes change, they need to be analyzed and discussed so the reader understands the changes.

15. Highest & Best Use - statement

16. Sales Comparison Approach (use of tables and charts can help shorten this section)
    Although a complete sales comparison approach is not expected, commentary is necessary on the activity level of sales in the market and the direction of values. Presentation of unit prices of recent transactions and current listings would be helpful. Comparable sales data are to be placed in the addendum. This section can successfully be addressed in a couple of paragraphs.

17. Income Capitalization Approach (use of tables and charts can help shorten this section)
    a. Subject Property update from the perspective of the property manager and leasing broker
    b. An analysis of recent leasing at the Subject Property, including a table summarizing the terms of the recent leases. Include starting rent, rent steps and concessions over the term. Indicate the TI allowance for each lease, and if it was a new lease or a renewal.
    c. Analyze and discuss near-term rollover
    d. Explanation of projected lease-up of vacant space
    e. Market rent discussion and analysis (comparables to be included in addendum)
        i. Include both actual lease information and current asking rates
        ii. Data should include start date, term, starting rent, rent escalations, concessions and tenant improvement allowances
        iii. Discuss the impact concessions and tenant improvements have on the market rental value (effective rent)
        iv. Draw reasonable and supportable conclusion
    f. Vacancy and Collection Loss
    g. Other income, percentage rent, and expense reimbursements
    h. Effective gross income
    i. Operating expenses (this is presented in a table)
        i. Presentation of historical income and expenses. Include a three-year history of the Subject Property's operating performance, the current budget, and the year-1 projection from Argus Enterprise in the same table for comparison purposes. Include sufficient detail for the revenues. Where possible, follow the expense line items (and order) from the budget and TIAA's chart of account.
        ii. Discuss why changes are made to estimates from previous valuation.
    j. Capital expenditures – needs to be itemized and explained how they are incorporated in the analysis
    k. Capitalization and discount rate discussion – should reference the sales, interviews with market participants, investor surveys, etc. and tie the information back to the Subject Property. The appraiser should lead the reader to the rate conclusions.
    l. Direct capitalization summary with conclusion
    m. Table summary of discounted cash flow assumptions
    n. Property Reports (Cash Flow) and Valuation Reports (Present Value) are to be included in the body of the appraisal report
    o. Reconciliation of the income capitalization approach

18. Extraordinary Assumptions or Hypothetical Conditions

19. Exposure and Marketing Times

20. Addendum

5



a.  Stacking Plan (office buildings) or Lease Plan (retail and industrial)
b.  Rent roll from property management
c.  Operating statements from property management
d.  Comparable Sales
e.  Rent Comparables
f.  Tenant Reports (Lease Summary)
g.  Valuation Reports (Valuation & Return Summary)
h.  Audit Reports (Input Assumptions)
i.  Qualifications

Please keep in mind that this report is presented in restricted format. Most items can be addressed in a short paragraph, table, or bullet point. The idea is to get the reader to understand the logic, reasoning and conclusions established in the appraisal report. Should the appraiser have any questions or comments regarding these guidelines, please contact the TIAA appraiser engaging the assignment.

6



Great Value Self-Storage Portfolio Valuation

**TIAA's Chart of Account Mapping for ARGUS Files (from Yardi 6.0)**

| ARGUS Description | New Acct # | |
|---|---|---|
| **Revenue -** | | |
| Gross Potential Rent | 4100200000 | ⎫ |
| Gain to Lease | 4100300000 | ⎪ |
| Loss to Lease | 4100400000 | ⎬ Residential Properties |
| Loss - Model Unit | 4120300000 | ⎪ |
| Employee Discount | 4120600000 | ⎭ |
| Rental Income | 4000100900 | |
| Percentage Rent | 4000100050 | |
| Vacancy Loss | 4120200010 | |
| Rent Concessions | 4110100000 | |
| Recovery Income | 4060100010 | |
| Lease Termination Income | 4000400000 | |
| Parking Revenue | 4021000040 | |
| Other Rents | 4022900000 | |
| Miscellaneous Income | 4020900000 | |
| Bad Debt/Collection Loss | 4160060000 | |
| **Expenses -** | | |
| Cleaning | 5009000000 | |
| Repairs & Maintenance | 5019100010 | |
| Utilities | 5030900000 | |
| Grounds | 5020900000 | |
| Security | 5040900000 | |
| General Administrative (Recoverable) | 5080150000 | * |
| General Administrative (Non-Recoverable) | 5138900000 | |
| Non-Reimbursable Expenses | 5120100000 | → Used only for ground lease and legal fees |
| Management Fees | 5080100000 | |
| Real Estate Taxes | 5070900000 | |
| Insurance | 5051100000 | |
| Marketing | 5200100000 | ⎫ Hotel and |
| Salaries - Other Associated Labor/Benefit | 5260130000 | ⎬ Residential Properties |
| Other Expenses | 5331900000 | |
| **Capital Expenditures -** | | |
| Building Improvements | 1301900000 | |
| Tenant Improvements | 1303100950 | |
| Leasing Costs | 1370300950 | |

* Use this account code for G&A with Apartments

Account codes should not be applied to sub-total or total line items. Also, in situations where there are sub-lines, the parent line should not have account codes. Reference accounts do not need account codes.

