**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
In re:                                                           :   Chapter 11
                                                                 :
GVS Portfolio I B, LLC,                                          :   Case No. 21-10690 (CSS)
                                                                 :
           Debtor.[1]                                      :   **Related to Docket Nos. 8 and 53**
                                                                 :
                                                                 :
---------------------------------------------------------------- x

**RREF III STORAGE LLC'S REPLY IN FURTHER SUPPORT
OF ITS MOTION FOR ENTRY OF AN ORDER DISMISSING
THE DEBTOR'S CHAPTER 11 CASE WITH PREJUDICE**

RREF III Storage LLC ("RREF") hereby files this reply in further support of its motion to dismiss (the "Motion to Dismiss") contained in *RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case With Prejudice and Granting Relief from the Automatic Stay* [ECF No. 8] (the "Motion"),[2] and in response to the *Debtor's Preliminary Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* [ECF No. 53] (the "Objection"). In support of this reply, RREF respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor concedes, as it must, that it has the burden to establish that it filed this chapter 11 case in good faith. Under binding precedent, carrying that burden requires evidence of an objectively valid purpose for the Debtor to commence (and remain in) bankruptcy. That was,

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's taxpayer identification number, is as follows: GVS Portfolio I B, LLC (7171). The Debtor's mailing address is 814 Lavaca Street, Austin, TX 78701.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion. As a result of the status conference held by the Court on May 12, 2021, RREF and the Debtor are proceeding with a hearing on the Motion to Dismiss alone on May 26, 2021. To the extent the Court does not grant the Motion to Dismiss, RREF and the Debtor will go forward with briefing and discovery on the remainder of the relief sought in the Motion.

of course, always going to be a difficult showing to make, given that by the Debtor's own admission, the vast majority of the indicia of bad faith considered by courts within the Third Circuit are present here.

2.   Presumably aware of the uphill battle that it faces, the Debtor attempts to shift the narrative by focusing on its subjective belief that its sole asset (a membership interest in a holding company that owns the membership interests in yet another group of companies that actually own physical property) has substantial value that supposedly can be preserved only in bankruptcy. It is telling that the Objection—which is riddled with countless inconsistencies, distortions, and outright misstatements of fact and law—offers nothing but hearsay and conjecture in support of the Debtor's views. But those views are ultimately beside the point, because the mere presence of "equity value"—even if such value was assumed *arguendo* to exist for present purposes only—is not a valid basis for filing and remaining in bankruptcy.

3.   What is more, the Debtor's self-serving professions of "genuine subjective good faith" do not outweigh the overwhelming objective evidence to the contrary. The Debtor cannot dispute that it has no cash, no bank account, no employees, no ongoing business, and no operations; that it receives no income other than distributions made on account of its membership interest that are pledged for the benefit of, and remitted directly from the loan servicer to, its secured (and perhaps sole) creditor; that its lone asset is a piece of paper pledged to that creditor; and that the Debtor, like so many of its affiliates owned and controlled by Natin Paul, filed this case mere minutes before that asset was scheduled to be auctioned at a judicially-sanctioned foreclosure sale, representing the *third time* this Debtor has sought the intervention of the courts to prevent a sale from going forward.

4.  Furthermore, the Debtor has failed to propose any realistic means for realizing upon the purported value of its membership interest, whether by refinancing its defaulted mezzanine debt, recapitalizing the entire GVS enterprise, or otherwise; instead, it has asked the Court for more time to consider its options, something that the Debtor's equity owner has been asking for since the Mezz 2 Loan was accelerated in December 2019 (and, at the latest, since the secured lender first served a notice of a scheduled foreclosure sale in July 2020). The Debtor has done nothing in this case other than file required reports, respond to the Motion, and file applications to retain professionals who can be paid only through equity contributions. It has not articulated a clear exit strategy, including how it intends to confirm a chapter 11 plan over the objection of RREF. Perhaps most pressingly, the Debtor has not identified a committed source of funding to pay for the very significant costs attendant to any bankruptcy case.

