

600 N. King Street • Suite 400
P.O. Box 25130 • Wilmington, DE 19899
Zip Code For Deliveries 19801

THAD BRACEGIRDLE
Writer's Direct Access
302-429-4262
tbracegirdle@bayardlaw.com

May 24, 2021

**VIA E-FILING**

The Honorable Christopher S. Sontchi
U.S. Bankruptcy Court, District of Delaware
824 N. Market Street, 5th Floor
Wilmington, DE 19801

RE: *GVS Portfolio I B, LLC*; Case No. 21-10690 (CSS)

Dear Judge Sontchi:

We write on behalf of GVS Portfolio I B, LLC ("Debtor" or "GVS") to raise with the Court efforts by RREF III Storage LLC ("RREF") to prevent the Debtor from obtaining critical discovery relevant to the motion to dismiss portion of RREF's pending *Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* [D.I. 8] (the "Motion to Dismiss").

As the Debtor explained in opposing RREF's Motion to Dismiss, it commenced this Bankruptcy Case, among other reasons, to prevent the imminent evaporation of value threatened by RREF's UCC foreclosure sale scheduled for April 12, 2021. *See Debtor's Preliminary Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* [D.I. 53], ¶¶ 45-47. In particular, the facts and circumstances surrounding RREF's sudden purchase of its note immediately prior to a scheduled foreclosure sale, and the efforts taken (or not taken) by RREF and its agent, Jones Lang LaSalle ("JLL"), to promote and manage the UCC foreclosure sale since then, are central facts to the Debtor's case in chief opposing the Motion to Dismiss.

These key facts go to rebutting arguments made by RREF and confirming the Debtor's concern that RREF has acted not to maximize value but to seize an opportunity to acquire the 64 self-storage properties held indirectly by GVS. Notably, there was no discovery related to these matters in the New York state court action and this expedited proceeding is the first time the parties have engaged in fact discovery, albeit on a limited basis. After the Court scheduled a hearing on RREF's Motion for May 26, 2021, Debtor reasonably pared back its requests for production of documents to include, among other things, documents and communications relating to RREF's acquisition of the loan, the April 12, 2021 foreclosure sale, and to documents supporting the statements in the O'Toole Declaration. *See* **Exhibit A**, *Debtor's First Set of Discovery Requests Directed to RREF III Storage LLC in Connection with its Motion for Entry*



The Honorable Christopher S. Sontchi
*In re: GVS Portfolio I B, LLC*
May 24, 2021
Page 2

of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay; see also **Exhibit B**, Email from Thad Bracegirdle to Haimavathi Marlier (May 13, 2021, 17:22 EDT).

### 1. *Debtor reserves right to recall RREF's 30(b)(6) witness, given document production one business hour prior the deposition.*

To accommodate the May 26, 2021 hearing date, the parties negotiated and agreed to a highly compressed schedule providing for production of documents on May 19, 2021, followed by depositions on May 20-21, 2021. In the course of scheduling depositions, counsel for RREF initially represented that RREF's Rule 30(b)(6) designee, Michael Winston, was available to appear on either May 20 or 21, 2021. Subsequently, however – and without explanation – Debtor's counsel was informed that Mr. Winston would be made available *only* on May 20, 2021. Understandably concerned about deposing RREF's witness the next day after documents were produced, Debtor agreed to proceed on May 20, 2021 but reserved its right to seek additional deposition time should it have insufficient time to review and utilize documents RREF had yet to produce. *See* **Exhibit C,** Email from Thad Bracegirdle to Haimavathi Marlier (May 18, 2021, 09:29 EDT).

Regrettably, RREF did in fact attempt to exploit the compressed discovery schedule to its benefit (and to Debtor's prejudice). A few minutes before midnight on May 19, 2021, RREF produced over 900 documents to Debtor's counsel, leaving only one business hour before Mr. Winston's deposition was scheduled to begin at 10:00 a.m. the following morning. RREF's documents were produced in a format that could not be reviewed until they were uploaded into a e-discovery platform, a process that could not be completed for several hours. While Debtor's counsel attempted in good faith to review RREF's production and identify potential exhibits for Mr. Winston's deposition, the Debtor ultimately had no option but to reserve its right to recall Mr. Winston for additional testimony pending the Debtor's review of the production. *See* **Exhibit D**, pp. 69:11-15. By contrast, RREF demanded that the Debtor's Rule 30(b)(6) designee appear for deposition on May 21, 2021 – the same day of the Section 341 hearing for which the same witness was required – but then agreed to take the deposition on Saturday, May 22, 2021. Therefore, RREF had two full days to review the Debtor's production and, in fact, marked many of the Debtor's documents as deposition exhibits.

### 2. *RREF's production and the Winston deposition revealed the need for further investigation of issues relevant to the May 26 Hearing.*

The day after Mr. Winston was deposed, the Debtor's counsel identified some critical deficiencies that require further investigation:

- RREF's production includes e-mails between TIAA's and RREF's counsel reflecting that TIAA, in the days immediately before RREF purchased its note, was in the process of completing updated appraisals of the collateral and made them available to RREF. These new appraisals were not produced by RREF, likely because they



support a much higher valuation than RREF is claiming in this case, even though they were obviously responsive to Debtor's Request for Production No. 2.  RREF has flatly refused to produce these documents in response to the Debtor's request.  *See* **Exhibit E**, Email from Haimavathi Marlier to Thad Bracegirdle (May 21, 2021, 18:44 EDT); *see also RREF's Reponses and Objections to Debtor's Requests for Production*, attached hereto as **Exhibit F**.

- During his deposition, Mr. Winston testified that RREF performed its own internal valuation of the storage facility properties before deciding to purchase the note.  *See* **Exhibit D**, pp. 33:4-34:2.  None of these appraisals, or communications relating to them, were included within RREF's production, even though they were plainly responsive to Debtor's Request for Production No. 2.  Again, RREF has flatly refused to produce these or any other additional documents, despite the Debtor's request.  *See* **Exhibits E and F**.

- Debtor's Request for Production No. 12 sought documents or communications concerning the UCC foreclosure sale scheduled for April 12, 2021.  RREF's production included several participation statements from bidders expressing interest in earlier foreclosure sales in September 2020 and/or March 2021, but no such participation statements for the April 12, 2021 UCC foreclosure sale or other evidence related to parties who intended to participate at the sale.  The substance of this evidence (or its absence) is highly probative of Debtor's concern that the foreclosure process, especially after RREF's purchase of the note, was not value maximizing.  RREF has flatly refused to either produce these documents or confirm that they do not exist.  *See* **Exhibits E and F**.

In view of these significant issues, and consistent with its repeated reservations of rights, Debtor sought a supplemental deposition of Mr. Winston to ask questions relating to documents produced by RREF.  Like it did in response to Debtor's other requests, RREF refused to do so.  *See* **Exhibit D**, pp. 69:22-70:4, **and Exhibit E**.

### *3.  Request for Relief*

As noted above, the discovery that RREF has refused to produce is perhaps the most critically important to the Debtor in presenting its case on the Motion to Dismiss and RREF has no reasonable basis upon which to withholding it.  The discovery goes to the heart of the state court foreclosure process after RREF emerged on the scene and the objective value of the Debtor's assets.  RREF appears to believe that it is not required to participate in discovery concerning arguments with which it does not agree or to permit an appropriate deposition following a reasonable document review period.  Although the Debtor is using its best efforts with the minimal discovery period and scope that has been permitted, RREF's efforts to exploit the expedited schedule are highly prejudicial to the Debtor's ability to present its case and receive a fair hearing in two days' time.



The Honorable Christopher S. Sontchi
*In re: GVS Portfolio I B, LLC*
May 24, 2021
Page 4

In light of the upcoming hearing, the Debtor urgently requests that the Court order RREF to (i) produce the categories of documents identified above (and/or confirm that no such documents exist, as appropriate), and (ii) produce Mr. Winston for a supplemental deposition, both in sufficient time to permit the Debtor to use such evidence at the May 26, 2021 hearing. Counsel for the Debtor are available should the Court wish to discuss these matters further.

Respectfully submitted,

*/s/ Thad Bracegirdle*

Thad Bracegirdle, Esq.
Attorney ID No. 3691

TB/ERF/GJF/ bms
Attachments

Doc #24138121

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| GVS Portfolio I B, LLC,[1] | Case No. 21-10690 (CSS) |
| Debtor. | |

**DEBTOR'S FIRST SET OF DISCOVERY REQUESTS DIRECTED TO RREF III STORAGE LLC IN CONNECTION WITH ITS MOTION FOR ENTRY OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE WITH PREJUDICE AND GRANTING RELIEF FROM THE AUTOMATIC STAY**

Pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, as incorporated by Rules 7026, 7033, 7034, and 7036 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and made applicable to this proceeding pursuant to Bankruptcy Rule 9014(c), GVS Portfolio I B, LLC, as debtor and debtor in possession (the "Debtor"), hereby propounds the following interrogatories ("Interrogatories") and requests for production of documents ("Requests for Production") (each, a "Request" and collectively, the "Discovery Requests") upon RREF III Storage LLC ("RREF") in connection with *RREF's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* [D.I. 8] (the "Motion"). The documents requested shall be produced at the offices of Bayard, P.A., Attn: Erin R. Fay, no later than 5:00 p.m. (ET) on June 1, 2021, or such other date and time as the parties may agree or as ordered by the Court.

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, is as follows: GVS Portfolio I B, LLC (7171). The mailing address for the Debtor, solely for purposes of notices and communications, is: 814 Lavaca Street, Austin, TX 78701.

## DEFINITIONS

1.      "Communication," whether capitalized or not, shall mean the transmittal of information (in the form of facts, ideas, inquiries or otherwise), including but not limited to Documents.

2.      "Concerning," whether capitalized or not, shall mean relating to, referring to, describing, evidencing, or constituting.

3.      "Debtor" shall mean, individually and collectively, debtor GVS Portfolio I B, LLC and its affiliates, parents, subsidiaries, officers, managers, agents, representatives, employees, attorneys, assigns, predecessors in interest or any other person acting or purporting to act on its behalf.

4.      "Document," whether capitalized or not, is defined to be synonymous in meaning and equal in scope to the use of this term in Federal Rule of Civil Procedure 34(a), and shall include therefore, without limitation, any recording of information in whatever form, including but not limited to memoranda, correspondence, e-mails, personal notes, spreadsheets, databases, work papers, telephone logs, text messages, calendars, plan books, diaries, journals and daily records of activity, drawings, graphs, charts, maps, photographs, video and/or audio recordings and other data compilations from which information can be obtained or translated (with or without the use of detection devices), including electronic files, records, and archives.  For purpose of these Requests, a Document which is a copy of another Document is intended to be separately requested if the copy differs in any way by virtue of any changes, additions, redactions, annotations, or recipients.

5.      "JLL" shall mean, individually and collectively, Jones Lang LaSalle Inc. and its affiliates, parents, subsidiaries, officers, managers, agents, representatives, employees, attorneys, assigns, predecessors in interest or any other person acting or purporting to act on its behalf.

6.     "Movant" or "RREF" shall mean, individually and collectively, movant RREF III Storage LLC and its affiliates, parents, subsidiaries, officers, managers, agents, representatives, employees, attorneys, assigns, predecessors in interest or any other person acting or purporting to act on its behalf.

7.     "Motion" shall mean the *RREF's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay*, filed in the above-captioned action on April 26, 2021 (D.I. 8).

8.     "O'Toole Declaration" shall mean the *Declaration of Richard L. O'Toole*, dated April 26, 2021, filed in support of the Motion (D.I. 9).  Any capitalized terms not specifically defined herein shall have the meanings ascribed to them in the O'Toole Declaration.

9.     "SROA" shall mean, individually and collectively, SROA Capital, LLC (d/b/a Storage Rentals of America) and its affiliates, parents, subsidiaries, officers, managers, agents, representatives, employees, attorneys, assigns, predecessors in interest or any other person acting or purporting to act on its behalf.

10.     "TIAA" shall mean, individually and collectively, Teachers Annuity Association of America and its affiliates, parents, subsidiaries, officers, managers, agents, representatives, employees, attorneys, assigns, predecessors in interest or any other person acting or purporting to act on its behalf.

## **INSTRUCTIONS**

In construing these Discovery Requests, the following instructions shall apply:

1.     Each Interrogatory should be construed independently and not with reference to any other Interrogatory for the purposes of limitation.  Each Interrogatory should be responded to fully and to the extent not covered by another Interrogatory.

2.      When an Interrogatory asks for specific information, such as a date, and the specific information requested is not known to you, such Interrogatory shall be deemed to ask (a) to approximate the information requested as well as possible, provided that the response indicates that the information being provided is an approximation or is incomplete in certain respects, and (b) to describe all efforts made by you to obtain the information necessary to answer the interrogatory.

3.      When an Interrogatory directs you to identify the basis or bases for a defense, contention, allegation or statement, the response to that Interrogatory must identify, at a minimum, the following: (a) all facts, documents, communications and/or legal theories relied upon by you in support of the defense, contention, allegation or statement; and (b) all persons having knowledge of the facts, documents, communications and/or legal theories relied upon by you in support of the defense, contention, allegation or statement.

4.      You are requested to produce for inspection and copying all responsive documents and things in your possession, custody and control, including all documents and things in the possession, custody or control of any parent, subsidiary, affiliate, partner, or manager and each of their respective officers, directors, employees, agents, attorneys, accountants, financial advisors, representatives, or other persons acting, or who have acted, on your behalf.

5.      You are requested to produce responsive documents and things either as they are kept in the ordinary course of business or organized and labeled to correspond with the Requests for Production.  All documents that are physically attached to each other shall be produced in that form.  Documents that are segregated or separated from other documents, whether by inclusion and binders, files or sub-files, or by the use of dividers, tabs or any other method, shall be produced

in that form.  Documents are to be produced in their entirety without redaction, with the exception of redactions permitted by Instruction No. 9 below.

6.      More than one Request may ask for the same document or communication.  The presence of such duplication is not to be interpreted to narrow or limit the interpretation placed upon each individual Request.  Where a document or communication is requested in more than one Request, only one copy of it shall be produced.

7.      As to any Request for which no responsive documents exist, please so state by referring to the specific paragraph of the Request, and state whether any documents once existed, but have since been lost or destroyed, and the circumstances surrounding the loss or destruction of such documents.

8.      If any document or any portion thereof responsive to any Request for Production has been discarded, destroyed, or redacted in whole or part, you are requested to produce the following information: (a) the date the document was discarded or destroyed; (b) the reason(s) the document was discarded or destroyed; (c) the person(s) who discarded or destroyed the documents; and (d) where the document was maintained prior to its destruction.

9.      If any information requested herein is withheld under claim of privilege, or is not provided for whatever reason, you are requested at the time of responding to these Requests for Production to (a) describe in detail the claim of privilege or other reason used to withhold the information and (b) identify all information by date and subject matter, without disclosing its contents, in a manner sufficient to allow it to be described to the Court for ruling on the privilege or other reason asserted.  You are further requested to provide all requested information that is not subject to a claim of privilege or other reason for nonproduction by excising or otherwise

protecting the portions for which a privilege is asserted, if such a technique does not result in disclosing the contents of the portions for which some privilege is asserted.

10. All non-electronic documents produced and all electronic documents produced via a portable data storage device shall be delivered to Bayard, P.A., 600 N. King Street, Suite 400, Wilmington, DE 19801, Attention: Erin R. Fay, Esq. To the extent documents concerning these Requests for Production are to be sent by electronic mail, please send such documents to efay@bayardlaw.com.

11. To the fullest extent permitted by the Federal Rules of Civil Procedure, these Requests are continuing in nature so as to require you to produce additional documents falling within the scope of these Requests for Production if you discover or obtain possession, custody or control of such documents after the initial production is made until the time of trial.

12. The Debtor reserves its right to serve supplemental and/or additional Requests.

13. The applicable time period for each request is December 1, 2019 to the present, unless otherwise indicated.

## **INTERROGATORIES**

1. Identify all persons Movant intends to offer as a fact witness at any hearing on the Motion and, for each person identified, describe the subject matter of such person's expected testimony.

**RESPONSE**:

2. Identify all persons Movant intends to offer as an expert witness at any hearing on the Motion and, for each person identified, describe: (a) the subject matter of such person's

6

expected testimony; (b) the substance of the facts and opinions on which such person is expected

to testify; (c) the grounds for each opinion on which such person is expected to testify; and (d) all

other information required to be disclosed under Fed. R. Civ. P. 26(a)(2).

**RESPONSE**:

3.      Identify all documents Movant intends to offer as evidence at the hearing on the

Motion.

**RESPONSE**:

4.      Identify all persons with knowledge concerning the circumstances or transaction(s)

by which, as stated in Paragraph 7 of the O'Toole Declaration, "RREF purchased the Mezz 2 Loan

or March 8, 2021, and TIAA assigned RREF all of the rights flowing from the Mezz 2 Loan

Documents."

**RESPONSE**:

5.      Identify all persons with knowledge concerning the negotiations or circumstances

leading to the execution of the Mezzanine Assignment and Assumption Agreement between RREF

and TIAA and attached as Exhibit 13 to the O'Toole Declaration.

**RESPONSE**:

6.      Identify all persons with knowledge concerning the fair market value of the collateral pledged to secure the Mezz 2 Loan (as defined in Paragraph 6 of the O'Toole Declaration), including but not limited to knowledge concerning offers to purchase, indications of interest to purchase, valuations, or appraisals.

**RESPONSE**:

7.      Identify all persons with knowledge concerning fair market value of Debtor's assets, including but not limited to knowledge concerning valuations or appraisals.

**RESPONSE**:

8.      Identify all persons with knowledge concerning the fair market value of the Properties (as defined in Paragraph 11 of the O'Toole Declaration), including but not limited to knowledge concerning offers to purchase, indications of interest to purchase, valuations or appraisals.

**RESPONSE**:

9.      Identify all persons with knowledge of proposed or actual efforts to foreclose upon, sell or otherwise transfer Debtor's assets (including but not limited to the UCC foreclosure sales referenced in the O'Toole Declaration).

8

**RESPONSE**:

10.     Identify all "[c]reditors of these non-debtor subsidiary entities," as referenced in Paragraph 40 of the O'Toole Declaration, that have "take[n] action to enforce their rights against these non-debtor entities."

**RESPONSE**:

11.     Identify all "claims that unsecured creditors may have against the Mortgage Borrowers or Mezz 1 Borrower," as referenced in Paragraph 44 of the O'Toole Declaration, and the value of each claim identified.

**RESPONSE**:

12.     Identify all "state tax liens and mechanics' liens that encumber the portfolio," as referenced in Paragraph 44 of the O'Toole Declaration, and the value of each lien identified.

**RESPONSE**:

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     To the extent not attached to the O'Toole Declaration as Exhibits 1-25, all documents referenced in the O'Toole Declaration and/or supporting any statements in the O'Toole Declaration.

2.      All documents and communications concerning the circumstances or transaction(s) by which, as stated in Paragraph 7 of the O'Toole Declaration, "RREF purchased the Mezz 2 Loan or March 8, 2021, and TIAA assigned RREF all of the rights flowing from the Mezz 2 Loan Documents."

3.      All documents and communications concerning the negotiations or circumstances leading to the execution of the Mezzanine Assignment and Assumption Agreement between RREF and TIAA and attached as Exhibit 13 to the O'Toole Declaration.

4.      All documents or records concerning the Mezz 2 Loan transferred from TIAA to RREF in connection with and/or pursuant to RREF's purchase and assumption of the Mezz 2 Loan from TIAA, including but not limited to the "loan file."

5.      All documents supporting or concerning the statement, in Paragraph 27 of the O'Toole Declaration, that "on December 6, 2019, the Debtor failed to make its monthly Debt Service payment under the Mezz 2 Loan Agreement."

6.      Documents sufficient to prove the calculations of principal, accrued interest, late payment charges, protective advances, and costs and expenses related to enforcement of the Mezz 2 Loan stated in Paragraph 30 of the O'Toole Declaration.

7.      All documents supporting or concerning the statement, in Paragraph 33 of the O'Toole Declaration, that "despite TIAA's repeated demands [that the Debtor appoint a "Qualified Manager" to replace the Property Manager], the Debtor failed to do so."

8.      All documents supporting or concerning the statement, in Paragraph 34 of the O'Toole Declaration, that "RREF … cannot perform the required repairs until a foreclosure occurs."

