IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :    Chapter 11
                                                                 :
GVS Portfolio I B, LLC,                                          :    Case No. 21-10690 (CSS)
                                                                 :
                Debtor.[1]                                             :
                                                                 :
                                                                 :
---------------------------------------------------------------- x

# DECLARATION OF MICHAEL WINSTON

I, Michael Winston, hereby declare as follows:

1. I am a Managing Director of Related Fund Management LLC ("Related"), an affiliate of Movant RREF III Storage LLC ("RREF" or "Movant").

2. I submit this declaration in support of the Movant's *Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* (Dkt. No. 8), filed on April 26, 2021, and in support of the Movant's *Reply in Further Support of Its Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice* (Dkt. No. 67), filed on May 21, 2021. I make this declaration based on personal knowledge of administration of the documents referenced herein, as well as my review of RREF's relevant business records currently in my possession. If called to testify as a witness, I would testify under oath to these facts.

3. RREF is the holder of two loans to GVS Portfolio I B, LLC (the "Debtor") in the aggregate outstanding principal amount of $82 million (the "Mezz 2 Loan"), that are secured by the Debtor's only asset, its membership interest (the "Membership Interest") in GVS Portfolio

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's taxpayer identification number, is as follows: GVS Portfolio I B, LLC (7171). The Debtor's mailing address is 814 Lavaca Street, Austin, TX 78701.

I, LLC (the "Mezz 1 Borrower"). The Mezz 2 Loan has been in default since December 6, 2019. As a result of the Debtor's default, the maturity date of the Mezz 2 Loan was and remains accelerated. All obligations thereunder are due and payable.

4. The holder of the Mezz 2 Loan (the "Secured Lender") has attempted on three separate occasions to exercise its rights and remedies in respect of the Debtor's ongoing and prolonged defaults by holding a foreclosure sale in accordance with the requirements of the Uniform Commercial Code ("UCC"). Just before each scheduled auction, the Debtor initiated legal proceedings, or engaged in motion practice, to avoid foreclosure:

i. **Original UCC Sale:** Teachers Insurance Annuity Association of America ("TIAA") gave notice of a UCC foreclosure sale to take place on September 3, 2020 (the "Original UCC Sale"). Days before the Original UCC Sale was to take place, however, the Debtor filed a lawsuit to enjoin the sale. The court granted a preliminary injunction, approved the Debtor's and TIAA's stipulation as to a renewed mutually acceptable sale and marketing process, and ordered that the sale go forward on March 10, 2021.

ii. **Rescheduled UCC Sale:** RREF, having acquired TIAA's interest in the Mezz 2 Loan, intended to proceed with the court-ordered March 10, 2021 auction (the "Rescheduled UCC Sale"). Once again, the Debtor sought the court's intervention to prevent the sale from happening. The court denied the Debtor's motion and, once again, ordered the sale to go forward.

iii. **Second Rescheduled UCC Sale:** RREF scheduled yet another UCC auction, this time to be held at 10:00 a.m. on April 12, 2021 (the "Second Rescheduled UCC Sale"). Less than one hour before the auction was to begin, the Debtor triggered an automatic stay of the foreclosure by filing for bankruptcy.

5. The Mezz 2 Loan remains in default, with an outstanding balance including principal, interest, late payment charges, and costs and expenses of enforcement of more than $100 million as of May 24, 2021, and growing each day (the "Secured Debt"), exclusive of additional fees, premium, and other amounts that may be due and owing under the Secured Debt documents and applicable law.

## Overview of the Debtor

6.      Upon information and belief, the Debtor is not an operating company and does not have ongoing business operations or employees. *See* JX-36 (Debtor's Preliminary Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay, ¶ 55) (Dkt. No. 53). Upon information and belief, the Debtor was established as a special purpose entity within a corporate structure, the only business purpose of which is to hold the Membership Interest securing the Mezz 2 Loan.

