UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>GVS Portfolio I B, LLC,[1]<br><br>　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 21-10690 (CSS) |

**DECLARATION OF ALAN TANTLEFF IN SUPPORT OF DEBTOR'S OBJECTION TO PORTION OF RREF III STORAGE LLC'S MOTION FOR ENTRY OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE WITH <u>PREJUDICE AND GRANTING RELIEF FROM THE AUTOMATIC STAY</u>**

Pursuant to 28 U.S.C. § 1746, I, Alan Tantleff, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.　　I am a Senior Managing Director and a leader of the Real Estate Solutions practice of FTI Consulting, Inc. ("<u>FTI</u>").  On May 12, 2021, I was retained, subject to Court approval, as the Chief Restructuring Officer ("<u>CRO</u>") for the above-captioned debtor and debtor in possession ("<u>GVS</u>" or the "<u>Debtor</u>").  FTI was also retained to provide the Debtor with additional personnel to provide other services in support of my role as CRO.

2.　　I am over the age of 18, competent to testify, and authorized to submit this declaration (the "<u>Declaration</u>") in support of the *Debtor's Preliminary Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay* [D.I. 53] (the "<u>Objection</u>").[2]  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all of the facts set forth herein.

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, is as follows: GVS Portfolio I B, LLC (7171).  The mailing address for the Debtor, solely for purposes of notices and communications, is: 814 Lavaca Street, Austin, TX 78701.
[2] Capitalized terms used but not otherwise defined herein shall have the meanings give to them in the Objection.

3. I have a Bachelor of Science from Cornell University and a Master of Science in Real Estate Investment and Development from New York University. I am a licensed real estate broker in the State of New York and am approved by the New York State court system as a Part 36 Certified Real Estate Receiver.

4. Prior to joining FTI in 2010, I was a Managing Director at Hotel Asset Value Enhancement, a boutique asset-management and advisory practice. Before that, I worked at BlackRock Financial Services, where I worked on restructuring of the financial manager's $6 billion sub debt portfolio.

5. I was employed for approximately 10 years at Jones Lang LaSalle Hotels, where I was responsible for the sale and financing of hospitality real estate.

6. In my approximately 30 years as a structured finance professional, I have had diverse, hands-on experience in the areas of real estate investment and development, workouts and restructuring, asset management, foreclosures, structured debt and equity financing, brokerage and acquisitions and dispositions. I have experience in various types of real estate, and over the course of my career I have sold or financed more than $5 billion of real estate.

7. I have also been involved in numerous UCC foreclosure sales in the States of New York and Florida, judicial and non-judicial foreclosure sales, bankruptcy auctions and traditionally marketed real estate sales that often employ the auction format or modified auction format.

8. FTI was engaged to provide litigation support services to the Debtor in August 2020 in connection with *GVS Portfolio I B, LLC v. Teachers Insurance Annuity Association of America*, Index No. 654095/2020 (the "NY Action"), the action commenced by the Debtor on August 27, 2020 in the New York Supreme Court (the "NY Court") to enjoin a commercially unreasonable sale of the Collateral scheduled by TIAA that was noticed to occur on September 3, 2020 (the

"First Sale"). The services provided by FTI included providing three affidavits and testimony relating to efforts by TIAA (RREF's predecessor) to conduct a UCC foreclosure on the Debtor, and the commercial reasonableness of those attempts. In connection with the NY Action and FTI's services, I have developed familiarity with the Debtor, its business, the proposed foreclosure sale, certain issues affecting the Debtor, and the circumstances which led to the commencement of this Case. In my capacity as CRO, I am also familiar with the Debtor's history, financial affairs, and books and records. Further, I assisted in the review and preparation of the Debtor's Schedules of Assets and Liabilities [D.I. 54], Statement of Financial Affairs [D.I. 55], and Monthly Operating Report [D.I. 63] for the period from April 12, 2021 through April 30, 2021.

