IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | Case No. 21-10690 (CSS) |
| GVS Portfolio I B, LLC, | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | Related D.I.: 8, 53 and 67 |
| _____ | ) | |

## MEMORANDUM ORDER

Before the court is the Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay[1] filed on April 26, 2021 (the "Motion") by RREF III Storage LLC ("RREF"), and GVS Portfolio I B, LLC's (the "Debtor") Preliminary Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay[2] (the "Objection") filed on May 20, 2021.  The Court, having heard testimony and statements by the parties concerning the above at an evidentiary hearing on May 26, 2021,[3] finds and orders as follows:

### JURISDICTION

This Court has jurisdiction over the Motion, pursuant to 28 U.S.C. §§ 1334 and 157(b).  The Motion is a core matter within the meaning of 28 U.S.C. § 157(b)(2).  Venue

---

[1] D.I. 8.  RREF also filed a reply (D.I. 67) and the Declaration of Richard L. O'Toole (D.I. 9) (the "O'Toole Dec."), and the Declaration of Michael Winston (D.I. 76) (the "Winston Dec.") in support of the Motion.

[2] D.I. 53.  The Debtors also filed the Declaration of Alan Tantleff in Support of Debtor's Objection to Portion of RREF III Storage LLC's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case with Prejudice and Granting Relief from the Automatic Stay (D.I. 78) (the "Tantleff Dec.").

[3] *See* Tr. of Hr'g (May 26, 2021) (D.I. 83).  At the hearing, the parties submitted joint exhibits to the Court (referred to herein as "JX-#").

of the Motion in this Court is proper, pursuant to 28 U.S.C. § 1409.  This is a "core" proceeding, pursuant to § 157(b)(2); and the Court has the judicial power to enter a final order.  The statutory predicates for the relief requested herein are sections 105(a), 305(a)(l), 349(a), 362(d)(1), 362(d)(2), and 1112(b) of the Bankruptcy Code and related Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), including Bankruptcy Rules 1017, 2002, 4001 and 9014, and Local Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

## FINDINGS OF FACT

### A.  Background of the Debtor's Business and its Affiliates

The Debtor is an indirect subsidiary of World Class Holding Company, LLC ("World Class") and is the indirect owner of 64 self-storage facilities in Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, Tennessee, and Texas, branded as Great Value Storage, or GVS.  Great Value Storage offers secure storage units with 24-hour security systems, both climate controlled and non-climate controlled units, RV, car, and boat parking, moving and storage supplies and moving truck rental.  It caters to personal and business storage needs.

World Class is based in Austin, Texas and describes itself as one of the largest private real estate owners in the United States.  According to its website, World Class is in the business of acquiring undervalued businesses and assets located in 17 states for the purpose of owning, operating, and developing properties.  In addition to GVS, World

Class purports to own (a) World Class Property Company, a real estate investment company that owns, operates, and develops office, retail, multifamily, industrial, mixed-use, hospitality, and self-storage assets; (b) NowSpace, a provider of co-working office space; (c) World Class Technologies, a software development company; (d) World Class Mortgage Capital, a private commercial real estate lender; and (e) Westlake Industries, a commercial construction, industrial and energy infrastructure, and property services company.[4]

Natin Paul ("Paul") is the Founder, Chairman, President, CEO, and sole owner of World Class, and is therefore the Debtor's indirect owner.  Beginning in November 2019, at least 19 entities affiliated with World Class and Paul have filed for bankruptcy.

---

[4] *See* World-Class.com, Companies, https://www.world-class.com/companies.

**B.  Corporate Structure**

Below is the Debtor's position within the larger corporate structure of GVS.[5]



The Debtor's bankruptcy petition lists fifteen affiliates with cases pending in the

United States Bankruptcy Court for the Western District of Texas (the "Western District

---

[5]  *See* O'Toole Dec. at ¶ 13.

of Texas") that were filed between November 2019 and August 2020. These affiliates do not appear to be related to the GVS portfolio and are not within the corporate structure identified above.  In addition, at least eight affiliates of the Debtor filed bankruptcy petitions in this Court, but those cases were subsequently transferred to the Western District of Texas.