Note: Should the appraiser have any questions or comments regarding the chart of accounts, please contact the TIAA appraiser engaging this assignment.

*Revised August 1, 2018*                                                                 10



## EXHIBIT 6

**SROA Purchase Offer**

# SROA | CAPITAL

**SUMMARY OF PRINCIPAL TERMS**
**Great Value Storage**
**March 4, 2020**

| | |
|---|---|
| **Purchaser:** | SROA Acquisitions, LLC or and affiliate ("SROA" or "Purchaser").  SROA is a West Palm Beach-based, vertically-integrated commercial real estate investment management company that owns and operates 133 self-storage properties, consisting of 7 million square feet in 10 states, under the Storage Rentals of America brand. |
| **Property:** | Fee simple interest in 64 property self-storage portfolio.  See Exhibit B |
| **Purchase Price:** | $375,000,000 |
| | The equity required at closing shall be funded by SROA. SROA has secured internal approvals to proceed with the transaction, with final approvals subject to information obtained during the Due Diligence Period, including, but without limitation to, the items outlined on the attached Exhibit A. |
| **Earnest Money:** | Within three (3) business days following the full execution of a Purchase and Sale Agreement ("PSA", as hereinafter defined), $1,000,000 (the "Initial Earnest Money") will be deposited with Purchaser's title company (the "Escrow Company").  The Initial Earnest Money shall be deposited in a federally insured interest-bearing account and held in accordance with the terms of the PSA.  The Initial Earnest Money shall be fully refundable to Purchaser at any time during the Due Diligence Period (as hereinafter defined).  If, upon expiration of the Due Diligence Period, Purchaser elects to proceed with the transaction, an additional $3,000,000 will be deposited with Escrow Company, at which point the total Earnest Money Deposit shall become non-refundable and shall be applied to the Purchase Price at Closing. |
| **Due Diligence Period:** | Purchaser shall have forty-five (45) days (the "Due Diligence Period") from execution of the PSA and the delivery of all items contained on the attached Exhibit A to inspect the Property and all conditions affecting the Property. |
| | Seller shall cooperate with Purchaser and its representatives to immediately inspect and test in connection with Purchaser's due diligence investigation of the Property. Seller shall provide Purchaser with access to the Property, as well as any documents, reports and other items relating to the Property that Purchaser may reasonably request and which are in seller's possession or subject to its control. The cost of any inspections, tests, and studies shall be borne by Purchaser. |
| **Closing:** | The Closing shall occur as soon as reasonably practicable, but in no event later than fifteen (15) days following Purchaser receipt of approval to assume the existing loans from existing lenders and/or servicers. Purchaser shall have a one-time right to extend closing for an additional 30 days by providing notice at least 48 hours in advance of the outside closing date and delivery of an additional deposit of $2,000,000 which shall be applied against the Purchase Price. |
| **Closing Costs:** | Seller shall pay for and provide Purchaser with current ALTA surveys with respect to the Property and shall be solely responsible for the payment of all brokerage commissions.  Furthermore, Seller shall be responsible for any penalties or accrued interest owed to existing lenders. Seller and Purchaser shall pay the customary portion of recording costs and all other expenses related to conveyance of the Property and |

shall each be responsible for their respective legal costs associated with Closing. Seller and Purchaser shall allocate transfer taxes according to local market custom. Purchaser shall be solely responsible for the payment of its third-party reports.

**Prorations:**    All ad valorem taxes, assessments and other applicable operating expenses, both accrued and realized, shall be prorated as of the date of Closing on a cash basis based on each party's ownership period.

**Brand/IT:**    Seller agrees that, from and after the Closing, (a) Buyer shall have all rights, title and interest in and to the name "Great Value Storage" and any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any derivations, modifications or alterations thereof, and any word, name or mark confusingly similar thereto (collectively, the "Seller Marks"), and (b) within forty-five (45) days after the Closing, Seller and its affiliates shall cease use of any of the Seller Marks at any assets owned by Seller or its affiliates (or elsewhere) and, after such forty-five (45) day period, neither Seller nor any of its affiliates or representatives, shall have any, right, title or interest in or to the Seller In connection with the foregoing, all rights to any internet domains, web addresses, search engine accounts and similar proprietary information and information technology including, without limitation, the items listed on Exhibit C attached hereto (and all account information related thereto) shall be conveyed to Buyer at Closing.