5.  This all begs the question: why exactly should this Debtor remain in bankruptcy, particularly when compared to the considerably less expensive alternative of the UCC foreclosure sale, the terms of which were agreed to by the Debtor and that a New York state court has already determined was designed to maximize value? The Debtor's only answer to that question is that the New York state court was wrong. But seeking to appeal or collaterally attack a state court decision is not a legitimate use of the Bankruptcy Code.

6.  Simply put, the Debtor has failed to meet its burden to prove that the continuation of this case serves a valid purpose. The Motion to Dismiss should be granted.

## REPLY

**I.    The Debtor Cannot Prove its Objective Good Faith in Filing this Chapter 11 Case.**

7.  There is no dispute that binding Third Circuit precedent places the burden squarely on the Debtor to affirmatively show that its chapter 11 case "serves a valid bankruptcy purpose," and that it was not "filed merely to obtain a tactical litigation advantage." Objection, at 2; *id.*, ¶ 27

3

(citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Expr., Inc. (In re Integrated Telecom Expr., Inc.)*, 384 F.3d 108, 120 (3d Cir. 2004)).  The Debtor and RREF also agree that the valid purposes for a bankruptcy filing are either to preserve a going concern or to maximize the value of the debtor's estate, *see* Objection, ¶ 27, and that courts in this jurisdiction consider 13 probative factors in assessing whether a case serves a valid bankruptcy purpose.  *See* Objection, ¶¶ 49, 50 (citing *In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002)).

8.  The Debtor concedes that a majority of those factors are present here: (i) this is a single asset case; (ii) there are few if any unsecured creditors; (iii) there is no ongoing business or employees; (iv) the petition was filed on the eve of (or, more precisely, minutes before) a foreclosure; (v) this is a two party dispute; (vi) the Debtor has no cash or income;[3] and (vii) there is no pressure from non-moving creditors.  *See* Objection, ¶ 50.  Further, and as set forth herein, the remaining relevant factors overwhelmingly weigh in favor of dismissal.[4]

9.  Faced with this reality, the Debtor asks the Court to set aside the well-established objective factors for determining good faith as mere "guideposts," *id.*, ¶ 24, in favor of a subjective test spun from whole cloth that rests almost entirely on the Debtor's purportedly "genuine and earnest intent in filing this case."  *Id.*, ¶ 50.  The Court should reject the Debtor's invitation to throw all precedent out the window, and instead should faithfully apply the remaining disputed *Primestone* factors, which are discussed below, in accordance with established Third Circuit law.

---

[3]  Unless one were to count distributions that fall out of the bottom of the cash management waterfall and are remitted directly to RREF as the Debtor's "income."

[4]  Specifically, that (i) the chapter 11 case was commenced solely for the benefit of the automatic stay, (ii) numerous affiliated entities have filed for bankruptcy protection previously, (iii) the Debtor has no prospect of reorganization, and (iv) there is a lack of subjective good faith.  RREF does not allege that this specific Debtor entity engaged in any improper prepetition conduct (though Paul, of course, faces his own legal troubles, *see* Motion, ¶¶ 9-13) or that it was formed immediately prepetition, which are the two remaining factors.

### A. The Chapter 11 Case was Filed Merely to Obtain the Benefit of the Automatic Stay.

10.     The Debtor makes a perfunctory attempt to deny that it filed its chapter 11 case solely to obtain the benefit of the stay, stating without elaboration or support that "this case was filed for a variety of reasons beyond the application of the automatic stay . . . ." Objection, ¶ 50. But conclusory assertions are insufficient to overcome the strong presumption that a debtor filing a petition under these circumstances does so with the intent to abuse the stay. *See* Motion, ¶ 76 (collecting cases inferring that single-asset debtors filing on eve of foreclosure did so solely to reap benefit of stay). Indeed, the Debtor produced documents during discovery in this contested matter that showed definitively that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[5] *See* E-mail from Brian Elliott to Lisa Stark (Mar. 22, 2021), Bates Nos. WORLD000187 – WORLD000188, a copy of which is attached hereto as **Exhibit A**.