9.      All documents or communications concerning the UCC foreclosure sale scheduled for September 3, 2020, as referenced in Paragraph 35 of the O'Toole Declaration, including but not limited to any registration documents concerning the UCC foreclosure sale and documents or communications identifying potential or actual bidders participating in the UCC foreclosure sale.

10.      All documents or communications concerning the negotiation or circumstances leading to the execution of the Sale Stipulation, as referenced in Paragraph 36 of, and attached as Exhibit 21 to, the O'Toole Declaration.

11.      All documents or communications concerning the UCC foreclosure sale rescheduled for March 10, 2021, as referenced in Paragraph 36 of the O'Toole Declaration, including but not limited to any registration documents concerning the UCC foreclosure sale and documents or communications identifying potential or actual bidders participating in the UCC foreclosure sale.

12.      All documents or communications concerning the UCC foreclosure sale rescheduled for April 12, 2021, as referenced in Paragraph 38 of the O'Toole Declaration, including but not limited to any registration documents concerning the UCC foreclosure sale and documents or communications identifying potential or actual bidders participating in the UCC foreclosure sale.

13.      All documents and communications concerning whether and/or when, as stated in Paragraph 40 of the O'Toole Declaration, "[c]reditors of these non-debtor subsidiary entities" have taken or intend to "take action to enforce their rights against these non-debtor entities that will harm the value of the estate to RREF's detriment."

14.      All documents and communications, regardless of date, concerning the fair market value of the collateral pledged to secure the Mezz 2 Loan (as defined in Paragraph 6 of the O'Toole

Declaration), including but not limited to offers to purchase, indications of interest to purchase, valuations, or appraisals conducted by any person.

15.    All documents and communications, regardless of date, concerning the fair market value of Debtor's assets, including but not limited to valuations or appraisals conducted by any person.

16.    All documents and communications, regardless of date, concerning the fair market value of the Properties (as defined in Paragraph 11 of the O'Toole Declaration), including but not limited to offers to purchase, indications of interest to purchase, valuations or appraisals conducted by any person.

17.    All documents supporting or concerning the statement, in Paragraph 44 of the O'Toole Declaration, that "the portfolio of 64 self-storage facilities is worth approximately $325 million and likely does not account for claims that unsecured creditors may have against the Mortgage Borrowers or Mezz 1 Borrower … of the imposition of fees, costs, default interest, and other penalties in favor of the Senior Lenders."

18.    All documents concerning the "certain state tax liens and mechanics' liens that encumber the portfolio, and … exceed $1.5 million," as stated in Paragraph 44 of the O'Toole Declaration.

19.    All communications between or among RREF, TIAA, SROA and/or JLL concerning: (a) Debtor; (b) the Properties (as defined in Paragraph 11 of the O'Toole Declaration); (c) the Mezz 2 Loan (as defined in Paragraph 6 of the O'Toole Declaration); and/or (d) any proposed or actual efforts to foreclose upon, sell or otherwise transfer Debtor's assets (including but not limited to the UCC foreclosure sales referenced in the O'Toole Declaration).

20.     To the extent not responsive to other requests, all documents upon which RREF intends to rely in support of the Motion and/or which RREF intends to offer as evidence at any hearing on the Motion.

21.     To the extent not responsive to other requests, all documents provided to and/or relied upon by any person Movant intends to offer as an expert witness at any hearing on the Motion.

22.     To the extent not responsive to other requests, all documents identified in response to the foregoing interrogatories.

Dated: May 7, 2021
     Wilmington, Delaware          BAYARD, P.A.

                                     */s/ Erin R. Fay*
                                     Neil B. Glassman (No. 2087)
                                     Erin R. Fay (No. 5268)
                                     Gregory J. Flasser (No. 6154)
                                     600 N. King Street, Suite 400
                                     Wilmington, Delaware 19801
                                     Phone: (302) 655-5000
                                     Email: nglassman@bayardlaw.com
                                               efay@bayardlaw.com
                                               gflasser@bayardlaw.com

                                     *Proposed Counsel for the Debtor and*
                                     *Debtor in Possession*

**EXHIBIT B**

# Greg Flasser

| | |
|---|---|
| **From:** | Thad Bracegirdle |
| **Sent:** | Thursday, May 13, 2021 5:22 PM |
| **To:** | Marlier, Haimavathi V.; Erin Fay; Neil Glassman; Daniel N. Brogan |
| **Cc:** | Peck, James M.; Foudy, Theresa A.; Haims, Joel C.; Lightner, Mark Alexander; Minuti, Mark; DiSabatino, Monique Bair; Greg Flasser |
| **Subject:** | RE: In re GVS Portfolio I B, LLC |

Haima – Thanks for your patience.  Debtor's response to your proposed schedule is below.  As you and I discussed this afternoon, the feasibility of meeting these proposed deadlines assumes that the parties agree (1) preparing and exchanging privilege logs will not be required, and (2) all interrogatories will be withdrawn for the purposes of the motion to dismiss.  I understand that you and your client will have to consider and decide whether to agree to these two points.  Of course, any agreements on pre-hearing discovery concerning the motion to dismiss will not bind any party with respect to future discovery and the parties will reserve all rights in that regard.

May 17:  Written responses and objections to RFPs due
May 18:  Written responses to requests for admission due; parties disclose witnesses for hearing
May 19:  Document productions due (including any documents parties intend to use as exhibits at hearing); Debtor files response to Motion to Dismiss
May 20-21:  Depositions (including witnesses to be called at hearing)
May 24:  RREF files reply in support of Motion to Dismiss
May 25, by 12:00 noon:  Parties exchange witness lists and exhibit list (or alternatively submit joint exhibit list)

Rather than withdraw and serve new discovery, Debtor narrows its interrogatories and document requests for purposes of the Motion to Dismiss to the following (previously served on May 7):

Interrogatories No. 1, 2, 3, 10, 11, 12 (which would be withdrawn if both sides agree)
Document Requests No. 1, 2, 9, 11, 12, 19 (limited to communications between RREF and SROA), 20, 21, 22

Again, Debtor's proposal to narrow discovery at this stage of the proceeding is without prejudice to renewing and/or supplementing the requests in the future.

Unfortunately, Neil, Erin and I are unable to get together on a meet and confer call this evening.  We propose meeting and conferring at 10:30 am tomorrow morning if that will work for your team.

Best,

Thad J. Bracegirdle
Director
BAYARD, P.A.
+1 302-429-4262
tbracegirdle@bayardlaw.com

---

**From:** Marlier, Haimavathi V. <HMarlier@mofo.com>
**Sent:** Thursday, May 13, 2021 4:34 PM
**To:** Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair

<Monique.DiSabatino@saul.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

Erin, thank you for your email. (And Thad, thank you for your phone call of 1:30pm today. We are awaiting your email regarding that discussion, which you said you would send.)

We think it is important that we meet and confer today to resolve the schedule. What time is your team available?

Regards,

Haima

**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

---

**From:** Erin Fay <EFay@bayardlaw.com>
**Sent:** Wednesday, May 12, 2021 11:06 PM
**To:** Marlier, Haimavathi V. <HMarlier@mofo.com>; Neil Glassman <NGlassman@bayardlaw.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

<mark>External Email</mark>

---

Haima,

We are discussing your requests sent this evening and scheduling with our client and will be back in touch on a meet and confer.

Regards,

Erin

Erin R. Fay
Director
BAYARD, P.A.
Direct: +1 302-429-4242 | Mobile +1 302-290-2521
efay@bayardlaw.com
My Bio | V-Card | LinkedIn

---

**From:** Marlier, Haimavathi V. <HMarlier@mofo.com>
**Sent:** Wednesday, May 12, 2021 4:42 PM
**To:** Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Thad Bracegirdle

<tbracegirdle@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Subject:** In re GVS Portfolio I B, LLC

==CAUTION EXTERNAL==

Hi Erin,

In light of the outcome of today's hearing, we will withdraw the discovery served on GVS Portfolio I B, LLC ("Debtor") on April 30, 2021, specifically:

- RREF III Storage LLC's First Set of Discovery Requests Directed to Debtor in Connection with its Motion for Entry of an Order Dismissing the Debtor's Chapter II Case with Prejudice and Granting Relief from the Automatic Stay; and
- Notice of 30(b)(6) Deposition Directed to Debtor.

Shortly, our local counsel Saul Ewing will serve and notice RREF's revised discovery, which is narrowly targeted to information relevant to RREF's motion to dismiss alone. As whether the Debtor had a good faith basis for filing its petition is the only issue that will be determined at the May 26 hearing, it is our position that Debtor should need little to no discovery from RREF or third parties.

Working back from the May 26 hearing date, we propose the following schedule:

May 14:       Written responses and objections to RFPs due
May 17:       Debtor's Objection to the Motion to Dismiss due
May 18:       Written responses to interrogatories and requests for admission due
May 19:       Document productions due
May 20-21:    Depositions (including witnesses to be called at hearing)
May 24:       RREF Reply in Support of Motion to Dismiss due
May 24:       Parties exchange witness and exhibit lists

Are you available to meet and confer later today or tomorrow morning?

Regards,

Haima

**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

=====================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is

prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

=======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's [Privacy Policy](#).

**<u>EXHIBIT C</u>**

## Greg Flasser

| | |
|---|---|
| **From:** | Thad Bracegirdle |
| **Sent:** | Tuesday, May 18, 2021 9:29 PM |
| **To:** | Marlier, Haimavathi V.; Erin Fay; Greg Flasser; Daniel N. Brogan; Neil Glassman |
| **Cc:** | Peck, James M.; Foudy, Theresa A.; Haims, Joel C.; Lightner, Mark Alexander; Minuti, Mark; DiSabatino, Monique Bair |
| **Subject:** | RE: In re GVS Portfolio I B, LLC |

Haima – Thank you for following up.  We will send you details regarding the deposition logistics and document transmission by 5:00 pm tomorrow as requested.  As you are aware, document productions are not being made until tomorrow and we reserve all rights regarding starting a deposition the following day.  I understood from our call this morning that Mr. Winston was available both Thursday and Friday, but if he is now available only on Thursday we will plan accordingly with that reservation of rights.

We intend on Alan Tantleff being the Debtor's Rule 30(b)(6) witness and calling Mr. Tantleff at trial.  As we have not seen your document production or your reply brief, we reserve all rights to call or introduce testimony from (i) any witnesses called by RREF; (ii) any witnesses necessary to authenticate documentary evidence, whether or not previously identified; (iii) any witnesses necessary to rebut assertions or arguments made in RREF's to-be-filed reply, whether or not previously identified; and (iv) any witnesses necessary for impeachment or rebuttal purposes, whether or not previously identified.  Mr. Tantleff will also be testifying at the previously scheduled section 341 meeting held by the Office of the United States Trustee on May 21 (Friday).  As we do not believe that depositions should be dual tracked in this matter, we propose that Mr. Tantleff be deposed on Monday.

We further reserve all rights related to SROA, its alleged nonparty status, the relevance of the information it would produce, and its unwillingness to participate in discovery.

Best,

Thad J. Bracegirdle
Director
BAYARD, P.A.
+1 302-429-4262
tbracegirdle@bayardlaw.com

**From:** Marlier, Haimavathi V. <HMarlier@mofo.com>
**Sent:** Tuesday, May 18, 2021 9:17 PM
**To:** Erin Fay <EFay@bayardlaw.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Greg Flasser <GFlasser@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

As you know, the parties agreed to take depositions on Thursday and Friday. It is now Tuesday after 9pm and we are still waiting to hear from you as to who we are deposing and when we are deposing them. We need to know who your 30(b)(6) witness is and who you will put on at the hearing so that we can take care of deposition logistics and planning.

Regards,

Haima
_____

**From:** Marlier, Haimavathi V.
**Sent:** Tuesday, May 18, 2021 9:53 AM
**To:** 'Erin Fay' <EFay@bayardlaw.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Greg Flasser <GFlasser@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

To recap my conversations with Thad of this morning, due to scheduling conflicts, Michael Winston will be RREF's 30(b)(6) witness. Michael will be available on Thursday for his deposition. RREF will not call Richard O'Toole as a witness at the hearing. Accordingly, RREF will not be producing Richard O'Toole for deposition. Please send us virtual deposition information/logistics, including how you will provide exhibit copies for Michael to use during the deposition, by 5pm tomorrow (May 19).

I understand from Thad that Natin Paul is likely to be GVS's 30(b)(6) witness. We ask that you please confirm this, and identify of any other witnesses you may call at the hearing, by 5pm today (May 18) so that we can arrange for a court reporter and mailing of exhibits.

As Thad and I discussed on Sunday and again this morning, SROA is not a party to the bankruptcy proceeding. Any information SROA has is not relevant to the narrow question to be decided at the May 26 hearing and imposes a huge burden on a third party. SROA will object to the discovery requests within the time allotted by FRCP 45. For efficiency's sake, we ask that you withdraw the discovery to SROA, reserving your right to re-serve should the bankruptcy proceeding not be dismissed.

Regards,

Haima


**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

_____

**From:** Erin Fay <EFay@bayardlaw.com>
**Sent:** Monday, May 17, 2021 6:26 PM
**To:** DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>
**Cc:** Marlier, Haimavathi V. <HMarlier@mofo.com>; Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; Neil Glassman <NGlassman@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

**External Email**

Hi Monique,

We are endeavoring to get you comments tomorrow in advance of Wednesday's productions. If the order takes longer to get entered, we can stipulate to confidentiality per the local rules.

Best,

Erin

Erin R. Fay
Director
BAYARD, P.A.
Direct: +1 302-429-4242 | Mobile +1 302-290-2521
efay@bayardlaw.com
My Bio | V-Card | LinkedIn

**From:** DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Sent:** Monday, May 17, 2021 2:02 PM
**To:** Thad Bracegirdle <tbracegirdle@bayardlaw.com>
**Cc:** Marlier, Haimavathi V. <HMarlier@mofo.com>; Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; Neil Glassman <NGlassman@bayardlaw.com>; Erin Fay <EFay@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

Hi Thad,

Just wanted to touch base to see if there are any questions or comments regarding the attached.

Thank you,
Monique

MONIQUE BAIR DISABATINO | SAUL EWING ARNSTEIN & LEHR LLP | 302.421.6806

**From:** DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Sent:** Friday, May 14, 2021 5:58 PM
**To:** Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Marlier, Haimavathi V. <HMarlier@mofo.com>; Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

Hi Thad,

Attached you will find the draft protective order.  Please let us know if you have any comments.

Many thanks,
Monique

MONIQUE BAIR DISABATINO | SAUL EWING ARNSTEIN & LEHR LLP | 302.421.6806

---

**From:** Thad Bracegirdle <tbracegirdle@bayardlaw.com>
**Sent:** Friday, May 14, 2021 5:21 PM
**To:** Marlier, Haimavathi V. <HMarlier@mofo.com>; Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

**\*\*EXTERNAL EMAIL\*\* - This message originates from outside our Firm. Please consider carefully before responding or clicking links/attachments.**

Thanks, Haima.  As for the requested information, I anticipate that Debtor will narrow the requested deposition topics identified in RREF's Rule 30(b)(6) Notice and the SROA subpoena to the following:

RREF Rule 30(b)(6):  Topics 2 through 12, 16 through 18
SROA:  Topics 1, 5 and 6

This remains subject to our client's input and approval, but for the sake of expediency I am providing this tentative information as requested.  We'll look forward to receiving a draft protective order for our review.

Best,

Thad J. Bracegirdle
Director
BAYARD, P.A.
+1 302-429-4262
tbracegirdle@bayardlaw.com

---

**From:** Marlier, Haimavathi V. <HMarlier@mofo.com>
**Sent:** Friday, May 14, 2021 2:02 PM
**To:** Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

Bayard team,

Thank you for the call this morning. The parties have agreed to the schedule below:

| | |
|---|---|
| May 17: | Written responses and objections to RFPs due |
| May 17: | Debtor's Objection to the Motion to Dismiss due |
| May 18: | Written responses to interrogatories and requests for admission due; parties to identify witnesses who will be called at the hearing |
| May 19: | Document productions due; categorical privilege logs due |
| May 20-21: | Depositions (including witnesses to be called at hearing) |
| May 21: | RREF Reply in Support of Motion to Dismiss due |

May 24 (noon): Parties exchange witness and exhibit lists
May 25 (noon:   Parties exchange objections to witness and exhibit lists and identify joint exhibits

The parties agreed to exchange categorical privilege logs. I have included a May 19 date above for that.

You agreed to let us know narrowed topics for the FRCP 30(b)(6) deposition of RREF. Please send us those topics today, thank you. Please also advise us whether your narrowed discovery applies to your subpoena to SROA, leaving only requests 1 and 5.

The parties agreed to produce documents pursuant to a protective order. We will send you a draft in advance of the May 19 production date.

Regards, and thanks,

Haima

**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

---

**From:** Marlier, Haimavathi V.
**Sent:** Thursday, May 13, 2021 7:16 PM
**To:** 'Thad Bracegirdle' <tbracegirdle@bayardlaw.com>; Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

Thad,

Thank you for your email. We can meet and confer tomorrow at 10:30. Would you please send an invite? As to your proposal, we believe that the parties should exchange categorical privilege logs, which will obviate the need to log individual documents while describing categories of documents withheld as privileged with sufficient description of subject matter and recipients by category to assess whether they would appear to be privileged. Further, we cannot agree to withdraw interrogatories. We have served Debtor with narrow interrogatories tailored to motion to dismiss issues.

We can discuss the schedule during the meet and confer. In addition, it would be useful to discuss tomorrow whether you plan on narrowing your FRCP 30(b)(6) deposition topics; and whether you plan on presenting direct testimony live at the hearing, or prepare written declarations to serve as direct testimony.

We look forward to a productive discussion.

Regards,

Haima

**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

---

**From:** Thad Bracegirdle <tbracegirdle@bayardlaw.com>
**Sent:** Thursday, May 13, 2021 5:22 PM
**To:** Marlier, Haimavathi V. <HMarlier@mofo.com>; Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

---

<mark>External Email</mark>

---

Haima – Thanks for your patience.  Debtor's response to your proposed schedule is below.  As you and I discussed this afternoon, the feasibility of meeting these proposed deadlines assumes that the parties agree (1) preparing and exchanging privilege logs will not be required, and (2) all interrogatories will be withdrawn for the purposes of the motion to dismiss.  I understand that you and your client will have to consider and decide whether to agree to these two points.  Of course, any agreements on pre-hearing discovery concerning the motion to dismiss will not bind any party with respect to future discovery and the parties will reserve all rights in that regard.

May 17:  Written responses and objections to RFPs due
May 18:  Written responses to requests for admission due; parties disclose witnesses for hearing
May 19:  Document productions due (including any documents parties intend to use as exhibits at hearing); Debtor files response to Motion to Dismiss
May 20-21:  Depositions (including witnesses to be called at hearing)
May 24:  RREF files reply in support of Motion to Dismiss
May 25, by 12:00 noon:  Parties exchange witness lists and exhibit list (or alternatively submit joint exhibit list)

Rather than withdraw and serve new discovery, Debtor narrows its interrogatories and document requests for purposes of the Motion to Dismiss to the following (previously served on May 7):

Interrogatories No. 1, 2, 3, 10, 11, 12 (which would be withdrawn if both sides agree)
Document Requests No. 1, 2, 9, 11, 12, 19 (limited to communications between RREF and SROA), 20, 21, 22

Again, Debtor's proposal to narrow discovery at this stage of the proceeding is without prejudice to renewing and/or supplementing the requests in the future.

Unfortunately, Neil, Erin and I are unable to get together on a meet and confer call this evening.  We propose meeting and conferring at 10:30 am tomorrow morning if that will work for your team.

Best,

Thad J. Bracegirdle
Director
BAYARD, P.A.
+1 302-429-4262
tbracegirdle@bayardlaw.com

---

**From:** Marlier, Haimavathi V. <HMarlier@mofo.com>
**Sent:** Thursday, May 13, 2021 4:34 PM
**To:** Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

Erin, thank you for your email. (And Thad, thank you for your phone call of 1:30pm today. We are awaiting your email regarding that discussion, which you said you would send.)

We think it is important that we meet and confer today to resolve the schedule. What time is your team available?

Regards,

Haima

**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

---

**From:** Erin Fay <EFay@bayardlaw.com>
**Sent:** Wednesday, May 12, 2021 11:06 PM
**To:** Marlier, Haimavathi V. <HMarlier@mofo.com>; Neil Glassman <NGlassman@bayardlaw.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Subject:** RE: In re GVS Portfolio I B, LLC

<mark>External Email</mark>

---

Haima,

We are discussing your requests sent this evening and scheduling with our client and will be back in touch on a meet and confer.