7.      Upon information and belief, the Debtor's sole asset is its Membership Interest in a non-debtor, the Mezz 1 Borrower. Upon information and belief, the Mezz 1 Borrower owns 100% of the limited liability company membership interests in twelve limited liability companies (collectively, the "Property Owners").[2] *See* JX-6, at 1 (Mezzanine 2 Loan Agreement, dated as of November 30, 2018). The Property Owners own a portfolio of 64 self-storage facilities, branded as Great Value Storage, located in Colorado, Illinois, Indiana, Missouri, Mississippi, Nevada, New York, Ohio, Tennessee, and Texas (the "Properties"). *See* JX-6.

8.      Upon information and belief, Natin Paul is the President and indirect owner of both the Debtor and the Mezz 1 Borrower. Upon information and belief, the below chart illustrates the Debtor's position within the larger corporate structure:

---

[2]    These twelve LLCs are: GVS Colorado Holdings I, LLC; GVS Illinois Holdings I, LLC; GVS Indiana Holdings I, LLC; GVS Missouri Holdings I, LLC; WC Mississippi Storage Portfolio I, LLC; GVS Nevada Holdings I, LLC; GVS New York Holdings I, LLC; GVS Ohio Holdings I, LLC; GVS Ohio Holdings II, LLC; GVS Tennessee Holdings I, LLC; GVS Texas Holdings I, LLC; and GVS Texas Holdings II, LLC. *See* JX-6, at Schedule 1.

ny-2115895



### The Loans

9.      Upon information and belief, UBS AG, by and through its branch office at 1285 Avenue of the Americas, New York, New York ("UBS"), originated three loans to the Debtor and affiliated non-debtor entities: a mortgage loan and two mezzanine loans. *See* JX-46 ¶ 6 (Summons and Verified Compl., *GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020, NYSCEF Doc. No. 1 (N.Y. Sup. Ct. Aug. 27, 2020)).

10. Upon information and belief, UBS originated the mortgage loan in the principal amount of $110,000,000.00 (the "Mortgage Loan") to the twelve non-debtor Property Owners pursuant to a Mortgage Loan Agreement, dated as of November 30, 2018 (the "Mortgage Loan Agreement"). *See* JX-46 ¶ 7. The Mortgage Loan, which is secured by a first priority mortgage security interest in the Properties, is currently held by Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C15 Commercial Mortgage Pass-Through Certificates, Series 2018-C15 (the "Mortgage Loan Lender"). Midland Loan Services, a division of PNC Bank, National Association, is the servicer on behalf of the Mortgage Loan Lender (the "Servicer"). *See* JX-8 (Mortgage Loan Agreement).

11. Upon information and belief, pursuant to the Mezzanine 1 Loan Agreement, dated as of November 30, 2018 (the "Mezz 1 Loan Agreement"), UBS originated a loan in the principal amount of $103,000,000.00 (the "Mezz 1 Loan") to the Mezz 1 Borrower, which itself owns 100% of the membership interests in the Property Owners. *See* JX-46 ¶ 8. The Mezz 1 Loan, which is secured by the Mezz 1 Borrower's interests in the Property Owners, is currently held by ESS-GV Holdings LLC (the "Mezz 1 Lender," and together with the Mortgage Loan Lender, the "Senior Lenders"). *See* JX-9 (Mezz 1 Loan Agreement). Upon information and belief, the Mezz 1 Loan is evidenced by various Promissory Notes (the "Notes") made by the Debtor in favor of UBS. *See* JX-10 (Notes).

12. Upon information and belief, UBS also originated a second mezzanine loan of $63 million to the Debtor (the "Initial Mezz 2 Loan") pursuant to a Mezzanine 2 Loan Agreement, dated as of November 30, 2018 (the "Mezz 2 Loan Agreement"), and evidenced by a

Mezzanine 2 Promissory Note, dated as of November 30, 2018 (the "Mezz 2 Note"), made by the Debtor in favor of UBS. *See* JX-6 (Mezz 2 Loan Agreement); JX-11 (Mezz 2 Note).