    A.        **The Debtor and the GVS Portfolio**

9. The Debtor is a Delaware limited liability company that was formed on November 19, 2018. At all times since the Debtor's inception, its Board of Directors has consisted of Mr. Paul and two independent directors. At the insistence of the Debtor's initial lenders, the Debtor's LLC Agreement requires that the Board include the independent directors, as required by the loan documents. Both Mr. Paul and Richard Arthur, one of the independent directors, have been on the Debtor's board since the Debtor's formation in November 2018. The current second independent director, Colleen De Vries, joined the Board when her predecessor retired.

10. The Great Value Storage branded self-storage facilities, beneficially owned by the Debtor (the "GVS Portfolio"), offer secure storage units with 24-hour security systems, both climate controlled and non-climate controlled, RV, car, and boat parking, moving and storage supplies and moving truck rental. The GVS Portfolio caters to personal and business storage needs and includes 64 rental storage facilities in Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, Tennessee, and Texas. The GVS Portfolio, which consists of more than just self-storage facilities, took ten years to amass at a cost of approximately $300 million. Great

Value Storage is a successful business that employs workers at each of its locations, including resident managers who live at each of the properties, often with their families. The GVS Portfolio is more than just a collection of properties; it is an ongoing business. The GVS Portfolio is unique; it was painstakingly assembled via a series of acquisitions over a decade and, in light of that, it is difficult if not impossible to replace.

11. This portfolio of 64 properties is not only valuable, but also highly desirable and virtually impossible to replicate without significant effort expended over the course of many years. This is largely because the self-storage industry is highly fragmented, dominated by many private "mom and pop" owners. The largest owner of self-storage facilities, Public Storage, Inc. ("Public Storage"), owns 2,844 facilities out of an estimated 49,000 to 60,000 nationwide, or about 5% of total inventory. *See* JX-138 (Alexander Harris, *U.S. Self-Storage Industry Statistics*, SPAREFOOT (Jan. 27, 2021) [https://www.sparefoot.com/self-storage/news/1432-self-storage-industry-statistics/](https://www.sparefoot.com/self-storage/news/1432-self-storage-industry-statistics/)). This industry fragmentation is reflected in the following comment: "Industry ownership is fragmented, with 31.2% of self-storage space (by rentable square footage) owned by six public companies, 16.5% owned by the next top 94 operators, and 52.3% owned by small operators." *Id*. Thus, portfolios of self-storage properties of the size and geographical scope of the GVS Portfolio are highly desirable for institutional real estate investors and are in limited supply.

B. **The Loan Facilities**

12. On or about November 30, 2018, the original lender, UBS AG ("UBS") made three loans related to the GVS Portfolio, including a $110 million mortgage facility at the property entity level serviced by PNC/Midland (the "Mortgage Loan"), a $103 million mezzanine loan (the "Mezz 1 Loan") to GVS Portfolio I, LLC now held by ESS-GV Holdings LLC (a competitor of GVS),

and the consolidated mezzanine facility of $82 million in principal (the "Mezz 2 Loan") now held by RREF.

13.     RREF's predecessor, TIAA, acquired the facility in November 2018 and continuously held the Mezz 2 Loan until the evening of March 8, 2021—just 2 days prior to the date set for a sale of the collateral by UCC foreclosure auction.  As such, RREF only recently bought into its position and has only been the secured lender to the Debtor for a little over two months.

14.     UBS and its successor lenders were aware of the cohesiveness of the GVS Portfolio's corporate structure when structuring the cash management system.  Under this system, PNC/Midland as mortgage servicer collects rent and other payments through a lockbox account in the name of GVS Texas Holdings I, LLC.  Each month, PNC first pays the interest, fees, and expenses on its facility, reserves for escrows, etc. and then transfers cash first to a subaccount for the Mezz 1 Loan and then to a subaccount for the Mezz 2 Loan (the "Mezz 2 Account").  The Mezz 2 Account is a subaccount maintained on a ledger entry basis only under the cash management account in the name of GVS Texas Holdings I, LLC.  The cash management bank then remits funds from the subaccount of GVS Texas Holdings I, LLC to the lender under the Mezz 2 Loan.  Although these amounts are deemed distributions from the Debtor pursuant to the PNC Facility documents, in fact PNC pays this cash directly to RREF.