### C.  The Debtor's Funded Debt Obligations

On November 30, 2018, UBS AG ("UBS") originated three loans to GVS: a mortgage loan and two mezzanine loans.

UBS originated the mortgage loan (the "Mortgage Loan") in the amount of $110 million to twelve non-debtor limited liability companies (collectively, the "Mortgage Borrowers") that collectively own a portfolio of self-storage facilities located throughout the United States.  The Mortgage Loan is secured by a first priority mortgage and security interest in the properties, and is currently held by Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C15 Commercial Mortgage Pass-Through Certificates, Series 2018-C15 (the "Mortgage Loan Lender").  Midland Loan Services, a division of PNC Bank, National Association, is the servicer on behalf of the Mortgage Loan Lender (the "Servicer").

UBS originated a first mezzanine loan (the "Mezz 1 Loan," and together with the Mortgage Loan, the "Senior Loans") in the amount of $103 million to the Mezz 1 Borrower, which itself owns 100% of the membership interests in the Mortgage

Borrowers.  The Mezz 1 Loan is secured by Mezz 1 Borrower's interests in the Mortgage

Borrowers and is currently held by ESSGV Holdings LLC (the "Mezz 1 Lender," and

together with the Mortgage Lender, the "Senior Lenders").[6]

UBS also originated a second mezzanine loan in the amount of $63 million to the

Debtor[7] (the "Initial Mezz 2 Loan"), which itself owns 100% of the membership interests

in Mezz 1 Borrower.  The Initial Mezz 2 Loan is secured by the Debtor's interests in the

Mezz 1 Borrower.  The Initial Mezz 2 Loan is governed by that certain Mezzanine 2 Loan

Agreement dated as of November 30, 2018[8] (the "Mezz 2 Loan Agreement").    The

Debtor's obligations under the Mezz 2 Loan Agreement are evidenced by that certain

Mezzanine 2 Promissory Note, dated as of November 30, 2018[9] (the "Mezz 2 Note").

Shortly after the Initial Mezz 2 Loan was made, UBS assigned it to Teachers Insurance

Annuity Association of America ("TIAA"), and TIAA thereafter made a supplemental

loan in the amount of $19 million[10] (the "Mezz 2 Supplemental Loan," and together with

the Initial Mezz 2 Loan, the "Mezz 2 Loan") to the Debtor on January 7, 2019, which is

also secured by the Debtor's interests in the Mezz 1 Borrower.

On March 8, 2021, RREF acquired the Mezz 2 Loan from TIAA, pursuant to that

certain Mezzanine Assignment and Assumption Agreement[11] (the "Assignment

---

[6]  JX-9 (Mezzanine 1 Loan Agreement).

[7]  JX-10 (Promissory Notes A-1 through A-8 (Mezzanine 1 Loan)).

[8]  JX-11 (Promissory Note (Mezzanine 2 Loan)).

[9]  JX-12 (Note Allonge).

[10]  JX-17 (Supplemental Promissory Note (Mezzanine 2 Loan)).

[11]  JX-15 (Mezzanine Assignment and Assumption Agreement (Mezzanine 2 Loan)).

Agreement") and was transferred all of TIAA's right and interests in the Mezz 2 Loan. As of the Petition Date, the Debtor was indebted to RREF on account of its obligations under the Mezz 2 Loan and Mezz 2 Notes in the amount of approximately $100 million.[12]

In order to secure the Debtor's obligations to UBS under the Initial Mezz 2 Loan and Mezz 2 Note, the Debtor and UBS executed that certain Pledge and Security Agreement, dated as of November 30, 2018 (the "Pledge Agreement").[13]  Under the Pledge Agreement, the Debtor granted to UBS a first priority security interest in certain collateral (the "Mezz 2 Collateral"), which consisted primarily of the Debtor's equity ownership interest (the "Membership Interest") in Mezz 1 Borrower, along with any associated dividends, proceeds, or other property relating to the Membership Interest.

As further security for the Debtor's obligations under the Mezz 2 Loan and Mezz 2 Note, Paul irrevocably and unconditionally guaranteed the payment and performance of certain obligations in respect of the Mezz 2 Loan, pursuant to that certain Guaranty of Recourse Obligations (Mezzanine 2 Loan), dated as of November 30, 2018 (the "Mezz 2 Guaranty").[14]  The Mezz 2 Guaranty is irrevocable, remains in effect, and contains no obligation to exhaust any remedies in order to collect.