**Purchase and Sale Agreement:**    A PSA will be fully executed within twenty (20) business days of seller's execution of this Summary of Principal Terms.   This Summary of Principal Terms will immediately expire and be considered null and void at the end of such period.

**Non-Binding:**    This Summary of Principal Terms is non-binding except under "Exclusivity" (defined below), "Confidentiality" (defined below) and the balance of this paragraph, and shall not (in any event, with such exceptions) be deemed to create any rights in favor of, or impose any obligations upon, either party hereto, and accordingly neither party shall have any obligation or liability whatsoever with respect to the proposed transaction (with such exceptions) unless and until a definitive agreement with respect thereto, containing detailed terms, conditions and covenants satisfactory to both parties, have been executed and unconditionally delivered by both parties.

**Governing Law**:    This Summary of Principal Terms shall be governed by and construed in accordance with the internal laws (and not laws pertaining to conflicts or choice of law) of the State of Florida.  All parties consent to the exercise of personal jurisdiction over them in Florida and agree that any action arising out of or relating to this Summary of Principal Terms shall be brought exclusively in a court of competent subject matter jurisdiction located within the State of Florida.

**Exclusivity:**    Following the execution of this Summary of Principal Terms, seller or an affiliate will not seek to enter into any discussions or agreements with third-parties to acquire or recapitalize the Property or any portions thereof. Both Purchaser and seller shall use good faith efforts to effectuate the execution of the PSA within twenty (20) business days of seller's execution of this Summary of Principal Terms.

**Confidentiality:**    Seller, and its affiliates, representatives and advisors shall not disclose this Summary of Principal Terms or the contents herein to any other party without prior approval from Buyer.

If seller is in agreement with the foregoing, please execute this Summary of Principal Terms and return one original copy to Purchaser. Within three (3) business days of Purchaser's receipt of an executed original copy of this Summary of Principal Terms, seller shall circulate a draft Purchase and Sale Agreement to be used as the basis of negotiation between the parties hereto. The transaction will become binding on the parties in accordance with the terms contained in the final Purchase and Sale Agreement and executed by both parties.

In the event this Summary of Principal Terms is not executed by seller and delivered to Purchaser on or before 5:00 p.m. Eastern Time on March 9, 2020 this Summary of Principal Terms shall automatically become null and void and neither party shall have any liability to the other hereunder.

Very truly yours,

SROA Acquisitions, LLC

By:_____
Name: Jack Cooney
Title: Authorized Signatory

Confirmed and Agreed:

[SELLER]

By:_____
Name:
Title:

**EXHIBIT A**
**"Initial Due Diligence Deliverables"**

1.    Current Rent Roll

2.    Monthly statements in Microsoft Excel of income and expenses for the Property for the prior three (3) calendar years and current year-to-date, including annual expense audits if applicable.

3.    Monthly Occupancy Stats and Management Summary for the prior three (3) calendar years and trailing twelve (12) months.

4.    Monthly occupancy history for the Property for the previous five (5) full calendar years and current year-to-date.

5.    Access to Property for purposes of completing full environmental and property condition inspections, which shall include, but not be limited to, roofs and parking areas.

6.    Any existing Phase I and Phase II environmental assessments and any supplemental environmental reports or information.

7.    Any existing engineering reports, seismic, geotechnical or property condition assessments.

8.    Aged receivables reports for the prior three calendar years and current year-to-date.

9.    A list of service contracts, maintenance records and warranties relating to the Property and copies of each.

10.    Copies of the two preceding real estate tax bills, assessments, any related notices and any information on the most recent or current tax protests.

11.    Copies of all documents relating to any tax abatements currently benefiting the Property.

12.    Copy of building plans for the Property and any other improvements.

13.    A list of licenses, easements, leases, amendments or agreements affecting the Property and copies of each.

14.    Certificates of Occupancy for the Property.

15.    List of Hazardous Substances in use or stored on site.

16.    Copies of existing title policies or report(s) for the value of the Property.

17.    Copies of existing plats or surveys (including boundary, as-built, or topography) of the Property and/or site plans.