### B. Natin Paul is a Serial Bankruptcy Filer.

11.     The Objection makes much of the fact that the Debtor itself has never before filed for bankruptcy. *See* Objection, ¶ 50. While this may be true, any conclusion drawn from such a statement would miss the mark entirely. *See* Objection, ¶ 51. That is because the Debtor is owned and controlled by Natin Paul—the Founder, Chairman, President, CEO, and sole owner of World Class, which is the direct or indirect owner of an untold number of affiliates, including the Debtor. The troubling reality is that no fewer than 21 of those affiliates (several of which were not disclosed in the Debtor's bankruptcy petition)[6] have filed for bankruptcy over the last 18 months, including

---

[5] The redactions set forth in this reply are made in accordance with the *Confidentiality Agreement and Stipulated Protective Order*, approved by the Court on May 20, 2021 [ECF No. 60].

[6] *See In re WC Thousand Oaks Center, LP*, No. 21-10251 (TMD) (Bankr. W.D. Tex. Apr. 6, 2021); *In re WC 3rd and Trinity, LP*, No. 21-10252 (TMD) (Bankr. W.D. Tex. Apr. 6, 2021); *In re WC Teakwood Plaza, LLC*, No. 20-11104 (TMD) (Bankr. W.D. Tex. Oct. 6, 2020); *In re WC 4811 South Congress, LLC*, No. 20-11105

5

in this Court.[7] Many of these affiliated cases were filed on the eve or morning of a scheduled foreclosure sale. *See* Motion, at ¶ 69. As a result, the automatic stay has been lifted in 13 of the cases to permit the lender to proceed with foreclosure,[8] and at least two cases have been dismissed outright.[9]

12.  The simple fact is that Paul has become a serial filer that routinely abuses the bankruptcy process by filing entities he controls to deprive lenders of contractually bargained-for rights and property interests.[10] The Court need not blind itself to this modus operandi, as it is highly probative of the Debtor's lack of good faith in commencing this case. *See In re EFL Partners X*, No. 13-11495-MDC, 2013 WL 4508423 (Bankr. E.D. Pa. Aug. 23, 2013), at *4.

### C. The Debtor Has No Realistic Plan for Reorganizing.

13.  The Debtor's argument that there is a reasonable prospect for reorganization fares no better. The Debtor claims that due to significant value in the operating assets two entities down

---

(TMD) (Bankr. W.D. Tex. Oct. 6, 2020); *In re WC 56 East Avenue, LLC*, No. 19-11649 (TMD) (Bankr. W.D. Tex. Dec. 2, 2019).

[7]  *In re WC Thousand Oaks Center, LP*, No. 21-10251 (TMD) (Bankr. W.D. Tex. Apr. 6, 2021); *In re WC 3rd and Trinity, LP*, No. 21-10252 (TMD) (Bankr. W.D. Tex. Apr. 6, 2021); *In re WC Teakwood Plaza, LLC*, No. 20-11104 (TMD) (Bankr. W.D. Tex. Oct. 6, 2020); *In re WC 4811 South Congress LLC*, No. 20-11105 (TMD) (Bankr. W.D. Tex. Oct. 6, 2020); *In re WC 4th and Colorado, LP*, No. 20-10881 (TMD) (Bankr. W.D. Tex. Aug. 4, 2020); *In re WC 2101 W Ben White, LP*, No. 20-10182 (TMD) (Bankr. W.D. Tex. Feb. 4, 2020); *In re WC Hirshfeld Moore, LLC*, No. 20-10251 (TMD) (Bankr. W.D. Tex. Feb. 3, 2020); *In re Silicon Hills Campus, LLC*, No. 20-10042 (TMD) (Bankr. W.D. Tex. Jan. 7, 2020); *In re 900 Cesar Chavez, LLC*, No. 19-11527 (TMD) (Bankr. W.D. Tex. Nov. 4, 2019).