Regards,

Erin


Erin R. Fay
Director
BAYARD, P.A.
Direct: +1 302-429-4242 | Mobile +1 302-290-2521
efay@bayardlaw.com
My Bio | V-Card | LinkedIn

---

**From:** Marlier, Haimavathi V. <HMarlier@mofo.com>
**Sent:** Wednesday, May 12, 2021 4:42 PM
**To:** Erin Fay <EFay@bayardlaw.com>; Neil Glassman <NGlassman@bayardlaw.com>; Thad Bracegirdle <tbracegirdle@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>
**Cc:** Peck, James M. <JPeck@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Haims, Joel C. <JHaims@mofo.com>; Lightner, Mark Alexander <MLightner@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Subject:** In re GVS Portfolio I B, LLC


**CAUTION EXTERNAL**

Hi Erin,

In light of the outcome of today's hearing, we will withdraw the discovery served on GVS Portfolio I B, LLC ("Debtor") on April 30, 2021, specifically:

- RREF III Storage LLC's First Set of Discovery Requests Directed to Debtor in Connection with its Motion for Entry of an Order Dismissing the Debtor's Chapter II Case with Prejudice and Granting Relief from the Automatic Stay; and
- Notice of 30(b)(6) Deposition Directed to Debtor.

Shortly, our local counsel Saul Ewing will serve and notice RREF's revised discovery, which is narrowly targeted to information relevant to RREF's motion to dismiss alone. As whether the Debtor had a good faith basis for filing its petition is the only issue that will be determined at the May 26 hearing, it is our position that Debtor should need little to no discovery from RREF or third parties.

Working back from the May 26 hearing date, we propose the following schedule:

| | |
|---|---|
| May 14: | Written responses and objections to RFPs due |
| May 17: | Debtor's Objection to the Motion to Dismiss due |
| May 18: | Written responses to interrogatories and requests for admission due |
| May 19: | Document productions due |
| May 20-21: | Depositions (including witnesses to be called at hearing) |
| May 24: | RREF Reply in Support of Motion to Dismiss due |
| May 24: | Parties exchange witness and exhibit lists |

Are you available to meet and confer later today or tomorrow morning?

Regards,

Haima

**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

"Saul Ewing Arnstein & Lehr LLP (saul.com)" has made the following annotations:
+~~~~~~~~~~~~~~~~~~~~~+
This e-mail may contain privileged, confidential, copyrighted, or other legally protected information. If you are not the intended recipient (even if the e-mail address is yours), you may not use, copy, or retransmit it. If you have received this by mistake please notify us by return e-mail, then delete.
+~~~~~~~~~~~~~~~~~~~~~~+

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

**EXHIBIT D**

**In the Matter Of:**

*In re GVS Portfolio I B, LLC, Debtor.*

---

*MICHAEL E. WINSTON*

*May 20, 2021*

---



1

1          UNITED STATES BANKRUPTCY COURT

2              DISTRICT OF DELAWARE

3

4

5   In re                  ) Chapter 11
                           )
6   GVS Portfolio I B, LLC, ) Case No.
                           ) 21-10690 (CSS)
7       Debtor.            )

8

9

10        Deposition of RREF III Storage LLC

11     taken pursuant to Federal Rule 30(b)(6)

12     through its designee MICHAEL E. WINSTON

13     via remote videoconferencing of all

14     participants beginning at 10:05 a.m.,

15     on Thursday, May 20, 2021, before Kurt

16     A. Fetzer, Registered Diplomate

17     Reporter and Notary Public.

18

19

20

21

22             LEXITAS REPORTING
        Registered Professional Reporters
               1330 King Street
23        Wilmington, Delaware 19801
               (302) 655-0477
24           www.lexitaslegal.com

```
                                                              2
 1    APPEARANCES:

 2         NEIL B. GLASSMAN, ESQ.
           THAD J. BRACEGIRDLE, ESQ.
 3         BAYARD, P.A.
             600 North King Street
 4           Suite 400
             Wilmington, Delaware  19801
 5           Proposed Counsel for the Debtor
             and Debtor-in-Possession
 6
           JOEL C. HAIMS, ESQ.
 7         HAIMAVATHI V. MARLIER, ESQ.
           ANDREW KISSNER, ESQ.
 8         CASEY DUFFY, ESQ.
           MORRISON & FOERSTER LLP
 9           250 West 55th Street
             New York, New York  10019
10           For RREF III Storage LLC

11    ALSO PRESENT:
           JONATHAN BALAGIZI - MONITOR
12

13                    -  -  -  -  -

14

15

16

17

18

19

20

21

22

23

24
```

3

1          THE COURT REPORTER:  Will

2     counsel stipulate to the admissibility

3     of my oath via remote video-

4     conferencing?

5             MR. BRACEGIRDLE:  Yes.

6             MR. HAIMS:  Yes.

7

8               -  -  -  -  -

9

10         MICHAEL E. WINSTON,

11      the deponent herein, having first

12      been duly sworn on oath, was

13      examined and testified as follows:

14               EXAMINATION

15     BY MR. BRACEGIRDLE:

16      Q.   Sir, would you please state your

17     name for the record.

18      A.   Michael Winston.

19      Q.   Mr. Winston, by way of

20     introduction, my name is Thad

21     Bracegirdle.  I'm an attorney with

22     Bayard, P.A. in Wilmington, Delaware.

23             My firm represents the

24     debtor, GVS Portfolio I B, LLC, in a

4

1    bankruptcy proceeding pending in the

2    Bankruptcy Court for the District of

3    Delaware.

4              My first question, sir, is

5    have you been deposed before?

6      A.   Yes.

7      Q.   Okay.  How many times, if you

8    recall?

9      A.   Two or three times.

10     Q.   When was the last time you gave

11   a deposition?

12     A.   I don't recall.

13     Q.   Okay.  Would you say it was

14   maybe within the last five years?

15     A.   I don't recall.

16     Q.   Okay.  All right.  You don't

17   recall.

18              Just by way of ground rules,

19   I want to go over a couple of matters.

20   First, as I'm sure you know, I'm going

21   to be asking you a series of questions

22   today.  You'll be answering under oath

23   to the best of your ability and

24   Mr. Fetzer, the court reporter, is

1      going to be taking down everything that

2      we say and that your counsel says.

3                  So when I ask a question,

4      I'm going to assume you understood it

5      unless you tell me otherwise.

6                  Is that okay?

7      A.   Yes.

8      Q.   So if at any point you do not

9      understand a question, please speak up

10     and I'll try to rephrase it.

11                 I also ask that you provide

12     audible responses to my questions; that

13     is, shakes and nods of the head are not

14     able to be transcribed.  It's difficult

15     to transcribe mm-hmm's and things like

16     that, so I would just ask you to

17     provide full, audible responses.

18                 Okay?

19     A.   Yes.

20     Q.   Then, finally, if at any point

21     you would like to take a break, please

22     let me know and I'll try my best to

23     take a break at an appropriate time.

24                 Mr. Winston, what did you

6

```
 1     do, if anything, to prepare for today's
 2     deposition?
 3         A.   I just looked at the affidavits,
 4     the court filings.
 5         Q.   Okay.  Mr. Winston, can I ask
 6     you maybe to move closer to microphone
 7     or your computer?  I'm having a hard
 8     time.
 9         A.   How about now?  Is this better?
10         Q.   That's better, yes.
11         A.   I will speak up.
12         Q.   When you say "affidavits," which
13     affidavits in particular do you recall?
14         A.   The declaration of Richard
15     O'Toole and the 30(b)(6) notice of
16     deposition.  Maybe I'm using the wrong
17     term.
18         Q.   Okay.  So you have those two
19     documents with you today?
20         A.   Yes, I do.
21         Q.   Other than those two documents,
22     did you review any other materials to
23     prepare for your deposition today?
24         A.   I have with my counsel.
```

7

1      Q.    But in terms of written

2    materials, is there anything else that

3    you recall reviewing to prepare?

4      A.    Not specifically for this

5    deposition.

6      Q.    And you said you met with

7    counsel.  Was that one meeting or more

8    than one meeting?

9      A.    We had a few phone calls.

10     Q.    Phone calls.  Okay.

11            Do you recall when those

12   phone calls took place?

13     A.    Over the last few days.

14     Q.    And can you approximate for me

15   how many phone calls that was?

16     A.    Two to three phone calls.

17     Q.    And who were the attorneys that

18   participated on the phone calls with

19   you?

20     A.    Joel Haims.

21     Q.    Anybody else that you recall?

22     A.    And Haima Marlier.

23     Q.    Other than Mr. Haims and

24   Ms. Marlier, did any other people

8

1    participate in the phone calls you had

2    to prepare for the deposition?

3        A.   My general counsel.

4        Q.   And what's your general

5    counsel's name

6        A.   Richard O'Toole.

7        Q.   And are you currently employed?

8        A.   Yes.

9        Q.   And what is the nature of your

10   employment?

11       A.   I work in the real estate

12   private equity business.

13       Q.   And what is that real estate

14   private equity business?

15       A.   Related Fund Management.

16       Q.   What is your position with

17   Related Fund Management?

18       A.   I'm a managing director.

19       Q.   And what is the nature of

20   Related Fund Management's business?

21       A.   We make investments in various

22   types of real estate.

23       Q.   Can you describe for me, please,

24   what types of real estate your business

9

1    invests in?

2        A.   A broad spectrum, residential,

3    office, industrial, hospitality,

4    self-storage, debt equity.

5        Q.   In particular the self-storage

6    area, about how much in, about how much

7    in principal does Related Fund

8    Management have invested in the self-

9    storage area?

10       A.   Can I take a moment?

11            The GVS portfolio is our

12   sole investment in this space.

13       Q.   Mr. Winston, I would just ask

14   you before you go on unless you're

15   asking your counsel a question

16   concerning whether or not to assert

17   attorney-client privilege, I would ask

18   that you not mute your microphone,

19   please.

20            Okay?

21       A.   That's what I was doing.

22       Q.   Okay.  I just wanted to be sure

23   we were clear on the ground rules.

24       A.   Yes.

10

1                    MR. BRACEGIRDLE:   I

2    apologize.   Kurt, can you read back the

3    answer to the last question, please?

4                    (The reporter read back as

5    requested.)

6    BY MR. BRACEGIRDLE:

7        Q.   When you say the GVS Portfolio,

8    what are you referring to?

9        A.   The junior mezzanine loan on the

10   Great Value Storage portfolio.

11       Q.   When did Related Fund Management

12   acquire that interest in the Mezz loan?

13       A.   I believe it was March 2021.

14       Q.   Before that time when Related

15   acquired the interest in the GVS Mezz

16   loan, did Related have any prior

17   investments in the self-storage space?

18       A.   As a firm, no.  We have some

19   self-storage facilities located within

20   our various residential buildings but

21   not standalone self-storage.

22       Q.   Excuse me.

23                    MR. BRACEGIRDLE:  Off the

24   record for a moment.

11

1              (A discussion was held off

2        the record.)

3        BY MR. BRACEGIRDLE:

4          Q.   Mr. Winston, what are your

5        responsibilities as managing director

6        of Related Fund Management?

7          A.   I evaluate and oversee

8        investments for various funds that we

9        are the manager of.

10         Q.   And the GVS portfolio, is that

11       an investment that's within a

12       particular fund that you manage?

13         A.   Yes.

14         Q.   And what fund would that be?

15         A.   Related Real Estate Fund III,

16       L.P.

17         Q.   And other than the GVS

18       Portfolio, can you estimate for me how

19       many other properties are invested

20       through the Real Estate Fund III?

21         A.   At the present time?

22         Q.   Yes.

23         A.   I believe that there are -- when

24       you say "properties," do you mean

12

1    individual investments or individual

2    underlying properties?  Would you

3    consider GVS 64 properties or one

4    property?

5        Q.   Fair enough.  That's a fair

6    question.

7             So let's count the GVS

8    Portfolio as one investment.  So using

9    that metric, how many investments are

10   currently being pursued through the

11   Related Real Estate Fund III?

12       A.   Pursued is probably a poor

13   choice of words.  At the present time

14   we are invested in five to six

15   investment positions and have varying

16   numbers of underlying properties.

17            We are pursuing a wide

18   number of additional properties.

19       Q.   Am I correct that the loan that

20   you described earlier as the GVS

21   Portfolio, that's held through an

22   entity that's called RREF III Storage

23   LLC?

24       A.   Yes.  That's correct.

13

1      Q.    Does that entity hold any other

2      assets besides the loan interest in the

3      GVS Portfolio?

4      A.    No, it does not.

5      Q.    And when was that entity formed?

6      A.    I don't know the answer to that.

7      Q.    Was it formed in connection with

8      the acquisition of the GVS loan?

9      A.    I don't know the answer to that.

10     Q.    If there was somebody that you

11     wanted to ask at Related to learn the

12     answer to that question, who would you

13     go to?

14     A.    One of the associate general

15     counsel who handles that or one of the

16     paralegals in that group.

17     Q.    Does RREF III Storage LLC have

18     any purpose other than holding the

19     interest in the GVS loan?

20     A.    No.

21     Q.    I'm sorry.  I didn't hear you.

22     A.    No.

23     Q.    When did you first became aware

24     of what we've been describing this

14

1    morning as the GVS Portfolio?

2        A.   At some point during -- I don't

3    know -- the last four to five months of

4    2020 when I believe when the position

5    was being marketed for the initial UCC

6    auction.

7        Q.   Did you become aware of the

8    portfolio in connection with that UCC

9    auction you described?

10       A.   Yes.

11       Q.   And how was it that you came

12   about to become aware of that auction

13   and the portfolio?

14       A.   We received an e-mail from the

15   group that was marketing it.

16       Q.   You said the group that was

17   what?  I didn't hear.

18       A.   That was advertising it.

19       Q.   Who was that group that was

20   marketing the foreclosure sale?

21       A.   I believe it was Newmark.

22       Q.   Do you recall was it Newmark

23   that contacted Related and make Related

24   aware of the foreclosure sale?

1       A.    We received an e-mail.

2       Q.    And what do you recall about

3   that e-mail?

4       A.    That it mentioned that there was

5   going to be a UCC foreclosure auction

6   on a self-storage portfolio.

7       Q.    And after receiving that e-mail

8   did Related have an interest in

9   participating in the foreclosure sale?

10      A.    I believe we signed an NDA to

11  get information, but I don't know

12  whether we proceeded extensively at the

13  time.

14      Q.    All right.  Was there a point in

15  time following that first communication

16  from Newmark that Related did pursue

17  some effort to participate in a

18  foreclosure sale?

19      A.    When you say "participate in a

20  foreclosure sale," do you mean showing

21  up at an auction.

22      Q.    Okay.  I'll ask it this way.  So

23  I think you testified that at the first

24  contact you recall Related entering

16

1    into an NDA.  Is that correct?

2        A.    I believe that's accurate.

3        Q.    And then, but if I understand

4    your testimony then at that first point

5    you don't recall it being pursued

6    beyond the NDA.  Is that fair?

7        A.    I think we likely reviewed

8    information but did not pursue it

9    extensively.

10              I also believe, if I recall

11   properly, that foreclosure auction was

12   canceled or postponed for a rather

13   extended period of time so in a sense

14   there was nothing to pursue

15   extensively.

16       Q.    So at what point in time then

17   did Related begin pursuing the

18   opportunity extensively, to use your

19   word?

20       A.    In early 2021.

21       Q.    And what was it at that time

22   that caused Related to begin pursuing

23   the opportunity extensively?

24       A.    We were approached by a group

17

1      that had been looking to raise capital

2      for another bidder and reviewing the

3      information again and seeing if we

4      thought it was an attractive

5      opportunity.

6          Q.   And when you say that Related

7      began pursuing the opportunity

8      extensively in early 2021, would that

9      be say January to your recollection?

10         A.   I believe that's accurate.

11         Q.   Who was the group looking to

12     raise capital at that time that

13     contacted Related?

14         A.   Who was acting as the group

15     trying to raise capital, meaning who

16     was acting as the advisor?

17         Q.   I'll break it down.

18              So who was the bidder on

19     whose behalf Related was contacted?

20         A.   Well, we were, we were contacted

21     on the behalf of a group who I don't

22     know whether or not they intended to

23     bid, but we were contacted on behalf of

24     a group named SROA.

18

1       Q.   So I just want to make sure I'm

2    clear.

3               You said earlier that the

4    contact was from a group seeking to

5    raise capital for another bidder?

6       A.   That's right.

7       Q.   Okay.  I'm trying to distinguish

8    is there a difference between the group

9    and the bidder?

10              Are those two different

11   entities?

12      A.   Well, again, you're using --

13   yes, but you're using bidder to imply

14   it was only being evaluated as

15   something to bid within the context of

16   the UCC auction rather than an

17   evaluation of the acquisition of the

18   non-performing note.

19      Q.   All right.  So when you say a

20   group was looking to raise capital,

21   you're referring to SROA in that

22   situation.  Is that right?

23      A.   Yes.

24      Q.   And what was your understanding

19

1     of the purpose for which SROA was

2     seeking to raise capital?

3         A.    They were evaluating the

4     acquisition of the junior mezzanine

5     note.

6         Q.    Had Related done business with

7     SROA before they reached out to you at

8     that time?

9         A.    No.

10        Q.    And what was your understanding

11    at the time of what SROA's interest was

12    in acquiring the GVS note?

13        A.    Could you clarify what you mean

14    by their interest in?

15        Q.    Sure.

16              Well, you testified a moment

17    ago that it was your understanding that

18    SROA was seeking to raise capital for

19    the purpose of evaluating an

20    acquisition of the note.

21              So what I'm asking is do you

22    have an understanding as to what was

23    the nature of their interest in making

24    an acquisition of the note?

20

1      A.    I think, I presume that they

2    believed that the acquisition of the

3    note might present an attractive

4    investment opportunity.

5      Q.    So were they at that time

6    looking to team up with Related to

7    pursue an investment opportunity?

8      A.    You would have to ask them what

9    their intention was at the time.

10     Q.    So when they contacted you did

11   SROA make a proposal to Related in any

12   way?

13     A.    A proposal in what sense?

14     Q.    Sure.  I'm trying to understand

15   the nature of their communication.

16              So it sounds like they

17   reached out to Related.  And so what

18   did they communicate to you was their

19   purpose for contacting Related?

20     A.    That they believed that the

21   acquisition of the junior mezzanine

22   note might prove to be an attractive

23   investment opportunity.

24     Q.    All right.  And why was it that

1      they were contacting Related that they

2      communicated to you to further that

3      objective?

4          A.    Because they did not -- I

5      believe it was due to the fact that

6      they had neither adequate capital on

7      their own to pursue an acquisition of

8      that size and that they did not have

9      experience acquiring non-performing

10     notes.

11         Q.    And what do you understand to be

12     the nature of SROA's business?

13         A.    My understanding is that they

14     own and operate a large portfolio of

15     self-storage facilities.

16         Q.    So is it correct then to say

17     that what SROA was proposing was for

18     Related to assist with providing

19     capital to acquire the portfolio for

20     the purpose of SROA then operating the

21     storage facilities?

22              MR. HAIMS:   Objection.

23              You can answer.

24         A.    I don't think that's correct.

22

1    When we acquire non-performing loans,

2    we understand that we are only a lender

3    and we're just trying to get repaid.

4              However, we evaluate

5    contingencies, including what might

6    happen if we're not repaid.

7    Q.    And in the particular context of

8    this GVS Portfolio, did you evaluate

9    what those contingencies might be in

10   case Related was not repaid?

11   A.    Yes.

12   Q.    And what were those

13   contingencies that you evaluated?

14              MR. HAIMS:   I just want to

15   caution the witness not to disclose

16   privileged information.

17   Q.    And just to be clear, I'm not

18   looking for any sort of legal advice

19   for you to disclose.  But from a

20   business perspective if you could

21   identify for me what were the

22   contingencies that you considered at

23   that time?

24   A.    As I would imagine most lenders

23

1    would, we evaluated what might happen

2    if we needed to pursue and complete a

3    foreclosure on the non-performing loan

4    and take ownership of the collateral.

5        Q.   Did you consider what options

6    would be available in the event that

7    Related had to pursue foreclosure and

8    take ownership of the collateral?

9        A.   I'm not sure I follow the

10   question.

11       Q.   Sure.

12            I think you said you

13   evaluated the possibility that if the

14   loan was not repaid that a foreclose

15   would take place and that there's a

16   possibility that Related could take

17   ownership of the collateral.