13. Upon information and belief, and shortly after the Initial Mezz 2 Loan was made, UBS assigned the Initial Mezz 2 Loan and Mezz 2 Note—including its rights and property representing, relating to, and arising therefrom—to TIAA pursuant to that certain Mezzanine Assignment and Assumption Agreement (Mezz 2 Loan), dated as of December 3, 2018. *See* JX-15 (Mezzanine Assignment and Assumption Agreement (Mezz 2 Loan) between UBS and TIAA). The assignment of the Initial Mezz 2 Loan and the Mezz 2 Note is expressly permitted by Section 9.1(a) of the Mezz 2 Loan Agreement. *See* JX-6, § 9.1(a)(i), (ii) ("Lender shall have the right, at any time and from time to time, (i) to sell or otherwise transfer the Mezz 2 Loan as a whole loan or sell or otherwise transfer any portion thereof or any interest therein, [and] (ii) to sell participation interests in the Loan[.]"). By Note Allonge, dated December 3, 2018, UBS transferred its right to payment under the Mezz 2 Note by endorsing the Mezz 2 Note in favor of TIAA. *See* JX-12 (Dec. 3, 2018 Note Allonge).

14. Upon information and belief, TIAA extended to the Debtor a $19 million loan pursuant to the Omnibus Amendment to Mezzanine 2 Loan Agreement ("Omnibus Amendment"), as evidenced by a Supplemental Promissory Note (Mezzanine 2 Loan), dated as of January 7, 2019 (the "Supplemental Promissory Note"). *See* JX-16 (Omnibus Amendment); JX-17 (Supplemental Promissory Note). The Omnibus Amendment incorporates the terms of the Mezz 2 Loan Agreement and defines the Mezz 2 Loan as the aggregate principal amount of $82 million (*i.e.*, $63 million plus $19 million). *See* JX-16 ¶ 1.3. The Omnibus Amendment ratified all terms, covenants, and provisions of the Mezz 2 Loan Agreement and Mezz 2 Note. *See* JX-16 ¶ 1.9.

15. The Mezz 2 Loan is secured by the Debtor's Membership Interest in the Mezz 1 Borrower—the next most senior mezzanine borrower and the indirect owner, via twelve other LLCs, of 64 self-storage facilities—together with certain rights and property representing, relating to, or arising therefrom (the "Collateral"). *See* JX-7 (Pledge and Security Agreement to the Mezz 2 Loan Agreement).

16. On March 8, 2021, RREF executed a Mezzanine Assignment and Assumption Agreement with TIAA (the "Assignment"), and acquired all of TIAA's rights and interests in the Mezz 2 Loan. *See* JX-18 (Assignment). Pursuant to the Assignment, TIAA assigned to RREF "all of its right, title, and interest in and to . . . the Notes, the Loan, the Loan Agreement and the other Loan Documents." JX-18 ¶ 2. By two Note Allonges, dated March 8, 2021, TIAA transferred its right to payment under the Mezz 2 Note and Supplemental Promissory Note by endorsing them in favor of RREF. *See* JX-19 to JX-20 (Mar. 8, 2021 Note Allonges).

17. Upon information and belief, the respective rights, remedies, and obligations of the Mortgage Loan Lender, the Mezz 1 Lender, and RREF—including the relative payment and collateral priorities with respect to the loans to which all of the lenders are a party—are governed by, among other things, that certain Intercreditor Agreement, dated as of November 30, 2018 (as amended, restated, or otherwise modified from time to time, the "Intercreditor Agreement"), and the Cash Management Agreement, dated as of November 30, 2018, as amended by that certain Amendment to Cash Management Agreement, dated as of January 8, 2020 (as the same may be further amended, restated, or otherwise modified from time to time, the "Cash Management Agreement"). *See* JX-13 (Intercreditor Agreement); JX-14 (Cash Management Agreement).

18. Neither RREF nor Related are participants in the self-storage industry. Accordingly, to prepare for the possibility that RREF might take possession of the Collateral in the event its efforts to be repaid on the Secured Debt are unsuccessful, RREF's parent entity entered into an agreement with Storage Rentals of America ("SROA") on May 13, 2021. Under the terms of that agreement, SROA will manage and operate the self-storage facilities in the event RREF comes into possession of the Collateral following a foreclosure sale. SROA holds an ownership interest in RREF of approximately 2%.