    C.    **The Cured Defaults**

15.     The defaulted status of the Mezz 2 Loan resulted from a single late payment under the Mortgage Loan, which was quickly covered.  This late payment set off a cascade of events, ultimately resulting in TIAA purporting to accelerate its $82 million of junior debt.  After the late payment, PNC/Midland instituted hard cash management and trapped all rents in the lockbox

account for the implementation of cash management. Trapped in a lockbox, the property revenue was not available for the next monthly interest payment on the Mezz 1 Loan of $472,083, due on December 6, 2019. At this point, a total of $1,119,153 in property revenue was available and could have amply covered the missed interest payment, but because of unresolved administrative issues in the set-up of cash management protocols, PNC/Midland did not release the funds. Thereafter, TIAA issued a notice purporting to accelerate the Mezz 2 Loan on December 6, 2019.

16. On December 10, 2019, with the funds in the lockbox, and while the mortgage borrowers and PNC/Midland worked to resolve the administrative issues, TIAA cured the missed November 6, 2019 interest payment of $487,819 on the Mezz 1 Loan, which the borrower thereunder rectified on December 13, 2020. On December 20, 2019, while the lockbox funds were trapped by PNC/Midland, TIAA advanced the delayed payment to the Mezz 1 Loan lender as well, while it awaited release of funds from the lockbox. This advance was also subsequently cured when PNC/Midland finally released the lockbox funds, as set forth below.

17. On January 15, 2020, PNC/Midland released $2,417,721.94 in property revenue, but directed $1,067,902 of that revenue to the First Mezzanine Lender. More than half of that amount – $580,082 – was applied to default and late fees to the first mezzanine lender arising from the unreleased funds in December 2019. The Debtor protested this improper application with the lender group requesting that the $580,082 be directed to TIAA, not the First Mezzanine Lender. Had those default and late fees not been routed to the First Mezzanine Lender, TIAA would have received sufficient funds to satisfy its regular debt service payment.

18. In January 2020, despite the Debtor's efforts to resolve the foregoing issues, TIAA asked that its discussions with the Debtor be postponed until the administrative cash management set up was complete. The next month, in February 2020, an additional $63,667.90 in remaining

default and late fees from the prior month were applied to the Mezz 1 Loan (along with its regular monthly debt service), and then remaining property revenues in the amount of $1,339,993 were paid to TIAA. However, rather than applying those funds to repaying any protective advances TIAA made, and the regular interest it would have received but for the cash management set up issues, TIAA instead applied these funds to loan principal, on account of TIAA's needless acceleration of the Loan.

19.     In March 2020, PNC/Midland realized it had mistakenly miscalculated the amounts needed for property taxes and increased the tax escrow from $160,000 to $411,481. Increasing this escrow by nearly $300,000 resulted in another shortfall on the monthly payment to TIAA. TIAA received $354,196.04 from the March waterfall, which again would have been sufficient to cover TIAA's regular monthly interest payment had the tax escrow mistake not adversely impacted the March waterfall. During the period from December 2020 to March 2021, TIAA would have timely received its regular monthly debt service payments but for the administrative cash management issues, application of incorrect default fees, late fees, and tax escrow mistake.

20.     In March 2020, COVID-19 began fully taking hold and causing global, widespread economic calamity. The Debtor's business was not immune, and negotiations with TIAA completely stalled once the pandemic was in full swing. The Debtor continued to focus its attention on ensuring portfolio performance in light of the pandemic and also clarifying the protective advances, repayments, and interest rates with both mezzanine lenders. The Debtor did not receive the clarifying information from both lenders until May 20, 2020. During this time period, the Debtor continued to work with TIAA and communicated with the entire lender group every month on the payment date to ensure that cash management was functioning appropriately

and no further protective advances would be needed. The Debtor provided TIAA a written proposal on May 21, 2020 to address open issues, to which TIAA never responded.

21. The Debtor thereafter continued to work with TIAA each month. The Debtor had been encouraged by these discussions and believed that a resolution was possible. Abruptly, however, the Debtor received a July 17, 2020 Notice of Disposition of Collateral from TIAA setting the First Sale for September 2, 2020. *See* JX-128.