---

[12]  The respective rights, remedies and obligations of the Mortgage Loan Lender, the Mezz 1 Lender, and RREF—including the relative payment and collateral priorities with respect to the loans to which all of the lenders are a party—are governed by, among other things, that certain (a) Intercreditor Agreement, dated as of November 30, 2018 (as amended, restated, or otherwise modified from time to time, the "Intercreditor Agreement") (JX-13) and (b) Cash Management Agreement, dated as of November 30, 2018, as amended by that certain Amendment to Cash Management Agreement, dated as of January 8, 2020 (as the same may be further amended, restated, or otherwise modified from time to time, the "Cash Management Agreement") (JX-14) (Cash Management Agreement).

[13]  JX-7 (Pledge and Security Agreement (Mezzanine 2 Loan)).

[14]  JX-21 (Guaranty of Recourse Obligations (Mezzanine 2 Loan)).

## D. Events Leading to Bankruptcy

### i. Default of Mezz 2 Loan

The Debtor failed to make its monthly debt service payment on the Mezz 2 Loan on December 6, 2019.  After the late payment, the Servicer stopped the flow of property revenue, trapping all rents in a lockbox.  Trapped in a lockbox, the property revenue was not available for the next monthly interest payment on the Mezz 1 Loan of $472,083, due on December 6, 2019.  At this point, a total of $1,119,153 in property revenue was available and could have amply covered the missed interest payment, but because of unresolved administrative issues in the cash management protocols, the Servicer did not release the funds, and TIAA issued an Event of Default notice (the "Notice of Default").[15]  The Notice of Default accelerated the Mezz 2 Loan.

With the funds in the lockbox, and while the mortgage borrowers and the Servicer worked to resolve the administrative issues, on December 10, 2019, TIAA cured the missed November 6, 2019 interest payment of $487,819 on the Mezz 1 Loan, which the borrower thereunder rectified on December 13, 2019 by reimbursing TIAA.   On December 20, 2019, while the lockbox funds were trapped by the Servicer, TIAA advanced the delayed payment to the Mezz 1 Loan lender as well, while it awaited release of funds from the lockbox.  This advance was also subsequently cured when the Servicer finally released the lockbox funds, as set forth below. The Debtor then promptly reimbursed TIAA for these payments.

---

[15] JX-22 (Dec. 6, 2019 Ltr. from R. Tsul (TIAA) to Borrower re Mezzanine 2 Loan).

On January 15, 2020, the Servicer released $2,417,721.94 in property revenue, but directed $1,067,902 of that revenue to the Mezz 1 Lender.  More than half of that amount – $580,082 – was applied to default and late fees to the first mezzanine lender arising from the unreleased funds in December 2019.  The Debtor protested this improper application with the lender group.  Had those default and late fees not been routed to the Mezz 1 Lender, TIAA would have received sufficient funds to satisfy its regular debt service payment.

In January 2020, despite the Debtor's efforts to resolve the foregoing issues and work to a resolution, TIAA asked that the Debtor hold off on any resolution discussions with TIAA until the administrative cash management set up was complete.  The next month, in February 2020, an additional $63,667.90 in remaining default and late fees from the prior month were applied to the Mezz 1 Loan (along with its regular monthly debt service), and the remaining property revenues in the amount of $1,339,993 were paid to TIAA.  However, rather than applying those funds to repaying any protective advances TIAA made, and the regular interest it would have received but for the cash management set up issues, TIAA instead applied these funds to loan principal, on account of TIAA's acceleration of the Loan.

In addition, in March 2020, the Servicer realized it had mistakenly miscalculated the amounts needed for property taxes and increased the tax escrow from $160,000 to $411,481.  Increasing this escrow by nearly $300,000 resulted in another shortfall on the monthly payment to TIAA.

In March 2020, with the pandemic affecting all business, negotiations stalled. In May 2020, the Debtors provided a proposal to TIAA to address open issues, to which TIAA did not respond. The parties continued their negotiations.