18.    Schedule of capital improvements (excluding tenant improvements) made to the Property for the last five years.

19.    Zoning certifications for Purchaser's intended use.

20.    Copies of the tenant leases.

**EXHIBIT B**
**"Property List"**

| | | | | |
|---|---|---|---|---|
| 1 | 13825 FM 306 | Canyon Lake | TX | 78133 |
| 2 | 1151 E. Expressway 83 | San Benito | TX | 78586 |
| 3 | 7116 S. I H 35 | Austin | TX | 78745 |
| 4 | 10013 FM 620 N | Austin | TX | 78726 |
| 5 | 16905 Indian Chief | Cedar Park | TX | 78613 |
| 6 | 2407 S. Hwy 183 | Leander | TX | 78641 |
| 7 | 613 North Freeway | Fort Worth | TX | 76102 |
| 8 | 4901 South Freeway | Fort Worth | TX | 76115 |
| 9 | 9530 Skillman Street | Dallas | TX | 75243 |
| 10 | 920 Hwy 80 East | Mesquite | TX | 75149 |
| 11 | 4311 Samuell Blvd | Dallas | TX | 75228 |
| 12 | 4641 Production Drive | Dallas | TX | 75235 |
| 13 | 6250 Westward Lane | Houston | TX | 77081 |
| 14 | 8801 Boone Rd. | Houston | TX | 77099 |
| 15 | 8450 Cook Rd | Houston | TX | 77072 |
| 16 | 9951 Harwin Dr. | Houston | TX | 77036 |
| 17 | 9010 E.F. Lowry Expressway | Texas City | TX | 77591 |
| 18 | 410 North IH-45/Gulf Fwy | Texas City | TX | 77591 |
| 19 | 5550 Antoine Dr | Houston | TX | 77091 |
| 20 | 10640 Hempstead Rd. | Houston | TX | 77092 |
| 21 | 14318 Highway 249 | Houston | TX | 77086 |
| 22 | 3412 Garth Rd. | Baytown | TX | 77521 |
| 23 | 11702 Beechnut St | Houston | TX | 77072 |
| 24 | 10601 W Fairmont Pkwy | La Porte | TX | 77036 |
| 25 | 2150 Wirt Rd | Houston | TX | 77055 |
| 26 | 941 Fairmont | Pasadena | TX | 77504 |
| 27 | 4806 Marie Lane | Deer Park | TX | 77536 |
| 28 | 8320 Alabonson Rd | Houston | TX | 77088 |
| 29 | 5811 N. Houston Rosslyn Rd. | Houston | TX | 77088 |
| 30 | 632 Timkin Rd | Tomball | TX | 77375 |
| 31 | 16530 W. Hardy St | Houston | TX | 77060 |
| 32 | 15300 Kuykendahl Road | Houston | TX | 77090 |
| 33 | 2502 Bay Street | Texas City | TX | 77590 |
| 34 | 1910 25th Avenue North | Texas City | TX | 77590 |
| 35 | 3785 Shiloh Springs Rd | Trotwood | OH | 45426 |
| 36 | 426 N. Smithville Rd | Dayton | OH | 45431 |
| 37 | 60 Westpark Dr | Centerville | OH | 45459 |
| 38 | 435 Congress Park Drive | Centerville | OH | 45459 |
| 39 | 8501 Springboro Pike | Miamisburg | OH | 45342 |
| 40 | 4145 StateRoute 741S | Mason | OH | 45040 |
| 41 | 7986 Southern Blvd | Boardman | OH | 44512 |
| 42 | 123 S. Meridian Rd | Youngstown | OH | 44509 |
| 43 | 7821 Taylor Road SW | Reynoldsburg | OH | 43068 |
| 44 | 7200 Tussing Road | Reynoldsburg | OH | 43068 |
| 45 | 1585 Lexington Ave | Mansfield | OH | 44907 |
| 46 | 9984 Old State Road | Lewis Center | OH | 43035 |
| 47 | 5199 Westerville Road | Columbus | OH | 43231 |
| 48 | 5301 Tamarack Circle | Columbus | OH | 43229 |

| 49 | 580 East Dublin-Granville Rd | Worthington | OH | 43085 |
| 50 | 1330 Georgesville Road | Columbus | OH | 43228 |
| 51 | 1661 W Government Cove | Brandon | MS | 39042 |
| 52 | 2033 Oak Grove Road | Hattiesburg | MS | 39402 |
| 53 | 111 N Layfair Dr | Flowood | MS | 39232 |
| 54 | 1582 Route 9G | Hyde Park | NY | 12538 |
| 55 | 765 South Street | Newburgh | NY | 12550 |
| 56 | 1961 Covington Pike | Memphis | TN | 38128 |
| 57 | 3951 Lamar Rd | Memphis | TN | 38118 |
| 58 | 7273 Kearney Street | Commerce City | CO | 80022 |
| 59 | 443 Laredo Street | Aurora | CO | 80011 |
| 60 | 1710 N. Cunningham | Urbana | IL | 61802 |
| 61 | 2208 N. Market St | Champaign | IL | 61822 |
| 62 | 1441 N. Nellis Blvd | Las Vegas | NV | 89110 |
| 63 | 3380 N. Post Rd | Indianapolis | IN | 46226 |
| 64 | 9600 Marion Ridge | Kansas City | MO | 64137 |