[8]  *See In re WC 4811 South Congress, LLC*, No. 20-11105 (TMD) (Bankr. W.D. Tex. Apr. 13, 2021) [ECF No. 230]; *In re WC Teakwood Plaza, LLC*, No. 20-11104 (TMD) (Bankr. W.D. Tex. Apr. 13, 2021) [ECF No. 181]; *In re WC Hirschfeld Moore, LLC*, No. 20-10251 (TMD) (Bankr. W.D. Tex. Apr. 5, 2021) [ECF No. 210]; *In re WC 56 East Avenue, LLC*, No. 19-11649 (TMD) (Bankr. W.D. Tex. Jan. 20, 2021) [ECF No. 249]; *In re Silicon Hills Campus, LLC*, No. 20-10042 (TMD) (Bankr. W.D. Tex. Nov. 24, 2020) [ECF No. 230] (appeal pending); *In re WC 2101 W Ben White, LP*, No. 20-10182 (TMD) (Bankr. W.D. Tex. July 9, 2020) [ECF No. 52].

[9]  *In re WC Teakwood Plaza, LLC*, No. 20-11104 (TMD) (Bankr. W.D. Tex. May 17, 2021) [Docket No. 217]; *In re WC 4811 South Congress LLC*, No. 20-11105 (TMD) (Bankr. W.D. Tex. May 17, 2021) [Docket No. 302].

[10]  Something that, along with the overhang of governmental investigations, has no doubt complicated Paul's efforts to refinance the GVS loans.

in the capital structure, it sees a "clear . . . path toward [a] successful" emergence from chapter 11. *See* Objection, ¶¶ 56, 57.  Unsurprisingly, the Debtor never explains precisely what that path might be, or how it plans to proceed down it, instead offering a laundry list of potential options that the Debtor hypothetically might pursue.  *See* Objection, ¶¶ 38, 39, 57, 59.

14. The Court should start its inquiry by simply considering what the Debtor has done (or not done) in this case so far.  For starters, the Debtor took precisely zero steps to advance this case during its first two weeks in chapter 11.  The Debtor did not file any affidavits in support of its petition, nor did it file any motions seeking "first day" relief.  *See* Transcript of Hearing held on May 12, 2021 (the "May 12 Hrg. Tr."), at 19:12-16.  Had the Court not scheduled a case conference *sua sponte* (or had RREF not filed the Motion), one is left to wonder how long the Debtor would have left this case in limbo.  Even after being nudged by the Court, and pushed by RREF, the Debtor has done nothing but meet its mandatory reporting requirements, file bare bones schedules and statements (after receiving an extension of time to do so), file retention applications for its proposed professionals, and engage as a "chief restructuring officer" (on the date of the last status conference, no less) the expert witness it used in the state court foreclosure proceedings.

15. But none of these actions answer the sixty-four thousand dollar question:  how does a Debtor that has no cash, receives no income, and has no committed source of financing intend to pay for its professionals, to say nothing of the other costs, fees, and administrative expenses attendant to a chapter 11 case (including United States Trustee fees)?  *See* Motion, ¶ 77.  Based upon the retention applications filed, it appears that the equity owner paid the Debtor's proposed bankruptcy counsel a $100,000 retainer, and paid FTI Consulting, Inc. a $100,000 retainer for a "chief restructuring officer" (who is in turn paid $60,000 per month) and other professional advisory services (paid on an hourly basis at a rate of up to $1,295 per hour).  The Debtor has not

7

explained what happens when those retainers run out or how any of the other administrative expenses of the case will be paid.