18            What were the options within

19   that description that were considered

20   in terms of what would you do with the

21   collateral if it was acquired?

22            MR. HAIMS:  Objection.

23            Go ahead.

24       A.   We believed that we needed a

24

```
1    contingency plan in the event that we

2    were not successfully repaid, which was

3    our goal.

4              To clarify, our goal was to

5    successfully be repaid.  But as a

6    contingency if that were not possible

7    and we were forced to pursue a

8    foreclosure and take ownership of the

9    collateral, we believed that as a

10   contingency we needed to have a plan in

11   place to manage and operate the

12   collateral in order to preserve value.

13      Q.   And was SROA involved in that

14   contingency plan to manage and operate?

15      A.   What do you mean by were they

16   involved in that contingency plan?

17      Q.   All right.  Let me go back to

18   the beginning.

19              So after SROA contacted

20   Related, did you move forward with any

21   discussions with them on pursuing the

22   GVS opportunity?

23              MR. HAIMS:  Objection.

24              You can answer.
```

25

1      A.    We evaluated the acquisition of

2      the opportunity and as part of that

3      evaluation developed a contingency plan

4      that contemplated SROA stepping in as

5      property manager in the case that we

6      were unable to be successfully repaid

7      and need to pursue and complete

8      foreclosure of the collateral.

9      Q.    Did Related come to any

10     contractual arrangement with SROA

11     concerning this GVS opportunity?

12     A.    At what point in time?

13     Q.    At any point in time.

14     A.    Not prior to our acquisition of

15     the note.

16     Q.    All right.  We'll come back to

17     the acquisition of the note.

18            But in terms of SROA then,

19     am I to understand correctly that after

20     Related acquired the note it was at

21     that point that a contract was entered

22     into with SROA concerning the GVS

23     opportunity?

24     A.    Yes.

26

1              MR. HAIMS:   Hold on.   I

2      object.

3              But you can answer.

4      A.   Yes.

5      Q.   And what were the terms of that

6      contract, if you recall.

7      A.   SROA agreed to a contingent

8      management agreement and agreed to make

9      an investment in the note alongside of

10     us.

11     Q.   What was the nature of the

12     investment in the note that SROA agreed

13     to?

14     A.   What do you mean by "nature"?

15     Q.   Are they contributing any sort

16     of cash?

17              What sort of consideration

18     are they providing to invest in the

19     note?

20     A.   Yes.   They made a cash

21     investment.

22     Q.   Do you know how much that cash

23     investment was?

24     A.   I believe it was $1.5 million.

27

1     Q.   All right.  And then the

2    contingent plan you described involving

3    SROA, was the contingency the

4    acquisition of the collateral?

5     A.   I'm not sure I understand the

6    question.

7     Q.   Sure.

8          You described for me a

9    contingency whereby SROA would be

10   responsible for some management of the

11   underlying storage properties.  And so

12   was that contingency contingent upon

13   acquisition of the collateral?

14          MR. HAIMS:  Objection.

15    A.   By "acquisition of the

16   collateral," do you mean taking equity

17   ownership of the collateral subsequent

18   to a foreclosure or do you mean

19   acquisition of the non-performing note?

20    Q.   I'm trying to understand what

21   the terms of the contract are with

22   SROA.

23          So why don't you tell me

24   then what is the nature of the

28

1    contingent role of SROA pursuant to

2    entering into a contract with them?

3        A.    If we are unsuccessful in our

4    efforts to be repaid as a lender and

5    are forced to pursue and complete a

6    foreclosure and as a result take

7    ownership of the collateral and need to

8    operate and manage it in order to

9    preserve value, SROA would upon our

10   taking ownership subsequent to a

11   foreclosure be responsible for acting

12   as the property manager of what was our

13   collateral and at that point will be

14   our owned property.

15       Q.    Thank you for that.

16             Does Related have any

17   ownership interest in SROA?

18       A.    No.

19       Q.    Is there any affiliation between

20   Related and SROA other than ownership?

21             MR. HAIMS:   Objection.

22       A.    Not my knowledge.

23       Q.    Do Related and SROA share any

24   common management?

29

```
1              MR. HAIMS:  Objection.
2       A.    Nope.
3       Q.    Is there a principal at SROA
4    whom Related communicates concerning
5    the GVS opportunity?
6       A.    Yes.
7       Q.    And who would that be?
8       A.    Benjamin McFarland.
9       Q.    All right.  My understanding is
10   that Related through the RREF III
11   Storage LLC entity acquired the Mezz
12   loan on March 8th of this year.
13              Does that sound correct?
14              MR. HAIMS:  Objection.
15      A.    I believe that's correct.
16      Q.    And so can you describe for me
17   the chronology between when SROA
18   contacted Related in January of this
19   year and the point in time when Related
20   purchased the note from TIAA?
21      A.    Over that period of time we
22   evaluated the opportunity, performed an
23   underwriting of the underlying
24   collateral value, engaged in
```

30

1     discussions with TIAA about the

2     acquisition of the note and acquired

3     the note.

4         Q.    What was it about the note that

5     led Related to purchase it?

6         A.    We believed that it presented an

7     attractive investment opportunity.

8         Q.    And why was that?

9               What factors, if any, did

10    you believe made it attractive?

11              MR. HAIMS:   Objection.   I

12    just want to just pause here.   I've

13    been pretty or I mean very

14    accommodating over the last 40 minutes,

15    but we haven't had any questions that

16    go to the topic of this motion, which

17    is your client's good faith filing of

18    the bankruptcy.

19              What Related's evaluation of

20    this investment was has nothing to do

21    with that.   So I don't know where this

22    line is going, but we're going to have

23    to shut this down soon.

24              MR. BRACEGIRDLE:   Okay.   And

31

```
 1    I'll tell you where I'm going, Joel, is
 2    there's a 30(b)(6) topic concerning the
 3    circumstances surrounding the
 4    acquisition so that's where I think it
 5    fits in.
 6                So if that helps, that's
 7    where I'm going with this.
 8                MR. HAIMS:  And what's the
 9    relevance of that to the motion to
10    dismiss or the issue of the motion?
11                MR. BRACEGIRDLE:  Relevance
12    is not a reason to shut down a
13    deposition.  I'm entitled to ask
14    questions that are within the topic.
15    The topic has not been objected to.
16                I'm entitled to ask
17    questions on that topic and relevancy
18    can be determined by Judge Sontchi.
19                MR. HAIMS:  We can go
20    forward for now.
21                MR. BRACEGIRDLE:  Okay.
22    BY MR. BRACEGIRDLE:
23      Q.   So just to repeat my question,
24    Mr. Winston, what was it about the GVS
```

32

1    loan that made it an attractive

2    investment opportunity to Related?

3        A.    We believed that given the

4    nature of the loan that we could

5    acquire and the underlying collateral

6    by which it was secured that the

7    opportunity presented attractive risk-

8    adjusted returns.

9        Q.    And when you say that Related

10   performed an underwriting of the

11   underlying property, that's referring

12   to the storage facilities?

13       A.    Yes.   That's correct.

14       Q.    Did that underwriting process

15   entail any appraisal or valuation?

16       A.    By a third-party appraiser?

17              I'm sorry.   Is that a yes or

18   a no?

19       Q.    That's fine.   So when --

20       A.    No.   No.   I'm sorry.   To

21   clarify, I'm asking you are you asking

22   me if we performed a valuation with a

23   third-party appraiser?

24       Q.    I see.   Okay.   Whether third

33

1    party or internally, I'm just asking

2    whether an appraisal or valuation was

3    performed?

4       A.   There was no third-party

5    appraisal or valuation.

6               As with all investments, we

7    performed internally our own analysis

8    of value.

9       Q.   Okay.  And what goes into that

10   internal analysis of value?

11      A.   In this particular investment?

12      Q.   Sure.

13      A.   A review of the physical

14   properties, the historical cash flow to

15   the extent available, a few of the

16   amount of work that may be required at

17   the properties due to deferred

18   maintenance, an evaluation of where the

19   properties are located and an

20   evaluation of what the future cash

21   flows of the properties may be in order

22   to determine whether the loan can be

23   successfully repaid and, if that's not

24   possible, to determine what the cash

34

1    flows of the foreclosed collateral

2    might be.

3        Q.   Okay.  When Related purchased

4    the GVS loan from TIAA, what was the

5    consideration that was paid?

6               MR. HAIMS:  Objection.

7               I'm directing the witness

8    not to answer that question.

9               MR. BRACEGIRDLE:  On what

10   grounds?

11              MR. HAIMS:  Completely

12   outside the scope of this deposition,

13   inappropriate.  We're not answering

14   that question.

15              MR. BRACEGIRDLE:  Again,

16   Joel, look, it's within -- you know, we

17   have identified --

18              MR. HAIMS:  Let the judge

19   decide.

20              MR. BRACEGIRDLE:  Let me

21   finish for a second, Joel.

22              I mean we've identified the

23   topics we were going to pursue.  Up

24   until now there was no objection to any

1       of the topics that I was aware of.  I'm

2       getting to the very topics that were

3       noticed and I'm entitled to ask them.

4       That's all there is to it.

5                    And unless you've got an

6       objection or an instruction not to

7       answer on the grounds of privilege or

8       because you believe there's an order

9       from the Court preventing us from

10      getting to these matters, you just

11      can't instruct not to answer.

12                   MR. HAIMS:  Well, we can

13      disagree on that.

14                   I suggest we go off the

15      record for five minutes and let me talk

16      with my colleagues.

17                   MR. BRACEGIRDLE:  Okay.

18      Sure.

19                   Let's go off the record.

20                   (A brief recess was taken.)

21                   MR. BRACEGIRDLE:  Kurt, may

22      I ask you to read back the last

23      question I asked that preceded our

24      discussion?

36

1                (The reporter read back the

2      pending question).

3      BY MR. BRACEGIRDLE:

4         Q.   I will ask you to answer that

5      question, Mr. Winston.

6         A.   $82 million.

7         Q.   Does TIAA retain any continuing

8      interest in the note?

9         A.   No.

10        Q.   Does TIAA have any continuing

11     interest in the outcome of this

12     bankruptcy case?

13        A.   No.

14        Q.   And does TIAA have any

15     continuing interest in the outcome of a

16     foreclosure sale?

17        A.   No.

18        Q.   And at the time that Related

19     acquired the GVS note from the TIAA,

20     were you aware that the loan was in

21     default?

22        A.   Yes.

23        Q.   And did that have any bearing on

24     the decision-making process as to

1    whether or not to pursue the

2    investment?

3        A.   Do you mean did we take the fact

4    that the loan was in default into

5    consideration in evaluating whether to

6    acquire it?

7        Q.   Yes.

8        A.   Yes, we did.

9        Q.   And what impact, if any, did

10   that have?

11           MR. HAIMS:   Objection.

12           You can answer.

13       A.   We evaluated the fact that it

14   was in default and the underlying

15   collateral and believed that it

16   presented an attractive risk-adjusted

17   investment opportunity.

18       Q.   And when you say "risk-

19   adjusted," that accommodated the

20   presence of a default?

21       A.   I'm not sure what you mean by

22   that.

23       Q.   Sure.   I'm just trying to

24   understand within of decision-making

38

1        process where did the default fit in?

2                  MR. HAIMS:  Objection.

3                  You can answer.

4        A.   We evaluated and took into

5        account the fact that we were

6        purchasing a non-performing loan.

7        Q.   Okay.  And what about the fact

8        that it was non-performing have on the

9        decision to go forward with the

10       investment?

11       A.   I'm not sure how that question

12       is different from your prior one, but

13       we evaluated the fact that it was

14       non-performing, the cause of why it was

15       non-performing and the implications of

16       its being non-performing and factored

17       those into our analysis of the

18       investment opportunity.

19       Q.   And I suppose what I'm asking is

20       more specific as to how was it that

21       those particular factors influenced the

22       decision to proceed with the

23       investment?

24       A.   I'm not sure exactly what you

39

1    mean by that.  We saw that it was

2    non-performing and we evaluated what

3    that meant in terms of what we were

4    acquiring.

5        Q.   And when you say you evaluated

6    what that meant, that's what I'm

7    asking.  What did it mean?

8        A.   We evaluated the fully accrued

9    value of the note that we were

10   acquiring and various provisions of the

11   loan documents detailing what happens

12   when the note becomes non-performing

13   following an event of default.

14       Q.   Okay.  So was the possibility of

15   acquiring the underlying properties in

16   this situation a factor in deciding

17   whether or not to purchase the note?

18       A.   As I stated before, we were

19   acquiring a note and as a lender we

20   were seeking to be repaid.  We

21   evaluated a contingent scenario of what

22   might happen in the event that we were

23   not successfully repaid by our

24   borrower.

40

1      Q.    In this instance for the GVS

2   loan, was the difference between the

3   par value of the loan and the

4   consideration you paid, was that in

5   line with other investments that

6   Related has pursued?

7      A.    I'm not sure that I follow the

8   question.

9      Q.    Sure.

10            Well, is it fair to say that

11   in this situation the acquisition of

12   the GVS loan was acquired at a price

13   that was close to par?

14      A.    When you say "par," it was not

15   acquired at par of the fully accrued

16   loan balance at the time at which we

17   acquired it.

18      Q.    Right.   Okay.   And my question

19   gets to say the percentage of the

20   consideration that you paid as compared

21   to the overall loan value, was that

22   consistent with other investments that

23   Related has made in acquiring non-

24   performing loans?

41

1        A.    Every deal is different.

2        Q.    Okay.  Can you recall any other

3     acquisitions of non-performing loans

4     with the same ratio of purchase price

5     to outstanding value?

6        A.    I don't recall.

7        Q.    Okay.  When Related acquired the

8     loan from TIAA, did you acquire any

9     sort of understanding about the prior

10    efforts TIAA had made to enforce the

11    loan?

12              MR. HAIMS:  Again, I caution

13    you not to disclose attorney-client

14    information.

15       A.    We didn't acquire in the literal

16    context of the word acquire specific

17    knowledge.  As part of our diligence,

18    we reviewed the history with counsel

19    under privilege.

20       Q.    Okay.  All right.  I'm going to

21    mark as Exhibit 1 the declaration of

22    Mr. O'Toole, which I believe you have

23    there with you, Mr. Winston.

24       A.    Yes.

42

 1     Q.   All right.

 2               MR. BRACEGIRDLE:  And I'm

 3     sorry.  Joel, do you have a copy with

 4     you?

 5               MR. HAIMS:  Yes.  I have one

 6     and Michael has one.

 7               MR. BRACEGIRDLE:  Okay.

 8     Great.  I'll just read along.  I won't

 9     put it up on the screen.

10               (Winston Deposition Exhibit

11     No. 1 was marked for identification)

12     BY MR. BRACEGIRDLE:

13     Q.   Mr. Winston, I would like to

14     direct you to paragraph 33 of the

15     declaration.

16               MR. HAIMS:  Just for the

17     record, this is the declaration dated

18     April 26, 2021, correct?

19               MR. BRACEGIRDLE:  Correct.

20               MR. HAIMS:  Okay.  Go ahead.

21     BY MR. BRACEGIRDLE:

22     Q.   Mr. Winston, in paragraph 33 it

23     describes some actions that TIAA

24     undertook to exercise its rights.

43

1            And so the reason for my

2    prior question is do you understand

3    what's stated in paragraph 33 to be

4    accurate and correct?

5        A.   Yes.

6        Q.   All right.  And so, in

7    particular, as it states here, is it

8    your understanding that TIAA made

9    demands upon the debtor to appoint a,

10   quote, qualified manager, unquote?

11       A.   Yes, that is my understanding.

12       Q.   And what's the basis for your

13   understanding of that?

14       A.   If I recall correctly, following

15   an event of default under the loans the

16   lender had the right to require that

17   the borrower/manager cease to serve as

18   the manager and appoint a replacement

19   manager who met the criteria of a

20   qualified manager as defined under the

21   loan documents.

22       Q.   Okay.  So what you just

23   described is a contractual right.

24            And so what I would like to

44

1    know is do you have knowledge of

2    whether or not TIAA actually exercised

3    that right?

4        A.   As I understand it, they

5    delivered the notice to the borrower

6    informing the borrow that they were

7    exercising that right and the borrower

8    failed to or elected not to follow the

9    notice and did not appoint a

10   replacement qualified manager.

11       Q.   And is your knowledge of those

12   circumstances based on information

13   provided by TIAA?

14       A.   Yes.

15       Q.   And as you sit here today, do

16   you know whether or not the debtor has

17   actually appointed a qualified manager

18   to replace the property manager?

19       A.   To my knowledge --

20       Q.   I'm sorry?

21       A.   To my knowledge, they have not.

22       Q.   Okay.  If you could just move

23   down the page, Mr. Winston, to

24   paragraph 34 of Mr. O'Toole's

45

1    declaration.

2         A.   Okay.

3         Q.   So this makes reference to what

4    I understand to be a notice of default

5    by the property --

6              MR. HAIMS:  Thad?

7              MR. BRACEGIRDLE:  Yes.

8              MR. HAIMS:  Can you give him

9    just a minute to read it?

10             MR. BRACGIRDLE:  Oh, sure.

11   I didn't mean to jump ahead.  I

12   apologize.

13        A.   I got it.  Go ahead.

14        Q.   Okay.  So this makes reference

15   to a notice of event of default by the

16   property owners under a mortgage loan.

17             In that context do you

18   understand the property owners to mean

19   the entities that hold title to the

20   underlying storage facilities?

21        A.   Yes, that is my understanding.

22        Q.   And so the notice of default in

23   that context then falls under the

24   mortgages that are held by other

46

1    lenders and that are secured by those

2    properties.  Is that correct?

3        A.    That is my understanding.

4        Q.    All right.  And then in that

5    paragraph it makes reference to -- I'll

6    read the last sentence:  "RREF,

7    however, cannot perform the required

8    repairs until the foreclosure occurs

9    and the financial reporting defaults

10    are otherwise personal defaults and,

11    therefore, not susceptible to cure by

12    RREF."

13            What do you understand to be

14    the required repairs as described

15    there?

16        A.    As I understand it, at the time

17    that the overall financing closed,

18    which included the first mortgage, the

19    senior mezzanine loan and the junior

20    mezzanine loan, of which we were the

21    holder of the note, at that time the

22    lender group required and put into the

23    loan documents that there were a list

24    of deferred maintenance items at

47

1    various properties that the borrower

2    was required to repair within a certain

3    amount of time and, furthermore, that

4    the borrower did not complete those

5    repairs by the required date and as I

6    understand it as of today has still not

7    completed those repairs, thus causing a

8    default under the loan documents.

9        Q.   And how does that affect the

10   interest held by Related, if at all,

11   under the Mezz loan that it holds?

12       A.   As I understand it, defaults

13   under the Mezz loan have -- as I

14   understand it, the inter-creditor

15   provides the holder of the junior Mezz

16   note the right to cure certain defaults

17   by its borrower under either the first

18   mortgage or the senior mezzanine notes.

19            However, as a lender and not

20   the owner of the properties, it is not

21   physically possible for us to exercise

22   these cure rights.

23       Q.   Okay.  And what effect does that

24   have on the collateral that Related

48

1    holds that secures the Mezz loan?

2        A.   What physical effect does it

3    have on the underlying properties or

4    what effect does it have on the junior

5    mezzanine note that we're the holder

6    of?

7        Q.   No.  What effect does it have on

8    the note?

9        A.   My understanding -- and I would

10   either have to look at the inter-

11   creditor or ask my counsel for further

12   detail, but my understanding is that it

13   potentially causes a default that we in

14   certain circumstances might be required

15   to cure but which we are unable to do

16   so given the nature of the default.

17       Q.   All right.  Before Related

18   acquired the note from TIAA on March

19   8th of this year, had Related

20   participated in any of the preceding

21   foreclosure sales on the collateral?

22       A.   No.

23            But to clarify, there were

24   no foreclosure sales.  There was a

49

1    scheduled foreclosure sale.

2        Q.   Had Related registered to make a

3    bid in any of the preceding foreclosure

4    sales before it acquired the note?

5        A.   If I remember correctly, we

6    signed a confi to receive information

7    during the fall of 2020.  If I remember

8    correctly, the initial UCC auction was

9    canceled before any formal registration

10   documents were sent out to prospective

11   bidders who had signed the confi.

12              As such, there was no

13   preceding auction for which we could

14   have registered.