**The Loans are in Default**

19. The Mezz 2 Loan Agreement provides that the Debtor's failure to pay its monthly debt service payment shall constitute an "Event of Default":

> (i)(A) [I]f any monthly Debt Service, any monthly deposit of Reserve Funds or the payment due on the Maturity Date is not paid when due or (B) if any other portion of the Debt is not paid when due; provided that, with respect to this clause (B), such non-payment continues for five (5) days following notice to [the Debtor] that the same is due and payable.

JX-6 § 10.1(a)(i). Upon information and belief, on December 6, 2019, the Debtor failed to make its monthly Debt Service payment under the Mezz 2 Loan Agreement. *See* JX-22.

20. The Mezz 2 Loan Agreement further provides that, "[u]pon the occurrence and during the continuance of an Event of Default . . . , Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against [the Debtor] and in and to the collateral, including, without limitation, declaring the Debt to be immediately due and payable." JX-6 § 10.1(b).

21. Upon information and belief, on December 6, 2019, TIAA provided the Debtor with notice that an Event of Default had occurred by virtue of the Debtor's failure to pay

its monthly debt service on the Mezz 2 Loan by 3:00 p.m. on December 6, 2019. *See* JX-22 (Dec. 6, 2019 TIAA notice of default). The notice informed the Debtor that, in light of the Events of Default, "Mezzanine 2 Lender hereby accelerates the Mezzanine 2 Loan and declares the Mezzanine 2 Loan to be immediately due and payable in full." JX-22, at 2.

22. The Mezz 2 Loan Agreement, as amended by the Omnibus Amendment, provides "that, and for so long as, any Event of Default has occurred and remains outstanding" the principal balance shall accrue interest at the Default Rate of 13.715%. *See* JX-6 § 2.3.4; JX-16 § 1.1.

23. The Debtor's default was also a "Cash Management Trigger Event" under the Mortgage Loan Agreement. *See* JX-8 § 1.1. This triggering event caused certain provisions to take effect, including the requirement that the Property Owners remit monthly payments into a designated "Cash Management Account" held at the Servicer from and after the occurrence of a Cash Management Trigger Event. *See* JX-8 § 2.7.2 (b). The Cash Management Account contains various sub-accounts for the benefit of the creditors, including a Mezzanine 2 Debt Service Subaccount. *See* JX-8 § 2.1.

24. Upon information and belief, pursuant to the terms of the Intercreditor Agreement, TIAA made the following protective advances to cure payment defaults by the Debtor on the Mortgage Loan and Mezz 1 Loan:

| Date | Description | Principal |
|---|---|---|
| 12/9/2019 | TIAA Cure Payment – Nov. 2019 Mortgage Loan Default | $533,394.33 |
| 12/9/2019 | TIAA Cure Payment – Nov. 2019 Mezz 1 Loan Default | $487,819.46 |
| 12/20/2019 | TIAA Cure Payment – Dec. 2019 Mezz 1 Loan Default | $472,083.35 |
| 12/23/2019 | TIAA Cure Payment – Dec. 2019 Mortgage Loan Default | $681,161.11 |
| | **Total:** | **$2,174,458.25** |

25. Upon information and belief, on July 16, 2020, TIAA exercised its rights under Section 4 of that certain Subordination of Management Agreement and provided notice to

ny-2115895

the Debtor and Great Value Storage, LLC (the "Property Manager"), of its election to terminate the Property Manager at the Properties, effective immediately. *See* JX-28 (July 16, 2020 TIAA notice). Under the Subordination of Management Agreement, the Debtor was contractually required to appoint a "Qualified Manager" to replace the Property Manager, but despite TIAA's repeated demands, the Debtor failed to do so. *See* JX-62 (Subordination of Management Agreement).