22. The Mortgage Loan and Mezz 1 Loan are performing on their debt service obligations and are not at issue in this Case. Since the resolution of the disruptions noted here in in 2019-2020, the Mortgage Loan and the Mezz 1 Loan have been fully paid their monthly interest and fee amounts each month. The Debtor does not believe there is any substantial likelihood that the lenders under the Mortgage Loan or the Mezz 1 Loan will take enforcement actions, especially when they are being paid current under their respective loan agreements. To the extent of any other outstanding non-monetary requests from the Mortgage Loan or Mezz 1 Loan, I understand that those requests are being addressed with the relevant lenders.

**D.     The NY Action**

23. On August 27, 2020, the Debtor commenced the NY Action to enjoin the First Sale as commercially unreasonable. On September 18, 2020, following full briefing and argument, the NY Court granted GVS's motion for a preliminary injunction based on the finding that the First Sale was commercially unreasonable. *See* JX-25 (Decision and Order, dated September 2018, 2020 (the "Decision")). In the Decision, the NY Court instructed the parties to meet and confer as to the notice of the sale and terms of sale and submit a stipulation to the NY Court setting forth areas of agreement. *Id.* The NY Court further instructed the parties to submit letters identifying any remaining areas of disagreement. *Id*.

24. On October 5, 2020, the parties submitted a stipulation to the NY Court setting forth an agreement as to certain requirements of the Notice of Sale and the Terms of Sale, which the NY Court entered as an Order. *See* JX-26 (*Stipulation Regarding Terms of UUC Sale, Notice of UCC Sale and Confidentiality Agreement* ("UCC Sale Stipulation")). On October 23, 2020, the NY Court issued a Supplemental Decision and Order, setting a Sale date of March 10, 2021.

25. Among other things, the UCC Sale Stipulation provided: (i) that the Sale would be in conformity with the agreed upon UCC Public Sale Notice, Notice of Undertaking and Confidentiality Agreement, and the Terms of Sale; and (ii) for access to the properties by prospective bidders consistent with applicable state, city and local ordinances governing travel and access to facilities in light of the ongoing COVID-19 pandemic. *See* JX-130 (UCC Public Sale Notice), JX-131 (Notice of Undertaking and Confidentiality Agreement), JX-132 (Terms of Sale). Importantly, the parties further made clear that nothing in the UCC Sale Stipulation "negat[ed], modifi[ed] or affect[ed] in any way Lender's obligation pursuant to Section 9-610 of New York's Uniform Commercial Code, to conduct all aspects of the sale and/or disposition of the Collateral in a commercially reasonable manner." JX-26.

26. Further, the agreed upon UCC Public Sale Notice, identified the Seller of the Collateral in all capital letters as Defendant TIAA:

UCC PUBLIC SALE NOTICE

PLEASE TAKE NOTICE THAT Jones Lang LaSalle, on behalf of TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a New York corporation, for the benefit of the Separate Real Estate Account ("Secured Party") will offer for sale at public auction 100% of the limited liability company membership interests (the "Membership Interests") in GVS PORTFOLIO I, LLC, a Delaware limited liability company (the "Pledged Entity"), together with certain rights and property representing, relating to, or arising from the Membership Interests (collectively, the "Collateral").

JX-130. The Notice of Undertaking and Confidentiality Agreement likewise identified the Seller of the Collateral, Secured Party, and counterparty to the confidentiality agreement as TIAA. *See* JX-131. The Terms of Sale further identified the Secured Party and seller of the Collateral as TIAA: "'Secured Party' means Teachers Insurance and Annuity Association of America, a New York corporation, for the benefit of the Separate Real Estate Account." JX-132.

27. Two days prior to the scheduled sale, however, the "Secured Party" changed when TIAA sold the Loan to RREF for an undisclosed amount and without notice to any other bidders who had registered to bid at the auction. No notice was provided to the market that, at the time of the auction, the Loan would be held by a different seller.