In July 2020, the Debtor received a July 17, 2020, Notice of Disposition of Collateral from TIAA.[16]

### ii.    Foreclosure Action

The Debtor commenced an action in the New York Supreme Court (the "NY Court") on August 27, 2020, to enjoin the sale of the Collateral scheduled by TIAA that was noticed to occur on September 3, 2020, during the Labor Day Holiday week (the "First Sale"). Following full briefing and argument, on September 18, 2020, the NY Court granted GVS's motion for a preliminary injunction finding that the First Sale was commercially unreasonable.[17]  In the Decision, the NY Court instructed the parties to meet and confer as to the notice of the sale and terms of sale and submit a stipulation to the NY Court setting forth areas of agreement.[18]  The NY Court further instructed the parties to submit letters to the NY Court identifying any remaining areas of disagreement.[19]

---

[16]  JX-128 (Notification of Disposition of Collateral).

[17]  JX-25 (Decision + Order on Motion, *GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020, NY Sup. Ct. D.I. Doc. No. 108 (N.Y. Sup. Ct. Sept. 18, 2020)).

[18]  JX-25 (Decision + Order on Motion, *GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020, NY Sup. Ct. D.I. Doc. No. 108 (N.Y. Sup. Ct. Sept. 18, 2020)).

[19]  JX-25 (Decision + Order on Motion, *GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020, NY Sup. Ct. D.I. Doc. No. 108 (N.Y. Sup. Ct. Sept. 18, 2020)).

On October 5, 2020, the parties submitted a stipulation to the NY Court setting forth an agreement as to certain requirements of the Notice of Sale and the Terms of Sale, which the NY Court so-ordered ("UCC Sale Stipulation"). [20] On October 23, 2020, the NY Court issued a Supplemental Decision and Order, setting a Sale date of March 10, 2021.

Two days prior to the March 10, 2021 sale, TIAA sold the Loan to RREF for an undisclosed amount and without notice to GVS or any other bidder who had registered to bid at the auction. Following these events, the Debtor obtained a temporary restraining order from the NY Court, enjoining the auction from proceeding. Following briefing and argument, the NY State Court declined to issue a preliminary injunction, finding the process presumptively reasonable given the prior stipulation and without concern for intervening events or loss of value.

### iii.    Bankruptcy

The Debtor filed a chapter 11 petition on April 12, 2021. The Debtor believes that there is significant value in the GVS Portfolio that reaches far beyond the RREF loan. Since the Debtor's formation, including at the time of the filing of this case, the Debtor's board consists of Mr. Paul and two independent directors. Each independent board member has separate counsel. Each board member, after a period of review, approved the Debtor's bankruptcy petition.

---

[20] JX-26 (Stipulation Regarding Terms of UCC Sale, Notice of UCC Sale and Confidentiality Agreement, *GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020, NY Sup. Ct. D.I. 1112 (N.Y. Sup. Ct. Oct. 5, 2020)).

### iv.    Guaranty Action Against Paul

Promptly after the bankruptcy filing, RREF invoked its rights under the Mezz 2 Guaranty and commenced an action against Paul in the NY Court.[21]   The Guaranty Action, which remains pending, seeks payment from Paul of the full amount due and owing to RREF on account of the Mezz 2 Loan.

### v.    Motion

On April 26, 2021, RREF filed the Motion seeking to dismiss this case, arguing that it was not filed in good faith.  RREF alleges that the bankruptcy case was filed shortly before RREF was to conduct the court-ordered UCC foreclosure auction of the Debtor's sole asset that was pledged to secured approximately $100 million of indebtedness owed to RREF.  RREF asserts that the Debtor files this case solely for the purpose of triggering the automatic stay.  Specifically, RREF alleges that due to certain unstayed actions that may be taken by creditors at direct and indirect non-debtor subsidiaries, which actually own the real properties that form the basis of any value flowing up to the Debtor, this filing will irreparably harm RREF (the Debtor's only secured creditor).  RREF continues that the Debtor's case cannot achieve any legitimate chapter 11 bankruptcy objective because the Debtor simply owns a piece of paper, and that piece of paper is pledged to RREF.