16. The Court has previously expressed its "concern[]" with these same issues, noting the lack of a clear financing plan for this case and that the case could not continue to be funded directly by an insider without the "money . . . flow[ing] through the estate. . . ." May 12 Hrg. Tr., at 18:9-18. The Debtor's proffer in response—that it "intends to receive funding to pay the administrative expenses of its chapter 11 case that will be neutral to RREF," Objection, ¶ 55—is as vague as it is inadequate, and it is certainly no substitute for a clear plan to finance this case.

17. The Debtor also fails to seriously address RREF's legitimate concern that the Debtor cannot confirm a plan (however funded) over its objection. Even assuming *arguendo* that the unsecured creditors identified by the Debtor on its amended petition hold valid claims against it—a contention that RREF disputes[11]—if RREF rejects a plan, then confirmation will be made practically impossible for want of an impaired accepting class. *See* Motion, ¶ 75. As explained in the Motion, either (a) the Debtor is correct that there is sufficient equity value to pay unsecured creditors in full and render them unimpaired, or (b) RREF is correct that the Debtor is underwater on the Mezz 2 Loan, meaning that unsecured creditors will receive nothing and be deemed to reject any plan. *See* Motion, ¶ 75. Either way, the Debtor will be left without an impaired accepting

---

[11] Indeed, the larger of the two scheduled unsecured claims is $15,527.80 due to Cogency Global Inc., the corporate services firm that provides the Debtor with "Independent Directors." The invoice for that claim reflects that ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ *See* Cogency Global Inc., Apr. 8, 2021 Invoice, Bates No. WORLD000103, a copy of which is attached hereto as **Exhibit B**. The second claim, oddly, is for $6,200 for ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒," even though the Debtor does not make tax filings. *See* Julia Clark & Assocs., P.C., Oct. 19, 2020 Invoice, Bates No. WORLD000104, a copy of which is attached hereto as **Exhibit C**; *see also Monthly Operating Report*, ECF No. 63, at 1 ("Debtor does not . . . file its own tax return.").

class to "cram up" RREF.[12] Rather than grapple with this argument, the Debtor baldly proclaims that "it is premature to determine at this time" whether a plan is feasible. Objection, ¶ 57. But that is not the law, and the failure of the Debtor and Paul (who is no stranger to bankruptcy) to articulate a cogent exit strategy for this case should speak volumes.

18. Finally, it is worth emphasizing that, though the Debtor may want "additional time to continue its efforts to pursue a sale . . . or obtain an infusion of new capital that would lead to a successful plan . . ." Objection, ¶ 56, the Debtor has already had ample time to do so. The Mezz 2 Loan has been in default for over a year and a half, yet it still has not been refinanced, no sale has occurred, and no equity infusion has been made by Paul (or any other party) to prevent this filing.[13] Respectfully, the Court should see the Debtor's plea for more time for exactly what it is: a transparent request to retain further optionality at the expense of its lender.

### D. The Debtor's Attempt to Demonstrate Subjective Good Faith Does not Carry its Burden.

19. Rather than engage with the objective *Primestone* factors, the Debtor spills considerable ink touting its purported subjective intent for seeking relief from this Court. *See, e.g.,* Objection, at 1-2 ("The Debtor believes there is significant value here to preserve . . . ."); *id.* at 2 (the Debtor had "subjective good faith" in commencing this case); *id.*, ¶ 44 ("[T]he Debtor's intent

---

[12] As an alternative to a cram-up plan, the Debtor could always repay RREF in full on its claim (including damages arising from the Debtor's existing defaults), an outcome that would not only fulfill the requirements of the Bankruptcy Code, but also would be perfectly acceptable to RREF (despite the Debtor's insinuations to the contrary, *see* Objection, at 2). If the Debtor were capable of doing so, however, then that would of course beg the question of why the loan has remained in default for over a year and half and has yet to be repaid through third-party refinancing, an equity infusion by Paul, or otherwise.