15       Q.   Okay.  And as I understand it,

16   March 8th, the date on which Related

17   acquired the GVS loan from TIAA, that

18   was two days before a rescheduled

19   foreclosure sale.  Is that correct?

20       A.   I believe that is correct.

21       Q.   And did that March 10th

22   foreclosure sale go forward?

23       A.   No, it did not.

24       Q.   And what's your understanding as

50

1    to why that March 10th sale did not

2    proceed?

3        A.    My understanding is that the

4    borrower went to the New York courts to

5    get a stay to delay that foreclosure

6    auction.

7        Q.    All right.  Was the foreclosure

8    sale that was scheduled to take place

9    on March 10th, was Jones Lang LaSalle

10   involved in that in any way to your

11   knowledge?

12       A.    As the marketing group?

13       Q.    I'm just wondering did they have

14   involvement in the foreclosure sale?

15       A.    I believe that they were the

16   group running the process.

17       Q.    Did you have any communications

18   with Jones Lang LaSalle before Related

19   acquired the note from TIAA on March

20   8th?

21       A.    To my recollection, only in the

22   capacity of signing a confidentiality

23   agreement as a prospective bidder, and

24   I believe that we registered as a

51

1    bidder for that auction which was post

2    our acquisition date or which was meant

3    to be.

4           If we can go off the record

5    for one moment?

6      Q.   Sure.

7           (A discussion was held off

8    the record.)

9           THE WITNESS:  Can we go back

10   on the record?

11          THE COURT REPORTER:  I'm

12   back on the record now.

13          THE WITNESS:  And as a point

14   of clarification, earlier I mentioned

15   Newmark being involved during the

16   initial auction in 2020.  I meant to

17   say JLL.

18          MR. BRACEGIRDLE:  Okay.

19   Thank you for clarifying that.  I

20   appreciate it.

21   BY MR. BRACEGIRDLE:

22     Q.   Okay.  So if I understand your

23   testimony, Mr. Winston, so Related

24   registered as a bidder for a

52

1    foreclosure sale at or after the time

2    that it acquired the note on March 8th.

3    Is that correct?

4        A.   Do you mean that we registered

5    at or after or that the sale was

6    scheduled for at or after?

7        Q.   You mentioned just a moment ago

8    the fact that -- I believe you

9    testified that Related registered as a

10   bidder.

11       A.   You're asking when we

12   registered, correct?

13       Q.   Sure.  Yes.

14       A.   If I remember correctly, we

15   registered prior to the acquisition.

16       Q.   Okay.  All right.  And how long

17   before the acquisition did that happen?

18   Do you recall?

19       A.   I don't recall.  If I remember

20   correctly, one to two weeks but I don't

21   recall specifically.

22       Q.   Okay.  And after acquiring the

23   note, did Related have communications

24   with JLL concerning the foreclosure

53

1    sale that was to take place on March

2    10th?

3        A.   Yes.  As the holder of the note,

4    JLL was now engaged by us as the lender

5    to manage a commercially reasonable UCC

6    foreclosure process on our behalf and

7    as previously agreed to by the

8    borrower.

9        Q.   Okay.  And also after acquiring

10   the note on March 8th, did Related have

11   any communications with other potential

12   bidders for the collateral?

13       A.   Not to my knowledge apart from

14   SROA, who I don't know offhand whether

15   or not they completed the registration

16   process.

17       Q.   And after acquiring the note,

18   did Related have any communications

19   with actual bidders on the collateral

20   who had registered?

21       A.   I believe that the senior

22   mezzanine noteholder may have been a

23   registered bidder.  We spoke to them

24   briefly after acquiring the note in our

54

1    capacity as the junior noteholder.

2        Q.   Who was that senior noteholder?

3        A.   Extra Space Storage.

4        Q.   And what was the nature of the

5    communications that Related had with

6    them?

7        A.   To introduce ourselves, let them

8    know that we are now the holder of the

9    junior note which was subordinate to

10   them.

11       Q.   Any discussions beyond that

12   topic?

13       A.   No.

14       Q.   Are you aware of Extra Space

15   Storage taking any actions to enforce

16   its rights against the entity that

17   holds its debt?

18       A.   I don't recall offhand.

19       Q.   And are you aware of any of the

20   secured creditors for the entity that

21   holds the underlying storage facilities

22   taking any actions to enforce their

23   debt?

24       A.   I believe that they have sent

55

```
1    default notices which we just

2    discussed.

3        Q.   And other than providing those

4    notices of default, are you aware of

5    the lenders for those mortgages taking

6    any further actions to enforce?

7        A.   I believe that the loan servicer

8    enacted lockbox provisions prior to our

9    acquisition as provided under the

10   various loan documents following an

11   event of default.

12       Q.   Okay.  What about since the time

13   that Related acquired the loan, other

14   than the notes of default we talked

15   about earlier are you aware of any

16   other creditors of the entities holding

17   the underlying storage facilities

18   taking actions to enforce their rights?

19       A.   I don't recall whether there was

20   more than one default notice or whether

21   it came solely from the first mortgage

22   lender or from the senior mezzanine

23   noteholder or both, but apart from

24   default notices I don't recall any
```

56

```
 1     additional enforcement actions being

 2     taken subsequent to our acquisition.

 3        Q.   All right.  Can I ask you,

 4     Mr. Winston, to look back at Mr.

 5     O'Toole's declaration?  Now I would

 6     like you to take a look at paragraph

 7     40, please.

 8              And you'll see at --

 9              MR. HAIMS:  Thad, give him a

10     second.  He's still reading it.

11              MR. BRACEGIRDLE:  Sure.  I

12     apologize.

13        A.   Okay.  Go ahead.

14        Q.   So the last few sentences of

15     paragraph 40 state that "Creditors of

16     the non-debtor subsidiary entities,

17     however, are unaffected by the

18     restrictions of the automatic stay.

19     Such creditors are, therefore, free to

20     take action to enforce their rights

21     against these non-debtor entities that

22     will harm the value of the estate to

23     RREF's detriment."

24              With respect to that
```

57

1    statement, is it correct to say that

2    other than the actions that you have

3    testified about this morning that

4    you're unaware of any additional

5    actions being taken by those creditors

6    of the non-debtor subsidiaries?

7        A.   To my recollection and at this

8    point in time, yes.

9        Q.   And are you aware of any of

10   those creditors intending to take

11   action to enforce their rights?

12       A.   To my knowledge and at this

13   time, no.

14            But if there's insufficient

15   cash flow to pay debt service on their

16   positions, that may well change.

17       Q.   Right.  But it may not, right?

18   At this point we're just speculating.

19   Is that fair?

20       A.   As I said, to my knowledge at

21   this point, no, but that may change.

22       Q.   Okay.  And if creditors were

23   hypothetically to take those actions,

24   how, if at all, would that affect the

58

1    value of the estate to RREF's

2    detriment?

3        A.   We as the junior mezzanine

4    noteholder have the right under the

5    inter-creditor agreement to make

6    protective advances to the extent that

7    there is not sufficient cash flow to

8    pay current debt service on both the

9    first mortgage and the senior mezzanine

10   note.

11            To the extent that were to

12   happen, as I understand the provisions

13   of the automatic stay we are unable to

14   avail ourselves of those cure rights in

15   the ordinary course of business.  And I

16   trust you're aware that this has been a

17   topic addressed with the Court under

18   the bankruptcy proceeding.

19       Q.   Okay.  Other than what you just

20   described, are you aware of any other

21   ways in which the ongoing Chapter 11

22   proceeding could be harming RREF's

23   interest in the collateral?

24            MR. HAIMS:  Without

59

1    disclosing attorney-client privilege.

2        Q.   I'm not suggesting -- I'm just

3    saying from a business perspective

4    what's Related's position on that?  I

5    don't want you to disclose anything

6    that counsel has disclosed or has

7    communicated to you.

8        A.   Without knowing every provision

9    of the inter-creditor agreement off the

10   top of my head, as it's a rather

11   lengthy agreement, there are various

12   cure rights provided to the junior

13   mezzanine noteholder under the

14   inter-creditor agreement, all of which

15   in the ordinary course of business and

16   outside of the bankruptcy proceeding we

17   would be able to avail ourselves in the

18   normal course of business.

19             Without knowing each of them

20   offhand, I can't point to specific ones

21   that we would not be able to avail

22   ourselves given the bankruptcy

23   proceedings.

24             However, just as we may be

60

1        constrained from exercising our right

2        to make protective advances to pay

3        interest shortfalls, I presume that we

4        would need to review the exercise of

5        any cure rights that we have, monetary

6        or non-monetary, to understand whether

7        or not we are able to exercise those

8        within the context of a bankruptcy

9        proceeding.

10        Q.   Okay.  And if we look back at

11       paragraph 40 of Mr. O'Toole's

12       declaration, the first sentence of that

13       states "The debtor's initiation of

14       Chapter 11 proceedings and invocation

15       of the automatic stay is causing

16       irreparable harm to RREF, the debtor's

17       only secured creditor."

18                So is it correct to say that

19       that threat of irreparable harm refers

20       to the ability to preserve the cure

21       right that you just described?

22        A.   That is my understanding.

23        Q.   If I can ask you, Mr. Winston,

24       to turn to paragraph 44 of the

61

1    declaration.  We're hopefully on the

2    same page but just let me know when you

3    have finished reading it.

4        A.   Okay.

5        Q.   In paragraph 44 Mr. O'Toole

6    states that "Upon information and

7    belief, the portfolio of 64

8    self-storage facilities is worth

9    approximately $325 million."

10            Do you have any

11   understanding of what the basis is for

12   that statement that the portfolio of

13   the 64 self-storage facilities is worth

14   approximately $325 million?

15       A.   At the time of acquisition we

16   estimated in place net operating income

17   on a trailing basis to be approximately

18   $17.5 million, which at a 5.5 percent

19   cap rate equates to roughly 318 million

20   and change dollars, and I presume that

21   we rounded that to 325.

22       Q.   And so when the next sentence

23   goes on to say "The value likely does

24   not account for claims that unsecured

62

1    creditors may have against the mortgage

2    borrowers or Mezz 1 borrower," does

3    that mean that in the valuation you

4    just described those claims were not

5    accounted for?

6        A.   Correct.  That is a rough

7    valuation, not taking into account

8    claims that may exist.

9            MR. HAIMS:  Thad, let us

10   know when is another good time for a

11   break.

12           MR. BRACEGIRDLE:  Actually,

13   this is a good time.  We can go off the

14   record.

15           THE COURT REPORTER:  I'm off

16   the record.

17           (A brief recess was taken.)

18   BY MR. BRACEGIRDLE:

19       Q.   Mr. Winston, since the time when

20   SROA first contacted Related in January

21   of this year, have you acquired any

22   knowledge or understanding of property

23   values of storage facilities in the

24   United States generally?

63

1          MR. HAIMS:  Objection.

2     A.   You say property values of

3     storage facilities?

4     Q.   Yes.

5     A.   We reviewed various market

6     research on storage facilities in the

7     United States.

8     Q.   Okay.  And have you continued to

9     perform that research up to the present

10    time?

11         MR. HAIMS:  Objection.

12    A.   I review research that may come

13    across my desk from time to time.

14    Q.   Do you have any understanding as

15    to whether the property values of

16    storage facilities generally have been

17    increasing or decreasing over the last,

18    say, three months?

19    A.   I don't know what's happened

20    over the last three months.  But as

21    with all things in real estate, I think

22    that it's very specific to the

23    particular properties, their location,

24    their age, their quality and the way in

64

1    which they're being operated and

2    maintained.

3        Q.    Is there anything about the 64

4    storage facilities that are the

5    underlying properties here that suggest

6    to you that any of those factors would

7    have a negative effect on value?

8        A.    Yes.  We're aware of, as we just

9    discussed, deferred maintenance that

10   has not been performed.  We've seen

11   news articles about facilities within

12   the portfolio where units have been

13   broken into because there are no

14   managers.

15              These are older facilities

16   with I believe an average age or year

17   of being built of 1982 and for the most

18   part these are non-climate-controlled

19   facilities.

20              So I would say that these

21   relative to other storage portfolios

22   that may be out there and transactions

23   that have taken place, these have a

24   variety of things going against them

65

1   were one to be evaluating the value.

2       Q.   And other than the GVS loan, is

3   Related currently pursuing any other

4   investments in the public storage

5   space?

6       A.   We evaluate investments as they

7   come across our desk.  I believe we saw

8   a flyer for another portfolio being

9   marketed within the last week or so and

10  I can't speak for the entire universe

11  of individuals at this company.

12      Q.   Okay.  But within the funds that

13  you manage, are you aware of any other

14  storage facility opportunities being

15  pursued other than the GVS Portfolio?

16      A.   As I stated, I believe that we

17  saw a flyer for a portfolio of storage

18  facilities recently which I believe

19  we're in the process of obtaining

20  information on.

21      Q.   Okay.  Do you know where the

22  facilities that are the subject of that

23  flyer are located?

24      A.   I believe that it is

1    predominantly in the midwest, but I

2    don't recall specifically.

3        Q.    Do you know who the owner or

4    owners of those facilities are?

5        A.    I do not.

6        Q.    Has Related had any discussions

7    with Extra Space Storage concerning the

8    potential acquisition of Extra Space

9    Storage's debt position?

10       A.    No.

11       Q.    Has Related communicated with

12   any other creditors within the GVS

13   chain of entities concerning the

14   acquisition of any debt?

15       A.    We have communicated with

16   Midland in their capacity as loan

17   servicer.

18       Q.    And what has been the nature of

19   those communications?

20       A.    To introduce ourselves as the

21   new holder of the junior mezzanine note

22   at the time that we acquired it and

23   then various routine communications

24   having to do with the monthly payment

67

1    of interest.

2        Q.   Okay.  Has Related -- I'm sorry.

3    I didn't mean to cut you off.

4        A.   No.  That was somebody else, not

5    me.

6        Q.   Oh, okay.

7             Has Related had any

8    discussions with any of those mortgage

9    lenders about potentially acquiring

10   their debt?

11       A.   No.

12       Q.   And is Related at the present

13   time attempting to acquire securities

14   of any other affiliates of Great Value

15   Storage or Worldwide -- I'm sorry --

16   World Class?

17       A.   I do not know.

18       Q.   What about the --

19            MR. HAIMS:  Thad, if I

20   could, what topic are these questions

21   related to?

22            MR. BRACEGIRDLE:  Fair

23   enough.  Fair enough.  I'll withdraw

24   the question.

68

1    BY MR. BRACEGIRDLE:

2        Q.   Let me back up.

3                So I understand that RREF

4        has initiated litigation against

5        Mr. Paul for a personal guaranty in New

6        York State Court.  Is that correct?

7        A.   Yes.  That is my understanding.

8        Q.   And other than that suit and

9        RREF's actions in connection with the

10       bankruptcy proceeding, is RREF taking

11       any other actions to collect on the

12       note?

13       A.   I believe we were pursuing the

14       UCC foreclosure as a result of the

15       bankruptcy filing.  So there's the UCC

16       foreclosure, there's the bankruptcy and

17       then there's the guaranty claim that I

18       just mentioned.

19               And I would defer to my

20       counsel if I'm missing something, but

21       from my understanding that is what

22       we're doing.

23       Q.   Okay.  Well, Mr. Winston, those

24       are all of my questions at this time.

69

1     I appreciate your time.

2                 MR. BRACEGIRDLE:  Before I

3     hand over the witness, I just want for

4     the record just state a reservation of

5     rights.

6                 We received the production

7     of documents last night shortly before

8     midnight.  We've done our best to try

9     to review those before the beginning of

10    today's deposition.

11                I just want to on the record

12    reserve our right to re-call the

13    witness if there's any documents that

14    we find in the production that we think

15    merit additional examination.

16                With that, I will pass the

17    witness.

18                MR. HAIMS:  Could we go off

19    the record for two minutes?

20                MR. BRACEGIRDLE:  Yes.

21                (A brief recess was taken.)

22                MR. HAIMS:  We don't have

23    any questions for Mr. Winston at this

24    time, but I would note that this

70

1    deposition took place on an agreed-upon

2    schedule and we would object to any

3    further attempts to depose him outside

4    of the agreed-upon schedule.

5            But with that, I don't have

6    anything further at the moment.

7            MR. BRACEGIRDLE:  Okay.

8            THE COURT REPORTER: Counsel,

9    would you like to order an expedited

10   transcript or rough drafts?  How would

11   you like the transcript delivered?

12           MR. HAIMS:  Both.

13           MR. BRACEGIRDLE:  All of the

14   above both, Kurt.

15           THE COURT REPORTER: So

16   expedited final and rough drafts?

17           MR. HAIMS:  Yes, please.

18           MR. BRACEGIRDLE:  Yes.  I

19   would like a rough tonight and then

20   expedited.

21           Thank you.

22           (Deposition concluded at

23   11:50 a.m.)

24                 -  -  -  -  -

71

1                       I N D E X

2

   DEPONENT:  MICHAEL E. WINSTON     PAGE

3

        Examination by Mr. Bracegirdle  3

4

                   E X H I B I T S

5

6   WINSTON DEPOSITION EXHIBITS        MARKED

7   Exhibit 1   Declaration of Richard

8              L. O'Toole              3

9

10  DIRECTIONS NOT TO ANSWER     PAGE  LINE

11

            NONE

12

   REQUESTS MADE FOR DOCUMENTS  PAGE  LINE

13

             NONE

14

15  READING AND SIGNING INSTRUCTIONS PAGE 72
   ERRATA SHEET                     PAGE 73
16  CERTIFICATE OF REPORTER          PAGE 74

17

18

19

20

21

22

23

24

72

1              READING AND SIGNING INSTRUCTIONS

2       After reading the transcript of your
        deposition, please note any change or
3       correction and the reason therefor on
        the errata sheet that appears on the
4       following page. DO NOT MAKE ANY MARKS
        OR NOTATIONS ON THE TRANSCRIPT ITSELF.
5       Please sign and date the errata sheet
        and return it to our office at the
6       address indicated below.  Our office
        will distribute copies of the executed
7       errata sheet to all counsel.  If
        necessary, you can make additional
8       copies of the errata sheet.

9       Rule 30(e) governing this procedure
        provides the deposition may be filed as
10      transcribed if you do not return a
        signed errata sheet within 30 days.
11   RETURN ORIGINAL ERRATA SHEET TO:
     LEXITAS REPORTING
12   1330 King Street, Wilmington, DE  19801
     depos@wilfet.com - 302-655-0477
13

14

15

16

17

18

19

20

21

22

23

24

73

```
1    DEPONENT: MICHAEL E. WINSTON
     DATE:     Thursday, May 20, 2021
2    CASE:     GVS Portfolio I B, LLC

3                  ERRATA SHEET
     PAGE/LINE/CHANGE OR CORRECTION AND REASON
4
     ----/----/-------------------------------
5    ----/----/-------------------------------
     ----/----/-------------------------------
6    ----/----/-------------------------------
     ----/----/-------------------------------
7    ----/----/-------------------------------
     ----/----/-------------------------------
8    ----/----/-------------------------------
     ----/----/-------------------------------
9    ----/----/-------------------------------
     ----/----/-------------------------------
10   ----/----/-------------------------------
     ----/----/-------------------------------
11   ----/----/-------------------------------
     ----/----/-------------------------------
12   ----/----/-------------------------------
     ----/----/-------------------------------
13   ----/----/-------------------------------
     ----/----/-------------------------------
14   ----/----/-------------------------------
     ----/----/-------------------------------
15   ----/----/-------------------------------
     ----/----/-----------------------------
16   ----/----/-------------------------------
     ----/----/-------------------------------
17   ----/----/-------------------------------
     ----/----/-------------------------------
18
        I have read the foregoing transcript of
19   my deposition and, except for any
     corrections or changes noted above, I
20   hereby subscribe to the transcript as
     an accurate record of the statements
21   made by me.

22   Date:                          _
                       Signature of Deponent
23

24
```

74

1    State of Delaware   )

2                        )
     New Castle County   )
3

4                    CERTIFICATE OF REPORTER
5

6        I, Kurt A. Fetzer, Registered
     Diplomate Reporter and Notary Public,
7    do hereby certify that there came
     before me on Thursday, May 20, 2021,
8    the deponent herein, MICHAEL E.
     WINSTON, who was duly sworn by me and
9    thereafter examined by counsel for the
     respective parties; that the questions
10   asked of said deponent and the answers
     given were taken down by me in
11   Stenotype notes and thereafter
     transcribed by use of computer-aided
12   transcription and computer printer
     under my direction.
13

14       I further certify that the foregoing
     is a true and correct transcript of the
15   testimony given at said examination of
     said witness.