26. Upon information and belief, on December 16, 2020, TIAA delivered to the Debtor an additional notice stating, among other things, that the Debtor had yet to provide certain material financial statements to TIAA, including quarterly reports, annual reports, an annual budget, guarantor financial information, and other deliverables, as required by the terms of the Mezz 2 Loan. TIAA's December 16, 2020 notice also demanded that the Debtor appoint a replacement Qualified Manager. *See* JX-89 (Dec. 16, 2020 TIAA notice). Upon information and belief, TIAA delivered additional notices to the Debtor on January 22, 2021 and February 17, 2021, which continued to demand that the Debtor provide missing financial reporting and appoint a replacement Qualified Manager. *See* JX-87 (Jan. 22, 2021 TIAA notice); JX-95 (Feb. 17, 2021 TIAA notice).

27. On April 5, 2021, counsel for the Servicer delivered to RREF a copy of a notice of event of default by the Property Owners under the Mortgage Loan (the "Mortgage Loan Default Notice"). *See* JX-23 (Mortgage Loan Default Notice). In the Mortgage Loan Default Notice, the Servicer identified an "Event of Default" under the Mortgage Loan Agreement due to the Property Owners' failure to complete each of the "Required Repairs" as contemplated by Section 6.1.3 of the Mortgage Loan Agreement. *See* JX-23, at 5. Moreover, the Servicer identified certain financial reporting defaults, which, if not remedied within 30 days of the Property Owners'

receipt of the Mortgage Loan Default Notice, would each constitute an additional "Event of Default" under the Mortgage Loan Agreement. *See* JX-23, at 5. These financial reporting defaults included failures to: (i) timely furnish quarterly reports which were due, but not provided, on June 30, 2020, September 30, 2020 and December 31, 2020; (ii) timely submit an annual budget for 2021; and (iii) of Natin Paul to submit year-end 2019 financial statements. *See* JX-23, at 5.

28. Shortly after receiving the Mortgage Loan Default Notice, RREF sent the Property Owners a demand notice with instructions to cure the defaults. *See* JX-24 (Apr. 15, 2021 RREF demand notice). RREF, however, cannot perform the required repairs itself, and the financial reporting defaults are otherwise personal defaults and therefore not susceptible to cure by RREF.

29. On April 13, 2021, counsel for the Mezz 1 Lender delivered to RREF a copy of a notice of event of default by the Mezz 1 Borrower under the Mezz 1 Loan (the "<u>Mezz 1 Loan Default Notice</u>"). *See* JX-80 (Apr. 13, 2021 Mezz 1 Loan Default Notice). The Mezz 1 Loan Default Notice declared the same "Event of Default" under the Mezz 1 Loan as the Mortgage Loan Default Notice, and identified the same financial reporting defaults, each of which would constitute an additional "Event of Default" under the Mezz 1 Loan if not remedied within 30 days of the Mezz 1 Borrower's receipt of the Mezz 1 Loan Default Notice. *See* JX-80, at 4–5.

### The Debtor's Prepetition Attempts to Avoid UCC Foreclosure

30. Upon information and belief, the Debtor has resorted to litigation three times to avoid the disposition of the Collateral by UCC foreclosure sale. On three occasions, the Debtor initiated new legal proceedings or engaged in motion practice for the purpose of delaying the Secured Lender's attempts to exercise remedies pursuant the terms of the Mezz 2 Loan

Agreement and state law. The Debtor's tactics materialized just days—and in the case of the instant petition—minutes before the Collateral was to be sold.

31. Upon information and belief, the Original UCC Sale was scheduled for September 3, 2020. By then, the Mezz 2 Loan had been in default for nearly nine months. On August 27, 2020, just days before the Original UCC Sale was to take place, the Debtor filed a lawsuit in the Supreme Court of the State of New York, captioned *GVS Portfolio 1 B, LLC v. Teachers Insurance Annuity Association of America*, Index No. 654095/2020, seeking an injunction to prevent the sale from going forward. On September 18, 2020, Justice Masley granted the Debtor's motion for a preliminary injunction and ordered the Debtor and TIAA to (i) meet and confer as to the notice of the sale and terms of sale, (ii) submit a stipulation setting forth the terms of the agreement, and (iii) identify any areas of disagreement that remained. *See* JX-25 (Justice Masley's Sept. 18, 2020 order).