28. Following these events, the Debtor moved for and obtained a temporary restraining order from the NY Court enjoining the auction from proceeding on March 10, 2021. Following briefing and argument, the NY Court declined to issue a preliminary injunction, finding the process presumptively reasonable given the prior stipulation and without concern for intervening events or loss of value. *See* JX-27. In deciding Debtor's Motion for Preliminary Injunction, however, the NY Court was tasked with evaluating the sale's commercially reasonability, not ensuring that value was maximized for the benefit of all constituents, as is the objective in bankruptcy.

### E. The Debtor Filed this Case to Maximize Value

29. The decision to file for bankruptcy was made by its directors, including Natin Paul and the two independent directors, Richard Arthur and Colleen DeVries. The independent directors, through their counsel, discussed and evaluated the circumstances of the Debtor and the necessity of the filing over a period of almost two weeks. The directors evaluated significant amounts of information on a number of topics, including the view of the Debtor's management

and equity on value, the pending state court litigation, the Debtor's financial statements, and the goals of the bankruptcy proceeding.

30. The Debtor's LLC Agreement requires unanimous Board approval for a "Material Action," which is defined to include filing a voluntary bankruptcy petition. *See* JX-105, § 9(j)(iii). In accordance with this requirement, Debtor's management first approached the independent directors' counsel at K&L Gates on March 22, 2021 – three weeks before the filing – to raise the prospect of a voluntary bankruptcy. *See, e.g.*, JX-99. Two days later, the independent directors' counsel e-mailed the Debtor with a lengthy list of questions and a request for documents. *See id.*

31. Between March 24 and 31, 2021, the Debtor furnished the independent directors with full loan documentation (*see* JX-98), detailed answers to all of their questions (*see* JX-99), current financial statements (*see* JX-96, JX-97), the NKF appraisal referenced below (*see* JX-99), and the proposed Bankruptcy Petition (*see* JX-91). On March 31, 2021, after reviewing the materials provided by the Debtor, consulting with their counsel, and concluding their deliberative process, the independent directors executed a unanimous written consent approving the proposed Bankruptcy Filing. *See* JX-91. At the independent directors' request, the executed written consent was held in escrow pending their review of the final Bankruptcy Petition. *See id.* On April 11, 2021, the remaining directors of the Debtor and the Debtor's sole member also executed a unanimous written consent, thereby approving the Bankruptcy filing in accordance with the Debtor's LLC Agreement. *See* JX-2. The Debtor's LLC Agreement expressly authorizes the Board to act by written consent in lieu of a meeting. *See* JX-105, § 9(d).

32. The evidence shows there is significant value in the GVS Portfolio that reaches far beyond the RREF loan. Indeed, RREF admits there is an equity cushion, and only disputes the *amount* of the cushion. The record, however, demonstrates objectively that the equity cushion is

11

well in excess of what RREF contends. While there is approximately $295 million in combined principal debt, an appraisal completed in 2018 by CBRE in accordance with the Uniform Standards of Professional Appraisal Practice valued the GVS Portfolio as of October 10, 2018 at $375 million with a stabilized value of $392 million expected by October 10, 2019. *See* JX-104. Further, an appraisal conducted by Newmark Knight Frank Valuation & Advisory, LLC ("NKF") for TIAA, dated December 2, 2019, values the GVS Portfolio at a fair market value of $393,600,000. *See* JX-126. In my experience, appraisals done by lenders in regard to their collateral are done at conservative levels. In addition, in March 2020, the Debtor received an unsolicited offer from SROA Acquisitions, LLC ("SROA") to purchase the GVS Portfolio for $375 million. *See* JX-127. As RREF designee Michael Winston testified under oath, I understand that SROA now is jointly pursuing a foreclosure bid with RREF and, upon RREF's acquisition of the GVS Portfolio, would manage the 64 self-storage properties.