---

[21]  *See RREF III Storage LLC v. Natin Paul*, Index No. 0652558/2021 (N.Y. Sup. Ct. Apr. 16, 2021) (the "Guaranty Action").

## STANDARD OF REVIEW

"[O]nce a debtor's good faith is appropriately put at issue, it is the burden of the debtor to produce evidence of good faith."[22]  A debtor's good faith is "at issue" if a party (i) "call[s] into question [the] debtor's good faith, and" (ii) "put[s] on evidence sufficient to impugn that good faith . . . ."[23]  Where there is a disparity of information, and the known facts of the case align with the bad faith allegation, the debtor's good faith is placed at issue.[24]

It is unclear what "evidence to impugn the good faith" of the debtor means.  At least one court rejected the *Tamecki* "at issue" formulation[25] of the burden of proof in favor of a formulation placing upon the movant the "the burden of producing a prima facie case of 'bad faith,' as well as the ultimate risk of non-persuasion on that issue . . . ."[26]

---

[22]  *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 208 (3d Cir. 2000). *See also Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 162 n. 10 (3d Cir. 1999) (citations omitted).

[23]  *Tamecki*, 229 F.3d, at 207 n. 2 ("We hold merely that in this case where the trustee has called into question debtor's good faith, and put on evidence sufficient to impugn that good faith, the burden then shifts to the debtor to prove his good faith.").

[24]  *Id.* at 208, 211 (Alito, J. concurring) (responding to J. Rendell's dissent) ("But the trustee, who is obviously not a party to the divorce proceeding, is in a comparatively poor position to show the reason for the delay. *The known facts* about the divorce proceeding *are sufficient* to place upon the debtor the burden of explaining the reason for the delay, which has now reached seven years. It may be that there are entirely legitimate reasons for the delay. If so, it should have been easy for Tamecki to show what they were. But he made no effort to do so.") (emphasis added). *See also Perlin v. Hitachi Cap. Am. Corp.*, 497 F.3d 364, 368–69 (3d Cir. 2007) ("Applying the *Tamecki* framework, the Bankruptcy Court found that Hitachi had presented sufficient information to shift the burden to the [debtors] to prove that their petition was brought in good faith.").

[25]  *In re Horan*, 304 B.R. 42, 46 (Bankr. D. Conn. 2004) ("In her Supplemental Memorandum . . . , the UST argues that once a debtor's good faith is put at issue, the debtor has the burden of establishing good faith. As explained below, the court rejects that formulation of the burden of proof on a motion to dismiss a chapter 7 case for "bad faith." Rather, the court holds that the burden of producing a prima facie case of "bad faith," as well as the ultimate risk of non-persuasion on that issue, is on the movant.").

[26]  *Id.* at n.6 (declining to follow *Tamecki* due to uncertainty as to what it means but questioning whether *"evidence sufficient to impugn that good faith* . . . might be read to state the unremarkable proposition that,

In any event, whether a case has been filed in good faith is a fact intensive inquiry that must be examined against the totality of facts and circumstances.[27]

## ANALYSIS

Section 1112(b) of the Bankruptcy Code, provides, in pertinent part, that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.[28]

A hearing on a request for dismissal under section 1112(b) must be commenced by the Court no later than 30 days after filing of the motion and must be decided by the Court no later than 15 days after commencement of the hearing, unless the movant expressly consents to a continuance for a specific period of time or "compelling circumstances" prevent the Court from meeting the time limits.[29]

"Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith."[30]    Although the phrase "good faith" suggests an inquiry into the debtor's subjective intent in filing a bankruptcy petition, the Third Circuit has firmly held that the

---

once the movant has established a *prima facie* case of 'bad faith,' the burden of production shifts to the debtor.") (emphasis in original).

[27]  *SGL Carbon Corp.*, 200 F.3d at 165.

[28]  11 U.S.C. § 1112(b)(1).

[29]  11 U.S.C. § 1112(b)(3).

[30]  *Cross-Appellees v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) (quotations omitted).