[13] It also bears noting that, contrary to the Debtor's assertion, the Senior Loans are not "performing." Objection, ¶ 6. Rather, they are currently in default. *See* Motion, ¶¶ 30-31. This has likely made refinancing the GVS debt stack even more difficult, as those defaults prevent the prepayment of the Senior Loans absent the consent of the Senior Lenders. *See* O'Toole Decl., Ex. 3, § 2.5.1(a) (defeasance of Mortgage Loan only permitted "[s]o long as no Event of Default has occurred and remains outstanding").

in filing the petition was and continues to be the valid bankruptcy purpose of preserving its business and maximizing [] value . . . .").

20.     However, as the Debtor well knows—and as the authority cited in its own brief makes clear—the test under Third Circuit law is an *objective* one under which a debtor's subjective belief is at best as one of many factors (if not a complete afterthought).  *See, e.g., Cross-Appellees in 09-1432 v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618, n.8 (3d Cir. 2009) (The "good faith" inquiry is "based more on an objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than [its] subjective intent . . . ."); *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999) (same); *see also* Objection, ¶¶ 27, 35, 36 (citing *15375 Mem'l Corp.*).  And as amply demonstrated above, the objective factors considered by courts in assessing bad faith are almost all present here.  *See* ¶¶ 10-18, *supra*.

21.     Nevertheless, even to the extent subjective intent is relevant, it is certainly not clear that the Debtor did in fact file this case with the "genuine and earnest intent . . . to utilize the protections of chapter 11 to maximize the value of its estate for the benefit of all stakeholders" that the Debtor purports to have.  Objection, ¶ 50.  To the contrary, many facts demonstrate just the opposite, including the timing of the filing; Paul's pattern of serial filings; and the Debtor's failure to act like a debtor in possession, formulate a restructuring strategy, or articulate a plan to fund this case.  Perhaps the most obvious answer is also the correct one:  this filing was just the latest in a long line of attempts to stave off foreclosure for another day in the hopes that Paul (a statutory insider) can extract some equity value.[14]  In the absence of any evidence (other than the Debtor's

---

[14]     *Cf.* Transcript of Hearing at 13-14, *In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. May 17, 2021) (dismissing case filed as part of strategy for equity owner to "maintain ownership and control over the assets of the debtor for his own benefit").  A transcript of the hearing is attached hereto as **Exhibit D**.

own say-so) rebutting this conclusion, the Debtor cannot satisfy its burden of demonstrating by a preponderance of the evidence that the chapter 11 case was filed in good faith.

II. **The Debtor's Reliance on "Value" is Misplaced, Misinterprets the Law, and is Disingenuous.**

22. The Debtor is doubtlessly aware that nearly all of the factors relied upon by courts in assessing a debtor's good faith weigh against it. It is therefore unsurprising that the Debtor attempts to move the goalposts and focus on what it believes to be the "significant enterprise value" of GVS to justify the continuation of this chapter 11 case. Objection at 1; Stoler Decl., ¶ 22.[15] But as the law makes clear, "value" is not a factor that courts consider when assessing a debtor's good faith when filing for bankruptcy, and the Court should place no probative weight on it when considering the Motion to Dismiss.

    A. **The Debtor's Unsupported Assertions of "Value" are Irrelevant to the Motion to Dismiss.**

23. As an initial matter, even if value were relevant to the Motion to Dismiss (and it is not), the Debtor has not put forth any admissible evidence in support of its purportedly "firm" belief that there is any equity value to be protected in this bankruptcy, let alone that such value is "significant." *See* Stoler Decl., ¶ 22. To the contrary, the Debtor relies on inadmissible hearsay, stale appraisals, and rampant speculation based on incomparable transactions to arrive at a wildly inflated valuation of the GVS portfolio. *See* Stoler Decl., ¶¶ 22-24; *see id.*, Exhs. 4, 5, 6. Indeed, per the Debtor's own statement of financial affairs, the total amounts received from the waterfall distribution have come crashing down from $6,572,123 in 2019, to $2,731,720 in 2020, to a mere

---

[15] Although the Objection is replete with factual errors—and though RREF maintains that value is irrelevant to the instant motion practice—RREF is compelled to correct one particularly egregious misstatement made by the Debtor. Specifically, the Debtor contends that "RREF's own motion admits that there is an equity cushion . . . of $75 million . . . ." Objection, ¶ 58. The Motion to Dismiss says no such thing; to the contrary, RREF has stated its belief that there is a de minimis equity cushion of *at most* $12 million, or 3.7%. Motion, ¶ 45.