16       I further certify that I am not
     counsel, attorney, or relative of
17   either party, or otherwise interested
     in the event of this suit.
18

19

20

              Kurt A. Fetzer, RDR, CRR
21

22

23

24

**$**

**$1.5** 26:24
**$17.5** 61:18
**$325** 61:9,14
**$82** 36:6

**1**

**1** 41:21 42:11 62:2
**10th** 49:21 50:1,9 53:2
**11** 58:21 60:14
**11:50** 70:23
**1982** 64:17

**2**

**2020** 14:4 49:7 51:16
**2021** 10:13 16:20 17:8 42:18
**26** 42:18

**3**

**30(b)(6)** 6:15 31:2
**318** 61:19
**325** 61:21
**33** 42:14,22 43:3
**34** 44:24

**4**

**40** 30:14 56:7,15 60:11
**44** 60:24 61:5

**5**

**5.5** 61:18

**6**

**64** 12:3 61:7,13 64:3

**8**

**8th** 29:12 48:19 49:16 50:20 52:2
  53:10

**A**

**a.m.** 70:23
**ability** 4:23 60:20
**accommodated** 37:19
**accommodating** 30:14
**account** 38:5 61:24 62:7
**accounted** 62:5
**accrued** 39:8 40:15
**accurate** 16:2 17:10 43:4
**acquire** 10:12 21:19 22:1 32:5 37:6
  41:8,15,16 67:13
**acquired** 10:15 23:21 25:20 29:11
  30:2 36:19 40:12,15,17 41:7 48:18
  49:4,17 50:19 52:2 55:13 62:21 66:22
**acquiring** 19:12 21:9 39:4,10,15,19
  40:23 52:22 53:9,17,24 67:9
**acquisition** 13:8 18:17 19:4,20,24
  20:2,21 21:7 25:1,14,17 27:4,13,15,
  19 30:2 31:4 40:11 51:2 52:15,17
  55:9 56:2 61:15 66:8,14
**acquisitions** 41:3
**acting** 17:14,16 28:11
**action** 56:20 57:11
**actions** 42:23 54:15,22 55:6,18 56:1
  57:2,5,23 68:9,11
**actual** 53:19
**additional** 12:18 56:1 57:4 69:15
**addressed** 58:17
**adequate** 21:6
**adjusted** 32:8 37:19
**admissibility** 3:2
**advances** 58:6 60:2
**advertising** 14:18
**advice** 22:18
**advisor** 17:16

**affect** 47:9 57:24
**affidavits** 6:3,12,13
**affiliates** 67:14
**affiliation** 28:19
**age** 63:24 64:16
**agreed** 26:7,8,12 53:7
**agreed-upon** 70:1,4
**agreement** 26:8 50:23 58:5 59:9,11,
  14
**ahead** 23:23 42:20 45:11,13 56:13
**alongside** 26:9
**amount** 33:16 47:3
**analysis** 33:7,10 38:17
**answering** 4:22 34:13
**apologize** 10:2 45:12 56:12
**appoint** 43:9,18 44:9
**appointed** 44:17
**appraisal** 32:15 33:2,5
**appraiser** 32:16,23
**approached** 16:24
**approximate** 7:14
**approximately** 61:9,14,17
**April** 42:18
**area** 9:6,9
**arrangement** 25:10
**articles** 64:11
**assert** 9:16
**assets** 13:2
**assist** 21:18
**associate** 13:14
**assume** 5:4
**attempting** 67:13
**attempts** 70:3
**attorney** 3:21
**attorney-client** 9:17 41:13 59:1
**attorneys** 7:17
**attractive** 17:4 20:3,22 30:7,10 32:1,
  7 37:16

**auction**  14:6,9,12 15:5,21 16:11 18:16 49:8,13 50:6 51:1,16

**audible**  5:12,17

**automatic**  56:18 58:13 60:15

**avail**  58:14 59:17,21

**average**  64:16

**aware**  13:23 14:7,12,24 35:1 36:20 54:14,19 55:4,15 57:9 58:16,20 64:8 65:13

**B**

**back**  10:2,4 24:17 25:16 35:22 36:1 51:9,12 56:4 60:10 68:2

**balance**  40:16

**bankruptcy**  4:1,2 30:18 36:12 58:18 59:16,22 60:8 68:10,15,16

**based**  44:12

**basis**  43:12 61:11,17

**Bayard**  3:22

**bearing**  36:23

**began**  17:7

**begin**  16:17,22

**beginning**  24:18 69:9

**behalf**  17:19,21,23 53:6

**belief**  61:7

**believed**  20:2,20 23:24 24:9 30:6 32:3 37:15

**Benjamin**  29:8

**bid**  17:23 18:15 49:3

**bidder**  17:2,18 18:5,9,13 50:23 51:1, 24 52:10 53:23

**bidders**  49:11 53:12,19

**borrow**  44:6

**borrower**  39:24 44:5,7 47:1,4,17 50:4 53:8 62:2

**borrower/manager**  43:17

**borrowers**  62:2

**Bracegirdle**  3:5,15,21 10:1,6,23 11:3 30:24 31:11,21,22 34:9,15,20 35:17,21 36:3 42:2,7,12,19,21 45:7 51:18,21 56:11 62:12,18 67:22 68:1

69:2,20 70:7,13,18

**BRACGIRDLE**  45:10

**break**  5:21,23 17:17 62:11

**briefly**  53:24

**broad**  9:2

**broken**  64:13

**buildings**  10:20

**built**  64:17

**business**  8:12,14,20,24 19:6 21:12 22:20 58:15 59:3,15,18

**C**

**called**  12:22

**calls**  7:9,10,12,15,16,18 8:1

**canceled**  16:12 49:9

**cap**  61:19

**capacity**  50:22 54:1 66:16

**capital**  17:1,12,15 18:5,20 19:2,18 21:6,19

**case**  22:10 25:5 36:12

**cash**  26:16,20,22 33:14,20,24 57:15 58:7

**caused**  16:22

**causing**  47:7 60:15

**caution**  22:15 41:12

**cease**  43:17

**chain**  66:13

**change**  57:16,21 61:20

**Chapter**  58:21 60:14

**choice**  12:13

**chronology**  29:17

**circumstances**  31:3 44:12 48:14

**claim**  68:17

**claims**  61:24 62:4,8

**clarification**  51:14

**clarify**  19:13 24:4 32:21 48:23

**clarifying**  51:19

**Class**  67:16

**clear**  9:23 18:2 22:17

**client's**  30:17

**close**  40:13

**closed**  46:17

**closer**  6:6

**collateral**  23:4,8,17,21 24:9,12 25:8 27:4,13,16,17 28:7,13 29:24 32:5 34:1 37:15 47:24 48:21 53:12,19 58:23

**colleagues**  35:16

**collect**  68:11

**commercially**  53:5

**common**  28:24

**communicate**  20:18

**communicated**  21:2 59:7 66:11,15

**communicates**  29:4

**communication**  15:15 20:15

**communications**  50:17 52:23 53:11,18 54:5 66:19,23

**company**  65:11

**compared**  40:20

**complete**  23:2 25:7 28:5 47:4

**completed**  47:7 53:15

**Completely**  34:11

**computer**  6:7

**concluded**  70:22

**conferencing**  3:4

**confi**  49:6,11

**confidentiality**  50:22

**connection**  13:7 14:8 68:9

**consideration**  26:17 34:5 37:5 40:4, 20

**considered**  22:22 23:19

**consistent**  40:22

**constrained**  60:1

**contact**  15:24 18:4

**contacted**  14:23 17:13,19,20,23 20:10 24:19 29:18 62:20

**contacting**  20:19 21:1

**contemplated** 25:4

**context** 18:15 22:7 41:16 45:17,23 60:8

**contingencies** 22:5,9,13,22

**contingency** 24:1,6,10,14,16 25:3 27:3,9,12

**contingent** 26:7 27:2,12 28:1 39:21

**continued** 63:8

**continuing** 36:7,10,15

**contract** 25:21 26:6 27:21 28:2

**contractual** 25:10 43:23

**contributing** 26:15

**copy** 42:3

**correct** 12:19,24 16:1 21:16,24 29:13,15 32:13 42:18,19 43:4 46:2 49:19,20 52:3,12 57:1 60:18 62:6 68:6

**correctly** 25:19 43:14 49:5,8 52:14, 20

**counsel** 3:2 5:2 6:24 7:7 8:3 9:15 13:15 41:18 48:11 59:6 68:20 70:8

**counsel's** 8:5

**count** 12:7

**couple** 4:19

**court** 3:1 4:2,24 6:4 35:9 51:11 58:17 62:15 68:6 70:8,15

**courts** 50:4

**creditor** 48:11 60:17

**creditors** 54:20 55:16 56:15,19 57:5, 10,22 62:1 66:12

**criteria** 43:19

**cure** 46:11 47:16,22 48:15 58:14 59:12 60:5,20

**current** 58:8

**cut** 67:3

### D

**date** 47:5 49:16 51:2

**dated** 42:17

**days** 7:13 49:18

**deal** 41:1

**debt** 9:4 54:17,23 57:15 58:8 66:9,14 67:10

**debtor** 3:24 43:9 44:16

**debtor's** 60:13,16

**decide** 34:19

**deciding** 39:16

**decision** 38:9,22

**decision-making** 36:24 37:24

**declaration** 6:14 41:21 42:15,17 45:1 56:5 60:12 61:1

**decreasing** 63:17

**default** 36:21 37:4,14,20 38:1 39:13 43:15 45:4,15,22 47:8 48:13,16 55:1, 4,11,14,20,24

**defaults** 46:9,10 47:12,16

**defer** 68:19

**deferred** 33:17 46:24 64:9

**defined** 43:20

**Delaware** 3:22 4:3

**delay** 50:5

**delivered** 44:5 70:11

**demands** 43:9

**deponent** 3:11

**depose** 70:3

**deposed** 4:5

**deposition** 4:11 6:2,16,23 7:5 8:2 31:13 34:12 42:10 69:10 70:1,22

**describe** 8:23 29:16

**describes** 42:23

**describing** 13:24

**description** 23:19

**desk** 63:13 65:7

**detail** 48:12

**detailing** 39:11

**determine** 33:22,24

**determined** 31:18

**detriment** 56:23 58:2

**developed** 25:3

**difference** 18:8 40:2

**difficult** 5:14

**diligence** 41:17

**direct** 42:14

**directing** 34:7

**director** 8:18 11:5

**disagree** 35:13

**disclose** 22:15,19 41:13 59:5

**disclosed** 59:6

**disclosing** 59:1

**discussed** 55:2 64:9

**discussion** 11:1 35:24 51:7

**discussions** 24:21 30:1 54:11 66:6 67:8

**dismiss** 31:10

**distinguish** 18:7

**District** 4:2

**documents** 6:19,21 39:11 43:21 46:23 47:8 49:10 55:10 69:7,13

**dollars** 61:20

**drafts** 70:10,16

**due** 21:5 33:17

**duly** 3:12

### E

**e-mail** 14:14 15:1,3,7

**earlier** 12:20 18:3 51:14 55:15

**early** 16:20 17:8

**effect** 47:23 48:2,4,7 64:7

**effort** 15:17

**efforts** 28:4 41:10

**elected** 44:8

**employed** 8:7

**employment** 8:10

**enacted** 55:8

**enforce** 41:10 54:15,22 55:6,18 56:20 57:11

**enforcement** 56:1

engaged 29:24 53:4

entail 32:15

entered 25:21

entering 15:24 28:2

entire 65:10

entities 18:11 45:19 55:16 56:16,21 66:13

entitled 31:13,16 35:3

entity 12:22 13:1,5 29:11 54:16,20

equates 61:19

equity 8:12,14 9:4 27:16

estate 8:11,13,22,24 11:15,20 12:11 56:22 58:1 63:21

estimate 11:18

estimated 61:16

evaluate 11:7 22:4,8 65:6

evaluated 18:14 22:13 23:1,13 25:1 29:22 37:13 38:4,13 39:2,5,8,21

evaluating 19:3,19 37:5 65:1

evaluation 18:17 25:3 30:19 33:18, 20

event 23:6 24:1 39:13,22 43:15 45:15 55:11

examination 3:14 69:15

examined 3:13

Excuse 10:22

exercise 42:24 47:21 60:4,7

exercised 44:2

exercising 44:7 60:1

Exhibit 41:21 42:10

exist 62:8

expedited 70:9,16,20

experience 21:9

extended 16:13

extensively 15:12 16:9,15,18,23 17:8

extent 33:15 58:6,11

Extra 54:3,14 66:7,8

F

facilities 10:19 21:15,21 32:12 45:20 54:21 55:17 61:8,13 62:23 63:3,6,16 64:4,11,15,19 65:18,22 66:4

facility 65:14

fact 21:5 37:3,13 38:5,7,13 52:8

factor 39:16

factored 38:16

factors 30:9 38:21 64:6

failed 44:8

fair 12:5 16:6 40:10 57:19 67:22,23

faith 30:17

fall 49:7

falls 45:23

Fetzer 4:24

filing 30:17 68:15

filings 6:4

final 70:16

finally 5:20

financial 46:9

financing 46:17

find 69:14

fine 32:19

finish 34:21

finished 61:3

firm 3:23 10:18

fit 38:1

fits 31:5

flow 33:14 57:15 58:7

flows 33:21 34:1

flyer 65:8,17,23

follow 23:9 40:7 44:8

forced 24:7 28:5

foreclose 23:14

foreclosed 34:1

foreclosure 14:20,24 15:5,9,18,20 16:11 23:3,7 24:8 25:8 27:18 28:6,11 36:16 46:8 48:21,24 49:1,3,19,22

50:5,7,14 52:1,24 53:6 68:14,16

formal 49:9

formed 13:5,7

forward 24:20 31:20 38:9 49:22

free 56:19

full 5:17

fully 39:8 40:15

fund 8:15,17,20 9:7 10:11 11:6,12, 14,15,20 12:11

funds 11:8 65:12

future 33:20

G

gave 4:10

general 8:3,4 13:14

generally 62:24 63:16

give 45:8 56:9

goal 24:3,4

good 30:17 62:10,13

Great 10:10 42:8 67:14

ground 4:18 9:23

grounds 34:10 35:7

group 13:16 14:15,16,19 16:24 17:11,14,21,24 18:4,8,20 46:22 50:12,16

guaranty 68:5,17

GVS 3:24 9:11 10:7,15 11:10,17 12:3, 7,20 13:3,8,19 14:1 19:12 22:8 24:22 25:11,22 29:5 31:24 34:4 36:19 40:1, 12 49:17 65:2,15 66:12

H

Haima 7:22

Haims 3:6 7:20,23 21:22 22:14 23:22 24:23 26:1 27:14 28:21 29:1,14 30:11 31:8,19 34:6,11,18 35:12 37:11 38:2 41:12 42:5,16,20 45:6,8 56:9 58:24 62:9 63:1,11 67:19 69:18,22 70:12,17

hand 69:3

handles 13:15

happen 22:6 23:1 39:22 52:17 58:12

happened 63:19

hard 6:7

harm 56:22 60:16,19

harming 58:22

head 5:13 59:10

hear 13:21 14:17

held 11:1 12:21 45:24 47:10 51:7

helps 31:6

historical 33:14

history 41:18

hold 13:1 26:1 45:19

holder 46:21 47:15 48:5 53:3 54:8 66:21

holding 13:18 55:16

holds 47:11 48:1 54:17,21

hospitality 9:3

hypothetically 57:23

**I**

identification 42:11

identified 34:17,22

identify 22:21

lll 11:15,20 12:11,22 13:17 29:10

imagine 22:24

impact 37:9

implications 38:15

imply 18:13

inappropriate 34:13

included 46:18

including 22:5

income 61:16

increasing 63:17

individual 12:1

individuals 65:11

industrial 9:3

influenced 38:21

information 15:11 16:8 17:3 22:16 41:14 44:12 49:6 61:6 65:20

informing 44:6

initial 14:5 49:8 51:16

initiated 68:4

initiation 60:13

instance 40:1

instruct 35:11

instruction 35:6

insufficient 57:14

intended 17:22

intending 57:10

intention 20:9

inter- 48:10

inter-creditor 47:14 58:5 59:9,14

interest 10:12,15 13:2,19 15:8 19:11, 14,23 28:17 36:8,11,15 47:10 58:23 60:3 67:1

internal 33:10

internally 33:1,7

introduce 54:7 66:20

introduction 3:20

invest 26:18

invested 9:8 11:19 12:14

investment 9:12 11:11 12:8,15 20:4, 7,23 26:9,12,21,23 30:7,20 32:2 33:11 37:2,17 38:10,18,23

investments 8:21 10:17 11:8 12:1,9 33:6 40:5,22 65:4,6

invests 9:1

invocation 60:14

involved 24:13,16 50:10 51:15

involvement 50:14

involving 27:2

irreparable 60:16,19

issue 31:10

items 46:24

**J**

January 17:9 29:18 62:20

JLL 51:17 52:24 53:4

Joel 7:20 31:1 34:16,21 42:3

Jones 50:9,18

judge 31:18 34:18

jump 45:11

junior 10:9 19:4 20:21 46:19 47:15 48:4 54:1,9 58:3 59:12 66:21

**K**

knowing 59:8,19

knowledge 28:22 41:17 44:1,11,19, 21 50:11 53:13 57:12,20 62:22

Kurt 10:2 35:21 70:14

**L**

L.P. 11:16

Lang 50:9,18

large 21:14

Lasalle 50:9,18

learn 13:11

led 30:5

legal 22:18

lender 22:2 28:4 39:19 43:16 46:22 47:19 53:4 55:22

lenders 22:24 46:1 55:5 67:9

lengthy 59:11

list 46:23

literal 41:15

litigation 68:4

LLC 3:24 12:23 13:17 29:11

loan 10:9,12,16 12:19 13:2,8,19 23:3, 14 29:12 32:1,4 33:22 34:4 36:20 37:4 38:6 39:11 40:2,3,12,16,21 41:8, 11 43:21 45:16 46:19,20,23 47:8,11, 13 48:1 49:17 55:7,10,13 65:2 66:16

loans 22:1 40:24 41:3 43:15

**located** 10:19 33:19 65:23

**location** 63:23

**lockbox** 55:8

**long** 52:16

**looked** 6:3

**M**

**made** 26:20 30:10 32:1 40:23 41:10 43:8

**maintained** 64:2

**maintenance** 33:18 46:24 64:9

**make** 8:21 14:23 18:1 20:11 26:8 49:2 58:5 60:2

**makes** 45:3,14 46:5

**making** 19:23

**manage** 11:12 24:11,14 28:8 53:5 65:13

**management** 8:15,17 9:8 10:11 11:6 26:8 27:10 28:24

**Management's** 8:20

**manager** 11:9 25:5 28:12 43:10,18, 19,20 44:10,17,18

**managers** 64:14

**managing** 8:18 11:5

**March** 10:13 29:12 48:18 49:16,21 50:1,9,19 52:2 53:1,10

**mark** 41:21

**marked** 42:11

**market** 63:5

**marketed** 14:5 65:9

**marketing** 14:15,20 50:12

**Marlier** 7:22,24

**materials** 6:22 7:2

**matters** 4:19 35:10

**Mcfarland** 29:8

**meaning** 17:15

**meant** 39:3,6 51:2,16

**meeting** 7:7,8

**mentioned** 15:4 51:14 52:7 68:18

**merit** 69:15

**met** 7:6 43:19

**metric** 12:9

**Mezz** 10:12,15 29:11 47:11,13,15 48:1 62:2

**mezzanine** 10:9 19:4 20:21 46:19,20 47:18 48:5 53:22 55:22 58:3,9 59:13 66:21

**Michael** 3:10,18 42:6

**microphone** 6:6 9:18

**Midland** 66:16

**midnight** 69:8

**midwest** 66:1

**million** 26:24 36:6 61:9,14,18,19

**minute** 45:9

**minutes** 30:14 35:15 69:19

**missing** 68:20

**mm-hmm's** 5:15

**moment** 9:10 10:24 19:16 51:5 52:7 70:6

**monetary** 60:5

**monthly** 66:24

**months** 14:3 63:18,20

**morning** 14:1 57:3

**mortgage** 45:16 46:18 47:18 55:21 58:9 62:1 67:8

**mortgages** 45:24 55:5

**motion** 30:16 31:9,10

**move** 6:6 24:20 44:22

**mute** 9:18

**N**

**named** 17:24

**nature** 8:9,19 19:23 20:15 21:12 26:11,14 27:24 32:4 48:16 54:4 66:18

**NDA** 15:10 16:1,6

**needed** 23:2,24 24:10

**negative** 64:7

**net** 61:16

**Newmark** 14:21,22 15:16 51:15

**news** 64:11

**night** 69:7

**nods** 5:13

**non-** 40:23

**non-climate-controlled** 64:18

**non-debtor** 56:16,21 57:6

**non-monetary** 60:6

**non-performing** 18:18 21:9 22:1 23:3 27:19 38:6,8,14,15,16 39:2,12 41:3

**normal** 59:18

**note** 18:18 19:5,12,20,24 20:3,22 25:15,17,20 26:9,12,19 27:19 29:20 30:2,3,4 36:8,19 39:9,12,17,19 46:21 47:16 48:5,8,18 49:4 50:19 52:2,23 53:3,10,17,24 54:9 58:10 66:21 68:12 69:24