32. Upon information and belief, counsel for the Debtor and TIAA entered into that certain Stipulation Regarding Terms of UCC Sale, Notice of UCC Sale, and Confidentiality Agreement (the "Sale Stipulation"). *See* JX-26 (Sale Stipulation). TIAA and the Debtor informed Justice Masley that the only area of disagreement that remained was the date on which the sale should take place. Justice Masley "so-ordered" the Sale Stipulation, and separately issued an order setting March 10, 2021 as the date for the Rescheduled UCC Sale to proceed. In advance of the Rescheduled UCC Sale, eight prospective bidders submitted participation statements indicating their intention to take part in the auction.

33. On March 9, 2021, one day prior to the Rescheduled UCC Sale date, the Debtor once again forestalled the Secured Lender's exercise of remedies by seeking a temporary restraining order from the New York state court, arguing, among other things, that the sale of the

Mezz 2 Loan to RREF made the Rescheduled UCC Sale commercially unreasonable. Justice Masley granted a temporary restraining order, but denied a preliminary injunction on March 30, 2021, concluding that the Debtor's arguments were without merit, ordering RREF to notify bidders that it (and not TIAA) was the new secured party, and ruling that the Second Rescheduled UCC Sale could take place seven days after sending such notice. *See* JX-27 (Justice Masley's Mar. 30, 2021 order).

34. RREF scheduled the Second Rescheduled UCC Sale for April 12, 2021 at 10:00 a.m., pursuant to the terms of Justice Masley's order. Only minutes before the Second Rescheduled UCC Sale was set to begin, the Debtor once again thwarted the Secured Lender's attempts to exercise remedies by filing a voluntary petition (the "Petition") in this Court. *See* JX-1 (Petition).

**Amounts Due and Owing**

35. The Debtor has made little-to-no monthly debt service payments to the Secured Lender since the loan was accelerated on December 6, 2019. Prior to the Event of Default, the monthly interest payment due was $595,525, or $7,146,300 per year. Since the Event of Default, under the default interest rate, the monthly interest payment due was $937,191, or $11,246,292 per year. Because the Mezz 2 Loan was accelerated, the total amount outstanding has been due and owing since December 6, 2019.

36. Since there was a Cash Management Triggering Event, all available income flowing up from the Properties has been paid by the Servicer first to the Senior Lenders, and then the remaining funds to the Secured Lender. As reflected in the below chart showing the amounts paid monthly to the Secured Lender since the Event of Default, the available income consistently has been insufficient to service the Secured Debt:

ny-2115895

| Time Period | Debt Service |
|---|---:|
| Dec. 2019 | $0.00 |
| Jan. 2020 | $0.00 |
| Feb. 2020 | $1,058,736.43 |
| Mar. 2020 | $289,220.76 |
| Apr. 2020 | $63,302.15 |
| May 2020 | $211,412.30 |
| June 2020 | $0.00 |
| July 2020 | $0.00 |
| Aug. 2020 | $0.00 |
| Sept. 2020 | $0.00 |
| Oct. 2020 | $0.00 |
| Nov. 2020 | $0.00 |
| Dec. 2020 | $0.00 |
| Jan. 2021 | $0.00 |
| Feb. 2021 | $0.00 |
| Mar. 2021 | $0.00 |
| Apr. 2021 | $0.00 |

37.    As of May 24, 2021, the total amount of principal, interest due, protective advances, fees for late payment, and costs and expenses due and owing to RREF, the Secured Lender, is not less than $100,558,321.37, exclusive of additional fees, premium, and other amounts that may be due and owing under the Secured Debt documents and applicable law. This amount comprises an aggregate principal amount of $82 million plus $595,525.00 in interest accruing at 8.715%, $15,298,342.00 in default interest accruing at 13.715% from the date of the Debtor's default on December 6, 2019 and late payment charges, $1,153,244.46 in protective advances, and $1,511,209.91 in costs and expenses related to enforcement of the Mezz 2 Loan.

[*Signature block on next page.*]

     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May 25, 2021
       New York, New York

                                                  _____
                                                  Michael Winston