33. CBRE's appraisal identifies the limited supply of portfolios of self-storage properties, the difficulty of assembling them, and the significance to investors of being able to acquire a portfolio as factors in its valuation. *See* JX-104. CBRE supported its analysis with interviews of market participants concerning "portfolio premiums" associated with the sale of self-storage portfolios:

> Joe Margolis, CEO of Extra Space (NYSE:EXR) … said self-storage portfolios command lower cap and yield rates [thus higher prices] than individual assets because of the ability to place a large amount of capital in one transaction and risk diversification. He also noted that as portfolios available to purchase have declined over the past year (after several years of robust activity), the market for portfolios remains frothy.
>
> \*   \*   \*
>
> Christopher P. Marr, CEO of publicly traded Cubesmart: in a separate [conversation] … told us they would like to internally value the individual assets and apply a premium in the form of cap/yield

>rates, but there is insufficient time during the deal cycle. As a result, he said they do 'like everybody else' and roll up the financials and apply a portfolio cap/yield rates, that are lower than individual assets. He also noted that with the number of new players seeking to store capital in the sector, including hedge funds like Carlyle, Brookfield and TPG, that 'everybody' wants to buy portfolios.

*Id*.

34. Based on my experience in the market, and knowledge of this Debtor and its assets, I believe that this portfolio would command a premium based on the difficulty of amassing a comparable portfolio of storage facilities. There is significant interest amongst the large, publicly traded self-storage companies looking to grow rapidly, enjoy a greater market share, and achieve economies of scale. The self-storage market is "hot."

35. This was highlighted in the acquisition of ezStorage by Public Storage [Nasdaq: PSA] for $1.8 billion in April 2021. According to public materials issued by Public Storage, the acquisition was completed at a price reflecting a 3.6% nominal capitalization rate based on historical NOI at 86% occupancy. If one were to use this same capitalization rate as a metric of value for the GVS Portfolio, the portfolio would yield a value of more than $466 million.[3] The table below illustrates the value of the GVS Portfolio based upon a range of cap rates:

| Great Value Storage - Implied Value Based on Cap Rate | | | | | |
|---|---|---|---|---|---|
| Cap Rate | 3.60% | 4.00% | 4.25% | 4.50% | 4.75% |
| Implied Value | $ 466,378,194 | $ 419,740,375 | $ 395,049,765 | $ 373,102,556 | $ 353,465,579 |

36. The ezStorage portfolio consisted of 48 "high quality" properties comprising of 4.2 million net rentable square feet. Public Storage's $1.8 billion acquisition of the ezStorage portfolio equates to a per square foot value of $427.50. The GVS Portfolio is comprised of 4.0 million square feet spread across 64 average quality properties. While understanding that the ezStorage

---

[3] The capitalization rate is a metric of value commonly used in commercial real estate. This measure is computed based on a property's, or in this case the portfolio's, net income and is calculated by dividing the net operating income by property asset value and is expressed as a percentage.

portfolio consisted of a higher-caliber product, if the GVS Portfolio trades $100 per square foot, a fraction of the value that ezStorage traded for, the GVS Portfolio would be valued at $400 million.

37. Based on my understanding of the current condition of the GVS Portfolio properties and the self-storage market, I do not believe that the value of the GVS Portfolio would have declined since the prior appraisals were completed; in fact it is likely that the value has increased as competition for self-storage assets accelerates.

38. In addition to continued routine and deferred maintenance, the Company has largely corrected any damage caused by the storms that ravaged Texas this year.

39. There are other market indications of value proving that RREF is comfortably over-secured. For example, in December 2020, Brookfield Asset Management sold Simply Self Storage to Blackstone Real Estate Income Trust for $1.3 billion. *See* JX-137 (https://www.blackstone.com/press-releases/article/blackstone-real-estate-income-trust-completes-acquisition-of-simply-self-storage-for-approximately-1-2-billion/). At this valuation, the GVS Portfolio is worth somewhere between $450 million (if the same cap rate is applied) and $495 million (if the price per square foot is applied). Even assuming a significant adjustment to the assumptions for the Simply Self Storage portfolio versus the GVS Portfolio, there is still ample equity above the combined outstanding debt, and RREF is clearly fully secured in its position.