"good faith" filing requirement is "based more on objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor."[31]

The Third Circuit has identified two essential elements for a "good faith" bankruptcy filing. First, the bankruptcy petition must "serve[] a valid bankruptcy purpose."[32]  Second, the bankruptcy cannot be filed "merely to obtain tactical litigation advantage."[33]

In determining whether a filing was made in bad faith, courts in the Third Circuit have also considered whether the following factors are present: (a) single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure; (e) two-party dispute that can be resolved in pending state court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous bankruptcy petitions; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k) debtor formed immediately prepetition; (l) the debtor filed solely to create automatic stay; and (m) the subjective intent of the debtor[34] (collectively referred to as the "*Primestone* factors").

---

[31]  *Id.* at 618 n.8; *see also SGL Carbon Corp.*, 200 F.3d at 165.

[32]  *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 120 (3d Cir. 2004).

[33]  *15375 Memorial*, 589 F.3d at 625 (citation omitted).

[34]  *See In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298-99 (Bankr. D. Del. 201) (referred to herein as "*Jameson*") (*quoting Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002)).

### a. Valid Bankruptcy Purpose

The basic purposes of chapter 11 are "preserving going concerns," and "maximizing property available to satisfy creditors."[35]

RREF claims that the Debtor is not a "going concern" capable of reorganization because it is a special purpose entity that has no employees or operations and was created only for the limited purpose of, and may not conduct any activities other than, owning the 100% Membership Interest in Mezz 1 Borrower and paying the Mezz 2 Loan. RREF continues that the Debtor cannot make a showing that chapter 11 will maximize the value of the Debtor's estate and that value would be lost outside of bankruptcy. Finally, RREF argues that the sole purpose of these cases was to obtain the benefit of the automatic stay and halt the state-law foreclosure process in favor of an alternative process of liquidating and distributing the Debtor's assets.

Although the Debtor does not dispute that it has only a single asset – it asserts that it filed its petition to prevent a foreclosure sale set to run at the last minute by an aggressive competitor that would forfeit significant value.

In *Jameson*, the debtor—a "Mezz II" borrower entity—was a special purpose entity formed in order to obtain mezzanine financing to acquire a chain of hotels.[36] The *Jameson* debtor was a middle mezzanine entity in a corporate family of four mezzanine entities

---

[35] *Integrated Telecom Express, Inc.*, 384 F.3d at 119 (citing *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435, 119 S. Ct. 1411, 1413, 143 L. Ed. 2d 607 (1999)).

[36] *See Jameson*, 461 B.R. at 301.

and two lower operating companies who owned and operated a chain of hotels.[37]  The entities were all formed as part of a transaction to purchase the hotel chain, at which time debt was placed at all five levels up the corporate ladder.[38]  The sole asset held by each of the *Jameson* mezzanine borrowers was a 100% membership interest in each entity's respective subsidiaries, with the mezzanine loans at each level of the capital structure secured by such interests.[39]

The *Jameson* hotel chain subsequently fell into financial distress and was unable to repay or refinance the mezzanine or mortgage loans at maturity.[40]  Accordingly, lenders at all levels of the capital structure commenced enforcement actions against their respective borrowers.[41]  The lender that controlled the more senior Mezz I and Mezz II loans (an entity known as "Colony") commenced foreclosure proceedings and scheduled a UCC foreclosure sale.[42]  Meanwhile, the lender that controlled the more junior Mezz III and Mezz IV loans (an entity known as "Gramercy") exercised its proxy rights to replace the non-independent directors at all levels of the capital structure, allowing the Mezz 2 Lenders to appoint the same director, James Gregory, to control the first mezzanine level entity and the operating companies.[43]  Gregory was nothing more than a puppet carrying

---

[37] *Jameson*, 461 B.R. at 295-96.

[38] *Id.*

[39] *Id.* at 306.

[40] *Id.* at 296 (The debt on all of the companies matured in 2008, which maturity was extended three times to August 2011).

[41] *Id.* at 296.

[42] *Id.* at 300.