38539550.1 05/21/2021

$110,871 in the first four months of 2021—an amount nowhere near capable of even servicing the secured debt, never mind providing value to equity. *See Statement of Financial Affairs*, filed on May 18, 2021 [Dkt. No. 55], p. 7.

24. In any event, the mere presence of "value"—even if substantial—does not, on its own, constitute a valid purpose for filing or remaining in bankruptcy where all that will be achieved in the case is the liquidation and distribution of that value to stakeholders. *NMSBPCSLSDHB, LP v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 126 (3d Cir. 2004). Rather, the Debtor must affirmatively demonstrate that the continuation of the chapter 11 case would "create or preserve some value that would otherwise be lost outside of bankruptcy, not merely distributed to a different stakeholder." *In re SureFunding, LLC*, No. 20-10953 (LSS), 2020 WL 8834902, at *4 (Bankr. D. Del. June 2, 2020); *see also* Motion at ¶ 53. The Debtor has failed to offer any such proof here.

25. Instead, the Debtor offers mere conclusory assertions that it has worked "tirelessly" to "maximize [] value" and obtain "a new capital infusion," along with a cryptic reference to indications of "interest the Debtor has received since filing the petition" from unidentified parties on yet-to-be disclosed terms. *See* Stoler Decl., ¶¶ 25-26. These assertions, however, cannot be taken seriously given the Debtor's own admission at the last status conference (a full month after the Petition Date) that it still had not yet even retained an appraiser to value the GVS portfolio. *See* May 12 Hrg. Tr. at 15:16:23. Moreover, to the best of RREF's knowledge, the Debtor has not engaged a broker to market the properties or an investment banker to solicit interest from the capital markets to refinance the GVS debt stack or otherwise recapitalize the enterprise, though it has had over a year to do so. The Debtor's professed dedication to maximizing value is all the

more ironic in light of its mismanagement of the GVS portfolio and persistent failure to maintain the self-storage properties in good repair. *See, e.g.,* Motion, ¶¶ 30-31.

26. Regardless, in the absence of a concrete plan to realize upon any "value" of the GVS properties, one is left with the inescapable conclusion that continuation in bankruptcy would not "create or preserve" new value, but would in fact be value-destructive (particularly when compared to the previously scheduled UCC foreclosure sale that was judicially determined to be commercially reasonable).

**B.    The Debtor Cannot Relitigate the New York State Court Litigation.**

27. Rather than confront these difficult facts head on or propose a realistic path forward, the Debtor instead devotes a significant portion of its Objection to attacking the commercial reasonableness of the UCC foreclosure sale (the terms of which the Debtor agreed to) and attempting to re-litigate the New York state court's approval of the sale going forward as commercially reasonable. *See* Objection, ¶¶ 25, 44-48. The Debtor asserts that bankruptcy court supervision is necessary to "avoid a forfeiture of substantial value," rehashes its baseless claims that RREF's purchase of the Mezz 2 Loan from TIAA chilled bidding, and accuses RREF of tilting the proposed auction in favor of its preferred bidder. *See* Objection, at 3; *id.*, ¶¶ 46-48.