**noteholder** 53:22 54:1,2 55:23 58:4 59:13

**notes** 21:10 47:18 55:14

**notice** 6:15 44:5,9 45:4,15,22 55:20

**noticed** 35:3

**notices** 55:1,4,24

**number** 12:18

**numbers** 12:16

**O**

**O'TOOLE** 6:15 8:6 41:22 61:5

**O'Toole's** 44:24 56:5 60:11

**oath** 3:3,12 4:22

**object** 26:2 70:2

**objected** 31:15

**objection** 21:22 23:22 24:23 27:14 28:21 29:1,14 30:11 34:6,24 35:6 37:11 38:2 63:1,11

**objective** 21:3

**obtaining** 65:19

**occurs** 46:8

**offhand** 53:14 54:18 59:20

**30(b)(6)**

office 9:3

older 64:15

ongoing 58:21

operate 21:14 24:11,14 28:8

operated 64:1

operating 21:20 61:16

opportunities 65:14

opportunity 16:18,23 17:5,7 20:4,7, 23 24:22 25:2,11,23 29:5,22 30:7 32:2,7 37:17 38:18

options 23:5,18

order 24:12 28:8 33:21 35:8 70:9

ordinary 58:15 59:15

outcome 36:11,15

outstanding 41:5

oversee 11:7

owned 28:14

owner 47:20 66:3

owners 45:16,18 66:4

ownership 23:4,8,17 24:8 27:17 28:7,10,17,20

**P**

P.A. 3:22

paid 34:5 40:4,20

par 40:3,13,14,15

paragraph 42:14,22 43:3 44:24 46:5 56:6,15 60:11,24 61:5

paralegals 13:16

part 25:2 41:17 64:18

participate 8:1 15:17,19

participated 7:18 48:20

participating 15:9

party 33:1

pass 69:16

Paul 68:5

pause 30:12

pay 57:15 58:8 60:2

payment 66:24

pending 4:1 36:2

people 7:24

percent 61:18

percentage 40:19

perform 46:7 63:9

performed 29:22 32:10,22 33:3,7 64:10

performing 40:24

period 16:13 29:21

personal 46:10 68:5

perspective 22:20 59:3

phone 7:9,10,12,15,16,18 8:1

physical 33:13 48:2

physically 47:21

place 7:12 23:15 24:11 50:8 53:1 61:16 64:23 70:1

plan 24:1,10,14,16 25:3 27:2

point 5:8,20 14:2 15:14 16:4,16 25:12,13,21 28:13 29:19 51:13 57:8, 18,21 59:20

poor 12:12

portfolio 3:24 9:11 10:7,10 11:10,18 12:8,21 13:3 14:1,8,13 15:6 21:14,19 22:8 61:7,12 64:12 65:8,15,17

portfolios 64:21

position 8:16 14:4 59:4 66:9

positions 12:15 57:16

possibility 23:13,16 39:14

post 51:1

postponed 16:12

potential 53:11 66:8

potentially 48:13 67:9

preceded 35:23

preceding 48:20 49:3,13

predominantly 66:1

prepare 6:1,23 7:3 8:2

presence 37:20

present 11:21 12:13 20:3 63:9 67:12

presented 30:6 32:7 37:16

preserve 24:12 28:9 60:20

presume 20:1 60:3 61:20

pretty 30:13

preventing 35:9

previously 53:7

price 40:12 41:4

principal 9:7 29:3

prior 10:16 25:14 38:12 41:9 43:2 52:15 55:8

private 8:12,14

privilege 9:17 35:7 41:19 59:1

privileged 22:16

proceed 38:22 50:2

proceeded 15:12

proceeding 4:1 58:18,22 59:16 60:9 68:10

proceedings 59:23 60:14

process 32:14 36:24 38:1 50:16 53:6,16 65:19

production 69:6,14

properly 16:11

properties 11:19,24 12:2,3,16,18 27:11 33:14,17,19,21 39:15 46:2 47:1,20 48:3 63:23 64:5

property 12:4 25:5 28:12,14 32:11 44:18 45:5,16,18 62:22 63:2,15

proposal 20:11,13

proposing 21:17

prospective 49:10 50:23

protective 58:6 60:2

prove 20:22

provide 5:11,17

provided 44:13 55:9 59:12

providing 21:18 26:18 55:3

provision 59:8

provisions 39:10 55:8 58:12

public 65:4

purchase 30:5 39:17 41:4

**purchased** 29:20 34:3

**purchasing** 38:6

**purpose** 13:18 19:1,19 20:19 21:20

**pursuant** 28:1

**pursue** 15:16 16:8,14 20:7 21:7 23:2, 7 24:7 25:7 28:5 34:23 37:1

**pursued** 12:10,12 16:5 40:6 65:15

**pursuing** 12:17 16:17,22 17:7 24:21 65:3 68:13

**put** 42:9 46:22

---

**Q**

**qualified** 43:10,20 44:10,17

**quality** 63:24

**question** 4:4 5:3,9 9:15 10:3 12:6 13:12 23:10 27:6 31:23 34:8,14 35:23 36:2,5 38:11 40:8,18 43:2 67:24

**questions** 4:21 5:12 30:15 31:14,17 67:20 68:24 69:23

**quote** 43:10

---

**R**

**raise** 17:1,12,15 18:5,20 19:2,18

**rate** 61:19

**ratio** 41:4

**re-call** 69:12

**reached** 19:7 20:17

**read** 10:2,4 35:22 36:1 42:8 45:9 46:6

**reading** 56:10 61:3

**real** 8:11,13,22,24 11:15,20 12:11 63:21

**reason** 31:12 43:1

**reasonable** 53:5

**recall** 4:8,12,15,17 6:13 7:3,11,21 14:22 15:2,24 16:5,10 26:6 41:2,6 43:14 52:18,19,21 54:18 55:19,24 66:2

**receive** 49:6

**received** 14:14 15:1 69:6

**receiving** 15:7

**recently** 65:18

**recess** 35:20 62:17 69:21

**recollection** 17:9 50:21 57:7

**record** 3:17 10:24 11:2 35:15,19 42:17 51:4,8,10,12 62:14,16 69:4,11, 19

**reference** 45:3,14 46:5

**referring** 10:8 18:21 32:11

**refers** 60:19

**registered** 49:2,14 50:24 51:24 52:4, 9,12,15 53:20,23

**registration** 49:9 53:15

**related** 8:15,17,20 9:7 10:11,14,16 11:6,15 12:11 13:11 14:23 15:8,16,24 16:17,22 17:6,13,19 19:6 20:6,11,17, 19 21:1,18 22:10 23:7,16 24:20 25:9, 20 28:16,20,23 29:4,10,18,19 30:5 32:2,9 34:3 36:18 40:6,23 41:7 47:10, 24 48:17,19 49:2,16 50:18 51:23 52:9,23 53:10,18 54:5 55:13 62:20 65:3 66:6,11 67:2,7,12,21

**Related's** 30:19 59:4

**relative** 64:21

**relevance** 31:9,11

**relevancy** 31:17

**remember** 49:5,7 52:14,19

**remote** 3:3

**repaid** 22:3,6,10 23:14 24:2,5 25:6 28:4 33:23 39:20,23

**repair** 47:2

**repairs** 46:8,14 47:5,7

**repeat** 31:23

**rephrase** 5:10

**replace** 44:18

**replacement** 43:18 44:10

**reporter** 3:1 4:24 10:4 36:1 51:11 62:15 70:8,15

**reporting** 46:9

**represents** 3:23

**requested** 10:5

**require** 43:16

**required** 33:16 46:7,14,22 47:2,5

48:14

**rescheduled** 49:18

**research** 63:6,9,12

**reservation** 69:4

**reserve** 69:12

**residential** 9:2 10:20

**respect** 56:24

**responses** 5:12,17

**responsibilities** 11:5

**responsible** 27:10 28:11

**restrictions** 56:18

**result** 28:6 68:14

**retain** 36:7

**returns** 32:8

**review** 6:22 33:13 60:4 63:12 69:9

**reviewed** 16:7 41:18 63:5

**reviewing** 7:3 17:2

**Richard** 6:14 8:6

**rights** 42:24 47:22 54:16 55:18 56:20 57:11 58:14 59:12 60:5 69:5

**risk-** 32:7 37:18

**risk-adjusted** 37:16

**role** 28:1

**rough** 62:6 70:10,16,19

**roughly** 61:19

**rounded** 61:21

**routine** 66:23

**RREF** 12:22 13:17 29:10 46:6,12 60:16 68:3,10

**RREF's** 56:23 58:1,22 68:9

**rules** 4:18 9:23

**running** 50:16

---

**S**

**sale** 14:20,24 15:9,18,20 36:16 49:1, 19,22 50:1,8,14 52:1,5 53:1

**sales** 48:21,24 49:4

**scenario** 39:21

schedule 70:2,4

scheduled 49:1 50:8 52:6

scope 34:12

screen 42:9

secured 32:6 46:1 54:20 60:17

secures 48:1

securities 67:13

seeking 18:4 19:2,18 39:20

self- 9:8

self-storage 9:4,5 10:17,19,21 15:6
  21:15 61:8,13

senior 46:19 47:18 53:21 54:2 55:22
  58:9

sense 16:13 20:13

sentence 46:6 60:12 61:22

sentences 56:14

series 4:21

serve 43:17

service 57:15 58:8

servicer 55:7 66:17

shakes 5:13

share 28:23

shortfalls 60:3

shortly 69:7

showing 15:20

shut 30:23 31:12

signed 15:10 49:6,11

signing 50:22

sir 3:16 4:4

sit 44:15

situation 18:22 39:16 40:11

size 21:8

sole 9:12

solely 55:21

Sontchi 31:18

sort 22:18 26:15,17 41:9

sound 29:13

sounds 20:16

space 9:12 10:17 54:3,14 65:5 66:7,8

speak 5:9 6:11 65:10

specific 38:20 41:16 59:20 63:22

specifically 7:4 52:21 66:2

spectrum 9:2

speculating 57:18

spoke 53:23

SROA 17:24 18:21 19:1,7,18 20:11
  21:17,20 24:13,19 25:4,10,18,22
  26:7,12 27:3,9,22 28:1,9,17,20,23
  29:3,17 53:14 62:20

SROA's 19:11 21:12

standalone 10:21

state 3:16 56:15 68:6 69:4

stated 39:18 43:3 65:16

statement 57:1 61:12

states 43:7 60:13 61:6 62:24 63:7

stay 50:5 56:18 58:13 60:15

stepping 25:4

stipulate 3:2

storage 9:9 10:10 12:22 13:17 21:21
  27:11 29:11 32:12 45:20 54:3,15,21
  55:17 62:23 63:3,6,16 64:4,21 65:4,
  14,17 66:7 67:15

Storage's 66:9

subject 65:22

subordinate 54:9

subsequent 27:17 28:10 56:2

subsidiaries 57:6

subsidiary 56:16

successfully 24:2,5 25:6 33:23
  39:23

sufficient 58:7

suggest 35:14 64:5

suggesting 59:2

suit 68:8

suppose 38:19

surrounding 31:3

susceptible 46:11

sworn 3:12

---

**T**

taking 5:1 27:16 28:10 54:15,22
  55:5,18 62:7 68:10

talk 35:15

talked 55:14

team 20:6

term 6:17

terms 7:1 23:20 25:18 26:5 27:21
  39:3

testified 3:13 15:23 19:16 52:9 57:3

testimony 16:4 51:23

Thad 3:20 45:6 56:9 62:9 67:19

things 5:15 63:21 64:24

third-party 32:16,23 33:4

thought 17:4

threat 60:19

TIAA 29:20 30:1 34:4 36:7,10,14,19
  41:8,10 42:23 43:8 44:2,13 48:18
  49:17 50:19

time 4:10 5:23 6:8 10:14 11:21 12:13
  15:13,15 16:13,16,21 17:12 19:8,11
  20:5,9 22:23 25:12,13 29:19,21 36:18
  40:16 46:16,21 47:3 52:1 55:12 57:8,
  13 61:15 62:10,13,19 63:10,13 66:22
  67:13 68:24 69:1,24

times 4:7,9

title 45:19

today 4:22 6:19,23 44:15 47:6

today's 6:1 69:10

tonight 70:19

top 59:10

topic 30:16 31:2,14,15,17 54:12
  58:17 67:20

topics 34:23 35:1,2

trailing 61:17

transactions 64:22

transcribe 5:15

transcribed 5:14

transcript 70:10,11

---

**trust** 58:16

**turn** 60:24

**types** 8:22,24

---

**U**

---

**UCC** 14:5,8 15:5 18:16 49:8 53:5
68:14,15

**unable** 25:6 48:15 58:13

**unaffected** 56:17

**unaware** 57:4

**underlying** 12:2,16 27:11 29:23
32:5,11 37:14 39:15 45:20 48:3 54:21
55:17 64:5

**understand** 5:9 16:3 20:14 21:11
22:2 25:19 27:5,20 37:24 43:2 44:4
45:4,18 46:13,16 47:6,12,14 49:15
51:22 58:12 60:6 68:3

**understanding** 18:24 19:10,17,22
21:13 29:9 41:9 43:8,11,13 45:21
46:3 48:9,12 49:24 50:3 60:22 61:11
62:22 63:14 68:7,21

**understood** 5:4

**undertook** 42:24

**underwriting** 29:23 32:10,14

**United** 62:24 63:7

**units** 64:12

**universe** 65:10

**unquote** 43:10

**unsecured** 61:24

**unsuccessful** 28:3

---

**V**

---

**valuation** 32:15,22 33:2,5 62:3,7

**values** 62:23 63:2,15

**variety** 64:24

**varying** 12:15

**video-** 3:3

---

**W**

---

**wanted** 9:22 13:11

**ways** 58:21

**week** 65:9

**weeks** 52:20

**wide** 12:17

**Wilmington** 3:22

**winston** 3:10,18,19 5:24 6:5 9:13
11:4 31:24 36:5 41:23 42:10,13,22
44:23 51:23 56:4 60:23 62:19 68:23
69:23

**withdraw** 67:23

**wondering** 50:13

**word** 16:19 41:16

**words** 12:13

**work** 8:11 33:16

**World** 67:16

**Worldwide** 67:15

**worth** 61:8,13

**written** 7:1

**wrong** 6:16

---

**Y**

---

**year** 29:12,19 48:19 62:21 64:16

**years** 4:14

**York** 50:4 68:6

**EXHIBIT E**

**Greg Flasser**

---

| | |
|---|---|
| **From:** | Marlier, Haimavathi V. <HMarlier@mofo.com> |
| **Sent:** | Friday, May 21, 2021 6:44 PM |
| **To:** | Thad Bracegirdle; Haims, Joel C.; Foudy, Theresa A.; Minuti, Mark; DiSabatino, Monique Bair |
| **Cc:** | Neil Glassman; Erin Fay; Daniel N. Brogan; Greg Flasser |
| **Subject:** | RE: RREF Discovery Deficiencies |

==CAUTION EXTERNAL==

Hi Thad, we object to the production of the three categories of documents that you have bullet-pointed below. As articulated in RREF's responses and objections to GVS's discovery requests, these documents are completely irrelevant to whether Debtor filed its bankruptcy petition in good faith and are, therefore, outside the scope of the May 26 hearing. (GVS, which bears the burden of proving a good faith basis for its bankruptcy filing, produced only 69 documents.) We also object to any further attempts to depose Mr. Winston. You had the documents you refer to below, in an electronic, text-searchable form, in advance of the deposition and had ample opportunity to ask Mr. Winston questions, yet ended the deposition - which started at 10:05 a.m. - at 11:50 a.m. If you identify the documents you wish to ask Mr. Winston about, we will consider your request, reserving all rights.

Regards,

Haima

**HAIMAVATHI V. MARLIER**
Partner | Morrison & Foerster LLP
250 West 55th Street | New York, NY 10019-9601
**Office:** +1 (212) 336-4409
**Mobile:** +1 (347) 448-1277
mofo.com | LinkedIn | Twitter

---

**From:** Thad Bracegirdle <tbracegirdle@bayardlaw.com>
**Sent:** Friday, May 21, 2021 5:23 PM
**To:** Haims, Joel C. <JHaims@mofo.com>; Marlier, Haimavathi V. <HMarlier@mofo.com>; Foudy, Theresa A. <TFoudy@mofo.com>; Minuti, Mark <Mark.Minuti@saul.com>; DiSabatino, Monique Bair <Monique.DiSabatino@saul.com>
**Cc:** Neil Glassman <NGlassman@bayardlaw.com>; Erin Fay <EFay@bayardlaw.com>; Daniel N. Brogan <DBrogan@bayardlaw.com>; Greg Flasser <GFlasser@bayardlaw.com>
**Subject:** RREF Discovery Deficiencies
**Importance:** High

==External Email==

---

Dear Counsel – I'm writing to address the following issues concerning RREF's document production:

- E-mails between TIAA and Related counsel produced in discovery (RREF 665, RREF 668) reflect that TIAA obtained updated appraisals in early March 2021 which were provided to Related. We are unaware of these appraisals having been produced, even though they are responsive to Debtor's Request for Production No. 2. Please produce these documents as soon as practicable.
- During yesterday's deposition, Mr. Winston testified that Related performed its own internal valuation of the storage facility properties in connection with underwriting and evaluating the purchase of Debtor's loan from TIAA (see pp. 33:4-34:2). None of these appraisals, or communications relating to them, were produced, even though they are responsive to Debtor's Request for Production No. 2. Please produce these documents as soon as practicable.
- Debtor's Request for Production No. 12 sought documents or communications concerning the UCC foreclosure sale scheduled for April 12, 2021. All of the participation statements produced by RREF are directed to TIAA, indicating that they concerned the earlier UCC foreclosure sales scheduled for September 2020 and/or March 2021. No participation statements concerning the April 12, 2021 UCC foreclosure sale were produced – please confirm that RREF has no such participation statements in its possession, custody or control, or produce them as soon as practicable.

Finally, as I noted yesterday on the record Debtor reserved its right to recall Mr. Winston for deposition based on RREF's production of responsive documents only 10 hours before Mr. Winston's deposition was scheduled to begin. We do require additional testimony from Mr. Winston to address certain documents already produced by RREF as well as the documents to be produced in response to my foregoing requests. Accordingly, please confirm times when Mr. Winston will be available for a short supplemental deposition on Sunday, Monday or Tuesday (May 23-25) and I am confident that we can find a date and time that will work for the witness and all counsel.

Thank you,

**Thad J. Bracegirdle**
**Director** | tbracegirdle@bayardlaw.com
My Bio | V-Card | LinkedIn



**Bayard, P.A.**
600 North King Street, Suite 400
P.O. Box 25130 Wilmington, DE 19899
Zip Code For Deliveries 19801
Direct: +1 302-429-4262 | Fax: +1 302-658-6395
www.bayardlaw.com

Electronic communications may be intercepted or altered, so the integrity of this message and any attachments cannot be guaranteed. This e-mail contains confidential information for the addressee and may be privileged under the attorney-client relationship. If you received this e-mail in error, please contact the sender by reply e-mail or by phone at +1 302.429.4262 (collect if you wish) and destroy the message without disclosing the contents.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

======================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.