40. As this evidence shows, at the time of the filing of this Chapter 11 case, the Debtor had a good faith basis to believe there was significant value in the GVS Portfolio that reached far beyond RREF's loan. This belief continues today and is confirmed by the value data points discussed herein and the interest the Debtor has received since filing the petition. This interest would not exist in a foreclosure process run by Debtor's competitor and the Debtor filed this case to utilize the tools in the Bankruptcy Code to maximize value for all stakeholders.

41. Since FTI was retained on May 12, 2021, I have been working with the Debtor and FTI personnel to determine the best path forward to effectuate a reorganization and to maximize the value of the estate. Currently, FTI and the Debtor are working to obtain a new capital infusion (either as debtor in possession financing or exit financing or both) that will allow it to effectuate a reorganization. To date, we have contacted no fewer than 45 parties regarding potential DIP financing or other options. Twenty-three parties have executed confidentiality agreements and all 23 of those parties have received access to a data room. As of today, we have received three term sheets for post-petition financing that would take out the Mezz 2 Loan and permit a plan or sale to occur on a reasonable timeframe. FTI expects to receive a number of additional term sheets from the lenders with whom we have been in communication.

42. The Debtor believes that the reorganization process and pay-off of RREF must occur under this Court's supervision to provide fair and adequate notice to all constituents, protect their rights, and preserve the value of the estate.

43. Moreover, the Debtor believes that filing the Chapter 11 case was, and is, the best way to preserve the significant value of its asset in contrast to the looming value destructive foreclosure sale that was set for April 12, 2021. The circumstances existing at that time had changed dramatically since the Debtor and TIAA stipulated to a foreclosure sale in 2020. Just two days before the scheduled March 10, 2021 sale, prospective bidders learned suddenly that RREF was now the seller *and* a registered bidder (jointly with SROA) with the power to make a cash bid, credit bid, and select the winning bidder. Under the proposed foreclosure sale, RREF has wide latitude to select the winning bidder; the Terms of Sale make clear that "[RREF] reserves the right to (i) accept a lower bid, if the bid is on terms that offer a more certain likelihood of execution." JX-132, ¶ 5(b). After RREF purchased the Mezz 2 Loan, previously registered bidders, some of

whom already are participants in the storage market, surely would have thought twice about participating in a process requiring them to share their financials with RREF, another market actor. *See id.* ¶ 3(b) ("Each prospective bidder must demonstrate its financial ability to tender the purchase price for the Collateral, by submitting to [RREF] . . . a certified balance sheet or other certified financial information."). Given these disclosure requirements and RREF's sudden emergence as both seller and registered bidder with the ability to select the winning bid, the Debtor rationally believed that prospective bidders would presuppose that their bids would not be treated fairly.

44. This taints the foreclosure sale and prevents it from maximizing the Collateral's value. A sale by a disinterested financial buyer, such as TIAA, suggests that bidders will be treated fairly, thus prompting prospective bidders to undertake the expensive and time-consuming analysis to construct a bid. Then, RREF suddenly replaced TIAA just days before the scheduled sale as the seller and competitor, with access to all of the bids and bid submissions, and the ultimate decision-maker on accepting a bid. Based on my experience, I believe it is a reasonable to assume that bidders participate more actively when they believe their offers are being considered fairly and that participation would be negatively impacted by the circumstances in the UCC foreclosure process here.

45. In contrast to a UCC foreclosure process, this bankruptcy case provides a superior platform for maximizing value because it establishes a transparent and as even as possible a playing field for all potentially interested parties to pursue a transaction. A sale or plan process in this chapter 11 case would have established procedures and timelines publicly available on this Court's docket and distributed widely to known or potential bidders. Such parties could conduct further diligence through myself and with direct access to the Debtor and other information related

to the GVS Portfolio. I believe that this process is significantly superior to the proposed UCC foreclosure alternative and will maximize value in a manner not available in a UCC foreclosure.

46. As evidence of the superiority of the bankruptcy platform, I have been in active negotiations with no fewer than 15 parties interested in transaction with the Debtor for a reorganization that will repay RREF in full, as noted herein, including actively negotiating term sheets.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 25, 2021

*/s/ Alan Tantleff*
Alan Tantleff
Chief Restructuring Officer