[43] *Id.* at 296.

out the will of the controlling and managing Mezz 2 Lender to force the Jameson debtor

into bankruptcy to gain an advantage over the other lenders.[44]   Gregory, a former

employee of the controlling Mezz 2 Lender and long-time friend of the controlling Mezz

2 Lender's chief legal officer, admitted that he was installed to get the attention of the

other lenders and that his appointment was a means to present the controlling Mezz 2

Lender's opinion.[45]

At the control of the Mezz 2 Lender and hours before the scheduled foreclosure

sale, Gregory caused Jameson to file for bankruptcy in this Court.[46]   Colony then filed a

motion to dismiss the case with prejudice and for relief from the automatic stay to

proceed with the UCC foreclosure sale.[47]

This Court agreed with Colony and both dismissed the case with prejudice and

granted relief from the automatic stay for several reasons, finding that Mezz II's

bankruptcy was a bad faith filing.  Noting that Mezz II had "only one asset," and that the

"petition was filed on the eve of foreclosure" on that asset, the Court found that Gramercy

caused Mezz II to file its petition "solely to obtain the benefit of the automatic stay,"

which is not a valid purpose for seeking bankruptcy relief.[48]  In addition to holding that

"nearly all" of the indicia of bad faith were present, the Court also found "compelling"

---

[44] *Id.* at 300-01.

[45]  *Id.* at 300 (The *Jameson* Court also found evidence that Gregory received at least $800,000 from the controlling Mezz 2 Lender to pay various fees and took direction from (and gave information to) the controlling Mezz 2 Lender throughout the process. *Id.*).

[46] *Id.* at 296.

[47] *Id.* at 297.

[48] *Id.* at 297.

Colony's arguments that the Mezz II bankruptcy filing was merely a "litigation tactic" to "forestall [Colony's] efforts to foreclose on its collateral . . . ."[49]  Further, the Court found that the debtor had not demonstrated any "benefit to be gained by having Mezz II remain in bankruptcy" because there was "no evidence that the bankruptcy case" would "realize some value that would not be available" through a UCC foreclosure sale.[50]  At bottom, the matter before Judge Walrath was an inter-creditor dispute as to which lender should be able to control the debtor and whether the petition was filed to increase negotiation leverage between the creditors.[51]

Here, the Court finds that there are facts that would lead to a finding that the filing by the Debtor was not in bad faith.  The lower-level debt facilities are performing and are 2 years away from maturity.  The Debtor only had one late payment, which triggered the default.  Furthermore, here, unlike *Jameson*, there are no intercreditor disputes and no lower-level enforcement actions have been filed.  Lastly, unlike in J*ameson*, where the Mezz 2 Lender planted Gregory on the debtor's board to gather information and act as its agent, here, there is no "unclean hands" issue.  .[52]

Although somewhat distinguishable from *Jameson*, the Court is troubled by the Debtor's filing.  Here, the Debtor's amended petition and the Debtor's schedules only list

---

[49] *Id.* at 300.

[50] *Id.* at 303 ("The Debtors have presented no evidence that more value will be realized in bankruptcy than could have been realized without it.  The Debtors have known since August 2008 of the need to refinance the debt or to sell the enterprise, have made numerous efforts to do so, but have been unable to achieve either.").

[51] *Id.* at 299.

[52] *Id.*

two unsecured creditors.[53]  In addition, the claims register[54] only reflects one additional unsecured claim.  The Debtor has no other creditors and from the testimony at the hearing, the Court finds that at least one of these unsecured creditors is typically paid from a different affiliated entity.[55]

Moreover, several of the *Primestone* factors are indicative of dismissal of this case: this as a single asset case;[56] by the Debtor's own admission, there are (on the date hereof) three potential *de minimis* unsecured creditors; there is no ongoing business or employees; the petition was filed on the eve of foreclosure;[57] the Debtor has no cash or income (other than the cash management waterfall); and there is no pressure from non-moving parties.

---

[53] D.I. 3. (Listing two unsecured creditors on List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders, Official Form 204).  *See* Tr. of Hr'g May 26, 2021, 41:23-43:7.

[54] Claims Register (Listing one filed unsecured claim).  The Debtor listed $21,727.80 in unsecured claims on its schedules (listing the same two creditors as noted in the Debtor's petition, D.I. 3).  *See* D.I. 54.