28. These allegations are not only false, but as explained in the Motion, they were also considered and roundly rejected by the New York state court when it denied the Debtor's request for a preliminary injunction. *See* Motion, ¶ 39; *see also GVS v. TIAA*, No. 0654095/2020 (N.Y. Sup. Ct. Mar. 30, 2021), ECF No. 177, at 7-8 (New York state court declined to "accept GVS's drastic invitation to infer collusion" and observed that "GVS fails to explain how the sale [of the Mezz 2 Loan] renders the process agreed upon by the parties commercially unreasonable."). While the Debtor may be dissatisfied with the outcome of the litigation in New York state court, it is not entitled to re-litigate those issues here. *See* Transcript of Hearing at 13-14, *In re Stream TV*

13

*Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. May 17, 2021) (dismissing case as bad faith filing where case was filed, in part, to collaterally attack Delaware Chancery Court ruling that was unfavorable to the debtor's majority equity owner); *see also Graham v. IRS (In re Graham)*, 973 F.2d 1089, 1097 (3d Cir. 1992) (doctrine of collateral estoppel precludes relitigation of same issues between same parties); *cf. Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) ("state-court losers complaining of injuries caused by state-court judgments" cannot seek *de facto* appellate review in federal court).

29. The Debtor attempts to sidestep the fact that it is seeking yet another bite at the apple (as this is the third time now it has sought judicial intervention to avoid foreclosure) by suggesting that the New York state court did not consider the foregoing arguments, and that its task was to "oversee a commercially reasonable sale, not to ensure that value was maximized. . . ." Objection, ¶¶ 17, 48. That is simply untrue, both as a matter of law and a matter of fact. Not only is the "commercial reasonableness" requirement of UCC sales intended to, among other things, ensure that property "not be sacrificed by sale at less than the true value," *Long Island Tr. Co. v. Williams*, 133 Misc. 2d 746, 753 (N.Y. Civ. Ct. 1986), *aff'd,* 142 Misc. 2d 4 (N.Y. App. Term 1988), but the New York state court specifically held that the goal of this sale in particular was "to maximize the [] price." *GVS v. TIAA*, ECF No. 177, at 5.

30. It is irrefutable that RREF and TIAA, through their retained broker, engaged in a lengthy and robust marketing process, agreed to by the Debtor, of the Debtor's indirect equity interest in the GVS portfolio, and that no less than six bidders were ready, willing, and able to bid on that interest at a competitive auction. *See* Motion, ¶ 36. With that in mind, and in light of the Debtor's stated belief in the substantial value of the properties, the Debtor's assertion that moving forward with a competitive foreclosure sale would lead to a "forfeiture" of value is particularly

puzzling: both the Uniform Commercial Code and the relevant loan documents provide that any excess value realized at auction will be returned to the Debtor, the same as under a bankruptcy sale. *See* N.Y.U.C.C. § 9-615(d); Pledge Agreement, § 9(b).

31.    In sum, the Debtor has not carried its burden of demonstrating that remaining in bankruptcy will preserve—let alone enhance—the value of the equity interest in the GVS portfolio pledged in favor of RREF.

## CONCLUSION

32.    A debtor wishing to remain in chapter 11 has the burden of proving that it had an objective, good faith basis for seeking relief under the Bankruptcy Code. As set forth above, the Debtor has fallen woefully short of carrying that burden here. The Motion to Dismiss should be granted.

[remainder of page left intentionally blank]

Dated: May 21, 2021
      Wilmington, Delaware     **SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 North Market Street, Suite 2300
Wilmington, Delaware 19801
Telephone: (302) 421-6806
Facsimile: (302) 421-6813
Email: mark.minuti@saul.com
Email: monique.disabatino@saul.com

-and-

**MORRISON & FOERSTER LLP**
James M. Peck (admitted *pro hac vice*)
Theresa A. Foudy (admitted *pro hac vice*)
Mark Alexander Lightner (admitted *pro hac vice*)
Andrew Kissner
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jpeck@mofo.com
Email: tfoudy@mofo.com
Email: mlightner@mofo.com
Email: akissner@mofo.com

*Attorneys for RREF III Storage LLC*