**<u>EXHIBIT F</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------- x
```
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GVS Portfolio I B, LLC, | : | Case No. 21-10690 (CSS) |
| | : | |
| Debtor.[1] | : | **Related to Docket No. 8** |
| | : | |
| | : | |
```
------------------------------------------------------------- x
```

### RREF III STORAGE LLC'S RESPONSES AND OBJECTIONS TO DEBTOR'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO RREF III STORAGE LLC IN CONNECTION WITH ITS MOTION FOR ENTRY OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE WITH PREJUDICE

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this contested matter by Rules 7026, 7034, and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), RREF Storage III LLC ("RREF"), by and through its undersigned counsel, hereby responds and objects (the "Responses and Objections") to those requests for the production of documents (the "Requests") set forth in *Debtor's First Set of Discovery Requests Directed to RREF III Storage LLC in Connection with its Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay,* dated May 7, 2021, that the Debtor has identified as documents that it is continuing to request in connection with RREF's *Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice* (the "Motion to Dismiss").[2]

---

[1]    The Debtor in this chapter 11 case, together with the last four digits of the Debtor's taxpayer identification number, is as follows:  GVS Portfolio I B, LLC (7171).  The Debtor's mailing address is 814 Lavaca Street, Austin, TX 78701.

[2]    These Responses and Objections pertain to Requests 1, 2, 9, 11, 12, 19 (limited to communications between RREF and SROA), 20, 21, and 22, as identified by Debtor's counsel on May 14, 2021.

## GENERAL OBJECTIONS

1.      The Responses and Objections set forth in this section apply to each of the Requests and are not necessarily repeated in response to each individual Request.  The assertion of the same, similar, or additional objections in RREF's specific objections to an individual Request, or the failure to assert any additional objection to a Request, does not waive any of RREF's objections set forth in this section or the following sections.

2.      These Responses and Objections are made without waiving or intending to waive: (a) all objections to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose in this or any subsequent matter or proceeding, including in any other case or action; (b) the right to object to the use of any documents (or the subject matter thereof) that may be produced in any matter or proceeding in this or any other case or action on any grounds; (c) the right to preserve, prior to production, and as a condition of production, the confidentiality or the proprietary nature of any documents that may be produced or the subject matter thereof; (d) the right to object on any ground at any time to a demand for further production or other discovery involving or relating to the subject matter of the Requests; and (e) the right at any time to revise, supplement, clarify or amend these Responses and Objections, if further factual developments or analysis warrants a modification or if additional documents are located that are called for by the Requests.

3.      RREF objects generally to the "Instructions" set forth in the Requests to the extent that they purport to impose requirements, obligations or duties that exceed those imposed by the Federal Rules, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, or any applicable order of the Court.

38519011.2

4.      RREF objects generally to the Requests to the extent that they seek information or documents protected from discovery by the attorney-client privilege, the attorney work product doctrine, the common-interest privilege, or any other applicable privilege or doctrine.

5.      Nothing contained in these Responses and Objections is intended as, or shall in any way be deemed as, a waiver of any attorney-client privilege, any work product doctrine, or any other applicable privilege or doctrine.   Inadvertent production of any such protected document shall not constitute a waiver of any privilege or any other ground for objection to discovery with respect to such document or any other document, or with respect to the subject matter thereof, or with respect to the information contained therein, nor shall such inadvertent production waive RREF's right to object to the use of any such document or the information contained therein during any subsequent matter or proceeding.   Upon notification that such disclosure was inadvertent, the information or document(s) and any copies thereof shall be returned immediately.

6.      RREF objects generally to the Requests to the extent that they are vague, ambiguous, overly broad or unduly burdensome, not proportional to the needs of this case, and/or to the extent that they request information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

7.      RREF objects generally to the Requests to the extent they seek public documents that are equally available to the Debtor through less burdensome means, including, without limitation, court records, county clerk records, securities and corporate filings, and press releases.

8.      RREF objects generally to the Requests to the extent they seek private, confidential, proprietary documents and information and/or trade secrets of RREF.

38519011.2

9.      RREF objects generally to the Requests to the extent that they seek to impose an obligation on it to search for documents beyond where such documents would be kept in the ordinary course of business.  RREF's responses are limited to documents from sources reasonably likely to have responsive documents and are consistent with RREF's standard record retention policies.

10.      RREF objects generally to the Requests to the extent that they call for the production of any document that is not within RREF's possession, custody, and/or control on the ground that it would be unduly burdensome to require such production.

11.      RREF objects generally to the Requests to the extent that they seek documents or information that is (a) in the possession, custody or control of the Debtor, or (b) obtainable from some other source that is more convenient, less burdensome, or less expensive.

12.      RREF objects generally to the Requests to the extent that they are overly broad, including requests for the production of "all" documents when all relevant facts can be obtained from fewer than "all" documents or when "all" documents would call for the production of duplicates of the same documents already produced or withheld on the grounds of privilege or other objections raised herein.

13.      RREF objects generally to the Requests, because the Motion to Dismiss concerns the Debtor's basis for filing its petition as of April 12, 2021.  Documents or information in the possession of RREF that were not in the Debtor's possession on April 12, 2021 are irrelevant.

14.      RREF objects generally to all the Requests to the extent they seek discovery of documents reflective of RREF's judgments, evaluations, or assessments of value, because such Requests seek confidential and proprietary information that is irrelevant to the Motion to Dismiss, and, as such, are overbroad, unduly burdensome, and disproportionate to the discovery

that is needed to resolve the Motion to Dismiss. RREF will not produce such documents or information.

15.     Given the compressed schedule for the production of documents, it was incumbent upon the Debtor to narrowly tailor its discovery requests. The Debtor's Requests, however, are not proportional to what is appropriate in the current contested matter.

16.     RREF objects to searching for or producing any text messages, voice-mails, or any similar messages, each of which is not readily accessible and/or would be unduly burdensome and not proportionate to the needs of the contested matter and the abbreviated timeframe for discovery.

17.     The Responses and Objections provided herein have been prepared pursuant to a reasonable and diligent investigation and search for the documents requested. RREF reserves the right to revise, correct, add to, supplement, clarify and/or modify its Responses and Objections should any additional information become available through discovery or otherwise.

18.     These General Objections are specifically incorporated by reference as though fully set forth in each response to the Requests given below.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     RREF objects to Definition No. 6, and all Definitions whose terms are defined to include any entity and its affiliates, parents, subsidiaries, officers, managers, agents, representatives, employees, attorneys, assigns, predecessors in interest or any other person acting or purporting to act on the entity's behalf. This definition renders the Requests in which the term is used vague and ambiguous, overly broad, unduly burdensome, and oppressive, and seek the production of documents neither relevant to the subject matter of the current proceeding nor reasonably calculated to lead to the discovery of admissible evidence in any proceeding.

38519011.2

2.      RREF objects to Instruction No. 13 to the extent it is overbroad, unduly burdensome, and/or seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Specifically, Instruction No. 13 seeks production of documents and information during the period from and including December 1, 2019 to the present date, a time period that predates RREF's March 8, 2020 acquisition of those loans extended to the Debtor pursuant to (i) the Mezz 2 Loan Agreement, dated as of November 30, 2018, and (ii) the Omnibus Amendment to Mezzanine 2 Loan documents, dated as of January 7, 2019 (collectively, the "Mezz 2 Loan"), and is thus far broader than when relevant communications with RREF took place.

3.      In searching for any documents, RREF is utilizing electronic tools that it believes are reasonable and proportionally appropriate, including email threading and de-duplication. Furthermore, RREF is collecting documents and communications in response to the Requests in a manner that it considers reasonable and proportionally appropriate.  None of these electronic tools or methods of collection assures the collection, review and production of "all documents" as requested by the Debtor; however, they represent RREF's good faith effort to comply, subject to the Responses and Objections contained herein.  If RREF states in these Responses and Objections that responsive documents, if any, will be produced, that does not constitute an admission that responsive documents do exist.  RREF's responses to any particular Requests, including its agreement to produce documents, do not constitute admissions that such documents are evidence of any particular allegation or issue.

## SPECIFIC RESPONSES AND OBJECTIONS

Subject to and without waiving RREF's General Objections and Objections to Definitions and Instructions, RREF responds as follows:

38519011.2

**REQUEST NO. 1:**

To the extent not attached to the O'Toole Declaration as Exhibits 1-25, all documents referenced in the O'Toole Declaration and/or supporting any statements in the O'Toole Declaration.

**RESPONSE TO REQUEST NO. 1:**

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein.  RREF objects to this Request to the extent it seeks information or documents protected from discovery by the attorney-client privilege, attorney work product doctrine, the common-interest privilege or any other applicable privilege or doctrine.  RREF further objects to this Request to the extent that it calls for the production of any filings in *GVS v. TIAA*, which are publicly available.  Moreover, RREF objects to this Request on relevance grounds to the extent that it seeks documents and information that are not relevant to the Motion to Dismiss.  RREF also objects that the request for "all" documents "supporting any statement" in the O'Toole Declaration is vague, overly broad, unduly burdensome, and seeks the production of documents and information that are not relevant or material to, or reasonably calculated to lead to, the discovery of admissible evidence, and not proportional to what is appropriate for the current matter.  RREF further objects to this Request on the grounds that it is unreasonably cumulative or duplicative and seeks documents that are in the possession, custody, or control of the Debtor.

Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce non-privileged documents, if any, that are referenced in the O'Toole Declaration but not attached as an exhibit thereto.

**REQUEST NO. 2:**

All documents and communications concerning the circumstances or transaction(s) by which, as stated in Paragraph 7 of the O'Toole Declaration, "RREF purchased the Mezz 2 Loan or [sic] March 8, 2021, and TIAA assigned RREF all of the rights flowing from the Mezz 2 Loan Documents."

**RESPONSE TO REQUEST NO. 2:**

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein. RREF objects to this Request to the extent it is duplicative or cumulative of Request No. 1. RREF further objects to this Request to the extent it seeks information or documents protected from discovery by the attorney-client privilege, attorney work product doctrine, the common-interest privilege or any other applicable privilege or doctrine. Moreover, RREF objects to this Request on relevance grounds, because it seeks documents and information that are not relevant to the Motion to Dismiss. RREF also objects that the request for "all" documents "concerning the circumstances or transaction(s)" is vague, overly broad, unduly burdensome, and seeks the production of documents and information that are not relevant or material to, or reasonably calculated to lead to, the discovery of admissible evidence, and not proportional to what is appropriate for the current matter. RREF further objects to the extent this Request seeks documents and/or information that constitute, in whole or in part, trade secrets or protected, private, confidential, proprietary, or competitively sensitive information.

Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce non-privileged documents, if any, responsive to Request No. 2, except to the extent such documents reflect RREF's judgments, evaluations, or assessments of value.

38519011.2

**REQUEST NO. 9:**

All documents or communications concerning the UCC foreclosure sale scheduled for September 3, 2020, as referenced in Paragraph 35 of the O'Toole Declaration, including but not limited to any registration documents concerning the UCC foreclosure sale and documents or communications identifying potential or actual bidders participating in the UCC foreclosure sale.

**RESPONSE TO REQUEST NO. 9:**

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein.  RREF objects to this Request to the extent it is duplicative or cumulative of Request No. 1.  RREF further objects to this Request to the extent it calls for the production of documents that are not within RREF's possession, custody, and/or control because they precede RREF's purchase and assumption of the Mezz 2 Loan.  Moreover, RREF objects to this Request on relevance grounds, because it seeks documents and information that are not relevant to the Motion to Dismiss.  RREF also objects that the request for "all" documents "concerning" a UCC foreclosure sale that did not take place is vague, overly broad, unduly burdensome, and seeks the production of documents and information that are not relevant or material to, or reasonably calculated to lead to, the discovery of admissible evidence, and not proportional to what is appropriate for the current matter.  RREF further objects to the extent this Request seeks documents and/or information that constitute, in whole or in part, trade secrets or protected, private, confidential, proprietary, or competitively sensitive information.

Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce non-privileged documents, if any, responsive to Request No. 9, except to the extent such documents reflect RREF's judgments, evaluations, or assessments of value.

9

**REQUEST NO. 11:**

All documents or communications concerning the UCC foreclosure sale rescheduled for March 10, 2021, as referenced in Paragraph 36 of the O'Toole Declaration, including but not limited to any registration documents concerning the UCC foreclosure sale and documents or communications identifying potential or actual bidders participating in the UCC foreclosure sale.

**RESPONSE TO REQUEST NO. 11:**

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein.  RREF objects to this Request to the extent it is duplicative or cumulative of Request No. 1.  RREF further objects to this Request to the extent it seeks information or documents protected from discovery by the attorney-client privilege, attorney work product doctrine, the common-interest privilege, or any other applicable privilege or doctrine.  Moreover, RREF objects to this Request on relevance grounds, because it seeks documents and information that are not relevant to the Motion to Dismiss.  RREF also objects that the request for "all" documents "concerning" a UCC foreclosure sale that did not take place is vague, overly broad, unduly burdensome, and seeks the production of documents and information that are not relevant or material to, or reasonably calculated to lead to, the discovery of admissible evidence, and not proportional to what is appropriate for the current matter.  RREF further objects to the extent this Request seeks documents and/or information that constitute, in whole or in part, trade secrets or protected, private, confidential, proprietary, or competitively sensitive information.

Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce non-privileged documents, if any, responsive to Request No. 11, except to the extent such documents reflect RREF's judgments, evaluations, or assessments of value.

10

**REQUEST NO. 12**:

All documents or communications concerning the UCC foreclosure sale scheduled for April 12, 2021, as referenced in Paragraph 38 of the O'Toole Declaration, including but not limited to any registration documents concerning the UCC foreclosure sale and documents or communications identifying potential or actual bidders participating in the UCC foreclosure sale.

**RESPONSE TO REQUEST NO. 12**:

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein.  RREF objects to this Request to the extent it is duplicative or cumulative of Request No. 1.  RREF further objects to this Request to the extent it seeks information or documents protected from discovery by the attorney-client privilege, attorney work product doctrine, the common-interest privilege, or any other applicable privilege or doctrine.  Moreover, RREF objects to this Request on relevance grounds, because it seeks documents and information that are not relevant to the Motion to Dismiss.  RREF also objects that the request for "all" documents "concerning" a UCC foreclosure sale that did not take place is vague, overly broad, unduly burdensome, and seeks the production of documents and information that are not relevant or material to, or reasonably calculated to lead to, the discovery of admissible evidence, and not proportional to what is appropriate for the current matter.  RREF further objects to the extent this Request seeks documents and/or information that constitute, in whole or in part, trade secrets or protected, private, confidential, proprietary, or competitively sensitive information.

Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce non-privileged documents, if any, responsive to Request No. 12, except to the extent such documents reflect RREF's judgments, evaluations, or assessments of value.

11

**REQUEST NO. 19:**

All communications between or among RREF, TIAA, SROA and/or JLL concerning: (a) Debtor; (b) the Properties (as defined in Paragraph 11 of the O'Toole Declaration); (c) the Mezz 2 Loan (as defined in Paragraph 6 of the O'Toole Declaration); and/or (d) any proposed or actual efforts to foreclose upon, sell or otherwise transfer Debtor's assets (including but not limited to the UCC foreclosure sales referenced in the O'Toole Declaration).

**RESPONSE TO REQUEST NO. 19:**

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein.  RREF objects to this Request to the extent it is duplicative or cumulative of Request No. 1.  RREF further objects to this Request to the extent it seeks information or documents protected from discovery by the attorney-client privilege, attorney work product doctrine, the common-interest privilege, or any other applicable privilege or doctrine.  Moreover, RREF objects to this Request on relevance grounds, because it seeks documents and information that are not relevant to the Motion to Dismiss.  RREF also objects that the request for "all" communications "concerning" the Debtor, the Properties, the Mezz 2 Loan, or any proposed or actual efforts to foreclose upon, sell, or otherwise transfer the Debtor's "assets" is vague, overly broad, unduly burdensome, and seeks the production of documents and information that are not relevant or material to, or reasonably calculated to lead to, the discovery of admissible evidence, and not proportional to what is appropriate for the current matter.  RREF also objects that the Request is confusing to the extent it represents that Debtor has more than one asset.  RREF further objects to the extent this Request seeks documents and/or information that constitute, in whole or in part, trade secrets or protected, private, confidential, proprietary, or competitively sensitive information.

38519011.2

Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce non-privileged communications with SROA, if any, responsive to Request No. 19, except to the extent such documents reflect RREF's judgments, evaluations, or assessments of value.

**REQUEST NO. 20:**

To the extent not responsive to other requests, all documents upon which RREF intends to rely in support of the Motion and/or which RREF intends to offer as evidence at any hearing on the Motion.

**RESPONSE TO REQUEST NO. 20:**

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein. RREF further objects to this Request to the extent it seeks information or documents protected from discovery by the attorney-client privilege, attorney work product doctrine, the common-interest privilege, or any other applicable privilege or doctrine. RREF also objects to this Request on the grounds that RREF has no obligation to introduce any evidence or rely upon any documents at the hearing on the Motion to Dismiss. RREF further objects because this Request is premature in that it calls for the disclosure of exhibits in advance of the dates agreed to between RREF and the Debtor.

**REQUEST NO. 21:**

To the extent not responsive to other requests, all documents provided to and/or relied upon by any person Movant intends to offer as an expert witness at any hearing on the Motion.

13

**RESPONSE TO REQUEST NO. 21**:

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein.  RREF further objects to this Request to the extent it seeks information or documents protected from discovery by the attorney-client privilege, attorney work product doctrine, the common-interest privilege, or any other applicable privilege or doctrine.  RREF also objects to this Request on the grounds that RREF has no obligation to call any witnesses (including expert witnesses), introduce any evidence or rely upon any documents at the hearing on the Motion to Dismiss.  Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce responsive, non-privileged documents, if any.

**REQUEST NO. 22**:

To the extent not responsive to other requests, all documents identified in response to the foregoing interrogatories.

[remainder of page left intentionally blank]

14

**RESPONSE TO REQUEST NO. 22:**

RREF incorporates by reference the General Objections and Objections to Definitions and Instructions stated above as if fully set forth herein.  Subject to and without waiving the foregoing General and Specific Objections, following execution of an appropriate confidentiality agreement, RREF will produce responsive, non-privileged documents, if any.

Dated: May 17, 2021

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique Bair DiSabatino (DE Bar No. 6027)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Email:  mark.minuti@saul.com
Email:  monique.disabatino@saul.com

-and-

**MORRISON & FOERSTER LLP**
James M. Peck
Theresa A. Foudy
Joel C. Haims
Haimavathi V. Marlier
Mark A. Lightner
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Email:  jpeck@mofo.com
Email:  tfoudy@mofo.com
Email:  jhaims@mofo.com
Email:  hmarlier@mofo.com
Email:  mlightner@mofo.com

*Attorneys for RREF III Storage LLC*

15

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
In re:                              :    Chapter 11
                                    :
GVS Portfolio I B, LLC,             :    Case No. 21-10690 (CSS)
                                    :
                Debtor.¹            :
                                    :
                                    :
------------------------------------------------------------- x
```

**NOTICE OF SERVICE OF RREF III STORAGE LLC'S RESPONSES
AND OBJECTIONS TO DEBTOR'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS DIRECTED TO RREF III STORAGE
LLC IN CONNECTION WITH ITS MOTION FOR ENTRY OF AN ORDER
DISMISSING THE DEBTOR'S CHAPTER 11 CASE WITH PREJUDICE**

I, Monique B. DiSabatino, hereby certify that on May 17, 2021, I caused a copy of **RREF III Storage LLC's Responses and Objections to Debtor's First Set of Requests for Production of Documents Directed to RREF III Storage LLC in Connection with Its Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice** to be served via Electronic Mail on the following parties.

> Neil B. Glassman, Esq.
> Thad J. Bracegirdle, Esq.
> Erin R. Fay, Esq.
> Gregory J. Flasser, Esq.
> The Bayard Firm
> 600 N. King Street, Suite 400
> Wilmington, DE 19801

---

¹    The Debtor in this chapter 11 case, together with the last four digits of the Debtor's taxpayer identification number, is as follows:  GVS Portfolio I B, LLC (7171).  The Debtor's mailing address is 814 Lavaca Street, Austin, TX 78701.

Dated: May 17, 2021  **SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique Bair DiSabatino (DE Bar No. 6027)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Email:  mark.minuti@saul.com
Email:  monique.disabatino@saul.com

-and-

**MORRISON & FOERSTER LLP**
James M. Peck
Joel C. Haims
Theresa A. Foudy
Haimavathi V. Marlier
Mark A. Lightner
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Email:  jpeck@mofo.com
Email:  jhaims@mofo.com
Email:  tfoudy@mofo.com
Email:  hmarlier@mofo.com
Email:  mlightner@mofo.com

*Attorneys for RREF III Storage LLC*