[55] The testimony by Alan Tantleff at trial continued that even the Debtor's professionals were instructed *only* to assist with RREF's debt and no other creditor.  Tr. of Hr'g May 26, 2021, 44:18 -46:12.  *See e.g., In re EHT US1, Inc.*, Del. Bankr. No. 21-10036 (CSS), 2021 WL 2206507, at *15 (Bankr. D. Del. June 1, 2021) ("The Debtors have commenced a sale process aimed at maximizing the value of the Debtors' assets. In that regard, on May 28, 2021, the Court entered four sale orders authorizing the sale of all but one of the Debtors' hotels for approximately $482 million. The restructuring of the Debtors though a 363 sale followed by a plan is a legitimate bankruptcy purposes. Lastly, the Parent Debtors have obtained financing for the Debtors' operations during the Chapter 11 cases." (footnotes omitted)).

[56] The Debtor asserts that the Debtor is part of a larger enterprise through which the value of the Debtor's assert truly lies.  However, none of the other affiliate entities filed their petitions with the Debtor.  Here, the Debtor came to this Court on its own.  *See e.g., EHT US1, Inc.*, Del. Bankr. No. 21-10036 (CSS), 2021 WL 2206507 at *15 ("[I]t is important to note that, in the context of large, complex, multi-debtor chapter 11 cases, nonoperational holding companies routinely file for bankruptcy. This is consistent with the principle that when a business enterprise includes multiple debtors, the dismissal analysis is not performed with respect to a debtor in isolation—the court must consider such debtors 'holistically.'" (footnotes and citations omitted)).

[57] Upon filing its petition, the Debtor did not have a budget for the bankruptcy case (and still does not have a budget for taking this caser to completion) nor did they hire counsel until the day prior to filing.  *See* Tr. of Hr'g May 26, 2021, 46:13-24.  The Debtor does not have a committed source of funds seven weeks into their bankruptcy case.  Tr. of Hr'g May 26, 2021, 47:13-21.

Although not all of the *Primestone* factors are present here, "no single factor is determinative of lack of good faith in filing a petition."[58]

As for the two-party nature of this dispute, this is where the Court takes the most pause to consider – this is certainly a dispute between the Debtor and RREF, a competitor. And there is nothing nefarious about the Debtor needing breathing room to ensure a fair and open sale process – however, this is not a subjective good faith test, rather, objective. The Debtor should have and did seek such relief in the New York Supreme Court case. What also causes pause is RREF's aggressive behavior in calling defaults over one late (and cured) payment, but again, that is something for the New York state court to consider. Here, this Court only need look at the objective good faith of the Debtor on the Petition Date – it is not to look at RREF's behavior, which the New York state court has reviewed. Here, there is nothing that need happen in this Court that cannot happen in state court, including, but not limited, to a stay of the sale action.[59]

In sum, the Debtor has not met its burden that the bankruptcy petition serves a valid bankruptcy purpose. As a result, the Debtor's case was not filed in good faith and must be dismissed.

---

[58] *Integrated Telecom Express, Inc.*, 384 F.3d at 118.

[59] At the hearing, the Debtor asserted that on the eve of the hearing it received four DIP term sheets. *See* Tr. of Hr'g May 26, 2021, 145:2-5. Term sheets and offers received six weeks after the Debtor's petition date cannot be considered to show the Debtor's good faith as of the petition date. Furthermore, since the hearing on the Motion, the Debtor has filed no motion for approval of DIP financing and there is no indication that any motion is forthcoming.

### b. Litigation Tactic

Furthermore, a case is filed in bad faith if "the petition is filed merely to obtain a tactical litigation advantage."[60] Here, the fact that this case was filed immediately before foreclosure in order to obtain the automatic stay coupled with the two-party nature of the dispute between the Debtor and RREF, supports the finding that this case was filed by the Debtor for a tactical advantage against RREF in the New York state court litigation that resulted in a foreclosure sale.

## CONCLUSION

The Court **GRANTS** the Motion and hereby **DISMISSES** the Debtor's case for having been filed in bad faith.

_____
Christopher S. Sontchi
Chief United States Bankruptcy Judge

Date: June 4, 2021

---

[60] *Integrated Telecom Express, Inc.*, 384 F.3d at 120 (citing *SGL Carbon Corp.*, 200 F.3d at 165).